UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

| | | |
|---|---|---|
| WESTFIELD NATIONAL INSURANCE COMPANY | ) | CASE NO. 5:19 CV 83-TBR |
| | ) | |
| | ) | JUDGE THOMAS B. RUSSELL |
| Plaintiff | ) | |
| | ) | <u>DECLARATION OF DAN SLAYTON</u> |
| v. | ) | |
| | ) | |
| QUEST PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Defendant | ) | |

Pursuant to 28 U.S.C. § 1746, Dan Slayton states as follows:

1.      I am a Casualty Complex Claims Specialist for Westfield Insurance Company and its affiliates, including Westfield National Insurance Company ("Westfield"), and make this Declaration based on my personal knowledge and review of Westfield's business records.

2.      Exhibit 1 attached hereto is a true and correct copy of the Complaint in the case *City of Metropolis, Illinois v. AmerisourceBergen Drug Corporation, et al.*, Case No. 1:18-OP-45537 in the U.S. District Court for the Northern District of Ohio ("Metropolis Lawsuit"), which is part of the multi-district National Prescription Opiate Litigation, Case No. 1:17-MD-2804 in the U.S. District Court for the Northern District of Ohio ("MDL").

3.      Exhibit 2 attached hereto is a true and correct copy of Metropolis' Short Form for Supplementing Complaint and Amending Defendants and Jury Demand, filed in the Metropolis Lawsuit.

4.      Exhibit 3 attached hereto is a true and correct copy of the Complaint in the case *City of Oklahoma City v. Purdue Pharma L.P., et al.*, Case No. CJ-2018-6179 in the District Court of Oklahoma County, which is now part of the MDL.

5.      Exhibit 4 attached hereto is a true and correct copy of the Complaint in the case *Board of County Commissioners of Jefferson County, Oklahoma v. Purdue Pharma L.P.*, Case No. CJ-19-1 in the District Court of Jefferson County, Oklahoma, which is now part of the MDL.

6.      Exhibit 5 attached hereto is a true and correct copy of Quest Pharmaceuticals, Inc.'s ("Quest") Answers and Responses to Westfield's First Set of Interrogatories, Request for Production of Documents and Requests for Admissions in this case.

7.      Exhibit 6 attached hereto is a true, correct, and certified copy of Policy No. CWP 3263063 issued by Westfield to Quest, as in effect for the period 10/26/2015 - 10/1/2016. Bates Numbers have been added at the bottom right corner of each page for ease of reference.

8.      Exhibit 7 attached hereto is a true, correct, and certified copy of Policy No. CWP 3263063 issued by Westfield to Quest, as in effect for the period 10/1/2016 - 10/1/2017. Bates Numbers have been added at the bottom right corner of each page for ease of reference.

9.      Exhibit 8 attached here to is a true and correct copy of the Complaint in the case *State of West Virginia v. AmerisourceBergen Drug Corporation, et al.*, Circuit Court of Boone County West Virginia, Case No. 12-C-141.

10.     I declare under penalty of perjury that the foregoing is true and correct.


1/26/2021
DATE

DAN SLAYTON

2

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | Case No. 1:17-md-02804<br>Hon. Dan A. Polster |
| CITY OF METROPOLIS, ILLINOIS,<br>a Municipal Corporation, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.: 1:18-op-45537 |
| AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; CARDINAL HEALTH 112, LLC; CARDINAL HEALTH 110, LLC; CARDINAL HEALTH 108, LLC; CARDINAL HEALTH 105, INC.; CARDINAL HEALTH 414, LLC; McKESSON CORPORATION; PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC. n/k/a ALLERGEN FINANCE, LLC; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MALLINCKRODT PLC and MALLINCKRODT LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT**<br><br>Complaint for Public Nuisance; Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §1961 *et seq.;* Illinois Narcotics Profit Forfeiture Act, 725 ILCS 175/1 *et seq.;* Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.;* Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.;* Negligence and Negligent Misrepresentation; Negligence Per Se; Civil Conspiracy; and Fraud and Fraudulent Misrepresentation<br><br>**JURY TRIAL DEMANDED AND ENDORSED HEREON** |
| Defendants. | ) ) | |

**EXHIBIT 1**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 2

II.   PARTIES ................................................................................................. 3

    A.   PLAINTIFF.......................................................................................3

    B.   DEFENDANTS ................................................................................5

        **1.   Manufacturer Defendants. ..............................................................5**
        **2.   Distributor Defendants. ...............................................................10**

III.  JURISDICTION & VENUE.................................................................. 14

IV.   FACTUAL BACKGROUND.................................................................. 15

    A.   THE OPIOID EPIDEMIC. ............................................................15

        **1.   The National Opioid Epidemic. ..................................................15**
        **2.   The Opioid Epidemic in Illinois...............................................20**
        **3.   The Opioid Epidemic in The City. ............................................21**

    B.   THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE, AND
        UNFAIR MARKETING OF OPIOIDS. ........................................24

        **1.   Each Manufacturer Defendant Used Multiple Avenues to**
        **Disseminate Their False and Deceptive Statements about Opioids. ............26**
        **2.   The Manufacturer Defendants' Marketing Scheme Misrepresented**
        **the Risks and Benefits of Opioids. ...............................................40**
          i.   The Manufacturer Defendants embarked upon a campaign of false,
              deceptive, and unfair assurances grossly understating and misstating
              the dangerous addiction risks of the opioid drugs. ...................................40
          ii.   The Manufacturer Defendants embarked upon a campaign of false,
              deceptive, and unfair assurances grossly overstating the benefits of
              the opioid drugs.............................................................................50
        **3.   The Manufacturer Defendants Targeted Susceptible Prescribers**
        **and Vulnerable Patient Populations. ...............................................57**
        **4.   The Manufacturer Defendants made Materially Deceptive**
        **Statements and Concealed Materials Facts.......................................58**
        **5.   The Manufacturer Defendants Fraudulently Concealed Their**
        **Misconduct............................................................................64**
    C.   THE DISTRIBUTOR DEFENDANTS' UNLAWFUL DISTRIBUTION OF
        OPIOIDS. ..................................................................................66

**EXHIBIT 1**

     1.    **The Distributor Defendants Have a Duty under Federal and State Law to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders.** ......................................................67

     2.    **The Distributor Defendants Breached their Duties.** ...............................75

     3.    **The Distributor Defendants Have Sought to Avoid and Have Misrepresented their Compliance with their Legal Duties.** ..........................78

   D.   THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT, AND PREVENT SUSPICIOUS ORDERS. .......................................................86

   E.   DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES. .......................................................93

   F.   DEFENDANTS' FRAUDULENT AND DECEPTIVE MARKETING OF OPIOIDS DIRECTLY CAUSED HARM TO THE PLAINTIFF. ...............................96

     1.    **Increase in Opioid Prescribing Nationally** ...............................96

     2.    **City of Chicago Investigation** ...............................97

   G.   STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTED STATUTES OF LIMITATIONS AS DEFENSES. .......................................................103

     1.    **Continuing Conduct** .......................................................103

     2.    **Equitable Estoppel.** .......................................................104

     3.    **Fraudulent Concealment.** .......................................................106

     4.    **Distributor Defendants' Conduct is Exposed** .......................................................107

V.    LEGAL CAUSES OF ACTION .......................................................109

   COUNT I – PUBLIC NUISANCE ILLINOIS COMMON LAW (Against all Defendants) .......................................................109

   COUNT II – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1961, *et seq.* (Against All Defendants) ............118

    A.    **THE OPIOID DIVERSION ENTERPRISE** .......................................................122

    B.    **CONDUCT OF THE OPIOID DIVERSION ENTERPRISE** ...............136

    C.    **PATTERN OF RACKETEERING ACTIVITY** ...............................141

       1.   The RICO Defendants Engaged in Mail and Wire Fraud. ...............141

       2.   The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances and Their Crimes Are Punishable as Felonies ...............149

    D.    **DAMAGES** .......................................................154

**EXHIBIT 1**

COUNT III – RACKETEERT INFLUENCED AND CORRUPT
ORGANIZATIONS ACT 18 U.S.C. 1962(d), *et seq.* (Against All Defendants)........155

    **A.**    **THE OPIOID DIVERSION ENTERPRISE.** .................................... **156**
    **B.**    **CONDUCT OF THE OPIOID DIVERSION ENTERPRISE.** ......... **156**
    **C.**    **PATTERN OF RACKETEERING ACTIVITY.** ............................... **156**
    **D.**    **DAMAGES.** ................................................................................. **156**

COUNT IV – NARCOTICS PROFIT FORFEITURE ACT 725 ILCS 175/1 *et
seq.* (Against All Defendants)....................................................................................157

    **A.**    **THE OPIOID DIVERSION ENTERPRISE.** .................................... **157**
    **B.**    **CONDUCT OF THE OPIOID DIVERSION ENTERPRISE.** ......... **158**
    **C.**    **PATTERN OF RACKETEERING ACTIVITY.** ............................... **159**
    **D.**    **DAMAGES.** ................................................................................. **160**

COUNT V - UNIFORM DECEPTIVE TRADE PRACTICES ACT 815 ILCS
510/1 *et seq.* (Against All Defendants).......................................................................160

COUNT VI - NEGLIGENCE AND NEGLIGENT MISREPRESENTATION
ILLINOIS COMMON LAW (Against All Defendants).............................................162

COUNT VII - NEGLIGENCE PER SE (Against All Defendants) ............................167

COUNT VIII - CIVIL CONSPIRACY (Against All Defendants) .............................168

COUNT IX - FRAUD AND FRAUDULENT MISREPRESENTATION
(Against All Defendants) ........................................................................................173

PUNITIVE DAMAGES ........................................................................................ 175

RELIEF ................................................................................................................ 176

**EXHIBIT 1**

NOW COMES the Plaintiff, the CITY OF METROPOLIS ("The City"), by its chief legal counsel, Rick Abell, City of Metropolis Corporation Counsel, and undersigned attorneys, bring this action against Defendants, Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceutical Industries, LTD.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Allergan PLC f/k/a Actavis PLC; Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc.; Watson Laboratories, Inc.; Actavis, LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Mallinckrodt plc; Mallinckrodt LLC; McKesson Corporation; Cardinal Health, Inc.; Cardinal Health 112, LLC, Cardinal Health 110, LLC, Cardinal Health 108, LLC, Cardinal Health 105, Inc., Cardinal Health 414, LLC and AmerisourceBergen Drug Corporation (collectively "Defendants") for public nuisance; for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*.; Illinois Narcotics Profit Forfeiture Act, 725 ILCS 175/1 *et seq*.; Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*.; negligence and negligent misrepresentation; negligence per se; civil conspiracy; and fraud and fraudulent misrepresentation.

Plaintiff alleges that Defendants ***unlawfully*** sold or caused to be sold millions of prescription opioids into the City of Metropolis, Illinois ("The City"). Plaintiff asserts that such unlawful conduct resulted in the ***foreseeable***, widespread diversion of prescription opioids into the illicit market, 1970 U.S.C.C.A.N. §§ 4566, 4571-72, creating a serious public health and safety crisis in The City  involving opioid abuse, addiction, morbidity and mortality, and is a public nuisance.

Plaintiff alleges as follows:

1

**EXHIBIT 1**

# I.    INTRODUCTION

1.      Plaintiff brings this civil action to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup monies that have been spent because of Defendants' false, deceptive and unfair marketing and/or unlawful diversion of prescription opioids.[1] Such economic damages were foreseeable to Defendants and were sustained because of Defendants intentional and/or unlawful actions and omissions.

2.      Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2]

3.      The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[3]

4.      Plaintiff brings this suit against the manufacturers of prescription opioids. The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. These pharmaceutical companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, turning patients into drug addicts for their own corporate profit. Such actions were intentional and/or unlawful.

5.      Plaintiff also brings this suit against the wholesale distributors of these highly addictive drugs.  The distributors and manufacturers intentionally and/or unlawfully breached their legal duties under federal and state law to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates.

---

[1] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

[2] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*,  374 N. Eng. J. Med. 1253 (2016).

[3] *See* Robert M. Califf et al., A Proactive Response to Prescription Opioid Abuse, 374 N. Eng. J. Med. 1480 (2016).

EXHIBIT 1

## II.   **PARTIES**

### A. PLAINTIFF

6.       Plaintiff, the CITY OF METROPOLIS, ILLINOIS ("The City") is authorized to enforce the causes of action brought herein. The City is a municipal corporation, organized and existing under the laws of the State of Illinois. Illinois Const. Art. VII, Sect. 7.

7.       The City has declared, *inter alia*, that opioid[4] abuse, addiction, morbidity and mortality has created a serious public health and safety crisis in the City, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

8.       The City has further declared and resolved that there is a substantial need for legal services, that these services cannot be adequately performed or provided solely by the attorneys and supporting personnel salaried through the City, and that to fulfill the duties of the City, experienced undersigned counsel have been retained.

9.       The distribution and diversion of opioids into the City created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

10.       Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiff seeks relief.  Categories of past and continuing sustained damages include, *inter alia*,: (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born

---

[4] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

3

**EXHIBIT 1**

with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) and costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. These damages have been suffered, and continue to be suffered directly, by the Plaintiff.

11.     Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct. Plaintiff is authorized by law to abate any nuisance and prosecute in any court of competent jurisdiction any person who creates, continues, contributes to, or suffers such nuisance to exist and prevent injury and annoyance from such nuisance. 65 ILSC 5/11-60-2.

12.     Plaintiff, the City of Metropolis, has standing to bring this public nuisance action for damages and to abate the public nuisance in The City. 65 ILSC 5/11-60-2.

13.     Plaintiff, the City of Metropolis, has standing to bring claims under the federal RICO statute. 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property); 18 U.S.C. § 1964 ("persons" have standing).

14.     Plaintiff, the City of Metropolis, has standing to bring claims for civil relief under the Narcotics Profit Forfeiture Act. 725 ILCS 175/3(c) ("'Person' includes any individual or entity capable of holding a legal or beneficial interest in property."); 725 ILCS 175/6(c) (person injured has standing).

15.     The City is a "government or governmental subdivision" and therefore a "person" with standing to bring this action under the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1(5); 815 ILCS 510/3.

16.     Plaintiff, the City of Metropolis, as a municipal corporation that can sue and be sued, has standing to bring common law actions.

4

**EXHIBIT 1**

## B. DEFENDANTS

### 1. Manufacturer Defendants.

17.     The Manufacturer Defendants are defined below. At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. The Manufacturer Defendants, at all times, have manufactured and sold prescription opioids without fulfilling their legal duty prevent diversion and report suspicious orders.

18.     PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue") which is registered to do business in Illinois.

19.     Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States, the State of Illinois, Massac County, and the City. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual nationwide sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

20.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania and is registered to do business in Illinois. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS

EXHIBIT 1

USA, INC. ("Teva USA") is a Delaware corporation which is registered to do business in Illinois and is a wholly owned subsidiary of Teva Ltd. in Pennsylvania. Teva USA acquired Cephalon in October 2011.

21.     Cephalon, Inc. manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States, the State of Illinois, Massac County, and the City. Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[5] Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[6] In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay $425 million.[7]

22.     Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines"

---

[5]  *Highlights of Prescribing Information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII* (2009), https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[6]  *Highlights of Prescribing Information, FENTORA® (fentanyl citrate) buccal tablet, CII* (2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.

[7]  Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

EXHIBIT 1

division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

23.     All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.[8] Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including *inter alia* sales of Fentora®.[9] Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to as "Cephalon."

24.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. NORAMCO, INC. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J until July 2016. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN

---

[8] *E.g.*, ACTIQ, http://www.actiq.com/ (displaying logo at bottom-left) (last visited Aug. 21, 2017).

[9] Teva Ltd., Annual Report (Form 20-F) 62 (Feb. 12, 2013),
http://annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2012.pdf.

**EXHIBIT 1**

PHARMACEUTICALS, INC., is a Pennsylvania corporation registered to do business in Illinois with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco, and J&J are referred to as "Janssen."

25.     Janssen manufactures, promotes, sells, and distributes drugs in the United States, the State of Illinois, Massac County, and the City, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

26.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to as "Endo."

27.     Endo develops, markets, and sells prescription drugs, such as the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, the State of Illinois, Massac County, and the City. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it

EXHIBIT 1

accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

28.     ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired ALLERGAN PLC in March 2015, and the combined company changed its name to ALLERGAN PLC in January 2015. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then ACTAVIS PLC in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of ALLERGAN PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc., n/k/a Allergan Finance, LLC). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is registered to do business with the Illinois Secretary of State as a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS, LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by ALLERGAN PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, ALLERGAN PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. Allergan plc, Actavis plc, Actavis, Inc., Allergan Finance, LLC, Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to as "Actavis."

29.     Actavis manufactures, promotes, sells, and distributes opioids, such as the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and

EXHIBIT 1

Opana, in the United States, the State of Illinois, Massac County, and the City. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

30.     MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware and licensed to do business in Illinois.  Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, PLC.  Mallinckrodt, PLC, and Mallinckrodt, LLC are referred to as "Mallinckrodt."

31.     Mallinckrodt manufactures, markets, and sells drugs in the United States, the State of Illinois, Massac County, and the City, including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

**2.  Distributor Defendants.**

32.     The Distributor Defendants also are defined below. At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes.  The Distributor Distributors universally failed to comply with federal and/or state law. Plaintiff alleges the unlawful conduct by the Distributor Distributors is responsible for the volume of prescription opioids plaguing The City.

33.     Defendant, McKESSON CORPORATION, is registered with the Illinois Secretary of State as a Delaware corporation which may be served through its registered agent for service of

EXHIBIT 1

process, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703. McKESSON CORPORATION has its principal place of business located in San Francisco, California. McKesson is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation, and operates distribution centers in Illinois, including in Aurora, Illinois.

34.     Defendant, CARDINAL HEALTH, INC. is an Ohio corporation, with its principal office located in Dublin, Ohio. Under the name "Cardinal Health," Defendant is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation.

35.     CARDINAL HEALTH 112, LLC, is a subsidiary of CARDINAL HEALTH, INC., is registered with the Illinois Secretary of State as having its principal office in Ohio, is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation, and may be served through its registered agent for service of process, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

36.     CARDINAL HEALTH 110, LLC, is a subsidiary of CARDINAL HEALTH, INC., is registered with the Illinois Secretary of State as having its principal office in Ohio, is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation, and may be served through its registered agent for service of process, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

37.     CARDINAL HEALTH 108, LLC, is a subsidiary of CARDINAL HEALTH, INC., is registered with the Illinois Secretary of State as having its principal office in Tennessee, is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation, and may be served through its registered agent for service of process, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

EXHIBIT 1

38.     CARDINAL HEALTH 105, INC., is a subsidiary of CARDINAL HEALTH, INC., is registered with the Illinois Secretary of State as an Ohio Corporation having its principal office in Ohio, is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation, and may be served through its registered agent for service of process, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

39.     CARDINAL HEALTH 414, LLC, is a subsidiary of CARDINAL HEALTH, INC., is registered with the Illinois Secretary of State as having its principal office in Ohio, is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation, and may be served through its registered agent for service of process, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

40.     CARDINAL HEALTH, INC., CARDINAL HEALTH 112, LLC, CARDINAL HEALTH 110, LLC, CARDINAL HEALTH 108, LLC, CARDINAL HEALTH 105, INC., and/or CARDINAL HEALTH 414, LLC (occ. collectively "Cardinal Health") operate distribution centers in Illinois, including in Aurora, Illinois. Cardinal Health also operates distribution centers outside of Illinois from which Cardinal Health ships opioids into Illinois, including in The City.

41.     Defendant, AMERISOURCEBERGEN DRUG CORPORATION, is registered with the Illinois Secretary of State as a Delaware corporation which may be served through its registered agent for service of process, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.  AMERISOURCEBERGEN DRUG CORPORATION's principal place of business is located in Chesterbrook, Pennsylvania.   AMERISOURCEBERGEN DRUG CORPORATION is licensed as a wholesale drug distributor by the Illinois Department of Financial and Professional Regulation, and operates distribution centers in Illinois, including in Romeoville, Illinois.

12

EXHIBIT 1

42.     The data which reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v. USDOJ*, 784 F.3d 448 (8th Cir. 2015). Neither the DEA[10] nor the wholesale distributors[11] will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the claims asserted herein.

43.     Consequently, Plaintiff has named the three (3) wholesale distributors (i.e., AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation) which dominate 85% of the market share for the distribution of prescription opioids.  The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs.  *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal Health, Inc., McKesson Corporation, and AmerisourceBergen Drug Corporation predecessors). Each has been investigated and/or fined by the DEA for the failure to report suspicious orders.  Plaintiff has reason to believe each has engaged in unlawful conduct which resulted in the diversion of prescription opioids into our community and that discovery will likely reveal others who likewise engaged in unlawful conduct.  Plaintiff names each of the "Big 3" herein as defendants and places the industry on notice that the Plaintiff is acting to abate the public nuisance plaguing the community. Plaintiff will request expedited discovery pursuant to Rule 26(d) of the Federal Rules of Civil Procedure to

---

[10] *See* Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").

[11] *See* Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available.  Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

**EXHIBIT 1**

secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

### III.    JURISDICTION & VENUE

44.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

45.    This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a), because the Plaintiff is a "citizen" of the State of Illinois and, upon information and belief, the named Defendants are citizens of states other than Illinois, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

46.    This Court has personal jurisdiction over Defendants because they conduct business in Illinois, purposefully direct or directed their actions toward Illinois, consented to be sued in Illinois by registering an agent for service of process, consensually submitted to the jurisdiction of Illinois when obtaining a manufacturer or distributor license, and have the requisite minimum contacts with Illinois necessary to constitutionally permit the Court to exercise jurisdiction.

47.    This Court also has personal jurisdiction over all of the defendants under 18 U.S.C. 1965(b). This Court may exercise nation-wide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the court in a single trial. *See, e.g.*, *Iron Workers Local Union No. 17 Insurance*

**EXHIBIT 1**

*Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 796 (1998) (citing *LaSalle National Bank v. Arroyo Office Plaza, Ltd.,* 1988 WL 23824, *3 (N.D. Ill. Mar 10, 1988)); *Butcher's Union Local No. 498 v. SDC Invest., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

48.     Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. § 1391 and 18 U.S.C. §1965 because a substantial part of the events or omissions giving rise to the claim occurred in this District and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District. 28 U.S.C. §§ 1391(b); 18 U.S.C. §1965(a).

49.     Plaintiff does not bring any product liability claims or causes of action and does not seek compensatory damages for death, physical injury to person, or emotional distress.

## IV.     FACTUAL BACKGROUND

### A. THE OPIOID EPIDEMIC.

#### 1.   The National Opioid Epidemic.

50.     The past two decades have been characterized by increasing abuse and diversion of prescription drugs, including opioid medications, in the United States.[12]

51.     Prescription opioids have become widely prescribed.  By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[13]

52.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

---

[12] *See* Richard C. Dart et al, Trends in Opioid Analgesic Abuse and Mortality in the United States, 372 N. Eng. J. Med. 241 (2015).

[13] Katherine M. Keyes et al., Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States, 104 Am. J. Pub. Health e52 (2014).

EXHIBIT 1

a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

c.  Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

d.  The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older— a total of 12 million people—reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

e.  Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

f.  Almost 5,500 people start to misuse prescription painkillers every day.[14]

53.  The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[15]

54.  Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[16]

---

[14] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[15] *See* Califf et al., *supra* note 3.

[16] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

16

EXHIBIT 1

55.     Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin.[17]

56.     Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.[18]

57.     The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. ***Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use,*** specifically among persons who report past-year dependence or abuse. The increased availability of heroin, combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.[19]

58.     The societal costs of prescription drug abuse are "huge."[20]

---

[17] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*, https://www.cdc.gov/vitalsigns/heroin/index.html  (last updated July 7, 2015).

[18] *See* Wilson M. Compton, Relationship Between Nonmedical Prescription-Opioid Use and Heroin, 374 N. Eng. J. Med. 154 (2016).

[19] *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

[20] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 [hereinafter Brief of HDMA].

**EXHIBIT 1**

59.     Across the nation, local governments are struggling with a pernicious, ever-expanding epidemic of opioid addiction and abuse. Every day, more than 90 Americans lose their lives after overdosing on opioids.[21]

60.     The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[22] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[23]

61.     The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999–2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[24]

62.     The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[25]

63.     Every day brings a new revelation regarding the depth of the opioid plague: just to name one example, the New York Times reported in September 2017 that the epidemic, which

---

[21] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, *MMWR MORB MORTAL WKLY REP.* 2016;65, doi:10.15585/mmwr.mm655051e1).

[22] Opioid Crisis, NIH.

[23] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

[24] *See* Rose A. Rudd et al., Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

[25] *See* Volkow & McLellan, *supra* note 1.

18

EXHIBIT 1

now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous, deadly opioids are "everywhere" and mistaken as candy.[26]

64.     The tragic opioid epidemic impacts infants. The use of opiates during pregnancy can result in a drug withdrawal syndrome in newborns called Neonatal Abstinence Syndrome (NAS). There was a five-fold increase in the proportion of babies born with NAS from 2000 to 2012, when an estimated 21,732 infants were born with NAS —equivalent to one baby suffering from opiate withdrawal born every 25 minutes.[27]  The cost of treating these infants is significant. Newborns with NAS were more likely than other babies to also have low birthweight and respiratory complications. In 2012, newborns with NAS stayed in the hospital an average of 16.9 days (compared to 2.1. days for other newborns).[28]

65.     In 2016, the President of the United States declared an opioid and heroin epidemic.[29]

66.     The epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country.[30]  Meanwhile, the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public while

---

[26]  Julie Turkewitz, 'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims, N.Y. Times, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[27] Dramatic Increases in maternal Opioid Use and Neonatal Abstinence Syndrome, NIH National Institute on Drug Abuse, available at https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternal-opioid-use-neonatal-abstinence-syndrome (last visited Aug. 8, 2017).https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternal-opioid-use-neonatal-abstinence-syndrome (last visited Aug. 8, 2017).

[28] Id.

[29] See Proclamation No. 9499, 81 Fed. Reg.  65,173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week").

[30] See Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

EXHIBIT 1

public entities experience tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

67.     The prescription opioid manufacturers and distributors, including the Defendants, have continued their wrongful, intentional, and unlawful conduct, despite their knowledge that such conduct is causing and/or continuing to the national, state, and local opioid epidemic.

### 2.  The Opioid Epidemic in Illinois.

68.     Illinois has been especially ravaged by the national opioid crisis.

69.     Illinois has been devastated by the opioid epidemic. In Illinois, more people died from an opioid drug overdose in 2014 than from homicide or motor vehicle accidents. Opioid drug overdoses killed 45% more people than homicide. Opioid drug overdoses killed 25% more people than motor vehicle crashes. And, opioid drug overdoses killed more people than gun-related causes.[31]

70.     In 2016, the opioid epidemic killed, 1,889 Illinois residents, and from 2008 through 2014, the State saw a 274 percent increase in opioid-related overdose deaths.[32]

71.     Illinois is one of the States identified by the United States Center for Disease Control and Prevention (CDC) as having a statistically significant drug overdose death rate

---

[31]*See* Prescription Opioids and Heroin, Illinois Department of Public Health, available at http://www.dph.illinois.gov/topics-services/prevention-wellness/prescription-opioids-and-heroin (last visited November 2, 2017).

[32] Travis Morse, *Opioid victims speak out*, Mt. Vernon Register News, Oct. 13, 2017, available at http://www.register-news.com/news/opioid-victims-speak-out/article_674c5270-b063-11e7-9b59-cbeb0ceae992.html (last visited Oct. 25, 2017).

EXHIBIT 1

increase from 2014 to 2015, and from 2013 to 2014.[33] The percent increase from 2014 to 2015 was 7.6%, and the percent increase from 2013 to 2014 was 8.3%.[34]

### 3. The Opioid Epidemic in The City.

72.     The opioid epidemic is occurring in The City. The CDC has tracked prescription rates per county in the United States, identifying the geographic "hotspots" for rates of opioid prescriptions.[35] The CDC has calculated the geographic distribution at county levels of opioid prescriptions dispensed per 100 persons,[36] revealing that Massac County, Illinois, where the City of Metropolis is located, has been a consistent hotspot for nearly the past decade.

73.     The CDC's statistics prove that the opioid prescription rates in Massac County, and therefore the City of Metropolis, have exceeded any legitimate medical, scientific, or industrial purpose. The overall opioid prescribing rate in 2016 was 66.5 prescriptions per 100 people.[37] However, in Massac County, Illinois, the 2016 prescription rate was 149.3 per 100 people – a rate of more than one prescription for every person.[38] Similarly, the 2015 Massac County prescription rate was 163.9 per 100 people.[39]

74.     Unfortunately, the 2015 and 2016 high rates of opioid prescriptions were not an aberration for Massac County. Consistently, the opioid prescribing rates in Massac County have

---

[33] Drug Overdose Death Data, CDC, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last visited Aug. 8, 2017).

[34] *Id.*

[35] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited April 9, 2018).

[36] *Id.*

[37] *Id.*

[38]     U.S.     County     Prescribing     Rates,     2016,     CDC     available     at https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html (last visited April 9, 2018).

[39]     U.S.     County     Prescribing     Rates,     2015,     CDC,     available     at https://www.cdc.gov/drugoverdose/maps/rxcounty2015.html (last visited April 9, 2018).

**EXHIBIT 1**

been significantly greater than the national average, as well as in excess of one prescription per person. Compared to a national average of 75.6 opioid prescriptions per 100 people in 2014,[40] the Massac County opioid prescription rate was 141.3 per 100 people in 2014.[41] Compared to a national average of 78.1 opioid prescriptions per 100 people in 2013,[42] the opioid prescription rate in Massac County was 132.9 per 100 people in 2013.[43] Compared to a national average of 81.3 opioid prescriptions per 100 people in 2012,[44] the opioid prescription rate in Massac County was 135.4 per 100 people in 2012.[45] Compared to a national average of 80.9 opioid prescriptions per 100 people prescribed opioids in 2011,[46] the opioid prescription rate in Massac County was 130.7 per 100 people in 2011.[47] Compared to a national average of 81.2 opioid prescriptions per 100 people prescribed opioids in 2010,[48] the Massac County opioid prescription rate was 119.7 per 100 people in 2010.[49]

---

[40] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited April 9, 2018).

[41] U.S. County Prescribing Rates, 2014, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2014.html (last visited April 9, 2018).

[42] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited April 9, 2018).

[43] U.S. County Prescribing Rates, 2013, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2013.html (last visited April 9, 2018).

[44] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited April 9, 2018).

[45] U.S. County Prescribing Rates, 2012, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2012.html (last visited April 9, 2018).

[46] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited April 9, 2018).

[47] U.S. County Prescribing Rates, 2011, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2011.html (last visited April 9, 2018).

[48] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited April 9, 2018).

[49] U.S. County Prescribing Rates, 2010, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2010.html (last visited April 9, 2018).

EXHIBIT 1

75.     The opioid epidemic has placed increased budgetary constraints upon *inter alia* the public health and medical care expenditures of the State and The City.

76.     Opioid addiction is a primary reason that Illinois citizens seek substance abuse treatment.  Thus, the epidemic has placed increased budgetary costs upon the State and The City's services and expenditures.

77.     Criminal charges associated with the diversion of opioids have increased. This has placed increased budgetary costs upon the State and The City's criminal law enforcement expenses.

78.     Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and The City.

79.     Prescription opioid abuse, addiction, morbidity, and mortality are a temporary public nuisance in the State and The City, which remains unabated.

80.     Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and The City.

81.     Heroin abuse, addiction, morbidity, and mortality are a temporary public nuisance in the State and The City, which remains unabated.

82.     To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[50]

---

[50] *See* Rose A. Rudd, MSPH, et al, *Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015*, Morbidity and Mortality Weekly Report (MMWR), Centers for Disease Control and Prevention, 65(50-51);1445–1452 (December 30, 2016).

**EXHIBIT 1**

83.    "A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain."[51]

## B.  THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE, AND UNFAIR MARKETING OF OPIOIDS.

84.    The opioid epidemic did not happen by accident.

85.    Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

86.    Each Manufacturer Defendant has conducted, and has continued to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

---

[51] *See* Alexander GC, Frattaroli S, Gielen AC, eds. *The Prescription Opioid Epidemic: An Evidence-Based Approach*, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland: 2015, available at http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-injury-research-and-policy/publications-resources/CenterPubs/2015-prescription-opioid-epidemic-report.pdf  (last visited Aug. 10, 2017).

**EXHIBIT 1**

87.     The Manufacturer Defendants have made false and misleading claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs that: (1) downplayed the serious risk of addiction; (2) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

88.     The Manufacturer Defendants have disseminated these common messages to reverse the popular and medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded front groups.

89.     Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009.[52] In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon

---

[52] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine*, Fortune, Nov. 9, 2011, http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, *Drugmakers Hooked on $10bn Opioid Habit*, Fin. Times, Aug. 10, 2016, https://www. ft.com/content/f6e989a8-5dac-11e6-bb77-a121aa8abd95.

**EXHIBIT 1**

General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[53] This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

90.    The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

### 1. Each Manufacturer Defendant Used Multiple Avenues to Disseminate Their False and Deceptive Statements about Opioids.

91.    The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in and around the State, including in The City. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout the State and The City.

92.    The Manufacturer Defendants employed the same marketing plans and strategies and deployed the same messages in and around the State, including in The City, as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that the Manufacturer Defendants' messages are accurately and consistently delivered across

---

[53] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016), http://turnthetiderx.org/.

**EXHIBIT 1**

marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory. The Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

93.     The Manufacturer Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising. The Manufacturer Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

### i.   Direct Marketing.

94.     The Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Manufacturer Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs. For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

95.     Many of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Upon information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad

EXHIBIT 1

described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

96.     Second, each Manufacturer Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. The Manufacturer Defendants have not corrected this misinformation. Instead, each Defendant devoted massive resources to direct sales contacts with doctors. Upon information and belief, in 2014 alone, the Manufacturer Defendants spent in excess of $168 million on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

97.     The Manufacturer Defendants' detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, the Manufacturer Defendants purchase, manipulate and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus, the Manufacturer Defendants know their detailing to doctors is effective.

98.     The Manufacturer Defendants' detailers have been reprimanded for their deceptive promotions. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated." Those materials in particular "fail to

EXHIBIT 1

reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."[54]

### ii.  Indirect Marketing.

99.     The Manufacturer Defendants' indirectly marketed their opioids using unbranded advertising, paid speakers and "key opinion leaders" ("KOLs"), and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

100.     The Manufacturer Defendants deceptively marketed opioids in The City through unbranded advertising – e.g., advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, the Manufacturer Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, and medical conferences and seminars. To this end, the Manufacturer Defendants used third-party public relations firms to help control those messages when they originated from third-parties.

101.     The Manufacturer Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to and typically is not

---

[54] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010),
http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

EXHIBIT 1

reviewed by the FDA. The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, the Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long term opioid use for chronic pain.

102.    Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

103.    Borrowing a page from Big Tobacco's playbook, the Manufacturer Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors who served as KOLS, and (b) funding, assisting, directing, and encouraging seemingly neutral and credible Front Groups. The Manufacturer Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, the Manufacturer Defendants persuaded doctors and patients that what

**EXHIBIT 1**

they have long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and that the compassionate treatment of pain required opioids.

104.    In 2007, multiple States sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion, and sale of OxyContin. Certain states settled their claims in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future.  By using indirect marketing strategies, however, Purdue intentionally circumvented these restrictions.  Such actions include contributing the creation of misleading publications and prescribing guidelines which lack reliable scientific basis and promote prescribing practices which have worsened the opioid crisis.

105.    Pro-opioid doctors are one of the most important avenues that the Manufacturer Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Manufacturer Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that doctors who provided testimonials on the site were paid by Purdue and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

106.    Defendants utilized many KOLs, including many of the same ones.

107.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Manufacturer Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen,

EXHIBIT 1

and Purdue (among others), and was a paid consultant to Cephalon and Purdue. Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Manufacturer Defendants.

108.    Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[55]

109.    Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids

---

[55] Good Morning America (ABC television broadcast Aug. 30, 2010).

EXHIBIT 1

does not exist."[56] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[57]

110.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

111.     During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

112.     Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.  Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own

---

[56] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[57] *Id.*

EXHIBIT 1

guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

113.    In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors in the State and doctors treating residents of The City.[58]

114.    Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and co-author Beth Dove wrote in their 2007 book *Avoiding Opioid Abuse While Managing Pain*—a book that is still available online—when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."[59] Upon information and belief, Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[60]

115.    The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Manufacturer Defendants, these

---

[58] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk*, http://www.emergingsolutionsinpain.com/ce-education/opioid-management?option=com_continued&view=frontmatter&Itemid=303&course=209 (last visited Aug. 22, 2017).

[59] Lynn Webster & Beth Dove, Avoiding Opioid Abuse While Managing Pain (2007).

[60] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html.

EXHIBIT 1

"Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted the Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

116.    These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival. The Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, the Manufacturer Defendants made sure that the Front Groups would generate only the messages that the Manufacturer Defendants wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

117.    Defendants Cephalon, Endo, Janssen, and Purdue, in particular, utilized many Front Groups, including many of the same ones. Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF") and Pain & Policy Studies Group ("PPSG").[61]

118.    The most prominent of the Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012,

---

[61] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015), https://www.finance.senate.gov/imo/media/doc/050517%20Senator%20Wyden%20to%20Secretary%20Price%20re%20FDA%20Opioid%20Prescriber%20Working%20Group.pdf.

EXHIBIT 1

primarily from Endo and Purdue. APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach citizens of the State and The City.

119.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

120.    APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors.  Upon information and belief, it was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain. APF functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant

EXHIBIT 1

was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

121.    Plaintiff is informed, and believes, that on several occasions, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

122.    The U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer Defendants stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[62]

123.    Another front group for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

124.    AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational

---

[62] Charles Ornstein & Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups*, Wash. Post, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html.

EXHIBIT 1

programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

125.     Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

126.     The Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

127.     In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patients' addiction to opioids was low. Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[63]

---

[63] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement from the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).

**EXHIBIT 1**

128.    AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[64] Treatment guidelines have been relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

129.    At least fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[65] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the State and The City during the relevant time period, are still available online, and were reprinted in

---

[64] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).

[65] *Id.*

**EXHIBIT 1**

the Journal of Pain. The Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer Defendants financial support to members of the panel.

130. The Manufacturer Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer Defendants determined would reduce prescribing.

## 2. The Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.

### i. The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs.

131. To falsely assure physicians and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the

EXHIBIT 1

drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. The Manufacturer Defendants have not only failed to correct these misrepresentations, they continue to make them today.

132.    Opioid manufacturers, including Defendants Endo Pharmaceuticals, Inc. and Purdue Pharma L.P., have entered into settlement agreements with public entities that prohibit them from making many of the misrepresentations identified in this Complaint. Yet even afterward, each Manufacturer Defendant continued to misrepresent the risks and benefits of long-term opioid use in the State and The City and each continues to fail to correct its past misrepresentations.

133.    Some illustrative examples of the Manufacturer Defendants' false, deceptive, and unfair claims about the purportedly low risk of addiction include:

   a.  Actavis's predecessor caused a patient education brochure, *Managing Chronic Back Pain*, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

   b.  Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online.[66]

   c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly

---

[66] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment Options*], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

**EXHIBIT 1**

suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

    d.   Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

    e.   Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

    f.   Janssen currently runs a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."

    g.   Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction."[67]

    h.   Consistent with the Manufacturer Defendants' published marketing materials, upon information and belief, detailers for Purdue, Endo, Janssen, and Cephalon in the State and The City minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

    i.   Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued in an *amicus* brief to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.[68]

134.    These claims are contrary to longstanding scientific evidence. A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an

---

[67] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

[68] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) [hereinafter Brief of APF] at 9.

EXHIBIT 1

alternative term for opioid addiction], [and] overdose . . .).”[69] The 2016 CDC Guideline further explains that “[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder” and that “continuing opioid therapy for 3 months substantially increases risk for opioid use disorder.”[70]

135.    The FDA further exposed the falsity of Defendants’ claims about the low risk of addiction when it announced changes to the labels for extended-release and long-acting (“ER/LA”) opioids in 2013 and for immediate release (“IR”) opioids in 2016. In its announcements, the FDA found that “most opioid drugs have ‘high potential for abuse’” and that opioids “are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death.” According to the FDA, because of the “known serious risks” associated with long-term opioid use, including “risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death,” opioids should be used only “in patients for whom alternative treatment options” like non-opioid drugs have failed.[71]

136.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid “use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers

---

[69] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[70] *Id.* at 2, 25.

[71] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep’t of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://www.regulations.gov/contentStreamer?documentId=FDA-2012-P-0818-0793&attachmentNumber=1&contentType=pdf.; Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep’t of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016), https://www.regulations.gov/contentStreamer?documentId=FDA-2014-P-0205-0006&attachmentNumber=1&contentType=pdf.

EXHIBIT 1

meeting the clinical criteria for an opioid use disorder."[72] Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in this State.

137.    In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, the Manufacturer Defendants also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Manufacturer Defendants misrepresented, to doctors and patients, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (i.e. pseudoaddiction) – and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

138.    To this end, one of Purdue's employees, Dr. David Haddox, invented a phenomenon called "pseudoaddiction." KOL Dr. Portenoy popularized the term. Examples of the false, misleading, deceptive, and unfair statements regarding pseudoaddiction include:

   a. Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction.[73] The 2012 edition, which remains available for sale online, continues to teach that pseudoaddiction is real.[74]

   b. Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain

---

[72] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc. (*Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

[73] Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2007) at 62.

[74] *See* Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2d ed. 2012).

**EXHIBIT 1**

is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

c.   Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d.   Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

e.   Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse". In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

139.   In the 2016 CDC Guideline, the CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already addicted patients.

140.   In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive, and unfair practice is the Manufacturer Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to

45

EXHIBIT 1

their patients, and patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

a. Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b. Purdue, upon information and belief, sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c. As recently as 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

141.    The 2016 CDC Guideline confirms the falsity of these claims. The Guideline explains that there are no studies assessing the effectiveness of risk mitigation strategies "for improving outcomes related to overdose, addiction, abuse or misuse."[75]

142.    A fourth category of deceptive messaging regarding dangerous opioids is the Manufacturer Defendants' false assurances regarding the alleged ease of eliminating opioid dependence. The Manufacturer Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, but they failed to disclose the increased difficulty of stopping opioids after long-term use. In truth, the 2016 CDC Guideline explains that the symptoms of opioid withdrawal include abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia, drug cravings, anxiety, insomnia, spontaneous abortion and premature labor in pregnant women.[76]

---

[75] *Id.* at 11.

[76] *Id.* at 26.

46

**EXHIBIT 1**

143.    The Manufacturer Defendants nonetheless downplayed the severity of opioid detoxification. For example, upon information and belief, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[77]

144.    A fifth category of false, deceptive, and unfair statements the Manufacturer Defendants made to sell more drugs is that opioid dosages could be increased indefinitely without added risk. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. The Manufacturer Defendants' deceptive claims include:

    a.    Upon information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis appears to have continued to use these materials in 2009 and beyond.

    b.    Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for severe pain.[78] This publication is still available online.

    c.    Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

---

[77] APF, *Policymaker's Guide*, *supra* note 48, at 32.

[78] APF, *Treatment Options*, *supra* note 47, at 12.

**EXHIBIT 1**

d.  Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."[79]

e.  Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f.  Upon information and belief, Purdue's In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," and that "the need for higher doses of medication is not necessarily indicative of addiction," but inaccurately downplayed the risks from high opioid dosages.[80]

h.  In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

i.  Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.[81]

j.  Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued in an *amicus* brief to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[82]

145.  Once again, the 2016 CDC Guideline reveals that the Manufacturer Defendants' representations regarding opioids were lacking in scientific evidence. The 2016 CDC Guideline

---

[79] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

[80] APF, *Policymaker's Guide*, *supra* note 48, at 32.

[81] The College on Problems of Drug Dependence, *About the College*, http://cpdd.org (last visited Aug. 21, 2017).

[82] Brief of APF, *supra* note 49, at 9.

**EXHIBIT 1**

clarifies that the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."[83] More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[84] The CDC also states that there is an increased risk "for opioid use disorder, respiratory depression, and death at higher dosages."[85] That is why the CDC advises doctors to "avoid increasing dosage" to above 90 morphine milligram equivalents per day.[86]

146.    Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can cure addiction and abuse.

147.    The Manufacturer Defendants made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. This claim was false. The FDA warned in a 2013 letter that Opana ER Extended-Release Tablets' "extended-release features can be compromised, causing the medication to 'dose dump,' when subject to . . . forms of manipulation such as cutting, grinding, or chewing, followed by swallowing."[87] Also troubling, Opana ER can be prepared for snorting using commonly available methods and "readily prepared for injection."[88] The letter

---

[83] 2016 CDC Guideline, *supra* note 50, at 22–23.

[84] *Id.* at 23–24.

[85] *Id.* at 21.

[86] *Id.* at 16.

[87] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.

[88] *Id*. at 6.

**EXHIBIT 1**

discussed "the troubling possibility that a higher (and rising) percentage of [Opana ER Extended-Release Tablet] abuse is occurring via injection."[89] Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed. In June 2017, the FDA requested that Opana ER be removed from the market.

    **ii.**    **The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs.**

    148.    To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the CDC Guideline makes clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials $\leq$ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.[90] The FDA, too, has recognized the lack of evidence to support long-term opioid use. Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

    149.    Some illustrative examples of the Manufacturer Defendants' false claims are:

    a.    Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

    b.    Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

    c.    Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional

---

[89] *Id*. at 6 n.21.

[90] *Id.* at 15.

**EXHIBIT 1**

improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

d. Janssen promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules."

e. Upon information and belief, Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.

f. *Responsible Opioid Prescribing* (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function.

g. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."[91] This publication is still available online.

h. Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

i. Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient."[92] Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

j. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under-treated. In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

---

[91] APF, Treatment Options, supra note 47.

[92] *E.g.*, NIPC, *Persistent Pain and the Older Patient* (2007),
https://www.painedu.org/Downloads/NIPC/Activities/B173_Providence_RI_%20Invite.pdf.

**EXHIBIT 1**

    k.    Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain."[93] The Policymaker's Guide was originally published in 2011.

    l.    Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

150.    As the FDA and other agencies have made clear for years, these claims have no support in the scientific literature.

151.    In 2010, the FDA warned Actavis, in response to its advertising of Kadian described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[94] And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

152.    The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Manufacturer Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for

---

[93] APF, *Policymaker's Guide*, *supra* note 48, at 29.

[94] Letter from Thomas Abrams to Doug Boothe, *supra* note 32.

**EXHIBIT 1**

which alternative treatment options" like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.[95] Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

153.    Purdue's competitors were aware of this problem. For example, upon information and belief, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Upon information and belief, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

---

[95] 2016 CDC Guideline, *supra* note 50, at 12.

**EXHIBIT 1**

154.    Front Groups supported by Purdue likewise echoed these representations. For example, in an amicus brief submitted to the Supreme Court of Ohio by the American Pain Foundation, the National Foundation for the Treatment of Pain and the Ohio Pain Initiative in support of Purdue, those amici represented:

> OxyContin is particularly useful for sustained long-term pain because it comes in higher, compact pills with a slow release coating. OxyContin pills can work for 12 hours. This makes it easier for patients to comply with dosing requirements without experiencing a roller-coaster of pain relief followed quickly by pain renewal that can occur with shorter acting medications. It also helps the patient sleep through the night, which is often impossible with short-acting medications. For many of those serviced by Pain Care Amici, OxyContin has been a miracle medication.[96]

155.    Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.[97] Specifically, the FDA advised that

---

[96]  Reply Brief of Amicus Curiae of the American Pain Foundation, The National Foundation for the Treatment of Pain and the Ohio Pain Initiative Supporting Appellants, *Howland v. Purdue Pharma L.P.*, No. 2003-1538 (Ohio Apr. 13, 2004), 2004 WL 1637768, at *4 (footnote omitted).

[97] *See* U.S. Food & Drug Admin., *Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets)* (Sept. 26, 2007), https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm

EXHIBIT 1

Fentora "is only approved for breakthrough cancer pain in patients who are *opioid-tolerant,* meaning those patients who take a regular, daily, around-the-clock narcotic pain medication."[98]

156.    Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, and for which it is not safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

a.   Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

b.   Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

c.   In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

157.    Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

---

[98] *Id.*

**EXHIBIT 1**

158.     Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report that a Los Angeles clinic prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described it internally as "an organized drug ring" until years after law enforcement shut it down. In doing so, Purdue protected its own profits at the expense of public health and safety.[99]

159.     Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to

---

[99] Harriet Ryan et al., *More Than 1 Million Oxycontin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, L.A. Times, July 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/.

EXHIBIT 1

prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

### 3. The Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.

160.    As a part of their deceptive marketing scheme, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., including this State and The City. For example, the Manufacturer Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept the Manufacturer Defendants' misrepresentations.

161.    The Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. The Manufacturer Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance, and a smaller window between safe and unsafe dosages.[100] The 2016 CDC Guideline concludes that there must be "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. *Id*. at 27. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

---

[100] 2016 CDC Guideline, *supra* note 50, at 13.

EXHIBIT 1

4. **The Manufacturer Defendants made Materially Deceptive Statements and Concealed Materials Facts.**

162.    As alleged herein, the Manufacturer Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts, in the course of manufacturing, marketing, and selling prescription opioids. The Manufacturer Defendants' actions were intentional and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

163.    Defendant Purdue made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;

b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c. Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;

d. Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

e. Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

EXHIBIT 1

h.  Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n.  Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

o.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

p.  Exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

q.  Making deceptive statements concerning the use of opioids to treat chronic noncancer pain to prescribers through in-person detailing; and

r.  Withholding from law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its opioid, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs they knew would reach these same prescribers.

**EXHIBIT 1**

164.     Defendant Endo made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.   Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.   Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.   Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

d.   Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e.   Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f.   Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.   Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.   Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.   Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

**EXHIBIT 1**

k.  Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

165.  Defendant Janssen made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.  Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c.  Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

d.  Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e.  Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

f.  Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

61

**EXHIBIT 1**

g.   Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

h.   Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

i.   Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

j.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.   Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l.   Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

m.   Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

n.   Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

166.   Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.   Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b.   Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

**EXHIBIT 1**

c.   Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d.   Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e.   Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g.   Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h.   Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

i.   Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j.   Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

167.   Defendant Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.   Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

b.   Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

c.   Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

EXHIBIT 1

    d.   Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

### 5.  The Manufacturer Defendants Fraudulently Concealed Their Misconduct.

168.    The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience establish that opioids are highly addictive and are responsible for a long list of very serious adverse outcomes. The FDA warned Defendants of this, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and death – all of which clearly described the harm from long-term opioid use and that patients were suffering from addiction, overdose, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements, based on medical evidence, that conclusively expose the falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements in New York prohibiting them from making some of the same misrepresentations described in this Complaint.

169.    At all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Manufacturer Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. Defendants also never disclosed their role in

**EXHIBIT 1**

shaping, editing, and approving the content of information and materials disseminated by these third parties. The Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, PainKnowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own role.

170.     Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful, and supported by objective evidence when they were not. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by The City. Thus, the Manufacturer Defendants successfully concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not

EXHIBIT 1

know of the existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## C. THE DISTRIBUTOR DEFENDANTS' UNLAWFUL DISTRIBUTION OF OPIOIDS.

171.    Each Distributor Defendant has an affirmative duty under both federal law (21 U.S.C. § 823, 21 CFR 1301.74) and Illinois law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs into the State and The City. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). Illinois' minimum requirements for wholesale drug distribution mandate that "[w]holesale drug distributors shall operate in compliance with applicable federal, state and local laws and regulations."  Ill. Admin. Code Title 68, § 1510.50(i). Wholesale drug distributors licensed in Illinois are also specifically required to comply with all applicable DEA regulations. Ill. Admin. Code Title 68, § 1510.50(i)(2).  Moreover, wholesale drug distributors must comply with the regulations promulgated by the Illinois Department of Financial and Professional Regulation, and comply with the wholesale drug distributor licensing guidelines adopted in 21 C.F.R. Part 205. 225 ILCS 120/40.

172.    The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

173.    Each Distributor Defendant repeatedly and purposefully breached its duties under state and federal law.  Such breaches are a direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into the State and The City.

174.    The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and

**EXHIBIT 1**

The City. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

175.    The opioid epidemic in Illinois, including *inter alia* in The City, remains an immediate **hazard to public health and safety**.

176.    The opioid epidemic in the State and The City is a temporary and continuous **public nuisance** and remains unabated.

177.    The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

    **1.    The Distributor Defendants Have a Duty under Federal and State Law to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders.**

178.    Opioids are a Schedule II controlled substance under Illinois law. *See* 720 ILCS 570/206. Opioids are categorized as "Schedule II" drugs because they have a "high potential for abuse" and the potential to cause "severe psychological or physiological dependence." 720 ILCS 570/205; 21 U.S.C. §§ 812(b), 812(2)(A)-(C).

179.    Federal regulations impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

180.    In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not

**EXHIBIT 1**

likely to be diverted into illegal channels. *See Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017).  Regardless, all flagged orders must be reported.  *Id.*

181.    These prescription drugs are regulated for the purpose of providing a "closed" system **intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market**, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[101]

182.    As wholesale drug distributors, each Defendant was required under Illinois law to first be licensed by the Department of Financial and Professional Regulation. 225 ILCS 120/25. To receive and maintain this license, each of the Distributor Defendants assumed a duty to comply with the regulations adopted by the Department of Financial and Professional Regulation and the wholesale drug distributor guidelines in 21 C.F.R. Part 205. 225 ILCS 120/40.

183.    Each Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act.  *See* 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.  Each of the Distributor Defendants is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme. Those requirements are adopted and incorporated into Illinois law. 225 ILCS 120/40; Ill. Admin. Code Title 68, § 1510.50(i).

184.    Each Distributor Defendant has an affirmative duty under federal and Illinois law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain

---

[101] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

68

EXHIBIT 1

"effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(1).

185.    Federal regulations, incorporated by Illinois law (225 ILCS 120/40; Ill. Admin. Code Title 68, § 1510.50(i)), impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

186.    "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. *See* 21 CFR 1301.74(b). These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry

EXHIBIT 1

187.    Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations define each participant's role and responsibilities.[102]

188.    As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly … distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as … the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[103]

189.    The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.[104]

190.    The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The

---

[102] Brief for Healthcare Distribution Management Association  and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22  [hereinafter Brief for HDMA and NACDS].  The Healthcare Distribution Management Association (HDMA or HMA)—now known as the Healthcare Distribution Alliance (HDA)—is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others: AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation. *See generally* HDA, *About*, https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017).  The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart.  *See generally* NACDS, *Mission*, https://www.nacds.org/ about/mission/ (last visited Aug. 21, 2017).

[103] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances.  The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[104] *See* Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

EXHIBIT 1

letter expressly states that a distributor, *in addition* to reporting suspicious orders, has a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[105]  The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[106]  The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[107]

191.    The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[108] This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[109]  The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant.  Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report.  Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels.  Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.

> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency.  These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a registrant need

---

[105]  Rannazzisi Letter, *supra* note 83, at 2.

[106]  *Id.* at 1.

[107]  *Id.* at 2.

[108]  *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

[109]  *Id.*

EXHIBIT 1

not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious.  The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders.  For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient.  This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor.  Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially.  Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious.  Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion.  Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.[110]

Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[111]

---

[110] *Id.*

[111] *Id.*

EXHIBIT 1

192.   The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."[112]

193.   The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."  The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[113]

194.   Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in the State and The City and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to the State and The City.

195.   Each Distributor Defendant owes a duty under federal and state law to maintain effective controls to prevent diversion in the State and The City, including a duty to monitor, detect, report, and refuse to fill suspicious orders of prescription opioids originating from the State

---

[112]  *See* Brief of HDMA, *supra* note 19, 2012 WL 1637016, at *2.

[113] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in Cardinal Health, Inc. v. Holder, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

73

EXHIBIT 1

and The City and/or orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into the State and The City.

196.    Each Distributor Defendant owes a duty under federal and state law to detect suspicious orders of prescription opioids originating from the State and The City and/or orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into the State and The City.

197.    Each Distributor Defendant owes a duty under federal and state law to investigate suspicious orders of prescription opioids originating from the State and The City and/or orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into the State and The City. *See Masters Pharmaceuticals, Inc.; Decision and Order*, 80 FR 55418-01, 55477 (September 15, 2015).

198.    Each Distributor Defendant owes a duty under federal and state law to refuse suspicious orders of prescription opioids originating from the State and The City and/or orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into the State and The City.

199.    Each Distributor Defendant owes a duty under federal and state law to report suspicious orders of prescription opioids originating from the State and The City and/or orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into the State and The City.

200.    Each Distributor Defendant owes a duty under federal and state law to maintain effective controls against the diversion of prescription opioids into illicit markets in the State and The City.

EXHIBIT 1

201.    The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

202.    The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in the State and The City and the damages caused thereby.

**2.  The Distributor Defendants Breached their Duties.**

203.    Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses.[114]

204.    The sheer volume of prescription opioids distributed to pharmacies in the State and The City, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into the State and The City, is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[115]

205.    The Distributor Defendants failed to report "suspicious orders" originating from the State or The City, or which the Distributor Defendants knew were likely to be diverted to the State or The City, to the federal and state authorities, including the DEA.

---

[114] *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.

[115] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).

EXHIBIT 1

206.    The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in the State or The City, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to the State or The City.

207.    The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from the State and The City, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to the State and The City.

208.    The following Illinois and federal laws: 720 ILCS 570/205; 225 ILCS 120/40;  Ill. Admin. Code Title 68, § 1510.50(i); 21 U.S.C. §§ 812, 823; 21 C.F.R. § 1301.74; 28 C.F.R. § 0.100, and laws and regulations incorporated therein, are public safety laws.

209.    The Illinois Legislature's intent in promulgating the Illinois Controlled Substances Act, Act 570 of Chapter 720, was to effectively:

> (1) limit access of such substances only to those persons who have demonstrated an appropriate sense of responsibility and have a lawful and legitimate reason to possess them; (2) deter the unlawful and destructive abuse of controlled substances; (3) penalize most heavily the illicit traffickers or profiteers of controlled substances, who propagate and perpetuate the abuse of such substances with reckless disregard for its consumptive consequences upon every element of society; (4) acknowledge the functional and consequential differences between the various types of controlled substances and provide for correspondingly different degrees of control over each of the various types; (5) unify where feasible and codify the efforts of this State to conform with the regulatory systems of the Federal government; and (6) provide law enforcement authorities with the necessary resources to make this system efficacious.

720 ILCS 570/100.

210.    The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

76

EXHIBIT 1

211.    The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and state law. 21 C.F.R. § 1301.74(b) and Illinois laws and regulations incorporating federal requirements. 225 ILCS 120/40; Ill. Admin. Code Title 68, § 1510.50(i).

212.    Each Distributor Defendant breached its duty to provide effective controls and procedures to guard against theft and diversion of controlled substances in violation of Illinois regulations and federal law. *See, e.g.*, 68 Ill. Admin. Code 1510.50; 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

213.    The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[116]

214.    The federal and state laws at issue here are public safety laws.

215.    The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under Illinois law.

216.    The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by federal and state law which are required to legally acquire and maintain a license to distribute prescription opiates.

217.    The Distributor Defendants acted with actual malice in breaching their duties, *i.e.*, they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

---

[116] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

**EXHIBIT 1**

218.    The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

### 3.    The Distributor Defendants Have Sought to Avoid and Have Misrepresented their Compliance with their Legal Duties.

219.    The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under state and federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

220.    Distributor Defendants have refused to recognize any duty beyond *reporting* suspicious orders. In *Masters Pharmaceuticals*, the HDMA, a trade association run the Distributor Defendants, and the NACDS submitted amicus briefs regarding the legal duty of wholesale distributors.  Inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing, they argued as follows**:**

   a.   The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to *investigate* orders (e.g., by interrogating pharmacies and physicians) and take action to *halt* suspicious orders before they are filled."[117]

   b.   The Associations argued that, "DEA now appears to have changed its position to require that distributors not only *report* suspicious orders, but *investigate* and *halt* suspicious orders.  Such a change in agency position must be accompanied by an acknowledgment of the change and a reasoned explanation for it.  In other words, an agency must display awareness that it *is* changing position and show that there are good reasons for the new policy.  This is especially important here, because

---

[117] Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *4–5.

**EXHIBIT 1**

imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[118]

c.   The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[119]

d.   The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties."[120]

e.   The Associations alleged (inaccurately) that "DEA's regulations [] sensibly impose[] a duty on distributors simply to *report* suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[121]

f.   Also, inaccurately, the Associations argued that, "[i]mposing a duty on distributors – which lack the patient information and the necessary medical expertise – to investigate and halt orders may force distributors to take a shot-in-the-dark approach to complying with DEA's demands."[122]

221.   The positions taken by the trade groups is emblematic of the position taken by the Distributor Defendants in a futile attempt to deny their legal obligations to prevent diversion of the dangerous drugs.[123]

222.   The Court of Appeals for the District of Columbia recently issued its opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting. *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). The D.C. Circuit Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require

---

[118] *Id.* at *8 (citations and quotation marks omitted).

[119] *Id.* at *14.

[120] *Id.* at *22.

[121] *Id.* at *24–25.

[122] *Id.* at 26.

[123] *See* Brief of HDMA, *supra* note 19, 2012 WL 1637016, at *3 (arguing the wholesale distributor industry "does not know the rules of the road because" they claim (inaccurately) that the "DEA has not adequately explained them").

**EXHIBIT 1**

that in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order." *Id.* at 212. Master Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders. *Id.* at 218–19, 226. A distributor's investigation must dispel all the red flags giving rise to suspicious circumstance prior to shipping a suspicious order. *Id*. at 226. The Circuit Court also rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created or imposed new duties. *Id*. at 220.

223.    Wholesale Distributor McKesson has recently been forced to specifically admit to breach of its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[124]  Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[125] McKesson admitted that, during this time

---

[124] *See* Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), https://www.justice.gov/opa/press-release/file/928476/download.

[125] *Id.* at 4.

EXHIBIT 1

period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq.*, at the McKesson Distribution Centers" including the McKesson Distribution Center located in "Washington Courthouse, Ohio."[126]  Due to these violations, McKesson agreed that its authority to distribute controlled substances from the Washington Courthouse, Ohio facility (among other facilities) would be partially suspended.[127]

224.    The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances to the DEA.[128]  In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed to do so.[129]  The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."[130]  As a result of these violations, McKesson was fined and required to pay to the United States $150,000,000.[131]

225.    Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though

---

[126] *Id.*

[127] *Id.* at 6.

[128] *Id.* at 4.

[129] *Id.*

[130] *Id.*; *see also* Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.

[131] *See* 2017 Settlement Agreement and Release, *supra* note 112, at 6.

81

EXHIBIT 1

McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

226.    Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012.[132] The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[133] These actions include the following:

a.   On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

b.   On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

c.   On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d.   On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

---

[132] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[133] *Id.*

**EXHIBIT 1**

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Sante Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

227.   Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug

EXHIBIT 1

Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[134]

228.   In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

229.   For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[135]  Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

230.   Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is

---

[134] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, **Error! Hyperlink reference not valid.**https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

[135] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

**EXHIBIT 1**

"deeply passionate about curbing the opioid epidemic in our country."[136] Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

231.   By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

232.   Meanwhile, the opioid epidemic rages unabated in the Nation, the State, and in The City.

233.   The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry. The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

234.   The Distributor Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the State and in The City.

---

[136] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

85

EXHIBIT 1

**D. THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT, AND PREVENT SUSPICIOUS ORDERS.**

235.    The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under federal and state law.

236.    Under Illinois law, the definition of "wholesale distributors" includes manufacturers. 225 ILCS 120/15. As wholesale drug distributors, each Manufacturer Defendant was required under Illinois law to first be licensed by the Department of Financial and Professional Regulation. 225 ILCS 120/25. To received and maintain this license, each of the Manufacturer Defendants assumed a duty to comply with the regulations adopted by the Department of Financial and Professional Regulation and the wholesale drug distributor guidelines in 21 C.F.R. Part 205. 225 ILCS 120/40.

237.    Like the Distributor Defendants, the Manufacturer Defendants were required to register with the DEA to manufacture schedule II controlled substances, like prescription opioids. *See* 21 U.S.C. § 823(a).  A requirement of such registration is the:

> maintenance of effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, research, or industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes . . .

21 USCA § 823(a)(1). Those requirements are adopted and incorporated into Illinois law. 225 ILCS 120/40; Ill. Admin. Code Title 68, § 1510.50(i).

238.    Additionally, as "registrants" under Section 823, the Manufacturer Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances:

86

**EXHIBIT 1**

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74. *See also* 21 C.F.R. § 1301.02 ("Any term used in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter."); 21 C.F.R. § 1300.01 ("Registrant means any person who is registered pursuant to either section 303 or section 1008 of the Act (21 U.S.C. 823 or 958)." These federal regulations are incorporated by Illinois law (225 ILCS 120/40); Ill. Admin. Code Title 68, § 1510.50(i)). Like the Distributor Defendants, the Manufacture Defendants breached these duties.

239.    Each Manufacturer Defendant has an affirmative duty under federal and Illinois law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(b)(1).

240.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion.   The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product.   Thus, the Manufacturer Defendants knew – just as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being

**EXHIBIT 1**

placed and filled.  The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

241.    Federal statutes and regulations are clear: just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion." 21 C.F.R. § 1301.74; 21 USCA § 823(a)(1).

242.    The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law upon opioid manufacturers, fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[137]

243.    In the press release accompanying the settlement, the Department of Justice stated: Mallinckrodt did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . "Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. . . ."[138]

244.    Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious

---

[137] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders

[138] *Id.*

EXHIBIT 1

orders' for controlled substances – orders that are unusual in their frequency, size, or other patterns

. . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S.

pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without

notifying DEA of these suspicious orders."[139]

245.     The Memorandum of Agreement entered into by Mallinckrodt ("2017 Mallinckrodt

MOA") avers "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain

effective controls against diversion, including a requirement that it review and monitor these sales

and report suspicious orders to DEA."[140]

246.     The 2017 Mallinckrodt MOA further details the DEA's allegations regarding

Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

> With respect to its distribution of oxycodone and hydrocodone products,
> Mallinckrodt's alleged failure to distribute these controlled substances in a manner
> authorized by its registration and Mallinckrodt's alleged failure to operate an
> effective suspicious order monitoring system and to report suspicious orders to the
> DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b).
> The above includes, but is not limited to Mallinckrodt's alleged failure to:
>
>    i.   conduct adequate due diligence of its customers;
>
>    ii.  detect and report to the DEA orders of unusual size and frequency;
>
>    iii. detect and report to the DEA orders deviating substantially from
>         normal patterns including, but not limited to, those identified in
>         letters from the DEA Deputy Assistant Administrator, Office of
>         Diversion Control, to registrants dated September 27, 2006 and
>         December 27, 2007:
>
>         1.   orders that resulted in a disproportionate amount of a
>              substance which is most often abused going to a particular
>              geographic region where there was known diversion,

---

[139] *Id.*

[140] Administrative Memorandum of Agreement between the United States Department of Justice, the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download. ("2017 Mallinckrodt MOA").

EXHIBIT 1

2. orders that purchased a disproportionate amount of a substance which is most often abused compared to other products, and

3. orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

iv. use "chargeback" information from its distributors to evaluate suspicious orders. Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

v. take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[141]

247.    Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007." Mallinckrodt further agreed that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product. Further, Mallinckrodt agrees to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[142]

248.    Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors). The transaction information contains data relating to the direct customer sales of

---

[141] 2017 Mallinckrodt MOA at p. 2-3.

[142] *Id.* at 3-4.

EXHIBIT 1

controlled substances to "downstream" registrants."  Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[143]

249.    The same duties imposed by federal and state law on Mallinckrodt were imposed upon all Distributor Defendants.

250.    The same business practices utilized by Mallinckrodt regarding "charge backs" and receipt and review of data from opioid distributors regarding orders of opioids were utilized industry-wide among opioid manufacturers and distributors, including, upon information and belief, the other Distributor Defendants.

251.    Through, *inter alia*, the charge back data, the Manufacturer Defendants could monitor suspicious orders of opioids.

252.    The Manufacturer Defendants failed to monitor, report, and halt suspicious orders of opioids as required by federal and state law.

253.    The Manufacturer Defendants' failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful.

254.    The Manufacturer Defendants have misrepresented their compliance with federal and state law.

255.    The Manufacturer Defendants' actions and omissions in failing to effective prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into the State and The City.

256.    The Manufacturer Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the

---

[143] *Id.* at p.5.

**EXHIBIT 1**

authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and state law. 21 C.F.R. § 1301.74(b) and Illinois laws and regulations incorporating federal requirements. 225 ILCS 120/40; Ill. Admin. Code Title 68, § 1510.50(i).

257.    Each Manufacturer Defendant breached its duty to provide effective controls and procedures to guard against theft and diversion of controlled substances in violation of Illinois regulations and federal law. *See, e.g.*, 68 Ill. Admin. Code 1510.50; 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

258.    The Manufacturer Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.

259.    The following Illinois and federal laws: 720 ILCS 570/205; 225 ILCS 120/40;  Ill. Admin. Code Title 68, § 1510.50(i); 21 U.S.C. §§ 812, 823; 21 C.F.R. § 1301.74; 28 C.F.R. § 0.100, and laws and regulations incorporated therein, are public safety laws.

260.    The Manufacturer Defendants' violations of public safety statutes constitute prima facie evidence of negligence under Illinois law.

261.    The unlawful conduct by the Manufacturer Defendants is purposeful and intentional. The Manufacturer Defendants refuse to abide by the duties imposed by federal and state law which are required to legally acquire and maintain a license to distribute prescription opiates.

262.    The Manufacturer Defendants acted with actual malice in breaching their duties, *i.e*., they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

EXHIBIT 1

263.    The Manufacturer Defendants' repeated violation of public safety statutes demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damage.

### E.  DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF LEGAL DUTIES CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES.

264.    As the Manufacturer Defendants' efforts to expand the market for opioids increased so have the rates of prescription and sale of their products — and the rates of opioid-related substance abuse, hospitalization, and death among the people of the State and The City. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like the State and The City, fueling the epidemic.

265.    There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[144]

266.    Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[145]

267.    The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[146]

268.    The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths.[147]

---

[144] *See* Dart at al., *supra* note 11.

[145] *See* Volkow & McLellan, *supra* note 1.

[146] *See* Califf et al., *supra* note 3.

[147] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *supra* note 13.

EXHIBIT 1

269.     As shown above, the opioid epidemic has escalated in the State and The City with devastating effects. Substantial opiate-related substance abuse, hospitalization and death that mirrors Defendants' increased distribution of opiates.

270.     Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the massive distribution of opioids to the State and The City and areas from which such opioids are being diverted into the State and The City, has caused the Defendant-caused opioid epidemic to include heroin addiction, abuse, and death.

271.     Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in The City.

272.     Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in The City.

273.     Defendants repeatedly and purposefully breached their duties under state and federal law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes into the State and The City.

274.     The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and The City. This diversion and the epidemic are direct causes of foreseeable harms incurred by the Plaintiff.

275.     Defendants intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiff seeks relief, as alleged herein. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

**EXHIBIT 1**

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 101 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   99 of 183.   PageID #: 99
7864

276.    Plaintiff seeks economic damages from the Defendants as reimbursement for the costs association with past efforts to eliminate the hazards to public health and safety.

277.    Plaintiff seeks economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

278.    To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[148]

279.    A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.[149]

280.    These community-based problems require community-based solutions that have been limited by "budgetary constraints at the state and Federal levels."[150]

281.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon the Plaintiff.

---

[148] *See* Rudd et al., *supra* note 20, at 1145.

[149] *See* Johns Hopkins Bloomberg School of Public Health, *The Prescription Opioid Epidemic: An Evidence-Based Approach* (G. Caleb Alexander et al. eds., 2015), http://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf.

[150] *See* Office of Nat'l Drug Control Policy, Exec. Office of the President, *Epidemic: Responding to America's Prescription Drug Abuse Crisis* (2011), **Error! Hyperlink reference not valid.**https://www.ncjrs.gov/pdffiles1/ondcp/rx_abuse_plan.pdf.

**EXHIBIT 1**

## F. DEFENDANTS' FRAUDULENT AND DECEPTIVE MARKETING OF OPIOIDS DIRECTLY CAUSED HARM TO THE PLAINTIFF.

### 1.  Increase in Opioid Prescribing Nationally

282.    Defendants' scheme to change the medical consensus regarding opioid therapy for chronic pain worked. During the year 2000, outpatient retail pharmacies filled 174 million prescriptions for opioids nationwide. During 2009, they provided 83 million more.

283.    Opioid prescriptions increased even as the percentage of patients visiting the doctor for pain remained constant.

284.    A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[151]

285.    Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the population over 45 have used opioids. Indeed, "[o]pioids are the most common means of treatment for chronic pain."[152] From 1980 to 2000, opioid prescriptions for chronic pain visits doubled. This is the result not of an epidemic of pain, but an epidemic of prescribing. A study of 7.8 million doctor visits found that prescribing for pain increased by 73% between 2000 and 2010 – even though the number of office visits in which patients complained of pain did not change and prescribing of non-opioid pain medications decreased. For back pain alone – one of the most common chronic pain conditions – the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs, or acetaminophen declined and referrals to physical therapy remained steady – and climbing.

---

[151] Matthew Daubress et al., Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010, 51 (10) med. Care 870 (2013).

[152] Deborah Grady et al., *Opioids for Chronic Pain*, 171 (16) Arch. Intern. Med. 1426 (2011).

**EXHIBIT 1**

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 103 of 940 PageID #:
Case: 1:18-op-45537-DAP  Doc #: 1  Filed: 05/07/18  101 of 183.  PageID #: 101
286

286.    This increase corresponds with, and was caused by, the Defendants' massive marketing push. The industry's spending nationwide on marketing of opioids stood at more than $20 million per quarter and $91 million annually in 2000. By 2011, that figure hit its peak of more than $70 million per quarter and $288 million annually, a more than three-fold increase. By 2014, the figures dropped to roughly $45 million per quarter and $182 million annually, as the Defendants confronted increased concern regarding opioid addiction, abuse, and diversion. Even so, the Defendants still spend double what they spent in 2000 on opioid marketing.

287.    By far the largest component of this spending was opioid drug makers' detailing visits to individual doctors, with total detailing expenditures more than doubling between 2000 and 2014 and now standing at $168 million annually.

## 2.  City of Chicago Investigation

288.    The City of Chicago complaint shows, the connection between Defendants' marketing and opioid prescribing.  The connection is confirmed both by documents provided by Defendants, which begin to describe their efforts to train, target, market to, and track Chicago prescribers, and by the City's interviews with many of these doctors.

289.    As described above, the Defendants' marketing in Chicago, and throughout Illinois and The City, took varied forms. The Defendants heavily relied on speakers bureau programs, in which physicians received very prescriptive training – including slide decks and scripts to which they were expected to adhere – and then were paid to speak to other physicians at Defendant-funded events.

290.    Those speakers identified by the City of Chicago responded to the Defendants' marketing by prescribing opioids, comprising 7,480 prescriptions, representing $1.36 million, written by these physicians and paid for by the City of Chicago's health plans in the period June

EXHIBIT 1

1, 2005 – June 28, 2015, which was roughly 10% of the City of Chicago health plans' total opioid spending.[153]

291.    But the true value of these speakers was a force multiplier, generating prescriptions by passing on the Defendants' biased messages supporting opioid treatment for chronic pain, with the misrepresentations contained in their scripts, to the speakers' peers.

292.    The Defendants also targeted Illinois prescribers and potential prescribers for visits by the companies' sales representatives. As described in greater detail herein, the Defendants carefully tracked the prescribing behavior of prescribers, targeting them by specialty, prescribing volume, and other criteria. Upon information and belief, these physicians, many of whom were visited numerous times, responded to the marketing pitches by prescribing the Defendants' opioids.

293.    Also, the City of Chicago interviewed numerous Chicago doctors who prescribed opioids for chronic pain to Chicago consumers and employees, and these interviews confirmed the influence of the Defendants' deceptive marketing in this State. These doctors relied on treatment guidelines or scientific articles, attended CMEs, were visited by drug representatives and were trained by doctors who provided the Defendants' deceptive messages. These doctors explained that: (a) many of their chronic pain patients became addicted to opioids; (b) they frequently had to prescribe opioids for months – or longer – solely to taper addicted chronic pain patients from the drugs; (c) few of their patients were advised or aware of the risks of addiction from long-term use of opioids; and (d) based on their own experience, they now regard opioids as inappropriate for chronic pain, largely because of the incidence of addiction, the lack of efficacy of opioids over

---

[153] These speakers' bureau members where three times more likely to prescribe branded drugs, which were the subject of the Pharma Defendants' speaking programs, than the other prescribers in the City of Chicago health plans' data.

EXHIBIT 1

time and without escalating doses, and other adverse effects, like hyperalgesia. The City of Chicago, as part of interviews conducted with prescribers, found that the Defendants' deceptive marketing had a profound effect on prescribers, which, upon information and belief, also affected prescribers in the State and The City.

294.    According to the City of Chicago, Chicago Prescriber B, an anesthesiologist, has used many of the major brands and types of opioids, including those marketed by Actavis, Endo, Janssen, and Purdue. As noted herein greater detail, Prescriber B reported that he talked with opioids manufacturers' sales representatives on a regular basis and that he has met with detailers from Actavis, Endo, Janssen, and Purdue.

295.    Prescriber B also has attended, and continues to attend, drug company-sponsored CMEs on the use of opioids. He knows that the programs may be biased, but he relies on the information because he has not time to research the issue on his own. Prescriber B indicated that he was most likely to trust information presented in CMEs by other physicians, even where he knew those CMEs were sponsored by drug companies.

296.    Prescriber B has reigned in his opioid prescribing in recent years because of the problems he has seen related to abuse and addiction. Knowing what he knows now, he would have prescribed fewer opioids in the past. He feels he did not previously have complete information about the risks and benefits of opioids.

297.    According to the City of Chicago investigation, Chicago Prescriber D is a family care physician in Melrose Park, Illinois. He has met with sales representatives from Actavis, Endo, and Purdue. Representatives from all of these companies said that their products were "steady state" drugs without peaks and troughs, which he interpreted to mean that the drugs were less likely

EXHIBIT 1

to be addictive. The sales representatives did not typically bring up addiction other than to represent that there is a lower addiction risk with long-acting opioids.

298.    Prescriber D indicated he has relied on sales representatives and the information they provide. In the past, his understanding was that long-acting opioids were less addictive. He did not comprehend how addictive opioids could be, but he came to that knowledge over time as he experienced it in his practice. He believes sales representatives should be more up front about opioid addiction.

299.    Furthermore, the City of Chicago found Prescriber RR specializes in internal medicine at the University of Illinois Hospital and Health Sciences System (located in Chicago) and regularly treats pain patients. He explained that most of the patients for whom he prescribed opioids complained of chronic pain in their lower back, or less frequently, osteoarthritis. He noted that many patients seeking treatment for pain were already prescribed opioids by another doctor, typically their primary care physician. He noted, further, that many of the patients he followed had taken opioids for more than a year.

300.    Though Prescriber RR observed that most patients eventually begin to self-escalate their does, and then seek early refills – a sign of addiction – he explained that he learned through medical school and in his early residency that opioids were safer than NSAIDs and more effective. Prescriber RR described this view as engrained in the curriculum.

301.    Based on his own clinical experience and research, Prescriber RR does not now believe that opioids are medically appropriate for chronic pain as a first-line treatment, but reluctantly prescribes opioids to patients to try to taper them off the drugs. Prescriber RR described opioids as almost always requiring escalating doses. He further noted that it is very hard to end

EXHIBIT 1

opioid therapy. Even successful weaning takes six months to a year, depending on how long the patient was on the drugs.

302.    Prescriber RR noted further that one of the dangers of opioids, beyond the risk of addiction, is that they distract from other, more successful treatments, such as physical therapy weight loss, or treatment for mental health issues.

303.    The City of Chicago also found that, Chicago Prescriber SS, a physician who has worked with veterans seeking treatment for pain, indicated that he unfortunately prescribes opioids for chronic pain. He explained, based on his clinical experience and observations, that opioids are taken for much longer than is safe or necessary. Prescriber SS based his opinion on the fact that patients – even if they had no intention to abuse the drug – often become so tolerant and dependent that it is difficult to stop using the drugs. Prescriber SS has prescribed opioids that he would not have prescribed but for the fact that patients became addicted through chronic opioid therapy and thus need to be tapered off the drug.

304.    As a result of the Defendants' conduct, Prescriber SS previously learned that opioids are the most appropriate treatment for chronic pain. He also observed other providers using opioids for chronic pain and found support for their opioid use in medical literature that he had read. He also specifically pointed to the AAPM/APS Guidelines as one source of his support for his opinions about opioids. These guidelines, Prescriber SS explained, made him more willing to prescribe opioids for chronic pain; as he explained, doctors want to know what others are doing and that there is a science behind the practice. He also noted, generally, that professional organizations promoted opioids to treat chronic pain.

305.    More recently, the prevalence of opioid abuse and addiction changed Prescriber SS's views on the use of opioids. He explained that the institution at which he works has similarly

EXHIBIT 1

experienced a change in practice as to the proper way to treat chronic pain. He also observed doctors often feel their hands are tied because their patients come to them already on opioids for chronic pain.

306.    The influence of the Defendants' deceptive marketing in Chicago and throughout Illinois extends far beyond the physicians who were detailed by Defendants' sales representatives or attended their talks or CMEs, however. The Defendants' campaign to change the medical and public perception of opioids resulted in health care providers writing opioid prescriptions to treat chronic pain even though they were never direct targets of the Defendants' deceptive marketing. They prescribed these drugs because it was the new normal – their patients demanded them, and their colleagues prescribed them, and the medical profession more generally had adopted the Defendants' message that the appropriate treatment of pain required such drugs. Even some who were more circumspect about prescribing opioids for chronic pain ended up doing so because they had patients who were addicted or they wished to avoid conflict with patients who request them.

307.    As evidence of how this process worked, the City of Chicago interviewed physicians who had not been detailed by the Defendants' representatives. Upon information and belief, similar patterns are present throughout Illinois and The City.

308.    The City of Chicago interviewed Chicago Prescriber JJ, a family practice physician, does not recall being exposed to opioid marketing but does prescribe the drugs. In the past, she prescribed opioids primarily to treat acute pain. More and more, however, she uses opioids – generally hydrocodone with Tylenol, and also OxyContin – for the treatment of chronic pain associated with non-terminal illnesses. Recently, she has been uncomfortable with the amount of opioid prescriptions she writes. Prescriber JJ has become aware of heightened concerns about

EXHIBIT 1

opioid addiction and the risk of overdose. She believes there is an epidemic of pain medication, and is worried she may be contributing to this epidemic.

309.    Similarly, the City of Chicago discovered that Chicago Prescriber KK, who practices internal and geriatric medicine, "unfortunately" prescribes opioids. He has not attended a pain CME, unless it was part of a larger internal medicine or primary care presentation, and sales representatives are no permitted in his building. However, he has patients who became addicted to opioids, and he does prescribe opioids to this population. He has patients who have been on OxyContin for more than a year and are "going nowhere but up"; some of his patients take opioids "like candy." He believes doctors in general, responding to a message that patients should experience no pain, have gone overboard in using opioids.

310.    Finally, the City of Chicago has discovered that Chicago Prescriber L, an internist, who does not attend drug company CMEs and does not receive any sales representatives at his office. Nevertheless, his practice has been "inundated" with patients who started elsewhere on prescription opioids to treat chronic pain and are now addicted. Patients "just come in asking for opioids." He has seen in his health center that it is very difficult to break these patients' habits, an effort that is the source of arguments between patients and physicians. Two years ago, he instituted a "chronic pain contract" requiring patients to do more than take opioids if they wanted refills, including, for example, doing physical therapy, losing weight, or tapering off the drugs over time.

## G. STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTED STATUTES OF LIMITATIONS AS DEFENSES.

### 1. Continuing Conduct.

311.    Plaintiff contends it continues to suffer harm from the unlawful actions by the Defendants.

EXHIBIT 1

312.     The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury.  The damages have not occurred all at once but have continued to occur and have increased as time progresses.  The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.  The wrongdoing and unlawful activity by Defendants has not ceased.  The public nuisance remains unabated.

### 2.  Equitable Estoppel.

313.     To the extent any statutes of limitations defenses may even be raised against the Plaintiff's claims for actions involving public rights, Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State and The City, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State and The City, that they are working to curb the opioid epidemic.

314.     For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[154]

315.     Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[155]

---

[154] Bernstein et al., *supra* note 117.

[155] Higham et al., *supra* note 118.

**EXHIBIT 1**

316.     Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associations, HDMA and NACDS, filed an *amicus* brief in *Masters Pharmaceuticals*, which made the following statements:[156]

   a.   "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

   b.   "DEA regulations that have been in place for more than 40 years require distributors to *report* suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."

   c.   "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."

   d.   "A particular order or series of orders can raise red flags because of its unusual size, frequency, or departure from typical patterns with a given pharmacy."

   e.   "Distributors also monitor for and report abnormal behavior by pharmacies placing orders, such as refusing to provide business contact information or insisting on paying in cash."

Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Distributor Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

317.     The Distributor Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, that will confirm their identities and the extent of their wrongful and illegal activities.

318.     The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer

---

[156] Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *3-4, *25.

EXHIBIT 1

Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The medical community, consumers, the State, and The City were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the State and in The City.

319.    The Plaintiff reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 3. Fraudulent Concealment.

320.    The Plaintiff's claims are further subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein. As alleged herein, Defendants knew of the wrongful acts set forth above, and had material information pertinent to their discovery, and concealed them from the Plaintiff.  The Plaintiff did not know, or could not have known through the exercise of reasonable diligence, of its cause of action, as a result of Defendants' conduct.

321.    The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

322.    In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein

**EXHIBIT 1**

323.    Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations.  Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiff is unable to obtain vital information bearing on their claims absent any fault or lack of diligence on its part.

### 4.    Distributor Defendants' Conduct is Exposed.

324.    On December 17, 2016, the Charleston Gazette-Mail published a groundbreaking, Pulitzer Prize-Winning story.[157]

325.    The journalist had been seeking drug shipping sales data since August 8, 2016, when the Charleston Gazette-Mail Newspaper sought access to certain limited ARCOS data. However, "[t]he wholesalers and their lawyers fought to keep the sales numbers secret in previous court actions brought by the newspaper."[158]  But, finally, "[t]he Gazette-Mail obtained previously confidential drug shipping sales records, . . . [which] disclose the number of pills sold to every pharmacy in the state."[159]

326.    With the data in its possession, on December 17, 2016, the Gazette-Mail published its shocking analysis of the data.[160] The Gazette-Mail made the following statements, based on the limited West Virginia ARCOS data in its possession about the Defendants conduct in West Virginia:

---

[157] Eric Eyre of *Charleston Gazette-Mail*, Charleston, WV, The 2017 Pulitzer Prize Winner in Investigative Reporting, available at http://www.pulitzer.org/winners/eric-eyre (last visited July 3, 2017).

[158] Eric Eyre, Drug firms poured 780M painkillers into WV amid rise of overdoses, Charleston Gazette-Mail, December 17, 2016, available at http://www.wvgazettemail.com/news-health/20161217/drug-firms-poured-780m-painkillers-into-wv-amid-rise-of-overdoses (last visited July 3, 2017).

[159] *Id*.

[160] *Id*.

EXHIBIT 1

    a.   "In six years, drug wholesalers showered the state with 780 million hydrocodone and oxycodone pills, while 1,728 West Virginians fatally overdosed on those two painkillers."[161]

    b.   "While the death toll climbed, drug wholesalers continued to ship massive quantities of pain pills."[162]

    c.   The quantity of opioids delivered during this period "amount to 433 pain pills for every man, woman and child in West Virginia."[163]

    d.   "The nation's three largest prescription drug wholesalers — McKesson Corp., Cardinal Health and AmerisourceBergen Drug Co. — supplied more than half of all pain pills statewide." [164]

    e.   "For more than a decade, the same distributors disregarded rules to report suspicious orders for controlled substances in West Virginia to the state Board of Pharmacy, the Gazette-Mail found." [165]

    f.   "Year after year, the drug companies also shipped pain pills in increasing stronger formulations, DEA data shows." [166]

327.   Given the Distributor Defendants' efforts to mislead the public and conceal their unlawful conduct, as alleged above, Plaintiff did not have any reason to know of the Distributor Defendants' unlawful conduct or their role in creating the opioid nuisance.

328.   Plaintiff was relieved of any duty to investigate because it reasonably and justifiably relied on Defendants to fulfill their reporting requirements and comply with the law. Plaintiff did not discover and could not have discovered, despite all due diligence, the schemes alleged herein. The conduct revealed by the Gazette-Mail concerned only West Virginia counties

---

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

EXHIBIT 1

(with regard to the Charleston Gazette-Mail publication) or a single distributor (with regard to the DOJ fine against McKesson).

## V.   <u>LEGAL CAUSES OF ACTION</u>

### COUNT I – PUBLIC NUISANCE
### ILLINOIS COMMON LAW
### (Against all Defendants)

329.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

330.   This Count for common law public nuisance is brought by Plaintiff.

331.   Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of Plaintiff's injury.

332.   By causing dangerously addictive drugs to flood the community, and to be diverted for illicit purposes, each Defendant has injuriously affected rights common to the general public, specifically including the rights of the State and The City to public health, public safety, public peace, public comfort, and public convenience. The public nuisance caused by Defendants' diversion of dangerous drugs has caused substantial annoyance, inconvenience, and injury to the public.

333.   By selling dangerously addictive opioid drugs diverted from a legitimate medical, scientific, or industrial purpose, Defendants have committed a course of conduct that injuriously affects the safety, health, and morals of the State and The City.

334.   By failing to maintain a closed system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected the safety, health and morals of the State and The City.

EXHIBIT 1

335.    The residents of  the State and The City have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property. Specifically, widespread distribution of prescription opioids for illicit purposes jeopardizes these common rights, and the illegal widespread distribution of prescription opioids would not be possible but for the unlawful and intentional acts, or failures to act, by Defendants.

336.    Defendants intentionally, unlawfully, and recklessly distribute and sell prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to  the State and The City illegally, resulting in addiction and abuse, an elevated level of crime, death and injuries to the State and The City residents, a higher level of fear, discomfort and inconvenience to the residents of  the State and The City, and direct costs to the State and The City.

337.    Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the State and The City and its residents.

338.    Defendants intentionally, unlawfully, and recklessly manufacture, market, distribute, and sell opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to the State and The City, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of the State and The City, a higher level of fear, discomfort, and inconvenience to the residents of the State and The City, and direct costs to the State and The City.

339.    Defendants unlawfully and/or intentionally manufacture, market, distribute, and sell opioids without maintaining effective controls against diversion. Such conduct was illegal. Defendants violated the federal and Illinois Controlled Substances Acts. Defendants' failures to

**EXHIBIT 1**

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 117 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   115 of 183.   PageID #: 115
800

maintain effective controls against diversion include Defendants' failures to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

340.    Defendants have caused a substantial and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property. Moreover, when an enterprise is regulated by state or federal law, as is the case here, the substantial and unreasonable interference element of a public nuisance claim can be met by a showing that Defendants violated applicable statutes or regulations or that Defendants were otherwise negligent in carrying out the enterprise. *Gilmore v. Stanmar, Inc.*, 633 N.E.2d 985, 993 (Ill. 1994). Here, Defendants are not in compliance with applicable law or are otherwise negligent in carrying out their respective enterprises.

341.    Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally in the State and The City is of a continuing nature and has produced a significant effect upon the public's rights, including the public's right to health and safety.

342.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

343.    A violation of any rule or law controlling the distribution of a drug of abuse in the State and The City is a public nuisance.

344.    Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 118 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   116 of 183.   PageID #: 116
360

345.    Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that the Defendants allow and/or cause to be illegally distributed and possessed in the State and The City will be diverted, leading to abuse, addiction, crime, and public health costs.

346.    As a result of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance to person and property.

347.    Defendants know, and/or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

348.    Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

349.    Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the State and The City. Defendants are in the business of distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous according to federal and Illinois law. *See, e.g.*, 21 U.S.C.A. § 812 (b)(2); 720 ILCS 570/205.

350.    Defendants' conduct in marketing, distributing, and selling prescription opioids which the Defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to the residents of the State and The City and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 119 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   117 of 183.   PageID #: 117
300

351.    It is, or should be, reasonably foreseeable to Defendants that their conduct will cause deaths and injuries to residents in the State and The City, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

352.    The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in the State and The City not only causes deaths and injuries, but also creates a palpable climate of fear among the residents of the State and The City where opioid diversion, abuse, and addiction are prevalent and where they tend to be used frequently.

353.    Defendants' conduct makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

354.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' unique position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

355.    The presence of diverted prescription opioids in the State and The City, and the consequence of prescription opioids having been diverted in the State and The City, proximately results in significant costs to the Plaintiff and to the State and The City in order to enforce the law, equip its police force, respond to emergencies, and treat the victims of opioid abuse and addiction.

356.    Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make the State and The City a safer place to live.

EXHIBIT 1

357.    Defendants' conduct is a direct and proximate cause of deaths and injuries to the residents of the State and The City, costs borne by the State and The City, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

358.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the State and The City residents, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. The City has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

359.    Defendants' actions created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in the State and The City, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting, and without refusing to fill, suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids.  Such actions were inherently dangerous.

360.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in the State and The City.

114

**EXHIBIT 1**

361.     Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

362.     Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm. Defendants acted willfully, and with such gross negligence as to indicate a wanton disregard of the rights of others.

363.     The damages available to the Plaintiff include, *inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

364.     As a direct and proximate result of Defendants' conduct, the Plaintiff has suffered actual injury and damages including, but not limited to, significant increased expenses for police, emergency, ambulance services, health, prosecution, corrections and other services. The Plaintiff seeks recovery for its own harm. While The City normally has some expenses related to these services, the expenses have been significantly increased as a direct and proximate result of Defendants' conduct, and thus constitute specific and special injuries. The increased expenditures have been a necessary means to respond to issues created by unlawful opioid prescription drugs in The City, but much greater expenditures are needed to abate the serious problems caused by the opioid epidemic.

365.     The City has sustained specific and special injuries because its damages include, *inter alia,* health services and law enforcement expenditures, and include without limitation costs sustained by The City's payments for health services, including *inter alia* hospital and ambulance

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 122 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   120 of 183.   PageID #: 120
805

operations, costs related to opioid addiction treatment and overdose prevention, and payments by governmental payor programs, such as employee health insurance. Thus, The City seeks recovery for its own harm.

366.     The Plaintiff further seeks to abate in the future this nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference with a right common to the public. Such abatement is feasible here and can be accomplished by providing financial resources to The City to combat the problems arising from unlawfully diverted opioids.

367.     Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* abatement, compensatory damages, and punitive damages from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

368.     Defendants' intentional and unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

369.     Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the State and The City. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and severe addiction. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

370.     The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of prescription opioid abuse and heroin use

EXHIBIT 1

resulting from Defendants' abdication of their gate-keeping and diversion prevention duties, and

the Manufacturer Defendants' fraudulent marketing activities, have caused harm to the entire

community that includes, but is not limited to:

a.  The high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

b.  Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids has made opioids a recreational drug of choice among Illinois teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c.  Even those residents of the State and City who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d.  The opioid epidemic has increased health care costs.

e.  Employers have lost the value of productive and healthy employees.

f.  Defendants' failure to maintain effective controls against diversion of dangerously addictive prescription opioids for non-medical use and abuses has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g.  Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h.  The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on health care services and law enforcement in the State and The City.

i.  The significant and unreasonable interference with public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the State and The City;

j.  Defendants' interference with the comfortable enjoyment of life in the State and The City is unreasonable because there is little society utility to opioid diversion

**EXHIBIT 1**

and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

k.   The categories of damages sustained by The City includes opioid-related costs and burdens placed upon first responders, whose resources and expertise are necessary to keep our community safe. The resources of *inter alia* emergency responders, police, medical, and ambulance services have been drained, over and above typical municipal community needs, as a result of the opioid epidemic in the State and City.

371.   Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* actual damages, temporary and preliminary injunctive relief, equitable relief, restitution, disgorgement, abatement, punitive damages, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT II – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. 1961, *et seq.*
### (Against All Defendants)

372.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

373.   Plaintiff brings this Count on behalf of itself against the following Defendants, as defined above: Purdue, Cephalon, Janssen, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (collectively, for purposes of this Count, the "RICO Defendants").

374.   The RICO Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

375.   Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

**EXHIBIT 1**

affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §
1962(c); *United State v. Turkette*, 452 U.S. 576, 580 (1981).

376.    The term "enterprise" is defined as including "any individual, partnership,
corporation, association, or other legal entity, and any union or group of individuals associated in
fact although not a legal entity." 18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 580; *Boyle v. U.S.*, 556
U.S. 938, 944 (2009). The definition of "enterprise" in Section 1961(4) includes legitimate and
illegitimate enterprises within its scope. Specifically, the section "describes two separate
categories of associations that come within the purview of an 'enterprise' -- the first encompassing
organizations such as corporations, partnerships, and other 'legal entities,' and the second covering
'any union or group of individuals associated in fact although not a legal entity.'" *Turkette*, 452
U.S. at 577. The second category is not a more generalized description of the first. *Id.*

377.    For over a decade, the RICO Defendants aggressively sought to bolster their
revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully
and surreptitiously increasing the volume of opioids they sold. However, the RICO Defendants
are not permitted to engage in a limitless expansion of their market through the unlawful sales of
regulated painkillers.  As "registrants," the RICO Defendants operated and continue to operate
within the "closed-system" created under the Controlled Substances Act, 21 U.S.C. § 821, et seq.
(the "CSA").  The CSA restricts the RICO Defendants' ability to manufacture or distribute
Schedule II substances like opioids by requiring them to: (1) register to manufacture or distribute
opioids; (2) maintain effective controls against diversion of the controlled substances that they
manufacturer or distribute; (3) design and operate a system to identify suspicious orders of
controlled substances, halt such unlawful sales, and report them to the DEA; and (4) make sales

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 126 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   124 of 183.   PageID #: 124
300

within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

378.    The closed-system created by the CSA, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of [controlled substances]."[167]

379.    Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders.[168]  As discussed in detail below, through the RICO Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production quotas for opioids allowed by the DEA.[169]  In doing so, the RICO Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate obscene profits.

380.    Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect harmony by each of them. In particular, each of the RICO Defendants were associated with, and conducted or participated in, the affairs of the RICO enterprise (defined below and referred to

---

[167] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[168] 21 U.S.C. § 823(a)(1), (b)(1); 21 C.F.R. § 1301.74(b)-(c).

[169] 21 C.F.R. § 1303.11(b); 21 C.F.R. § 1303.23.

EXHIBIT 1

collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, deceive the public and federal and state regulators into believing that the RICO Defendants were faithfully fulfilling their statutory obligations. The RICO Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the RICO Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the Plaintiff experienced tens of millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained in detail below, the RICO Defendants' misconduct violated Section 1962(c) and Plaintiff is entitled to treble damages for its injuries under 18 U.S.C. § 1964(c).

381.    Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States. Specifically, the Healthcare Distribution Alliance (the "HDA")[170]  is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

---

[170] Health Distribution Alliance, <u>History</u>, Health Distribution Alliance, (last accessed on September 15, 2017), https://www.healthcaredistribution.org/about/hda-history.

EXHIBIT 1

382.    On information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

383.    Each of the RICO Defendants is a legal entity separate and distinct from the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

384.    The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

## A.  THE OPIOID DIVERSION ENTERPRISE

385.    Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.[171] The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.[172] Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[173] As reflected in comments from United

---

[171] Joseph T. Rannazzisi Decl. ¶ 4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

[172] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.

[173] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 U.S.C. § 801(20; 21 U.S.C. §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

EXHIBIT 1

States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof balls."[174] Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[175] Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.[176] All registrants -- manufacturers and distributors alike -- must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.[177] When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse.[178]  The result is the scourge of addiction that has occurred.

386.   In 2006 and 2007, the DEA issued multiple letters to the Distributor Defendants reminding them of their obligation to maintain effective controls against diversion of particular controlled substances, design and operate a system to disclose suspicious orders, and to inform the

---

[174] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments of Sen. Dodd, Jan 23, 1970).

[175] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[176] See Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12-dea-rannazzisi.pdf).

[177] *Id.*

[178] Joseph T. Rannazzisi Decl. ¶ 10, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

EXHIBIT 1

DEA of any suspicious orders.[179] The DEA also published suggested questions that a distributor should ask prior to shipping controlled substances, in order to "know their customers."[180]

387.    Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."[181] When evaluating production quotas, the DEA was instructed to consider the following information:

a.    Information provided by the Department of Health and Human Services;

b.    Total net disposal of the basic class by all manufacturers;

c.    Trends in the national rate of disposal of the basic class;

d.    An applicant's production cycle and current inventory position;

e.    Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

388.    Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.[182]

---

[179] Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (September 27, 2006); Joseph T. Rannazzisi, In Reference to Registration # RC0183080 (December 27, 2007).

[180] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levin1_ques.pdf).

[181] 1970 U.S.C.C.A.N. 4566 at 5490; see also Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

[182] See Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

EXHIBIT 1

389.    It is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[183]

390.    At all relevant times, the RICO Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

391.    The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone, and oxycodone increased 13-fold, 4-fold, and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the country with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[184] On information and belief, the Opioid Diversion Enterprise has been ongoing for at least the last decade.[185]

392.    The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. But, it

---

[183] *Id.* (citing 21 U.S.C. 842(b)).

[184] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S. Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States. Am J Public Health. 2014;104(2):e52-9.

[185] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 132 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   130 of 183.   PageID #: 130
345

was not until recently that United States and State regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public.

393.    At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the RICO Defendants would have a larger pool of prescription opioids from which to profit.

394.    The Opioid Diversion Enterprise also engaged in efforts to lobby against the DEA's authority to hold the RICO Defendants liable for disregarding their duty to prevent diversion. Members of the Pain Care Forum (described in greater detail below) and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority. The Ensuring Patient Access and Effective Drug Enforcement Act significantly reduced the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations[186] The

---

[186] *See* <u>HDMA is now the Healthcare Distribution Alliance</u>, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-

EXHIBIT 1

HDA and other members of the Pain Care Forum contributed substantial amounts of money to political campaigns for federal candidates, state candidates, political action committees and political parties. Plaintiff is informed and believes that the Pain Care Forum and its members poured at least $3.5 million into lobbying efforts in this jurisdiction while the HDA devoted over a million dollars a year to its lobbying efforts between 2011 and 2016.

395.     The Opioid Diversion Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity, that involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by the production quotas set by the DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

396.     The Opioid Diversion Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across states lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout The City, and the corresponding payment and/or receipt of money from the sale of the same.

---

investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html;  Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

**EXHIBIT 1**

Case 5:19-cv-00083-GNS-LLK Document 36-2 Filed 02/01/21 Page 134 of 940 PageID #:
Case: 1:18-op-45537-DAP Doc #: 1 Filed: 05/07/18 132 of 183. PageID #: 132
847

397. Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of racketeering activity.

398. Each of the RICO Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The RICO Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

399. The RICO Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

400. The Pain Care Forum ("PCF") has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

EXHIBIT 1

401.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drugmakers <u>and their allies</u> shaped the national response to the ongoing wave of prescription opioid abuse."[187] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[188]

402.    Not surprisingly, each of the RICO Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[189] In 2012, membership and participating organizations included the HDA (of which all RICO Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen Pharmaceuticals), Actavis (*i.e.*, Allergan), and Teva (the parent company of Cephalon).[190] Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[191] Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

---

[187] Matthew Perrone, <u>Pro-Painkiller echo chamber shaped policy amid drug epidemic</u>, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic (emphasis added).

[188] *Id*.

[189] <u>PAIN CARE FORUM 2012 Meetings Schedule</u>, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf

[190] *Id*. Plaintiff is informed and believes that Mallinckrodt became an active member of the PCF sometime after 2012.

[191] *Id*. The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation. <u>Executive Committee</u>, Healthcare Distribution Alliance (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/executive-committee.

EXHIBIT 1

403.    The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings. And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

404.    The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drugmakers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

405.    Second, the HDA -- or Healthcare Distribution Alliance -- led to the formation of interpersonal relationships and an organization between the RICO Defendants. Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants named in the Complaint, including Actavis (*i.e.*, Allergan), Endo, Purdue, Mallinckrodt and Cephalon were members of the HDA.[192] And, the HDA and each of the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

---

[192] <u>Manufacturer Membership</u>, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/membership/manufacturer.

EXHIBIT 1

406.   In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[193] Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

407.   The application for manufacturer membership in the HDA further indicates the level of connection that existed between the RICO Defendants.[194] The manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company. The HDA application also requests that the manufacturer identify its current distribution information and its most recent year end net sales through any HDA distributors, including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[195]

408.   After becoming members, the Distributors and Manufacturers were eligible to participate on councils, committees, task forces and working groups, including:

---

[193] <u>Manufacturer Membership Benefits</u>, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

[194] <u>Manufacturer Membership Application</u>, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.

[195] *Id*.

EXHIBIT 1

a. Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."[196]

b. Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions.  The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce."  Participation in this committee includes distributors and manufacturer members.[197]

c. Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain."  Participation in this committee includes distributors and manufacturer members.[198]

d. Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement."  Participation in this committee includes distributors and manufacturer members.[199]

e. Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.[200]

f. Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[201]

---

[196] Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees

[197] Id.

[198] Id.

[199] Id.

[200] Id.

[201] Id.

EXHIBIT 1

g.  eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[202]

h.  ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.[203]

i.  Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals."  Participation includes Distributor and Manufacturer Members.[204]

409.    The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

410.    The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA, and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[205]  The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[206] The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, it

---

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance, (accessed on September 14, 2017),  https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

[206] *Id.*

EXHIBIT 1

is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[207]

411.    Third, the RICO Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

412.    The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[208] As reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales.[209] On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[210] The Manufacturer Defendants used this information to gather high-level data regarding overall

---

[207] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

[208] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; see also, Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letters From Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on September 14, 2017), http://www.purduepharma.com/payers/managed-markets/.

[209] Id.

[210] Webinars, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

EXHIBIT 1

distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

413.   The contractual relationships among the RICO Defendants also include vault security programs. The RICO Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Plaintiff is informed and believes that manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Plaintiff is informed and believes that these agreements were used by the RICO Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

414.   Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The RICO Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships, and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the RICO Defendants was in communication and cooperation.

415.   According to articles published by the Center for Public Integrity and The Associated Press, the Pain Care Forum -- whose members include the Manufacturers and the Distributors' trade association has been lobbying on behalf of the Manufacturers and Distributors

135

EXHIBIT 1

for "more than a decade."[211] And, from 2006 to 2016 the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures.[212] Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 2000, if not longer.[213]

416.    As described above, the RICO Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise. Plaintiff is informed and believes that the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

### B.  CONDUCT OF THE OPIOID DIVERSION ENTERPRISE

417.    During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their Federal and State obligations to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate unlawful profits, as follows:

418.    Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

---

[211] Matthew Perrone, Pro-Painkiller echo chamber shaped policy amid drug epidemic, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

[212] Id.

[213] HDA History, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/hda-history.

EXHIBIT 1

419.    Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

420.    Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

421.    Defendants paid nearly $800 million dollars to influence local, state and federal governments through joint lobbying efforts as part of the Pain Care Forum. The RICO Defendants were all members of their Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members, included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids.

422.    The RICO Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

423.    The RICO Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[214]

---

[214] *See* HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/; Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017, https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK  Document 36-2  Filed 02/01/21  Page 144 of 940 PageID #:
Case: 1:18-op-45537-DAP  Doc #: 1  Filed: 05/07/18  142 of 183.  PageID #: 142
327

424.    The RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiff is informed and believes that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, Plaintiff is informed and believes that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

425.    The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO Defendants.

426.    The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the RICO Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[215] On information and belief, the "know your customer" questionnaires informed the RICO Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

---

[215] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

EXHIBIT 1

427.    The RICO Defendants refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same despite their actual knowledge of drug diversion rings. The RICO Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[216] and 117 recommended decision in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders -- all for failure to report suspicious orders.[217]

428.    Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, and identify suspicious orders and report them to the DEA.

429.    The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid. The Manufacturer and Distributor Defendants did this through their participation in the Pain Care Forum and Healthcare Distributors Alliance.

430.    The RICO Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and ensured that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the RICO Defendants ensured that the DEA had no

---

[216] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[217] *Id.*

EXHIBIT 1

basis for refusing to increase or decrease the production quotas for prescription opioids due to diversion of suspicious orders. The RICO Defendants influenced the DEA production quotas in the following ways:

    a.   The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

    b.   The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

    c.   The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioids prescriptions filled by the Distributor Defendants;

    d.   The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

    e.   The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[218]

    f.   The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

    g.   The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

    h.   The RICO Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

    i.   The RICO Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

    j.   The RICO Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

---

[218] Harriet Ryan, et al., <u>More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew</u>, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/

EXHIBIT 1

431.    The scheme devised and implemented by the RICO Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## C.  PATTERN OF RACKETEERING ACTIVITY

432.    The RICO Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); and 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment buying selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

### 1.    The RICO Defendants Engaged in Mail and Wire Fraud.

433.    The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

434.    The RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion

EXHIBIT 1

Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone

and the Internet to transmit mailings and wires in interstate or foreign commerce.

435.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands

of interstate mail and wire communications in service of their scheme through virtually uniform

misrepresentations, concealments and material omissions regarding their compliance with their

mandatory reporting requirements and the actions necessary to carry out their unlawful goal of

selling prescription opioids without reporting suspicious orders or the diversion of opioids into the

illicit market.

436.    In devising and executing the illegal scheme, the RICO Defendants devised and

knowingly carried out a material scheme and/or artifice to defraud by means of materially false or

fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of

executing the illegal scheme, the RICO Defendants committed these racketeering acts, which

number in the thousands, intentionally and knowingly with the specific intent to advance the illegal

scheme.

437.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1))

include, but are not limited to:

   a.   Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or
        receiving, or by causing to be sent and/or received, materials via U.S. mail or
        commercial interstate carriers for the purpose of executing the unlawful scheme to
        design, manufacture, market, and sell the prescription opioids by means of false
        pretenses, misrepresentations, promises, and omissions.

   b.   Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting
        and/or receiving, or by causing to be transmitted and/or received, materials by wire
        for the purpose of executing the unlawful scheme to design, manufacture, market,
        and sell the prescription opioids by means of false pretenses, misrepresentations,
        promises, and omissions.

438.    The RICO Defendants' use of the mail and wires includes, but is not limited to, the

transmission, delivery, or shipment of the following by the Manufacturers, Distributors, or third

**EXHIBIT 1**

parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme, including but not limited to:

a. The prescription opioids themselves;

b. Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

c. Defendants' DEA registrations;

d. Documents and communications that supported and/or facilitated Defendants' DEA registrations;

e. Documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

f. Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

g. Documents and communications related to the Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h. Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

i. Documents for processing and receiving payment for prescription opioids;

j. Payments from the Distributors to the Manufacturers;

k. Rebates and chargebacks from the Manufacturers to the Distributors;

l. Payments to Defendants' lobbyists through the Pain Care Forum;

m. Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

n. Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

o. Other documents and things, including electronic communications.

439. On information and belief, the RICO Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received)

EXHIBIT 1

by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce, including the following:

440.   Purdue manufactures multiple forms of prescription opioids, including but not limited to: OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER. Purdue manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

441.   The Distributor Defendants shipped Purdue's prescription opioids throughout this jurisdiction.

442.   Cephalon manufactures multiple forms of prescription opioids, including but not limited to: Actiq and Fentora. Cephalon manufactured and shipped these prescription opioids to the Distributor Defendants in this jurisdiction.

443.   The Distributor Defendants shipped Teva's prescription opioids throughout this jurisdiction.

444.   Janssen manufactures prescription opioids known as Duragesic. Janssen manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

445.   The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

446.   Endo manufactures multiple forms of prescription opioids, including but not limited to: Opana/Opana ER, Percodan, Percocet, and Zydone. Endo manufactured and shipped its prescription opioids to the Distributor Defendants in Ohio.

447.   The Distributor Defendants shipped Janssen's prescription opioids throughout this jurisdiction.

EXHIBIT 1

448.     Actavis manufactures multiple forms of prescription opioids, including but not limited to: Kadin and Norco, as well as generic versions of the drugs known as Kadian, Duragesic and Opana. Actavis manufactured and shipped its prescription opioids to the Distributor Defendants in this jurisdiction.

449.     The Distributor Defendants shipped Actavis' prescription opioids throughout this jurisdiction.

450.     Mallinckrodt manufactures multiple forms of prescription opioids, including but not limited to: Exalgo and Roxicodone.

451.     The Distributor Defendants shipped Mallinckrodt's prescription opioids throughout this jurisdiction.

452.     The RICO Defendants also used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

453.     At the same time, the RICO Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids and that they complied with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

454.     Plaintiff is also informed and believes that the RICO Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

EXHIBIT 1

455.    The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

456.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and the public that Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The RICO Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which they could profit.

457.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. But, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

458.    The RICO Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. These actions violate 18 U.S.C. § 1962(c). Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the RICO Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the RICO Defendants.

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 153 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   151 of 183.   PageID #: 151
386

459.    The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

460.    The RICO Defendants hid from the general public, and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the RICO Defendants were filling on a daily basis -- leading to the diversion of a tens of millions of doses of prescriptions opioids into the illicit market.

461.    The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

462.    Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding marketing prescription opioids and refusing to report suspicious orders.

463.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

464.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants while Plaintiff was left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme.

EXHIBIT 1

465. The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, Defendants are distinct from the enterprise.

466. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

467. Many of the precise dates of the RICO Defendants' criminal actions at issue here have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioids Addiction and Opioid Diversion Enterprise alleged herein depended upon secrecy.

468. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiff. Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on consumers in this jurisdiction, its citizens or the Plaintiff. In designing and implementing the scheme, at all times Defendants were cognizant of the fact that those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and reliable information regarding Defendants' products and their manufacture and distribution of those products. The Defendants were also aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain a closed system and to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

148

EXHIBIT 1

469.     By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

470.     It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations, would harm Plaintiff by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

471.     The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

### 2.     The RICO Defendants Manufactured, Sold and/or Dealt in Controlled Substances and Their Crimes Are Punishable as Felonies

472.     The RICO Defendants conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(D) by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

473.     The RICO Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 483(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter. A violation of section 483(a)(4) is punishable by up to four years in jail, making it a felony. 21 U.S.C. § 483(d)(1).

474.     Each of the RICO Defendants qualify as registrants under the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to the registrant

EXHIBIT 1

suspicious orders of controlled substances., and inform the DEA of suspicious orders when discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

475.    Pursuant to the CSA and the Code of Federal Regulations, the RICO Defendants were required to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

476.    The RICO Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA including the Manufacturer Defendants' applications for production quotas. Specifically, the RICO Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

477.    For example, The DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015, McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis. The settlement was finalized on January 17, 2017.[219]

478.    Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of the CSA and Code of Federal Regulations as it relates to reporting suspicious orders of prescription opioids. In 2016, the Los Angeles Times reported that Purdue was aware of

---

[219] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017(), http://www.mckesson.com/about-mckesson/newsroom/press-releases/2017/mckesson-finalizes-settlement-with-doj-and-dea-to-resolve-past-claims/.

EXHIBIT 1

a pill mill operating out of Los Angeles yet failed to alert the DEA.[220] The LA Times uncovered

that Purdue began tracking a surge in prescriptions in Los Angeles, including one prescriber in

particular. A Purdue sales manager spoke with company officials in 2009 about the prescriber,

asking "Shouldn't the DEA be contacted about this?" and adding that she felt "very certain this is

an organized drug ring."[221] Despite knowledge of the staggering amount of pills being issued in

Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly

addictive OxyContin and did not tell authorities what it knew about Lake Medical until several

years later when the clinic was out of business and its leaders indicted. By that time, 1.1 million

pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."[222]

479.   Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation

for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt arguing that it

ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida

between 2008 and 2012.[223] After six years of DEA investigation, Mallinckrodt agreed to a

settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that

Mallinckrodt's response was that everyone knew what was going on in Florida but they had no

duty to report it.[224]

---

[220] Harriet Ryan, et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

[221] Id.

[222] Id.

[223] Lenny Bernstein & Scott Higham, The government's struggle to hold opioid manufacturers accountable, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356. This number accounted for 66% of all oxycodone sold in the state of Florida during that time.

[224] Id.

EXHIBIT 1

480.    Plaintiff is informed and believes that the foregoing examples reflect the RICO Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74. This conclusion is supported by the sheer volume of enforcement actions available in the public record against the Distributor Defendants.[225] For example:

a. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

---

[225] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

**EXHIBIT 1**

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

481.   These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

482.   The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

483.   Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential

EXHIBIT 1

part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

484.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers in this jurisdiction and the Plaintiff. Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on this jurisdiction, its citizens or the Plaintiff. The Defendants were aware that Plaintiff and the citizens of this jurisdiction rely on the Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

485.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

486.    It was foreseeable to Defendants that refusing to report and halt suspicious orders, as required by the CSA and Code of Federal Regulations would harm Plaintiff by allowing the flow of prescriptions opioids from appropriate medical channels into the illicit drug market.

487.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**D.  DAMAGES**

488.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference.

**EXHIBIT 1**

489.    Plaintiff's injuries, and those of the citizens of The City, were proximately caused by Defendants' racketeering activities. But for the RICO Defendants' conduct, Plaintiff would not have paid the health services and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

490.    Plaintiff's injuries, and those of the citizens of The City, were directly caused by the RICO Defendants' racketeering activities.

491.    Plaintiff was most directly harmed and there is no other plaintiff better suited to seek a remedy for the economic harms at issue here.

492.    Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT III – RACKETEERT INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. 1962(d), *et seq*.
## (Against All Defendants)

493.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

494.    Plaintiff brings this claim on its own behalf against all RICO Defendants. At all relevant times, the RICO Defendants were associated with the Opioid Diversion Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Under Section 1962(d) it is unlawful for "any person to conspire to violate" Section 1962(d), among other provisions. 18 U.S.C. § 1962(d).

155

**EXHIBIT 1**

495.    Defendants conspired to violate Section 1962(c), as alleged more fully above, by conducting the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity, as incorporated by reference below.

### A.  THE OPIOID DIVERSION ENTERPRISE.

496.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the Paragraphs contained in Section A of the preceding Count of this Complaint concerning the Opioid Diversion Enterprise.

### B.  CONDUCT OF THE OPIOID DIVERSION ENTERPRISE.

497.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the Paragraphs contained in Section B of the preceding Count of this Complaint concerning the Conduct of the Opioid Diversion Enterprise.

### C.  PATTERN OF RACKETEERING ACTIVITY.

498.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the Paragraphs contained in Section C of the preceding Count of this Complaint concerning the Pattern of Racketeering Activity.

### D.  DAMAGES.

499.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference.

500.    Plaintiff's injuries, and those of its citizens, were proximately caused by the RICO Defendants' racketeering activities. But for the RICO Defendants' conduct, Plaintiff would not have paid the health services and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

**EXHIBIT 1**

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 163 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   161 of 183.   PageID #: 161
866

501.     Plaintiff's injuries and those of the citizens of the City were directly caused by the RICO Defendants' racketeering activities.

502.     Plaintiff was most directly harmed and there is no other plaintiff better suited to seek a remedy for the economic harms at issue here.

503.     Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT IV – NARCOTICS PROFIT FORFEITURE ACT
### 725 ILCS 175/1 *et seq.*
### (Against All Defendants)

504.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

505.     This Count is brought pursuant to 725 ILCS 175/7 for civil relief only. Plaintiff was injured in its business, person, and/or property as a result of each Defendant's wrongful conduct (725 ILCS 175/6(c)), and is a person who can bring an action for civil damages, threefold damages, and attorney fees (725 ILCS 175/3(c)).

506.     Defendant corporations are "persons" within the meaning of 725 ILCS 175/3(c), which conducted the affairs of an opioid narcotics racketeering enterprise through a pattern of racketeering activity, in violation of Chapter 725, Act 175, the Illinois Narcotics Profit Forfeiture Act.

## A.  THE OPIOID DIVERSION ENTERPRISE.

507.     For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the Paragraphs contained in Section A of the preceding two Counts of this Complaint concerning the Opioid Diversion Enterprise.

**EXHIBIT 1**

508.   Defendants' Opioids Diversion Enterprise is an association in fact and meets the definition of enterprise in 725 ILCS 175/3(d).

**B. CONDUCT OF THE OPIOID DIVERSION ENTERPRISE.**

509.   For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the Paragraphs contained in Section B of the preceding two Counts of this Complaint concerning the Conduct of the Opioid Diversion Enterprise.

510.   As alleged above in language incorporated herewith by reference, each Defendant has violated the Illinois Controlled Substances Act and the United States Controlled Substances Act, and such conduct is punishable as a felony. Therefore, each Defendant has engaged in narcotics activity, as prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/3(a).

511.   Each Defendant receives income knowing such income is derived from the pattern of racketeering activity in which it participated, which is prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/4(a). As more fully described in this Complaint, each Defendant is aware that it has diverted dangerously addictive opioid narcotics into illicit streams of commerce in violation of mandatory, non-delegable duties and requirements for state and federal wholesale drug distribution licenses and registrations. Defendants have received income by distributing dangerous Schedule II substances in violation of state and federal Controlled Substances Acts and associated regulations.

512.   As more fully described in this Complaint, in addition to said receipt of income, each Defendant uses or invests all or part of the income, or proceeds of such income, to establish, acquire, and/or operate an enterprise doing business in the State of Illinois, which is prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/4(b).

513.   As more fully described in this Complaint, each Defendant knowingly, through a pattern of narcotics activity, acquires and maintains an interest in or contract of an enterprise which

EXHIBIT 1

is engaged in, and which activities affect, business in the State of Illinois, which is prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/4(c).

514.    As more fully described in this Complaint, each Defendant is associated with an enterprise doing business in the State of Illinois and knowingly conducts or participates in the conduct of such enterprise's affairs through a pattern of narcotics activity in which Defendants participate, as prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 725/4(d).

### C.  PATTERN OF RACKETEERING ACTIVITY.

515.    For efficiency and avoiding repetition, for purposes of this claim, Plaintiff incorporates by reference the Paragraphs contained in Section C of the preceding two Counts of this Complaint concerning the Pattern of Racketeering Activity.

516.    Allegations regarding Defendants' conduct in relation to the Opioids Diversion Enterprise's pattern of racketeering activity are set out herein, including in Count II, *supra*, which allegations are incorporated as if fully set forth herein. Each Defendant conducted and participated in the conduct of the affairs of each Defendant's Opioids Marketing Enterprise through a pattern of racketeering activity, which violates Chapter 725, Act 175, the Illinois Narcotics Profit Forfeiture Act.

517.    As explained herein, each Defendant conducted or participated in the enterprise's affairs through commission of criminal offenses which constitute a pattern of narcotics racketeering activity. 725 ILCS 175/3(b). Each Defendant has committed two or more, and indeed multiple, acts of narcotics activity within 5 years of each other. At least one, and indeed multiple, acts of narcotics activity were committed after the effective date of Act 175. At least one of these acts, and indeed multiple, acts of narcotics activity are punishable as a Class X, 1, or 2 felonies.

EXHIBIT 1

## D.  DAMAGES.

518.    Defendants' violations of law and their pattern of racketeering activity have directly and proximately caused The City to be injured in its business or property because The City has paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference.

519.    The injuries incurred by The City were proximately caused by Defendants' racketeering activities. But for Defendants' conduct, The City would not have paid *inter alia* the health services and law enforcement services expenditures required by the plague of drug-addicted residents.

520.    The Plaintiff's injuries were directly caused by Defendants' racketeering activities.

521.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, treble damages, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

### COUNT V - UNIFORM DECEPTIVE TRADE PRACTICES ACT
### 815 ILCS 510/1 *et seq.*
### (Against All Defendants)

522.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

523.    This Count is brought by the Plaintiff under the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1 *et seq.*, as the Plaintiff is a "government or governmental subdivision" and therefore is a "person" under the definitions of the UDTPA. *See* 815 ILCS 510/1(5).

**EXHIBIT 1**

524.    As evidenced by the conduct detailed above, Manufacturer Defendants have violated Section 2 of the UDTPA, 815 ILCS 510/2, by engaging in one or more of the following deceptive trade practices in their business, vocation, or occupation:

a.  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

b.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

c.  Representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

d.  Disparaging the goods, services, or business of another by false or misleading representations of fact; and

e.  Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

525.    As evidenced by the conduct detailed above, Distributor Defendants have violated Section 2 of the UDTPA, 815 ILCS 510/2, by engaging in one or more of the following deceptive trade practices in their business, vocation, or occupation:

a.  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

b.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; and/or

c.  Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

526.    As also described in greater detail above, Distributor Defendants' deceptive trade practices specifically include, but are not necessarily limited to, the following:

a.  The practice of not monitoring for suspicious orders of prescription opioids;

b.  The practice of not detecting suspicious orders of prescription opioids

c.  The practice of not investigating suspicious orders of prescription opioids;

EXHIBIT 1

    d.    The practice of filling, or failing to refuse fulfillment of, suspicious orders of prescription opioids;

    e.    The practice of not reporting suspicious orders of prescription opioids;

    f.    The practice of rewarding increases in prescription opioid sales; and/or

    g.    The practice of falsely misrepresenting to the public that Defendants were complying with their legal obligations.

527.    Plaintiff has been damaged, and is likely to be further damaged in the future, by the deceptive trade practices described herein.

528.    Defendants egregiously and willfully engaged in the deceptive trade practices described herein.

529.    Section 3 of the UDTPA, 815 ILCS 510/3, empowers this Court to grant injunctive relief upon terms it considers reasonable, as well as costs and attorneys' fees against Defendants if the Court finds that Defendants willfully engaged in a deceptive trade practice.

530.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, attorney fees and costs, and pre- and post-judgment interest.

### COUNT VI - NEGLIGENCE AND NEGLIGENT MISREPRESENTATION
### ILLINOIS COMMON LAW
#### (Against All Defendants)

531.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

532.    This Count for common law negligence and negligent misrepresentation is brought by the Plaintiff against all Defendants.

533.    "To state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that

**EXHIBIT 1**

duty, and an injury proximately caused by that breach." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1096 (Ill. 2012) (quot. & cit. om.). All such essential elements exist here.

534.     To state a cause of action for negligent misrepresentation, a complaint "need allege only that the defendant was careless or negligent in ascertaining the truth of the statement, and that the defendant had a duty to convey accurate information to the plaintiff." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 424 (Ill. App. 2015) (quot. & cit. om.). All such essential elements exist here.

535.     Each Defendant had an obligation to exercise due care in marketing, selling, and distributing highly dangerous opioid drugs in the State and The City.

536.     Each Defendant had an obligation to exercise due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs in the State and The City.

537.     If a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury. *Simpkins*, 965 N.E.2d at 1097. Each Defendant owed a duty to the Plaintiff, and to the public health and safety in The City, because the injury was foreseeable, and in fact foreseen, by the Defendants.

538.     In addition, each Defendant owed a duty to the Plaintiff because the injury was likely.  Each Defendant was required to guard against the injury as a requirement for the licenses each Defendant maintains, and the burden of guarding against the injury was voluntarily assumed and not unduly onerous. The burden of guarding against the injury is properly placed upon each Defendant, and indeed, federal and state licensing and registration requirements required that each Defendant guard against the diversion of dangerously addictive opioids for illicit purposes.

539.     Reasonably prudent manufacturers and distributors would have anticipated that the scourge of opioid addiction would wreak havoc on communities. As explained above, the system whereby manufacturers and distributors are the gatekeepers between manufacturers and

EXHIBIT 1

pharmacies exists *for the purpose* of controlling dangerous substances such as opioids. Defendants were repeatedly warned by law enforcement. The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

540.    The existence of a duty depends on the foreseeability of the injury.  Each Defendant owed a duty to the Plaintiff because the injuries alleged herein was foreseeable, and in fact foreseen, by the Defendants.

541.    Reasonably prudent manufacturers and distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities. The closed system of opioid distribution whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

542.    Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to the illegal drug market as a result of a drug addiction that was foreseeable to the Manufacturer Defendants.

543.    Moreover, Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

EXHIBIT 1

544.     The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

545.     As described above in language expressly incorporated herein, Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for non-medical purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

546.     As described elsewhere in the Complaint in language expressly incorporated herein, Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids to the State and The City and destinations from which they knew opioids were likely to be diverted into the State and The City, in addition to other misrepresentations alleged and incorporated herein.

547.     As described elsewhere in the Complaint in language expressly incorporated herein, Manufacturer Defendants breached their duties to exercise due care in the business of pharmaceutical manufacturers of dangerous opioids, which are Schedule II Controlled Substances, and by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drug were not safe or suitable.

548.     The Manufacturer Defendants misrepresented and concealed the addictive nature of prescription opioids and its lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 172 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   170 of 183.   PageID #: 170
355

549.   All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

550.   Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

551.   The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

552.   As described above in language expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

553.   Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants' knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, Defendants breached their duties to monitor for, report, and halt suspicious orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

554.   Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence under State law.

555.   Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' actions and omissions.  Plaintiff does not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

556.   Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 173 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   171 of 183.   PageID #: 171
356

profits, compensatory and punitive damages, and all damages allowed by law to be paid by the
Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT VII - NEGLIGENCE PER SE**
**(Against All Defendants)**

557.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if set
forth fully herein, and further alleges as follows.

558.    The Illinois and federal laws set out in 720 ILCS 570/205; 225 ILCS 120/40; Ill.
Admin. Code Title 68, § 1510.50(i); 21 U.S.C. §§ 812, 823; 21 C.F.R. § 1301.74; 28 C.F.R. §
0.100, are public safety laws. Each Defendant had a duty under, *inter alia,* these laws maintain
effective controls against diversion of prescription opioids and to guard against, prevent, and report
suspicious orders of opioids.

559.    Defendants' actions and omissions in violation of the law constitute negligence per
se.

560.    Defendants' actions and omissions were intentional and/or unlawful, and
Defendants acted with actual malice.

561.    It was foreseeable that the breach of duty described herein would result in the
economic damages for which Plaintiff seeks recovery.

562.    As described above in language expressly incorporated herein, Defendants
breached their duties to maintain effective controls against diversion of dangerously addictive
opioids, including violating public safety statutes and statute designed to protect human life
requiring that as wholesale drug distributors, Defendants could only distribute these dangerous
drugs under a closed system – a system Defendants were responsible for guarding.

**EXHIBIT 1**

563.    As described above in language expressly incorporated herein, Defendants' breach of statutory and regulatory duties caused, bears a causal connection with, and proximately resulted in, harm and damages sought by the Plaintiff.

564.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' negligence per se. Plaintiff does not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

565.    Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT VIII - CIVIL CONSPIRACY
### (Against All Defendants)

566.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

567.    As set forth herein, Defendants engaged in a civil conspiracy to create an absolute public nuisance in conjunction with their unlawful distribution and diversion of opioids into the State and The City.

568.    Defendants Cephalon, Endo, Janssen, and Purdue each conspired with various KOLs and Front Groups to commit unlawful acts or lawful acts in an unlawful manner. Defendants Cephalon, Endo, Janssen, and Purdue, and the various KOLs and Front Groups with which each of them was allied, knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote the use of opioids for the treatment of chronic pain by making and disseminating false, unsubstantiated, and misleading statements and misrepresentations to prescribers and consumers. Defendants Cephalon, Endo, Janssen, and Purdue enlisted various KOLs and Front Groups to

168

EXHIBIT 1

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 175 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   173 of 183.   PageID #: 173
858

make and disseminate these statements in furtherance of their common strategy to increase opioid

sales, and Defendants Cephalon, Endo, Janssen, and Purdue – along with the KOLs and Front

Groups with whom each of them conspired – knew that the statements they made and disseminated

served this purpose.

569.    By engaging in the conduct described in this Complaint, Defendant Cephalon

agreed with Front Groups FSMB and APF that they would deceptively promote the risks, benefits,

and superiority of opioid therapy. As part of its agreements with FSMB and APF, Cephalon

provided support for FSMB's and APF's deceptive statements promoting opioids and FSMB and

APF used that support to more broadly disseminate deceptive messaging promoting opioids, which

would benefit Cephalon's drugs. As set forth above, *Responsible Opioid Prescribing* (Cephalon

and FSMB) and *Treatment Options: A Guide for People Living with Pain* (Cephalon and APF) are

publications that contained a number of deceptive statements about opioids. They are products of

these conspiracies, and the collaboration between Cephalon and each of these entities in creating

and disseminating these publications is further evidence of each conspiracy's existence.

570.    By engaging in the conduct described in this Complaint, Defendant Endo agreed

with Front Groups, APF, NIPC, AGS, and FSMB that they would deceptively promote the risks,

benefits, and superiority of opioid therapy. As part of its agreements with APF, NIPC, AGS, and

FSMB, Endo provided support for APF, NIPC, AGS and FSMB's deceptive statements promoting

opioids and APF, NIPC, AGS, and FSMB used that support to more broadly disseminate deceptive

messaging promoting opioids, which would benefit Endo's drugs. *Persistent Pain in the Older

Adult* (Endo, APF, and NIPC), *Painknowledge.com* (Endo, APF, NPIC), *Exit Wounds* (Endo and

APF); *Pharmacological Management of Persistent Pain in Older Persons* (Endo and AGS), and

*Responsible Opioid Prescribing* (Endo and FSMB) are publications, CMEs, and websites that

**EXHIBIT 1**

contained a number of deceptive statements about opioids as outlined above. They are products of these conspiracies, and the collaboration between Endo and each of these entities in creating and disseminating these publications, CMEs, and websites is further evidence of each conspiracy's existence.

571.    By engaging in the conduct described in this Complaint, Defendant Janssen agreed with Front Groups AAPM, AGS, and APF that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with AAPM, AGS, APF, Janssen provided support for AAPM, AGS, and APF's deceptive statements promoting opioids and Conrad & Associates LLC, Medical Writer X, AAPM, AGS, and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Janssen's drugs. *Finding Relief: Pain Management for Older Adults* (Janssen, AAPM, and AGS), a CME promoting the *Pharmacological Management of Persistent Pain in Older Persons* (Janssen and AGS); the *Let's Talk Pain* website (Janssen and APF), and *Exit Wounds* (Janssen and APF) are publications, CMEs, and websites that contained a number of deceptive statements about opioids, as outlined above. They are products of these conspiracies and the collaboration between Janssen and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

572.    By engaging in the conduct described in this Complaint, Defendant Purdue agreed with Front Groups APF, FSMB, and AGS that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with APF, FSMB, and AGS, Purdue provided support for APF, FSMB, and AGS's deceptive statements promoting opioids and APF, FSMB, and AGS used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Purdue's drugs. The *Partners Against Pain* website (Purdue and

EXHIBIT 1

APF), *A Policymaker's Guide to Understanding Pain & Its Management* (Purdue and APF), *Treatment Options: A Guide for People Living with Pain* (Purdue and APF); *Exit Wounds* (Purdue and APF),[226] *Responsible Opioid Prescribing* (Purdue and FSMB), and a CME promoting the *Pharmacological Management of Persistent Pain in Older Persons* (Purdue and AGS) are publications, CMEs, and websites that contained a number of deceptive statements about opioids, as outlined above. They are products of these conspiracies, and the collaboration between Purdue and each of these entities in creating and disseminating these publications, CMEs and websites is further evidence of each conspiracy's existence.

573.    Each of the participants to the conspiracies outlined above was aware of the misleading nature of the statements they planned to issue and of the role they played in each scheme to deceptively promote opioids as appropriate for the treatment of chronic pain. These Defendants and third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using opioids to the residents, patients, and prescribers of the State and The City in return for increased pharmaceutical sales, financial contributions, reputational enhancements, and other benefits.

574.    As outlined in this Complaint, Defendants Cephalon, Endo, Janssen, and Purdue played an active role in determining the substance of the misleading messages issued by KOLs and Front Groups, including by providing content themselves, editing and approving content developed by their co-conspirators, and providing slide decks for speaking engagements. Defendants further ensured that these misstatements were widely disseminated, by both distributing the misstatements themselves and providing their co-conspirators with funding and

---

[226] Purdue's collaborations with APF through APF's "Corporate Roundtable" and Purdue and APF's active collaboration in running PCF constitute additional evidence of the conspiracy between Purdue and APF to deceptively promote opioids.

EXHIBIT 1

other assistance with distribution. The result was an unrelenting stream of misleading information about the risks, benefits, and superiority of using opioids to treat chronic pain from sources Defendants knew were trusted by prescribers. Defendants exercised direct editorial control over most of these statements. However, even if Defendants did not directly disseminate or control the content of these misleading statements, they are liable for conspiring with the third parties who did.

575.    As set forth herein, Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful distribution and diversion of opioids into the State and The City.

576.    Distributor and Manufacturer Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

577.    The Manufacturer Defendants further unlawfully marketed opioids in the State and The City in furtherance of that conspiracy.

578.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, to create the injuries alleged herein.

579.    Defendants participated in unlawful acts or lawful acts in an unlawful manner and in furtherance of a civil conspiracy by, among other unlawful conduct:

    a.   Violating, aiding and abetting in the violation, or causing the violation of 720 ILCS § 5/17-10.5;

    b.   Violating the UDTPA; and

    c.   Committing common law unjust enrichment.

580.    Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonably or lawful excuse.

EXHIBIT 1

581.    Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

582.    By reasons of Defendants' unlawful acts, the Plaintiff has been damaged and continues to be damaged by paying for the costs of opioid prescriptions for chronic pain and has suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain.

583.    Because Defendants' marketing caused doctors and other health care providers to prescribe and The City to pay for long-term opioid treatment using opioids manufactured or distributed by other drug makers, Defendants caused and are responsible for those costs and claims, as well.

584.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' civil conspiracy. Plaintiff does not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

585.    Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT IX - FRAUD AND FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

586.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

587.    Defendants violated their general duty not to actively deceive, and have made knowingly false statements and have omitted and/or concealed information which made statements Defendants did make knowingly false.  Defendants acted intentionally and/or unlawfully.

173

EXHIBIT 1

588.     In Illinois, the elements to state a cause of action for common law fraud are: "(1) a statement by defendant; (2) of a material nature as opposed to opinion; (3) that was untrue; (4) that was known or believed by the speaker to be untrue or made in culpable ignorance of its truth or falsity; (5) that was relied on by the plaintiff to his detriment; (6) made for the purpose of inducing reliance; and (7) such reliance led to the plaintiff's injury. *Olendorf v. General Motors Corp.*, 322 Ill.App.3d 825, 831 (Ill. App. 2001) (quot. & cit. om.). All such essential elements exist here.

589.     Similarly, to state a cause of action for fraudulent misrepresentation in Illinois, the elements are: "(1) a false statement of material fact; (2) knowledge or belief of the falsity by the person making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 423 (Ill. App. 2015) (quot. & cit. om.). All such essential elements exist here.

590.     As alleged herein, Defendants made false statements regarding their compliance with state and federal law regarding their duties to prevent diversion, their duties to monitor, report and halt suspicious orders, and/or concealed their noncompliance with these requirements.

591.     As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

592.     As alleged herein, Defendants knowingly and/or intentionally made representations that were false. Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff, the State and The City, the public, and persons on whom Plaintiff relied.

EXHIBIT 1

593.     These false representations and concealments were reasonably calculated to deceive Plaintiff and the physicians who prescribed opioids for persons in the State and The City, were  made with the intent to deceive, and did in fact deceive these persons and Plaintiff.

594.     Plaintiff, including the residents of The City, and the physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

595.     Plaintiff justifiably relied on Defendants' representations and/or concealments, both directly and indirectly.  Plaintiff's injuries were proximately caused by this reliance.

596.     The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of Defendants' fraudulent conduct.

597.     Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment.  Plaintiff does not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

598.     Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## PUNITIVE DAMAGES

599.     Plaintiff incorporates all paragraphs of this Complaint as if set forth fully herein, and further alleges as follows.

600.     By engaging in the above-described unfair acts or practices, Defendants acted with actual malice, wantonly, and oppressively. Defendants acted with conscious disregard to the rights of others and/or in a reckless, wanton, willful, or gross manner.  Defendants acted with a prolonged

**EXHIBIT 1**

indifference to the adverse consequences of their actions and/or omissions.  Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm.

601.    Here, Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the State and The City by, these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence, and the safety of the community, and an award of punitive damages is appropriate, as punishment and a deterrence.

602.    By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

## **RELIEF**

**WHEREFORE,** the Plaintiff respectfully prays that this Court grant the following relief:

1.  Enter Judgment in favor of the Plaintiff in a final order against each of the Defendants;

2.  Enjoin the Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in unlawful sales of prescription opioid pills and ordering temporary, preliminary or permanent injunction;

3.  Allocate monetary damages attributable to each Defendant for each Count pled above;

**EXHIBIT 1**

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 183 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 1   Filed: 05/07/18   181 of 183.   PageID #: 181
366

4.  Order that Defendants compensate The City for its past and future damages and costs to abate the ongoing public nuisance caused by the opioid epidemic;

5.  Impose an award of actual and triple the actual damages the Plaintiff sustained as a result of each Defendant's violation of the Racketeer Influenced and Corrupt Organizations Act, and any allowable civil penalty;

6.  Impose an award of actual and triple the actual damages the Plaintiff sustained as a result of each Defendant's violation of the Narcotics Profit Forfeiture Act;

7.  Order that each Defendant pay restitution;

8.  Order that each Defendant disgorge profits;

9.  Order that each Defendant is liable for civil penalties under Illinois law;

10. Allocate monetary damages attributable to each Defendant to compensate the Plaintiff for the expenses and costs that it bears as a result of the public nuisance, including without limitation (A) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments/services for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (B) costs for providing treatment, counseling, rehabilitation services; (C) costs for providing treatment of infants born with opioid-related medical conditions; (D) costs associated with law enforcement and public safety relating to the opioid epidemic, including without limitation first responders and ambulance services; and (E) any other expenses or damages caused by the Defendants' diversion of opioids;

11. Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance and otherwise abate the public nuisance;

EXHIBIT 1

12. Award judgment against the Defendants requiring Defendants to pay punitive and exemplary damages;

13. Granting the Plaintiff:

    1. The cost of investigation, reasonable attorneys' fees, and all costs and expenses;

    2. Pre-judgment and post-judgment interest; and,

    3. All other relief as provided by law and/or as the Court deems appropriate and just.

PLAINTIFF DEMANDS A TRIAL BY JURY.


Dated: 5/7/2018

CITY OF METROPOLIS, ILLINOIS
By Rick Abell, CITY OF METROPOLIS
CORPORATE COUNSEL,


/s/ Thomas J. Lech
Thomas J. Lech #6256261
Ann E. Callis #6203933
Gregory R. Jones #6325696
**Goldenberg Heller & Antognoli, P.C.**
2227 South State Route 157
Edwardsville, IL 62025
Tel.: 618-656-5150
Fax: 618-656-6230
tlech@ghalaw.com
acallis@ghalaw.com
gjones@ghalaw.com

Paul T. Farrell, Jr.
**Greene, Ketchum, Farrell, Bailey & Tweel, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Tel.: 800.479.0053 or 304.525.9115
Fax: 304.529.3284
paul@greeneketchum.com

James M. "Mike"
Peter J. Mougey
Page A. Poerschke
Laura S. Dunning
Archie C. Lamb, Jr.
Jeffrey Gaddy
Neil E. "Ned" McWilliams, Jr.
**Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
850.435.7068 (office)
850.436.6068 (fax)
mpapantonio@levinlaw.com

Russell W. Budd
J. Burton LeBlanc, IV
Laura J. Baughman
S. Ann Saucer
**Baron & Budd, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
rbudd@baronbudd.com
bleblanc@baronbudd.com
lbaughman@baronbudd.com
asaucer@baronbudd.com

**EXHIBIT 1**

pmougey@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
alamb@levinlaw.com
jgaddy@levinlaw.com
nmcwilliams@levinlaw.com

James C. Peterson
R. Edison Hill
**Hill, Peterson, Carper,**
  **Bee & Deitzler, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.: 304-345-5667
Fax: 304-345-1519
jcpeterson@hpcdb.com
rehill@hpcbd.com

Anthony J. Majestro, Esq.
**Powell & Majestro, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

Eric D. Holland
R. Seth Crompton
**Holland Law Firm**
300 North Tucker, Suite 801
St. Louis, MO 63101
Tel.: 314-241-8111
Fax: 314-241-5554
eholland@allfela.com
scrompton@allfela.com

Roland K. Tellis
Mark P. Pifko
**Baron & Budd, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Tel.: 818-839-2333
Fax: 818-986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

Michael J. Fuller, Jr.
Amy Quezon
**McHugh Fuller Law Group, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com

David Cates
**Cates Mahoney, LLC**
216 West Pointe Drive, Suite A
Swansea, IL 62226
Tel.: 618-277-3644
Fax: 618-277-7882
dcates@cateslaw.com

**EXHIBIT 1**

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

**DEFENDANTS**

**(b)**  County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☐ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII.  REQUESTED IN COMPLAINT:

☐  CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**   Civil Categories: (Please check <u>one category only</u>).

1. ☐   General Civil
2. ☐   Administrative Review/Social Security
3. ☐   Habeas Corpus Death Penalty

*If under Title 28, §2255, name the SENTENCING JUDGE: _____

CASE NUMBER: _____

**II.**   <u>**RELATED OR REFILED CASES**</u>.  See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled.  Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

This action:   is **RELATED** to another  **PENDING** civil case      is a **REFILED** case      was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**   In accordance with Local Civil Rule **3.8**, actions involving counties in the Eastern Division shall be filed at any of  the divisional offices therein.  Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER.  UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

(1)   <u>**Resident defendant**</u>. If the defendant resides in a county within this district, please set forth the name of such county
<u>COUNTY:</u>
<u>Corporation</u> **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

(2)   <u>**Non-Resident defendant**</u>. If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.
<u>COUNTY:</u>

(3)   <u>**Other Cases**</u>. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.
<u>COUNTY:</u>

**IV.**   The Counties in the Northern District of Ohio are divided into divisions as shown below.  After the county is determined in Section **III**, please check the appropriate division.

<u>**EASTERN DIVISION**</u>

☐   **AKRON**          **(Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)**
☐   **CLEVELAND**     **(Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake,**
                              **Lorain, Medina and Richland)**
☐   **YOUNGSTOWN**   **(Counties: Columbiana, Mahoning and Trumbull)**

<u>**WESTERN DIVISION**</u>

☐   **TOLEDO**         **(Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry,**
                              **Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca**
                              **VanWert, Williams, Wood and Wyandot)**

**EXHIBIT 1**

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.    Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.    Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.    Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.    Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

**EXHIBIT 1**

<u>**Attachment to CIVIL COVER SHEET**</u>

**CITY OF METROPOLIS, ILLINOIS, a Municipal Corporation v.
AMERISOURCEBERGEN DRUG CORPORATION, et al.**

**I. PLAINTIFF**

(c) Attorneys (*Firm Name, Address, and Telephone Number*)

Thomas J. Lech  #6256261
Ann E. Callis  #6203933
Gregory R. Jones  #6325696
**Goldenberg Heller & Antognoli, P.C.**
2227 South State Route 157
Edwardsville, IL 62025
Tel.: 618-656-5150
Fax: 618-656-6230
tlech@ghalaw.com
acallis@ghalaw.com
gjones@ghalaw.com

James M. "Mike" Papantonio
Peter J. Mougey
Page A. Poerschke
Laura S. Dunning
Archie C. Lamb, Jr.
Jeffrey Gaddy
Neil E. "Ned" McWilliams, Jr.
**Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
850.435.7068 (office)
850.436.6068 (fax)
mpapantonio@levinlaw.com
pmougey@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
alamb@levinlaw.com
jgaddy@levinlaw.com
nmcwilliams@levinlaw.com

Paul T. Farrell, Jr.
**Greene, Ketchum, Farrell, Bailey & Tweel,
LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Tel.: 800.479.0053 or 304.525.9115
Fax: 304.529.3284
paul@greeneketchum.com

Russell W. Budd
J. Burton LeBlanc, IV
Laura J. Baughman
S. Ann Saucer
**Baron & Budd, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
rbudd@baronbudd.com
bleblanc@baronbudd.com
lbaughman@baronbudd.com
asaucer@baronbudd.com

Roland K. Tellis
Mark P. Pifko
**Baron & Budd, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Tel.: 818-839-2333
Fax: 818-986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

**EXHIBIT 1**

James C. Peterson
R. Edison Hill
**Hill, Peterson, Carper,**
**   Bee & Deitzler, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.: 304-345-5667
Fax: 304-345-1519
jcpeterson@hpcdb.com
rehill@hpcbd.com

Anthony J. Majestro, Esq.
**Powell & Majestro, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

Eric D. Holland
R. Seth Crompton
**Holland Law Firm**
300 North Tucker, Suite 801
St. Louis, MO  63101
Tel.:  314-241-8111
Fax:  314-241-5554
eholland@allfela.com
scrompton@allfela.com

Michael J. Fuller, Jr.
Amy Quezon
**McHugh Fuller Law Group, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com

David Cates
**Cates Mahoney, LLC**
216 West Pointe Drive, Suite A
Swansea, IL  62226
Tel.: 618-277-3644
Fax:  618-277-7882
dcates@cateslaw.com

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*City of Metropolis, Illinois v. AmerisourceBergen Drug Corporation, et al.*<br><br>1:18-op-45537 | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster<br><br>**SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND** |

Plaintiff submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in the Corrected Second Amended Complaint and Jury Demand in the case of *The County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al.,* Case No. 1:18-op-45090 ("*Summit County* Pleadings"), *In Re National Prescription Opiate Litigation,* in the United States District Court for the Northern District of Ohio, Dkt #513, 514[1]), and as may be amended in the future, and any additional claims asserted herein. Plaintiff also hereby amends its complaint to alter the defendants against which claims are asserted as identified below. To the extent defendants were previously sued in plaintiff(s)' existing complaint and they are no longer identified as defendants herein, they have been dismissed without prejudice except as limited by CMO-1, Section 6(e). Doc. #232.

---

[1] Docket #513 is the redacted Summit Second Amended Complaint and Docket #514 is the unredacted Summit Corrected Second Amended Complaint filed under seal in Case No. 1:17-md-02804-DAP. The redacted Summit Corrected Second Amended Complaint is also filed in its individual docket, Case No. 1:18-op-45090-DAP, Docket #24.

**EXHIBIT 2**

Case 5:19-cv-00083-GNS-LLK Document 36-2 Filed 02/01/21 Page 192 of 940 PageID #:
Case: 1:18-op-45537-DAP Doc #: 2 Filed: 03/06/19 2 of 10. PageID #: 190
376

## INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

Plaintiff(s)' Existing Complaint, City of Metropolis, Illinois v. AmerisourceBergen Drug

Corporation, et al. (1:18-op-45537), as may have been previously amended, is expressly

incorporated by reference to this Short Form as if fully set forth herein except to the extent that

allegations regarding certain defendants that are not listed in section 1 below are dismissed

without prejudice.

## PARTIES – DEFENDANTS

1. Having reviewed the relevant ARCOS data, Plaintiff asserts claims against the
following Defendants:

AMERISOURCEBERGEN DRUG CORPORATION, CARDINAL HEALTH, INC., McKESSON CORPORATION, PURDUE PHARMA L.P., PURDUE PHARMA, INC., PURDUE FREDERICK COMPANY, INC., THE, TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., CEPHALON, INC., JOHNSON & JOHNSON, JANSSEN PHARMACEUTICALS, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA INC. N/K/A JANSSEN PHARMACEUTICALS, INC., NORAMCO, INC., ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS, INC., ALLERGAN PLC F/K/A ACTAVIS PLC, WATSON PHARMACEUTICALS, INC. N/K/A ACTAVIS, INC. N/K/A ALLERGEN FINANCE, LLC, WATSON LABORATORIES, INC., ACTAVIS LLC, ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC., MALLINCKRODT PLC, MALLINCKRODT LLC, H.D. SMITH, LLC D/B/A H.D. SMITH, F/K/A H.D. SMITH WHOLESALE DRUG COMPANY, ANDA, INC., QUEST PHARMACEUTICALS, INC., PAR PHARMACEUTICAL, INC., PAR PHARMACEUTICAL COMPANIES, INC., SPECGX, LLC, WALGREENS BOOTS ALLIANCE, INC..

**I, Anthony J. Majestro, Counsel for Plaintiff(s), certify that in identifying all Defendants, I have followed the procedure approved by the Court and reviewed the ARCOS data that I understand to be relevant to Plaintiff(s). I further certify that, except as set forth below, each of the Defendant(s) newly added herein appears in the ARCOS data I reviewed.**
**I understand that for each newly added Defendant not appearing in the ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.**

**Dated: March 6, 2019**          Signed: /s/ Anthony J. Majestro _____

**EXHIBIT 2**

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 193 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 2   Filed: 03/06/19   3 of 10.   PageID #: 191
376

**Factual Allegations Regarding Individual Defendants**

1.1.    Defendants H.D. SMITH, LLC D/B/A H.D. SMITH, F/K/A H.D. SMITH

WHOLESALE DRUG COMPANY, ANDA, INC., QUEST PHARMACEUTICALS, INC., PAR

PHARMACEUTICAL, INC., PAR PHARMACEUTICAL COMPANIES, INC., SPECGX,

LLC, WALGREENS BOOTS ALLIANCE, INC. are hereby added as Defendants by this

pleading based on the following jurisdictional allegations:

1.1.1    Defendant **H.D. Smith, LLC d/b/a H.D. Smith, f/k/a H.D. Smith Wholesale**

**Drug Company** ("H.D. Smith"), through its various DEA registered subsidiaries and affiliated

entities, is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country,

including in Plaintiff's Community. H.D. Smith is registered to conduct business and/or conducts

business in Plaintiff's community as a licensed wholesale pharmaceutical distributor under the

following named business entities: H.D. Smith Wholesale Drug Company, H.D. Smith Holdings,

LLC, and H.D. Smith Holding Company. H.D. Smith Wholesale Drug Company has been

restructured and it is currently doing business as H.D. Smith, LLC. H.D. Smith is the largest

independent wholesaler in the United States. In January 2018, Defendant AmerisourceBergen

acquired H.D. Smith. H.D. Smith is a distributor of wholesale brand, generic and specialty

pharmaceuticals and is a Delaware limited liability company with its principal place of business

in Springfield, Illinois. At all times relevant to this Complaint, H.D. Smith distributed

prescription opioids throughout the United States, including in Plaintiff's Community

specifically. H.D. Smith distributed opioids, in violation of the duties owed to Plaintiff as set

forth in Plaintiff's original complaint and the other allegations incorporated herein, in sufficient

quantities to be a proximate cause of Plaintiff's injuries. H.D. Smith is sued as a Distributor

Defendant.

**EXHIBIT 2**

1.1.2    Defendant **Anda, Inc.,** ("Anda") through its various DEA registrant subsidiaries and affiliated entities, including but not limited to, Anda Pharmaceuticals, Inc., is the fourth largest distributor of generic pharmaceuticals in the United States. Anda, Inc. is a Florida corporation with its principal office located in Weston, Florida. In October 2016, Defendant Teva acquired Anda from Allergan plc (i.e., Defendant Actavis), for $500 million in cash. Anda is registered to conduct business and/or conducts business in Plaintiff's community as a licensed wholesale pharmaceutical distributor. Anda distributed opioids, in violation of the duties owed to Plaintiff as set forth in Plaintiff's original complaint and the other allegations incorporated herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries. Anda is sued as a Distributor Defendant.

1.1.3    Defendant **Quest Pharmaceuticals, Inc.** is a Kentucky corporation with its principal place of business in Murray, Kentucky. Quest Pharmaceuticals, Inc. is registered to conduct business and/or conducts business in Plaintiff's community as a licensed wholesale pharmaceutical distributor. Quest Pharmaceuticals, Inc. distributed opioids, in violation of the duties owed to Plaintiff as set forth in Plaintiff's original complaint and the other allegations incorporated herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries. Quest Pharmaceuticals, Inc. is sued as a Distributor Defendant.

1.1.4    Defendant **Par Pharmaceutical, Inc.** is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant **Par Pharmaceutical Companies, Inc.** is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. (Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc., collectively "Par Pharmaceutical") was acquired by Endo

**EXHIBIT 2**

Case 5:19-cv-00083-GNS-LLK   Document 36-2   Filed 02/01/21   Page 195 of 940 PageID #:
Case: 1:18-op-45537-DAP   Doc #: 2   Filed: 03/06/19   5 of 10.   PageID #: 193
378

International plc in September 2015 and is an operating company of Endo International plc. Par Pharmaceutical is registered to conduct business and/or conducts business in Plaintiff's community as a licensed wholesale pharmaceutical distributor. Par Pharmaceutical distributed opioids, in violation of the duties owed to Plaintiff as set forth in Plaintiff's original complaint and the other allegations incorporated herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries. Par Pharmaceutical is sued as a Marketing Defendant.

1.1.5    Defendant **SpecGx, LLC** is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly owned subsidiary of Defendant Mallinckrodt plc. SpecGx, LLC is registered to conduct business and/or conducts business in Plaintiff's community as a licensed wholesale pharmaceutical distributor. SpecGx, LLC distributed opioids, in violation of the duties owed to Plaintiff as set forth in Plaintiff's original complaint and the other allegations incorporated herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries. SpecGx, LLC is sued as a Marketing Defendant.

1.1.6    Defendant **Walgreens Boots Alliance, Inc.,** is a Delaware corporation with its principal place of business in Illinois. Walgreens Boots Alliance Inc. is registered to conduct business and/or conducts business in Plaintiffs' community as a licensed wholesale distributor under the following named business entities: Walgreen Co.; Walgreen Eastern Co., Inc.; Walgreen Arizona Drug Co. (collectively "Walgreens"). Walgreens distributed opioids, in violation of the duties owed to Plaintiff as set forth in Plaintiff's original complaint and the other allegations incorporated herein, in sufficient quantities to be a proximate cause of Plaintiff's injuries. Walgreens is sued as both a Distributor Defendant and as a National Retail Pharmacy Defendant.

**EXHIBIT 2**

## COMMON FACTUAL ALLEGATIONS

2.      By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the *Summit County* Pleadings as identified in the Court's Order implementing the Short Form procedure. Dkt. #1282.

☒ Common Factual Allegations (Paragraphs 130 through 670 and 746 through 813)

☒ RICO Marketing Enterprise Common Factual Allegations (Paragraphs 814-848)

☒ RICO Supply Chain Enterprise Common Factual Allegations (Paragraphs 849-877)

3.      If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here.  Plaintiff(s) assert(s) the following additional facts to support the claim(s) identified in Paragraph 6 below (below or attached):
N/A _____

## CLAIMS

4.      The following federal **RICO causes of action** asserted in the *Summit County* Pleadings as identified in the Court's implementing order and any subsequent amendments, Dkt. <u>1282</u>, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff(s)'s Existing Complaint (check all that apply):

☒  First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Summit County* Pleadings, Paragraphs 878-905)

☒  Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Summit County* Pleadings, Paragraphs 906-938)

5.      Plaintiff asserts the following **additional claims** as indicated (below or attached):
N/A

6.      To the extent Plaintiff(s) wish(es) to **dismiss claims** previously asserted in

Plaintiff(s)'s Existing Complaint, they are identified below and will be dismissed without

prejudice:  N/A

**EXHIBIT 2**

WHEREFORE, Plaintiff(s) prays for relief as set forth in the *Summit County* Pleadings in

*In Re National Prescription Opiate Litigation* in the United States District Court for the Northern

District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated: March 6, 2019                     /s/Anthony J. Majestro
                                         *Attorney for Plaintiff(s)*
                                         Anthony J. Majestro
                                         J.C. Powell
                                         James S. Nelson
                                         Christina L. Smith
                                         **POWELL & MAJESTRO, PLLC**
                                         405 Capitol Street, Suite P-1200
                                         Charleston, WV 25301
                                         Tel.: 304-346-2889
                                         Fax: 304-346-2895
                                         amajestro@powellmajestro.com
                                         jcpowell@powellmajestro.com
                                         jnelson@powellmajestro.com
                                         csmith@powellmajestro.com

                                         /s/J. Burton LeBlanc, IV
                                         Russell W. Budd
                                         J. Burton LeBlanc, IV
                                         Laura J. Baughman
                                         Christine C. Mansour
                                         **BARON & BUDD, P.C.**
                                         3102 Oak Lawn Avenue, Suite 1100
                                         Dallas, TX 75219
                                         Tel.: 214-521-3605
                                         Fax: 214-520-1181
                                         rbudd@baronbudd.com
                                         bleblanc@baronbudd.com
                                         lbaughman@baronbudd.com
                                         cmansour@baronbudd.com

**EXHIBIT 2**

/s/Peter J. Mougey

Peter J. Mougey
Troy Rafferty
Archie C. Lamb, Jr.
Page A. Poerschke
Laura S. Dunning
Jeffrey Gaddy
**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY &
PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com
trafferty@levinlaw.com
alamb@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
jgaddy@levinlaw.com


/s/ Paul T. Farrell, Jr.

Paul T. Farrell, Jr.
M. Bert Ketchum, III
**Greene, Ketchum, Farrell,
Bailey & Tweel, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Phone:  800.479.0053 or 304.525.9115
Fax:      304.529.3284
paul@greeneketchum.com
bert@greeneketchum.com

**EXHIBIT 2**

/s/James C. Peterson
R. Edison Hill (WVSB No. 1734)
James C. Peterson (WVSB No. 2880)
Harry C. Deitzler (WVSB No. 981)
Aaron L. Harrah (WVSB No. 9937)
Sandra B. Harrah (WVSB No. 7130)
Douglas A. Spencer (WVSB No. 9369)
**HILL, PETERSON, CARPER,
  BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.:  304-345-5667
Fax:  304-345-1519
jcpeterson@hpcbd.com
rehill@hpcbd.com
HGDeitzler@hpcbd.com
aaron@hpcbd.com
sandra@hpcbd.com
doug@hpcbd.com


/s/Michael J. Fuller, Jr.
Michael J. Fuller, Jr.
Amy J. Quezon
**MCHUGH FULLER LAW GROUP,
PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com

9

**EXHIBIT 2**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of March, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

/s/Anthony J. Majestro
Anthony J. Majestro
*Attorney for Plaintiff(s)*

**EXHIBIT 2**

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

NOV - 8 2018

RICK WARREN
COURT CLERK

48

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

CITY OF OKLAHOMA CITY,

        Plaintiff,

v.

(1)   PURDUE PHARMA L.P.,
(2)   PURDUE PHARMA INC.,
(3)   THE PURDUE FREDERICK COMPANY,
(4)   CEPHALON, INC.,
(5)   TEVA PHARMACEUTICAL INDUSTRIES, LTD.,
(6)   TEVA PHARMACEUTICALS USA, INC.,
(7)   JANSSEN PHARMACEUTICALS, INC.,
(8)   JOHNSON & JOHNSON,
(9)   ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.,
(10)  JANSSEN PHARMACEUTICA, INC.,
(11)  ENDO HEALTH SOLUTIONS INC.,
(12)  ENDO PHARMACEUTICALS INC.,
(13)  ALLERGAN PLC,
(14)  ACTAVIS PLC
(15)  ACTAVIS PHARMA, INC.,
(16)  WATSON PHARMACEUTICAL, INC.
(17)  WATSON PHARMA, INC.,
(18)  WATSON LABORATORIES, INC.,
(19)  ACTAVIS LLC,
(20)  MALLINCKRODT PLC,
(21)  MALLINCKRODT LLC,
(22)  INSYS THERAPEUTIC, INC.,
(23)  MCKESSON CORP.,
(24)  CARDINAL HEALTH, INC.,
(25)  AMERISOURCEBERGEN CORP.,
(26)  ANDA PHARMACEUTICALS, INC.,
(27)  ANDA, INC.,
(28)  GCP PHARMA, LLC,
(29)  KEYSOURCE MEDICAL, INC.,
(30)  MORRIS & DICKSON CO, LLC,
(31)  QUEST PHARMACEUTICALS, INC.,
(32)  THE HARVARD DRUG GROUP, LLC,
(33)  PHYSICIANS TOTAL CARE, INC.,
(34)  WILLIAM VALUCK, M.D.,
(35)  HARVEY JENKINS, M.D.,

CJ-2018-6179

Case No.

**PETITION**

22676854_1

EXHIBIT 3

(36)   RUSSELL PORTENOY, M.D.,
(37)   PERRY FINE, M.D., and
(38)   LYNN WEBSTER, M.D.,

         Defendants.

## I.   INTRODUCTION

1.     The opioid epidemic is ravaging communities across the United States, but particularly in Oklahoma, as a result of corporate greed. The Oklahoma City metro area has a population of roughly 1.38 million people, which amounts to roughly 35% of the state's population residing in this area. Oklahoma City spends substantial amounts annually to provide and pay for a wide range of services to its residents, including law enforcement and emergency medical services. In recent years, more of those resources have gone to battling the opioid epidemic as a direct result of the actions of Defendants.

2.     Oklahoma City also employees thousands of people and is responsible for funding a medical insurance plan for its employees and retirees.

3.     Oklahoma City brings this action in its legal and sovereign capacity to protect the health, safety, and welfare of all its residents.

4.     Opioids are highly addictive and, historically, medical professionals have prescribed them in limited circumstances to patients with cancer, terminal illnesses, or acute short-term pain. Defendants manufacture and distribute opioids and, therefore, the limited uses for which medical professionals prescribed opioids undermined Defendants' ability to maximize profits. Thus, Defendants sought to maximize their profits by selling more opioids.  Defendants accomplished this goal by expanding the market beyond the limited circumstances of medically necessary opioid use and successfully convinced

2

EXHIBIT 3

medical professionals to prescribe opioids to a broader range of patients for longer periods of time.

5.      Defendants chose to falsely downplay the risk of opioid addiction and overstate the efficacy of opioids for more wide-ranging conditions, including chronic non-cancer pain, in a willful effort to maximize their profits at the expense of human life. Over several years, Defendants implemented unprecedented and large-scale deceptive marketing campaigns that misrepresented the risks of addiction from their opioids and pushed unsubstantiated benefits. Defendants were extremely successful in increasing the sales of opioids. For example, sales of OxyContin rose from roughly $48 million in 1996 to roughly $3 billion by 2009.

6.      This epidemic has been building for years and the effects of this crisis have only been exacerbated by Defendants' efforts to conceal and minimize the risks of opioid addiction.

7.      The costs and adverse effects of the opioid epidemic could have been, and should have been, prevented by Defendants. The prescription drug industry is required by law to secure and monitor opioids at every step in the stream of commerce, thereby protecting opioids from theft, misuse, and diversion. The industry is required to implement and follow processes that stop suspicious or unusual orders by pharmacies, doctors, clinics, or patients.

8.      Instead of acting with reasonable care and in compliance with their legal duties, the Defendants intentionally saturated communities with opioids and pocketed billions of dollars in the process.

**EXHIBIT 3**

9.    Defendants also flooded the market with false declarations designed to convince doctors, patients, and government entities that prescription opioids posed a low risk of addiction. Those claims were false[1] and Defendants knew it.

10.    Defendants created an environment where physicians were motivated to dispense opioids to their patients at the expense of Oklahoma City and its residents. Certain physicians profited by promoting Defendants' false message, and by dispensing Defendants' opioids with reckless indifference to their risks.

11.    Defendants' actions directly and foreseeably caused damages to Oklahoma City and its residents, including but not limited to, actual costs, the loss of opportunity, or diversion of: healthcare and emergency care costs, costs for social services for those suffering from opioid addiction, overdose, or death; counseling, treatment and rehabilitation services; treatment of infants born with opioid-related medical conditions; care for children whose parents suffer from opioid-related disability or incapacitation; and law enforcement and public safety relating to the opioid epidemic within the City. Oklahoma City has also suffered substantial damages due to the lost productivity of its residents, increased administrative costs, and the lost opportunity for growth and self-determination. These damages have been suffered and continue to be suffered directly by Oklahoma City.

12.    Oklahoma City seeks the abatement of the continuing epidemic created by Defendants' wrongful and/or unlawful conduct.

---

[1] *See* Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at: http://turnthetiderx.org/

4

**EXHIBIT 3**

## II.    THE PARTIES

### A.    Plaintiff

13.    The City of Oklahoma City is an incorporated municipality that has the power to sue and be sued.   Plaintiff is referred to as "Oklahoma City" or "City".

### B.    Pharmaceutical Defendants

14.    The Pharmaceutical Defendants are defined below. At all relevant times, the Pharmaceutical Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of prescription opioid drugs. The Pharmaceutical Defendants, at all times, have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

15.    PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut.   THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company are referred to collectively as "Purdue").

16.    Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States, including Oklahoma. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes

**EXHIBIT 3**

roughly 30% of the entire market for analgesic drugs (painkillers). Purdue has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

17.     CEPHALON, INC. is a Delaware corporation with its principal place in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a wholly owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon, Inc. in October 2011.

18.     Cephalon, Inc. manufactures, promotes, sells and distributes opioids such as Actiq and Fentora in the United States, including in Oklahoma. The Federal Drug Administration ("FDA") approved Actiq and Fentora only for the management of breakthrough cancer pain in patients who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

19.     Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses

**EXHIBIT 3**

that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon, Inc. to disclose that it is a wholly owned subsidiary of Teva Ltd. on prescription savings cards indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales." Through interrelated operations like these, Teva Ltd. operates in Oklahoma and the rest of the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Pharmaceuticals Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to collectively as "Cephalon"). Cephalon has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

20.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as Janssen Pharmaceuticals, Inc.,

**EXHIBIT 3**

is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to collectively as "Janssen"). Upon information and belief, J&J controls the sale and development of Janssen Pharmaceutical's products and corresponds with the FDA regarding Janssen's products.

21.     Janssen manufactures, promotes, sells, and distributes drugs in the United States, including in Oklahoma, including the opioid Duragesic (fentanyl). Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Janssen has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

22.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to collectively as "Endo").

23.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, including in Oklahoma. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone

8

**EXHIBIT 3**

products in the United States, including in Oklahoma, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. Endo has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

24.      ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan plc in March 2015. Before that, WATSON PHARMACEUTICALS, INC. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, and then Actavis plc in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to collectively as "Actavis").

25.      Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions

**EXHIBIT 3**

of Duragesic and Opana, in the United States, including in Oklahoma. Actavis has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

26.    MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its United States headquarters in St. Louis, Missouri. MALLINCKRODT, LLC, is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinkrodt, plc. Mallinckrodt, plc and Mallinckrodt, LLC are collectively referred to as "Mallinckrodt."

27.    Mallinckrodt manufactures, markets, and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the Drug Enforcement Administration ("DEA") of suspicious orders of controlled substances. Mallinckrodt has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

28.    INSYS THERAPEUTICS, INC. is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys Therapeutics, Inc. is referred to as "Insys" and has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

29.    Insys develops, markets, and sells prescription drugs, including Subsys, a sublingual spray of fentanyl, in Oklahoma City and nationally. In 2017, the founder of Insys, its CEO, and several former executives, were criminally charged in connection with paying millions of dollars in bribes to physicians to prescribe Subsys. The bribes were paid through sham speaker fees, jobs for prescribers' relatives and friends, and other

EXHIBIT 3

forms of compensation.   Insys is currently under investigation by the United States Department of Justice for its conduct.

30.     Collectively, Purdue, Cephalon, Janssen, Endo, Actavis, Mallinckrodt, and Insys are referred to herein as the "Pharmaceutical Defendants" or "Manufacturer Defendants."

**C.     Distributor Defendants**

31.     CARDINAL HEALTH, INC. ("Cardinal") is a publicly traded company incorporated under the laws of Ohio and with a principal place of business in Ohio.

32.     Cardinal distributes prescription opioids to providers and retailers, including in Oklahoma. Cardinal is registered to do business and receive service of process in Oklahoma. Cardinal is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

33.     AMERISOURCEBERGEN CORPORATION ("AmerisourceBergen") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in Pennsylvania.

34.     AmerisourceBergen distributes prescription opioids to providers and retailers, including in Oklahoma.  AmerisourceBergen is registered to do business and receive service of process in Oklahoma.

35.     AmerisourceBergen is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

36.     MCKESSON CORPORATION ("McKesson") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in San Francisco, California.

**EXHIBIT 3**

37.     McKesson distributes prescription opioids to providers and retailers, including in Oklahoma. McKesson is registered to do business and receive service of process in Oklahoma. McKesson is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

38.     ANDA PHARMACEUTICALS INC. is a publicly traded company incorporated under the laws of Florida with its principal place of business in Mississippi.

39.     ANDA INC. is a publicly traded company incorporated under the laws of Florida with its principal place of business in Florida. (Anda Pharmaceuticals, Inc. and Anda, Inc. are referred to collectively as "Anda"). Anda is a subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis.

40.     Anda distributes prescription opioids to providers and retailers, including in Oklahoma. Anda is registered to do business and receive service of process in Oklahoma. Anda is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

41.     GCP PHARMA, LLC ("GCP Pharma") was a privately held company incorporated under the laws of Oklahoma with its principal place of business in Oklahoma.

42.     GCP Pharma distributed prescription opioids to providers and retailers, including in Oklahoma. GCP Pharma was registered to do business and receive service of process in Oklahoma. GCP Pharma was also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

EXHIBIT 3

43.     KEYSOURCE MEDICAL, INC ("Keysource") is a privately held company incorporated under the laws of Delaware with its principal place of business in Ohio. Keysource is a subsidiary of Friedman Capital.

44.     Keysource distributes prescription opioids to providers and retailers, including in Oklahoma. Keysource is registered to do business and receive service of process in Oklahoma. Keysource is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

45.     MORRIS & DICKSON CO, LLC ("Morris") is a privately held company incorporated under the laws of Louisiana with its principal place of business in Louisiana.

46.     Morris distributes prescription opioids to providers and retailers, including in Oklahoma. Morris is registered to do business and receive service of process in Oklahoma. Morris is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

47.     QUEST PHARMACEUTICALS, INC ("Quest") is a privately held company incorporated under the laws of Kentucky with its principal place of business in Kentucky.

48.     Quest distributes prescription opioids to providers and retailers, including in Oklahoma. Quest is registered to do business and receive service of process in Oklahoma. Quest is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

49.     THE HARVARD DRUG GROUP, LLC ("Harvard Drug") is a privately held company incorporated under the laws of Michigan with its principal place of business in Michigan. Harvard Drug is a subsidiary of Cardinal Health, Inc.

**EXHIBIT 3**

50.     Harvard Drug distributes prescription opioids to providers and retailers, including in Oklahoma. Harvard Drug is registered to do business and receive service of process in Oklahoma. Harvard Drug is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

51.     PHYSICIANS TOTAL CARE, INC. ("PTC") is a corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business in the city of Tulsa, Oklahoma, and is duly authorized to transact business in the State of Oklahoma. PTC is a packager and wholesale distributor of pharmaceuticals. PTC receives large quantities of pharmaceuticals from pharmaceutical manufacturers and then repackages those pharmaceuticals into smaller packages and distributes them to its customers, i.e. hospitals, government agencies, pharmacies, and treating physicians.

52.     Collectively, Cardinal, AmerisourceBergen, McKesson, Anda, GCP Pharma, Keysource, M&D, Quest, Harvard Drug, and PTC, are the "Distributor Defendants."

53.     The data that reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v. U.S. D.O.J.*, 784 F.3d 448, 451 (8th Cir. 2015). Neither the DEA nor the wholesale distributors will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the claims asserted herein. *See id.* at 452-53. Collectively, AmerisourceBergen, Cardinal, and McKesson dominate 85% of the market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade*

14

**EXHIBIT 3**

*Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal, McKesson, and AmerisourceBergen predecessors). Each has been investigated and/or fined by the DEA for the failure to report suspicious orders. Oklahoma City has reason to believe each has engaged in unlawful conduct, which resulted in the diversion of prescription opioids into its community. Oklahoma City names each of the "Big 3" herein as defendants and places the industry on notice that Oklahoma City is acting to abate the public nuisance plaguing its community. Oklahoma City will request discovery to secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

**D.     Medical Provider Defendants**

54.     WILLIAM VALUCK M.D. is an individual currently incarcerated in Oklahoma. Dr. Valuck operated a "cash only" pain management clinic in southwest Oklahoma City and often over-prescribed opioids. In 2014, Dr. Valuck entered a guilty plea as part of an agreement reached with the State of Oklahoma for eight counts of murder in the second degree related to the deaths of his patients.

55.     Upon information and belief, one of Dr. Valuck's patients that died from drug toxicity was prescribed approximately 600 pills at a clinical visit at his office and died roughly a month after the prescription was filled. Upon information and belief, this type of clinical visit became an increasingly common practice where Dr. Valuck's patients were prescribed hundreds of opioid pills per visit.

**EXHIBIT 3**

56.     HARVEY JENKINS, M.D. is an individual residing in Oklahoma. Dr. Jenkins operated a pain clinic in south Oklahoma City and often prescribed lethal dosages of opioids while not properly examining or keeping adequate records on his patients. In 2016, Dr. Jenkins was charged with twenty-nine felonies connected to his "pill mill" clinic.

57.     Patients would be briefly seen by Dr. Jenkins and then prescribed large amounts of pills, mainly opioid painkillers. Moreover, the prescriptions were so large that there were not any procedures in place by Dr. Jenkins to guard against the diversion of narcotics.

58.     RUSSELL PORTENOY, M.D., is an individual residing in New York. Dr. Portenoy received benefits from Defendants for promoting the use of opioids for long-term chronic pain and downplaying the risks of addiction of opioids.

59.     PERRY FINE, M.D., is an individual residing in Utah. Dr. Fine received benefits from Defendants for promoting the use of opioids for long-term chronic pain and downplaying the risks of addiction of opioids.

60.     LYNN WEBSTER, M.D., is an individual residing in Utah. Dr. Webster received benefits from Defendants for promoting the use of opioids for long-term chronic pain and downplaying the risks of addiction of opioids.

### III.     JURISDICTION AND VENUE

61.     This Court has jurisdiction over this action.

62.     Venue is proper in Oklahoma County, State of Oklahoma.

**EXHIBIT 3**

63.    This action is non-removable because there is incomplete diversity of residents and no substantial federal question presented.

## IV.    ADDITIONAL FACTUAL BACKGROUND

### A.    Overview of National Opioid Epidemic

64.    Historically, opioids were considered too addictive and debilitating to be part of a long-term pain management regimen for chronic pain.  Prior to the 1990s, the medical profession adhered to the standard that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer and end-of-life care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time as well as the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, medical professionals generally did not prescribe opioids for chronic pain.

65.    Moreover, opioids also tend to induce tolerance, whereby a person who uses opioids repeatedly over time no longer responds to the drug as strongly as before, thus requiring a higher dose to achieve the same effect. This tolerance contributes to the high risk of overdose during a relapse for those addicted to opioids.

66.    As described herein, Defendants engaged in conduct that directly caused medical professionals to unwittingly prescribe long term and increased amounts of opioids. Defendants did so to take advantage of a much larger and lucrative market for chronic pain patients.

67.    As a result of Defendants' wrongful conduct, prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate

EXHIBIT 3

every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[2] From 1999 to 2013, the amount of prescription painkillers prescribed and sold in the United States nearly quadrupled. Yet, there had not been an overall change in the amount of pain reported by patients.

68.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention declared prescription painkiller overdoses to be at epidemic levels. The press release noted:

    a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

    b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin) and oxymorphone (Opana).

    c.  Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

    d.  The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically, according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

    e.  Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

---

[2] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health 52 (2014).

**EXHIBIT 3**

f. Almost 5,500 people start to misuse prescription painkillers every day.[3]

69. Many Americans, including residents of Oklahoma City, are now addicted to prescription opioids and the number of deaths due to prescription opioid overdose has reached epidemic levels. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[4] In 2017, drug overdoses increased approximately 10 percent killing roughly 72,000 people in the United States.[5] On October 27, 2017, the President of the United States declared the opioid epidemic a public health emergency.

70. The National Institute on Drug Abuse identifies addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[6] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment and criminal justice expenditures.[7]

71. Deaths from prescription opioids have quadrupled in the past 20 years and treatment admission and emergency room visits related to the abuse of opioids for non-

---

[3] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[4] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf

[5] *See* National Institute on Drug Abuse (overdose death rates-last updated August 2018): https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates.

[6] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, *MMWR MORB MORTAL WKLY REP*. 2016;65, doi:10.15585/mmwr.mm655051e1).

[7] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

**EXHIBIT 3**

medical use have also dramatically increased. From 1999 through 2016, overdoes deaths killed 350,000 Americans. Approximately 175 Americans are currently dying every day as a result of opioid related overdoses.

72.     The increases in opioid deaths and addiction treatments are directly related to the prescribing practices created by Defendants. According to the CDC,[8] opioid deaths and treatment admissions are tied to opioid sales. By 2015, sales of opioids raised to 9.6 billion.

73.     During the next hour, six Americans will die from opioid overdoses, two babies will be born dependent on opioids and will begin to go through withdrawals, and drug manufactures and distributors will earn 2.7 million dollars in opioid sales.

74.     Defendants have continued their wrongful and unlawful conduct, despite their knowledge that such conduct is causing and continuing to cause the opioid epidemic.

**B.      Overview of Opioid Epidemic in Oklahoma**

75.     Communities have been devastated by the opioid epidemic as a result of Defendants' deceptive marketing and distribution/diversion of opioids. Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions dispensed per 100 people in 2012. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009. In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of these deaths.

---

[8] U.S. Dep't of Health & Human Servs., *Addressing Prescription Drug Abuse in the United States*, available at:
https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf

**EXHIBIT 3**

76.     In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate. Oklahoma had the 10th highest drug overdose death rate in the nation in 2014. Opioids are the most common class of drug involved in unintentional overdose deaths in Oklahoma. Approximately ten Oklahomans die every week as a result of prescription opioids overdoses.

77.     In 2015, there were approximately 823 fatal drug overdoses in Oklahoma, an almost 140% increase over 2001, with opioids contributing to the largest number of these deaths. As of 2015, there were more prescription drug overdose deaths each year in Oklahoma than overdose deaths from alcohol and all illegal drugs combined.

78.     In Oklahoma, more overdose deaths involved hydrocodone or oxycodone than methamphetamines, heroin, and cocaine combined.

79.     According to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident with approximately 877 milligrams of opioids distributed per adult resident.

80.     A National Survey on Drug Use and Health revealed Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers.

81.     The Oklahoma City Fire Department and Oklahoma City Police Department now carry Naloxone and Narcan, antidotes to opioid overdose, in an effort to battle the epidemic.

82.     The Defendants' saturation of communities with prescription opioids has created accessibility and availability of prescription opioids, which is fueling illicit opioid addiction. According to the CDC, past misuse of prescription opioids is the strongest risk

**EXHIBIT 3**

factor for a person starting and using heroin. Between 2000 and 2014, the number of overdose deaths from heroin nationwide quintupled. Eighty percent of people who abuse heroin started with prescription opioids.

83.     Defendants' conduct is affecting even Oklahoma City's youngest and most vulnerable citizens. The national rate of babies born with neonatal abstinence syndrome ("NAS"), a group of conditions newborns experience when withdrawing from exposure to drugs like opioids, increased fivefold from 2000 to 2012. In 2014, the number of newborns testing positive for prescription medications doubled the number reported in 2013. A baby is born addicted to opioids every nineteen minutes in the United States.

**C.     Pharmaceutical Defendants' False, Deceptive and Unfair Marketing of Opioids.**

84.     Each Pharmaceutical Defendant developed a well-funded marketing scheme based on deception to persuade doctors and patients that opioids can and should be used for treatment of chronic pain, resulting in opioid treatment for a much larger segment of the population, and for a longer time, of patients who are much more likely to become addicted. In connection with this scheme, Pharmaceutical Defendants spent, and continue to spend, millions of dollars on promotional activities and materials that deny or minimize the risks of opioids while overstating the benefit of using them for chronic pain.

85.     The deceptive marketing schemes included, among others: (1) false or misleading direct, branded advertisements; (2) false or misleading direct-to-physician marketing, also known as "detailing;" (3) false or misleading materials speaker programs, webinars, and brochures; and (4) false or misleading unbranded advertisements or statements by purportedly neutral third parties that were really designed and distributed

22

**EXHIBIT 3**

by the Pharmaceutical Defendants. In addition to using third parties to disguise the source of their misinformation campaign, the Pharmaceutical Defendants also retained the services of certain physicians, known as "key opinion leaders" or "KOLs" to convince both doctors and patients that opioids were safe for the treatment of chronic pain.

86.     The Pharmaceutical Defendants have made false and misleading claims regarding the risks of using their drugs that: (1) downplayed the seriousness of addiction; (2) created and promoted the concept of "pseudo addiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Pharmaceutical Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Pharmaceutical Defendants' claims.

87.     The Pharmaceutical Defendants have disseminated these common messages to reverse the popular and medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Pharmaceutical Defendants recruited for their support of their marketing messages, through unbranded marketing and through industry-funded front groups.

**EXHIBIT 3**

88.     These statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC.

89.     Pharmaceutical Defendants' efforts have been extremely successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[9] This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand). When those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

90.     Pharmaceutical Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

### 1. Each Pharmaceutical Defendant Used Multiple Avenues to Disseminate Their False and Deceptive Statements About Opioids.

91.     Pharmaceutical Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in and around Oklahoma

---

[9] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug.2016), http://turnthetiderx.org

**EXHIBIT 3**

City. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout Oklahoma City.

92.    Pharmaceutical Defendants employed the same marketing plans and strategies and deployed the same messages in and around Oklahoma City, as they did nationwide. Across the opioid pharmaceutical industry, corporate headquarters funded and oversaw "core message" development on a national basis. This comprehensive approach ensures that the Pharmaceutical Defendants' messages are consistently delivered in each sales territory across marketing channels, including detailing visits, speaker events, and advertising. The Pharmaceutical Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

93.    The Pharmaceutical Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks and sales training materials; and nationally coordinated advertising. The Pharmaceutical Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages and slide decks, and supervisors rode along with them periodically to check on their performance and compliance.

### i.    Direct Marketing

94.    The Pharmaceutical Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Pharmaceutical Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of opioids. For example,

**EXHIBIT 3**

upon information and belief, the Pharmaceutical Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

95.      Many of the Pharmaceutical Defendants' branded ads that deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like a construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain relief and functional improvement. Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

96.      Each Pharmaceutical Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. The Pharmaceutical Defendants have not corrected this misinformation. Instead, each devoted massive resources to direct sales contacts with doctors. The Pharmaceutical Defendants spent in excess of $168 million in 2014 alone on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

97.      The Pharmaceutical Defendants' detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, the Pharmaceutical Defendants purchase, manipulate, and analyze some of the most sophisticated data

26

**EXHIBIT 3**

available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus, the Pharmaceutical Defendants know their detailing to doctors is effective.

98.     The Pharmaceutical Defendants have been reprimanded for their deceptive promotions. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated." Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."[10]

## ii.     Indirect Marketing

99.     The Pharmaceutical Defendants indirectly marketed their opioids using unbranded advertising, paid speakers and KOLs, and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

100.     The Pharmaceutical Defendants deceptively marketed opioids in Oklahoma City through unbranded advertising promoting opioid use generally without naming specific opioids. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Pharmaceutical Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely

---

[10] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

**EXHIBIT 3**

and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, the Pharmaceutical Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, and medical conferences and seminars. To this end, the Pharmaceutical Defendants used third-party public relations firms to help control those messages when they originated from third parties.

101.   The Pharmaceutical Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny.  The Pharmaceutical Defendants used third-party, unbranded advertising to give the false appearance that the deceptive messages came from independent and objective sources. Like the tobacco companies, the Pharmaceutical Defendants used third parties that they funded, directed and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

102.   Pharmaceutical Defendants also identified doctors to serve, for payment, on their speakers' bureaus.  These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. Upon information and belief, these presentations conveyed misleading information, omitted material information, and

28

**EXHIBIT 3**

failed to correct Pharmaceutical Defendants' prior misrepresentations about the risks and benefits of opioids.

103.    Borrowing a page from Big Tobacco's playbook, the Pharmaceutical Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging and directing doctors who served as KOLS; and (b) funding, assisting, directing and encouraging seemingly neutral and credible Front Groups. The Pharmaceutical Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, the Pharmaceutical Defendants persuaded doctors and patients that what they have long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and that the compassionate treatment of pain required opioids.

104.    In 2007, multiple States sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion and sale of OxyContin. Certain states settled their claims in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future. By using indirect marketing strategies, however, Purdue intentionally circumvented these restrictions. Such actions included contributing to the creation of misleading publications and prescribing guidelines, which lack a reliable scientific basis and promote prescribing practices that have worsened the opioid crisis.

105.    Pro-opioid doctors are one of the most important avenues that the Pharmaceutical Defendants use to spread their false and deceptive statements about the

**EXHIBIT 3**

risks and benefits of long-term opioid use. The Pharmaceutical Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that Purdue paid doctors who provided testimonials on the site and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials. Defendants utilized many KOLs, including many of the same ones.

106.   Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Pharmaceutical Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees and honoraria from Cephalon, Endo, Janssen and Purdue (among others) and was a paid consultant to Cephalon and Purdue. Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society's ("APS") and the American Academy of Pain Medicine's ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Pharmaceutical Defendants.

107.   Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is

30

EXHIBIT 3

extremely low." He appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that the person is not going to become addicted.[11]

108.    Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and 90s about addiction that weren't true."[12] These lectures falsely claimed that less than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[13] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[14]

109.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of the American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo and Purdue. At the same time,

---

[11] Good Morning America (ABC television broadcast Aug. 30, 2010).
[12] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012.
[13] *Id.*
[14] *Id.*

**EXHIBIT 3**

Dr. Webster was receiving significant funding from the Pharmaceutical Defendants (including nearly $2 million from Cephalon).

110.    During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

111.    Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and, for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen and Purdue. Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

112.    In 2011, Dr. Webster presented via webinar a program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was

EXHIBIT 3

available to and was intended to reach doctors treating members of Plaintiff's Community.[15]

113.    Dr. Webster also was a leading proponent of the concept of "pseudo addiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and co-author Beth Dove wrote in their 2007 book Avoiding Opioid Abuse While Managing Pain, when faced with signs of abnormal behavior, increasing the dose "in most cases . . . should be the clinician's first response."[16] Upon information and belief, Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[17]

114.    The Pharmaceutical Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Pharmaceutical Defendants, these "Front Groups" generated treatment guidelines, unbranded materials and programs that favored chronic opioid therapy. They also assisted the Pharmaceutical Defendants by responding to negative articles, advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific

---

[15] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk.*
[16] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).
[17] John Fauber, *Painkiller Boom Fuele by Networking*, Milwaukee Wisc J. Sentinel, Feb. 18, 2012.

33

**EXHIBIT 3**

evidence, and conducting outreach to vulnerable patient populations targeted by the Pharmaceutical Defendants.

115.    These Front Groups depended on the Pharmaceutical Defendants for funding and, in some cases, for survival. The Pharmaceutical Defendants also exercised control over programs and materials created by these groups by collaborating on, editing and approving their content and by funding their dissemination. In doing so, the Pharmaceutical Defendants made sure that the Front Groups would generate only the messages that the Pharmaceutical Defendants wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of patients suffering from pain or doctors treating those patients.

116.    Pharmaceutical Defendants Cephalon, Endo, Janssen and Purdue, in particular, utilized many Front Groups, including several of the same ones.  The most prominent include the APS, American Geriatrics Society, the Federation of State Medical Boards, American Chronic Pain Association, the Center for Practical Bioethics, the U.S. Pain Foundation ("USPF") and the Pain & Policy Studies Group.[18]

117.    The most prominent of the Pharmaceutical Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, primarily from Endo and Purdue. APF issued education guides for patients, reporters and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign

---

[18] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015).

**EXHIBIT 3**

to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes, including death among returning veterans. APF also engaged in a significant multimedia campaign through radio, television, and the internet to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach the residents of Oklahoma City.

118.   In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of a total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo and others.

119.   APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing and thus the profitability of its sponsors. Upon information and belief, it was often called upon to provide "patient representatives" for the Pharmaceutical Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain. APF functioned largely as an advocate for the interests of the Pharmaceutical Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to strategically align its investments in nonprofit organizations that share its business interests.

**EXHIBIT 3**

120.   Upon information and belief, on several occasions representatives of the Pharmaceutical Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

121.   The United States Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer Defendants stopped funding it. Within days of being targeted by a Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[19]

122.   Another front group for the Pharmaceutical Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Pharmaceutical Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

123.   AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's

---

[19] Charles Ornstein & Tracy Weber, Senate Panel Investigates Drug Companies' Ties to Pain Groups, Wash. Post, May 8, 2012.

**EXHIBIT 3**

marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Pharmaceutical Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

124.   Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Defendant Perry Fine and Defendant Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

125.   The Pharmaceutical Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

126.   In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patients' addiction to opioids was low. Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website

**EXHIBIT 3**

until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[20]

127. AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[21] Doctors, especially the general practitioners and family doctors targeted by the Pharmaceutical Defendants, have relied upon treatment guidelines. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

128. At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Pharmaceutical Defendants Janssen, Cephalon, Endo, and Purdue. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[22] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Pharmaceutical Defendants, made to the sponsoring organizations

---

[20] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).
[21] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).
[22] *Id.*

EXHIBIT 3

and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids. The Guidelines have been cited hundreds of times in academic literature, are still available online, and were reprinted in the Journal of Pain. The Pharmaceutical Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Pharmaceutical Defendants financial support to members of the panel.

129. The Pharmaceutical Defendants worked together through Front Groups to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Pharmaceutical Defendants. Among other projects, PCF worked to ensure that a mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Pharmaceutical Defendants determined would reduce prescribing.

**D. Pharmaceutical Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.**

**1. The Pharmaceutical Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs.**

130. To falsely assure physicians and patients that opioids are safe, the Pharmaceutical Defendants deceptively trivialized and failed to disclose the risks of long-

EXHIBIT 3

term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations, which are described below, reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Not only have the Pharmaceutical Defendants failed to correct these misrepresentations, they continue to make them today.

131.    Opioid manufacturers, including Pharmaceutical Defendants Endo Pharmaceuticals, Inc. and Purdue Pharma L.P., have entered into settlement agreements with public entities that prohibit them from making many of the misrepresentations identified in this Petition. However, each Pharmaceutical Defendant continued to misrepresent the risks and benefits of long-term opioid use and each continues to fail to correct its past misrepresentations.

132.    Some illustrative examples of the Manufacturer Defendants' false, deceptive, and unfair claims about the purportedly low risk of addiction include:

a.    Actavis' predecessor caused a patient education brochure, Managing Chronic Back Pain, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis' acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

**EXHIBIT 3**

b.   Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft.

c.   Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

d.   Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

e.   Janssen reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f.   Janssen runs a website, Prescriberesponsibly.com, which claims that concerns about opioid addiction are "overestimated."

g.   Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction."[23]

---

[23] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

EXHIBIT 3

h.  Consistent with the Pharmaceutical Defendants' published marketing materials, upon information and belief, detailers for the Pharmaceutical Defendants in Oklahoma and Plaintiff's Community minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

i.  Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Pharmaceutical Defendants' Front Groups APF and NFP argued in an amicus brief to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.[24]

133.  These claims are contrary to longstanding scientific evidence. A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction], [and] overdose . . .)."[25] The 2016 CDC Guideline further explains that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[26]

134.  The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release and long-acting ("ER/LA") opioids in 2013 and for immediate release ("IR") opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal

---

[24] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurwitz*, No. 05-4474 (4th Cir. Sept. 8, 2005), at 9.

[25] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[26] *Id.* at 2, 25.

**EXHIBIT 3**

opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.[27]

135.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."[28] Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in Oklahoma City.

136.    In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, Pharmaceutical Defendants also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Pharmaceutical Defendants

---

[27] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013); Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016).
[28] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc.* (Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

**EXHIBIT 3**

misrepresented, to both doctors and patients, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (i.e. "pseudoaddiction"), and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

137.   In the 2016 CDC Guideline, the CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already addicted patients.

138.   In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive, and unfair practice is the Pharmaceutical Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Pharmaceutical Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Pharmaceutical Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and made patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

> a.   Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

**EXHIBIT 3**

b.   Purdue, upon information and belief, sponsored a 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c.   In 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients and not opioids are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

d.   On information and belief, detailers for the Pharmaceutical Defendants have touted and continue to tout to doctors the reliability and effectiveness of screening or monitoring patients as a tool for managing opioid abuse and addiction.

139.   Once again, the 2016 CDC Guideline confirms that these statements were false, misleading, and unsupported at the time they were made by the Pharmaceutical Defendants. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

140.   To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, the Pharmaceutical Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

EXHIBIT 3

141.   For example, on information and belief, a 2011 non-credit educational program sponsored by Endo, entitled Persistent Pain in the Older Adult, claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

142.   Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[29]

143.   The Pharmaceutical Defendants deceptively minimized the significant symptoms of opioid withdrawal, which as explained in the 2016 CDC Guideline, include drug craving, anxiety, insomnia, abdominal pain, vomiting, diarrhea, tremor, and tachycardia (rapid heartbeat), and grossly understated the difficulty of tapering, particularly after long-term opioid use.

144.   Contrary to the Pharmaceutical Defendants' representations, the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "more than a few days of exposure to opioids significantly increases hazards" and "each day of unnecessary opioid use increases likelihood of physical dependence without adding benefit."

---

[29] Available at: http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

EXHIBIT 3

145.    The Pharmaceutical Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to the Pharmaceutical Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples of these deceptive claims are described below:

    a.   On information and belief, Actavis' predecessor created a patient brochure for Kadian that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."

    b.   Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.[30]

    c.   Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

    d.   Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . .You won't 'run out' of pain relief."[31]

---

[30] Available at, https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.
[31] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

**EXHIBIT 3**

e. Janssen, on information and belief, sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f. On information and belief, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages.

h. In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

i. Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Front Group APF and others argued to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.

j. On information and belief, Purdue's detailers have told doctors that they should increase the dose of OxyContin, rather than the frequency of use, to address early failure.

146. These claims conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is

48

**EXHIBIT 3**

increased at higher opioid dosages." The CDC also states that there are "increased risks for opioid use disorder, respiratory depression, and death at higher dosages."

147.    The Pharmaceutical Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can prevent and curb addiction and abuse.

148.    These abuse deterrent formulations (AD opioids) purportedly are harder to crush, chew, or grind; become gelatinous when combined with a liquid, making them harder to inject; or contain a counteragent such as naloxone that is activated if the tablets are tampered. Despite this, AD opioids can be defeated often quickly and easily by those determined to do so. The 2016 CDC Guideline state that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies, even when they work, do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes. Moreover, they do not reduce the rate of misuse and abuse by patients who become addicted after using opioids long term as prescribed or who escalate their use by taking more pills or higher doses. Tom Frieden, the Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction, overdoses, or death."[32]

149.    Despite this lack of evidence, the Pharmaceutical Defendants have made and continue to make misleading claims about the ability of their so-called abuse-deterrent opioid formulations to prevent or reduce abuse and addiction and the safety of these formulations.

---

[32] Matthew Perrone et al., *Drugmakers push profitable, but unproven, opioid solution*, Center for Public Integrity (Dec. 15, 2016).

**EXHIBIT 3**

150.    For example, Endo has marketed Opana ER as tamper or crush resistant and less prone to misuse and abuse even though: (1) on information and belief, the FDA warned in a 2013 letter that there was no evidence that Opana ER would provide a reduction in oral, intranasal or intravenous abuse; and (2) Endo's own studies, which it failed to disclose, showed that Opana ER[33] could still be ground and chewed. Nonetheless, Endo's advertisements for Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. And on information and belief, detailers for Endo have informed doctors that Opana ER is harder to abuse. Likewise, Purdue has engaged and continues to engage in deceptive marketing of its AD opioids, i.e., reformulated Oxycontin and Hysingla. Before April 2013, Purdue did not market its opioids based on their abuse deterrent properties. However, beginning in 2013 and continuing today, detailers from Purdue regularly use the so-called abuse deterrent properties of Purdue's opioid products as a primary selling point to differentiate those products from their competitors. Specifically, on information and belief, these detailers: (1) falsely claim that Purdue's AD opioids prevent tampering and cannot be crushed or snorted; (2) falsely claim that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less likely to yield a euphoric high, and are disfavored by opioid abusers; (3) falsely claim Purdue's AD opioids are "safer" than other opioids; and (4) fail to disclose that Purdue's AD opioids do not impact oral abuse or misuse and that its abuse deterrent properties can be defeated.

[33] Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, in May 2017, an FDA advisory committee recommended that Opana ER be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017 and requested that Endo withdraw Opana ER from the market. Press Release, "FDA requests removal of Opana ER for risks related to abuse," June 8, 2017, available at: https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

EXHIBIT 3

151.    These statements and omissions by Purdue are false and misleading. Purdue knew and should have known that reformulated OxyContin is not better at tamper resistance than the original OxyContin and is still regularly tampered with and abused. A 2015 study also shows that many opioid addicts are abusing Purdue's AD opioids through oral intake or by defeating the abuse deterrent mechanism. Indeed, one-third of the patients in the study defeated the abuse deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD opioids was reduced, those addicts simply shifted to other drugs such as heroin.[34] Despite this, J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.[35]

152.    The development, marketing, and sale of AD opioids are a continuation of the Pharmaceutical Defendants' strategy to use misinformation to drive profit. The Pharmaceutical Defendants' claims that AD opioids are safe falsely assuage doctors' concerns about the toll caused by the explosion in opioid abuse, causing doctors to prescribe more AD opioids, which are far more expensive than other opioid products even though they provide little or no additional benefit.

---

[34] Cicero, Theodore J., and Matthew S. Ellis, "Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from Oxycontin" (2015) 72.5 *JAMA Psychiatry* 424-430.

[35] See Harrison Jacobs, *There is a big problem with the government's plan to stop the drug-overdose epidemic*, Business Insider, Mar. 14, 2016, available at: http://www.businessinsider.com/robert-califf-abuse-deterrent-drugs-have-a-big-flaw-2016-3.

**EXHIBIT 3**

   2. **The Pharmaceutical Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs.**

153. To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long term opioid use. But as the CDC Guideline makes clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.[36] The FDA, too, has recognized the lack of evidence to support long-term opioid use. Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

154. Some illustrative examples of the Manufacturer Defendants' false claims are:

   a. Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

   b. Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

   c. Janssen sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009) – which states as "a fact" that "opioids may make it easier for

---

[36] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.

52

**EXHIBIT 3**

people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

d. Janssen promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules."

e. Upon information and belief, Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves the patients' function.

f. *Responsible Opioid Prescribing* (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function.

g. Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."[37]

h. Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

i. Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient." Upon information and belief, a CME disseminated via webcast

---

[37] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

**EXHIBIT 3**

claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

j.  Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under treated. In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

k.  Purdue sponsored the development and distribution of APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain." The Policymaker's Guide was originally published in 2011.

3.  **The Pharmaceutical Defendants' sales representatives have conveyed and continue to convey the message that opioids will improve patient function.**

155.  As the FDA and other agencies have made clear for years, these claims have no support in scientific literature.

156.  In 2010, the FDA warned Actavis, in response to its advertising of Kadian described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[38] And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their

---

[38] Letter from Thomas Abrams to Doug Boothe.

**EXHIBIT 3**

overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

157.    The Pharmaceutical Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs (nonsteroidal anti-inflammatory drugs), so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Pharmaceutical Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain. The Pharmaceutical Defendants have overstated the number of deaths from NSAIDS and have prominently featured the risks of NSAIDS, while minimizing or failing to mention the serious risks of opioids.

158.    Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is

**EXHIBIT 3**

released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

159.   Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl based IR opioids. Neither is approved for, or has been shown to be safe or effective for, chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm.

160.   Despite this, on information and belief, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe.[39] As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain.

---

[39] *See* Press Release, U.S. Dep't of Justice, *Biopharmaceutical Company, Cephalon, to Pay $425 million & Enter Plea To Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

**EXHIBIT 3**

161.   Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses. For example:

a.   Cephalon paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer or non-cancer related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

b.   Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

c.   In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

162.   The Pharmaceutical Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Pharmaceutical Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths, all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death

57

EXHIBIT 3

in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of the Pharmaceutical Defendants' misrepresentations.

163. On information and belief, the Pharmaceutical Defendants coordinated their messaging through national and regional sales and speaker trainings and coordinated advertisements and marketing materials.

164. Moreover, at all times relevant to this Petition, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Pharmaceutical Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Pharmaceutical Defendants' false and misleading statements about the risks and benefits of long-term opioid use for chronic pain.

165. Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. The Pharmaceutical Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for the Pharmaceutical Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions.

**EXHIBIT 3**

166.    The Pharmaceutical Defendants' efforts to artificially increase the number of opioid prescriptions directly and predictably caused a corresponding increase in opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[40] Many abusers start with legitimate prescriptions. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths and prevent opioid related morbidity."[41] The Pharmaceutical Defendants' false and misleading statements directly caused the current opioid epidemic.

**E.    Distributor Defendants' Unlawful Distribution of Opioids.**

167.    In addition to common law duties to exercise reasonable care under the circumstances,[42] the Distributor Defendants owe a duty under state law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Plaintiff's Community as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into Plaintiff's Community. *See* 63 O.S. Chapter 2 (Oklahoma Uniform Controlled Dangerous Substances Act, hereinafter "Oklahoma CSA").

168.    The Oklahoma CSA creates a legal framework for the distribution and dispensing of opioids in Oklahoma. It is a system of checks and balances throughout the entire supply chain of opioids and requires every person or entity that manufactures,

---

[40] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, Morbidity and Mortality Wkly Rep. (Jan. 1, 2016).

[41] *Id.*

[42] This includes a duty not to create a foreseeable risk of harm to others, but also a duty to exercise reasonable care to prevent threatened harm after engaging in affirmative conduct and either realizing or should realize that such conduct has created an unreasonable risk of harm to another.

**EXHIBIT 3**

distributes, or dispenses opioids to obtain "registration" with the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. Registrants at every level of the supply chain must fulfill their obligations under the Oklahoma CSA; otherwise there is an overwhelming risk of harm to Oklahoma City.

169.   Pursuant to the Oklahoma CSA and the Oklahoma Administrative Code, all opioid distributors are required to maintain effective controls against opioid diversion. Defendant Distributors must create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders can include orders of unusual size, orders that deviate from usual ordering patterns, and/or unusual frequency of orders. Thus, at a minimum to comply with these requirements, Defendant Distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of potential diversion.

170.   Oklahoma law also creates a distribution monitoring system for controlled substances and requires distributor and dispensers of controlled dangerous substances to keep records and maintain inventories.

171.   Similarly, the Oklahoma administrative code requires anyone who distributes or dispenses prescription opioids to inform the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of suspicious orders when discovered. The code also requires reporting of theft or any significant loss of any controlled dangerous substances upon discovery of such theft or loss.

172.   The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

**EXHIBIT 3**

173.     Each Distributor Defendant repeatedly and purposefully breached its duties. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiff's Community.

174.     The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Oklahoma City. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover.

175.     The opioid epidemic in Oklahoma City remains an immediate hazard to public health and safety.

176.     The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

## 1. The Distributor Defendants Negligently Failed to Control the Flow of Opioids to Oklahoma City Through Illicit Channels.

177.     The DEA has provided guidance to distributors to combat opioid diversion. On information and belief, since 2006 the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales, due diligence, and regulatory responsibilities. The DEA also provides distributors with data on controlled substance distribution patterns and trends, including data on the volume and frequency of orders and the percentage of controlled versus non-controlled purchases. On information and belief, the DEA has also hosted conferences for opioid distributors and has participated in numerous meetings and events with trade associations.

178.     On September 27, 2006, and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on

EXHIBIT 3

suspicious order monitoring and the responsibilities and obligations of registrants to prevent diversion.

179. As part of the legal obligation to maintain effective controls against diversion, the distributor is required to exercise due care in confirming the legitimacy of each and every order prior to filling. Circumstances that could be indicative of diversion include ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; ordering a disproportionate amount of controlled substances versus non-controlled prescription drugs; ordering excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors.

180. Suspicious orders must be reported when discovered. Registrants must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted. Filling a suspicious order and then completing the sale does not absolve the registrant from legal responsibility.

181. On information and belief, the Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" emphasizing the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

182. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made

EXHIBIT 3

statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

183.    These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

184.    Despite their duties to prevent diversion, the Distributor Defendants have knowingly or negligently allowed diversion.[43] The DEA has repeatedly taken action to attempt to force compliance, including 178 registrant actions between 2008 and 2012, 76 orders to show cause issued by the Office of Administrative Law Judges, and 41 actions involving immediate suspension orders.[44] The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties, including:

    a.  In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000.[45]

    b.  McKesson has a history of repeatedly failing to perform its duties. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson's system

---

[43] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Wash. Post, Oct. 15, 2017; Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs intended for patients ended up in the hands of illegal users: 'No one was doing their job,'* Wash. Post, Oct. 22, 2016.

[44] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), available at: https://oig.justice.gov/reports/2014/e1403.pdf.

[45] Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), available at: https://www.justice.gov/opa/press-release/file/928476/download

**EXHIBIT 3**

for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.

c. On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion.

d. On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

e. On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

f. On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

g. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.[46]

h. On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

i. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.

j. In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of

---

[46] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, Wash. Post, Jan. 11, 2017.

EXHIBIT 3

the Controlled Substances Act.[47]

k. On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses a year.

l. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.

m. In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

n. In May of 2018, Morris was ordered by the Drug Enforcement Administration (DEA) to cease sales of opioids, alleging that the company failed to report unusually large narcotics shipments to drugstores. Morris had distributed excessive amounts of opioids to five of the top 10 pharmacies purchasing narcotics in Louisiana. In some cases, Morris allowed independent pharmacies to purchase six times the quantity of narcotics than they would normally order from the distributor. Despite receiving these excessively large orders, Morris never filed a suspicious activity report on any of the drugstores in question.

o. In 2016, drug wholesalers Anda Inc., The Harvard Drug Group, Associated Pharmacies, KeySource Medical Inc. and Quest Pharmaceuticals shipped an excessive number of prescription opioids such as oxycodone and hydrocodone tablets to small towns. In doing so, these drug wholesalers purposely and intentionally violated their legal duty to monitor their distribution of opioids, the result of which is the creation of a hazard to public health and safety.

---

[47] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016.

**EXHIBIT 3**

p.  In 2013, The Department of Health and Human Services ("DHHS") informed PTC of numerous opioid related infractions, which included mispackaging and mislabeling Morphine, but also failing to investigate the matter after it shipped the mislabeled drugs and had been made aware of its failure to properly package the Morphine.

q.  In addition to these violations, PTC repackaged and distributed prescription opioid drugs such as Oxycodone without an approved application at their principal place of business in Tulsa, Oklahoma.

185.  Although law enforcement authorities have penalized distributors, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

186.  The Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion created an enormous black market for prescription opioids, which market extended to Oklahoma City. Each Distributor Defendant knew or should have known that the amount of opioids flowing to Oklahoma City was far in excess of what could be consumed for medically necessary purposes.

187.  The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists purchasing large quantities of opioids, and doctors, such as Dr. Valuck and Dr. Jenkins, who were inappropriately prescribing commonly-abused opioids; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Plaintiff's

**EXHIBIT 3**

community; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

188. On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing the areas around Plaintiff's community to perform due diligence inspections to ensure that the controlled substances the Distributor Defendants had furnished were not being diverted to illegal uses.

189. On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the areas around Plaintiff's community, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

190. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the market in and around Plaintiff's community with highly addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

191. It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It is also reasonably foreseeable that many of these injuries will be suffered by the residents of Oklahoma City, and that the costs of these injuries will be borne by Oklahoma City.

192. The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by

**EXHIBIT 3**

Oklahoma City, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

193. The Distributor Defendants were aware of widespread prescription opioid abuse in and around Plaintiff's community, but, on information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

194. The use of opioids by residents of Oklahoma City who were addicted or who did not have a medically necessary purpose could not occur without the knowing cooperation and assistance of the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, the residents of Oklahoma City and Oklahoma City would have avoided significant injury.

195. The Distributor Defendants made substantial profits over the years based on the diversion of opioids into Oklahoma City. The Distributor Defendants knew that Oklahoma City and its residents would be unjustly forced to bear the costs of these injuries and damages.

196. The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids within Oklahoma City showed an intentional or reckless disregard for the safety of Oklahoma City and its residents. Their conduct poses a continuing threat to the health, safety, and welfare of Oklahoma City.

**EXHIBIT 3**

197.   The Distributor Defendants' violations constitute prima facie evidence of negligence.

## 2. The Pharmaceutical Defendants Negligently Failed to Control the Flow of Opioids within Oklahoma City Through Illicit Channels.

198.   The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescriptions opioids that were incumbent upon the Distributor Defendants were also legally required of the Pharmaceutical Defendants under state law.

199.   Like the Distributor Defendants, the Pharmaceutical Defendants are required to design and operate a system to detect suspicious orders, and to report such orders to law enforcement. *See* 63 O.S. Chapter 2 (Oklahoma CSA). The Pharmaceutical Defendants have not done so.

200.   On information and belief, for over a decade the Pharmaceutical Defendants have been able to track the distribution and prescribing of their opioids down to the retail and prescriber level. Thus, the Pharmaceutical Defendants had actual knowledge of the prescribing practices of doctors, including red flags indicating diversion. The Pharmaceutical Defendants did not report those red flags, nor did they cease marketing to those doctors. Like the Distributor Defendants, the Pharmaceutical Defendants breached their duties under the law.

201.   The Pharmaceutical Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The Pharmaceutical Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer

**EXHIBIT 3**

to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Pharmaceutical Defendants knew the volume, frequency, and pattern of opioid orders being placed and filled. The Pharmaceutical Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

202. The Department of Justice recently fined Mallinckrodt $35 million for failing to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements. [48] Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report suspicious orders for controlled substances – orders that are unusual in their frequency, size, or other patterns. . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying the DEA of these suspicious orders." [49] Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007." [50]

---

[48] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million- settlement-failure-report-suspicious- orders.
[49] *Id.*
[50] 2017 Mallinckrodt MOA at p. 2-3.

EXHIBIT 3

203.     Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of thousands of doctors and could identify doctors who displayed red flags for diversion such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.[51] Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In doing so, Purdue protected its own profits at the expense of public health and safety.

204.     Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the NY AG found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list. The NY AG also found that, in certain cases where Endo's sales representatives detailed prescribers

---

[51] Scott Glover and Lisa Girion, *OxyContin maker closely guards its list of suspect doctors*, L.A. Times, August 11, 2013.

EXHIBIT 3

who were convicted of illegal prescribing of opioids, those representatives could have recognized signs of diversion and reported those prescribers but failed to do so.

205.    On information and belief, the other Pharmaceutical Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

206.    The Pharmaceutical Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into Oklahoma City.

**F.    Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the Harm Alleged Herein and Substantial Damages.**

207.    As the Pharmaceutical Defendants' efforts to expand the market for opioids increased so have the rates of prescription and sale of their products — and the rates of opioid-related substance abuse, hospitalization, and death among the people of Oklahoma City. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like Oklahoma City, fueling the epidemic. The Medical Provider Defendants helped promote the false messages of Defendants and fuel the epidemic with careless prescribing practices.

208.    As shown above, the opioid epidemic has escalated in Plaintiff's community with devastating effects. Substantial opiate-related substance abuse, hospitalization and death mirror Defendants' increased sales, distribution, and prescribing of opioids.

209.    Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, like heroin, the massive distribution of opioids to Oklahoma City and areas from which such opioids are being

**EXHIBIT 3**

diverted into Oklahoma City, has caused the opioid epidemic to include heroin addiction, abuse, and death.

210.    Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety to the residents of Oklahoma City.

211.    Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety to the residents of Oklahoma City.

212.    Defendants repeatedly and purposefully breached their legal duties, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes into Oklahoma City.

213.    The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Oklahoma City. This diversion and the epidemic are direct causes of foreseeable harms incurred by Oklahoma City.

214.    Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Oklahoma City seeks relief, as alleged herein.

215.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon Oklahoma City.

**EXHIBIT 3**

## V.   CAUSES OF ACTION

### A.   Public Nuisance, 50 O.S. § 2 (Against all Defendants)

216.   Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

217.   Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injury the property, health, safety and/or comfort of a considerable number of persons in Oklahoma City by their production, promotion, and marketing of opioids for use by residents of Oklahoma City.

218.   Defendants' misrepresentations and omissions regarding opioids, as set forth above, have created an opioid addiction epidemic in Oklahoma City that constitutes a public nuisance. Defendants have created a condition that affects entire communities, neighborhoods, and considerable numbers of persons at the same time.

219.   Defendants' misrepresentations and omissions regarding opioids constitute unlawful acts and/or omissions of duties, which annoy, injure, or endanger the comfort, repose, health, and/or safety of others, and offend decency to a considerable number of persons in Oklahoma City. It has even caused deaths, serious injuries, and a severe disruption of public peace, order and safety.

220.   Defendants have a duty to abate the nuisance caused by the prescription opioid epidemic.

221.   Defendants have failed to abate the nuisance they created.

222.   Defendants' conduct directly and proximately caused injury to Plaintiff and its residents.

**EXHIBIT 3**

223.    As a direct result of Defendants' conduct, Oklahoma City and its residents have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, social services and other services, lost tax revenue, as well as injury and death of residents of Oklahoma City.

224.    Defendants are liable to Oklahoma City for the costs borne by it as a result of the opioid epidemic and for the costs of abating the nuisance created by Defendants.

**B.    Fraud: Actual and Constructive (Against All Defendants)**

225.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

226.    Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and concealed facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above.

227.    Defendants knew at the time that they made their misrepresentations that they were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Namely, Defendants knowingly and/or recklessly:

    a. downplayed the substantial risks of addiction and other side-effects of their opioids, including affirmatively stating in sales calls and other marketing outlets that their drugs were not as addictive as they truly are, stating that classic signs of addiction were actually an indication of

**EXHIBIT 3**

"pseudoaddiction" requiring more opioid treatment, and omitting the

high risk of addiction actually present;

b. overstated the efficacy of their opioids, including making false

statements regarding the effectiveness of the drugs for treating chronic

non-cancer pain and their ability to improve function; and

c. misrepresented the medical usefulness and necessity of their opioids,

including affirmatively marketing their drugs for off label uses without

solicitation and not in response to questions from healthcare providers.

228.     Defendants intended that Plaintiff and its residents would rely on their

misrepresentations regarding the risks, efficacy, and medical necessity of their opioids, to

increase the number of opioid prescriptions and users within Oklahoma City.

229.     Plaintiff and its residents reasonably relied upon Defendants'

misrepresentations, and that Defendants would not conceal material facts.

230.     Defendants are liable to Plaintiff for their actual fraud.

231.     Defendants had a legal and/or equitable duty to disclose the dangerous and

addictive nature of opioids and prevent their diversion. Instead, Defendants mislead the

medical community and the residents of Oklahoma City and flooded the market with

their dangerous drugs.   Defendants had a duty to accurately disclose the dangers of

opioids, and not mislead the public in order to make profits.

232.     Defendants conduct constitutes constructive fraud for which Defendants

are liable to Plaintiff.

233.     As a result of Defendants' actual and constructive fraud, Oklahoma City

has suffered actual damages, including but not limited to, significant costs related to

EXHIBIT 3

healthcare, undermining of the economic productivity of its residents, and the harming of the long-term health and welfare of the people of Oklahoma City.

234.    Defendants' conduct was willful, wanton, and malicious and was directed at the public generally. As a result, Oklahoma City seeks to recover punitive damages against Defendants.

**C.    Negligence and Negligent Misrepresentation (Against All Defendants)**

235.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

236.    Defendants had a legal duty to act with the exercise of ordinary care or skill to prevent injury to another.

237.    Defendants breached this duty through their deceptive marketing campaign, distributions of opioids, and failure to divert opioids from illicit channels. Defendants knew of the highly addictive nature and dangers of prescription opioids. Yet, Defendants' negligently misrepresented and omitted the danger of opioids to consumers, including in Oklahoma City, in a coordinated effort to sell more opioids.

238.    The Medical Provider Defendants additionally breached their duty of care by negligently prescribing opioids when they were not medically necessary.

239.    Defendants' breach of their duty of care directly and proximately caused damage to Oklahoma City.

**D.    Civil Conspiracy (Against All Defendants)**

240.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

77

**EXHIBIT 3**

241.    Defendants engaged in a civil conspiracy in their unlawful marketing of opioids and/or distribution of opioids into Oklahoma City.

242.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein.

243.    Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

**E.      Unjust Enrichment (Against All Defendants)**

244.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

245.    Defendants received a benefit in the form of billions of dollars in revenue from the sale of prescription opioids to treat chronic pain.

246.    Defendants were aware they were receiving that benefit. Defendants' conduct was designed to bring about that benefit.

247.    Defendants retained that benefit at the expense of Oklahoma City, who has borne, and who continues to bear, the economic and social costs of Defendants' scheme.

248.    It is inequitable for the Defendants to retain that benefit without paying for it.

249.    Oklahoma City is entitled to recover from Defendants' prescription opioid profits the amounts Oklahoma City has spent and will have to spend in the future to address the effects of Defendants' actions.

**EXHIBIT 3**

**F.      Punitive Damages**

250.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

251.    Defendants acted with malice, purposely, and intentionally.    At a minimum, Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

252.    Plaintiff is entitled to punitive damages in addition to actual damages from Defendants.

**JURY TRIAL DEMAND**

253.    Plaintiff hereby requests a trial by jury.

**RELIEF**

**WHEREFORE,** the Plaintiff respectfully prays that this Court grant the following relief:

(i)      Enter judgment in favor of the Plaintiff against each of the Defendants awarding Plaintiff its actual damages;

(ii)     Order that Defendants compensate the Plaintiff for the future costs to abate the ongoing public nuisance caused by the opioid epidemic;

(iii)    Enter judgment against the Defendants requiring Defendants to pay punitive damages;

(iv)     Enter judgment against Defendants awarding Plaintiff its reasonable attorneys' fees, all costs and expenses; pre-judgment and post-judgment interest; and

(v)      All other such and further relief as this Court may deem just and proper.

**EXHIBIT 3**

Respectfully submitted,

TONY G. PUCKETT, OBA #13336
TODD A. COURT, OBA #19438
MCAFEE & TAFT A PROFESSIONAL CORPORATION
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK  73102-7103
405/235-9621; 405/235-0439 (FAX)
tony.puckett@mcafeetaft.com
todd.court@mcafeetaft.com

*-and-*

MATTHEW J. SILL, OBA #21547
HARRISON C. LUJAN, OBA #30154
FULMER SILL LAW GROUP
P.O. Box 2448
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Phone/Fax: 405-510-0077
msill@fulmersill.com
hlujan@fulmersill.com
*Attorneys for Plaintiff*

**EXHIBIT 3**

**IN THE DISTRICT COURT OF JEFFERSON COUNTY STATE OF OKLAHOMA**

FILED

JAN 14 2019

KIM BERRY, COURT CLERK
JEFFERSON COUNTY

---

BOARD OF COUNTY COMMISSIONERS OF
JEFFERSON COUNTY,

        Plaintiff,

v.

(1)    PURDUE PHARMA L.P.,
(2)    PURDUE PHARMA INC.,
(3)    THE PURDUE FREDERICK COMPANY,
(4)    CEPHALON, INC.,
(5)    TEVA PHARMACEUTICAL INDUSTRIES, LTD.,
(6)    TEVA PHARMACEUTICALS USA, INC.,
(7)    JANSSEN PHARMACEUTICALS, INC.,
(8)    JOHNSON & JOHNSON,
(9)    ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.,
(10)  JANSSEN PHARMACEUTICA, INC.,
(11)  ENDO HEALTH SOLUTIONS INC.,
(12)  ENDO PHARMACEUTICALS INC.,
(13)  ALLERGAN PLC,
(14)  ACTAVIS PLC
(15)  ACTAVIS PHARMA, INC.,
(16)  WATSON PHARMACEUTICAL, INC.
(17)  WATSON PHARMA, INC.,
(18)  WATSON LABORATORIES, INC.,
(19)  ACTAVIS LLC,
(20)  MALLINCKRODT PLC,
(21)  MALLINCKRODT LLC,
(22)  INSYS THERAPEUTIC, INC.,
(23)  MCKESSON CORP.,
(24)  CARDINAL HEALTH, INC.,
(25)  AMERISOURCEBERGEN CORP.,
(26)  ANDA PHARMACEUTICALS, INC.,
(27)  ANDA, INC.,
(28)  GCP PHARMA, LLC,
(29)  KEYSOURCE MEDICAL, INC.,
(30)  MORRIS & DICKSON CO, LLC,
(31)  QUEST PHARMACEUTICALS, INC.,
(32)  THE HARVARD DRUG GROUP, LLC,
(33)  PHYSICIANS TOTAL CARE, INC.,

Case No. CJ-19-1

**PETITION**

2019-01-07 Jefferson County Petition

EXHIBIT 4

(34)   CVS HEALTH CORPORATION,
(35)   CVS PHARMACY, INC.,
(36)   OKLAHOMA CVS PHARMACY, LLC,
(37)   WALGREENS BOOTS ALLIANCE, INC.
    a/k/a WALGREEN CO.,
(38)   WILLIAM VALUCK, M.D.,
(39)   HARVEY JENKINS, M.D.,
(40)   RUSSELL PORTENOY, M.D.,
(41)   PERRY FINE, M.D., and
(42)   LYNN WEBSTER, M.D.,

Defendants.

## I.  <u>INTRODUCTION</u>

1.      The opioid epidemic is ravaging communities across the United States, but particularly in Oklahoma, as a result of corporate greed. From 2007-2013, Jefferson County had an unintentional poisoning death rate higher than the average rate for the state of Oklahoma. In recent years, more of those resources have gone to battling the opioid epidemic as a direct result of the actions of Defendants.

2.      Jefferson County also employees dozens of people and is responsible for funding a medical insurance plan for its employees and retirees.

3.      Jefferson County brings this action in its legal and sovereign capacity to protect the health, safety, and welfare of all its residents.

4.      Opioids are highly addictive and, historically, medical professionals have prescribed them in limited circumstances to patients with cancer, terminal illnesses, or acute short-term pain. Defendants manufacture and distribute opioids and, therefore, the limited uses for which medical professionals prescribed opioids undermined Defendants' ability to maximize profits. Thus, Defendants sought to maximize their profits by selling more opioids.  Defendants accomplished this goal by expanding the market beyond the

2

**EXHIBIT 4**

limited circumstances of medically necessary opioid use and successfully convinced medical professionals to prescribe opioids to a broader range of patients for longer periods of time.

5.      Defendants chose to falsely downplay the risk of opioid addiction and overstate the efficacy of opioids for more wide-ranging conditions, including chronic non-cancer pain, in a willful effort to maximize their profits at the expense of human life. Over several years, Defendants implemented unprecedented and large-scale deceptive marketing campaigns that misrepresented the risks of addiction from their opioids and pushed unsubstantiated benefits. Defendants were extremely successful in increasing the sales of opioids. For example, sales of OxyContin rose from roughly $48 million in 1996 to roughly $3 billion by 2009.

6.      This epidemic has been building for years and the effects of this crisis have only been exacerbated by Defendants' efforts to conceal and minimize the risks of opioid addiction.

7.      The costs and adverse effects of the opioid epidemic could have been, and should have been, prevented by Defendants.  The prescription drug industry is required by law to secure and monitor opioids at every step in the stream of commerce, thereby protecting opioids from theft, misuse, and diversion. The industry is required to implement and follow processes that stop suspicious or unusual orders by pharmacies, doctors, clinics, or patients.

8.      Instead of acting with reasonable care and in compliance with their legal duties, the Defendants intentionally saturated communities with opioids and pocketed billions of dollars in the process.

**EXHIBIT 4**

9.      Defendants also flooded the market with false declarations designed to convince doctors, patients, and government entities that prescription opioids posed a low risk of addiction. Those claims were false[1] and Defendants knew it.

10.     Defendants created an environment where physicians were motivated to dispense opioids to their patients at the expense of Jefferson County and its residents. Certain physicians profited by promoting Defendants' false message, and by dispensing Defendants' opioids with reckless indifference to their risks.

11.     Defendants' actions directly and foreseeably caused damages to Jefferson County and its residents, including but not limited to, actual costs, the loss of opportunity, or diversion of: healthcare and emergency care costs, costs for social services for those suffering from opioid addiction, overdose, or death; counseling, treatment and rehabilitation services; treatment of infants born with opioid-related medical conditions; care for children whose parents suffer from opioid-related disability or incapacitation; and law enforcement and public safety relating to the opioid epidemic within the County. Jefferson County has also suffered substantial damages due to the lost productivity of its residents, increased administrative costs, and the lost opportunity for growth and self-determination. These damages have been suffered and continue to be suffered directly by Jefferson County.

12.     Jefferson County seeks the abatement of the continuing epidemic created by Defendants' wrongful and/or unlawful conduct.

---

[1] *See* Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at: http://turnthetiderx.org/

EXHIBIT 4

## II.    THE PARTIES

### A.    Plaintiff

13.    Jefferson County is an organized county within the State of Oklahoma, a body corporate and politic, with the statutory authority and power to sue and be sued. Jefferson County provides a wide range of services on behalf of its residents, including but not limited to social services for families and children, public health, public assistance, law enforcement and emergency care. Plaintiff is referred to as "Jefferson County" or "County".

### B.    Pharmaceutical Defendants

14.    The Pharmaceutical Defendants are defined below. At all relevant times, the Pharmaceutical Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of prescription opioid drugs. The Pharmaceutical Defendants, at all times, have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

15.    PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut.  THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company are referred to collectively as "Purdue").

EXHIBIT 4

16.     Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States, including Oklahoma. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers). Purdue has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

17.     CEPHALON, INC. is a Delaware corporation with its principal place in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a wholly owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon, Inc. in October 2011.

18.     Cephalon, Inc. manufactures, promotes, sells and distributes opioids such as Actiq and Fentora in the United States, including in Oklahoma. The Federal Drug Administration ("FDA") approved Actiq and Fentora only for the management of breakthrough cancer pain in patients who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

19.     Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and

EXHIBIT 4

marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon, Inc. to disclose that it is a wholly owned subsidiary of Teva Ltd. on prescription savings cards indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales." Through interrelated operations like these, Teva Ltd. operates in Oklahoma and the rest of the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Pharmaceuticals Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to collectively as "Cephalon"). Cephalon has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

EXHIBIT 4

20.    JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to collectively as "Janssen").  Upon information and belief, J&J controls the sale and development of Janssen Pharmaceutical's products and corresponds with the FDA regarding Janssen's products.

21.    Janssen manufactures, promotes, sells, and distributes drugs in the United States, including in Oklahoma, including the opioid Duragesic (fentanyl). Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Janssen has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

22.    ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to collectively as "Endo").

8

EXHIBIT 4

23.    Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, including in Oklahoma. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, including in Oklahoma, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. Endo has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

24.    ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan plc in March 2015. Before that, WATSON PHARMACEUTICALS, INC. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, and then Actavis plc in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products

EXHIBIT 4

ultimately inure to its benefit. (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to collectively as "Actavis").

25.      Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States, including in Oklahoma. Actavis has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

26.      MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its United States headquarters in St. Louis, Missouri. MALLINCKRODT, LLC, is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinkrodt, plc. Mallinckrodt, plc and Mallinckrodt, LLC are collectively referred to as "Mallinckrodt."

27.      Mallinckrodt manufactures, markets, and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the Drug Enforcement Administration ("DEA") of suspicious orders of controlled substances. Mallinckrodt has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

28.      INSYS THERAPEUTICS, INC. is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys Therapeutics, Inc. is referred to as "Insys" and has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

10

EXHIBIT 4

29.     Insys develops, markets, and sells prescription drugs, including Subsys, a sublingual spray of fentanyl, in Jefferson County and nationally. In 2017, the founder of Insys, its CEO, and several former executives, were criminally charged in connection with paying millions of dollars in bribes to physicians to prescribe Subsys. The bribes were paid through sham speaker fees, jobs for prescribers' relatives and friends, and other forms of compensation.  Insys is currently under investigation by the United States Department of Justice for its conduct.

30.     Collectively, Purdue, Cephalon, Janssen, Endo, Actavis, Mallinckrodt, and Insys are referred to herein as the "Pharmaceutical Defendants" or "Manufacturer Defendants."

C.     **Distributor Defendants**

31.     CARDINAL HEALTH, INC. ("Cardinal") is a publicly traded company incorporated under the laws of Ohio and with a principal place of business in Ohio.

32.     Cardinal distributes prescription opioids to providers and retailers, including in Oklahoma. Cardinal is registered to do business and receive service of process in Oklahoma. Cardinal is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

33.     AMERISOURCEBERGEN CORPORATION ("AmerisourceBergen") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in Pennsylvania.

34.     AmerisourceBergen distributes prescription opioids to providers and retailers, including in Oklahoma.  AmerisourceBergen is registered to do business and receive service of process in Oklahoma.

11

EXHIBIT 4

35.     AmerisourceBergen is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

36.     MCKESSON CORPORATION ("McKesson") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in San Francisco, California.

37.     McKesson distributes prescription opioids to providers and retailers, including in Oklahoma. McKesson is registered to do business and receive service of process in Oklahoma. McKesson is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

38.     ANDA PHARMACEUTICALS INC. is a publicly traded company incorporated under the laws of Florida with its principal place of business in Mississippi.

39.     ANDA INC. is a publicly traded company incorporated under the laws of Florida with its principal place of business in Florida. (Anda Pharmaceuticals, Inc. and Anda, Inc. are referred to collectively as "Anda"). Anda is a subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis.

40.     Anda distributes prescription opioids to providers and retailers, including in Oklahoma. Anda is registered to do business and receive service of process in Oklahoma. Anda is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

41.     GCP PHARMA, LLC ("GCP Pharma") was a privately held company incorporated under the laws of Oklahoma with its principal place of business in Oklahoma.

EXHIBIT 4

42.     GCP Pharma distributed prescription opioids to providers and retailers, including in Oklahoma. GCP Pharma was registered to do business and receive service of process in Oklahoma. GCP Pharma was also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

43.     KEYSOURCE MEDICAL, INC ("Keysource") is a privately held company incorporated under the laws of Delaware with its principal place of business in Ohio. Keysource is a subsidiary of Friedman Capital.

44.     Keysource distributes prescription opioids to providers and retailers, including in Oklahoma. Keysource is registered to do business and receive service of process in Oklahoma. Keysource is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

45.     MORRIS & DICKSON CO, LLC ("Morris") is a privately held company incorporated under the laws of Louisiana with its principal place of business in Louisiana.

46.     Morris distributes prescription opioids to providers and retailers, including in Oklahoma. Morris is registered to do business and receive service of process in Oklahoma. Morris is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

47.     QUEST PHARMACEUTICALS, INC ("Quest") is a privately held company incorporated under the laws of Kentucky with its principal place of business in Kentucky.

48.     Quest distributes prescription opioids to providers and retailers, including in Oklahoma. Quest is registered to do business and receive service of process in

13

EXHIBIT 4

Oklahoma. Quest is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

49.     THE HARVARD DRUG GROUP, LLC ("Harvard Drug") is a privately held company incorporated under the laws of Michigan with its principal place of business in Michigan. Harvard Drug is a subsidiary of Cardinal Health, Inc.

50.     Harvard Drug distributes prescription opioids to providers and retailers, including in Oklahoma. Harvard Drug is registered to do business and receive service of process in Oklahoma. Harvard Drug is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

51.     PHYSICIANS TOTAL CARE, INC. ("PTC") is a corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business in the city of Tulsa, Oklahoma, and is duly authorized to transact business in the State of Oklahoma. PTC is a packager and wholesale distributor of pharmaceuticals. PTC receives large quantities of pharmaceuticals from pharmaceutical manufacturers and then repackages those pharmaceuticals into smaller packages and distributes them to its customers, i.e. hospitals, government agencies, pharmacies, and treating physicians.

52.     CVS HEALTH CORPORATION is a Delaware corporation with its principal place of business in Rhode Island. CVS PHRMACY, INC. is a foreign for profit business corporation with its principal place of business in Rhode Island. OKLAHOMA CVS PHARMACY, LLC is a domestic limited liability company established under the laws of Oklahoma with its principal place of business in Oklahoma. CVS Health Corporation, CVS Pharmacy, Inc. and Oklahoma CVS Pharmacy, LLC are collectively known as "CVS". During all relevant times, CVS

EXHIBIT 4

has sold and continues to sell prescription opioids in and around Oklahoma. CVS is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

53.     WALGREENS BOOTS ALLIANCE, INC. also known as Walgreen Co. ("Walgreens") is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Walgreens has sold and continues to sell prescription opioids in and around Oklahoma. Walgreens is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

54.     Collectively, Cardinal, AmerisourceBergen, McKesson, Anda, GCP Pharma, Keysource, M&D, Quest, Harvard Drug, PTC, CVS and Walgreens are the "Distributor Defendants."

55.     The data that reveals and/or confirms the identity of each wrongful opioid distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v. U.S. D.O.J.*, 784 F.3d 448, 451 (8th Cir. 2015). Neither the DEA nor the wholesale distributors will voluntarily disclose the data necessary to identify with specificity the transactions which will form the evidentiary basis for the claims asserted herein. *See id.* at 452-53. Collectively, AmerisourceBergen, Cardinal, and McKesson dominate 85% of the market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal, McKesson, and AmerisourceBergen predecessors). Each has been investigated and/or fined by the DEA for the failure to report suspicious orders. Jefferson County has

15

EXHIBIT 4

reason to believe each has engaged in unlawful conduct, which resulted in the diversion of prescription opioids into its community. Jefferson County names each of the "Big 3" herein as defendants and places the industry on notice that Jefferson County is acting to abate the public nuisance plaguing its community. Jefferson County will request discovery to secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

**D.    Medical Provider Defendants**

56.    WILLIAM VALUCK M.D. is an individual currently incarcerated in Oklahoma. Dr. Valuck operated a "cash only" pain management clinic in southwest Oklahoma City and often over-prescribed opioids. In 2014, Dr. Valuck entered a guilty plea as part of an agreement reached with the State of Oklahoma for eight counts of murder in the second degree related to the deaths of his patients.

57.    Upon information and belief, one of Dr. Valuck's patients that died from drug toxicity was prescribed approximately 600 pills at a clinical visit at his office and died roughly a month after the prescription was filled. Upon information and belief, this type of clinical visit became an increasingly common practice where Dr. Valuck's patients were prescribed hundreds of opioid pills per visit.

58.    Upon information and belief, Jefferson County residents would travel to Dr. Valuck's office  and received  substantial quantities of opioid

16

EXHIBIT 4

prescriptions written by Dr. Valuck. Dr. Valuck was conducive to the promotion of opioids for sale and distribution in Jefferson County.

59.     HARVEY JENKINS, M.D. is an individual residing in Oklahoma. Dr. Jenkins operated a pain clinic in south Oklahoma City and often prescribed lethal dosages of opioids while not properly examining or keeping adequate records on his patients. In 2016, Dr. Jenkins was charged with twenty-nine felonies connected to his "pill mill" clinic.

60.     Patients would be briefly seen by Dr. Jenkins and then prescribed large amounts of pills, mainly opioid painkillers. Moreover, the prescriptions were so large that there were not any procedures in place by Dr. Jenkins to guard against the diversion of narcotics.

61.     Upon information and belief, Jefferson County residents would travel to Dr. Jenkins' office and received substantial quantities of opioid prescriptions written by Dr. Jenkins. Dr. Jenkins was conducive to the promotion of opioids for sale and distribution in Jefferson County.

62.     RUSSELL PORTENOY, M.D., is an individual residing in New York. Dr. Portenoy received benefits from Defendants for promoting the use of opioids for long-term chronic pain and downplaying the risks of addiction of opioids.

63.     PERRY FINE, M.D., is an individual residing in Utah. Dr. Fine received benefits from Defendants for promoting the use of opioids for long-term chronic pain and downplaying the risks of addiction of opioids.

EXHIBIT 4

64.    LYNN WEBSTER, M.D., is an individual residing in Utah. Dr. Webster received benefits from Defendants for promoting the use of opioids for long-term chronic pain and downplaying the risks of addiction of opioids.

## III.    JURISDICTION AND VENUE

65.    This Court has jurisdiction over this action. Defendants conduct business in Jefferson County and throughout Oklahoma and have deliberately engaged in significant acts and omissions within Jefferson County that have injured its residents. Defendants purposefully directed their activities at Jefferson County, including, but not limited to, marketing, distributing, prescribing, or selling prescription opioids within Jefferson County.

66.    Venue is proper in Jefferson County, State of Oklahoma.

67.    This action is non-removable because there is incomplete diversity of residents and no substantial federal question presented.

## IV.    ADDITIONAL FACTUAL BACKGROUND

### A.    Overview of National Opioid Epidemic

68.    Historically, opioids were considered too addictive and debilitating to be part of a long-term pain management regimen for chronic pain. Prior to the 1990s, the medical profession adhered to the standard that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer and end-of-life care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time as well as the serious risk of addiction and other side

18

EXHIBIT 4

effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, medical professionals generally did not prescribe opioids for chronic pain.

69.     Moreover, opioids also tend to induce tolerance, whereby a person who uses opioids repeatedly over time no longer responds to the drug as strongly as before, thus requiring a higher dose to achieve the same effect. This tolerance contributes to the high risk of overdose during a relapse for those addicted to opioids.

70.     As described herein, Defendants engaged in conduct that directly caused medical professionals to unwittingly prescribe long term and increased amounts of opioids. Defendants did so to take advantage of a much larger and lucrative market for chronic pain patients.

71.     As a result of Defendants' wrongful conduct, prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[2] From 1999 to 2013, the amount of prescription painkillers prescribed and sold in the United States nearly quadrupled. Yet, there had not been an overall change in the amount of pain reported by patients.

72.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention declared prescription painkiller overdoses to be at epidemic levels. The press release noted:

    a. The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

    b. More than 40 people die every day from overdoses

---

[2] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health 52 (2014).

EXHIBIT 4

involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin) and oxymorphone (Opana).

c.  Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

d.  The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically, according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

e.  Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

f.  Almost 5,500 people start to misuse prescription painkillers every day.[3]

73.  Many Americans, including residents of Jefferson County, are now addicted to prescription opioids and the number of deaths due to prescription opioid overdose has reached epidemic levels. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[4]  In 2017, drug overdoses increased approximately 10

---

[3] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.
[4] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf

EXHIBIT 4

percent killing roughly 72,000 people in the United States.[5]  On October 27, 2017, the President of the United States declared the opioid epidemic a public health emergency.

74.    The National Institute on Drug Abuse identifies addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[6] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment and criminal justice expenditures.[7]

75.    Deaths from prescription opioids have quadrupled in the past 20 years and treatment admission and emergency room visits related to the abuse of opioids for non-medical use have also dramatically increased.  From 1999 through 2016, overdoes deaths killed 350,000 Americans.  Approximately 175 Americans are currently dying every day as a result of opioid related overdoses.

76.    The increases in opioid deaths and addiction treatments are directly related to the prescribing practices created by Defendants.  According to the CDC,[8] opioid deaths and treatment admissions are tied to opioid sales.  By 2015, sales of opioids raised to 9.6 billion.

---

[5] *See* National Institute on Drug Abuse (overdose death rates-last updated August 2018): https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates.
[6] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P,  David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, *MMWR MORB MORTAL WKLY REP*. 2016;65, doi:10.15585/mmwr.mm655051e1).
[7] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).
[8] U.S. Dep't of Health & Human Servs., *Addressing Prescription Drug Abuse in the United States*, available at: https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf

**EXHIBIT 4**

77.   During the next hour, six Americans will die from opioid overdoses, two babies will be born dependent on opioids and will begin to go through withdrawals, and drug manufactures and distributors will earn 2.7 million dollars in opioid sales.

78.   Defendants have continued their wrongful and unlawful conduct, despite their knowledge that such conduct is causing and continuing to cause the opioid epidemic.

**B.   Overview of Opioid Epidemic in Oklahoma**

79.   Communities have been devastated by the opioid epidemic as a result of Defendants' deceptive marketing and distribution/diversion of opioids. Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions dispensed per 100 people in 2012. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009. In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of these deaths.

80.   In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate. Oklahoma had the 10th highest drug overdose death rate in the nation in 2014. Opioids are the most common class of drug involved in unintentional overdose deaths in Oklahoma. Approximately ten Oklahomans die every week as a result of prescription opioids overdoses.

81.   In 2015, there were approximately 823 fatal drug overdoses in Oklahoma, an almost 140% increase over 2001, with opioids contributing to the largest number of these deaths. As of 2015, there were more prescription drug overdose deaths each year in Oklahoma than overdose deaths from alcohol and all illegal drugs combined.

**EXHIBIT 4**

82.     In Oklahoma, more overdose deaths involved hydrocodone or oxycodone than methamphetamines, heroin, and cocaine combined.

83.     According to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident with approximately 877 milligrams of opioids distributed per adult resident.

84.     A National Survey on Drug Use and Health revealed Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers.

85.     The Jefferson County Sheriff's Department now carries Naloxone and Narcan, antidotes to opioid overdose, in an effort to battle the epidemic.

86.     The Defendants' saturation of communities with prescription opioids has created accessibility and availability of prescription opioids, which is fueling illicit opioid addiction. According to the CDC, past misuse of prescription opioids is the strongest risk factor for a person starting and using heroin. Between 2000 and 2014, the number of overdose deaths from heroin nationwide quintupled.  Eighty percent of people who abuse heroin started with prescription opioids.

87.     Defendants' conduct is affecting even Jefferson County's youngest and most vulnerable citizens. The national rate of babies born with neonatal abstinence syndrome ("NAS"), a group of conditions newborns experience when withdrawing from exposure to drugs like opioids, increased fivefold from 2000 to 2012. In 2014, the number of newborns testing positive for prescription medications doubled the number reported in 2013.  A baby is born addicted to opioids every nineteen minutes in the United States.

EXHIBIT 4

**C.   Pharmaceutical Defendants' False, Deceptive and Unfair Marketing of Opioids.**

88.     Each Pharmaceutical Defendant developed a well-funded marketing scheme based on deception to persuade doctors and patients that opioids can and should be used for treatment of chronic pain, resulting in opioid treatment for a much larger segment of the population, and for a longer time, of patients who are much more likely to become addicted. In connection with this scheme, Pharmaceutical Defendants spent, and continue to spend, millions of dollars on promotional activities and materials that deny or minimize the risks of opioids while overstating the benefit of using them for chronic pain.

89.     The deceptive marketing schemes included, among others: (1) false or misleading direct, branded advertisements; (2) false or misleading direct-to-physician marketing, also known as "detailing;" (3) false or misleading materials speaker programs, webinars, and brochures; and (4) false or misleading unbranded advertisements or statements by purportedly neutral third parties that were really designed and distributed by the Pharmaceutical Defendants. In addition to using third parties to disguise the source of their misinformation campaign, the Pharmaceutical Defendants also retained the services of certain physicians, known as "key opinion leaders" or "KOLs" to convince both doctors and patients that opioids were safe for the treatment of chronic pain.

90.     The Pharmaceutical Defendants have made false and misleading claims regarding the risks of using their drugs that: (1) downplayed the seriousness of addiction; (2) created and promoted the concept of "pseudo addiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated

24

EXHIBIT 4

with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Pharmaceutical Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Pharmaceutical Defendants' claims.

91.     The Pharmaceutical Defendants have disseminated these common messages to reverse the popular and medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Pharmaceutical Defendants recruited for their support of their marketing messages, through unbranded marketing and through industry-funded front groups.

92.     These statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC.

93.     Pharmaceutical Defendants' efforts have been extremely successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion in revenue annually since 2009. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for

EXHIBIT 4

legitimate pain."[9] This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on them (the demand). When those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

94.     Pharmaceutical Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

### 1. Each Pharmaceutical Defendant Used Multiple Avenues to Disseminate Their False and Deceptive Statements About Opioids.

95.     Pharmaceutical Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in and around Jefferson County. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout Jefferson County.

96.     Pharmaceutical Defendants employed the same marketing plans and strategies and deployed the same messages in and around Jefferson County, as they did nationwide. Across the opioid pharmaceutical industry, corporate headquarters funded and oversaw "core message" development on a national basis. This comprehensive approach ensures that the Pharmaceutical Defendants' messages are consistently delivered in each sales territory across marketing channels, including detailing visits,

---

[9] Letter from Vivek H. Murthy, U.S. Surgeon General (Aug.2016), http://turnthetiderx.org

EXHIBIT 4

speaker events, and advertising. The Pharmaceutical Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

97.     The Pharmaceutical Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks and sales training materials; and nationally coordinated advertising. The Pharmaceutical Defendants' sales representatives and physician speakers were required to stick to prescribed talking points, sales messages and slide decks, and supervisors rode along with them periodically to check on their performance and compliance.

### i.  Direct Marketing

98.     The Pharmaceutical Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Pharmaceutical Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of opioids. For example, upon information and belief, the Pharmaceutical Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

99.     Many of the Pharmaceutical Defendants' branded ads that deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like a construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain relief and functional improvement. Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain

EXHIBIT 4

patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

100.    Each Pharmaceutical Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. The Pharmaceutical Defendants have not corrected this misinformation. Instead, each devoted massive resources to direct sales contacts with doctors. The Pharmaceutical Defendants spent in excess of $168 million in 2014 alone on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

101.    The Pharmaceutical Defendants' detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, the Pharmaceutical Defendants purchase, manipulate, and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus, the Pharmaceutical Defendants know their detailing to doctors is effective.

102.    The Pharmaceutical Defendants have been reprimanded for their deceptive promotions. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated." Those materials

EXHIBIT 4

in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."[10]

## ii.     Indirect Marketing

103.    The Pharmaceutical Defendants indirectly marketed their opioids using unbranded advertising, paid speakers and KOLs, and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

104.    The Pharmaceutical Defendants deceptively marketed opioids in Jefferson County through unbranded advertising promoting opioid use generally without naming specific opioids. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Pharmaceutical Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, the Pharmaceutical Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, and medical conferences and seminars. To this end, the Pharmaceutical Defendants used third-party public relations firms to help control those messages when they originated from third parties.

---

[10] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

**EXHIBIT 4**

105.    The Pharmaceutical Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny.  The Pharmaceutical Defendants used third-party, unbranded advertising to give the false appearance that the deceptive messages came from independent and objective sources. Like the tobacco companies, the Pharmaceutical Defendants used third parties that they funded, directed and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

106.    Pharmaceutical Defendants also identified doctors to serve, for payment, on their speakers' bureaus.  These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. Upon information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Pharmaceutical Defendants' prior misrepresentations about the risks and benefits of opioids.

107.    Borrowing a page from Big Tobacco's playbook, the Pharmaceutical Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging and directing doctors who served as KOLS; and (b) funding, assisting, directing and encouraging seemingly neutral and credible Front Groups. The Pharmaceutical Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such

30

EXHIBIT 4

as treatment guidelines, CME programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, the Pharmaceutical Defendants persuaded doctors and patients that what they have long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and that the compassionate treatment of pain required opioids.

108.    In 2007, multiple States sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion and sale of OxyContin. Certain states settled their claims in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future. By using indirect marketing strategies, however, Purdue intentionally circumvented these restrictions. Such actions included contributing to the creation of misleading publications and prescribing guidelines, which lack a reliable scientific basis and promote prescribing practices that have worsened the opioid crisis.

109.    Pro-opioid doctors are one of the most important avenues that the Pharmaceutical Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Pharmaceutical Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that Purdue paid doctors who provided testimonials on the site and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials. Defendants utilized many KOLs, including many of the same ones.

EXHIBIT 4

110.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Pharmaceutical Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees and honoraria from Cephalon, Endo, Janssen and Purdue (among others) and was a paid consultant to Cephalon and Purdue. Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society's ("APS") and the American Academy of Pain Medicine's ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Pharmaceutical Defendants.

111.    Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that the person is not going to become addicted.[11]

---

[11] Good Morning America (ABC television broadcast Aug. 30, 2010).

32

EXHIBIT 4

112.    Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and 90s about addiction that weren't true."[12] These lectures falsely claimed that less than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[13] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[14]

113.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of the American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo and Purdue. At the same time, Dr. Webster was receiving significant funding from the Pharmaceutical Defendants (including nearly $2 million from Cephalon).

114.    During a portion of his time as a KOL, Dr. Webster was under investigation for overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

---

[12] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012.
[13] *Id.*
[14] *Id.*

33

EXHIBIT 4

115.    Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and, for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen and Purdue. Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

116.    In 2011, Dr. Webster presented via webinar a program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors treating members of Plaintiff's Community.[15]

117.    Dr. Webster also was a leading proponent of the concept of "pseudo addiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and co-author Beth Dove wrote in their 2007 book Avoiding Opioid Abuse While Managing Pain, when

---

[15] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk.*

EXHIBIT 4

faced with signs of abnormal behavior, increasing the dose "in most cases . . . should be the clinician's first response."[16] Upon information and belief, Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[17]

118.    The Pharmaceutical Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Pharmaceutical Defendants, these "Front Groups" generated treatment guidelines, unbranded materials and programs that favored chronic opioid therapy. They also assisted the Pharmaceutical Defendants by responding to negative articles, advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and conducting outreach to vulnerable patient populations targeted by the Pharmaceutical Defendants.

119.    These Front Groups depended on the Pharmaceutical Defendants for funding and, in some cases, for survival. The Pharmaceutical Defendants also exercised control over programs and materials created by these groups by collaborating on, editing and approving their content and by funding their dissemination. In doing so, the Pharmaceutical Defendants made sure that the Front Groups would generate only the messages that the Pharmaceutical Defendants wanted to distribute. Despite this, the Front

---

[16] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).
[17] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc J. Sentinel, Feb. 18, 2012.

EXHIBIT 4

Groups held themselves out as independent and serving the needs of patients suffering from pain or doctors treating those patients.

120.    Pharmaceutical Defendants Cephalon, Endo, Janssen and Purdue, in particular, utilized many Front Groups, including several of the same ones. The most prominent include the APS, American Geriatrics Society, the Federation of State Medical Boards, American Chronic Pain Association, the Center for Practical Bioethics, the U.S. Pain Foundation ("USPF") and the Pain & Policy Studies Group.[18]

121.    The most prominent of the Pharmaceutical Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, primarily from Endo and Purdue. APF issued education guides for patients, reporters and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes, including death among returning veterans. APF also engaged in a significant multimedia campaign through radio, television, and the internet to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach the residents of Jefferson County.

122.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF

---

[18] *See generally, e.g.,* Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015).

EXHIBIT 4

received about $2.3 million from industry sources out of a total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo and others.

123.    APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing and thus the profitability of its sponsors. Upon information and belief, it was often called upon to provide "patient representatives" for the Pharmaceutical Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain. APF functioned largely as an advocate for the interests of the Pharmaceutical Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to strategically align its investments in nonprofit organizations that share its business interests.

124.    Upon information and belief, on several occasions representatives of the Pharmaceutical Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

125.    The United States Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer Defendants

EXHIBIT 4

stopped funding it. Within days of being targeted by a Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[19]

126.    Another front group for the Pharmaceutical Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Pharmaceutical Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

127.    AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Pharmaceutical Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

128.    Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo

---

[19] Charles Ornstein & Tracy Weber, Senate Panel Investigates Drug Companies' Ties to Pain Groups, Wash. Post, May 8, 2012.

EXHIBIT 4

attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Defendant Perry Fine and Defendant Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

129.   The Pharmaceutical Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

130.   In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patients' addiction to opioids was low. Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[20]

131.   AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[21] Doctors, especially the general practitioners and family doctors targeted by the Pharmaceutical Defendants, have relied upon treatment guidelines. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they

---

[20] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).
[21] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).

EXHIBIT 4

should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

132.   At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Pharmaceutical Defendants Janssen, Cephalon, Endo, and Purdue. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[22] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Pharmaceutical Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids. The Guidelines have been cited hundreds of times in academic literature, are still available online, and were reprinted in the Journal of Pain. The Pharmaceutical Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Pharmaceutical Defendants financial support to members of the panel.

133.   The Pharmaceutical Defendants worked together through Front Groups to spread their deceptive messages about the risks and benefits of long-term opioid therapy.

---

[22] *Id.*

**EXHIBIT 4**

For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Pharmaceutical Defendants. Among other projects, PCF worked to ensure that a mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Pharmaceutical Defendants determined would reduce prescribing.

**D.    Pharmaceutical Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.**

**1.    The Pharmaceutical Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs.**

134.    To falsely assure physicians and patients that opioids are safe, the Pharmaceutical Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations, which are described below, reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and

EXHIBIT 4

overdose and are inherently less addictive. Not only have the Pharmaceutical Defendants

failed to correct these misrepresentations, they continue to make them today.

135.     Opioid manufacturers, including Pharmaceutical Defendants Endo

Pharmaceuticals, Inc. and Purdue Pharma L.P., have entered into settlement agreements

with public entities that prohibit them from making many of the misrepresentations

identified in this Petition. However, each Pharmaceutical Defendant continued to

misrepresent the risks and benefits of long-term opioid use and each continues to fail to

correct its past misrepresentations.

136.     Some illustrative examples of the Manufacturer Defendants' false,

deceptive, and unfair claims about the purportedly low risk of addiction include:

a.     Actavis' predecessor caused a patient education brochure,
       Managing Chronic Back Pain, to be distributed beginning in
       2003 that admitted that opioid addiction is possible, but falsely
       claimed that it is "less likely if you have never had an
       addiction problem." Based on Actavis' acquisition of its
       predecessor's marketing materials along with the rights to
       Kadian, it appears that Actavis continued to use this brochure in
       2009 and beyond.

b.     Cephalon and Purdue sponsored APF's Treatment Options: A
       Guide for People Living with Pain (2007), which suggested
       that addiction is rare and limited to extreme cases of
       unauthorized dose escalations, obtaining duplicative opioid
       prescriptions from multiple sources, or theft.

c.     Endo sponsored a website, "PainKnowledge," which, upon
       information and belief, claimed in 2009 that "[p]eople who
       take opioids as prescribed usually do not become addicted."
       Upon information and belief, another Endo website,
       PainAction.com, stated "Did you know? Most chronic pain
       patients do not become addicted to the opioid medications
       that are prescribed for them." Endo also distributed an
       "Informed Consent" document on PainAction.com that
       misleadingly suggested that only people who "have problems
       with substance abuse and addiction" are likely to become
       addicted to opioid medications.

EXHIBIT 4

d.   Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

e.   Janssen reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f.   Janssen runs a website, Prescriberesponsibly.com, which claims that concerns about opioid addiction are "overestimated."

g.   Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction."[23]

h.   Consistent with the Pharmaceutical Defendants' published marketing materials, upon information and belief, detailers for the Pharmaceutical Defendants in Oklahoma and Plaintiff's Community minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

i.   Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Pharmaceutical Defendants' Front Groups APF and NFP argued in an amicus brief to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.[24]

---

[23] Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Management* 6 (2011) [hereinafter APF, *Policymaker's Guide*], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.
[24] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005), at 9.

EXHIBIT 4

137. These claims are contrary to longstanding scientific evidence. A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction], [and] overdose . . .)."[25] The 2016 CDC Guideline further explains that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[26]

138. The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release and long-acting ("ER/LA") opioids in 2013 and for immediate release ("IR") opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.[27]

---

[25] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[26] *Id.* at 2, 25.

[27] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013); Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan and Becker, LLP (Mar. 22, 2016).

**EXHIBIT 4**

139.   The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."[28] Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in Jefferson County.

140.   In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, Pharmaceutical Defendants also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Pharmaceutical Defendants misrepresented, to both doctors and patients, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (i.e. "pseudoaddiction"), and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

141.   In the 2016 CDC Guideline, the CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already addicted patients.

---

[28] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc.* (Assurance No. 15-228), at 16, https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

**EXHIBIT 4**

142.    In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive, and unfair practice is the Pharmaceutical Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Pharmaceutical Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Pharmaceutical Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and made patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

a.    Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speaker's bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b.    Purdue, upon information and belief, sponsored a 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c.    In 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients and not opioids are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

d.    On information and belief, detailers for the Pharmaceutical Defendants have touted and continue to tout to doctors the

EXHIBIT 4

reliability and effectiveness of screening or monitoring patients
as a tool for managing opioid abuse and addiction.

143. Once again, the 2016 CDC Guideline confirms that these statements were false, misleading, and unsupported at the time they were made by the Pharmaceutical Defendants. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

144. To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, the Pharmaceutical Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

145. For example, on information and belief, a 2011 non-credit educational program sponsored by Endo, entitled Persistent Pain in the Older Adult, claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

146. Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[s]ymptoms of physical dependence can often be

**EXHIBIT 4**

ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[29]

147.    The Pharmaceutical Defendants deceptively minimized the significant symptoms of opioid withdrawal, which as explained in the 2016 CDC Guideline, include drug craving, anxiety, insomnia, abdominal pain, vomiting, diarrhea, tremor, and tachycardia (rapid heartbeat), and grossly understated the difficulty of tapering, particularly after long-term opioid use.

148.    Contrary to the Pharmaceutical Defendants' representations, the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "more than a few days of exposure to opioids significantly increases hazards" and "each day of unnecessary opioid use increases likelihood of physical dependence without adding benefit."

149.    The Pharmaceutical Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to the Pharmaceutical Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples of these deceptive claims are described below:

---

[29] Available at: http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

EXHIBIT 4

a.  On information and belief, Actavis' predecessor created a patient brochure for Kadian that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."

b.  Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.[30]

c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d.  Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . .You won't 'run out' of pain relief."[31]

e.  Janssen, on information and belief, sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f.  On information and belief, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.  Purdue sponsored APF's *A Policymaker's Guide to*

---

[30] Available at, https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.
[31] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

**EXHIBIT 4**

*Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages.

h. In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

i. Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Front Group APF and others argued to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.

j. On information and belief, Purdue's detailers have told doctors that they should increase the dose of OxyContin, rather than the frequency of use, to address early failure.

150.    These claims conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC also states that there are "increased risks for opioid use disorder, respiratory depression, and death at higher dosages."

151.    The Pharmaceutical Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can prevent and curb addiction and abuse.

152.    These abuse deterrent formulations (AD opioids) purportedly are harder to crush, chew, or grind; become gelatinous when combined with a liquid, making them harder to inject; or contain a counteragent such as naloxone that is activated if the tablets

EXHIBIT 4

are tampered. Despite this, AD opioids can be defeated often quickly and easily by those determined to do so. The 2016 CDC Guideline state that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies, even when they work, do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes. Moreover, they do not reduce the rate of misuse and abuse by patients who become addicted after using opioids long term as prescribed or who escalate their use by taking more pills or higher doses. Tom Frieden, the Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction, overdoses, or death."[32]

153.    Despite this lack of evidence, the Pharmaceutical Defendants have made and continue to make misleading claims about the ability of their so-called abuse-deterrent opioid formulations to prevent or reduce abuse and addiction and the safety of these formulations.

154.    For example, Endo has marketed Opana ER as tamper or crush resistant and less prone to misuse and abuse even though: (1) on information and belief, the FDA warned in a 2013 letter that there was no evidence that Opana ER would provide a reduction in oral, intranasal or intravenous abuse; and (2) Endo's own studies, which it failed to disclose, showed that Opana ER[33] could still be ground and chewed. Nonetheless,

---

[32] Matthew Perrone et al., *Drugmakers push profitable, but unproven, opioid solution*, Center for Public Integrity (Dec. 15, 2016).

[33] Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, in May 2017, an FDA advisory committee recommended that Opana ER be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017 and requested that Endo withdraw Opana ER from the market. Press Release, "FDA requests removal of Opana ER for risks related to abuse," June 8, 2017, available at: https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

EXHIBIT 4

Endo's advertisements for Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. And on information and belief, detailers for Endo have informed doctors that Opana ER is harder to abuse. Likewise, Purdue has engaged and continues to engage in deceptive marketing of its AD opioids, i.e., reformulated Oxycontin and Hysingla. Before April 2013, Purdue did not market its opioids based on their abuse deterrent properties. However, beginning in 2013 and continuing today, detailers from Purdue regularly use the so-called abuse deterrent properties of Purdue's opioid products as a primary selling point to differentiate those products from their competitors. Specifically, on information and belief, these detailers: (1) falsely claim that Purdue's AD opioids prevent tampering and cannot be crushed or snorted; (2) falsely claim that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less likely to yield a euphoric high, and are disfavored by opioid abusers; (3) falsely claim Purdue's AD opioids are "safer" than other opioids; and (4) fail to disclose that Purdue's AD opioids do not impact oral abuse or misuse and that its abuse deterrent properties can be defeated.

155.    These statements and omissions by Purdue are false and misleading. Purdue knew and should have known that reformulated OxyContin is not better at tamper resistance than the original OxyContin and is still regularly tampered with and abused. A 2015 study also shows that many opioid addicts are abusing Purdue's AD opioids through oral intake or by defeating the abuse deterrent mechanism. Indeed, one-third of the patients in the study defeated the abuse deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD

52

EXHIBIT 4

opioids was reduced, those addicts simply shifted to other drugs such as heroin.[34] Despite this, J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.[35]

156.    The development, marketing, and sale of AD opioids are a continuation of the Pharmaceutical Defendants' strategy to use misinformation to drive profit. The Pharmaceutical Defendants' claims that AD opioids are safe falsely assuage doctors' concerns about the toll caused by the explosion in opioid abuse, causing doctors to prescribe more AD opioids, which are far more expensive than other opioid products even though they provide little or no additional benefit.

### 2. The Pharmaceutical Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs.

157.    To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long term opioid use. But as the CDC Guideline makes clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.[36] The FDA, too, has recognized the lack of evidence to support long-term opioid use. Despite this,

---

[34] Cicero, Theodore J., and Matthew S. Ellis, "Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from Oxycontin" (2015) 72.5 *JAMA Psychiatry* 424-430.

[35] See Harrison Jacobs, *There is a big problem with the government's plan to stop the drug-overdose epidemic,* Business Insider, Mar. 14, 2016, available at: http://www.businessinsider.com/robert-califf-abuse-deterrent-drugs-have-a-big-flaw-2016-3.

[36] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.

EXHIBIT 4

Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

158.    Some illustrative examples of the Manufacturer Defendants' false claims are:

a. Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

b. Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c. Janssen sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

d. Janssen promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules."

e. Upon information and belief, Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves the patients' function.

f. *Responsible Opioid Prescribing* (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function.

EXHIBIT 4

g. Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."[37]

h. Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

i. Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient." Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

j. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under treated. In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

k. Purdue sponsored the development and distribution of APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain." The Policymaker's Guide was originally published in 2011.

---

[37] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

**EXHIBIT 4**

### 3. The Pharmaceutical Defendants' sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

159.   As the FDA and other agencies have made clear for years, these claims have no support in scientific literature.

160.   In 2010, the FDA warned Actavis, in response to its advertising of Kadian described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[38] And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

161.   The Pharmaceutical Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs (nonsteroidal anti-inflammatory drugs), so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Pharmaceutical Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate."

---

[38] Letter from Thomas Abrams to Doug Boothe.

**EXHIBIT 4**

And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain. The Pharmaceutical Defendants have overstated the number of deaths from NSAIDS and have prominently featured the risks of NSAIDS, while minimizing or failing to mention the serious risks of opioids.

162.    Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

163.    Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl

EXHIBIT 4

based IR opioids. Neither is approved for, or has been shown to be safe or effective for, chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm.

164.    Despite this, on information and belief, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe.[39] As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain.

165.    Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses. For example:

   a.   Cephalon paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer or non-cancer related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

   b.   Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

   c.   In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk

---

[39] *See* Press Release, U.S. Dep't of Justice, *Biopharmaceutical Company, Cephalon, to Pay $425 million & Enter Plea To Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

EXHIBIT 4

Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

166.   The Pharmaceutical Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Pharmaceutical Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths, all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of the Pharmaceutical Defendants' misrepresentations.

167.   On information and belief, the Pharmaceutical Defendants coordinated their messaging through national and regional sales and speaker trainings and coordinated advertisements and marketing materials.

168.   Moreover, at all times relevant to this Petition, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the deceptive marketing of chronic opioid therapy

59

EXHIBIT 4

by funding and working through third parties like Front Groups and KOLs. The Pharmaceutical Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Pharmaceutical Defendants' false and misleading statements about the risks and benefits of long-term opioid use for chronic pain.

169.    Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. The Pharmaceutical Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for the Pharmaceutical Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions.

170.    The Pharmaceutical Defendants' efforts to artificially increase the number of opioid prescriptions directly and predictably caused a corresponding increase in opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[40] Many abusers start with legitimate prescriptions. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths and prevent opioid related morbidity."[41] The Pharmaceutical Defendants' false and misleading statements directly caused the current opioid epidemic.

---

[40] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, Morbidity and Mortality Wkly Rep. (Jan. 1, 2016).
[41] *Id.*

**EXHIBIT 4**

E.     **Distributor Defendants' Unlawful Distribution of Opioids.**

171.    In addition to common law duties to exercise reasonable care under the circumstances,[42] the Distributor Defendants owe a duty under state law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Plaintiff's Community as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into Plaintiff's Community. *See* 63 O.S. Chapter 2 (Oklahoma Uniform Controlled Dangerous Substances Act, hereinafter "Oklahoma CSA").

172.    The Oklahoma CSA creates a legal framework for the distribution and dispensing of opioids in Oklahoma. It is a system of checks and balances throughout the entire supply chain of opioids and requires every person or entity that manufactures, distributes, or dispenses opioids to obtain "registration" with the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. Registrants at every level of the supply chain must fulfill their obligations under the Oklahoma CSA; otherwise there is an overwhelming risk of harm to Jefferson County.

173.    Pursuant to the Oklahoma CSA and the Oklahoma Administrative Code, all opioid distributors are required to maintain effective controls against opioid diversion. Defendant Distributors must create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders can include orders of unusual size, orders that deviate from usual ordering patterns, and/or unusual frequency of orders. Thus, at a minimum to comply with these requirements,

---

[42] This includes a duty not to create a foreseeable risk of harm to others, but also a duty to exercise reasonable care to prevent threatened harm after engaging in affirmative conduct and either realizing or should realize that such conduct has created an unreasonable risk of harm to another.

EXHIBIT 4

Defendant Distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of potential diversion.

174. Oklahoma law also creates a distribution monitoring system for controlled substances and requires distributor and dispensers of controlled dangerous substances to keep records and maintain inventories.

175. Similarly, the Oklahoma administrative code requires anyone who distributes or dispenses prescription opioids to inform the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of suspicious orders when discovered. The code also requires reporting of theft or any significant loss of any controlled dangerous substances upon discovery of such theft or loss.

176. The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

177. Each Distributor Defendant repeatedly and purposefully breached its duties. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiff's Community.

178. The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Jefferson County. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover.

179. The opioid epidemic in Jefferson County remains an immediate hazard to public health and safety.

EXHIBIT 4

180. The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

### 1. The Distributor Defendants Negligently Failed to Control the Flow of Opioids to Jefferson County Through Illicit Channels.

181. The DEA has provided guidance to distributors to combat opioid diversion. On information and belief, since 2006 the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales, due diligence, and regulatory responsibilities. The DEA also provides distributors with data on controlled substance distribution patterns and trends, including data on the volume and frequency of orders and the percentage of controlled versus non-controlled purchases. On information and belief, the DEA has also hosted conferences for opioid distributors and has participated in numerous meetings and events with trade associations.

182. On September 27, 2006, and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring and the responsibilities and obligations of registrants to prevent diversion.

183. As part of the legal obligation to maintain effective controls against diversion, the distributor is required to exercise due care in confirming the legitimacy of each and every order prior to filling. Circumstances that could be indicative of diversion include ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; ordering a disproportionate amount of controlled substances versus non-controlled prescription drugs; ordering excessive quantities of a

EXHIBIT 4

limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors.

184.    Suspicious orders must be reported when discovered. Registrants must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted. Filling a suspicious order and then completing the sale does not absolve the registrant from legal responsibility.

185.    On information and belief, the Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" emphasizing the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

186.    Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

187.    These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

188.    Despite their duties to prevent diversion, the Distributor Defendants have knowingly or negligently allowed diversion.[43] The DEA has repeatedly taken action to

---

[43] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Wash. Post, Oct. 15, 2017; Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs intended for*

EXHIBIT 4

attempt to force compliance, including 178 registrant actions between 2008 and 2012, 76 orders to show cause issued by the Office of Administrative Law Judges, and 41 actions involving immediate suspension orders.[44] The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties, including:

a.   In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000.[45]

b.   McKesson has a history of repeatedly failing to perform its duties. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.

c.   On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion.

d.   On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

---

*patients ended up in the hands of illegal users: 'No one was doing their job,'* Wash. Post, Oct. 22, 2016.

[44] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), available at: https://oig.justice.gov/reports/2014/e1403.pdf.

[45] Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), available at: https://www.justice.gov/opa/press-release/file/928476/download

**EXHIBIT 4**

e. On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

f. On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

g. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.[46]

h. On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

i. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.

j. In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act.[47]

k. On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses a year.

l. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it

---

[46] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, Wash. Post, Jan. 11, 2017.

[47] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016.

EXHIBIT 4

was not controlling shipments of prescription opioids to Internet pharmacies.

m. In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

n. In May of 2018, Morris was ordered by the Drug Enforcement Administration (DEA) to cease sales of opioids, alleging that the company failed to report unusually large narcotics shipments to drugstores. Morris had distributed excessive amounts of opioids to five of the top 10 pharmacies purchasing narcotics in Louisiana. In some cases, Morris allowed independent pharmacies to purchase six times the quantity of narcotics than they would normally order from the distributor. Despite receiving these excessively large orders, Morris never filed a suspicious activity report on any of the drugstores in question.

o. In 2016, drug wholesalers Anda Inc., The Harvard Drug Group, Associated Pharmacies, KeySource Medical Inc. and Quest Pharmaceuticals shipped an excessive number of prescription opioids such as oxycodone and hydrocodone tablets to small towns. In doing so, these drug wholesalers purposely and intentionally violated their legal duty to monitor their distribution of opioids, the result of which is the creation of a hazard to public health and safety.

p. In 2013, The Department of Health and Human Services ("DHHS") informed PTC of numerous opioid related infractions, which included mispackaging and mislabeling Morphine, but also failing to investigate the matter after it shipped the mislabeled drugs and had been made aware of its failure to properly package the Morphine.

q. In addition to these violations, PTC repackaged and distributed prescription opioid drugs such as Oxycodone without an approved application at their principal place of business in Tulsa, Oklahoma.

r. In 2013, CVS agreed to pay $11 million to the United States to settle civil penalty claims for record-keeping violations over a six-year period in the United States District Court for the Western District of Oklahoma. The violations included filling prescriptions for prescribers whose registration numbers were not current or valid, entering and maintaining CVS dispensing

EXHIBIT 4

records in which non-prescribing practitioners were substituted for registration numbers of prescribing practitioners and creating, entering and maintaining invalid "dummy" registration numbers of prescribing practitioners that were provided to the Oklahoma prescription drug monitoring program.

s.  In 2013, Walgreens agreed to pay $80 million in civil penalties related to allegations of record-keeping and dispensing violations. The allegations accused Walgreens of endangering public safety in that it allowed millions of controlled substances, including oxycodone, to reach the black market. Walgreens was barred from shipping oxycodone and other controlled drugs from its Jupiter, Florida distribution center.

189.    Although law enforcement authorities have penalized distributors, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

190.    The Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion created an enormous black market for prescription opioids, which market extended to Jefferson County. Each Distributor Defendant knew or should have known that the amount of opioids flowing to Jefferson County was far in excess of what could be consumed for medically necessary purposes.

191.    The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists purchasing large quantities of opioids, and doctors, such as Dr. Valuck and Dr. Jenkins, who were inappropriately prescribing commonly-abused opioids; investigating demographic or epidemiological facts

EXHIBIT 4

concerning the increasing demand for narcotic painkillers in and around Plaintiff's community; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

192.    On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing the areas around Plaintiff's community to perform due diligence inspections to ensure that the controlled substances the Distributor Defendants had furnished were not being diverted to illegal uses.

193.    On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the areas around Plaintiff's community, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

194.    It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the market in and around Plaintiff's community with highly addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

195.    It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It is also reasonably foreseeable that many of these injuries will be suffered by the residents of Jefferson County, and that the costs of these injuries will be borne by Jefferson County.

EXHIBIT 4

196.    The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by Jefferson County, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

197.    The Distributor Defendants were aware of widespread prescription opioid abuse in and around Plaintiff's community, but, on information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

198.    The use of opioids by residents of Jefferson County who were addicted or who did not have a medically necessary purpose could not occur without the knowing cooperation and assistance of the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, the residents of Jefferson County and Jefferson County would have avoided significant injury.

199.    The Distributor Defendants made substantial profits over the years based on the diversion of opioids into Jefferson County. The Distributor Defendants knew that Jefferson County and its residents would be unjustly forced to bear the costs of these injuries and damages.

200.    The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids within Jefferson County showed an intentional or reckless

70

EXHIBIT 4

disregard for the safety of Jefferson County and its residents. Their conduct poses a continuing threat to the health, safety, and welfare of Jefferson County.

201. The Distributor Defendants' violations constitute prima facie evidence of negligence.

### 2. The Pharmaceutical Defendants Negligently Failed to Control the Flow of Opioids within Jefferson County Through Illicit Channels.

202. The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescriptions opioids that were incumbent upon the Distributor Defendants were also legally required of the Pharmaceutical Defendants under state law.

203. Like the Distributor Defendants, the Pharmaceutical Defendants are required to design and operate a system to detect suspicious orders, and to report such orders to law enforcement. *See* 63 O.S. Chapter 2 (Oklahoma CSA). The Pharmaceutical Defendants have not done so.

204. On information and belief, for over a decade the Pharmaceutical Defendants have been able to track the distribution and prescribing of their opioids down to the retail and prescriber level. Thus, the Pharmaceutical Defendants had actual knowledge of the prescribing practices of doctors, including red flags indicating diversion. The Pharmaceutical Defendants did not report those red flags, nor did they cease marketing to those doctors. Like the Distributor Defendants, the Pharmaceutical Defendants breached their duties under the law.

205. The Pharmaceutical Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent

EXHIBIT 4

diversion. The Pharmaceutical Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Pharmaceutical Defendants knew the volume, frequency, and pattern of opioid orders being placed and filled. The Pharmaceutical Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

206.    The Department of Justice recently fined Mallinckrodt $35 million for failing to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements. [48] Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report suspicious orders for controlled substances – orders that are unusual in their frequency, size, or other patterns. . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying the DEA of these suspicious orders." [49] Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy

---

[48] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million- settlement-failure-report-suspicious- orders.
[49] *Id.*

EXHIBIT 4

Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."[50]

207.    Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of thousands of doctors and could identify doctors who displayed red flags for diversion such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.[51] Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In doing so, Purdue protected its own profits at the expense of public health and safety.

208.    Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the NY AG found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for

---

[50] 2017 Mallinckrodt MOA at p. 2-3.

[51] Scott Glover and Lisa Girion, *OxyContin maker closely guards its list of suspect doctors*, L.A. Times, August 11, 2013.

EXHIBIT 4

illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list. The NY AG also found that, in certain cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of opioids, those representatives could have recognized signs of diversion and reported those prescribers but failed to do so.

209.    On information and belief, the other Pharmaceutical Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

210.    The Pharmaceutical Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into Jefferson County.

**F.    Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the Harm Alleged Herein and Substantial Damages.**

211.    As the Pharmaceutical Defendants' efforts to expand the market for opioids increased so have the rates of prescription and sale of their products — and the rates of opioid-related substance abuse, hospitalization, and death among the people of Jefferson County. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like Jefferson County, fueling the epidemic. The Medical Provider Defendants helped promote the false messages of Defendants and fuel the epidemic with careless prescribing practices.

212.    As shown above, the opioid epidemic has escalated in Plaintiff's community with devastating effects. Substantial opiate-related substance abuse, hospitalization and death mirror Defendants' increased sales, distribution, and prescribing of opioids.

EXHIBIT 4

213.   Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, like heroin, the significant distribution of opioids to Jefferson County and areas from which such opioids are being diverted into Jefferson County, has caused the opioid epidemic to include heroin addiction, abuse, and death.

214.   Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety to the residents of Jefferson County.

215.   Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety to the residents of Jefferson County.

216.   Defendants repeatedly and purposefully breached their legal duties, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes into Jefferson County.

217.   The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Jefferson County. This diversion and the epidemic are direct causes of foreseeable harms incurred by Jefferson County.

218.   Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Jefferson County seeks relief, as alleged herein.

219.   Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to

EXHIBIT 4

take responsibility for the financial burdens their conduct has inflicted upon Jefferson County.

## V.    CAUSES OF ACTION

### A.    Public Nuisance, (Against all Defendants)

220.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

221.    Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injury the property, health, safety and/or comfort of a considerable number of persons in Jefferson County by their production, promotion, and marketing of opioids for use by residents of Jefferson County.

222.    Defendants' misrepresentations and omissions regarding opioids, as set forth above, have created an opioid addiction epidemic in Jefferson County that constitutes a public nuisance. Defendants have created a condition that affects entire communities, neighborhoods, and considerable numbers of persons at the same time.

223.    Defendants' misrepresentations and omissions regarding opioids constitute unlawful acts and/or omissions of duties, which annoy, injure, or endanger the comfort, repose, health, and/or safety of others, and offend decency to a considerable number of persons in Jefferson County. It has even caused deaths, serious injuries, and a severe disruption of public peace, order and safety.

224.    Defendants have a duty to abate the nuisance caused by the prescription opioid epidemic.

225.    Defendants have failed to abate the nuisance they created.

EXHIBIT 4

226.    Defendants' conduct directly and proximately caused injury to Plaintiff and its residents.

227.    As a direct result of Defendants' conduct, Jefferson County and its residents have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, social services and other services, lost tax revenue, as well as injury and death of residents of Jefferson County.

228.    Defendants are liable to Jefferson County for the costs borne by it as a result of the opioid epidemic and for the costs of abating the nuisance created by Defendants.

**B.      Fraud: Actual and Constructive (Against All Defendants)**

229.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

230.    Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and concealed facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail above.

231.    Defendants knew at the time that they made their misrepresentations that they were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Namely, Defendants knowingly and/or recklessly:

        a. downplayed the substantial risks of addiction and other side-effects of
           their opioids, including affirmatively stating in sales calls and other

77

EXHIBIT 4

marketing outlets that their drugs were not as addictive as they truly are, stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring more opioid treatment, and omitting the high risk of addiction actually present;

b. overstated the efficacy of their opioids, including making false statements regarding the effectiveness of the drugs for treating chronic non-cancer pain and their ability to improve function; and

c. misrepresented the medical usefulness and necessity of their opioids, including affirmatively marketing their drugs for off label uses without solicitation and not in response to questions from healthcare providers.

232. Defendants intended that Plaintiff and its residents would rely on their misrepresentations regarding the risks, efficacy, and medical necessity of their opioids, to increase the number of opioid prescriptions and users within Jefferson County.

233. Plaintiff and its residents reasonably relied upon Defendants' misrepresentations, and that Defendants would not conceal material facts.

234. Defendants are liable to Plaintiff for their actual fraud.

235. Defendants had a legal and/or equitable duty to disclose the dangerous and addictive nature of opioids and prevent their diversion. Instead, Defendants mislead the medical community and the residents of Jefferson County and flooded the market with their dangerous drugs. Defendants had a duty to accurately disclose the dangers of opioids, and not mislead the public in order to make profits.

236. Defendant's conduct constitutes constructive fraud for which Defendants are liable to Plaintiff.

EXHIBIT 4

237.    As a result of Defendants' actual and constructive fraud, Jefferson County has suffered actual damages, including but not limited to, significant costs related to healthcare, undermining of the economic productivity of its residents, and the harming of the long-term health and welfare of the people of Jefferson County.

238.    Defendants' repeated and continuing conduct was willful, wanton, and malicious and was directed at the public generally. As a result, Jefferson County seeks to recover punitive damages against Defendants.

**C.    Negligence and Negligent Misrepresentation (Against All Defendants)**

239.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

240.    Defendants had a legal duty to act with the exercise of ordinary care or skill to prevent injury to another.

241.    Defendants breached this duty through their deceptive marketing campaign, distributions of opioids, and failure to divert opioids from illicit channels. Defendants knew of the highly addictive nature and dangers of prescription opioids. Yet, Defendants' negligently misrepresented and omitted the danger of opioids to consumers, including in Jefferson County, in a coordinated effort to sell more opioids.

242.    The Medical Provider Defendants additionally breached their duty of care by negligently prescribing opioids when they were not medically necessary.

243.    Defendants' repeated and continuing breach of their duty of care directly and proximately caused damage to Jefferson County.

EXHIBIT 4

### D.       Civil Conspiracy (Against All Defendants)

244.      Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

245.      Defendants engaged in a civil conspiracy in their unlawful marketing of opioids and/or distribution of opioids into Jefferson County.

246.      Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein.

247.      Defendants' conspiracy, and Defendants' repeated and continuing actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

### E.       Unjust Enrichment (Against All Defendants)

248.      Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

249.      Defendants received a benefit in the form of billions of dollars in revenue from the sale of prescription opioids to treat chronic pain.

250.      Defendants were aware they were receiving that benefit. Defendants' repeated and continuing conduct was designed to bring about that benefit.

251.      Defendants retained that benefit at the expense of Jefferson County, who has borne, and who continues to bear, the economic and social costs of Defendants' scheme.

252.      It is inequitable for the Defendants to retain that benefit without paying for it.

EXHIBIT 4

253.   Jefferson County is entitled to recover from Defendants' prescription opioid profits the amounts Jefferson County has spent and will have to spend in the future to address the effects of Defendants' actions.

**F.**   **Punitive Damages**

**G.**   Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

251.   Defendants acted with malice, purposely, and intentionally.   At a minimum, Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

252.   Plaintiff is entitled to punitive damages in addition to actual damages from Defendants.

## JURY TRIAL DEMAND

253.   Plaintiff hereby requests a trial by jury.

## RELIEF

**WHEREFORE,** the Plaintiff respectfully prays that this Court grant the following relief:

(i)   Enter judgment in favor of the Plaintiff against each of the Defendants awarding Plaintiff its actual damages;

(ii)   Order that Defendants compensate the Plaintiff for the future costs to abate the ongoing public nuisance caused by the opioid epidemic;

(iii)   Enter judgment against the Defendants requiring Defendants to pay punitive damages;

**EXHIBIT 4**

(iv)   Enter judgment against Defendants awarding Plaintiff its reasonable attorneys' fees, all costs and expenses; pre-judgment and post-judgment interest; and

(v)   All other such and further relief as this Court may deem just and proper.

Respectfully submitted,

TONY G. PUCKETT, OBA #13336
TODD A. COURT, OBA #19438
McAFEE & TAFT A PROFESSIONAL CORPORATION
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK  73102-7103
405/235-9621; 405/235-0439 (FAX)
tony.puckett@mcafeetaft.com
todd.court@mcafeetaft.com

-and-

MATTHEW J. SILL, OBA #21547
HARRISON C. LUJAN, OBA #30154
ALEX YAFFE, OBA #21053
FULMER SILL
P.O. Box 2448
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Phone/Fax: 405-510-0077
msill@fulmersill.com
hlujan@fulmersill.com
*Attorneys for Plaintiff*

82

EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| WESTFIELD NATIONAL INSURANCE COMPANY | ) ) ) |
| Plaintiff | ) ) |
| v. | ) Civil Action No. 5:19-cv-83-TBR ) |
| QUEST PHARMACEUTICALS, INC. | ) ) |
| Defendant/Third-Party Plaintiff | ) ) |
| v. | ) ) |
| ASSUREDPARTNERS NL, LLC | ) ) |
| Third-Party Defendant | ) |

**QUEST PHARMACEUTICALS, INC.'S ANSWERS AND RESPONSES TO WESTFIELD NATIONAL INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES, REQUEST FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION**

Defendant Quest Pharmaceuticals, Inc., by counsel, for its responses to the plaintiff's interrogatories and request for production of documents states:

**GENERAL OBJECTIONS**

1.      Defendant objects to each request for production to the extent that it could be construed as requesting disclosure of information prepared by or at the direction of its attorneys; to the extent that it could be construed as requesting disclosure of information prepared by or for defendant or its representatives in contemplation of litigation or trial; to the extent that it could be construed as requesting disclosure, release or review of confidential communications by and between defendant and its attorneys; and to the extent that it is otherwise covered by attorney-client privilege and the attorney work-product privilege.

**EXHIBIT 5**

2.       Defendant asserts that the answers are given without in any way waiving or intending to waive, but on the contrary intending to preserve: (a) all questions as to the competency, relevancy, materiality, privilege and admissibility as evidence, for any purpose, of the answers, or subject matter thereof, in any subsequent proceedings in, or the trial of, this action; (b) the right to object to the use of any of the answers in any subsequent proceedings in, or the trial of, this action; (c) the right to object on any ground, at any time, or to a demand for further discovery procedures involving or relating to the answers herein provided; and (d) the right to review, correct, add or to clarify any of the answers to these interrogatories.

3.       Defendant responds that all answers are based upon information presently available after diligent investigation, and defendant reserves the right to supplement or amend its answers should additional information become available at a later point. In addition, such answers will be supplemented by lists of witnesses, lists of exhibits, contentions, depositions and other pleadings.

4.       Defendant responds that Defendant has a record retention policy to retain records for seven years.  Accordingly, Defendant may not retain responsive records prior to that time.

Subject to the above general objections, which are hereby interposed as to each response below, defendant specifically answers and objects as follows:

possession, custody or control of the document since it was created; and

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**  State the name, address and telephone number of each person providing information responsive to these requests for admissions, interrogatories and requests for production of documents.

**ANSWER:**

**EXHIBIT 5**

a. Kevin E. Higgins, President, Quest Pharmaceuticals, Inc., 300 E. Chestnut Street, Murray, Kentucky 42071, 270-759-1248

b. Michael C. Cappock, Vice President, Quest Pharmaceuticals, Inc., 300 E. Chestnut Street, Murray, Kentucky 42071, 270-759-1248

c. Timothy R. Greer, Controller, Quest Pharmaceuticals, Inc., 300 E. Chestnut Street, Murray, Kentucky 42071, 270-759-1248

**INTERROGATORY NO. 2:**   Identify all people with knowledge of the nature of the damages

sought in the Underlying Litigation.

**ANSWER:    Objection.  This Interrogatory seeks disclosure of information protected by the attorney-client and/or work product privileges.  Without waiving this objection:**

a. John Haggerty.  Fox Rothschild LLP, Stone Manor Corporate Center, 2700 Kelly Road, Suite 300 Warrington, PA 18976, (215) 918-3564.

b. Nick Salter.  Fox Rothschild LLP, Stone Manor Corporate Center, 2700 Kelly Road, Suite 300 Warrington, PA 18976, (215) 918-3576.

c. Plaintiffs' counsel in Underlying Litigation.  Please refer to the Table of Cases previously provided in this case as well as the Complaints and Amended Complaints produced in response to RFP #1.

**INTERROGATORY NO. 3:**   Identify the nature of the damages sought in the Underlying

Litigation.

**ANSWER:  Objection.  This Interrogatory seeks disclosure of information protected by the attorney-client and/or work product privileges, is vague, and is unduly burdensome. Without waiving this objection:**

Quest has not been named in any active track within the MDL or Underlying Litigation.  Accordingly, there has not been any relevant discovery as to any of the plaintiffs' claims against Quest and plaintiffs' damages have not been identified with any specificity other than that stated in the Complaints and Amended Complaints, which speak for themselves.

**EXHIBIT 5**

**INTERROGATORY NO. 4:**  If you contend that the Westfield Policy provides coverage to you for damages or expenses attributable to the Underlying Litigation, identify the amount and the nature of such damages.

**ANSWER:  Objection.  This Interrogatory seeks disclosure of information protected by the attorney-client and/or work product privileges, is vague, and is unduly burdensome. Without waiving this objection:**

**Quest has not been named in any active track within the MDL or Underlying Litigation.  Accordingly, there has not been any relevant discovery as to any of the plaintiffs' claims against Quest and plaintiffs' damages have not been identified with any specificity other than that stated in the Complaints and Amended Complaints, which speak for themselves.**

**INTERROGATORY NO. 5:**   Identify all insurers with which you have made a claim for coverage for damages arising from the Underlying Litigation with reference to the nature of the policy, the relevant policy number, and policy period.

**ANSWER:   All lawsuits specifically identified in the Complaint for Declaratory Relief were tendered to the following liability insurers:**

    i.    **Erie Insurance Exchange – Tendered for defense January 15, 2019 via email to John Rainey, agent with Tigrett & Pennington. Claim number A00001554485 was assigned by Erie Insurance on January 18, 2019.  Quest does not recall receiving a Reservation of Rights letter from Erie prior to this lawsuit.   Quest's only contact with Erie has been a phone conversation between Tim Greer and Michael Greenwell, a Commercial General Liability Specialists with Erie Insurance. Tim Greer sends the notifications of the complaints to Mr. Greenwell via email whenever Quest is served a complaint.**

    ii.    **Westfield Insurance – Tendered for defense on January 25, 2019 via email to Westfieldccc@westfieldgrp.com. Westfield Insurance letter from Robert Clayton addressed to Quest Pharmaceuticals, Inc. dated January 30, 2019 acknowledged receipt of claim and assigned Claim No. 0001997718.  A letter from Richard M. Garner with Collins Roche Utley & Garner addressed to Quest Pharmaceuticals, Inc. dated June**

4

**EXHIBIT 5**

4, 2019. **This letter states that Westfield would be defending Quest Pharmaceuticals, Inc. through attorney John Haggerty of Fox Rothschild and that defense is provided under full reservation of rights.**

iii. **Motorists Mutual Insurance Company – Tendered for defense on January 25, 2019 via email to** webclaim@motoristsgroup.com. **Motorists Mutual Insurance Company is providing defense through John Haggerty of Fox Rothschild. Quest does not recall receiving any notice from Motorists Mutual Insurance of reservation of rights.**

**See also Quest's answer to Interrogatory #10.**

**INTERROGATORY NO. 6:** Identify each person whom you intend to call as a witness, whether as an expert or non-expert, at any hearing or trial of this matter and the substance of their expected testimony.

**ANSWER: Objection. This Interrogatory seeks disclosure of information protected by the attorney-client and/or work product privileges. Without waiving this objection, Quest has not yet decided what witnesses they will call at trial, but they will comply with any pretrial orders of the Court regarding the identification of witnesses to be used at trial. Quest further states it may call the following witnesses:**

a. **Kevin E. Higgins, President, Quest Pharmaceuticals, Inc., 300 E. Chestnut Street, Murray, Kentucky 42071, 270-759-1248**
b. **Michael C. Cappock, Vice President, Quest Pharmaceuticals, Inc., 300 E. Chestnut Street, Murray, Kentucky 42071, 270-759-1248**
c. **Timothy R. Greer, Controller, Quest Pharmaceuticals, Inc., 300 E. Chestnut Street, Murray, Kentucky 42071, 270-759-1248**

**INTERROGATORY NO. 7:** Identify every evidentiary exhibit you intend to present at any hearing or trial of this matter.

**EXHIBIT 5**

**ANSWER:** Objection. This Interrogatory seeks disclosure of information protected by the attorney-client and/or work product privileges. Without waiving this objection, Quest has not yet decided what exhibits it will rely upon at trial, but they will comply with any pretrial orders of the Court regarding the identification of exhibits to be used at trial. Quest further states it may rely upon all documents produced in response to Westfield's Requests for Production of Documents and every document produced by Westfield in response to Quest's Requests for Production of Documents.

**INTERROGATORY NO. 8:** State the date when, and the manner in which, you first became aware of the facts underlying the allegations in the Underlying Litigation.

**ANSWER:** Prior to the filing and service of the complaints of the lawsuits identified in the Complaint for Declaratory Relief, Quest Pharmaceuticals, Inc. did not receive any advance written demand, notice or other notification of any of the claims contained therein. In general, Quest has been notified of the Underlying Litigation by its counsel John Haggerty. The Table of Cases includes a date on which Quest was served with each complaint in the Underlying Litigation.

**INTERROGATORY NO. 9:** For each response Quest gives to the requests for admission that follow that is other than an unqualified admission, state every fact upon which Quest relies for such answer, and identify each person who has knowledge of such facts.

**ANSWER:** Quest Pharmaceuticals, Inc. has provided the factual basis for its denials in response to each specific Requests for Admissions. These responses are incorporated herein.

**EXHIBIT 5**

**INTERROGATORY NO. 10:**   Identify every primary, umbrella, and excess liability policy to which Quest was a party between 2001 and the present with reference to the nature of the policy (e.g., commercial general liability, professional liability, directors & officers, etc.), the relevant policy number, and policy period.

**ANSWER:**

   a.   **State Automobile Mutual Insurance Company**
      i.   **Policy Periods, Status, and Premiums:**
         1.   **October 26, 2000 to October 26, 2001**
            a.   **Property/General Liability/Umbrella Premium**
         2.   **October 26, 2001 to October 26, 2002 – Renewed**
            a.   **Property/General Liability/Umbrella Premium**
         3.   **October 26, 2002 to October 26, 2003 – Renewed**
            a.   **Property/General Liability/Umbrella Premium**
         4.   **October 26, 2003 to October 26, 2004 – Renewed**
            a.   **Property/General Liability/Umbrella Premium**

   b.   **Motorists Mutual Insurance Company**
      ii.   **Policy Periods, Status, and Premiums:**
         1.   **October 26, 2004 to October 26, 2005 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $11,865**
         2.   **October 26, 2005 to October 26, 2006 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $12,490**
         3.   **October 26, 2006 to October 26, 2007 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $12,087**
         4.   **October 26, 2007 to October 26, 2008 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $11,983**
         5.   **October 26, 2008 to October 26, 2009 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $12,453**
         6.   **October 26, 2009 to October 26, 2010 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $12,793**
         7.   **October 26, 2010 to October 26, 2011 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $12,746**
         8.   **October 26, 2011 to October 26, 2012 – Renewed**
            a.   **Property/General Liability/Umbrella Premium $13,059**
         9.   **October 26, 2012 to October 26, 2013 – Renewed**

**EXHIBIT 5**

  a. Property/General Liability/Umbrella Premium $13,844
10. October 26, 2013 to October 26, 2014 – Renewed
  a. Property/General Liability/Umbrella Premium $14,401
11. October 26, 2014 to October 26, 2015 – Cancelled by Insured at renewal
  a. Property/General Liability/Umbrella Premium $15,310

c. Westfield Insurance
  iii. Policy Periods:
   1. October 26, 2015 to October 26, 2016 – Renewed
    a. Property/General Liability/Umbrella Premium $17,675
   2. October 1, 2016 to October 1, 2017 – Cancelled by Insured at renewal
    a. Property/General Liability/Umbrella Premium $17,810

d. Erie Insurance Exchange
  iv. Policy Periods:
   1. October 1, 2017 to October 1, 2018 – Renewed
    a. Property/General Liability/Umbrella Premium $18,495
   2. October 1, 2018 to October 1, 2019 – Current Policy
    a. Property/General Liability/Umbrella Premium $16,473

**INTERROGATORY NO. 11:**   Identify every state and federal license or permit required for Quest to distribute pharmaceutical substances.  If such licenses or permits are held by individual employees or agents of Quest, identify those persons.

**ANSWER:  Please see Folder #2 and Folder #3 in Quest's Responses to Westfield's Requests For Production of Documents.**

8

**EXHIBIT 5**

**INTERROGATORY NO. 12:** Describe the internal procedures or processes Quest has used for the last ten years to ensure that Quest does not dispense or distribute prescription medicine for illegitimate medical or non-medical purposes.

**ANSWER:** **Quest maintains Standard Operating Procedures to ensure the customers possess current and valid licensure. Please see Folder #2 and Folder #3 in Quest's Responses to Westfield's Requests For Production of Documents.**

**INTERROGATORY NO. 13:** Describe the internal procedures or processes that Quest has used for the last ten years to distribute controlled substances to pharmacies.

**ANSWER:** **Quest maintains Standard Operating Procedures to ensure the customers possess current and valid licensure. This includes the customer authentication procedures referenced in the above question, as well as an additional Suspicious Order Monitoring program and Operating Procedures. Please see Folder #2 and Folder #3 in Quest's Responses to Westfield's Requests For Production of Documents.**

**INTERROGATORY NO. 14:** Identify all suspicious order investigations against Quest or its employees or agents in the last ten years with respect to the distribution of controlled substances, including their outcomes.

**ANSWER:** **Upon information and belief, there have been no suspicious order investigations against Quest Pharmaceuticals, Inc.**

9

**EXHIBIT 5**

## Verification Page

I have read the foregoing Answers to Interrogatories and the information contained therein is true and correct to the best of my knowledge and belief.

QUEST PHARMACEUTICALS, INC.

BY: _____

TITLE: _____

STATE OF _____ )

COUNTY OF _____ ) (SCT.

Subscribed and sworn to before me by _____ of QUEST PHARMACEUTICALS, INC., on behalf of said Company, on this the _____ day of _____ 2020.

My commission expires: _____.

_____
NOTARY PUBLIC, STATE-AT-LARGE

**EXHIBIT 5**

## REQUEST FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Produce a copy of every document that Quest intends to use as evidence or as demonstrative evidence at any hearing or trial of this matter.

**RESPONSE: Objection. This Interrogatory seeks disclosure of information protected by the attorney-client and/or work product privileges. Without waiving this objection, Quest has not decided what exhibits it will rely upon at trial, but they will comply with any pretrial orders of the Court regarding the identification of exhibits to be used at trial. Quest further states it may rely upon all documents produced in response to Westfield's Requests for Production of Documents and every document produced by Westfield in response to Quest's Requests for Production of Documents.**

**In addition, Quest will produce the following documents that it may rely upon at trial:**

- **Table of Cases**
- **Complaints and Amended Complaints in Underlying Litigation that have been Served Upon Quest**
- **Quest's correspondence reporting filing of Underlying Litigation**
- **Quest's Standard Operating Procedures**
- **Quest's License Applications**

**REQUEST NO. 2:** Produce copies of all written discovery and discovery responses, including all documents responsive to such written discovery and expert reports, that has been exchanged among the parties in the Underlying Litigation.

**RESPONSE: Quest has not been named in any active track within the MDL or Underlying Litigation. Accordingly, there has not been any relevant discovery as to any of the plaintiffs' claims against Quest and plaintiffs' damages have not been identified with any specificity other than that stated in the Complaints and Amended Complaints, which speak for themselves.**

**REQUEST NO. 3:** Produce a copy of all primary and excess liability insurance policies maintained by Quest from 2001 to the present.

**RESPONSE: Policies from Motorists Mutual Insurance Company for policy periods 10-26-2008 through 10-26-2015, Westfield Insurance for policy periods 10-26-15 through 10-26-17, and Erie Insurance Exchange for policy period 10-1-17 through 10-1-19 will be provided. Quest no longer possesses any of the insurance policies prior to 10-26-2008.**

**EXHIBIT 5**

**REQUEST NO. 4:**   Produce a copy of all controlled substances permits/licenses that have been issued to Quest or its employees or agents since 2001.

**RESPONSE:   Quest does not maintain copies of licenses back to 2001.  A history of Quest's licenses, including the date they were originally acquired and the current expiration date of the current license, may be found in Folder #2.  A copy of all current Quest Licenses are in Folder #3.**

**REQUEST NO. 5:**  Produce a copy of any written or electronic communications between Quest and any liability insurers regarding coverage for the allegations in the Underlying Litigation.

**RESPONSE:          Please see Folder #6, #7, #8, and #9.  At this time, Quest is not able to locate a Reservation of Rights letter sent by Erie.**

**REQUEST NO. 6:**  Produce copies of the internal procedures or processes Quest has used for the last ten years to ensure that Quest does not dispense or distribute prescription medicine for illegitimate medical or non-medical purposes.

**RESPONSE:  Please refer to Folder #4, which contains:**

- **Vendor and Customer Authentication 11.13.14**
- **DSCSA Authorized Trading Partners 2.8.16**
- **21 Controlled Substance Account Approval & Existing Account Review 8.20.19**
- **4A Customer Authentication & Review 9.23.19**

**REQUEST NO. 7:**  Produce a copy of the internal procedures or processes that Quest has used for the last ten years, including suspicious order monitoring procedures or processes, to distribute controlled substances to pharmacies.

**RESPONSE:  Please refer to Folder #4, which contains:**

- **SOM Monitoring 11.13.14**
- **SOM Monitoring 1.29.18**
- **Suspicious Order Monitoring 7.10.19**

12

**EXHIBIT 5**

**REQUEST NO. 8:**  Produce a copy of all documents related to any suspicious order investigations against Quest or its employees or agents in the last ten years with respect to the distribution of controlled substances.

**RESPONSE:**        **Upon information and belief, Quest has not been party to a suspicious order investigation and has no responsive documents.**

**REQUEST NO. 9:**   Produce a copy of all settlement communications between Quest and any other party to the Underlying Litigation.

**RESPONSE:  Quest is not aware of any settlement communications between its counsel in the Underlying Litigation and Plaintiffs in the Underlying Litigation.**

**REQUEST NO. 10:**   Produce a copy of Quest's organizational chart(s) from 2001 to the present.

**RESPONSE:  Please refer to Folder #5 which contains:**

    a.  **Org Chart 11.11.2014**
    b.  **Org Chart 1.29.2018**
    c.  **Organizational Chart 1.18.2019**
    d.  **Organizational Chart 7.20.2020**

**REQUEST NO. 11:**   Produce a copy of Quest's financial data, income statements, and revenue from 2001 to present for the sales of controlled substances.

**RESPONSE:  Objection.  This Requests is overly broad, unduly burdensome, and not likely to lead to admissible evidence.**

**EXHIBIT 5**

## REQUESTS FOR ADMISSION

**REQUEST NO. 1:**   Admit that Exhibit 1 attached hereto and bearing Bates stamp _____ is a true and correct copy of the Westfield Policy for the period October 26, 2015-October 1, 2016.

**RESPONSE:  Admit.**

**REQUEST NO. 2:**   Admit that Exhibit 2 attached hereto and bearing Bates stamp _____ is a true and correct copy of the Westfield Policy for the period October 1, 2016-October 1, 2017.

**RESPONSE:  Admit.**

**REQUEST NO. 3:**   Admit that the Westfield Policy does not provide coverage for any injunctive or other equitable relief sought in the Underlying Litigation.

**RESPONSE:  Admit.**

**REQUEST NO. 4:**   Admit that Quest is a wholesale distributor of pharmaceutical products.

**RESPONSE:  Admit.**

**REQUEST NO. 5**   Admit that Quest distributes pharmaceutical products in Kentucky and other States.

**RESPONSE:  Admit.**

**REQUEST NO. 6:**   Admit that Quest, as a wholesale distributor of pharmaceutical products in Kentucky and other States, is subject to professional regulation by the Kentucky Board of

14

**EXHIBIT 5**

Pharmacy and the Board of Pharmacy or a similar entity in each State where Quest distributes pharmaceutical products.

**RESPONSE: Admit.**


**REQUEST NO. 7:**   Admit that Kentucky law requires Quest to obtain annually a controlled substance permit/license from the Kentucky Board of Pharmacy in order to distribute controlled substances in Kentucky.

**RESPONSE: Admit.**


**REQUEST NO. 8:**   Admit that Quest is a Kentucky corporation whose principal place of business is in Kentucky.

**RESPONSE: Admit.**


**REQUEST NO. 9:**   Admit that Quest used a Kentucky insurance agent to procure the Westfield Policy.

**RESPONSE: Admit.**


**REQUEST NO. 10:**   Admit that the Westfield Policy was contracted for and negotiated in Kentucky.

**RESPONSE: Admit.**


**REQUEST NO. 11:** Admit that Kentucky law governs interpretation of the Westfield Policy.

**EXHIBIT 5**

**RESPONSE:  Admit.**


**REQUEST NO. 12:**   Admit that Quest was a defendant in the West Virginia Litigation.

**RESPONSE:  Admit.**


**REQUEST NO. 13:**   Admit that the Amended Complaint in the West Virginia Litigation alleged that Quest and the other defendants contributed to the "prescription drug epidemic" in West Virginia by improperly and illegally distributing opioids and other controlled substances.

**RESPONSE:  Admit.**


**REQUEST NO. 14:**   Admit that in the West Virginia Litigation the State of West Virginia sought to recover hundreds of millions of dollars of economic losses to the State allegedly caused by the defendants' improper distribution of controlled substances.

**RESPONSE:  Admit in part and deny in part.  The State of West Virginia sought to recover hundreds of millions of dollars of economic losses to the State allegedly caused by multiple defendants' actions.  Attributing this lawsuit to Quest's action alone is misleading.**


**REQUEST NO. 15:**   Admit that Quest knew when it first applied for the Westfield Policy that the State of West Virginia alleged that it had sustained economic losses as a result of Quest's alleged improper distribution of controlled substances.

**RESPONSE:  Admit.**


**REQUEST NO. 16:**   Admit that Quest settled the West Virginia Litigation for $250,000.

**EXHIBIT 5**

**RESPONSE:  Admit.**

Respectfully submitted,

WHITLOW, ROBERTS, HOUSTON & STRAUB, PLLC
Attorneys for Defendant Quest Pharmaceuticals, Inc.

BY:   /s/ Ryan T. Polczynski
        James R. Coltharp, Jr., Esq.
        Ryan T. Polczynski, Esq.
        300 Broadway
        Post Office Box 995
        Paducah, Kentucky 42002-0995
        Telephone:  (270) 443-4516
        Facsimile:  (270) 442-1712
        jcoltharp@whitlow-law.com
        rtp@whitlow-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of September, 2020 I have served a true and correct copy of the foregoing via electronic mail upon the following:

John W. Walters, Esq. and Benjamin T. Harris, Esq.,Walter Richardson, PLLC – Lexington, 771 Corporate Drive, Suite 900, Lexington, KY 40503, *Attorneys for Plaintiff*

Elizabeth M. Bass, Esq., Walters Richardson PLLC, 313 East Main Street, Suite 5, Hendersonville, TN 37075, *Attorneys for Plaintiff*

Brian F. Haara, Esq., and Kristin E. McCall, Esq., Tachau Meek PLC, 101 South Fifth Street, PNC Tower, Louisville, KY 40202-3120, *Attorneys for AssuredPartners NL, LLC*

        /s/ Ryan T. Polczynski
        Ryan T. Polczynski, Esq.

**EXHIBIT 5**



**EXHIBIT 5**

Insured:        **QUEST PHARMACEUTICALS INC.**
Claim Number:   **0001874313**
Date of Loss:   **September 30, 2017**



Policy Number:      CWP 3263063
Policy Period(s):   10/26/2015 - 10/1/2016
Policy Cancelled:   10/01/2016

☑ **CERTIFIED POLICY**

I, SARA IRELAND _____, Region Service Leader of the
Westfield National Insurance Company, do hereby certify that the foregoing copy was
prepared under my supervision and to the best of my knowledge and belief is a true and
correct copy of the policy with an effective date of 10/26/2015 - 10/1/2016 .

Signature: _____ *SARA IRELAND* _____

☐ **NON-CERTIFIED POLICY**

This policy is not certified for the following reason(s): _____

_____

_____

# *Commercial Insurance Coverage Policy*



**THIS POLICY HAS BEEN
ESPECIALLY DESIGNED**

*FOR:*

*QUEST PHARMACEUTICALS INC.*

*BY:*

*ASSURED NEACE LUKENS INS AGCY*

*THROUGH:*

*WESTFIELD NATIONAL INSURANCE COMPANY*



**W E S T F I E L D**
**I N S U R A N C E**
Sharing Knowledge. Building Trust.®

ID 7004 (0411)

002
**EXHIBIT 6**

*IN WITNESS WHEREOF,* this Company has caused this policy to be signed by its President and Secretary and countersigned by a duly authorized representative of the Company if required by law.

*Frank A Carrino* Secretary          *Edward J. Lungen III* President

**EXHIBIT 6**



Welcome to Westfield Insurance!  Thank you for selecting Westfield as your insurance carrier and for placing your trust in us.

In business since 1848, Westfield has a longstanding reputation for stability, integrity and financial strength.  You can rely on us to add value by providing underwriting expertise in a forthright and professional manner.

Insurance from Westfield is available exclusively through leading independent agents who bring knowledge and service excellence to customers.  If you have any questions on your insurance, please contact your independent insurance agent:

ASSURED NEACE LUKENS INS AGCY
859-543-1716

We look forward to fulfilling your business needs and delivering on Westfield's promise of protection.  Welcome, and thank you for allowing us to serve you.

Sincerely,

*Edward J. Largent III*

Edward J. Largent III
President
Westfield Insurance

Ohio Farmers Insurance Company - Westfield Insurance Company - Westfield National Insurance Company
American Select Insurance Company - Old Guard Insurance Company
One Park Circle - P.O. Box 5001 -  Westfield Center, Ohio  44251-5001
1.800.243.0210 - fax 330.887.0840 - www.westfieldinsurance.com

AD 1272  01 09

004
**EXHIBIT 6**

# KENTUCKY STATE SURCHARGE EXPLANATION

The State Surcharge included in your policy is required by the Insurance Premium Tax Laws in Chapter 136 of the Kentucky Revised Statutes.  The funds generated from this surcharge provide sufficient funds for the uses and purposes of the Firefighters Foundation Program fund as prescribed by KRS 95A.220 and KRS 95A.262 and the Law Enforcement Foundation Program fund as prescribed by KRS 15.430.

If you have any questions concerning this surcharge, please contact your independent insurance agent.

**AD 755  04-10**

## Welcome to Westfield Insurance!



**WESTFIELD**
I N S U R A N C E
Sharing Knowledge. Building Trust.®

## Billing Services
We will mail a separate invoice approximately 20 days before the effective date of your policy.  Please mail all payments in the envelope provided with your invoice to Westfield Insurance, PO Box 9001566, Louisville, KY,  40290-1566.

## WIC*draw*
WIC*draw* is an electronic funds transfer program that will save you time and money. With your approval, Westfield Insurance will draw payments directly from your check-ing, savings, or credit union account. To enroll in WIC*draw*, complete the enrollment form enclosed with your invoice.

## Pay by Phone
Call JPMorgan Chase Pay Connexion's automated toll-free number at 1.800.766.9133 to make your payment using your Visa®, MasterCard®, Discover®, debit card or checking account.  JPMorgan will charge a convenience fee for this service and reserves the right to limit the amount of each transaction.

## Payment Plans and Installment Fees
Your invoice will indicate the payment plan you have selected.  You may choose another payment plan at any time by contacting billing customer service at 1.800.552.9134. Some exceptions apply.  Installment fees are charged according to the payment option you select and vary by state.

| Pay Plan | Pay by Check | Pay electronically "WIC*draw*" |
|---|---|---|
| Monthly | $5.00 | - 0 - |
| Quarterly | $5.00 | - 0 - |
| Semi-Annual | - 0 - | - 0 - |
| Annual | - 0 - | - 0 - |

## Due Dates and Additional Assistance
Payment is expected on or before the due date.  You may choose to change the due date on your account or contact us at **1.800.552.9134** for additional information.

## Thank You!
We appreciate your business.  If you have any questions about your insurance pro-tection, please contact your independent agent.

**AD 759  08 10**

One Park Circle ● P.O. Box 5001 ● Westfield Center, OH  44251-5001 ● 1.800.243.0210 ● fax 330.887.0840 ● www.westfieldinsurance.com



**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

10/23/15

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

CWP 3263063

## NOTICE TO KENTUCKY POLICYHOLDERS

Your insurance policy(ies) may be subject to a license fee or tax imposed by your local government.  The amount of the fee or tax is determined by the local government of the insured risk location.  The amount of tax and the local government(s) charging the tax will be shown on all future renewal certificates for your policy(ies).

If you believe you have been charged the tax in error, or overcharged, you may contact your insurance company at the address below to request a refund or credit for the tax paid.  If you need further assistance after contacting the company, you may contact the Kentucky Office of Insurance.

According to the Kentucky Revised Statute (KRS) 91A.080 and the regulations thereunder, a refund request or dispute notice *must* be mailed and contain the following information:

  i.   Name of insured
  ii.  Address(es) of insured property(ies)
  iii. Dates of coverage
  iv.  Amount of tax paid
  v.   Type of premium

It is also helpful to include the policy number for all policy(ies) involved.  Please mail this information to:

Westfield Group
Attn:  Legal Department
P.O. Box 5001
Westfield Center, Ohio  44251-5001

Upon receipt of this information, the company will have 90 days to respond to your request and, if deemed appropriate, refund any money due to you.

**AD 89 28  12/08**

007
**EXHIBIT 6**



## IMPORTANT NOTICE TO OUR POLICYHOLDERS

*Westfield Insurance Fraud Hot-Line*

PLEASE READ THIS IMPORTANT INFORMATION

- Fraudulent insurance claims cost us all money.

- Call us if you have information concerning a fraudulent insurance claim.

- All information will be kept confidential.

- Call and discuss your information with a trained investigator, or leave the information anonymously on a telephone answering machine.

- We can all help fight insurance fraud.

AD 8522  (08-10)

## Be a Fraud Buster
## 1-800-654-6482

### Detach and retain information below for future use.

   

**Fraud Hot-Line**
**1-800-654-6482**



**Westfield Center, Ohio  44251**
**www.westfieldinsurance.com**

**Fraud Hot-Line**
**1-800-654-6482**



**Westfield Center, Ohio  44251**
**www.westfieldinsurance.com**

008
**EXHIBIT 6**

THIS NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY. IF THERE IS ANY CONFLICT BETWEEN YOUR POLICY AND THIS NOTICE, THE PROVISIONS OF YOUR POLICY SHALL PREVAIL.

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE and PREMIUM

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

## PREMIUM CHARGED

During your current policy period, the portion, if any, of your premium that is attributable to coverage for acts of terrorism as defined in the Act is $_____  (refer to Common Policy Declarations if blank).

**If you do not desire the coverage** for acts of terrorism as defined in the Act, as amended, you may reject the coverage and instruct the insurance company to remove it and refund the premium described above. **To reject the coverage, you must:**

1) advise the insurance company by letter (on your company letterhead),

2) signed by the owner, representative, or properly designated official of the named insured.

**The insurance company must receive your letter within 60 days** from the date shown at the bottom right side of the forms titled "Common Policy Declarations". Please refer to "Common Policy Declarations" for the mailing address of the insurance company.

If your policy premium is $500, that may represent a minimum premium. In that case, the portion that is attributable to acts of terrorism as defined in the Act, as amended, may be included within that minimum and your total premium will not be reduced if you reject coverage for acts of terrorism. The minimum premium will still apply.

Should you have any question regarding this notice, please contact your insurance agent.

**AD 85 84**  01 15

# IMPORTANT -- PREMIUM AUDIT NOTICE

Westfield Insurance welcomes the opportunity to service your insurance needs.  The following information outlines the company's requirements for auditing your accounting records.

Your particular type of business has a policy premium that is based on estimated exposures at the time this policy was issued.  Since the exposures that are used to rate your policy fluctuate during the policy year, your final premium cannot be determined until after the expiration date of the policy term.

An accurate premium audit is a benefit to you and your business.  We recommend the person(s) in charge of keeping your financial records (e.g., Payroll; Gross Sales; Total Cost) be aware of insurance auditor needs.  Records that are accurate and properly maintained allow you to gain the most benefit from your premium audit.  Please ask questions and allow your auditor to assist you.

**WHO WILL MAKE THE AUDIT?**

You will be asked to complete a premium audit in one of three ways:

**Mail/Voluntary** - a form will be provided to you.  The form will ask a series of questions relative to your type of risk and your type of policy.  You will be asked to fill out the form in its entirety and return to Westfield for summary.

**Telephone** - a telephone auditor will call you on the phone to discuss your risk and gather your financials.  This could be a staff auditor or vendor auditor depending on your policy.

**Physical** - a field auditor will contact you to visit your premises.  They will ask about your operations and physically review your financial records.  This could be a staff auditor or vendor auditor depending on your policy.

**WHAT RECORDS WILL BE NEEDED?**

The Premium Auditor will examine and audit all of your records that relate to your policy.  The records needed will vary depending upon the type of coverage you have.  In most cases, the auditor will be able to obtain the necessary audit data from two or more of the following records:

Payroll Journals with monthly/quarterly totals     Individual Earning Cards with monthly/quarterly totals
Quarterly Tax Reports for Federal/State            Certificates of Insurance for sub-contractors
General Ledgers/Income/Sales Journals

In the course of the audit, the auditor will ask some questions about your records and your business operations.  This will assist the Auditor in properly classifying your operations and employees.

**HOW SHOULD YOUR RECORDS BE KEPT:**

**Payroll:**  Many of the premiums for your General Liability insurance are based on payroll which is defined as remuneration.  Remuneration means money or substitutes for money.  Payroll includes:

Wages              Bonuses              Holiday Pay          Sick Pay
Commissions        Overtime Pay         Vacation Pay         Payment for piece work

**Overtime:**  The amount paid in excess of straight time pay can be deducted if the excess can be verified by your records.  Your records must show overtime separately by employee.

**Division of Payroll:**  Division of an individual employee's payroll to more than one classification is not allowed.  Exception: For construction or erection operations, the payroll of an employee may be allocated to each type of work performed **if proper records are kept.**  Payroll **cannot** be divided between construction and office or sales classifications.

**Gross Sales:**  Another premium base for General Liability insurance is gross sales.  This means the gross amount charged by you to others for all goods or products, sold or distributed and operations performed by you for others.

This information is provided to you as assistance for proper record-keeping requirements.  Other insurance companies may differ in their requirements.

**AD 80 12** (8-10)

010
**EXHIBIT 6**

## IMPORTANT NOTICE TO OUR POLICYHOLDERS

## POLICY COVERAGE CHANGE - ADDITION OF ASBESTOS EXCLUSION

Your policy is endorsed to include our Asbestos Exclusion Endorsement (CU 70 00 or CG 70 17).  This endorsement **reduces your coverage.**  It changes your policy so it **will not** cover bodily injury, property damage, personal injury or personal and advertising injury due to asbestos exposure.  It also states the policy **will not** cover any loss, cost or expense incurred in complying with any federal, state or local provision of law regarding the inspection, monitoring, or control of asbestos in any goods, products or structures.

The above information is only a guide to help you understand the changes to your policy.  We recommend you read your policy and the endorsement.  If you have questions about this or want more information, please contact your independent insurance agent.

**AD 89 31  10 08**

**EXHIBIT 6**

# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this summary nor can it be construed to replace any provision of your policy. You should read your policy and review your declaration page for complete information on the coverages you are provided.

**CU 21 25 -- Total Pollution Exclusion**

- Amends the hostile fire exception by describing circumstances that are not included.

**AD 8251** 12 06

**31**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**NEW**
**COMMON POLICY DECLARATIONS**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** 16-07381 | **PROD.** | 000 |

| NAMED INSURED AND MAILING ADDRESS | AGENCY / PROD |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A |
|---|

| Policy  From  10/26/15 | at 12:01 A.M. Standard Time at your |
| Period  To    10/26/16 | mailing address shown above. |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Business: DRUG DIST                          Named Insured is:  Corporation
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
In return for the payment of the premium, and subject to all terms of this
policy, we agree with you to provide the insurance as stated in this policy.
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS

| | |
|---|---:|
| COMMERCIAL PROPERTY COVERAGE PART | $    9,021.00 |
| DATA COMPROMISE/IDENTITY RECOVERY COVERAGE PART | $      107.00 |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $    3,658.00 |
| COMMERCIAL AUTO COVERAGE PART | $       71.00 |
| COMMERCIAL INLAND MARINE COVERAGE PART | Included |
| CRIME AND FIDELITY COVERAGE PART | Included |
| COMMERCIAL UMBRELLA COVERAGE PART | $    2,250.00 |
| TERRORISM INSURANCE COVERAGE | $      143.00 |
| | |
| Policy Annual Premium | $   15,250.00 |
| | |
| Municipal Tax | $    1,663.51 |
| State Surcharge | $      274.51 |
| | |
| Total Advance Annual Policy Premium | $   17,188.02 |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

The above is a summary of your coverages. For more detail,
please refer to the individual coverage parts inside your policy.

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Forms and Endorsements applicable to all coverage parts:
 IL0019   0488*, IL0017   1198*, ID7004   0411*, IL0003   0908*, IL0263   0908*.

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

| COUNTERSIGNED: _____ BY _____ |
|---|
| Date | Authorized Representative |

013
**EXHIBIT 6**

31

**WESTFIELD**
INSURANCE
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**NEW**
**COMMON POLICY DECLARATIONS**
(Continued)

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |

| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |

Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A

| Policy<br>Period | From<br>To | 10/26/15<br>10/26/16 | at 12:01 A.M. Standard Time at your<br>mailing address shown above. |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Commercial Lines
Disclosure of Local Government Tax

Municipal Tax              * - CITY   MURRAY                    $  1,663.51

Municipal Tax              * - TOTAL                           $  1,663.51

* The municipal tax amount includes a collection fee that is either 15% of the
tax collected or 2% of the premium charged, whichever is less

014
**EXHIBIT 6**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> CRIME AND FIDELITY COVERAGE PART
> EMPLOYMENT - RELATED PRACTICES LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued.  On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

© ISO Properties, Inc., 2007                    **IL 00 03  09 08**

**EXHIBIT 6**

INTERLINE

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# KENTUCKY CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART *
EMPLOYMENT - RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.** **Cancellation of Policies in Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least 14 days before the effective date of cancellation.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.** **Cancellation of Policies In Effect For More Than 60 Days**

**a.** If this policy has been in effect for more than 60 days or is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium;

(2) Discovery of fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

(3) Discovery of willful or reckless acts or omissions on your part which increase any hazard insured against;

(4) The occurrence of a change in the risk which substantially in-

creases any hazard insured against after insurance coverage has been issued or renewed;

(5) A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

(6) We are unable to reinsure the risk covered by the policy; or

(7) A determination by the commissioner that the continuation of the policy would place us in violation of the Kentucky insurance code or regulations of the commissioner.

**b.** If we cancel this policy based on Paragraph **7.a.** above, we will mail or deliver a written notice of cancellation to the first Named Insured, stating the reason for cancellation, at least:

(1) 14 days before the effective date of the cancellation, if cancellation is for nonpayment of premium; or

(2) 75 days before the effective date of the cancellation, if cancellation is for any reason stated in **7.a.(2)** through **7.a.(7)** above.

C. The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

1. For the purpose of this Condition:

    a. Any policy period or term of less than six months shall be considered to be a policy period or term of six months; and

    b. Any policy period or term of more than one year or any policy with no fixed expiration date shall be considered a policy period or term of one year.

2. If we elect not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the reason for nonrenewal, to the first Named Insured shown in the Declarations, at the last mailing address known to us, at least 75 days before the expiration date of the policy period.

3. If notice of nonrenewal is not provided pursuant to this Condition, coverage under the same terms and conditions shall be deemed to be renewed for the ensuing policy period upon payment of the appropriate premium until you have accepted replacement coverage with another insurer, or until you have agreed to the nonrenewal.

4. If we mail or deliver a renewal notice to the first Named Insured at least 30 days before the end of the policy period, stating the renewal premium and its due date, the policy will terminate without further notice unless the renewal premium is received by us or our authorized agent by the due date.

5. If this policy terminates because the renewal premium has not been received by the due date, we will, within 15 days, mail or deliver to the first Named Insured at his last known address a notice that the policy was not renewed and the date it was terminated.

6. If notice is mailed, proof of mailing is sufficient proof of notice.

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1.  The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2.  We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    **a.** 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

    **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

3.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4.  Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5.  If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6.  If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1.  We have the right to:

    **a.** Make inspections and surveys at any time;

    **b.** Give you reports on the conditions we find; and

    **c.** Recommend changes.

2.  We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    **a.** Are safe or healthful; or

    **b.** Comply with laws, regulations, codes or standards.

3.  Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4.  Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statues, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1.  Is responsible for the payment of all premiums; and

2.  Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

**IL 00 17 11 98**

PAGE   01 OF   01      CP DS 00  (10-14)                    10/25/15                    ORIGINAL

**31**

### WESTFIELD
INSURANCE
Sharing Knowledge. Building Trust.®

**NEW**
**COMMERCIAL PROPERTY DECLARATIONS**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |
|---|---|

Policy Number: CWP 3 263 063      ³11³  WIC Account Number: 1600961480    ³  A

| Policy | From | 10/26/15 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| Period | To | 10/26/16 | mailing address shown above. |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
DESCRIPTION OF PREMISES

| Loc Bldg  Address, City & State | Construction | Occupancy |
|---|---|---|
| 001 001 300 CHESTNUT ST | Non- | DRUG STORE |
|   MURRAY, KY 42071 | Combustible | |
| 001 002 300 CHESTNUT ST | Non- | DRUG STORE |
|   MURRAY, KY 42071 | Combustible | |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
COVERAGES PROVIDED - Insurance at the described premises applies only for
coverages for which a limit of insurance is shown. OPTIONAL COVERAGES applicable
only when entries are made in the schedules below:

| Loc Bldg | Coverage | Coins | Infl.<br>Guard | Repl.<br>Cost | Limit of<br>Insurance | Premium |
|---|---|---|---|---|---|---|
| | Blanket Building & Pers Prop | 100% | N/A | See Below | $5,870,000 | $6,812 |
| 001 001 | Building | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 001 001 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 001 001 | Bus Income incl Rental Value | 100% | N/A | N/A | $1,000,000 | $950 |
| | Cause of Loss:  Special | | | | | |
| 001 002 | Building | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 001 002 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |

OPTIONAL COVERAGES

| Loc Bldg | Applicable to | Option Description | Premium |
|---|---|---|---|
| ALL ALL | Blanket Building & Pers Prop | Agreed value - expires 10/26/16 | INCLUDED |
| 001 001 | | Sig Series Distributor Endt | $330 |
| 001 002 | | Sig Series Distributor Endt | $250 |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Equipment Breakdown Coverage Premium       $    679.00
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Total Advance Annual Property Premium       $   9,021.00
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Deductible is      $1000
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Forms and Endorsements applicable to this coverage part:

| CP0030 | 0607*, | CP0090 | 0788*, | IL0952 | 0115*, | CP0166 | 0900*, | CP0140 | 0706*, |
|---|---|---|---|---|---|---|---|---|---|
| CP7083 | 0408*, | CP7084 | 0408*, | CP1032 | 0808*, | CP1556 | 0607*, | CP7091 | 1112*, |
| CP7102 | 1113*, | CPDS00 | 1014*, | CP1030 | 0607*, | CP0010 | 0607*, | IL0415 | 1004*, |
| CP7092 | 1109*, | CP0415 | 1000*, | CP0405 | 0402*, | CP1230 | 0695*, | CP0407 | 1091*, |
| CP0440 | 0607*, | CP0417 | 0607*, | CP0401 | 1000*. | | | | |

019
**EXHIBIT 6**

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**NEW**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |
|---|---|

| Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A |
|---|

Policy    From   10/26/15          at 12:01 A.M. Standard Time at your
Period    To     10/26/16          mailing address shown above.
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

**SIGNATURE SERIES**
**COMMERCIAL PROPERTY DISTRIBUTOR ENDORSEMENT**
**SCHEDULE**

This schedule modifies insurance provided under the

SIGNATURE SERIES COMMERCIAL PROPERTY ENDORSEMENT
SIGNATURE SERIES COMMERCIAL PROPERTY DISTRIBUTOR ENDORSEMENT

**LOCATION SCHEDULE**
Note: Crime Coverages included via CR 00 21 apply on a policy-level basis,
including those locations/buildings not scheduled below.

Loc.  Bldg.
No.   No.            Address, City & State
001   001            300 CHESTNUT ST, MURRAY, KY 42071
001   002            300 CHESTNUT ST, MURRAY, KY 42071

The limits listed in Section I below are the most we will pay for each coverage
in any one occurrence unless a different limit is listed in Section II below.
(Refer to policy language for specific coverages, conditions and exclusions.)

**Section I**

| Coverage | Limit of Insurance |
|---|---|
| Accounts Receivable (CM 00 66) | |
|     Property At Your Premises | $50,000 |
|     Property Away From Your Premises | NIL |
| Appurtenant Buildings and Structures | $25,000 |
| Backup of Sewers or Drains | $50,000 |
| Brands and Labels (CP 04 01) | Included |
| Bridges, Roadways, Walks, Patios and other Paved Surfaces | Included |
| Business Income Changes - Beginning of the Period of Restoration (CP 15 56) | |
|     Business Income (and Extra Expense), Business Income (without Extra Expense) including Civil Authority Reduction in Waiting Period | 24 hours |
| Business Income from Dependent Properties | $250,000 |
| Changes in Temperature | $50,000 |
| Computer Coverage | |
|     Hardware, Data and Media | $250,000 |
|     Laptops/Portable Computers and Software (away from premises) | $10,000 |
| Credit Card Invoices | $1,000 |
| Debris Removal - Additional Insurance (CP 04 15) | |
|     Building & Contents (Combined) | $100,000 |
| Deferred Payments | $50,000 |
| Employee Theft (CR 00 21) | $25,000 |
|     Deductible Amount Per Occurrence: | NIL |

020
EXHIBIT 6

31

# WESTFIELD
## INSURANCE
Sharing Knowledge. Building Trust.®

**NEW**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSURED NEACE LUKENS INS AGCY
2416 SIR BARTON WAY STE 300
LEXINGTON KY 40509-3001
TELEPHONE 859-543-1716

Policy Number: CWP 3 263 063      ³11³  WIC Account Number: 1600961480   ³  A

Policy    From   10/26/15      at 12:01 A.M. Standard Time at your
Period    To     10/26/16      mailing address shown above.

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

| | |
|---|---|
| Excavation Costs | Included |
| Extra Expense | $50,000 |
| Fine Arts (IM 74 00) | |
|     Max per item | $5,000 |
|     Catastrophe Limit | $25,000 |
|     Deductible: | NIL |
|     Breakage: | Breakage Exclusion Applies |
| Fire Department Service Charge | $25,000 |
|     (Virginia Includes Volunteer Fire Departments) | |
|     (Increased Limits Are Not Available For Arizona) | |
| Fire Extinguisher Recharge Expense | Included |
| Forgery or Alteration (CR 00 21) | $25,000 |
|     Deductible Amount Per Occurrence: | NIL |
| Foundations of Buildings | Included |
| Ingress / Egress | $50,000 |
| | 12 Hour Waiting Period |
| Inside the Premises - Theft of Money & Securities  (CR 00 21) | $25,000 |
|     Deductible Amount Per Occurrence: | NIL |
| Outside the Premises (CR 00 21) | $25,000 |
|     Deductible Amount Per Occurrence: | NIL |
| Inventory and Appraisals | $10,000 |
| Leasehold Interest in Improvements and Betterments | Included |
| Lock Replacement | $10,000 |
| Loss Adjustment Expenses | $25,000 |
| Money Orders and Counterfeit Money (CR 00 21) | $1,500 |
|     Deductible Amount Per Occurrence: | NIL |
| Newly Acquired or Constructed Property | |
|     Buildings | $1,000,000/180 days |
|     Business Personal Property | $500,000/180 days |
|     Fine Arts | $10,000/180 days |
|     Business Income | 180 days |
| Non Owned Detached Trailers | $10,000 |
| Ordinance or Law (CP 04 05) | |
|     Loss to undamaged portion of building (if applicable) | Incl up to Bldg Lmt |
|     Demolition Cost / Increased Cost Of Const. Combined Limit | $100,000 |
|     Equipment | Included |
| Outdoor Property | |
|     Any one tree, shrub or plant | $2,500 |
|     Any one occurrence | $25,000 |
| Outdoor Signs | $12,500 |
| Patterns, Dies, Molds, and Forms | $10,000 |

021
**EXHIBIT 6**

**31**

# WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**NEW**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |

Policy Number: CWP 3 263 063          ³11³  WIC Account Number: 1600961480    ³  A

| Policy | From | 10/26/15 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| Period | To | 10/26/16 | mailing address shown above. |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Peak Season - Automatic Increase (CP 12 30)
  Period (From/To): Annual Policy Period          Lesser of: 25% or $50,000

Personal Effects and Property of Others
  Any one person in any one loss                              $5,000
  Any one occurrence                                         $50,000

Pollutant Clean Up and Removal  (CP 04 07)                   $50,000
  Deductible:                                                   NIL

Premises Boundary Increased Distance                     1,000 feet

Professional Fees - Architect and Engineer                  $25,000

Property at Un-named Locations                              $25,000

Property at Un-named Locations - Business Income           $25,000

Property in Transit                                         $50,000

Property in Transit - Business Income and Extra Expense     $50,000

Property off Premises                                       $50,000
  Max per salesperson                                       $10,000

Reward Payment
  Information                                               $10,000
  Stolen Property                                           $10,000

Spoilage incl. Refrigeration Maintenance Agreement, Selling Price,
  Breakdown Or Contamination and Power Outage (CP 04 40)    $50,000
  Deductible:                                                  $500

Stamps, tickets, including lottery tickets held for sale, and
letters of credit                                              $500

Storage of Duplicate Data and Records                      $25,000

Theft Damage to Un-owned Building Property                 Included

Tree Debris Removal                                         $1,000

Underground Pipes, Flues, and Drains                       Included

Utility Services - Direct Damage (CP 04 17)
Building                                                    $50,000
  Includes: Water Supply Property
            Communication Supply Property (No Overhead
            Transmission Lines)
            Power Supply Property (No Overhead Transmission
            Lines)
Business Personal Property                                  $50,000
  Includes: Water Supply Property
            Communication Supply Property (No Overhead
            Transmission Lines)
            Power Supply Property (No Overhead Transmission
            Lines)

Vacancy                                                 11% Occupied

022
**EXHIBIT 6**

**31**

## WESTFIELD INSURANCE
*Sharing Knowledge. Building Trust.™*

**NEW**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063      ³11³   WIC Account Number: 1600961480    ³  A |
|---|

| Policy   From   10/26/15 | at 12:01 A.M. Standard Time at your |
| Period   To     10/26/16 | mailing address shown above. |

Valuable Papers and Records (CM 00 67)
    All Other Covered Property                            $50,000
    Property Away From Your Premises             $5,000
    Deductible:                                    NIL

| Distributor Coverage | Limit of Insurance |
|---|---|
| Non Owned Detached Trailers | $50,000 |
| Refrigeration Breakdown Expense | $10,000 |
| Transit Property in Care of Carriers for Hire | $50,000 |

If a limit is listed in Section II, that limit will supersede the limit in
Section I for the designated coverage(s), location(s) and building(s)
listed below.

If no limit is listed in Section II, there are no changes to Section I.

Note: If "All" is designated as the Loc. No./Bldg. No. Coverage applies to all
locations, including those locations / buildings not scheduled.

Section II

| Loc.   Bldg. | | |
|---|---|---|
| No.    No.    Coverage | | Limit of Insurance |

023
**EXHIBIT 6**

COMMERCIAL PROPERTY

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning.  Refer to Section **F.**, **Definitions.**

**A. Coverage**

   **1. Business Income**

      Business Income means the:

      **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

      **b.** Continuing normal operating expenses incurred, including payroll.

      For manufacturing risks, Net Income includes the net sales value of production.

      Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

      **(1)** Business Income Including "Rental Value".

      **(2)** Business Income Other Than "Rental Value".

      **(3)** "Rental Value".

      If option **(1)** above is selected, the term Business Income will include "Rental Value".  If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

      If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

      We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss.  With respect to loss of or damage to personal property in the open or personal property in a vehicle,

the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

   **2. Extra Expense**

      **a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies to that premises.

      **b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

      We will pay Extra Expense (other than the expense to repair or replace property) to:

      **(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

      **(2)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise have been payable under this Coverage Form.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss Form as shown in the Declarations.

**4. Additional Limitation - Interruption of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage - Interruption of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage - Interruption of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage - Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

(3) Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

    (a) Used in the construction, alterations or additions; or

    (b) Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

c. **Extended Business Income**

(1) **Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

    (a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

    (b) Ends on the earlier of:

        (i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

        (ii) 30 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(2) **"Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

    (a) Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

    (b) Ends on the earlier of:

        (i) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

        (ii) 30 consecutive days after the date determined in (2)(a) above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

d. **Interruption of Computer Operations**

(1) Under this Additional Coverage, electronic data has the meaning described under Additional Limitation - Interruption of Computer Operations.

(2) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss.

(3) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) If the Causes of Loss - Special Form applies, coverage under this Additional Coverage - Interruption Of Computer Operations is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

(b) If the Causes Of Loss - Broad Form applies, coverage under this Additional Coverage - Interruption Of Computer Operations includes Collapse as set forth in that form.

(c) If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage - Interruption Of Computer Operations.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for

you to inspect, design, install, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage - Interruption of Computer Operations is $2,500 for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(5) This Additional Coverage - Interruption in Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in (4) above has not been exhausted.

6. Coverage Extension

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

Newly Acquired Locations

a. You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location.

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

EXHIBIT 6

(1) This policy expires;

(2) 30 days expire after you acquire or begin to construct the property; or

(3) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

## B. Limits Of Insurance

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

1. Alterations And New Buildings;
2. Civil Authority;
3. Extra Expense; or
4. Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage.

## C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the amount of Net Income and operating expense or amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.  Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 2. Duties In The Event Of Loss

a. You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage.  Include a description of the property involved.

(3) As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.  This will not increase the Limit of Insurance.  However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss.  Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request.  We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

EXHIBIT 6

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

3. **Loss Determination**

a. The amount of Business Income loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

b. The amount of Extra Expense will be determined based on:

(1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

(a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

(b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

c. **Resumption Of Operations**

We will reduce the amount of your:

(1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

(2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

d. If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

4. **Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

a. We have reached agreement with you on the amount of loss; or

b. An appraisal award has been made.

D. **Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

1. The Coinsurance percentage shown for Business Income in the Declarations; times

2. The sum of:

a. The Net Income (Net Profit or Loss before income taxes), and

EXHIBIT 6

b. Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

Step (1): Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step (2): Divide the Limit of Insurance for the described premises by the figure determined in Step (1): and

Step (3): Multiply the total amount of loss by the figure determined in Step (2):

We will pay the amount determined in Step (3) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

(1) Prepaid freight - outgoing;
(2) Returns and allowances;
(3) Discounts;
(4) Bad debts;
(5) Collection expenses;
(6) Cost of raw stock and factory supplies consumed (including transportation charges);
(7) Cost of merchandise sold (including transportation charges);
(8) Cost of other supplies consumed (including transportation charges);
(9) Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;
(10) Power, heat and refrigeration expenses that do not continue under contract (if Form CP 15 11 is attached);
(11) All ordinary payroll expenses or the amount of payroll expense excluded (if Form CP 15 10 is attached); and
(12) Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion - not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**EXAMPLE #1 (UNDERINSURANCE)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $400,000
The Coinsurance percentage is: 50%
The Limit of Insurance is: $150,000
The amount of loss is: $ 80,000

Step (1): $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $150,000 ÷ $200,000 = .75

Step (3): $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**EXAMPLE #2 (ADEQUATE INSURANCE)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $400,000
The Coinsurance percentage is: 50%
The Limit of Insurance is: $200,000
The amount of loss is: $ 80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

E. **Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

(1) The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

(2) The Limit of Insurance shown in the Declarations.

2. **Monthly Limit Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

(1) The Limit of Insurance, multiplied by

(2) The fraction shown in the Declarations for this Optional Coverage.

EXAMPLE

When: The Limit of Insurance is    $120,000
The fraction shown in the Declarations for this Optional Coverage is    1/4

The most we will pay for loss in each period of 30 consecutive days is:    $30,000

($120,000 x 1/4 = $30,000)

If, in this example, the actual amount of loss is:

| | |
|---|---|
| Days 1-30: | $40,000 |
| Days 31-60: | 20,000 |
| Days 61-90: | 30,000 |
| | $90,000 |

We will pay:

| | |
|---|---|
| Days 1-30: | $30,000 |
| Days 31-60: | 20,000 |
| Days 61-90: | 30,000 |
| | $80,000 |

The remaining $10,000 is not covered.

3. **Business Income Agreed Value**

a. To activate this Optional Coverage:

(1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

(a) During the 12 months prior to the date of the Work Sheet; and

(b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

(2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

(a) The Coinsurance percentage shown in the Declarations; multiplied by

(b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

b. The Additional Condition, Coinsurance, is suspended until:

(1) 12 months after the effective date of this Optional Coverage; or

(2) The expiration date of this policy;

whichever occurs first.

c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

(1) Within 12 months of the effective date of this Optional Coverage; or

(2) When you request a change in your Business Income Limit of Insurance.

d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

(1) The Business Income Limit of Insurance; divided by

(2) The Agreed Value.

EXAMPLE

When: The Limit of Insurance is    $100,000
The Agreed Value is    $200,000
The amount of loss is    $ 80,000

Step (1): $100,000 ÷ $200,000 = .50

Step (2): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

4. **Extended Period Of Indemnity**

   Under Paragraph **A.5.c.**, **Extended Business Income**, the number 30 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

F. **Definitions**

   1. "Finished stock" means stock you have manufactured.

      "Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

      "Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

   2. "Operations" means:

      a. Your business activities occurring at the described premises; and

      b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

   3. "Period of restoration" means the period of time that:

      a. Begins:

         (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

         (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

         caused by or resulting from any Covered Cause of Loss at the described premises; and

      b. Ends on the earlier of:

         (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

         (2) The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

   (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration."

   4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

   5. "Rental Value" means Business Income that consists of:

      a. Net Income (Net Profit of Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

      b. Continuing normal operating expenses incurred in connection with that premises, including:

         (1) Payroll; and

         (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

   6. "Suspension" means:

      a. The slowdown or cessation of your business activities; or

      b. That a part of all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

**EXHIBIT 6**

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:
   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.

2. The coverage territory is:
   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

**a.** Someone insured by this insurance;

**b.** A business firm:

    **(1)** Owned or controlled by you; or

    **(2)** That owns or controls you; or

**c.** Your tenant.

This will not restrict your insurance.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

© Insurance Services Office, Inc., 2015                                                          **IL 09 52  01 15**

035
**EXHIBIT 6**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot.  Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

**1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

**2.** Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

© ISO Properties, Inc., 2006

**CP 01 40  07 06**

036
**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                               COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

These coverages apply to all locations covered on the policy, unless otherwise specified.

## SCHEDULE OF COVERED LOCATIONS WITH DEDUCTIBLES

| Loc. No. | Bldg. No. | Combined All Coverages Deductible | Direct Coverages Deductible | Indirect Coverages Deductible | Spoilage Deductible ($ Amt. or % of Loss) |
|---|---|---|---|---|---|
| 001 | ALL | $ 1,000 | | | |

CP 70 83  04 08

037
**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                                        COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

Equipment Breakdown is subject to the Limits of Insurance shown in the Commercial Property Coverage Part Declarations unless otherwise specified on the schedule below.

| Coverages | Limits |
|---|---|
| Equipment Breakdown Limit | $ |
| Business Income | $ |
| Extra Expense | $ |

The Limits for the following Coverages are included in the Equipment Breakdown Coverage form for $50,000 each unless otherwise specified on the schedule below.  (Note:  The Service Interruption Limit will follow the Business Income, Extra Expense or Spoilage Limit with a 24 hour waiting period).

| Coverages | Limits |
|---|---|
| Expediting Expenses | $ |
| Hazardous Substances | $ |
| Spoilage | $ |
| Computer Equipment | $ |
| Data Restoration | $ |
| Service Interruption | $ |

CP 70 83  04 08

EXHIBIT 6

POLICY NUMBER:  CWP 3263063                                    COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

**Other Conditions**

039
**EXHIBIT 6**

COMMERCIAL PROPERTY

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# EQUIPMENT BREAKDOWN COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

A. The following is added as an **Additional Coverage** to the **Causes of Loss - Basic Form, Broad Form or Special Form.**

**Additional Coverage - Equipment Breakdown**

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below:

1. We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

   a. mechanical breakdown, including rupture or bursting caused by centrifugal force;

   b. artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

   c. explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

   d. loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

   e. loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

2. Unless otherwise shown in the Schedule, the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance:

   a. **Expediting Expenses**

      With respect to your damaged Covered Property, we will pay up to $50,000 unless otherwise shown in a Schedule, the reasonable extra cost to:

      (1) make temporary repairs; and

      (2) expedite permanent repairs or permanent replacement.

   b. **Hazardous Substances**

      We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property.

      This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in **2.c.(1)(b)** below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

      The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000 unless otherwise shown in a Schedule.

   c. **Spoilage**

      (1) We will pay:

         (a) for physical damage to "perishable goods" due to spoilage;

         (b) for physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;

         (c) any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

EXHIBIT 6

(2) If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss, damage or expense under this coverage is $50,000 unless otherwise shown in the Schedule.

d. **Computer Equipment**

We will pay for loss, damage or expense caused by or resulting from an "accident" to "computer equipment."

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, is shown as covered, is $50,000 unless otherwise shown in a Schedule. Computers used primarily to control or operate "covered equipment" are not subject to this limit.

e. **Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "data."

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000 unless otherwise shown in a Schedule.

f. **Service Interruption**

(1) Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by an "accident" to equipment that is owned by a utility, landlord or other supplier with whom you have a contract to supply you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that is not Covered Property.

(2) Unless otherwise shown in a Schedule, Service Interruption coverage will not apply unless the failure or disruption of service exceeds 24 hours immediately following the "accident."

(3) The most we will pay for loss, damage or expense under this coverage is the limit that applies to Business Income, Extra Expense or Spoilage, except that if a limit is shown in a Schedule for Service Interruption, that limit will apply to Business Income and Extra Expense loss under this coverage.

g. **Business Income and Extra Expense**

Any insurance provided under this coverage part for Business Income or Extra Expense is extended to the coverage provided by this endorsement. The most we will pay for loss of Business Income you sustain or necessary Extra Expense you incur is the limit shown in the Declarations for that coverage, unless otherwise shown in a Schedule.

3. EXCLUSIONS

All exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

a. The exclusions are modified as follows:

(1) If the Causes of Loss - Basic Form or Causes of Loss - Broad Form applies, the following is added to Exclusion **B.2.**:

Depletion, deterioration, corrosion, erosion, wear and tear, or other gradually developing conditions. But if an "accident" results, we will pay for the resulting loss, damage or expense.

(2) The following is added to Exclusion **B.1.g.**:

However, if electrical "covered equipment" requires drying out because of Water as described in **g.(1)** through **g.(3)** above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

(3) If the Causes of Loss - Special Form applies, as respects this endorsement only, the last paragraph of Exclusion **B.2.d.** is deleted and replaced with the following:

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

**b.** We will not pay under this endorsement for loss, damage or expense caused by or resulting from:

(1) your failure to use all reasonable means to protect Covered Property from damage following an "accident";

(2) any defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind. But if an "accident" results, we will pay for the resulting loss, damage or expense; or

(3) any of the following tests:

a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

**c.** With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in **A.1.c.** above); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

**d.** With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

(1) loss caused by your failure to use due diligence and dispatch all reasonable means to resume business; or

(2) any increase in loss resulting from an agreement between you and your customer or supplier.

**e.** We will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident": Any mold, fungus, mildew or yeast, including any spores or toxins produced by or emanating from such mold, fungus, mildew or yeast. This includes, but is not limited to, costs arising from clean up, removal, or abatement of such mold, fungus, mildew or yeast, spores or toxins. However, this exclusion does not apply to spoilage of personal property that is "perishable goods," to the extent that spoilage is covered under Spoilage coverage.

**f.** We will not pay under this endorsement for any loss or damage to animals.

4. DEFINITIONS

The following definitions are added:

**a.** "Boilers and vessels" means:

(1) Any boiler, including attached steam, condensate and feedwater piping; and

(2) Any fired or unfired pressure vessel subject to vacuum or internal pressure other than the static pressure of its contents.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

**b.** "Computer equipment" means Covered Property that is electronic computer or other data processing equipment, including "media" and peripherals used in conjunction with such equipment.

**c.** "Covered equipment"

(1) "Covered equipment" means, unless otherwise specified in a Schedule, Covered Property:

EXHIBIT 6

(a) that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

(b) which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

(2) None of the following is "covered equipment":

(a) structure, foundation, cabinet, compartment or air supported structure or building;

(b) insulating or refractory material;

(c) sewer piping, underground vessels or piping, or piping forming a part of a sprinkler system;

(d) water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

(e) "vehicle" or any equipment mounted on a "vehicle";

(f) satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

(g) dragline, excavation or construction equipment; or

(h) equipment manufactured by you for sale.

d. "Data" means information or instructions stored in digital code capable of being processed by machinery.

e. "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

f. "Media" means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

g. "One accident" means:  If an initial "accident" causes other "accidents,"

all will be considered "one accident."  All "accidents" that are the result of the same event will be considered "one accident."

h. "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

i. "Production machinery" means any machine or apparatus that processes or produces a product intended for eventual sale.  However, "production machinery" does not mean any fired or unfired pressure vessel other than a cylinder containing a movable plunger or piston.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

j. "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power.  "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

B. The Building and Personal Property Coverage Form is modified as follows.  The definitions stated above also apply to section **B**. of this endorsement.

1. DEDUCTIBLE

The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in a Schedule.  If a separate Equipment Breakdown deductible is shown, the following applies.

Only as regards Equipment Breakdown Coverage, provision D. DEDUCTIBLE is deleted and replaced with the following:

a. Deductibles for Each Coverage

(1) Unless the Schedule indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one accident."

(2) We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the Schedule.  We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

(3) If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one accident," only the highest deductible for each coverage will apply.

b.  Direct and Indirect Coverages

(1) Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the Schedule.

(2) Unless more specifically indicated in the Schedule:

(a) Indirect Coverages Deductibles apply to Business Income and Extra Expense loss; and

(b) Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this endorsement.

c.  Application of Deductibles

(1) Dollar Deductibles

We will not pay for loss, damage or expense resulting from any "one accident" until the amount of loss, damage or expense exceeds the applicable Deductible shown in the Schedule.  We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

(2) Time Deductible

If a time deductible is shown in the Schedule, we will not be liable for any loss occurring during the specified number of hours or day immediately following the "accident."  If a time deductible is expressed in days, each day

shall mean twenty-four consecutive hours.

(3) Multiple of Average Daily Value (ADV)

If a deductible is expressed as a number of times ADV, that amount will be calculated as follows:

The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" occurred, divided by the number of working days in that period.  No reduction shall be made for the Business Income not being earned, or in the number of working days, because of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption.  The ADV applies to the Business Income Value of the entire location, whether or not the loss affects the entire location.  If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations.  For purposes of this calculation, the period of interruption may not extend beyond the period of restoration.

The number indicated in the Schedule will be multiplied by the ADV as determined above. The result shall be used as the applicable deductible.

(4) Percentage of Loss Deductibles

If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage.  If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

2.  CONDITIONS

The following conditions are in addition to the Conditions in the Building and Personal Property Coverage Form and the Common Policy Conditions.

**a.** Suspension

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." This can be done by mailing or delivering a written notice of suspension to:

**(1)** your last known address; or

**(2)** the address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

**b.** Jurisdictional Inspections

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

**c.** Environmental, Safety and Efficiency Improvements

If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

**d.** Coinsurance

If a coinsurance percentage is shown in a Schedule for specified coverages, the following condition applies.

We will not pay for the full amount of your loss if the applicable limit is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, we will determine what percentage this calculated product is compared to the applicable limit and apply that percentage to the gross amount of loss. We will then subtract the applicable deductible. The resulting amount, or the applicable limit, is the most we will pay. We will not pay for the remainder of the loss. Coinsurance applies separately to each insured location.

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in a Schedule. Coverage provided under this endorsement does not provide an additional amount of insurance.

EXHIBIT 6

COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# WATER EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion in Paragraph **B.** replaces the **Water** Exclusion in this Coverage Part or Policy.

**B.** Water

    **1.** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

    **2.** Mudslide or mudflow;

    **3.** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

    **4.** Water under the ground surface pressing on, or flowing or seeping through:

        **a.** Foundations, walls, floors or paved surfaces;

        **b.** Basements, whether paved or not; or

        **c.** Doors, windows or other openings; or

    **5.** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.**, **3.** or **4.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **5.**, is caused by an act of nature or is otherwise caused.  An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

© Insurance Services Office, Inc., 2008                                        **CP 10 32  08 08**

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

# BUSINESS INCOME CHANGES-
# BEGINNING OF THE PERIOD OF RESTORATION

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

**SCHEDULE**

| Select Either A, or B | | |
|---|---|---|
| | | |
| A | ☐ | 72 Hour Time Period Is Replaced By 24 Hours |
| B | ☐ | 72 Hour Time Period Is Eliminated |
| **Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.** | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | |

**A.** If the Schedule indicates that the 72-hour time period is replaced by 24 hours, then;

1. The 72-hour time period in the definition of "period of restoration" is replaced by 24 hours.  Therefore, the period of restoration for Business Income Coverage begins 24 hours after the time of direct physical loss or damage, subject to all other provisions of the definition of "period of restoration"; and

2. The 72-hour time period in the Civil Authority Additional Coverage is replaced by 24 hours. Therefore, coverage under the Additional Coverage - Civil Authority begins 24 hours after the time of action of civil authority, subject to all other provisions of the Additional Coverage.

**B.** If the Schedule indicates that the 72-hour time period is eliminated then;

1. The 72-hour time period in the definition of "period of restoration" is deleted.  Therefore, the period of restoration for Business Income Coverage begins at the time of direct physical loss or damage, subject to all other provisions of the definition of "period of restoration"; and

2. The 72-hour time period in the Civil Authority Additional Coverage is deleted.  Therefore, coverage under the Additional Coverage - Civil Authority begins at the time of action of civil authority, subject to all other provisions of that Additional Coverage.

© ISO Properties, Inc., 2006

CP 15 56  06 07

047
**EXHIBIT 6**

COMMERCIAL PROPERTY

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.



# COMMERCIAL PROPERTY ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUSINESS INCOME COVERAGE FORMS
CAUSES OF LOSS - SPECIAL FORM

## BUILDING AND PERSONAL PROPERTY COVERAGE FORM AMENDMENT

If a coverage limit is shown as applicable in the Signature Series Commercial Property Coverage Endorsement Schedule, the following coverages apply.  These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

Under **Section A. Coverage 1. Covered Property a. Building,** the following is added;

(6) Foundations of buildings, structures, machinery or boilers if their foundations are below:

(a) The lowest basement floor: or

(b) The surface of the ground, if there is no basement.

(7) Appurtenant buildings and structures at the described premises up to a limit of $25,000;

(8) Underground pipes, flues and drains.

(9) Bridges, roadways, walks, patios and other paved surfaces.

(10) Retaining walls that are not part of a building.

Under **Section A. Coverage 1. Covered Property b. Your Business Personal Property,** the following is added:

(8) Your leasehold interest in improvements and betterments which are not damaged or destroyed, but which you lose because your lease is cancelled by the lessor as a result of damage to the building from a Covered Cause of Loss.  When this occurs, we will calculate the value of your interest in the improvements and betterments as though they had been damaged or destroyed and not repaired or replaced promptly, as provided in the Valuation Loss Condition.

Under Section **A. Coverage 2. Property Not Covered,** the following items are amended:

Paragraphs **d. g., l.** and **m.** are deleted.

Paragraph **f.** is replaced with the following:

f. The cost of excavations, grading, backfilling or filling, unless such cost is necessarily incurred in the repair or replacement of covered loss or damage to Covered Property below the surface of the ground;

Paragraph **i.** is replaced with the following:

i. Personal property while airborne or waterborne, except with respect to the property in transit coverages provided in the Coverage Extensions;

In **Section A. Coverage,** the references to 100 feet are changed to read 1,000 feet in the following paragraphs:

**1.a.(5)(b) Building;**
**1.b. Business Personal Property;**
**1.c.(2) Personal Property of Others; and**
**5. Coverage Extensions**

Under **Section A. Coverage, 4. Additional Coverages, c. Fire Department Service Charge,** the limit is changed from $1,000 to $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **A. Coverage, 4. Additional Coverages,** the following is **added:**

g. **Fire Extinguisher Recharge Expense**

We will pay to recharge or replace your fire extinguishers, whichever cost is less, when they are discharged as a result of fighting a fire caused by a Covered Cause of Loss, on or within 1,000 feet of your described premises.

No deductible apples to this Additional Coverage.

048
**EXHIBIT 6**

**h.   Lock Replacement**

We will pay the cost to repair the door locks or tumblers of your described premises due to "theft" of your door keys.

"Theft" means any act of stealing. "Theft" does not mean mysterious or unexplained disappearance of property.

The most we will pay under this Additional Coverage is $10,000, unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

No deductible applies to this Additional Coverage.

**i.   Reward Payment**

(1)   We will reimburse you for rewards paid as follows:

(a)   Up to $10,000 to an eligible person for information leading to the arrest and conviction of any person or persons committing a crime resulting in loss or damage to Covered Property from a Covered Cause of Loss. However, we will pay no more than the lesser of the following amounts

(i)   Actual cash value of the Covered Property at the time of loss or damage, but no more than the amount required to repair or replace it; or

(ii)   The amount determined by the loss settlement procedure applicable to Covered Property under the Loss Payment Condition.

(b)   Up to $10,000 to an eligible person for the return of stolen Covered Property, when the loss or damage is caused by theft. However, we will pay no more than the lesser of the following amounts:

(i)   Actual cash value based on the condition of the Covered Property at the time it is returned, but not more than the amount required to repair or replace it; or

(ii)   The amount determined by the loss settlement procedure applicable to the return Covered Property under the Loss Payment Condition.

(2)   This Additional Coverage applies subject to the following additional conditions:

(a)   An eligible person means that person designated by a law enforcement agency as being the first to voluntarily provide the information leading to the arrest and conviction or return of the stolen Covered Property, and who is not:

(i)   You;

(ii)   Your employee;

(iii)   Any employee of a law enforcement agency;

(iv)   An employee of a business engaged in property protection;

(v)   Any person who had custody of the Covered Property at the time the theft was committed; or

(vi)   Any person involved in the crime.

(b)   No reward will be reimbursed unless and until the person(s) committing the crime is/are convicted or the Covered Property is returned.

(c)   You must have posted public notice of reward prior to the first person volunteering the necessary information or returning the stolen Covered Property.

(3)   The lesser of the amount of the reward or the amount shown in the Signature Series Commercial Property Endorsement Schedule is the most we will reimburse for loss under this Additional Coverage for any one occurrence.

We will pay up to $10,000 as a reward for information which leads to an arson, theft or vandalism conviction in connection with a fire, theft or vandalism loss to property covered under this policy. Regardless of the number of persons involved in providing information, the limit of our liability under this Additional Coverage shall not be increased.

No deductible applies to this Additional Coverage.

**j.   Theft Damage to Un-owned Building Property**

(1)   We will pay for damage caused directly by theft or attempted theft to:

(a)   That part of any un-owned building containing Your Business Personal Property; or

(b)   Un-owned Equipment within the un-owned building used to maintain or service the building.

(2)   This Additional Coverage is primary and applies only to premises where you are a tenant and are required in your lease to cover this exposure. This Additional Coverage does not apply to damage by fire or explosion.

(3)   This Additional Coverage is included within the Limit of Insurance applicable to Your Business Personal Property at the location of loss, and does not increase that Limit of Insurance.

**k.   Professional Fees - Architects & Engineers**

We will pay for architect and engineering fees that are necessarily incurred in the repairing or replacing of the Building property as a direct result of a covered loss. These fees do not include those incurred by you in the preparation of a claim. Also, the architects and engineers used will be at our discretion.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

This Additional Coverage is included within the Building Limit of Insurance applicable at the location of loss and does not increase that Limit of Insurance.

**l.   Ordinance Or Law - Equipment Coverage**

(1)   Subject to Paragraph **(2)** below, if a Covered Cause of Loss occurs to equipment that is Covered Property, we will pay the additional costs to repair or replace the equipment as required by law.

(2)   If the Covered Cause of Loss occurs to refrigeration equipment that is Covered Property, we will pay:

(a)   The cost to reclaim the refrigerant as required by law;

(b)   The cost to retrofit the equipment to use a non-CFC refrigerant as required by the Clean Air Act of 1990 and any amendments thereto or any similar laws; and

(c)   The increased cost to recharge the system with a non-CFC refrigerant.

(3)   The terms of this coverage apply separately to each piece of covered equipment.

(4)   We will not pay under this endorsement for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", except as provided in **(2)(a)** above.

(5)   Loss to the equipment will be determined as follows:

(a)   If the Replacement Cost applies and the equipment is repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

(i)   The amount you actually spend to repair the equipment, but not for more than the amount it would cost to replace the equipment of the same kind and quality; or

(ii)   The Limit of Insurance shown in the Declarations as applicable to the covered Building or Your Business Personal Property.

(b)   If the Replacement Cost applies and the equipment is not repaired or replaced, or if the Replacement Cost does not apply, we will not pay more than the lesser of:

(i)  The actual cash value of the equipment at the time of loss; or

(ii)  The Limit of Insurance shown in the Declarations as applicable to the covered Building or Your Business Personal Property.

(c)  We will not pay for loss due to any ordinance or law that:

(i)  You were required to comply with before the loss, even if the equipment was undamaged; and

(ii)  You failed to comply with.

Under **Section A. Coverage, 5. Coverage Extensions, a. Newly Acquired Or Constructed Property (1) Buildings** the limit changed from $250,000 at each building to $1,000,000 at each building unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions, a. Newly Acquired Or Constructed Property (2) Your Business Personal Property** the limit is changed from $100,000 at each building to $500,000 at each building unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions, a. Newly Acquired Or Constructed Property (3) Period of Coverage (b)** is changed from 30 days to 180 days.

Under **Section A. Coverage, 5. Coverage Extensions, b. Personal Effects and Property of Others** subparagraph **(2)** is amended to personal property of others in your care, custody, or control while anywhere within the coverage territory.

The limit is changed from $2,500 at each described premises to $50,000 at each described premises unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule. We will not pay more than $5,000 to any one person in any one loss. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

Under **Section A. Coverage, 5. Coverage Extensions, d. Property Off-premises,** subparagraph **(3)** is replaced with the following: The most we will pay for loss or damage under this Extension is $50,000, but not more than $10,000 while in the care, custody or control of a salesperson unless a different limit of insurance is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions, e. Outdoor Property,** the last paragraph is amended to change the limit under this Extension from $1,000 to $25,000. The limit for any one tree, shrub or plant is changed from $250 to $2,500. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Under **Section A. Coverage, 5. Coverage Extensions, f. Non-owned Detached Trailers,** subparagraph **(3)**, the limit is changed from $5,000 to $10,000 unless a different limit of insurance is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions** the following is added:

g.  **Property In Transit**

You may extend the insurance provided by this Coverage Form to apply to your Covered Property (including property that is in the care, custody or control of your salespersons) in transit in or on a motor vehicle you own, lease or operate while between points within the coverage territory and more than 1,000 feet from the described premises. Loss or damage must be caused by or result from one of the following Covered Causes of Loss:

(1)  Fire, lightning, explosion, windstorm or hail, riot or civil commotion or vandalism;

(2)  Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed;

(3)  Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry;

(4)  Flood; or

(5)  Earthquake.

The coverage provided under this Extension replaces coverage provided under any other additional coverage extension applying to property in transit. The most we will pay for this coverage is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

h.  **Extra Expense**

We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises, including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

Extra Expense means expense incurred:

(1) To avoid or minimize the suspension of business to continue "operations":

    (a) At the described premises; or

    (b) At replacement premises or at temporary locations, including:

        (i) Relocation expenses: and

        (ii) Costs to equip and operate the replacement or tempo-rary locations.

(2) To minimize the suspension of busi-ness if you cannot continue "oper-ations"; or

(3) To repair or replace any property; or

(4) To research, replace or restore the lost information on damaged valu-able papers and records;

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage.

We will only pay for Extra Expense that occurs after the date of direct physical loss or damage. The most we will pay for loss or damage under this Extension is $50,000.

"Operations" means your business activ-ities occuring at the described premises.

"Period of Restoration" means the period of time that:

(1) Begins with the date of direct phys-ical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

(2) Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar qual-ity.

"Period of Restoration" does not include any increased period required due to the enforcement of any law that:

(1) Regulates the construction, use or repair, or requires the tearing down of any property; or

(2) Regulates the prevention, control, repair, clean-up or restoration of en-vironmental damage.

The expiration date of this policy will not cut short the "period of restoration."

i. **Back Up of Sewers or Drains**

You may extend the insurance provided by this Coverage Part to apply to loss or damage to your Covered Property caused by:

(1) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment.

(2) Subsurface water that enters into and overflows from within a:

    (a) Sump pump;

    (b) Sump pump well; or

    (c) Other type system;

designed to remove subsurface water from the foundation area.

The most we will pay for loss or damage under this Extension is $50,000 per any one occurrence including Business In-come unless a different limit is shown in the Signature Series Commercial Prop-erty Endorsement Schedule.

j. **Credit Card Invoices**

You may extend the insurance that ap-plies to Your Business Personal Property to apply to:

(1) Sums owed you from grantors of credit provided you are unable to collect from them due to direct loss or damage to your credit card in-voice records;

(2) Increased collection costs as a re-sult of such direct loss or damage; or

(3) Other reasonable expenses that you incur to re-establish your records of credit card invoices following such direct loss or damage:

that results from a Covered Cause of Loss to your records of credit card in-voices.

This insurance applies to credit card in-voices while:

(1) On premises scheduled in the Dec-larations of this policy;

(2) While being conveyed outside the premises; or

(3) While temporarily at other premises for any reason except storage.

The most we will pay for loss or damage under this Extension is $1,000 unless a different limit is shown in the Signature Series Commercial Property Endorse-ment Schedule.

EXHIBIT 6

**k.   Changes in Temperature**

You may extend the insurance provided by this coverage to apply to direct physical loss or damage to Covered Property, other than spoilage, caused by changes or extremes in temperature or humidity.

The most we will pay for loss or damage is $50,000 per any one occurrence including Business Income unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**l.   Inventory and Appraisals**

You may extend the insurance provided for Covered Property to apply to the cost of any inventory or appraisal that we require when loss or damage occurs to Covered Property.

The most we will pay for loss or damage under this Extension is $10,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**m.   Computer Coverage**

You may extend the insurance that applies to your Business Personal Property to apply to "computer equipment", "media", "data", and "computer programs". We will cover "computer equipment", "media", "data", and "computer programs" which you own, lease or rent from others or that are in your care, custody or control.  We will pay the replacement cost of reproducing lost or accidentally erased "data", "computer programs", documentation and source materials provided you actually replace or reproduce them.

This extension does not apply to:

(1)   Property you lease or rent to others while it is away from the described premises;

(2)   Any "data" or "media" which cannot be replaced with others of like kind or quality; or

(3)   Accounts, bills, evidence of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents, except as they may be converted to "data" processing "media" form, and then only in that form.

The most we will pay for loss or damage under this Extension is $250,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

A sublimit of $10,000 applies to laptops/portable computers and their software while away from the premises.

**n.   Deferred Payments**

You may extend the insurance that applies to your Business Personal Property to apply to direct physical loss or damage to personal property you have sold on an installment or other deferred payment basis after it has been accepted by the customer.

The most we will pay for loss or damage under this Extension is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**o.   Storage of Duplicate Data and Records**

You may extend the insurance provided by this Coverage form to apply to duplicate electronic data and valuable papers and records permanently stored at locations other than the described premises.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit  is shown in the Signature Series Commercial Property Endorsement Schedule.

**p.   Tree Debris Removal**

You may extend the insurance provided by this Coverage Form to apply to your expense to remove debris of trees that are blown onto the described premises by wind.

This Extension applies only if the wind is a Covered Cause of Loss.

The most we will pay for loss or damage under this Extension is $1,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**q.   Property at Un-named Locations**

You may extend the insurance provided by this Coverage Form to apply to Covered Property at Un-named Locations. Un-named Locations are locations that you own, lease or operate, but are not described in the Declarations.

This Extension does not apply to Covered Property that will or has become permanent part of an installation, fabrication or erection project being performed by you, or on your behalf, while at the project location.

However, for this Coverage Extension, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood, even if they are otherwise Covered Causes of Loss. Also, none of the Additional Coverages or other Coverage Extensions included in this Coverage Form applies to the coverage extended to an Un-named location.

If covered loss to Property at Un-named Locations results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm", the most we will pay in any one occurrence at any one un-named location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

r. **Newly Acquired Fine Arts**

We will cover additional objects of art that you acquire during the policy period, for up to 180 days, but not beyond the end of the policy period. The most we will pay for a loss for any one occurrence for such newly acquired objects of art is $10,000.

Under **Section C. Limits of Insurance** the second paragraph is replaced with the following:

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to the building, is $10,000 per sign in any one occurrence unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section E. Loss Conditions, 6. Vacancy, a. Description of Terms**, subparagraph **(1) (b)**, the 31% provision is amended to read 11%.

Under **Section E. Loss Conditions, 7. Valuation**, the following conditions are added:

f. "Data"

We will figure your loss to be the actual cost of reproducing the data, provided you actually replace or reproduce it. This includes computer programs, but not "media".

g. "Media"

We will figure your loss to be the actual cost of repairing or replacing the "media" with material of the same kind or quality.

Under **Section G. Optional Coverages, 3. Replacement Cost**, subparagraph **b. (1)** is deleted when the Replacement Cost option is selected for Business Personal Property.

Under **Section H. Definitions**, the following is added:

4. "Computer Equipment" means a network of machine components capable of accepting information, processing it according to plan and producing the desired results. It includes air conditioning, fire protection equipment and electrical equipment used exclusively in your computer operations.

5. "Data" means facts, concepts or instructions, including computer programs, which are

converted to a form usable to your data processing operations.

6. "Media" means material on which data are recorded.

7. "Computer Programs" means data used to direct computer equipment including diagrams or other records which can be used to reproduce programs.

8. "Named Storm" means a storm system identified by the National Weather Service as a tropical windstorm or hurricane.

**BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM AMENDMENT**

Under **Section A. Coverage, 5. Additional Coverages** the following is added:

e. **Business Income From Dependent Properties**

(1) The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of "operations" during the "period of restoration" caused by direct physical loss of or damage by a Covered Cause of Loss to property at the premises of a Dependent Property not specifically described under the Business Income From Dependent Properties - Broad Form endorsement or under the Business Income From Dependent Properties - Limited Form endorsement. However, for this additional coverage, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood, even if they are otherwise Covered Causes of Loss.

(2) Dependent Property means property at premises located anywhere in the world, which is operated by other on whom you depend to:

(a) Deliver materials or services to you or to others for your account;

(b) Deliver services, other than power, water or communication supply services (including services relating to internet access or access to any electronic network), to you or to others for your account;

(c) Accept your products or services;

(d) Manufacture products for delivery to your customers under contract of sale; or

(e) Attract customers to your business.

(3) With respect only to the insurance provided under this Additional Coverage, the following changes apply:

(a) The Extended Business Income Additional Coverage is amended by the following:

The loss of Business Income or loss of "Rental Value" must be caused by direct physical loss or damage at the premises of a Dependent Property caused by or resulting from a Covered Cause of Loss. However, for this Additional Coverage, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood even if they are otherwise Covered Causes of Loss.

(b) The Resumption of Operations Loss Condition is amended as follows:

We will reduce the amount of your Business Income loss to the extent you can resume your "operations" in whole or in part, by using any other available source of materials or outlet for your products or services.

(4) The most we will pay for loss in any one occurrence under this Additional Coverage is:

(a) $250,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement Schedule; or

(b) The sum of the Limits of Insurance shown on the Declarations that applies to loss of Business Income and Extra Expense under this Coverage form when direct physical loss occurs to property at the described premises, whichever is less. The limit applicable to this Additional Coverage is an additional amount of insurance.

However, if covered loss to Miscellaneous Dependent Property results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm," the most we will pay in any one occurrence at any one dependent property location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

f. Ingress/Egress

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused when ingress or egress to the described premises is physically prevented due to direct loss or damage to Property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

This coverage will not begin until 12 hours after the physical loss or damage has occurred. The most we will pay for loss under this Additional Coverage is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

g. Property in Transit

(1) We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur during the "period of restoration" due to direct physical loss of or damage to:

(a) Your business personal property; or

(b) Personal property of others in your care, custody or control;

While such property is in the due course of transit, including such property described in (1)(a) and (1)(b) above while in your vehicle more than 1,000 feet from the site at which the described premises are located.

If caused by such loss or damage to property in the due course of transit, we will also pay for the actual loss of Business Income you sustain during the additional period of coverage provided under the Extended Business Income Additional Coverage.

(2) Insurance under this Additional Coverage applies only if the loss or damage to the property in transit is caused by a covered Cause of Loss. Insurance under this Additional Coverage does not apply to any loss of Business Income or Extra Expense due to loss of or damage to:

(a) Vehicles or self propelled machines (including motor vehicles, trailers, aircraft, watercraft and similar conveyances) unless such vehicles are themselves in the due course of transit in or on another transporting conveyance;

(b) Property while waterborne, except in regular ferry operations in the course being moved by other means of transportation;

(c) Property shipped by mail;

(d) Contraband, or property in the course of illegal transportation or trade;

(e) Import shipments that have not been unloaded from any importing aircraft or watercraft, or that are under the protection of marine insurance;

(f) Export shipments once loaded on board exporting aircraft or watercraft, or under the protection of marine insurance; or

(g) Property sold by you under conditional sale, trust agreement, installment payment or other deferred payment plan, after delivery to customers.

(3) The most we will pay for loss or damage under this Additional Coverage is $50,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement schedule for Property in Transit - Business Income and Extra Expense.

**h. Property at Un-named Locations**

(1) The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of your "operations" during the "period of restoration" caused by direct physical loss or damage by a Covered Cause of Loss to:

(a) Your business personal property; or

(b) Personal property of others in your care, custody or control; while such property is at an Un-named Location as provided under the **Property at Un-named Locations** Coverage Extension.

(2) This Additional Coverage does not apply to:

(a) Property at a newly acquired location; or

(b) Property at the premises of a Dependent Property.

(3) The most we will pay for loss in any one occurrence under this Additional Coverage is $25,000.

The Limit applicable to this Additional Coverage is an additional amount of insurance.

However, if loss to Property at Un-named Locations results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm" the most we will pay for in any one occurrence at any one Un-named location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

Also, for Property at Un-named Locations, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood even if they are otherwise Covered Causes of Loss.

Also, none of the other Additional Coverages or Coverage Extensions included in this Coverage Form applies to the coverage extended to an Un-named location.

**i. Loss Adjustment Expenses**

In the event of covered loss or damage under this Coverage Part, we will pay for reasonable expenses incurred by you, at our request, to assist us in the determination of the amount of loss, such as taking inventory and appraisals and preparing documentation to develop the extent of loss.

We will not pay the following:

(1) Expenses incurred in connection with **Section C. Loss Conditions, 1. Appraisal**; or

(2) Public Adjustors' fees; or

(3) Expenses payable to attorneys.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement schedule.

No deductible applies to this Additional Coverage.

Under **6. Coverage Extension, Newly Acquired Locations**, paragraph **c.** subparagraph **(2)** is changed from 30 days to 180 days.

**BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM AMENDMENT**

Under **Section A. Coverage, 4. Additional Coverages** the following is added:

f. **Business Income From Dependent Properties**

(1) The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of "operations" during the "period of restoration" caused by direct physical loss of or damage by a Covered Cause of Loss to property at the premises of a Dependent Property not specifically described under the Business Income From Dependent Properties - Broad Form endorsement or under the Business Income From Dependent Properties - Limited Form endorsement. However, for this additional coverage, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood, even if they are otherwise Covered Causes of Loss.

(2) Dependent property means property at premises located anywhere in the world, which is operated by others on whom you depend to:

(a) Deliver materials or services to you or to others for your account;

(b) Deliver services, other than power, water or communication supply services (including services relating to internet access or access to any electronic network), to you or to others for your account;

(c) Accept your products or services;

(d) Manufacture products for delivery to your customers under contract of sale; or

(e) Attract customers to your business.

(3) With respect only to the insurance provided under this Additional Coverage, the following changes apply:

(a) The Extended Business Income Additional Coverage is amended by the following:

The loss of Business Income or loss of "Rental Value" must be caused by direct physical loss or damage at the premises of a Dependent Property caused by or resulting from a Covered Cause of Loss. However, for this Additional Coverage, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood, even if they are otherwise Covered Causes of Loss.

(b) The Resumption of Operations Loss Condition is amended as follows:

We will reduce the amount of your Business Income loss to the extent you can resume your "operations" in whole or in part, by using any other available source of materials or outlet for your products or services.

(4) The most we will pay for loss in any one occurrence under this Additional Coverage is:

(a) $250,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement Schedule; or

(b) The sum of the Limits of Insurance shown on the Declarations that applies to loss of Business Income and Extra Expense under this Coverage form when direct physical loss occurs to property at the described premises, whichever is less. The limit applicable to this Additional Coverage is an additional amount of insurance.

However, if covered loss to Miscellaneous Dependent Property results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm", the most we will pay in any one occurrence at any one dependent property location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

g. **Ingress/Egress**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused when ingress or egress to the described premises is physically prevented due to direct loss or damage to Property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

This coverage will not begin until 12 hours after the physical loss or damage has occurred. The most we will pay for loss under this Additional Coverage is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement schedule.

**h.  Property in Transit**

(1)  We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur during the "period of restoration" due to direct physical loss of or damage to:

(a)  Your business personal property; or

(b)  Personal property of others in your care, custody or control;

While such property is in the due course of transit, including such property described in **(1)(a)** and **(1)(b)** above while in your vehicle more than 1,000 feet from the site at which the described premises are located.

If caused by such loss or damage to property in the due course of transit, we will also pay for the actual loss of Business Income you sustain during the additional period of coverage provided under the Extended Business Income Additional Coverage.

(2)  Insurance under this Additional Coverage applies only if the loss or damage to the property in transit is caused by a covered Cause of Loss. Insurance under this Additional Coverage does not apply to any loss of Business Income or Extra Expense due to loss of or damage to:

(a)  Vehicles or self propelled machines (including motor vehicles, trailers, aircraft, watercraft and similar conveyances) unless such vehicles are themselves in the due course of transit in or on another transporting conveyance;

(b)  Property while waterborne, except in regular ferry operations in the course being moved by other means of transportation;

(c)  Property shipped by mail;

(d)  Contraband, or property in the course of illegal transportation or trade;

(e)  Import shipments that have not been unloaded from any importing aircraft or watercraft, or that are under the protection of marine insurance;

(f)  Export shipments once loaded on board exporting aircraft or watercraft, or under the protection of marine insurance; or

(g)  Property sold by you under conditional sale, trust agreement, installment payment or other deferred payment plan, after delivery to customers.

(3)  The most we will pay for loss or damage under this Additional Coverage is $50,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement schedule for Property in Transit - Business Income and Extra Expense.

**i.  Property at Un-named Locations**

(1)  The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of your "operations" during the "period of restoration" caused by direct physical loss or damage by a Covered Cause of Loss to:

(a)  Your business personal property; or

(b)  Personal property of others in your care, custody or control; while such property is at an Un-named Location as provided under the **Property at Un-named Locations** Coverage Extension.

(2)  This Additional Coverage does not apply to:

(a)  Property at a newly acquired location; or

(b)  Property at the premises of a Dependent Property.

(3)  The most we will pay for loss in any one occurrence under this Additional coverage is $25,000.

The Limit applicable to this Additional Coverage is an additional amount of insurance.

However, if loss to Property at Un-named Locations results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm" the most we will pay for in any one occurrence at any one Un-named location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

Also, for Property at Un-named Locations, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood even if they are otherwise Covered Causes of Loss.

Also, none of the other Additional Coverages or Coverage Extensions included in this Coverage Form applies to the coverage extended to an Un-named location.

j.  **Loss Adjustment Expenses**

In the event of covered loss or damage under this Coverage Part, we will pay for reasonable expenses incurred by you, at our request, to assist us in the determination of the amount of loss, such as taking inventory and appraisals and preparing documentation to develop the extent of loss.

We will not pay the following:

(1) Expenses incurred in connection with **Section C. Loss Conditions, 1. Appraisal**; or

(2) Public Adjustors' fees; or

(3) Expenses payable to attorneys.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement schedule.

No deductible applies to this Additional Coverage.

Under **5. Coverage Extension, NEWLY ACQUIRED LOCATIONS**, paragraph **c.** subparagraph **(2)** is changed from 30 days to 180 days.

**CAUSES OF LOSS - SPECIAL FORM AMENDMENT**

Under **Section C. Limitations**, subparagraph **3.c.**, the limit is changed from $2,500 to $10,000 for patterns, dies, molds and forms.

Under **Section C. Limitations**, subparagraph **3.d.**, the limit is changed from $250 to $500 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

Under **Section G. Definitions,** the following are added:

3.  "Computer Equipment" means a network of machine components capable of accepting information processing it according to plan and producing the desired results. It includes air conditioning, fire protection equipment and electrical equipment used exclusively in your computer operations.

4.  "Data" means facts, concepts or instructions, including computer programs, which are converted to a form usable to your data processing operations.

5.  "Media" means material on which data are recorded.

6.  "Computer Programs" means data used to direct computer equipment including diagrams or other records which can be used to reproduce programs.

7.  "Named Storm" means a storm system identified by the National Weather Service as a tropical windstorm or hurricane.

**EXHIBIT 6**

# CAUSES OF LOSS - SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning.  Refer to Section **G.**, Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

1. Excluded in Section **B.**, Exclusions; or

2. Limited in Section **C.**, Limitations;

that follow.

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty.  Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion.  But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.  But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

EXHIBIT 6

d. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

e. **Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access to access to any electronic, cellular or satellite network.

f. **War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. **Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

h. **"Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

but if "fungus", wet or dry rot or bacteria results in a "specified causes of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

(1) When "fungus", wet or dry rot or bacteria results from fire or lightning; or

(2) To the extent that coverage is provided in the Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, or otherwise interferes with any;

(1) Electrical or electronic wire, device, appliance, system or network; or

(2) Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to;

    (a) Electrical Current including arcing;

    (b) Electrical charge produced or conducted by a magnetic or electromagnetic field.

    (c) Pulse of electromagnetic energy; or

    (d) Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

b. Delay, loss of use or loss of market.

c. Smoke, vapor or gas from agricultural smudging or industrial operations.

d. (1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

(7) The following causes of loss to personal property:

    (a) Dampness or dryness of atmosphere;

    (b) Changes in or extremes of temperature; or

    (c) Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results

in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

e. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

f. Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

h. Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

(1) Acting alone or in collusion with others; or

(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

i. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

EXHIBIT 6

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property

   **(1)** An abrupt falling down or caving in

   **(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

   **(3)** Any Cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion as such condition relates to (1) or (2) above.

   But if collapse results in a Covered Cause of loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

   This exclusion, **k.** does not apply;

      **a.** To the extent that coverage is provided under the Additional Coverage - Collapse; or

      **b.** To collapse caused by one or more of the following;

         **(i)** The "specified causes of loss";

         **(ii)** Breakage of building glass;

         **(iii)** weight of rain that collects on a roof; or

         **(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

   **(1)** Planning, zoning, development, surveying, siting;

   **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   **(3)** Materials used in repair, construction, renovation or remodeling; or

   **(4)** Maintenance;

of part or all of any property on or off the described premises.

**4.** **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a.** **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form**

We will not pay for:

   **(1)** Any loss caused by or resulting from:

      **(a)** Damage or destruction of "finished stock"; or

**EXHIBIT 6**

(b) The time required to re-produce "finished stock".

This exclusion does not apply to Extra Expense.

(2) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(3) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

(4) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

(5) Any other consequential loss.

b. **Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.,** Ordinance Or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

(a) Your cancelling the lease;

(b) The suspension, lapse or cancellation of any license; or

(c) Any other consequential loss.

c. **Legal Liability Coverage Form**

(1) The following Exclusions do not apply to insurance under this Coverage Form:

(a) Paragraph **B.1.a.,** Ordinance Or Law;

(b) Paragraph **B.1.c.,** Governmental Action;

(c) Paragraph **B.1.d.,** Nuclear Hazard;

(d) Paragraph **B.1.e.,** Utility Services; and

(e) Paragraph **B.1.f.,** War And Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

(a) **Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

(i) Your assumption of liability was executed prior to the accident; and

(ii) The building is Covered Property under this Coverage Form.

(b) **Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

5. **Additional Exclusion**

The following provisions apply only to the specified property.

**LOSS OR DAMAGE TO PRODUCTS**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1.  We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

    a.  Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

    b.  Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

    c.  The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

        (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

    d.  Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

        However, this limitation does not apply to:

        (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

        (2) Business Income Coverage or Extra Expense Coverage.

    e.  Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

    f.  Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2.  We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

    a.  Animals, and then only if they are killed or their destruction is made necessary.

    b.  Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

        (1) Glass; or

        (2) Containers of property held for sale;

    c.  Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

        However, this limitation does not apply:

        (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

        (2) To Business Income Coverage or to Extra Expense Coverage.

3.  The special limit shown for each category, **a.** through **d.,** is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

a. $2,500 for furs, fur garments and garments trimmed with fur.

b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

c. $2,500 for patterns, dies, molds and forms.

d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

a. Results in discharge of any substance from an automatic fire protection system; or

b. Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage - Collapse**

The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of the Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

a. Building Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(1) A cause of loss listed in **2.a.** or **2.b.**

(2) One or more of the "specified causes of loss".

(3) Breakage of building glass;

(4) Weight of people or personal property; or

(5) Weight of rain that collects on a roof.

3. This **Additional Coverage - Collapse** does **not** apply to:

a. A building or any part of a building that is in danger of falling down or caving in;

b. A part of a building that is standing, even if it has separated from another part of the building; or

c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

b. Awnings, gutters and downspouts;

c. Yard fixtures;

d. Outdoor swimming pools;

e. Fences;

f. Piers, wharves and docks;

g. Beach or diving platforms or appurtenances;

h. Retaining walls; and

i. Walks, roadways and other paved surfaces;

**EXHIBIT 6**

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

(1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

(2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is not the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

a. The collapse of personal property was caused by a Cause of Loss listed in **2.a.** through **2.f.** above;

b. The personal property which collapses is inside a building; and

c. The property which collapses is not of a kind listed in **4.** above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage - Collapse does not apply to personal property that has not abruptly fallen down or caved in even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage - Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in **D.1.** through **D.7.**

E. **Additional Coverage-Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria is a result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

a. A "specified cause of loss" other than fire or lightning; or

b. Flood Coverage Endorsement applies to the affected premises.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of Covered Causes of Loss Form or under the Additional Coverage-Collapse.

6. The following **6.a.** or **6.b.** ,applies only if Business Income and/or Extra Expense Coverage applies to the described premises an only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form.

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   b If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs that "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

## F. Additional Coverage Extensions

1. **Property In Transit.**

   This Extension applies only to your personal property to which this form applies.

   a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   b. Loss or damage must be caused by or result from one of the following causes of loss:

      (1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

      (2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed.

      (3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   c. The most we will pay for loss or damage under this Extension is $5000.

   This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder or Molten Material Damage.**

   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

3. **Glass**

   a. We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

   b. We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

   This Coverage Extension, **F.3.,** does not increase the Limit of Insurance.

## G. Definitions

1. "Fungus" means any type of form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

**(1)** The cost of filling sinkholes; or

**(2)** Sinking or collapse of land into man-made underground cavities.

**b.** Falling objects does not include loss or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning.  Refer to Section **H.**, **Definitions.**

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

1. **Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

a. **Building,** meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery and

(b) Equipment;

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

(a) Fire-extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

b. **Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property - Separation Of Coverage form:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

c. **Personal Property Of Others** that is:

(1) In your care, custody or control; and

Copyright, Insurance Services Office, Inc., 2007

CP 00 10  06 07
Page 1 of 15
070
**EXHIBIT 6**

(2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2.  Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns;

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage - Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enables the computer or device connected to receive, process, store, retrieve or send data. This paragraph, **n.**, does not apply to your "stock" of prepackaged software;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

(1) Are licensed for use on public roads; or

(2) Are operated principally away from the described premises.

This paragraph does not apply to:

(a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

(b) Vehicles or self-propelled machines, other than autos, you hold for sale;

(c) Rowboats or canoes out of water at the described premises; or

(d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers

**EXHIBIT 6**

q.  The following property while outside of buildings:

(1)  Grain, hay, straw or other crops;

(2)  Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

3.  **Covered Causes Of Loss**

See applicable Causes Of Loss Form as shown in the Declarations.

4.  **Additional Coverages**

a.  **Debris Removal**

(1)  Subject to Paragraphs **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2)  Debris removal does not apply to costs to:

(a)  Extract "pollutants" from land or water; or

(b)  Remove, restore or replace polluted land or water.

(3)  Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

(a)  The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b)  Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

(4)  We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a)  The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b)  The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

(5)  Examples

The following examples assume that there is no Coinsurance penalty.

**Example #1**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $    500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |

($10,000 is 20% of $50,000)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**Example #2**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $    500 |
| Amount of Loss | $ 80,000 |
| Amount of Loss Payable | $ 79,500 |
| | ($80,000 - $500) |
| Debris Removal Expense | $ 30,000 |
| Debris Removal Expense Payable | |
| Basic Amount | $ 10,500 |
| Additional Amount | $ 10,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph **(4)**. Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b.   Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)**   While it is being moved or while temporarily stored at another location; and

**(2)**   Only if the loss or damage occurs within 30 days after the property is first moved.

**c.   Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 unless a higher limit is shown in the Declarations, for your liability for fire department service charges:

**(1)**   Assumed by contract or agreement prior to loss; or

**(2)**   Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d.   Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e.   Increased Cost Of Construction**

**(1)**   This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)**   In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in e.**(3)** through e.**(9)** of this Additional Coverage.

(3)  The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

(4)  Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

    **(a)**  You were required to comply with before the loss, even when the building was undamaged; and

    **(b)**  You failed to comply with.

(5)  Under this Additional Coverage, we will not pay for:

    **(a)**  The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

    **(b)**  Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

(6)  The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of : $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

(7)  With respect to this Additional Coverage:

    **(a)**  We will not pay for the Increased Cost of Construction:

        **(i)**  Until the property is actually repaired or replaced, at the same or another premises; and

        **(ii)**  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

    **(b)**  If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

    **(c)**  If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

(8)  This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

(9)  The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f.   Electronic Data**

(1) Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, - Electronic Data.

(2) Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss.  To the extent electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

(3) The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, - Electronic Data, subject to the following:

(a) If the Causes of Loss - Special Form applies, coverage under this Additional Coverage, - Electronic Data is limited to the "specified causes of loss" as defined in that Form, and Collapse as set forth in that Form.

(b) If the Causes of Loss - Broad Form applies, coverage under this Additional Coverage, - Electronic Data includes Collapse as set forth in that Form.

(c) If the Causes of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, - Electronic Data.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.    But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system

(including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, - Electronic Data is $2,500 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or number of premises, locations or computer systems involved.  If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after the policy year.  With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5.   Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a.   Newly Acquired Or Constructed Property**

(1) **Buildings**

If this policy covers Buildings, you may extend that insurance to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

(a) If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

(i) Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

(ii) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

(iii) Business personal property that you newly acquire, located at the described premises.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(b) This Extension does not apply to:

(i) Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

(ii) Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

(a) This policy expires;

(b) 30 days after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

(c) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, - Electronic Data.

**(2)** If the Causes of Loss - Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that Form, and Collapse as set forth in that Form.

**(3)** If the Causes of Loss - Broad Form applies, coverage under this Extension includes Collapse as set forth in that Form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d.** **Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e.** **Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f.** **Non-owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized land conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss Form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to the building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage:

1. Fire Department Service Charge;

2. Pollutant Clean-up And Removal;

3. Increased Cost of construction; and

4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (herein-after referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**EXAMPLE #1**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $250 |
| | |
| Limit of Insurance - Building #1: | $60,000 |
| Limit of Insurance - Building #2: | $80,000 |
| | |
| Loss to Building #1: | $60,100 |
| Loss to Building #2: | $90,000 |

The amount of loss to Building #1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building #1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building #1:

$60,100
-   250
$59,850 Loss Payable - Building #1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building #2. Loss payable for Building #2 is the Limit of Insurance of $80,000.

Total amount of loss payable: $59,850 + $80,000 = $139,850

**EXAMPLE #2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example #1.

| | |
|---|---|
| Loss to Building #1: | $ 70,000 |
| (exceeds Limit of Insurance plus Deductible) | |
| Loss to Building #2: | $ 90,000 |
| (exceeds Limit of Insurance plus Deductible) | |
| Loss Payable - Building #1: | $ 60,000 |
| (Limit of Insurance) | |
| Loss Payable - Building #2: | $ 80,000 |
| (Limit of Insurance) | |
| Total amount of loss payable: | $140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Abandonment**

There can be no abandonment of any property to us.

2. **Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

    **(1)** We have reached agreement with you on the amount of loss; or

    **(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

    **(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

        **(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

        **(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

            **(i)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

            **(ii)** Used by the building owner to conduct customary operations.

    **(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

    **(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

        **(a)** Vandalism;

        **(b)** Sprinkler leakage, unless you have protected the system against freezing;

        **(c)** Building glass breakage;

        **(d)** Water damage;

        **(e)** Theft; or

        **(f)** Attempted theft.

    **(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d., e.** and **f.** below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety-glazing material if required by law.

e. Tenant's Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**EXAMPLE #1 (UNDERINSURANCE)**

| When: | The value of the property is | $250,000 |
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $100,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $40,000 |
| Step (1): | $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements) | |
| Step (2): | $100,000 ÷ $200,000 = .50 | |
| Step (3): | $40,000 x .50 = $20,000 | |
| Step (4): | $20,000 - $250 = $19,750 | |

We will pay no more than $19,750. The remaining $20,250 is not covered.

**EXAMPLE #2 (ADEQUATE INSURANCE)**

| When: | The value of the property is | $250,000 |
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $200,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $40,000 |

081

**EXHIBIT 6**

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**EXAMPLE #3**

When: The value of the property is:

| | | |
|---|---|---|
| Building at Location #1 | $ 75,000 | |
| Building at Location #2 | $100,000 | |
| Personal Property at Location #2 | $ 75,000 | |
| | $250,000 | |

The Coinsurance percentage for it is    90%

The Limit of Insurance for Buildings and Personal Property at Location #1 and #2 is    $180,000

The Deductible is    $ 1,000

The amount of loss is:
Building at Location #2    $ 30,000

Personal Property at Location #2.    $ 20,000
        $ 50,000

Step (1): $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 ÷ $225,000 = .80

Step (3): $ 50,000 x .80 = $40,000

Step (4): $ 40,000 - $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclo-

sure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

G.  **Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

1.  **Agreed Value**

    a.  The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

    b.  If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

    c.  The terms of this Optional Coverage apply only to loss or damage that occurs:

        (1)  On or after the effective date of this Optional Coverage; and
        (2)  Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

2.  **Inflation Guard**

    a.  The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

    b.  The amount of increase will be:

        (1)  The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times
        (2)  The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times
        (3)  The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

If:  The applicable Limit

of Insurance is                     $100,000

The annual percentage
increase is                                8%

The number of days
since the beginning
of the policy year
(or last policy
change) is                                146

The amount of increase is
$100,000 x .08 x 146 ÷ 365 =      $3,200

3.  **Replacement Cost**

    a.  Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition, of this Coverage Form.

    b.  This Optional Coverage does not apply to:

        (1)  Personal property of others;
        (2)  Contents of a residence;
        (3)  Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or
        (4)  "Stock", unless the Including "Stock" option is shown in the Declarations.

        Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

    c.  You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

    d.  We will not pay on a replacement cost basis for any loss or damage:

        (1)  Until the lost or damaged property is actually repaired or replaced; and
        (2)  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments, will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e. We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

4. **Extension Of Replacement Cost To Personal Property Of Others**

a. If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

b. With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the replacement cost of the property or the applicable Limit of Insurance.

H. **Definitions**

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

EXHIBIT 6

POLICY NUMBER:   CWP 3263063                                    INTERLINE

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

   COMMERCIAL PROPERTY COVERAGE PART
   FARM COVERAGE PART

### SCHEDULE*

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|-----------|-----------|------------------------------------------|
| 001 | 001 | P-1 |

**Describe any "P-9":**

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to the:

Commercial Property Conditions
General Conditions in the Farm Property - Other Farm Provisions Form - Additional Coverages, Conditions, Definitions
General Conditions in the Mobile Agricultural Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage Form

**PROTECTIVE SAFEGUARDS**

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

   **"P-1"  Automatic Sprinkler System,** including related supervisory services.

   Automatic Sprinkler System means:

   a. Any automatic fire protective or extinguishing system, including connected:

      (1) Sprinklers and discharge nozzles;

      (2) Ducts, pipes, valves and fittings;

      (3) Tanks, their component parts and supports; and

      (4) Pumps and private fire protection mains.

   b. When supplied from an automatic fire protective system:

      (1) Non-automatic fire protective systems; and

      (2) Hydrants, standpipes and outlets.

**"P-2"  Automatic Fire Alarm,** protecting the entire building, that is:

   a. Connected to a central station; or

   b. Reporting to a public or private fire alarm station.

**"P-3"  Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4"  Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-9"** The protective system described in the Schedule.

Copyright, Insurance Services Office, Inc., 1997

IL 04 15 10 04
Page 1 of 2
085
**EXHIBIT 6**

**B.** The following is added to the EXCLUSIONS section of:

   CAUSES OF LOSS - BASIC FORM
   CAUSES OF LOSS - BROAD FORM
   CAUSES OF LOSS - SPECIAL FORM
   MORTGAGE HOLDERS ERRORS AND
      OMISSIONS COVERAGE FORM
   STANDARD PROPERTY POLICY
   CAUSES OF LOSS FORM - FARM
      PROPERTY
   MOBILE AGRICULTURAL MACHINERY
      AND EQUIPMENT COVERAGE FORM
   LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

COMMERCIAL PROPERTY

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.



# COMMERCIAL PROPERTY DISTRIBUTORS ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
SIGNATURE SERIES COMMERCIAL PROPERTY ENDORSEMENT
BUSINESS INCOME COVERAGE FORMS
CAUSES OF LOSS - SPECIAL FORM

**SIGNATURE SERIES COMMERCIAL PROPERTY ENDORSEMENT AMENDMENT**

Under Section **A. Coverage, 4. Additional Coverages** the following is added:

**m.** **"Refrigeration Breakdown Expense" - Vehicles You Own or Lease**

We will pay for necessary "Refrigeration Breakdown Expense" you incur to avoid the imminent spoilage of your refrigerated product due to the sudden and accidental breakdown of refrigeration equipment on transporting conveyances you own or lease.

The most we will pay for loss or damage under this Additional Coverage is $10,000 in any one occurrence unless a different limit of insurance is shown in the Signature Series Commercial Property Endorsement Schedule.

This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

"Refrigeration Breakdown Expense" means:

**(1)** Expenses to dispatch a replacement vehicle, including the additional wages of the driver of that replacement vehicle;

**(2)** Wages for laborers to unload the disabled vehicle and reload the replacement vehicle; and

**(3)** Expenses for temporary storage in cold storage facilities while awaiting disposition of the product.

**n.** **Transit Property in the Care of a "Carrier for Hire"**

We will cover direct physical loss caused by a Covered Cause of Loss to your property while in due course of "transit" including loading and unloading.

We only cover your property while in due course of "transit" when property is in the care of a "Carrier for Hire"

**(1)** If your property in "transit" includes property of others, we only cover property of others to the extent of your legal liability for direct physical loss caused by a Covered Cause of Loss.

**(2)** We only cover loading and unloading if your property in "transit" is loaded from or unloaded onto a sidewalk, street, loading dock, or similar area that is adjacent to the "Carrier for Hire".

The most we will pay for loss or damage under this Additional Coverage is $50,000 in any one occurrence unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under Section **A. Coverage, 5. Coverage Extensions, f. Non-Owned Detached Trailers**, subparagraph **(3)**, the limit is changed from $10,000 to $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section H. Definitions**, the following is added:

**9.** "Carriers for Hire" means any one vehicle, truck, trailer, semitrailer, or combination of these pulled by one power unit operated by a carrier for hire.

**EXHIBIT 6**

10. "Transit" means the shipment of covered property that:

    **a.**  begins at the point of shipment to a specific destination;

    **b.**  includes the ordinary reasonable and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment, including rest periods taken by the driver(s); and

    **c.**  ends upon acceptance of the good by or on behalf of the cosignee at the specified destination.

**EXHIBIT 6**

POLICY NUMBER:   CWP 3263063                                      COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEBRIS REMOVAL ADDITIONAL INSURANCE

This endorsement modifies insurance provided under the following:

>   BUILDERS' RISK COVERAGE FORM
>   BUILDING AND PERSONAL PROPERTY COVERAGE FORM
>   CONDOMINIUM ASSOCIATION COVERAGE FORM
>   CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
>   STANDARD PROPERTY POLICY
>   TOBACCO SALES WAREHOUSES COVERAGE FORM

**SCHEDULE***

| Prem. No. | Bldg. No. | Debris Removal Amount | Additional Premium |
|---|---|---|---|
| Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance. | | | |

\* Information required to complete this Schedule, If not shown on this endorsement will be shown in the Declarations.

The additional limit of $10,000 for debris removal in the **Debris Removal** Additional Coverages section is replaced by the higher amount shown in the Schedule.

Copyright, Insurance Services Office, Inc., 1999                            **CP 04 15** 10 00

EXHIBIT 6

| POLICY NUMBER: | CWP 3263063 | COMMERCIAL PROPERTY |

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE*

| Prem. No./ Bldg. No. | Cov. A | Cov. B Limit Of Insurance | Cov. C Limit Of Insurance | Cov. B and C Combined Limit Of Insurance |
|---|---|---|---|---|
| / | ☐ | $ | $ | $        ** |
| / | ☐ | $ | $ | $        ** |
| / | ☐ | $ | $ | $        ** |

Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.

\*  Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.

\*\*  Do **not** enter a Combined Limit of Insurance if individual Limits of Insurance are selected for Coverages **B** and **C**, or if one of these Coverages is not applicable.

**A.** Each Coverage - Coverage **A**, Coverage **B** and Coverage **C** - is provided under this endorsement only if that Coverage(s) is chosen by entry in the above Schedule and then only with respect to the building identified for that Coverage(s) in the Schedule.

**B.** **Application Of Coverage(s)**

The Coverage(s) provided by this endorsement apply only if both **B.1.** and **B.2.** are satisfied and are then subject to the qualifications set forth in **B.3.**

1. The ordinance or law:

   **a.** Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

   **b.** Is in force at the time of loss.

   But coverage under this endorsement applies only in response to the minimum requirements of the ordinance or law.  Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this endorsement.

2. **a.** The building sustains direct physical damage that is covered under this policy and such damage results in enforcement of the ordinance or law; or

   **b.** The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and the building damage in its entirety results in enforcement of the ordinance or law.

   **c.** The building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no coverage under this endorsement even if the building has also sustained covered direct physical damage.

3. In the situation described in **B.2.b.** above, we will not pay the full amount of loss otherwise payable under the terms of Coverages **A**, **B** and/or **C** of this endorsement.  Instead, we will pay a proportion of such loss; meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

Copyright, Insurance Services Office, Inc., 2001

**EXHIBIT 6**

(Section **H.** of this endorsement provides an example of this procedure.)

However, if the covered direct physical damage, alone, would have resulted in enforcement of the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of Coverages **A, B** and/or **C** of this endorsement.

**C.** We will not pay under Coverage A, B or C of this endorsement for:

   **1.** Enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

   **2.** The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**D.** Coverage

   **1.** **Coverage A - Coverage For Loss To The Undamaged Portion Of The Building**

   With respect to the building that has sustained direct physical damage, we will pay under Coverage **A** for the loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building.

   Coverage **A** is included within the Limit of Insurance shown in the Declarations as applicable to the covered building. Coverage **A** does not increase the Limit of Insurance.

   **2.** **Coverage B - Demolition Cost Coverage**

   With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building, as a consequence of enforcement of an ordinance or law that requires demolition of such damaged property.

   The Coinsurance Additional Condition does not apply to Demolition Cost Coverage.

   **3.** **Coverage C - Increased Cost Of Construction Coverage**

**a.** With respect to the building that has sustained covered direct physical damage, we will pay for the increased cost to:

   **(1)** Repair or reconstruct damaged portions of that building; and/or

   **(2)** Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

when the increased cost is a consequence of enforcement of the minimum requirements of the ordinance or law.

However:

   **(1)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

   **(2)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

The Coinsurance Additional Condition does not apply to Increased Cost of Construction Coverage.

**b.** When a building is damaged or destroyed and Coverage **C** applies to that building in accordance with **3.a.** above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same conditions stated in **3.a.:**

   **(1)** The cost of excavations, grading, backfilling and filling;

   **(2)** Foundation of the building;

   **(3)** Pilings; and

   **(4)** Underground pipes, flues and drains.

The items listed in **b.(1)** through **b.(4)** above are deleted from Property Not Covered, but only with respect to the coverage described in this Provision, **3.b.**

**E.** **Loss Payment**

   **1.** All following loss payment Provisions, **E.2.** through **E.5.**, are subject to the appointment procedures set forth in Section **B.3.** of this endorsement.

2. When there is a loss in value of an un-damaged portion of a building to which Coverage **A** applies, the loss payment for that building, including damaged and undamaged portions, will be deter-mined as follows:

    a. If the Replacement Cost Coverage Option applies and the property is not being repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

        (1) The amount you would actually spend to repair, rebuild or re-construct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

        (2) The Limit of Insurance shown in the Declarations as applica-ble to the covered building.

    b. If the Replacement Cost Coverage Option applies and the property is **not** repaired or replaced, or if the Replacement Cost Coverage Option does **not** apply, we will not pay more than the lesser of:

        (1) The actual cash value of the building at the time of loss; or

        (2) The Limit of Insurance shown in the Declarations as applica-ble to the covered building.

3. Unless Paragraph **E.5.** applies, loss payment under Coverage **B** - Demolition Cost Coverage will be determined as follows:

We will not pay more than the lesser of the following:

    a. The amount you actually spend to demolish and clear the site of the described premises; or

    b. The applicable Limit of Insurance shown for Coverage **B** in the Schedule above.

4. Unless Paragraph **E.5.** applies, loss payment under Coverage **C** - Increased Cost of Construction Coverage will be determined as follows:

    a. We will not pay under Coverage **C**:

        (1) Until the property is actually repaired or replaced, at the same or another premises; and

        (2) Unless the repairs or replace-ment are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

    b. If the building is repaired or re-placed at the same premises, or if you elect to rebuild at another premises, the most we will pay un-der Coverage **C** is the lesser of:

        (1) The increased cost of con-struction at the same prem-ises; or

        (2) The applicable Limit of Insur-ance shown for Coverage **C** in the Schedule above.

    c. If the ordinance or law requires re-location to another premises, the most we will pay under Coverage **C** is the lesser of:

        (1) The increased cost of con-struction at the new premises; or

        (2) The applicable Limit of Insur-ance shown for Coverage **C** in the Schedule above.

5. If a **Combined** Limit of Insurance is shown for Coverages **B** and **C** in the Schedule above, Paragraphs **E.3.** and **E.4.** of this endorsement do not apply with respect to the building that is sub-ject to the Combined Limit, and the fol-lowing loss payment provisions apply instead:

The most we will pay, for the total of all covered losses for Demolition Cost and Increased Cost of Construction, is the Combined Limit of Insurance shown for Coverages **B** and **C** in the Schedule above. Subject to this Combined Limit of Insurance, the following loss payment provisions apply:

    a. For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

    b. With respect to the Increased Cost of Construction:

        (1) We will not pay for the in-creased cost of construction:

            (a) Until the property is actu-ally repaired or replaced, at the same or another premises; and

(b) Unless the repairs or re-placement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(2) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the same premises.

(3) If the ordinance or law requires relocation to another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the new premises.

F. The terms of this endorsement apply separately to each building to which this endorsement applies.

G. Under this endorsement we will not pay for loss due to any ordinance or law that:

1. You were required to comply with before the loss, even if the building was undamaged; and

2. You failed to comply with.

H. Example of Proportionate Loss Payment for Ordinance or Law Coverage Losses (procedure as set forth in Section **B.3.** of this endorsement)

Assume:

• Wind is a Covered Cause of Loss; Flood is an excluded Cause of Loss

• The building has a value of $200,000

• Total direct physical damage to building: $100,000

• The ordinance or law in this jurisdiction is enforced when building damage equals or exceeds 50% of the building's value

• Portion of direct physical damage that is covered (caused by wind): $30,000

• Portion of direct physical damage that is not covered (caused by flood): $70,000

• Loss under Ordinance or Law Coverage **C** of this endorsement: $60,000

Step **1:**

Determine the proportion that the covered direct physical damage bears to the total direct physical damage.

$$\$30,000 \div \$100,000 = .30$$

Step **2:**

Apply that proportion to the Ordinance or Law loss.

$$\$60,000 \times .30 + \$18,000$$

In this example, the most we will pay under this endorsement for the Coverage **C** loss is $18,000, subject to the applicable Limit of Insurance and any other applicable provisions.

NOTE: The same procedure applies to losses under Coverages **A** and **B** of this endorsement.

I. The following definition is added:

"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

| POLICY NUMBER: | CWP 3263063 | COMMERCIAL PROPERTY |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PEAK SEASON LIMIT OF INSURANCE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE***

| Prem. No. | Bldg. No. | Covered Property | Peak Season Additional Limit of Insurance | Period From | To |
|-----------|-----------|------------------|-------------------------------------------|-------------|-----|
|           |           |                  |                                           |             |     |

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

The Limit of Insurance on covered personal property is increased to include the amount shown in the Schedule:

**A.**  At the described location(s); and

**B.**  Only from 12:01 A.M. Standard Time of the first day to 12:01 A.M. Standard Time of the last day of the applicable period(s) shown in the Schedule.

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

Copyright, ISO Commercial Risk Services, Inc., 1994

**CP 12 30** 06 95

094
**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                          COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# POLLUTANT CLEAN UP AND REMOVAL
# ADDITIONAL AGGREGATE LIMIT OF INSURANCE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
STANDARD PROPERTY POLICY
TOBACCO SALES WAREHOUSE COVERAGE FORM

### SCHEDULE*

| Prem. No. | Additional Aggregate Limit of Insurance | Deductible | Additional Premium |
|-----------|----------------------------------------|------------|--------------------|

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

A.  The $10,000 annual aggregate limit for the POLLUTANT CLEAN UP AND REMOVAL Additional Coverage is increased by the Additional Aggregate Limit of Insurance shown in the Schedule.

B.  We will not pay under this endorsement for "pollutants" clean up or removal costs in any occurrence until the total of all such costs exceeds the sum of:

1.  The $10,000 aggregate limit from the basic Pollutant Clean Up and Removal Additional Coverage, less any prior payments for the same policy year; plus

2.  The Deductible shown in the Schedule.

We will then pay the costs in excess of that sum, until the Additional Aggregate Limit of Insurance shown in the Schedule is used up during the applicable 12-month period.

Example:

The cost of "pollutants" clean up and removal is                                     $40,000

The remaining aggregate from the basic Additional Coverage (assuming $4,000 has previously been paid for the same policy year) is                                     $ 6,000

The Deductible shown in the Schedule is                                     $10,000

The Pollutant Clean Up and Removal Additional Aggregate Limit of Insurance is                                     $25,000

We will determine the most we will pay under this endorsement as follows:

| | |
|---|---|
| The cost incurred | $40,000 |
| Less the sum of the remaining basic Additional Coverage aggregate  $ 6,000 and the Deductible  <u>10,000.</u> | <u>-16,000</u> |

The most we will pay under this endorsement is                                     $24,000.

The remaining benefit under this endorsement for costs incurred for the policy year is $1,000.

C.  No other Deductible in this policy applies to this endorsement.

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

Copyright, ISO Commercial Risk Services, Inc., 1985, 1990                          **CP 04 07** 10 91

095
**EXHIBIT 6**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SPOILAGE COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM

### SCHEDULE

| Premises Number | Building Number | Limit Of Insurance |
|---|---|---|
| **Description Of Property:** | | |
| Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance. | | |
| **Deductible:** $500 | | |
| **Refrigeration Maintenance Agreement:** | | |
| **Causes Of Loss** | | |
| Breakdown Or Contamination: | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations | | |

The Coverage Form to which this endorsement applies is extended to insure against direct physical loss or damage by the Covered Causes of Loss, but only with respect to coverage provided by this endorsement.

**A.** Paragraph **A.1., Covered Property** is replaced by the following:

  **1. Covered Property**

  Covered Property means "perishable stock" at the described premises owned by you or by others that is in your care, custody or control.

**B.** With respect to the coverage provided by this endorsement, property located on buildings or in the open or in vehicles is considered to be Property Not Covered.

**C.** Paragraph **A.3., Covered Causes Of Loss** is replaced by the following:

  **3. Covered Causes Of Loss**

  Covered Causes of Loss means the following only if indicated by an "X" in the Schedule:

    **a.** Breakdown or Contamination, meaning:

    (1) Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at the described premises; and

    (2) Contamination by the refrigerant.

    **b.** Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

**D. Selling Price**

  If Selling Price is indicated by an "X" in the Schedule, the following is added to the **Valuation** Loss Condition:

  We will determine the value of finished "perishable stock" in the event of loss or damage at:

  1. The selling price, as if no loss or damage had occurred;

2.   Less discounts and expenses you otherwise would have had.

E.   Paragraph **A.5.**, **Coverage Extensions** does not apply.

F.   Paragraph **B. Exclusions** is replaced by the following:

**B.   Exclusions**

1.   Only the following Exclusions contained in Paragraph **B.1.** of the Causes of Loss Form applicable to this Coverage Part apply to Spoilage Coverage:

a.   Earth Movement;

b.   Governmental Action;

c.   Nuclear Hazard;

d.   War And Military Action; and

e.   Water.

2.   The following Exclusions are added:

We will not pay for loss or damage caused by or resulting from:

a.   The disconnection of any refrigerating, cooling or humidity control system from the source of power.

b.   The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

c.   The inability of an Electrical Utility Company or other power source to provide sufficient power due to:

(1)   Lack of fuel; or

(2)   Governmental order.

d.   The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand.

e.   Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

G.   Paragraph **D. Deductible** is replaced by the following:

We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Schedule of this endorsement. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance. No other deductible in this policy applies to the coverage provided by this endorsement.

H.   Paragraph **F.**, **Additional Conditions** is replaced by the following:

**ADDITIONAL CONDITION**

The following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

**REFRIGERATION MAINTENANCE AGREEMENTS**

If Breakdown or Contamination is designated as a Covered Cause of Loss and a refrigeration maintenance agreement is shown as applicable by an "X" in the Schedule, the following condition applies:

You must maintain a refrigeration maintenance or service agreement. If you voluntarily terminate this agreement and do not notify us, the insurance provided by this endorsement will be automatically suspended at the involved location.

I.   Paragraph **G.**, **Optional Coverages** does not apply.

J.   The following is added to the **Definitions**:

**"Perishable stock"** means personal property:

a.   Maintained under controlled conditions for its preservation; and

b.   Susceptible to loss or damage if the controlled conditions change.

EXHIBIT 6

POLICY NUMBER:    CWP 3263063                                              COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# UTILITY SERVICES -  DIRECT DAMAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY
TOBACCO SALES WAREHOUSES COVERAGE FORM

### SCHEDULE*

| Prem. No. | Bldg. No. | Utility Services Limit Of Insurance | Enter **"X"** for each applicable Property | | | | |
|---|---|---|---|---|---|---|---|
| | | | Water Supply Property | **Commu-nication Supply Property** (including overhead transmis-sion lines) | **Commu-nication Supply Property (not** including overhead transmis-sion lines) | **Power Supply Property** (including overhead transmis-sion lines) | **Power Supply Property (not** including overhead transmis-sion lines) |
| | | $ | | | | | |

**Covered Property:**

**Causes Of Loss Form Applicable:**

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** We will pay for loss of or damage to Covered Property described in the Schedule, caused by an interruption of service to the described premises.  The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss (as indicated in the Schedule) to the property described in Paragraph **C.** if such property is indicated by an "X" in the Schedule.

**B. Exception**

Coverage under this endorsement for loss or damage to Covered Property does not apply to loss or damage to electronic data, including destruction or corruption of electronic data.   The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

**C. Utility Services**

1. **Water Supply Services,** meaning the following types of property supplying water to the described premises:

    **a.** Pumping stations; and

    **b.** Water mains.

2. **Communication Supply Services,** meaning property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

    **a.** Communication transmission lines, including optic fiber transmission lines;

    **b.** Coaxial cables; and

    **c.** Microwave radio relays except satellites.

    It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

© ISO Properties, Inc., 2006

098
**EXHIBIT 6**

3. **Power Supply Services,** meaning the following types of property supplying electricity, steam or gas to the described premises:

   a.   Utility generating plants;

   b.   Switching stations;

   c.   Substations;

   d.   Transformers; and

   e.   Transmission lines.

It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

D.   If a Utility Services Limit Of Insurance is shown in the Schedule, such limit is part of, not in addition to, the Limit of Insurance stated in the Declarations or in the Separation Of Coverage endorsement as applicable to the Covered Property.

If no Limit of Insurance is shown for Utility Services, coverage under this endorsement is subject to the applicable Limit of Insurance on the Covered Property as shown in the Declarations or in the Separation Of Coverage endorsement.   But this Utility Services endorsement does not increase the applicable Limit of Insurance.

**EXHIBIT 6**

COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# BRANDS AND LABELS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

**A.** If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, we may take all or any part of the property at an agreed or appraised value.  If so, you may:

   **1.** Stamp "salvage" on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

   **2.** Remove the brands or labels, if doing so will not physically damage the merchandise.  You must relabel the merchandise or its containers to comply with the law.

**B.** We will pay reasonable costs you incur to perform the activity described in **A.1.** or **A.2.** above.  But the total we pay for these costs and the value of the damaged property will not exceed the applicable Limit of Insurance on such property.

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

Copyright, Insurance Services Office, Inc., 1999

**CP 04 01** 10 00

100
**EXHIBIT 6**

POLICY NUMBER:   CWP 3263063                                    INTERLINE

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

    COMMERCIAL PROPERTY COVERAGE PART
    FARM COVERAGE PART

### SCHEDULE*

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| 001 | 002 | P = 1 |

**Describe any "P-9":**

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to the:

Commercial Property Conditions
General Conditions in the Farm Property - Other Farm Provisions Form - Additional Coverages, Conditions, Definitions
General Conditions in the Mobile Agricultural Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage Form

**PROTECTIVE SAFEGUARDS**

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1"** **Automatic Sprinkler System**, including related supervisory services.

Automatic Sprinkler System means:

a. Any automatic fire protective or extinguishing system, including connected:

    (1) Sprinklers and discharge nozzles;

    (2) Ducts, pipes, valves and fittings;

    (3) Tanks, their component parts and supports; and

    (4) Pumps and private fire protection mains.

b. When supplied from an automatic fire protective system:

    (1) Non-automatic fire protective systems; and

    (2) Hydrants, standpipes and outlets.

**"P-2"** **Automatic Fire Alarm**, protecting the entire building, that is:

a. Connected to a central station; or

b. Reporting to a public or private fire alarm station.

**"P-3"** **Security Service**, with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4"** **Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-9"** The protective system described in the Schedule.

Copyright, Insurance Services Office, Inc., 1997

**B.** The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS - BASIC FORM
CAUSES OF LOSS - BROAD FORM
CAUSES OF LOSS - SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND
   OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
CAUSES OF LOSS FORM - FARM
   PROPERTY
MOBILE AGRICULTURAL MACHINERY
   AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# KENTUCKY CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The following exclusion and related provisions are added to Paragraph **B.2. Exclusions** in the Causes Of Loss Forms and to any Coverage Form or policy to which a Causes Of Loss Form is not attached:

1. We will not pay for loss or damage arising out of any act committed:

   **a.** By or at the direction of any insured; and

   **b.** With the intent to cause a loss.

2. However, this exclusion will not apply to deny coverage to an innocent co-insured who did not cooperate in or contribute to the creation of the loss, provided the loss is otherwise covered under this Coverage Part and:

   **a.** The loss arose out of a pattern of domestic violence and abuse; and

   **b.** The perpetrator of the loss is criminally prosecuted for the act causing the loss.

3. If we pay a claim pursuant to Paragraph **A.2.**, our payment to the insured is limited to that insured's ownership interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property.  In no event will we pay more than the Limit of Insurance.

**B.** The **Transfer Of Rights Of Recovery Against Others To Us** Condition, in the Commercial Property Conditions, is amended by adding the following:

If we pay an innocent co-insured for loss described in Paragraph **A.2.**, the rights of the innocent co-insured to recover damages from the perpetrator are transferred to us to the extent of our payment. Following the loss, the innocent co-insured may not waive such rights to recover against the perpetrator of the domestic violence.

Copyright, Insurance Services Office, Inc., 2000

**CP 01 66** 09 00

103
**EXHIBIT 6**

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**NEW**
**DATA COMPROMISE/IDENTITY RECOVERY**
**COVERAGE DECLARATIONS**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |
|---|---|

| Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A |
|---|

| Policy    From   10/26/15       at 12:01 A.M. Standard Time at your<br>Period     To     10/26/16       mailing address shown above. |
|---|

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
COVERAGES PROVIDED                                       LIMIT
DATA COMPROMISE
Section 1 - Response Expenses
Data Compromise Response Expenses Limit                         $50,000
   (Annual Aggregate)
Legal and Forensic Information Technology Review Sublimit        $5,000
   (Each "Personal Data Compromise")
Section 2 - Defense and Liability
Data Compromise Defense and Liability Limit                     $50,000
   (Annual Aggregate)


IDENTITY RECOVERY
Identity Recovery Expense Reimbursement Limit                   $15,000
```

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
POLICY DEDUCTIBLE IS
DATA COMPROMISE
Data Compromise Response Expenses Deductible                     $2,500
   (Each "Personal Data Compromise")
Data Compromise Defense and Liability Deductible                $2,500
   (Each "Data Compromise Suit")

IDENTITY RECOVERY
Identity Recovery Expense Reimbursement Deductible                $250
```

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
Total Advance Annual Data Compromise/Identity Recovery Premium    $107
```

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
Forms and Endorsements applicable to this Coverage part:
 IL7040   0611*, CP7113   0611*, IL7039   0611*.
```

**EXHIBIT 6**

# IDENTITY RECOVERY COVERAGE FORM

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations.  The words "we", "us" and "our" refer to the Company providing this Insurance.  Other words and phrases that appear in quotation marks have special meaning.  Refer to Section G - DEFINITIONS.

## A. COVERAGE

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

1. There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

2. Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery Coverage is applicable; and

3. Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured."

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

1. **Case Management Service**

   Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

2. **Expense Reimbursement**

   Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft."

## B. EXCLUSIONS

We do not cover loss or expense arising from any of the following.

1. The theft of a professional or business identity.

2. Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others.  However, this exclusion shall not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

3. An "identity theft" that is not reported in writing to the police.

4. War, including any of the following and any consequence of the following:

   a. Undeclared war, civil war, insurrection rebellion or revolution;

   b. Warlike act by a military force or military personnel; or

   c. Destruction, seizure or use for a military purpose.

5. Nuclear Hazard.  Nuclear Hazard means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

6. "Bodily injury" or "property damage".

## C. LIMITS OF INSURANCE

1. Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service.  Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement Coverage.

2. Expense Reimbursement Coverage is subject to a limit as indicated in the Declarations.  This is an annual aggregate per "identity recovery insured".  Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period.  If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.

Includes material from
Insurance Services Office, Inc.
with permission

IL 70 40  06 11
Page 1 of 4

105

**EXHIBIT 6**

3. Legal costs as provided under item **d.** of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement Coverage limit.

4. Item **e.** (Lost Wages) and item **f.** (Child and Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

5. Item **g.** (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

6. Item **h.** (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expenses Reimbursement Coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

**D. DEDUCTIBLES**

1. Case Management Service is not subject to a deductible.

2. Expense Reimbursement Coverage is subject to a deductible of $250. Any one "identity recovery insured" shall be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

**E. CONDITIONS**

The following conditions apply.

1. **Assistance and Claims**

   For assistance, the "identity recovery insured" should call the **Identity Recovery Help Line** at **866-937-2663**.

   The **Identity Recovery Help Line** can provide the "identity recovery insured" with:

   **a.** Information and advice for how to respond to a possible "identity theft"; and

   **b.** Instructions for how to submit a service request for Case Management

Service and/or a claim form for Expense Reimbursement Coverage.

In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.

As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity recovery expenses."

2. **Bankruptcy**

   The bankruptcy or insolvency of you or your estate will not relieve you or us of any obligation under this Identity Recovery Coverage.

3. **Concealment, Misrepresentation or Fraud**

   We will not pay for any loss and coverage will be void if you or any additional insured at any time:

   **a.** Intentionally cause or allow loss or expense in order to collect on insurance; or

   **b.** Intentionally conceal or misrepresent a material fact concerning:

   **(1)** This Identity Recovery Coverage; or

   **(2)** A claim under this Identity Recovery Coverage.

4. **Coverage Territory**

   Subject to its terms, conditions and exclusions, this policy applies to an "identity theft" occurring anywhere in the world, but we shall only pay for loss incurred by an "identity recovery insured" in the United States, Puerto Rico or Canada.

5. **Duties in the Event of Loss or Damage**

   You must see that the following are done in the event of loss:

   **a.** Report the "identity theft" to the police in writing.

   **b.** Give us a prompt notice of the loss.

c. Send us a signed, sworn proof of loss containing the information we request. You must do this within 60 days after our request.

d. Cooperate with us in the investigation and settlement of the claim.

6. **Legal Action Against Us**

No one may bring a legal action against us under this Identity Recovery Coverage unless:

a. There has been full compliance with all the terms of this Identity Recovery Coverage; and

b. The action is brought within two years after the date that the "identity theft" is first discovered by the "identity recovery insured".

7. **Liberalization**

If we adopt any standard form revision for general use that would broaden the coverage under this Identity Recovery Coverage without additional premium, the broadened coverage will apply to this Identity Recovery Coverage commencing on the date that such revision becomes effective in the jurisdiction of the mailing address for the First Named Insured.

8. **Other Insurance**

If there is other insurance that applies to the same loss, damage or expense, this identity Recovery Coverage shall apply only as excess insurance after all other applicable insurance has been exhausted.

9. **Services**

The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:

a. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured."

b. All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with the local conditions.

c. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts."

F. **DEFINITIONS**

1. "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

2. "**Identity Recovery Case Manager**" means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured." This includes, with the permission and cooperation of the "identity recovery insured," written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

3. "**Identity Recovery Expenses**" means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

a. Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft."

b. Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft."

c. Costs for credit reports from established credit bureaus.

d. Fees and expenses for an attorney approved by us for the following:

(1) The defense of any civil suit brought against an "identity recovery insured."

(2) The removal of any civil judgment wrongfully entered against an "identity recovery insured."

(3) Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency.

(4) Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report.

EXHIBIT 6

(5) The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured."

e. Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

f. Actual costs for supervision of children or elderly or infirm relatives or dependants of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

g. Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

h. Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft."

(1) Such costs include:

(a) Costs by the "identity recovery insured" to recover control over his or her personal identity.

(b) Deductibles or service fees from financial institutions.

(2) Such costs do not include:

(a) Costs to avoid, prevent or detect "identity theft" or other loss.

(b) Money lost or stolen.

(c) Costs that are restricted or excluded elsewhere in this endorsement or policy.

4. **"Identity Recovery Insured"** means the following:

a. When the entity insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured entity.

b. When the entity insured under this policy is a partnership, the "identity recovery insureds" are the current partners.

c. When the entity insured under this policy is a corporation or other organization, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" shall be:

(1) The chief executive of the insured entity; or

(2) As respects a religious institution, the senior ministerial employee.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured."

5. **"Identity Theft"** means the fraudulent use of the social security number or other method of identifying an "identity recovery insured." This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

6. **"Property Damage"** means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured.

EXHIBIT 6

# DATA COMPROMISE COVERAGE FORM

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Some words and phrases that appear in quotation marks have special meaning.  Refer to Definitions.

## SECTION 1 - RESPONSE EXPENSES

### A.  COVERAGE - SECTION 1

If the three conditions listed below have been met, then we will pay your expenses for Legal and Forensic Information Technology Review, Notification to Affected Individuals and Services to Affected Individuals directly arising from the covered cause of loss.

1.  There has been a "personal data compromise"; and

2.  Such "personal data compromise" is first discovered by you during the policy period for which this Coverage Form is applicable; and

3.  Such "personal data compromise" is reported to us within 60 days after the date it is first discovered by you.

The amount we will pay is limited as described in paragraph B, LIMITS OF INSURANCE - SECTION 1.

Please note that service providers must be approved by us as described in Condition **13.** - Service Providers.

1.  **Legal and Forensic Information Technology Review**

We will pay your necessary and reasonable costs for the following outside professional services.

a.  Legal Services

Professional legal counsel review of the "personal data compromise" and how you should best respond to it.

b.  Forensic Information Technology Services

Professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals."

2.  **Notification to Affected Individuals**

We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals."

3.  **Services to Affected Individuals**

We will pay your necessary and reasonable costs to provide the following services to "affected individuals."

a.  Informational Materials

A packet of loss prevention and customer support information.

b.  Help Line

A toll-free telephone line for "affected individuals" with questions about the "personal data compromise" or wanting to request additional services as listed in **c.** and **d.**

c.  Credit Report and Monitoring

A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records.  This service is subject to the "affected individual" enrolling for this service with the designated service provider.

d.  Identity Restoration Case Management

As respects any "affected individual" who is or appears to be a victim of "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

### B.  LIMITS OF INSURANCE - SECTION 1

1.  The most we will pay under Response Expenses coverage is the Data Compromise Response Expenses Limit indicated in the Declarations.

© 2006, 2009
Includes material from Insurance
Services Office, Inc. with permission

**EXHIBIT 6**

2. The most we will pay under Legal and Forensic Information Technology Review coverage for loss arising from any one "personal data compromise" is the Legal and Forensic Information Technology Sublimit indicated in the Declarations. This sublimit is part of, and not in addition to, the Data Compromise Response Expenses Limit.

3. The Data Compromise Response Expenses Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under Section **1** arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events occurring during that period.

4. A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Response Expenses Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

5. Coverage for Services to "affected individuals" is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals." Notwithstanding, coverage for Identity Restoration Case Management services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

C. **DEDUCTIBLE - SECTION 1**

Response Expenses coverage is subject to the Response Expenses Deductible indicated in the Declarations. You shall be responsible for such deductible amount as respects each "personal data compromise" covered under this Coverage Form.

## SECTION 2 - DEFENSE AND LIABILITY

A. **COVERAGE - SECTION 2**

1. If the five conditions listed below have been met, then we will pay for "data compromise defense costs" and "data compromise liability" directly arising from the covered cause of loss.

   a. All three conditions in SECTION 1 - RESPONSE EXPENSES, paragraph A, COVERAGE - SECTION 1 are met; and

   b. You have provided notifications and services to "affected individuals" in consultation with us pursuant to Response Expenses coverage; and

   c. You receive notice of a "data compromise suit" brought by one or more "affected individuals"; and

   d. Notice of such "data compromise suit" is received by you within two years of the date that the "affected individuals" are notified of the "personal data compromise"; and

   e. Such "data compromise suit" is reported to us within 60 days after the date it is first received by you.

2. The amount we will pay is limited as described in paragraph B, LIMITS OF INSURANCE - SECTION 2.

3. We will have the right but not the duty to defend the insured against any "data compromise suit." We reserve the right to approve any firm, service or legal counsel you select as stated in the CONDITIONS.

B. **LIMITS OF INSURANCE - SECTION 2**

1. The most we will pay under Defense and Liability coverage is the Data Compromise Defense and Liability Limit indicated in the Declarations.

2. The Data Compromise Defense and Liability Limit is an annual aggregate limit. This amount is the most we will pay for all loss covered under Section **2** arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events occurring during that period.

3. A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Defense and Liability Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

C. **DEDUCTIBLE - SECTION 2**

Defense and Liability coverage is subject to the Defense and Liability Deductible indicated in the Declarations. You shall be responsible for such deductible amount as respects each "data compromise suit" covered under this Coverage Form.

## EXCLUSIONS, CONDITIONS AND DEFINITIONS APPLICABLE TO BOTH SECTION 1 AND SECTION 2

### A. EXCLUSIONS

We will not pay for costs arising from the following:

1. Your intentional or willful complicity in a "personal data compromise."

2. Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you.

3. Any "personal data compromise" occurring prior to the first inception of this Coverage Form.

4. Except as specifically provided under coverage **A.1.b.** Forensic Information Technology Review Services, costs to research any deficiency. This includes, but is not limited to, any deficiency in your systems, procedures or physical security that may have contributed to a "personal data compromise."

5. Costs to correct any deficiency. This includes, but is not limited to, any deficiency in your systems, procedures or physical security that may have contributed to a "personal data compromise."

6. Any fines or penalties. This includes, but is not limited to, fees or surcharges from affected financial institutions.

7. Any criminal investigations or proceedings.

8. Any extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance.

9. Any virus or other malicious code that is or becomes named and recognized by the CERT Coordination Center, McAfee, Secunia, Symantec or other comparable third party monitors of malicious code activity.

10. Your reckless disregard for the security of "personally identifying information" in your care, custody or control.

11. That part of any "data compromise suit" seeking any non-monetary relief.

12. Seizure or destruction of property by order of governmental authority.

13. Nuclear reaction or radiation or radioactive contamination, however caused.

14. War and military action including any of the following and any consequence of any of the following:

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

15. "Bodily injury" or "property damage."

### B. CONDITIONS

The following conditions apply:

1. **Abandonment**

There can be no abandonment of any property to us.

2. **Concealment or Fraud**

This policy is void if you have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

3. **Coverage Territory**

The "personal data compromise" must involve "personally identifying information" that was within your care, custody or control within the United States of America and Puerto Rico.

4. **Data Compromise Liability Defense**

a. We shall have the right, but not the duty, to assume the defense of any applicable "data compromise suit" against you. You shall give us such information and cooperation as we may reasonably require. In the event we do not assume your defense, we shall, nevertheless, have the right to effectively associate with you in the defense and settlement of any "data compromise suit" that appears reasonably likely to involve us, including, but not limited to, the right to effectively associate in the negotiation of a settlement.

b. You shall not admit liability for or settle any "data compromise suit" or incur any defense costs without our prior written consent. However, if you are able to dispose of all "data compromise suits" which are subject to one deductible amount for an amount not exceeding the deductible amount (inclusive of defense costs), then our consent shall not be required for such claims and suits.

c. If you refuse to consent to any settlement recommended by us and acceptable to the claimant, we may then withdraw from your defense (if we have assumed your defense) by tendering control of the defense to you. From that point forward, you shall, at your own expense, negotiate or defend such "data compromise suit" independently of us. Our liability shall not exceed the amount for which the claim or suit could have been settled if such recommendation was consented to, plus defense costs incurred by us, and defense costs incurred by you with our written consent, prior to the date of such refusal.

d. We shall not be obligated to pay any damages or defense costs, or to defend or continue to defend any "data compromise suit" if we have assumed your defense, after the Data Compromise Defense and Liability Limit has been exhausted.

5. **Defense Counsel**

We will only pay for "data compromise defense costs" for services provided by legal counsel approved by us. You must obtain our prior approval for any firm, service or legal counsel whose expenses you want covered as "data compromise defense costs." We will not unreasonably withhold such approval.

6. **Due Diligence**

You agree to use due diligence to prevent and mitigate costs covered under this Coverage Form. This includes, but is not limited to, complying with reasonable and industry-accepted protocols for:

a. Providing and maintaining appropriate physical security for your premises, computer systems and hard copy files;

b. Providing and maintaining appropriate computer and Internet security;

c. Maintaining and updating at appropriate intervals backups of computer data;

d. Protecting transactions, such as processing credit card, debit card and check payments; and

e. Appropriate disposal of files containing "personally identifying information," including shredding hard copy files and destroying physical media used to store electronic data.

7. **Duties in the Event of a "Data Compromise Suit"**

a. If a "data compromise suit" is brought against you, you must:

(1) Immediately record the specifics of the "data compromise suit" and the date received; and

(2) Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "data compromise suit" is first received by you.

b. You must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "data compromise suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the "data compromise suit";

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of loss to which this insurance may also apply; and

(5) Take no action, or fail to take any required action, that prejudices your rights or our rights with respect to such "data compromise suit".

c. You may not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

d. If you become aware of a claim or complaint that may become a "data compromise suit," you shall promptly inform us of such claim or complaint.

8. **Duties In The Event Of a "Personal Data Compromise"**

You must see that the following are done in the event of a "personal data compromise":

a. Notify the police if a law may have been broken.

b. Give us prompt notice of the "personal data compromise". As noted in Section 1, A.3., you must report the "personal data compromise" to us within 60 days of the date you first discover it.

c. As soon as possible, give us a description of how, when and where the "personal data compromise" occurred.

d. Take all reasonable steps to protect "personally identifying information" remaining in your care, custody or control. If feasible, preserve evidence of the "personal data compromise".

e. Permit us to inspect the property and records proving the "personal data compromise".

f. If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

g. Send us a signed, sworn statement containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

h. Cooperate with us in the investigation or settlement of the claim.

### 9. Legal Action Against Us

No one may bring a legal action against us under this insurance unless:

a. There has been full compliance with all of the terms of this insurance; and

b. The actions is brought within 2 years after the date the "personal data compromise" is first discovered by you.

### 10. Legal Advice

We are not your legal advisor. Our determination of what is or is not covered under this Coverage Form does not represent advice or counsel from us about what you should or should not do.

### 11. Policy Period

This policy applies only to "personal data compromises" that are first discovered by you during the policy period shown in the General Declarations. The policy period begins and ends at 12:01 a.m., Standard Time, at your address shown in the General Declarations.

### 12. Pre-Notification Consultation

You agree to consult with us prior to the issuance of notification to "affected individuals." We assume no responsibility under this Data Compromise Coverage for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under Additional Condition **13.** Service Providers. You must provide the following at our pre-notification consultation with you:

a. The exact list of "affected individuals" to be notified, including contact information.

b. Information about the "personal data compromise" that may appropriately be communicated with "affected individuals."

c. The scope of services that you desire for the "affected individuals." For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Data Compromise Limit.

### 13. Service Providers

a. We will only pay under this Data Compromise Coverage for services that are provided by service providers approved by us. You must obtain our prior approval for any service provider whose expenses you want covered under this Data Compromise Coverage. We will not unreasonably withhold such approval.

b. Prior to the Pre-Notification Consultation described in Condition **12.** above, you must come to agreement with us regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals. We will suggest a service provider. If you prefer to use an alternate service provider, our coverage is subject to the following limitations:

(1) Such alternate service provider must be approved by us;

(2) Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

(3) Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

**14. Other Insurance**

If there is other insurance that applies to the same loss, damage or expense, this Data Compromise Coverage shall apply only as excess insurance after all other applicable insurance has been exhausted.

**15. Services**

The following conditions apply as respects any services provided to you or any "affected individual" by us, our designees or any service firm paid for in whole or in part under this Data Compromise coverage:

**a.** The effectiveness of such services depends on your cooperation and assistance.

**b.** All services may not be available or applicable to all individuals. For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

**c.** We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

**d.** You will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for you. We will pay you for costs and expenses covered under this Coverage Form after receiving receipts, bills or other records that support your claim.

## C. DEFINITIONS

With respect to the provisions of this Coverage Form only, the following definitions are added:

**1.** **"Affected individual"** means any person who is your current, former or prospective customer, client, member, owner, director or employee and whose "personally identifying information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this Coverage Form. This definition is subject to the following provisions:

**a.** "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual."

**b.** An "affected individual" must have a direct relationship with your interests as insured under this policy. The following are examples of individuals who would not meet this requirement:

**(1)** If you aggregate or sell information about individuals as part of your business, the individuals about whom you keep such information do not qualify as "affected individuals." However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

**(2)** If you store, process, transmit or transport records, the individuals whose "personally identifying information" you are storing, processing, transmitting or transporting for another entity do not qualify as "affected individuals." However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

**(3)** You may have operations, interests or properties that are not insured under this policy. Individuals who have a relationship with you through such other operations, interests or properties do not qualify as "affected individuals." However, specific individuals, may qualify as "affected individuals" for another reason, such as being an employee of the operation insured under this policy.

**c.** An "affected individual" may reside anywhere in the world. However, the coverage and services provided under this Coverage Form are only applicable and available within the United States of America, Puerto Rico and Canada.

**2.** **"Bodily Injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**3.** **"Data Compromise Defense Costs"** means expenses resulting solely from the investigation, defense and appeal of any "data compromise suit" against you. Such expenses must be reasonable and necessary. They may be incurred by us or by you with our written consent. They do not include your salaries or your loss of earnings. They do include premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond.

4. **"Data Compromise Liability"**

   a. "Data compromise liability" means the following, when they arise from a "data compromise suit":

      (1) Damages, judgments or settlements to "affected individuals";

      (2) Defense costs added to that part of any judgment paid by us, when such defense costs are awarded by law or court order; and

      (3) Pre-judgment interest and post-judgment interest on that part of any judgment paid by us.

   b. "Data compromise liability" does not mean:

      (1) Damages, judgments or settlements to anyone who is not an "affected individual";

      (2) Civil or criminal fines or penalties imposed by law;

      (3) Punitive or exemplary damages;

      (4) The multiplied portion of multiplied damages;

      (5) Taxes; or

      (6) Matters which may be deemed uninsurable under the applicable law.

5. **"Data Compromise Suit"**

   a. "Data Compromise Suit" means a civil proceeding in which damages to one or more "affected individuals" arising from a "personal data compromise" are alleged. Such proceeding must be brought in the United States of America, Puerto Rico or Canada. "Data compromise suit" includes:

      (1) An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent;

      (2) Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent; or

      (3) A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

   b. "Data compromise suit" does not mean any demand or action brought by or on behalf of someone who is:

      (1) Your director or officer;

      (2) Your owner or part-owner; or

      (3) A holder of your securities;

      in their capacity as such, whether directly, derivatively, or by class action. "Data compromise suit" will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual."

   c. "Data compromise suit" does not mean any demand or action brought by or on behalf of an organization, business, institution, governmental entity or any other party that is not an "affected individual."

6. **"Identity Theft"** means the fraudulent use of "personally identifying information." This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes.

   "Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

7. **"Personal Data Compromise"** means the loss, theft, accidental release or accidental publication of "personally identifying information" as respects one or more "affected individuals," if such loss, theft, accidental release or accidental publication has or could reasonably result in the fraudulent use of such information. This definition is subject to the following provisions:

   a. At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" must be in your direct care, custody or control.

   b. "Personal data compromise" does not include the loss, theft, release or publication of information that is in the care, custody or control of a third party to whom you have directly or indirectly turned over such information for any reason. This includes, but is not limited to, storage, processing, transmission or transportation of such information.

c. "Personal data compromise" includes disposal or abandonment of "personally identifying information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

(1) Your failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

(2) Such disposal or abandonment must take place during the time period for which this Data Compromise Coverage Form is effective.

d. "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof.

e. All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise."

8. **"Personally Identifying Information"** means information that could be used to commit fraud or other illegal activity involving the credit or identity of an "affected individual." This includes, but it not limited to, Social Security numbers or account numbers correlated with names and addresses.

"Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses with no correlated Social Security numbers or account numbers.

9. **"Property Damage"** means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured.

All other provisions of this policy apply.

# LIABILITY COVERAGE

LIABILITY COVERAGE

LIABILITY COVERAGE

**EXHIBIT 6**

**EXHIBIT 6**

**31**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**NEW**
**GENERAL LIABILITY DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSURED NEACE LUKENS INS AGCY
2416 SIR BARTON WAY STE 300
LEXINGTON KY 40509-3001
TELEPHONE 859-543-1716

Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480   ³  A

| Policy | From | 10/26/15 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| Period | To | 10/26/16 | mailing address shown above. |

**LIMITS OF INSURANCE -**

General Aggregate Limit (Other Than Products/Completed Operations)   $2,000,000

Products/Completed Operations Aggregate Limit                        $2,000,000

Personal & Advertising Injury Limit (Per Person Or Organization)     $1,000,000

Each Occurrence Limit                                                $1,000,000

Damage to Premises Rented to You Limit        (Any One Premises)       $500,000

Medical Expense Limit                         (Any One Person)          $5,000

TOTAL ADVANCE ANNUAL GENERAL LIABILITY PREMIUM    $3,658.00

**Forms And Endorsements Applicable To This Coverage Part:**
CG0001  0413*, IL0021  0908*, CG7000  1298*, CG2503  0509*, CG2504A 0509*,
CG2147  1207*, CG7017  1298*, CG2106  0514*, CG2170  0115*, CG2404A 0509*,
CG2426  0413*, CG7118  1112*, CG2003  0413*, CG2005  0413*, CG2011   0413*,
CG2012  0413*, CG2015  0413*, CG2018  0413*, CG2024  0413*, CG2027   0413*,
CG2029  0413*, CG2034  0413*.

**EXHIBIT 6**

**31**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**NEW**
**GENERAL LIABILITY DECLARATIONS**
(Continued)

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY 42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A |
|---|

| Policy | From | 10/26/15 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| Period | To | 10/26/16 | mailing address shown above. |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
Location Of All Premises Owned By, Rented To Or Controlled By The Named Insured
Are The Same As The Mailing Address Of The Policy Declarations Unless Otherwise
Indicated.

### GENERAL LIABILITY SCHEDULE

PREMIUM BASIS LEGEND -
S = GROSS     PER $1,000    A = AREA  PER 1,000 SQ. FT.    U = UNITS PER UNIT
    SALES                   C = TOTAL COST  PER $1,000    T = SEE CLASSIFICATION
P = PAYROLL  PER $1,000    M = ADMISSIONS  PER 1,000         NOTES
O = OTHERS   PER $1,000

RATE LEGEND -
PREM/OP  =  PREMISES AND OPERATIONS               MP = MINIMUM PREMIUM
PROD     =  PRODUCTS AND COMPLETED OPERATIONS
CMPCBN   =  COMPOSITE PREMISES/PRODUCTS COMPLETED OPERATIONS

| CLASSIFICATION | CODE | PREMIUM BASIS | RATE | PREMIUM |
|---|---|---|---|---|
| KENTUCKY | | | | |
| | | | | |
| 300 CHESTNUT ST | | | | |
| MURRAY           KY  42071 | | | | |
| DRUG DISTRIBUTORS | 12373 | S | PREM/OP | .030 | $1,560 |
| | | 52,000,000 | PROD. | .037 | $1,924 |
| | | | | | |
| PREM/OP   MP      $90 | | | | |
| PROD      MP      $36 | | | | |

OTHER ENDORSEMENTS -
 SIGNATURE SERIES COMML GL ENDT                              $174

TOTAL
TOTAL PREMIUM - PREMISES AND OPERATIONS                      $1,560
TOTAL PREMIUM - PRODUCTS AND COMPLETED OPERATIONS            $1,924
TOTAL PREMIUM - OTHER ENDORSEMENTS                           $174

        TOTAL ADVANCE ANNUAL GENERAL LIABILITY PREMIUM       $3,658

**EXHIBIT 6**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERAGES

### COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

© Insurance Services Office, Inc., 2012

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.  For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

f.  **Pollution**

(1)  "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a)  At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.  However, this subparagraph does not apply to:

(i)  "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii)  "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii)  "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b)  At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c)  Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i)  Any insured; or

(ii)  Any person or organization for whom you may be legally responsible; or

(d)  At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.  However, this subparagraph does not apply to:

(i)  "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them.  This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii)  "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii)  "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment."

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j.   Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.   Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.   Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.   Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.   Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product;"

(2) "Your work;" or

(3) "Impaired property;"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.   Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p.   Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

q. **Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner.  A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

1. **Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may at our discretion investigate any offense and settle any claim or "suit" that may result.  But:

(1) The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement.  This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g.  **Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h.  **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i.  **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.  Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j.  **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1)  Advertising, broadcasting, publishing or telecasting;

(2)  Designing or determining content of websites for others; or

(3)  An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k.  **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l.  **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address,

domain name or metatag, or any other similar tactics to mislead another's potential customers.

m.  **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n.  **Pollution - related**

Any loss, cost or expense arising out of any:

(1)  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2)  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

o.  **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1)  War, including undeclared or civil war;

(2)  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3)  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

p.  **Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1)  The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2)  The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C - MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury:"

**a. Any insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or particpating in any physical exercises or games, sports or athletic contests.

**f. Products - Completed Operations Hazard**

Included within the "products-completed operations hazard."

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit." However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e.  A trust, you are an insured.  Your trustees are also insureds, but only with respect to their duties as trustees.

2.  Each of the following is also an insured:

a.  Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.  However, none of these "employees" or "volunteer workers" are insureds for:

(1)  "Bodily injury" or "personal and advertising injury":

(a)  To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b)  To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1) (a) above;

(c)  For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1) (a) or (b) above; or

(d)  Arising out of his or her providing or failing to provide professional health care services.

(2)  "Property damage" to property:

(a)  Owned, occupied or used by;

(b)  Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b.  Any person (other than your "employee" or "volunteer worker), or any organization while acting as your real estate manager.

c.  Any person or organization having proper temporary custody of your property if you die, but only:

(1)  With respect to liability arising out of the maintenance or use of that property; and

(2)  Until your legal representative has been appointed.

d.  Your legal representative if you die, but only with respect to duties as such.  That representative will have all your rights and duties under this Coverage Part.

3.  Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization.  However:

a.  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b.  Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c.  Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a.  Insureds;

b.  Claims made or "suits" brought; or

c.  Persons or organizations making claims or bringing "suits."

2.  The General Aggregate Limit is the most we will pay for the sum of:

a.  Medical expenses under Coverage **C**;

b.  Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard;" and

**c.** Damages under Coverage **B**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A**; and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence."

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

b. **Excess Insurance**

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against

that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph **a.** above; or

(2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto;"

b. While it is in or on an aircraft, watercraft or "auto;" or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos:"

    (1) Equipment designed primarily for:

        (a) Snow removal;

        (b) Road maintenance, but not construction or resurfacing; or

        (c) Street cleaning;

    (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a) When all of the work called for in your contract has been completed.

        (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products - completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

POLICY NUMBER:   CWP 3263063          COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Designated Construction Projects:**

All Projects

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

A. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I** - Coverage **A** and for all medical expenses caused by accidents under Section **I** - Coverage **C**, which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

2. The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under Coverage **C** regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

3. Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project.  Such payments shall

not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

4. The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply.  However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

B. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I** - Coverage **A** and for all medical expenses caused by accidents under Section **I** - Coverage **C**, which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

**C.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

**D.** If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

**E.** The provisions of Section - **III** Limits of Insurance not otherwise modified by this endorsement shall continue to apply as stipulated.

**EXHIBIT 6**

POLICY NUMBER:   CWP 3263063 COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DESIGNATED LOCATION(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Designated Location(s):**

All rented, owned and occupied locations other than construction projects.

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I** - Coverage **A** and for all medical expenses caused by accidents under Section **I** - Coverage **C**, which can be attributed only to operations at a single designated "location" shown in the Schedule above:

1. A separate Designated Location General Aggregate Limit applies to each designated "location", and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

2. The Designated Location General Aggregate Limit is the most we will pay for the sum of all damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under Coverage **C** regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

3. Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses shall reduce the Designated Location General Aggregate Limit for that designated "location". Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Location General Aggregate Limit for any other designated "location" shown in the Schedule above.

4. The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Location General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I** - Coverage **A** and for all medical expenses caused by accidents under Section **I** - Coverage **C**, which cannot be attributed only to operations at a single designated "location" shown in the Schedule above:

1. Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Location General Aggregate Limit.

© Insurance Services Office, Inc., 2008

C. When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Location General Aggregate Limit.

D. For the purposes of this endorsement, the **Definitions** Section is amended by the addition of the following definition:

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

E. The provisions of Section **III** Limits of Insurance not otherwise modified by this endorsement shall continue to apply as stipulated.

**EXHIBIT 6**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT - RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity: and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006

**CG 21 47** 12 07

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Exclusion **2.p.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

2. **Exclusions**

This insurance does not apply to:

p. **Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

(1) Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

(2) The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

B. The following is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

2. **Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

CG 21 06  05 14

142

**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                                          COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person Or Organization: |
| --- |
| Any person or organization for whom you are required in a written contract or agreement to include a waiver of transfer of rights of recovery against others to us, provided the "bodily injury" or "property damage" occurs subsequent to the execution of the written agreement. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph 8. Transfer Of Rights Of Recovery Against Others To Us of Section IV - Conditions:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard".  This waiver applies only to the person or organization shown in the Schedule above.

© Insurance Services Office, Inc., 2008                                      **CG 24 04A** 05 09

143
**EXHIBIT 6**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf.  However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability

is permitted by law.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© Insurance Services Office, Inc., 2012

CG 24 26  04 13

144

**EXHIBIT 6**

COMMERCIAL GENERAL LIABILITY

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.



# COMMERCIAL GENERAL LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

### SCHEDULE

The coverage provided by this endorsement is summarized below and is intended to provide a general coverage description only.  For the details affecting each coverage, please refer to the terms and conditions in this endorsement.

A. **Expected or Intended Injury**
   - Reasonable Force
B. **Non-owned Watercraft**
   - Increased to 60 feet
C. **Non-owned Aircraft**
D. **Property Damage - Elevators**
E. **Damage To Premises Rented To You**
   - Limit increased to $500,000
F. **Personal and Advertising Injury**
   - Exclusions
G. **Medical Payments - Volunteer Workers**
H. **Voluntary Property Damage**
I. **Care, Custody and Control**
J. **Supplementary Payments**
   - Bail Bonds - $2500
   - Loss of Earnings - $1000
K. **Who Is An Insured broadened:**
   - Limited Liability Partnership
   - Joint Ventures / Partnership / Limited Liability Company
   - Health Care Professionals (Incidental Medical Malpractice)
   - Newly Formed or Acquired Entities (up to 365 days)
   - Individual Owners of Buildings
L. **Knowledge and Notice Of Occurrence**
M. **Unintentional Failure To Disclose Hazards**
N. **Liberalization**
O. **Definitions**
   - Bodily Injury redefined
   - Expanded Personal and Advertising Injury definition
   - Unintentional Damage or Destruction added

**In addition to the policy amendments contained in A through O listed above, the endorsements listed below will automatically be attached to your policy to complete the coverage provided by the Signature Series Commercial General Liability Endorsement:**
   - Additional Insured - Co-Owners of Insured Premises - CG 20 27
   - Additional Insured - Concessionaire - CG 20 03
   - Additional Insured - Controlling Interest - CG 20 05
   - Additional Insured - Grantor of Franchise - CG 20 29
   - Additional Insured - Lessor of Leased Equipment - CG 20 34
   - Additional Insured - Managers or Lessors of Premises - CG 20 11
   - Additional Insured - Mortgagee, Assignee or Receiver - CG 20 18
   - Additional Insured - Owners or Other Interests From Whom Land Has Been Leased - CG 20 24
   - Additional Insured - State or Governmental Agency or Subdivision or Political Subdivision - Permits or Authorizations - CG 20 12
   - Additional Insured - Vendors - CG 20 15
   - Waiver of Transfer of Rights of Recovery - CG 24 04

## A. EXPECTED OR INTENDED INJURY

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions a.** is replaced with the following:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force for the purpose of protecting persons or property.

## B. NON-OWNED WATERCRAFT

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions g. (2) (a)** is replaced with the following:

(a) Less than 60 feet long; and

## C. NON-OWNED AIRCRAFT

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions g. Aircraft, Auto or Watercraft,** the following is added:

(6) An aircraft you do not own, provided that:

(a) The pilot in command holds a currently effective certificate issued by the duly constituted authority of the United States of America or Canada, designating that person as a commercial or airline transport pilot;

(b) It is rented with a trained, paid crew; and

(c) It does not transport persons or cargo for a charge.

## D. PROPERTY DAMAGE - ELEVATORS

With respect to Exclusions of **SECTION I COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** item **2. Exclusions,** paragraphs **(3), (4)** and **(6)** Exclusion **j. Damage to Property** and Exclusion **K Damage To Your Product** do not apply to the use of elevators. The insurance afforded by this provision is excess over any valid and collectible property insurance (including any deductible) available to the insured, and the Other Insurance Condition is changed accordingly.

## E. DAMAGE TO PREMISES RENTED TO YOU

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions,** the last paragraph of item **2. Exclusions,** is replaced with the following:

Exclusions **c.** through **n.** do not apply to damage by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in **Section III - LIMITS OF INSURANCE.**

## F. PERSONAL AND ADVERTISING INJURY

Under **SECTION I - COVERAGES, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY,** the following are added to Item **2. Exclusions:**

q. **Discrimination Relating To Room, Dwelling or Premises**

Caused by discrimination directly or indirectly related to the sale, rental, lease or sub-lease or prospective sale, rental, lease or sub-lease of any room, dwelling or premises by or at the direction of any insured.

r. **Fines or Penalties**

Fines or penalties levied or imposed by a governmental entity because of discrimination.

## G. MEDICAL PAYMENTS - VOLUNTEER WORKERS

Under **SECTION I - COVERAGES, COVERAGE C MEDICAL PAYMENTS,** item **2. Exclusions b. Hired Person** is replaced with the following:

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or tenant of any insured; however this exclusion does not apply to "volunteer workers" while engaged in maintenance or repair of your premises.

Under **SECTION I - COVERAGES,** the following are added:

## H. VOLUNTARY PROPERTY DAMAGE

1. **Insuring Agreement**

We will pay, at your request, for "property damage" to property of others caused by you, or while in your possession arising out of your business operations.

2. **Exclusions**

Coverage for Voluntary Property Damage does not apply to:

a. "Loss" of property at premises owned, rented, leased, operated or used by you.

b. "Loss" of property while in transit;

c. "Loss" of property owned by, rented to, leased to, borrowed by or used by you;

d. The cost of repairing or replacing:

(1) "Your work" defectively or incorrectly done by you;

(2) "Your product" manufactured, sold or supplied by you; or

unless the "property damage" is caused directly by you after delivery of "your product" or completion of "your work" and resulting from a subsequent undertaking.

e. "Loss" of property caused by or arising out of the "products-completed operations hazard."

3. **Deductible**

We will not pay for "loss" in any one "occurrence" until the amount of "loss" exceeds $250. We will then pay the amount of "loss" in excess of $250, up to the applicable limit of insurance.

4. **Actual Cost**

In the event of covered "loss", you shall, if requested by us, replace the damaged property or furnish the labor and materials necessary for repairs thereto at your actual cost, excluding profit or overhead charges.

The most we will pay under Voluntary Property Damage for "loss" arising out of any one "occurrence" is $250. The most we will pay for the sum of all "losses" under this coverage is $1,000.

I. **CARE, CUSTODY OR CONTROL**

1. **Insuring Agreement**

We will pay those sums the insured becomes legally obligated to pay as damages because of "property damage" to property of others while in your care, custody or control or property as to which you are exercising physical control if the "property damage" arises out of your business operations.

2. **Exclusions**

Coverage for Care, Custody or Control does not apply to:

a. "Property damage" to property at any premises owned, rented, leased, operated or used by you;

b. "Property damage" to property while in transit;

c. The cost of repairing or replacing;

(1) "Your work" defectively or incorrectly done by you; or

(2) "Your product" manufactured, sold or supplied by you;

unless the "property damage" is caused directly by you after delivery of "your product" or completion of "your work" and resulting from a subsequent undertaking.

d. "Property damage" to property caused by or arising out of the "products-completed operations hazard".

3. **Deductible**

We will not pay for "property damage" in any one "occurrence" until the amount of "property damage" exceeds $250. We will then pay the amount of "property damage" in excess of $250, up to the applicable limit of insurance.

4. **Actual Cost**

In the event of covered "property damage", you shall, if requested by us, replace the property or furnish the labor and materials necessary for repairs thereto at your actual cost, excluding profit or overhead charges.

The most we will pay under Care, Custody or Control for "property damage" is $1,000 for each occurrence. The most we will pay for the sum of all damages because of "property damage" under this coverage is $5,000.

J. **SUPPLEMENTARY PAYMENTS**

Under **SECTION I - SUPPLEMENTARY PAYMENTS COVERAGES A AND B**, item **1.b.** is replaced with the following:

b. Up to $2,500 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the "Bodily Injury" Liability Coverage applies. We do not have to furnish these bonds.

Under **SECTION I - SUPPLEMENTARY PAYMENTS COVERAGES A AND B**, item **1.d.** is replaced with the following:

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $1,000 a day because of time off from work.

**K.   WHO IS AN INSURED BROADENED**

Under **SECTION II - WHO IS AN INSURED** Item **1.b.** is replaced with the following:

**b.**   A partnership (including a limited liability partnership) or joint venture, you are an insured.  Your members, your partners, and their spouses are also insured, but only with respect to the conduct of your business.

Under **SECTION II - WHO IS AN INSURED** the following is added to item **1:**

**f.**   Joint Ventures/Partnership/Limited Liability Company Coverage

You are an insured when you had an interest in a joint venture, partnership or limited liability company which is terminated or ended prior to or during this policy period but only to the extent of your interest in such joint venture, partnership or limited liability company.  This coverage does not apply:

(1)   Prior to the termination date of any joint venture, partnership or limited liability company; or

(2)   If there is other valid and collectible insurance purchased specifically to insure the partnership, joint venture or legal liability company.

Under **SECTION II - WHO IS AN INSURED,** item **2.a.** is replaced with the following:

**a.**   Your "employees" or volunteer workers, other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.  However, none of these "employees" or volunteer workers are an insured for:

(1)   "Bodily injury" or "personal and advertising injury":

(a)   To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are limited liability company), or to a co-"employee" or co-volunteer worker while that is either in the course of his or her employment or performing duties related to the conduct of your business;

(b)   To the spouse, child, parent, brother or sister of that co-"employee" or co-volunteer worker as a consequence of paragraph (1)(a) above;

(c)   For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

(d)   Arising out of his or her providing or failing to provide professional health care services.

This does not apply to nurses, emergency medical technicians or paramedics employed by you to provide health care services, but only if you are not in the business or occupation of providing such professional services.

(2)   "Property damage" to property:

(a)   Owned, occupied or used by,

(b)   Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees" or volunteer workers, any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

Under **SECTION II - WHO IS AN INSURED,** item **3.a.** is replaced with the following:

**a.**   Coverage under this provision is afforded only until the end of the policy period or the next anniversary of this policy's effective date after you acquire or form the organization, whichever is earlier.

Under **SECTION II - WHO IS AN INSURED,** the following is added:

**4.**   For **COVERAGE A** and **COVERAGE B** only the owner of any building leased to you, but only if the building owner is a shareholder in your corporation or a partner in your partnership insured in this policy, and only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you.  However, this insurance does not apply:

CG 71 18  11 12
Page 4 of 6
148
**EXHIBIT 6**

a.  To any "occurrence" or offense which takes place after you cease to be a tenant in the premises; or

b.  To structural alterations, new construction or demolition operations performed by or on behalf of the building owner.

Under **SECTION II - WHO IS AN INSURED** the last paragraph of this section is replaced with the following:

Except as provided in **3.** above, no person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a named insured in the Declarations.

L.  **KNOWLEDGE AND NOTICE OF OCCURRENCE**

Under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 2.  Duties in the Event of Occurrence, Offense, Claim Or Suit**, the following is added:

e.  The requirement in Condition **2.a.** applies only when the "occurrence" or offense is known to:

(1)  You, if you are an individual;

(2)  A partner, if you are a partnership;

(3)  An "executive officer" or insurance manager, if you are a corporation; or

(4)  A manager, if you are a limited liability company.

f.  The requirement in Condition **2. b.** will not be breached unless the breach occurs after such claim or "suit" is known to:

(1)  You, if you are an individual;

(2)  A partner, if you are a partnership;

(3)  An "executive officer" or insurance manager, if you are a corporation; or

(4)  A manager, if you are a limited liability company.

g.  Your rights under this Coverage Part will not be prejudiced if you fail to give us notice of an "occurrence," offense, claim, or "suit" and that failure is solely due to your reasonable belief that the "bodily injury" or "property damage" is not covered under this Coverage Part. However, you shall give written notice of this "occurrence," offense, claim, or "suit" to us as soon as you are aware this insurance may apply to such "occurrence", offense, claim, or "suit".

M.  **UNINTENTIONAL FAILURE TO DISCLOSE HAZARDS**

Under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 6.  Representations,** the following is added:

d.  Your failure to disclose all hazards or prior "occurrences" existing as of the inception date of this policy shall not prejudice the coverage afforded by this policy, provided such failure to disclose all hazards or prior "occurrences" is not intentional.

N.  **LIBERALIZATION**

Under **SECTION I - COVERAGES, SECTION II - WHO IS AN INSURED, SECTION III - LIMITS OF INSURANCE, SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS AND SECTION V - DEFINITIONS**, the following is added:

Liberalization

If we adopt any revision that would broaden the coverage under this endorsement without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this endorsement.

O.  **DEFINITIONS**

Under **SECTION V - DEFINITIONS**, item **3.** is deleted and replaced with the following:

3.  "Bodily injury" means bodily injury, disability, sickness, or disease sustained by a person, including death resulting from any of these at any time.  "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

Under **SECTION V - DEFINITIONS**, item **14.** the following is added to the definition of "Personal and advertising injury":

h.  Discrimination or humiliation that results in injury to the feelings or reputation of a natural person but only if such discrimination or humiliation is:

(1)  not done intentionally by or at the direction of:

(a)  The insured; or

(b)  Any "executive officer," director, stockholder, partner, member or manager (if you are a limited liability company) of the insured; and

CG 71 18  11 12
Page 5 of 6
149
**EXHIBIT 6**

(2) Not directly or indirectly related to the employment, prospective employment, past employment or termination of employment of any person or persons by any insured.

Under **SECTION V - DEFINITIONS, the following definition is added:**

23. "Loss" means unintentional damage or destruction but does not include disappearance, theft, or loss of use.

| POLICY NUMBER:  CWP 3263063 | COMMERCIAL GENERAL LIABILITY |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - CONCESSIONAIRES TRADING UNDER YOUR NAME

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Concessionaire(s): |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the concessionaire(s) shown in the Schedule but only with respect to their liability as a concessionaire trading under your name.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Service Office, Inc., 2012

CG 20 03  04 13

**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                                 **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# ADDITIONAL INSURED - CONTROLLING INTEREST

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Persons Or Organization: |
|---|
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability arising out of:

1. Their financial control of you; or

2. Premises they own, maintain or control while you lease or occupy these premises.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                                    CG 20 05  04 13

152
**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                    **COMMERCIAL GENERAL LIABILITY**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Designation Of Premises (Part Leased To You): |
| --- |
| **Name Of Person(s) Or Organization (Additional Insured):** |
| **Additional Premium:      $** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                    **CG 20 11  04 13**

**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063 **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED -
# STATE OR GOVERNMENTAL AGENCY OR SUBDIVISION
# OR POLITICAL SUBDIVISION - PERMITS OR AUTHORIZATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| |
|---|
| **State Or Governmental Agency Or Subdivision Or Political Subdivision:** |
| **Automatic status when required by written contract, agreement or permit.** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured any state or governmental agency or subdivision or political subdivision shown in the Schedule, subject to the following provisions:

1. This insurance applies only with respect to operations performed by you or on your behalf for which the state or governmental agency or subdivision or political subdivision has issued a permit or authorization.

   However:

   **a.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

   **b.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

2. This insurance does not apply to:

   **a.** "Bodily injury" "property damage" or "personal and advertising injury" arising out of operations performed for the federal government, state or municipality; or

   **b.** "Bodily injury" or "property damage" included within the "products-completed operations hazard".

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

   If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

   whichever is less.

   This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office Inc., 2012                                      CG 20 12  04 13

154
**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                          COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# ADDITIONAL INSURED - VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Products |
|---|---|
| Automatic status when required by written contract, agreement or permit. | Your products related to your operations. |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

A. **Section II - Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) (referred to throughout this endorsement as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business.

However:

1. The insurance afforded to such vendor only applies to the extent permitted by law; and

2. If coverage provided to the vendor is required by a contract or agreement, the insurance afforded to such vendor will not be broader than that which you are required by the contract or agreement to provide for such vendor.

B. With respect to the insurance afforded to these vendors, the following additional exclusions apply:

1. The insurance afforded the vendor does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

   b. Any express warranty unauthorized by you;

   c. Any physical or chemical change in the product made intentionally by the vendor;

   d. Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

   e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

   f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

   g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

   h. "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf.  However, this exclusion does not apply to:

© Insurance Services Office, Inc., 2012

CG 20 15   04 13
Page 1 of 2

155
**EXHIBIT 6**

(1) The exceptions contained in Subparagraphs **d.** or **f.**; or

(2) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

C. With respect to the insurance afforded to these vendors, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the vendor is required by a contract or agreement, the most we will pay on behalf of the vendor is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

POLICY NUMBER:   CWP 3263063                                COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED -
# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

### SCHEDULE

| Name Of Person Or Organization: | Designation Of Premises: |
|---|---|
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                                CG 20 18  04 13

**EXHIBIT 6**

POLICY NUMBER:   CWP 3263063                          **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - OWNERS OR OTHER INTERESTS FROM WHOM LAND HAS BEEN LEASED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s) | Designation Of Premises (Part Leased To You) |
|---|---|
|  |  |
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to you and shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to lease that land;

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                          **CG 20 24** 04 13

**EXHIBIT 6**

POLICY NUMBER:   CWP 3263063                                    **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - CO-OWNER OF INSURED PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s) | Location Of Premises |
|---|---|
|  |  |
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as co-owner of the premises shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                                    **CG 20 27** 04 13

159
**EXHIBIT 6**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - GRANTOR OF FRANCHISE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Persons Or Organization(s): |
|---|
| |
| Information required to complete this Schedule, if not shown above in the Declarations. |

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as grantor of a franchise to you.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

**CG 20 29** 04 13

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury", "personal and advertising injury" or "property damage" arising out of:

1.  Inhaling, ingesting or physical exposure to asbestos or goods or products containing asbestos; or

2.  The use of asbestos in constructing or manufacturing any goods, product or structure; or

3.  The removal, repair, encapsulation, enclosure, abatement or maintenance of asbestos in or from any goods, product or structure; or

4.  The manufacture, sale, distribution, transportation, storage or disposal of asbestos or goods or products containing asbestos.

This insurance does not apply to payment for the investigation or defense of any claim, injury, loss, fine, penalty or lawsuit related to any of the foregoing items 1 thru 4.  Nor do we have a duty to investigate or defend any such claim, injury, loss or lawsuit.

This insurance also does not apply to any loss, cost or expense incurred in complying with any federal, state or local provision of law regarding the inspection, monitoring, or control of asbestos in any goods, products or structures.

**CG 70 17** 12 98

**EXHIBIT 6**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with the procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015  CG 21 70  01 15

162
**EXHIBIT 6**

COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT - AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) from whom you lease equipment when you and such person(s) or organization(s) have agreed in writing in a contract or agreement that such person(s) or organization(s) be added as an additional insured on your policy.  Such person(s) or organization(s) is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However, the insurance afforded to such additional insured:

1. Only applies to the extent permitted by law; and

2. Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends

when their contract or agreement with you for such leased equipment ends.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement you have entered into with the additional insured; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

CG 20 34  04 13

163

**EXHIBIT 6**

# AUTO COVERAGE

AUTO COVERAGE

**EXHIBIT 6**

**EXHIBIT 6**

**31**

# WESTFIELD
## INSURANCE
Sharing Knowledge. Building Trust.®

**NEW**
**BUSINESS AUTO COVERAGE DECLARATIONS**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |

| ITEM ONE-NAMED INSURED & MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |

| QUEST PHARMACEUTICALS INC. | ASSURED NEACE LUKENS INS AGCY |
| PO BOX 270 | 2416 SIR BARTON WAY STE 300 |
| MURRAY KY  42071 | LEXINGTON KY 40509-3001 |
|  | TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063        ³11³   WIC Account Number: 1600961480   ³  A |

| Policy   From   10/26/15 | at 12:01 A.M. Standard Time at your |
| Period   To     10/26/16 | mailing address shown above. |

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
| ITEM TWO | SCHEDULE OF COVERAGES AND COVERED AUTOS |

Each Of These Coverages Will Apply Only To Those "Autos" Shown As Covered
"Autos"."Autos" Are Shown As Covered "Autos" For A Particular Coverage By The
Entry Of One Or More Of The Symbols From The Covered Auto Section of The
Business Auto Coverage Form Next To The Name Of The Coverage.

xxxxxxxxxxxxxxxxxxxxxxõxxxxxxxõxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxõxxxxxxxxxxxxx

|  | ³COVERED ³ | LIMIT | ³ |
| COVERAGES | ³ AUTO  ³ | THE MOST WE WILL PAY FOR ANY | ³ PREMIUM |
|  | ³SYMBOLS ³ | ONE ACCIDENT OR LOSS | ³ |

xxxxxxxxxxxxxxxxxxxxxxx±xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxõxxxxxxxxxxxx

| Liability | ³08 09 | ³Bodily Injury |  | ³ | $71 |
|  | ³ | ³  and | $1,000,000 Each Accident³ |  |  |
|  | ³ | ³Property Damage |  | ³ |  |

xxxxxxxxxxxxxxxxxõxxxxxxxõxxxxxxxxxõxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx±xxxxxxxxxxxx

|  | ³  TOTAL ADVANCE ANNUAL PREMIUM | ³ | $71 |

¿xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxõxxxxxxxxxxxx

|  | Đ××⁻ | Đ××⁻ | Đ××⁻ | Đ××⁻ |
| Audit Period (If Applies) | ³  ³ Annual | ³  ³ Semi-Annual | ³  ³ Quarterly | ³  ³ Monthly |
|  | ¿××\| | ¿××\| | ¿××\| | ¿××\| |

Forms And Endorsements Attached To This Coverage Form:
CADS03  0310*, CA0001  0310*, IL0021  0908*, CA0125  1202*, CA7080  0312*.

**EXHIBIT 6**

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**NEW**
**BUSINESS AUTO COVERAGE DECLARATIONS**
(Continued)

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
COMPANY PROVIDING COVERAGE        WESTFIELD NATIONAL INSURANCE COMPANY

| ITEM ONE–NAMED INSURED & MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.        ASSURED NEACE LUKENS INS AGCY
PO BOX 270                        2416 SIR BARTON WAY STE 300
MURRAY KY  42071                  LEXINGTON KY 40509-3001
                                  TELEPHONE 859-543-1716

Policy Number: CWP 3 263 063      ³11³  WIC Account Number: 1600961480    ³  A

Policy    From    10/26/15        at 12:01 A.M. Standard Time at your
Period    To      10/26/16        mailing address shown above.
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
HIRED AUTO LIABILITY

STATE        ESTIMATED ANNUAL COST OF HIRE                        PREMIUM

KY                          IF ANY

Cost Of Hire Means The Total Amount You Incur For The Hire Of Autos You Do Not
Own (Not Including Autos You Borrow Or Rent From Your Partners Or Employees Or
Their Family Members).  Cost Of Hire Does Not Include Charges For Services
Performed By Motor Carriers Of Property Or Passengers.

NON-OWNERSHIP LIABILITY

STATE     RATING BASIS–NUMBER OF EMPLOYEES     ESTIMATED NUMBER     PREMIUM
                                                 OF EMPLOYEES
KY                                                    1              $71

³Dxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx⁻
³                                                 ³
³TOTAL ADVANCE ANNUAL AUTO PREMIUM      $71 ³
¿xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx|

**EXHIBIT 6**

# BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos." The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description Of Covered Auto Designation Symbols**

| Symbol | Description Of Covered Auto Designation Symbols | |
|--------|------|------|
| 1 | Any "Auto" | |
| 2 | Owned "Autos" Only | Only those "autos" you own (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" you acquire ownership of after the policy begins. |
| 3 | Owned Private Passenger "Autos" Only | Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the policy begins. |
| 4 | Owned "Autos" Other Than Private Passenger "Autos" Only | Only those "autos" you own that are not of the private passenger type (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins. |
| 5 | Owned "Autos" Subject to No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are required to have no-fault benefits in the state where they are licensed or principally garaged. |
| 6 | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| 7 | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| 8 | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households. |
| 9 | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs. |
| 19 | Mobile Equipment Subject To Compulsory Or Financial Responsibility Or Other Motor Vehicle Insurance Law Only | Only those "autos" that are land vehicles and that would qualify under the definition of "mobile equipment" under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged. |

**B. Owned Autos You Acquire After The Policy Begins**

1. If Symbols **1, 2, 3, 4, 5, 6** or **19** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol **7** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

   a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

   b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos**

If Liability Coverage is provided by this coverage form, the following types of vehicles are also covered "autos" for Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto".

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

   a. Breakdown;

   b. Repair;

   c. Servicing;

   d. "Loss"; or

   e. Destruction.

**SECTION II - LIABILITY COVERAGE**

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

1. **Who Is An Insured**

   The following are "insureds":

   a. You for any covered "auto".

   b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

      (1) The owner or anyone else from whom you hire or borrow a covered "auto". This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

      (2) Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

      (3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

      (4) Anyone other than your "employees", partner (if you are a partnership), members (if you are a limited liability company) or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

      (5) A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

   c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

2. **Coverage Extensions**

   a. **Supplementary Payments**

We will pay for the "insured":

(1) All expenses we incur.

(2) Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

(4) All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

(5) All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend, but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

   b. **Out-of-state Coverage Extensions**

While a covered "auto" is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limits specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

**B. Exclusions**

This insurance does not apply to any of the following:

1. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured."

2. **Contractual**

Liability assumed under any contract or agreement.

But this exclusion does not apply to liability for damages:

   a. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

   b. That the "insured" would have in the absence of the contract or agreement.

3. **Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

4. **Employee Indemnification And Employer's Liability**

"Bodily injury" to:

   a. An "employee" of the "insured" arising out of and in the course of:

     (1) Employment by the "insured"; or

     (2) Performing the duties related to the conduct of the "insured's" business; or

   b. The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

   (1) Whether the "insured" may be liable as an employer or in any other capacity; and

   (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract." For the purposes of the coverage form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

5. **Fellow Employee**

"Bodily injury" to:

   **a.** Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

   **b.** The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **a.** above.

6. **Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

7. **Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

   **a.** Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

   **b.** After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

8. **Movement Of Property By Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

9. **Operations**

"Bodily injury" or "property damage" arising out of the operation of:

   **a.** Any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment"; or

   **b.** Machinery or equipment that is on, attached to or part of a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or

financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

10. **Completed Operations**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

   **a.** Work or operations performed by you or on your behalf; and

   **b.** Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraphs **a.** or **b.** above.

Your work will be deemed completed at the earliest of the following times:

   **(1)** When all of the work called for in your contract has been completed.

   **(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

   **(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

11. **Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

   **a.** That are, or that are contained in any property that is:

   **(1)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

   **(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

   **(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or ex-

pected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined resulting from any one "accident" is the Limit Of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury", and "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

**SECTION III - PHYSICAL DAMAGE COVERAGE**

**A. Coverage**

**1.** We will pay for "loss" to a covered "auto" or its equipment under:

**a. Comprehensive Coverage**

From any cause except:

**(1)** The covered "auto's" collision with another object; or

**(2)** The covered "auto's" overturn.

**b. Specified Causes Of Loss Coverage**

Caused by:

**(1)** Fire, lightning or explosion;

**(2)** Theft;

**(3)** Windstorm, hail or earthquake;

**(4)** Flood;

**(5)** Mischief or vandalism; or

**(6)** The sinking, burning, collision or derailment of any conveyance transporting the covered "auto."

**EXHIBIT 6**

    **c.** **Collision Coverage**

      Caused by:

      **(1)** The covered "auto's" collision with another object; or

      **(2)** The covered "auto's" overturn.

**2.** **Towing**

  We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

**3.** **Glass Breakage - Hitting A Bird Or Animal - Falling Objects Or Missiles**

  If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

  **a.** Glass breakage;

  **b.** "Loss" caused by hitting a bird or animal; and

  **c.** "Loss" caused by falling objects or missiles.

  However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

**4.** **Coverage Extension**

  **a.** **Transportation Expenses**

    We will pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the private passenger type. We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes Of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

  **b.** **Loss of Use Expenses**

    For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

    **(1)** Other than collision only if the Declarations indicate that Comprehensive Coverage is provided for any covered "auto";

    **(2)** Specified Causes Of Loss only if the Declarations indicate that Specified Causes of Loss Coverage is provided for any covered "auto"; or

    **(3)** Collision only if the Declarations indicate that Collision Coverage is provided for any covered "auto".

    However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

**B.** **Exclusions**

**1.** We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

  **a.** **Nuclear Hazard**

    **(1)** The explosion of any weapon employing atomic fission or fusion; or

    **(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

  **b.** **War Or Military Action**

    **(1)** War, including undeclared or civil war;

    **(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    **(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for "loss" to any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

**3.** We will not pay for "loss" due and confined to:

  **a.** Wear and tear, freezing, mechanical or electrical breakdown.

  **b.** Blowouts, punctures or other road damage to tires.

This exclusion does not apply to such "loss" resulting from the total theft of a covered "auto".

4. We will not pay for "loss" to any of the following:

   a. Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

   b. Any device designed or used to detect speed-measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed-measurement equipment.

   c. Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

   d. Any accessories used with the electronic equipment described in Paragraph **c.** above.

5. Exclusions **4.c.** and **4.d.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:

   a. Permanently installed in or upon the covered "auto";

   b. Removable from a housing unit which is permanently installed in or upon the covered "auto";

   c. An integral part of the same unit housing any electronic equipment described in Paragraphs **a.** and **b.** above; or

   d. Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system.

6. We will not pay for "loss" to a covered "auto" due to "diminution in value".

C. **Limit Of Insurance**

1. The most we will pay for "loss" in any one "accident" is the lesser of:

   a. The actual cash value of the damaged or stolen property as of the time of the "loss"; or

   b. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

2. $1,000 is the most we will pay for "loss" in any one "accident" to all electronic equipment that reproduces, receives or transmits audio, visual or data signals which, at the time of "loss", is:

   a. Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

   b. Removable from a permanently installed housing unit as described in Paragraph **2.a.** above or is an integral part of that equipment; or

   c. An integral part of such equipment.

3. An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

4. If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

D. **Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

## SECTION IV - BUSINESS AUTO CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

A. **Loss Conditions**

1. **Appraisal For Physical Damage Loss**

   If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   If we submit to an appraisal, we will still retain our right to deny the claim.

2. **Duties In The Event Of Accident, Claim, Suit Or Loss**

   We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

    **(1)** How, when and where the "accident" or "loss" occurred;

    **(2)** The "insured's" name and address; and

    **(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

    **(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

    **(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

    **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

    **(4)** Authorize us to obtain medical records or other pertinent information.

    **(5)** Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is "loss" to a covered "auto" or its equipment you must also do the following:

    **(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

    **(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

    **(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

    **(4)** Agree to examinations under oath at our request and give us a signed statement of your answers.

**3.** **Legal Action Against Us**

No one may bring a legal action against us under this coverage form until:

**a.** There has been full compliance with all the terms of this coverage form; and

**b.** Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4.** **Loss Payment - Physical Damage Coverages**

At our option we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property, at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5.** **Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this coverage form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B.** **General Conditions**

**1.** **Bankruptcy**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligations under this coverage form.

**2.** **Concealment, Misrepresentation Or Fraud**

This coverage form is void in any case of fraud by you at any time as it relates to this coverage form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This coverage form;

**b.** The covered "auto";

**c.** Your interest in the covered "auto"; or

    **d.** A claim under this coverage form.

**3. Liberalization**

If we revise this coverage form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit To Bailee - Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this coverage form.

**5. Other Insurance**

    **a.** For any covered "auto" you own, this coverage form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this coverage form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this coverage form provides for the "trailer" is:

        **(1)** Excess while it is connected to a motor vehicle you do not own.

        **(2)** Primary while it is connected to a covered "auto" you own.

    **b.** For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

    **c.** Regardless of the provisions of Paragraph **a.** above, this coverage form's Liability Coverage is primary for any liability assumed under an "insured contract."

    **d.** When this coverage form and any other coverage form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our coverage form bears to the total of the limits of all the coverage forms and policies covering on the same basis.

**6. Premium Audit**

    **a.** The estimated premium for this coverage form is based on the exposures you told us you would have when this policy began. We will compute the final premium due

when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

    **b.** If this policy is issued for more than one year, the premium for this coverage form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

Under this coverage form, we cover "accidents" and "losses" occurring:

    **a.** During the policy period shown in the Declarations; and

    **b.** Within the coverage territory.

The coverage territory is:

    **(1)** The United States of America;

    **(2)** The territories and possessions of the United States of America;

    **(3)** Puerto Rico; and

    **(4)** Canada; and

    **(5)** Anywhere in the world, if:

        **(a)** A covered "auto" of the private passenger type is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and

        **(b)** The "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico or Canada or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. Two Or More Coverage Forms Or Policies Issued By Us**

If this coverage form and any other coverage form or policy issued to you by us or any company affiliated with us applies to the same "accident," the aggregate maximum Limit of Insurance under all the coverage forms or policies shall not exceed the highest applicable Limit of

Insurance under any one coverage form or policy. This condition does not apply to any coverage form or policy issued by us or an affiliated company specifically to apply as excess insurance over this coverage form.

## SECTION V - DEFINITIONS

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means:

   **1.** A land motor vehicle, "trailer" or semi-trailer designed for travel on public roads; or

   **2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

   **1.** Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

   **2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

   **a.** That are, or that are contained in any property that is:

      **(1)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

      **(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

      **(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

   **b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

   **c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

   **(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

   **(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** or **6.c.** of the definition of "mobile equipment",

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

   **(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto;" and

   **(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract" means:

1. A lease of premises;

2. A sidetrack agreement;

3. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

5. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

6. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

   An "insured contract" does not include that part of any contract or agreement:

   **a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   **b.** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

   **c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

**K.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **a.** Power cranes, shovels, loaders, diggers or drills; or

   **b.** Road construction or resurfacing equipment such as graders, scrapers or rollers;

5. Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

   **b.** Cherry pickers and similar devices used to raise or lower workers; or

6. Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   **a.** Equipment designed primarily for:

   **(1)** Snow removal;

   **(2)** Road maintenance, but not construction or resurfacing; or

   **(3)** Street cleaning;

   **b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well-servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

L. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

M. "Property damage" means damage to or loss of use of tangible property.

N. "Suit" means a civil proceeding in which:

1. Damages because of "bodily injury" or "property damage"; or

2. A "covered pollution cost or expense"

to which this insurance applies, are alleged.

"Suit" includes:

a. An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the insured submits with our consent.

O. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

P. "Trailer" includes semitrailer.

INTERLINE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO MOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage:"

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured;" or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material," "special nuclear material" or "by-product material."

© ISO Properties, Inc., 2007

**EXHIBIT 6**

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

**(a)** Any "nuclear reactor;"

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or

utilizing "spent fuel," or **(3)** handling, processing or packaging "waste;"

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;"

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

**EXHIBIT 6**

COMMERCIAL AUTO

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# KENTUCKY CHANGES

For a covered "auto" licensed or principally garaged in, or "garage operations" conducted in Kentucky, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Changes In Covered Autos**

The following is added to Paragraph **C.** Certain Trailers, Mobile Equipment And Temporary Substitute Autos of Section **I** - Covered Autos:

If Collision Coverage is provided by the Coverage Form, any "auto" you do not own which is loaned to you as a temporary substitute for a covered "auto" you own that is out of use because of its breakdown, repair or servicing by a person, firm or corporation engaged in the business of selling, repairing and servicing "autos" is a covered "auto" for Collision Coverage.

**B. Changes In Liability Coverage**

The following Liability Coverage Exclusions of the Business Auto, Garage, Motor Carrier and Truckers Coverage Forms apply only to the extent that the limits of liability for such coverage exceed the limits of liability required by the Kentucky Motor Vehicle Reparations Act:

**a.** Expected or Intended Injury;

**b.** Care, Custody or Control;

**c.** Pollution; and

**d.** Pollution Exclusion Applicable To "Garage Operations" - Covered "Autos".

**C. Changes In Physical Damage Coverage**

No deductible applies under Comprehensive Coverage to "loss" to:

**a.** Glass used in the windshield, doors and windows; and

**b.** Glass, plastic or any other material used in lights required on an automobile by Chapter 189 of Kentucky Revised Statutes.

All other Physical Damage Coverage Provisions apply.

**D. Changes In Conditions**

**a.** For a temporary substitute for an "auto" you own which is out of use because of its breakdown, repair or servicing, if the substitute "auto" is operated by an "insured" and is loaned to you, with or without consideration, by a person engaged in the business of selling, repairing and servicing "autos", Liability and Collision Coverage provided by this form shall be primary in the event of an "accident" caused by the negligence of the "insured".

**b.** If you are engaged in the business of selling, repairing and servicing "autos", then for any "auto" you own, which is loaned to a customer, with or without consideration, as a temporary substitute for an "auto" owned by the customer which is out of use because of its breakdown, repair or servicing, Liability and Collision Coverage provided by this form shall be excess in the event of an "accident" caused by the negligence of the customer.

Copyright, Insurance Services Office, Inc., 2000

COMMERCIAL AUTO

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WHO IS AN INSURED AMENDMENT

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

Under **SECTION II - LIABILITY COVERAGE** Item **A.  Coverage**, paragraph **1.b.(1)** is deleted and replaced with the following:

**(1)**   The owner, any "employee" or agent of the owner, or anyone else from whom you hire or borrow a covered "auto".  This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

CA 70 80  03 12

183
**EXHIBIT 6**

INLAND MARINE COVERAGE

INLAND MARINE COVERAGE

INLAND MARINE COVERAGE

**EXHIBIT 6**

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL INLAND MARINE**
**NEW DECLARATIONS**
**SCHEDULE OF COVERAGE FORMS**

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSURED NEACE LUKENS INS AGCY
2416 SIR BARTON WAY STE 300
LEXINGTON KY 40509-3001
TELEPHONE 859-543-1716

Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A

| Policy | From | 10/26/15 | at 12:01 A.M. Standard Time at your |
| Period | To | 10/26/16 | mailing address shown above. |

This policy contains the following Inland Marine Coverage Forms:

| Coverage Forms | Premium |
|---|---|
| Accounts Receivable | Included |
| Fine Arts Floater Coverage | Included |
| Valuable Papers and Records | Included |

Total Advance Annual Inland Marine Premium     Included

All Forms and Endorsements applicable to Inland Marine Coverages:
CM0001   0904*, CM7090   0300*, CM7001   1110*, CM0066   0113*, IM7400   0811*,
IM7405   0811*, IM7406   0811*, IM7417   0811*, IM7423   0513*, CM7000   0292*,
CM0067   0113*.

**EXHIBIT 6**

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. Abandonment

There can be no abandonment of any property to us.

### B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. Duties In The Event Of Loss

You must see that the following are done in the event of loss or damage to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the loss or damage. Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the loss or damage occurred.

4. Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

5. You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

6. As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

    Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7. We may examine any insured under oath, while not in presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

8. Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

10. Cooperate with us in the investigation or settlement of the claim.

### D. Insurance Under Two Or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### E. Loss Payment

1. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

2. We will not pay you more than your financial interest in the Covered Property.

**3.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**4.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**5.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:

**a.** We have reached agreement with you on the amount of the loss; or

**b.** An appraisal award has been made.

**6.** We will not be liable for any part of a loss that has been paid or made good by others.

**F. Other Insurance**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**G. Pair, Sets Or Parts**

**1.** Pair or Set

In case of loss or damage to any part of a pair or set we may:

**a.** Repair or replace any part to restore the pair or set to its value before the loss or damage; or

**b.** Pay the difference between the value of the pair or set before and after the loss or damage.

**2.** Parts

In case of loss or damage to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

**H. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**I. Reinstatement Of Limit After Loss**

The Limit of Insurance will not be reduced by the payment of any claim, except for total loss or damage of a scheduled item, in which event we will refund the unearned premium on that item.

**J. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property.

**2.** After a loss to your Covered Property only if, at the time of loss, that party is one of the following:

**a.** Someone insured by this insurance; or

**b.** A business firm:

**(1)** Owned or controlled by you; or

**(2)** That owns or controls you.

This will not restrict your insurance.

**GENERAL CONDITIONS**

**A. Concealment, Misrepresentation Or Fraud**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B.  Control Of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C.  Legal Action Against Us**

No one may bring a legal action against us under this Coverage Part unless:

**1.**  There has been full compliance with all the terms of this Coverage Part; and

**2.**  The action is brought within 2 years after you first have knowledge of the direct loss or damage.

**D.  No Benefit To Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**E.  Policy Period, Coverage Territory**

We cover loss or damage commencing:

**1.**  During the policy period shown in the Declarations; and

**2.**  Within the coverage territory.

**F.  Valuation**

The value of property will be the least of the following amounts:

**1.**  The actual cash value of that property;

**2.**  The cost of reasonably restoring that property to its condition immediately before loss or damage; or

**3.**  The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

EXHIBIT 6

```
                WESTFIELD                    COMMERCIAL INLAND MARINE          31
                INSURANCE                          NEW DECLARATIONS
          Sharing Knowledge. Building Trust.™     ACCOUNTS RECEIVABLE COVERAGE
```

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |
|---|---|

| Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A |
|---|

```
   Policy     From   10/26/15      at 12:01 A.M. Standard Time at your
   Period     To     10/26/16      mailing address shown above.
```

DESCRIPTION OF PREMISES
Loc Bldg  Street Address, City & State                      Occupancy




*Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for
Coverages and Limits of Insurance.*

COVERED PROPERTY AND LIMITS OF INSURANCE
A. Coverage Applicable At Your Premises
Loc Bldg Item                                        Limits of Insurance




B. Coverage Applicable Away From Your Premises




* 80 % COINSURANCE APPLIES. REFER TO COVERAGE FORM.

DESCRIPTION OF RECEPTACLES
Loc Bldg Item  Class  Label    Issuer    Manufacturer




```
                     Total Advance Annual
                     Accounts Receivable Premium          Included
```

Forms and Endorsements applicable to this coverage:

COMMERCIAL INLAND MARINE

# ACCOUNTS RECEIVABLE COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **E** - Definitions.

**A. Coverage**

   1. We will pay:

      a. All amounts due from your customers that you are unable to collect;

      b. Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

      c. Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

      d. Other reasonable expenses that you incur to reestablish your records of accounts receivable;

      that result from Covered Causes of Loss to your records of accounts receivable.

   2. **Property Not Covered**

      Coverage does not apply to:

      a. Records of accounts receivable in storage away from the "premises" shown in the Declarations; or

      b. Contraband, or property in the course of illegal transportation or trade.

   3. **Covered Causes Of Loss**

      Covered Causes of Loss means direct physical loss or damage to your records of accounts receivable except those causes of loss listed in the Exclusions.

   4. **Additional Coverage - Collapse**

      The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in Paragraphs **a.** through **c.**

      a. For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

      b. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

      (1) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

      (2) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

      (3) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation;

      (4) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (a) A cause of loss listed in Paragraph **(1)** or **(2)**;

      (b) One or more of the following causes of loss: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; all only as insured against in this Coverage Form;

(c) Weight of people or personal property; or

(d) Weight of rain that collects on a roof;

c. This Additional Coverage - Collapse will not increase the Limits of Insurance provided in this Coverage Form.

5. **Coverage Extension**

**REMOVAL**

If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of loss or damage, we will pay for loss or damage while they are:

a. At a safe place away from your "premises"; or

b. Being taken to and returned from that place.

This Coverage Extension is included within the Limit of Insurance applicable to the "premises" from which the records of accounts receivable are removed.

**B.  Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    a. **Governmental Action**

    Seizure or destruction of property by order of governmental authority.

    But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

    b. **Nuclear Hazard**

    Nuclear reaction or radiation, or radioactive contamination, however caused.

    But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

    c. **War And Military Action**

    (1) War, including undeclared or civil war;

    (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for a loss or damage caused by or resulting from any of the following:

    a. Delay, loss of use, loss of market or any other consequential loss.

    b. Dishonest or criminal act (including theft) committed by:

    (1) You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

    (2) A manager or a member if you are a limited liability company; or

    (3) Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

    whether acting alone or in collusion with each other or with any other party.

    This exclusion applies whether or not an act occurs during your normal hours of operation.

    This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

    c. Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property.

    This exclusion applies only to the extent of the wrongful giving, taking or withholding.

d. Bookkeeping, accounting or billing errors or omissions.

e. Electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

   (1) Programming errors or faulty machine instructions;

   (2) Faulty installation or maintenance of data processing equipment or component parts;

   (3) An occurrence that took place more than 100 feet from your "premises"; or

   (4) Interruption of electrical power supply, power surge, blackout or brownout if the cause of such occurrence took place more than 100 feet from your "premises".

   But we will pay for direct loss or damage caused by lightning.

f. Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

g. Unauthorized instructions to transfer property to any person or to any place.

h. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

i. Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

   This exclusion applies whether or not an act occurs during your normal hours of operation.

3. We will not pay for loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

4. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

   a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

   b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

   c. Faulty, inadequate or defective:

      (1) Planning, zoning, development, surveying, siting;

      (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) Materials used in repair, construction, renovation or remodeling; or

      (4) Maintenance;

      of part or all of any property wherever located.

   d. Collapse, including any of the following conditions of property or any part of the property:

      (1) An abrupt falling down or caving in;

      (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

      (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinking or expansion as such condition relates to Paragraph **(1)** or **(2)**.

      This Exclusion **d.** does not apply to the extent that coverage is provided under the Additional Coverage - Collapse or to collapse caused by one or more of the following: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; weight of people or personal property; weight of rain that collects on a roof.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

**D.   Additional Conditions**

**1.   Determination Of Receivables**

General Condition **F.   Valuation** in the Commercial Inland Marine Conditions is replaced by the following:

**a.**   If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage, the following method will be used:

**(1)**   Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

**(2)**   Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

**b.**   The following will be deducted from the total amount of accounts receivable, however that amount is established:

**(1)**   The amount of the accounts for which there is no loss or damage;

**(2)**   The amount of the accounts that you are able to reestablish or collect;

**(3)**   An amount to allow for probable bad debts that you are normally unable to collect; and

**(4)**   All unearned interest and service charges.

**2.   Recoveries**

The following is added to Loss Condition **H. Recovered Property** in the Commercial Inland Marine Conditions:

You will pay us the amount of all recoveries you receive for a loss or damage paid by us. But any recoveries in excess of the amount we have paid belong to you.

**3.**   The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a.   Coverage Territory**

We cover records of accounts receivable:

**(1)**   Within your "premises"; and

**(2)**   Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

**(a)**   The United States of America (including its territories and possessions);

**(b)**   Puerto Rico; and

**(c)**   Canada.

**b.   Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

We will not pay the full amount of any loss if the value of all accounts receivable, except those in transit, at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for Coverage Applicable at All Locations.

Instead, we will determine the most we will pay using the following steps:

**(1)**   Multiply the value of all accounts receivable, except those in transit, at the time of loss by the Coinsurance percentage;

**(2)**   Divide the Limit of Insurance for Coverage Applicable At All Locations by the figure determined in Step **(1)**; and

**(3)**   Multiply the total amount of loss by the figure determined in Step **(2)**.

We will pay the amount determined in Step **(3)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

This condition will not apply to records of accounts receivable in transit, interest charges, excess collection expenses or expenses to reestablish your records of accounts receivable.

**c.   Protection Of Records**

Whenever you are not open for business, and except while you are actually using the records, you must keep all records of accounts receivable in receptacles that are described in the Declarations.

**E.   Definitions**

"Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

---

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL INLAND MARINE**
**NEW DECLARATIONS**
**VALUABLE PAPERS AND RECORDS COVERAGE**

**31**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSURED NEACE LUKENS INS AGCY
2416 SIR BARTON WAY STE 300
LEXINGTON KY 40509-3001
TELEPHONE 859-543-1716

Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480   ³  A

| Policy | From | 10/26/15 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| Period | To | 10/26/16 | mailing address shown above. |

COVERED PROPERTY AND LIMITS OF INSURANCE
Specifically Described Property
Loc Bldg Item   Description                              Limit of Insurance

*Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for
Coverages and Limits of Insurance.*

All Other Covered Property
Loc Bldg Item                                           Limit of Insurance

Property Away From Your Premises                         Limit of Insurance
Item

DESCRIPTION OF RECEPTACLES
Loc Bldg Item Class Label        Issuer      Manufacturer

Total Advance Annual
Valuable Papers and Records Premium            Included

Forms and Endorsements applicable to this coverage:
CM7000   0292*, CM0067   0113*.

194
**EXHIBIT 6**

COMMERCIAL INLAND MARINE

# VALUABLE PAPERS AND RECORDS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F** - Definitions.

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss.

1. Covered Property, as used in this Coverage Form, means "valuable papers and records" that are your property or property of others in your care, custody or control.

2. **Property Not Covered**

   Covered Property does not include:

   a. Property not specifically declared and described in the Declarations if such property cannot be replaced with other property of like kind and quality;

   b. Property held as samples or for delivery after sale;

   c. Property in storage away from the "premises" shown in the Declarations; or

   d. Contraband, or property in the course of illegal transportation or trade.

3. **Covered Causes Of Loss**

   Covered Causes of Loss means direct physical loss or damage to Covered Property except those causes of loss listed in the Exclusions.

4. **Additional Coverage - Collapse**

   The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in Paragraphs **a.** through **c.**

   a. For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

b. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   (1) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   (2) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   (3) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation;

   (4) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (a) A cause of loss listed in Paragraph **(1)** or **(2)**;

      (b) One or more of the following causes of loss: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; all only as insured against in this Coverage Form;

      (c) Weight of people or personal property; or

      (d) Weight of rain that collects on a roof;

c. This Additional Coverage - Collapse will not increase the Limits of Insurance provided in this Coverage Form.

© Insurance Services Office, Inc., 2011

CM 00 67 01 13

**EXHIBIT 6**

5. **Coverage Extensions**

a. **Removal**

If you give us written notice within 10 days of removal of your "valuable papers and records" because of imminent danger of loss or damage, we will pay for loss or damage while it is:

(1) At a safe place away from your "premises"; or

(2) Being taken to and returned from that place.

This Coverage Extension is included within the Limits of Insurance applicable to the "premises" from which the Covered Property is removed.

b. **Away From Your Premises**

We will pay up to $5,000 for loss or damage to Covered Property while it is away from your "premises".

But if a higher Limit Of Insurance is specified in the Declarations, the higher limit will apply.

The limit for this Coverage Extension is additional insurance.

B. **Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

a. **Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

b. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

c. **War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Delay, loss of use, loss of market or any other consequential loss.

b. Dishonest or criminal act (including theft) committed by:

(1) You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

(2) A manager or a member if you are a limited liability company; or

(3) Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

whether acting alone or in collusion with each other or with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

c. Errors or omissions in processing or copying.

But if errors or omissions in processing or copying result in fire or explosion, we will pay for the direct loss or damage caused by that fire or explosion if fire or explosion would be covered under this Coverage Form.

**d.** Electrical or magnetic injury, disturbance or erasure of electronic recordings.

But we will pay for direct loss or damage caused by lightning.

**e.** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**f.** Unauthorized instructions to transfer property to any person or to any place.

**g.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**h.** Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

**3.** We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property wherever located.

**d.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinking or expansion as such condition relates to Paragraph **(1)** or **(2)**.

This Exclusion **d.** does not apply to the extent that coverage is provided under the Additional Coverage - Collapse or to collapse caused by one or more of the following: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; weight of people or personal property; weight of rain that collects on a roof.

**e.** Wear and tear, any quality in the property that causes it to damage or destroy itself, gradual deterioration; insects, vermin or rodents.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

**D. Deductible**

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the Deductible, up to the applicable Limit of Insurance.

**E. Additional Conditions**

**1. Valuation - Specifically Declared Items**

The following is added to General Condition **F. Valuation** in the Commercial Inland Marine Conditions:

The value of each item of property that is specifically declared and described in the Declarations is the applicable Limit Of Insurance shown in the Declarations for that item.

**2. Recoveries**

The following is added to Loss Condition **H. Recovered Property** in the Commercial Inland Marine Conditions:

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. If so, your loss or damage will be readjusted based on the amount you received for the property recovered, with allowance for recovery expenses incurred.

3. The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

a. **Coverage Territory**

We cover property:

(1) Within your "premises"; and

(2) Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

(a) The United States of America (including its territories and possessions);

(b) Puerto Rico; and

(c) Canada.

b. **Protection Of Records**

Whenever you are not open for business, and except while you are actually using the property, you must keep all "valuable papers and records" in receptacles that are described in the Declarations.

F. **Definitions**

1. "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" or "securities", converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

2. "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

3. "Money" means:

a. Currency, coins and bank notes whether or not in current use; and

b. Travelers checks, register checks and money orders held for sale to the public.

4. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

a. Tokens, tickets, revenue and other stamps whether or not in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not of your own issue;

but does not include "money".

EXHIBIT 6

POLICY NUMBER: CWP 3263063

POLICY PERIOD: FROM 10/26/2015 TO 10/26/2016

# SCHEDULE OF COVERAGES
# FINE ARTS FLOATER

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

**COVERED PREMISES**

Refer to attached Fine Arts Schedule

**COVERED FINE ARTS**

Refer to attached Fine Arts Schedule

**CATASTROPHE LIMIT** Refer To Commercial Property Expanded and/or
Signature Series Schedule

**DEDUCTIBLE AMOUNT** Refer To Commercial Property Expanded and/or
Signature Series Schedule

| COVERAGE EXTENSIONS | | "Limit" |
|---|---|---|
| Emergency Removal | | 30 days |
| Emergency Removal Expenses | 30 days | $    1,000 |

| SUPPLEMENTAL COVERAGES | | "Limit" |
|---|---|---|
| Newly Acquired Art | | 25% of |
| | | catastrophe limit |
| Off-Premises Coverage | | $   25,000 |
| Property Used To Display Or Protect Art | | $    5,000 |
| Transit Coverage | | $   25,000 |

**ADDITIONAL INFORMATION**

IM7400    0811*, IM7405    0811*, IM7406    0811*, IM7417    0811*, IM7423    0513*.

××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××
Copyright, American Association of Insurance Services, Inc., 2011

199
**EXHIBIT 6**

PAGE   01 OF   01    IM 74 06 (08-11)

POLICY NUMBER: CWP 3263063

POLICY PERIOD: FROM 10/26/2015 TO 10/26/2016

# FINE ARTS SCHEDULE
# FINE ARTS FLOATER

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

Refer To Commercial Property Expanded and/or Signature Series Schedule(s) For

Coverages And Limits Of Insurance

Prem. No.                          Described Premises

SCHEDULED FINE ARTS

Item No.                    Description                          "Limit"

×××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××××
Copyright, American Association of Insurance Services, Inc., 2011

200
**EXHIBIT 6**

# FINE ARTS COVERAGE
## FINE ARTS FLOATER

In this coverage form, the words "you" and "your" mean the persons or organizations named as the insured on the declarations and the words "we", "us", and "our" mean the company providing this coverage.

Refer to the Definitions section at the end of this coverage form for additional words and phrases that have special meaning. These words and phrases are shown in quotation marks.

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Fine Arts Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment; cancellation; change, modification, or waiver of policy terms; inspections; and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

## PROPERTY COVERED

"We" cover the following property unless the property is excluded or subject to limitations.

**Fine Arts**

1. **Coverage** - "We" cover direct physical loss or damage caused by a covered peril to:

    a. "your" "fine arts";

    b. "fine arts" of others in "your" care, custody, and control; and

    c. "your" interest in jointly owned "fine arts".

    "We" only cover jointly owned "fine arts" to the extent of "your" interest at the time of loss or damage.

2. **Coverage Limitations**

    a. "We" only cover "fine arts":

        (1) that are described on the Fine Arts Schedule; and

        (2) while at a premises that is described on the Fine Arts Schedule.

    b. "We" only cover a described "fine art" item while the item is at the premises that is described on the same schedule as the item.

3. **We Do Not Cover** - "We" do not cover the loss of any "fine arts" due to a dispute of owner-

ship by a party claiming rightful ownership of the "fine arts". This includes a defect in title, whether or not the title has been perfected or secured.

## PROPERTY NOT COVERED

1. **Coins, Currency, And Stamps** - "We" do not cover numismatic or philatelic objects or collections including, but not limited to, coins, bills, currency, notes, and stamps.

2. **Contraband** - "We" do not cover contraband or property in the course of illegal transportation or trade.

3. **Jewelry, Stones, And Metals** - "We" do not cover jewelry, precious or semi-precious stones, gold, silver, platinum, or other precious metals or alloys.

    However, this exclusion does not apply to "antique" jewelry.

## COVERAGE EXTENSIONS

**Provisions That Apply To Coverage Extensions** - The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage, including a Coverage Extension, Supplemental Coverage, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following Coverage Extensions are not subject to and not considered in applying coinsurance conditions.

1. **Emergency Removal**

    a. **Coverage** - "We" cover direct physical loss or damage to covered property while it is being moved or being stored to prevent loss or damage caused by a covered peril.

Copyright, American Association of Insurance Service, Inc. 2011

**EXHIBIT 6**

b. **Time Limitation** - This coverage applies for up to 30 days after the property is first moved.

However, this coverage does not extend past the end of the policy period.

2. **Emergency Removal Expenses**

a. **Coverage** - "We" pay for "your" expenses to move or store covered property to prevent loss or damage caused by a covered peril.

b. **Time Limitation** - This coverage applies for up to 30 days after the property is first moved.

However, this coverage does not extend past the end of the policy period.

c. **Limit** - The most "we" pay in any one occurrence for expenses to move or store covered property to prevent a loss or damage is $1,000.

d. **This Is A Separate Limit** - The "limit" for Emergency Removal Expenses is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

## SUPPLEMENTAL COVERAGES

**Provisions That Apply To Supplemental Coverages** - The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

The "limit" available for coverage described under a Supplemental Coverage:

a. is the only "limit" available for the described coverage; and

b. is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension, including a Supplemental Coverage, Coverage Extension, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following Supplemental Coverages are not subject to and not considered in applying coinsurance conditions.

1. **Newly Acquired Art**

a. **Coverage** - "We" cover direct physical loss or damage caused by a covered peril to "fine arts" that "you" acquire during the policy period.

b. **Coverage Limitation** - "We" only cover newly acquired "fine arts" while in transit to or located at a premises that is described on the "schedule of coverages".

c. **Time Limitation** - This coverage applies for up to 90 days from the date "you" acquire the "fine arts" or until "you" report the acquired "fine arts" to "us", whichever occurs first.

However, this coverage does not extend past the end of the policy period.

d. **Additional Premium** - "You" must pay any additional premium due from the date "you" acquire the "fine arts".

e. **Limit** - The most "we" pay in any one occurrence for all newly acquired "fine arts" is 25% of the Catastrophe Limit that is indicated on the "schedule of coverages".

2. **Off-Premises Coverage**

a. **Coverage** - "We" cover direct physical loss or damage caused by a covered peril to "fine arts" while temporarily away from a premises that is described on the "schedule of coverages" for:

(1) exhibition at a museum, gallery, or other public premises not owned, operated, or occupied by "you"; or

(2) framing, repair, restoration, packing, or appraising.

b. **Limit** - The most "we" pay in any one occurrence for loss or damage to "fine arts" while temporarily away from a described premises is $10,000.

3. **Property Used To Display Or Protect Art**

a. **Coverage** - "We" cover direct physical loss or damage caused by a covered peril to stands, glass cases, and other similar property used to display covered "fine arts".

"We" will also cover protective devices designed and used specifically to protect covered "fine arts".

b. **Coverage Limitation** - "We" only cover property used to display or protect "fine arts" while at a premises described on the "schedule of coverages".

c. **Limit** - The most "we" pay in any one occurrence for loss or damage to property used to display or protect "fine arts" is $5,000.

4. **Transit Coverage**

a. **Coverage** - "We" cover direct physical loss or damage caused by a covered peril to covered "fine arts" in transit.

b. **Limit** - The most "we" pay in any one occurrence for loss or damage to "fine arts" in transit is $10,000.

## PERILS COVERED

"We" cover risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

a. **Civil Authority** - Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do cover loss or damage resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

b. **Nuclear Hazard** - Nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

c. **War And Military Action**

(1) War, including undeclared war or civil war;

(2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sover-

eign, or other authority using military personnel or other agents; or

(3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War And Military Action exclusion will apply in place of the Nuclear Hazard exclusion.

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

a. **Birds, Vermin, Rodents, Or Insects** - "We" do not pay for loss or damage caused by or resulting from birds, vermin, rodents, or insects.

b. **Contamination Or Deterioration** - "We" do not pay for loss or damage caused by or resulting from contamination or deterioration including, but not limited to, corrosion, decay, fungus, mildew, mold, rot, rust, or any other quality, fault, or weakness in the covered property that causes it to damage or destroy itself.

c. **Exposure To Light** - "We" do not pay for loss or damage caused by or resulting from exposure to light or UV rays including, but not limited to, fading or darkening resulting from exposure to light or UV rays.

d. **Missing Property** - "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

e. **Repair, Restoration, Retouching, Framing, Or Packing** - "We" do not pay for loss or damage caused by processing of or work upon covered property including, but not limited to, repair, restoration, retouching, framing, or packing.

f. **Temperature/Humidity** - "We" do not pay for loss or damage caused by dryness, dampness, humidity, or changes in or extremes of temperature.

However, if dryness, dampness, humidity, or changes in or extremes of temperature results from a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

**g.** **Voluntary Parting** - "We" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

**h.** **Wear And Tear** - "We" do not pay for loss or damage caused by wear and tear.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** - In case of a loss, "you" must:

   **a.** give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

   **b.** give notice to the police when the act that causes the loss is a crime.

2. **You Must Protect Property** - "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss.

   **a.** **Payment Of Reasonable Costs** - "We" do pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. "Our" payment of reasonable costs does not increase the "limit".

   **b.** **We Do Not Pay** - "We" do not pay for such repairs or emergency measures performed on property that has not been damaged by a peril insured against except as covered under the Coverage Extension, Emergency Removal Expenses.

3. **Proof Of Loss** - "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   **a.** the time, place, and circumstances of the loss;

   **b.** other policies of insurance that may cover the loss;

   **c.** "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   **d.** changes in title of the covered property during the policy period; and

**e.** estimates, specifications, inventories, and other reasonable information that "we" may require to settle the loss.

4. **Examination** - "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records** - "You" must produce records, including, but not limited to, tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. **Damaged Property** - "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

7. **Volunteer Payments** - "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** - "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** - "You" must cooperate with "us" in performing all acts required by this policy.

## VALUATION

1. **Fine Arts**

   **a.** **Total Loss**

       **(1)** **Scheduled Fine Arts** - In the event of a total loss to scheduled "fine arts", the value will be based on the "limit" indicated for the lost or damaged "fine arts" on the Fine Arts Schedule.

       **(2)** **Newly Acquired Art** - In the event of a total loss to "fine arts" covered under the Supplemental Coverage, Newly Acquired Art, the value of the "fine arts" will be based on the fair market value of the lost or damaged "fine arts" at the time of loss.

   **b.** **Partial Loss** - In the event of a partial loss or damage to a covered piece of "fine arts":

       **(1)** **Cost To Repair Or Restore** - The value of covered "fine arts" will be based on the cost to repair or restore the covered "fine arts" to the condition immediately before the loss or damage.

**(2) Diminished Value** - The value of covered "fine arts" will also be based on the diminished value of the covered "fine arts" that results from partial loss or damage.

Diminished value means the reduced value of the "fine arts" based on the difference between the value of the covered "fine arts" before the loss or damage and the fair market value of the "fine arts" after the loss or damage has been repaired and the "fine arts" restored.

**(3) Determination Of Diminished Value** - The diminished value will be determined by an independent certified fine arts appraiser. The independent certified fine arts appraiser may be selected by "you", subject to "our" approval. The cost of the appraisal will be borne equally by "you" and "us".

**(4) Cost To Repair Or Restore Plus Diminished Value Will Not Exceed**

**(a) Scheduled Fine Arts** - The cost to repair or restore plus the amount of the diminished value will not exceed the "limit" indicated for the piece on the Fine Arts Schedule.

**(b) Newly Acquired Art** - In the event of a partial loss to "fine arts" covered under the Supplemental Coverage, Newly Acquired Art, the cost to repair or restore plus the amount of the diminished value will not exceed the fair market value of the covered "fine arts" at the time of loss.

**c. Pair Or Set** - If a covered loss to "fine arts" involves a pair or set and part of the pair or set is undamaged:

**(1)** "you" may surrender the undamaged part of the pair or set to "us", and the covered loss will be valued on the basis of a total loss to the entire pair or set (refer to item **1.a.** Total Loss for the valuation of a total loss); or

**(2)** "you" may keep the undamaged part of the pair or set, and the covered loss will be valued on the basis of a partial loss to the entire pair or set (refer to item **1.b.** Partial Loss for the valuation of a partial loss).

**2. Other Property** - In the event of loss or damage to covered property other than covered "fine arts", the value of the property will be based on the actual cash value at the time of the loss (with a deduction for depreciation).

## HOW MUCH WE PAY

**1. Insurable Interest** - "We" do not cover more than "your" insurable interest in any property.

**2. Deductible** - "We" pay only that part of "your" loss over the deductible amount indicated on the "schedule of coverages" in any one occurrence.

**3. Loss Settlement Terms**

**a. Fine Arts** - Subject to paragraphs **1.**, **2.**, **4.**, **5.**, and **6.** under How Much We Pay, in the event of a total loss to covered "fine arts", "we" pay the lesser of:

**(1)** the amount determined under Valuation; or

**(2)** the "limit" that applies to the covered "fine arts".

**b. Other Property** - Subject to paragraphs **1.**, **2.**, **4.**, **5.** and **6.** under How Much We Pay, in the event of a total loss to covered property other than "fine arts", "we" pay the lesser of:

**(1)** the amount determined under Valuation;

**(2)** the cost to repair, restore, or replace the property with material of like kind and quality to the extent practicable; or

**(3)** the "limit" that applies to the covered property.

**4. Catastrophe Limit** - The most "we" pay in any one occurrence is the Catastrophe Limit indicated on the "schedule of coverages" regardless if an occurrence or loss involves:

**a.** one or more pieces of "fine arts";

**b.** one or more described premises; or

**c.** any combination of "fine arts", described premises, or coverages described under Coverage Extensions or Supplemental Coverages.

**5. Insurance Under More Than One Coverage** - If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

**6. Insurance Under More Than One Policy**

**a. Proportional Share** - "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

b. **Excess Amount** - If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

## LOSS PAYMENT

1. **Loss Payment Options**

   a. **Our Options** -- In the event of loss covered by this coverage form, "we" have the following options:

      (1) pay the value of the lost or damaged property;

      (2) pay the cost of repairing, restoring, or replacing the lost or damaged property;

      (3) repair, restore, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

      (4) take all or any part of the property at the agreed or appraised value.

   b. **Notice Of Our Intent To Repair, Restore, Or Replace** - "We" must give "you" notice of "our" intent to repair, restore, or replace within 30 days after receipt of a duly executed proof of loss.

2. **Your Losses**

   a. **Adjustment And Payment Of Loss** - "We" adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy.

   b. **Conditions For Payment Of Loss** - An insured loss will be payable 30 days after:

      (1) a satisfactory proof of loss is received; and

      (2) the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

3. **Property Of Others** -

   a. **Adjustment And Payment Of Loss To Property Of Others** - Losses to property of others may be adjusted with and paid to:

      (1) "you" on behalf of the owner; or

      (2) the owner.

   b. **We Do Not Have To Pay You If We Pay The Owner** - If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits brought by the owners at "our" expense.

## OTHER CONDITIONS

1. **Appraisal** - If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

   If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

   The appraisers will then determine and state separately the amount of each loss.

   The appraisers will also determine the value of covered property items at the time of the loss, if requested.

   If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three, sets the amount of the loss.

   Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us".

2. **Benefit To Others** - Insurance under this coverage will not directly or indirectly benefit anyone having custody of "your" property.

3. **Carriers For Hire** - "You" may accept bills of lading or shipping receipts issued by carriers for hire that limit their liability to less than the value of the covered property.

4. **Conformity With Statute** - When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

5. **Estates** - This provision applies only if the insured is an individual.

   a. **Your Death** - On "your" death, "we" cover the following as an insured:

      (1) the person who has custody of "your" property until a legal representative is qualified and appointed; or

      (2) "your" legal representative.

      This person or organization is an insured only with respect to property covered by this coverage.

**b. Policy Period Is Not Extended** - This coverage does not extend past the policy period.

**6. Misrepresentation, Concealment, Or Fraud** - This coverage is void as to "you" and any other insured if, before or after a loss:

    **a.** "you" or any other insured have willfully concealed or misrepresented:

        **(1)** a material fact or circumstance that relates to this insurance or the subject thereof; or

        **(2)** "your" interest herein; or

    **b.** there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

**7. Policy Period** - "We" pay for a covered loss that occurs during the policy period.

**8. Recoveries** - If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

    **a.** "you" must notify "us" promptly if "you" recover property or receive payment;

    **b.** "we" must notify "you" promptly if "we" recover property or receive payment;

    **c.** any recovery expenses incurred by either are reimbursed first;

    **d.** "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid, or any lesser amount to which "we" agree; and

    **e.** if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be pro rated between "you" and "us" based on "our" respective interest in the loss.

**9. Restoration Of Limits** - A loss "we" pay under this coverage does not reduce the applicable "limits" except in the event of:

    **a.** a total loss to a scheduled item; or

    **b.** payment of diminished value on a scheduled item.

"We" will reduce the limit and refund the unearned premium on that item.

**10. Subrogation** - If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" do not pay for a loss if "you" impair this right to recover.

"You" may waive "your" right to recover from others in writing before a loss occurs.

**11. Suit Against Us** - No one may bring a legal action against "us" under this coverage unless:

    **a.** all of the "terms" of this coverage have been complied with; and

    **b.** the suit has been brought within two years after "you" first have knowledge of the loss.

    If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by law.

**12. Territorial Limits** - "We" cover property while it is in the United States of America, its territories and possessions, Canada, and Puerto Rico.

## DEFINITIONS

**1.** "Antique" means an object having value because its:

    **a.** craftsmanship is in the style or fashion of former times; and

    **b.** age is 100 years old or older.

**2.** "Fine arts" means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; "antique" furniture; "antique" jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit.

**3.** "Limit" means the amount of coverage that applies.

**4.** "Schedule of coverages" means:

    **a.** all pages labeled "schedule of coverages" or schedules that pertain to this coverage; and

    **b.** declarations or supplemental declarations that pertain to this coverage.

**5.** "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

**6.** "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

Falling objects does not include loss or damage to:

    **a.** personal property in the open; or

**b.** the interior of buildings or structures or to personal property inside buildings or structures unless the exterior of the roofs or walls are first damaged by a falling object.

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

7. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

8. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow.

"Volcanic action" does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss or damage to the covered property.

This endorsement changes the
Fine Arts Coverage
- PLEASE READ THIS CAREFULLY -

# BREAKAGE EXCLUSION

**ADDITIONAL PERILS EXCLUDED**

The following exclusion is added:

**Breakage, Marring, And Scratching** - "We" do not pay for loss or damage caused by breakage, marring, or scratching of "fine arts".

But if breakage, marring, or scratching results in a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

Copyright, American Association of
Insurance Services, Inc., 2011                                                                    IM 7417  08 11

This endorsement changes the
Fine Arts Coverage
- PLEASE READ THIS CAREFULLY -

# DISHONEST ACTS EXCLUSION
## KENTUCKY

**ADDITIONAL PERIL EXCLUDED**

The following exclusion is added:

**Dishonest Acts** - "We" do not pay for loss or damage caused by or resulting from dishonest acts including, but not limited to, dishonest acts that are criminal, fraudulent, or illegal. This exclusion applies whether the acts are committed alone or in collusion with another by:

**(1)**   "you";

**(2)**   others who have an interest in the property;

**(3)**   others to whom "you" entrust the property;

**(4)**   "your" partners, officers, directors, trustees, or joint venturers; or

**(5)**   the employees or agents of **(1)**, **(2)**, **(3)**, or **(4)** above, whether or not they are at work.

However, if the loss arose out of a pattern of domestic abuse, committed by or at the direction of an insured, this exclusion will not apply to an otherwise covered loss suffered by another insured who did not cooperate with or contribute to the act that caused the loss. The insured that caused the loss must be criminally prosecuted for the act causing the loss. The innocent insured must cooperate in the prosecution.

Subject to all other "terms" of this policy, "our" payment to an insured who did not cooperate in or contribute to the act that caused the loss may be limited to that person's insurable interest in the property, less any payment made to a mortgagee or other party with a legal secured interest in the property. "We" retain all rights set forth in the Subrogation condition of this policy with regard to action against the perpetrator of the act that caused the loss.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for theft by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

Copyright, American Association of
Insurance Services, Inc., 2012                                                                 **IM 7423  05 13**

# CRIME COVERAGE

CRIME COVERAGE

**31**

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**NEW**
**CRIME AND FIDELITY COVERAGE PART DECLARATION**
**(COMMERCIAL ENTITIES)**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY |
|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |
|---|---|

Policy Number: CWP 3 263 063        ³11³  WIC Account Number: 1600961480    ³  A

| Policy | From | 10/26/15 | at 12:01 A.M. at your mailing address |
|---|---|---|---|
| Period | To | 10/26/16 | shown above. |

Insuring Agreements

Limit of Insurance  Deductible Amount
Per Occurrence    Per Occurrence

*Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for
Coverages and Limits of Insurance.*

Note: Employee Theft, Forgery Or Alterations, Inside The Premises - Theft Of
Money And Securities, Outside The Premises, and Money Orders And Counterfeit
Money included in the schedule(s) apply on a policy-level basis.

Coverage is Written: Primary

Total Advance Annual Crime Premium          Included

Forms and Endorsements forming part of this policy coverage when issued:
CR7000   0813*, CR0021   0813*, CR0253   0506*, CR0168   1010*.

CANCELLATION OF PRIOR INSURANCE ISSUED BY US:
By acceptance of this Coverage Part / Policy you give us notice cancelling prior
policy Nos. _____; the cancellation to be effective at the
time this Coverage Part become effective.

212
**EXHIBIT 6**

# COMMERCIAL CRIME COVERAGE FORM
## (LOSS SUSTAINED FORM)

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is or is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

### A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition **E.1.k.** or **E.1.l.**, which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.g.**:

#### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

#### 2. Forgery Or Alteration

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

(1) Made or drawn by or drawn upon you; or

(2) Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated to the same as the original it replaced.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **2.a.**, on the basis that it has

been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay for such legal expenses is in addition to the Limit of Insurance applicable to this Insuring Agreement.

#### 3. Inside The Premises - Theft Of Money And Securities

We will pay for:

**a.** Loss of "money" and "securities" inside the "premises" or "financial institution premises":

(1) Resulting directly from "theft" committed by a person present inside such "premises" or "financial institution premises"; or

(2) Resulting directly from disappearance or destruction.

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of, or unlawful entry into, those containers.

#### 4. Inside the Premises - Robbery Or Safe Burglary Of Other Property

We will pay for:

**a.** Loss of or damage to "other property":

(1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

(2) Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

EXHIBIT 6

c. Loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

5. **Outside The Premises**

We will pay for:

a. Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. Loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

6. **Computer And Funds Transfer Fraud**

a. We will pay for:

(1) Loss resulting directly from a fraudulent:

(a) Entry of "electronic data" or "computer program" into; or

(b) Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **6.a.(1)(a)** and **6.a.(1)(b):**

(i) "Money", "securities" or "other property" to be transferred, paid or delivered; or

(ii) Your account at a "financial institution" to be debited or deleted.

(2) Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and transfer, pay or deliver "money" or "securities" from that account.

b. As used in Paragraph **6.a.(1)**, fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such

entry or change made by an "employee" acting, in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for a "computer system" covered under this Insuring Agreement.

7. **Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having, in good faith, accepted in exchange for merchandise, "money" or services:

a. Money orders issued by any post office, express company or "financial institution" that are not paid upon presentation; or

b. "Counterfeit money" that is acquired during the regular course of business.

B. **Limit Of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit Of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or coverages.

C. **Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

D. **Exclusions**

1. This insurance does not cover:

a. **Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

(1) You; or

(2) Any of your partners or "members";

whether acting alone or in collusion with other persons.

b. **Acts Committed By Your Employees Learned Of By You Prior To The Policy Period**

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the Policy Period shown in the Declarations.

c. **Acts Committed By Your Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

(1) Whether acting alone or in collusion with other persons; or

(2) While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

d. **Confidential Or Personal Information**

Loss resulting from:

(1) The disclosure of your or another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

(2) The use of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of non-public information.

e. **Data Security Breach**

Fees, costs, fines, penalties and other expenses incurred by you which are related to the access to or disclosure of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists,

financial information, credit card information, health information or any other type of nonpublic information.

f. **Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

g. **Indirect Loss**

Loss that is an indirect result of an "occurrence" covered by this insurance including, but not limited to, loss resulting from:

(1) Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

(2) Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance; or

(3) Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

h. **Legal Fees, Costs And Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

i. **Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

j. **Pollution**

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

k. **War And Military Action**

Loss or damage resulting from:

(1) War, including undeclared or civil war;

**EXHIBIT 6**

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

2. Insuring Agreement **A.1.** does not cover:

a. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

b. **Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

c. **Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not cover:

a. **Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

b. **Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

c. **Fire**

Loss or damage resulting from fire, however caused, except:

(1) Loss of or damage to "money" and "securities"; and

(2) Loss from damage to a safe or vault.

d. **Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

e. **Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

f. **Transfer Or Surrender Of Property**

(1) Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "financial institution premises":

(a) On the basis of unauthorized instructions;

(b) As a result of a threat including, but not limited to:

(i) A threat to do bodily harm to any person;

(ii) A threat to do damage to any property;

(iii) A threat to introduce a denial of service attack into any "computer system";

(iv) A threat to introduce a virus or other malicious instruction into any "computer system" which is designed to damage, destroy or corrupt "electronic data" or "computer programs" stored within the "computer system";

(v) A threat to contaminate, pollute or render substandard your products or goods; or

(vi) A threat to disseminate, divulge or utilize:

i. Your confidential information;

ii. Confidential or personal information of another person or organization; or

iii. Weaknesses in the source code within any "computer system".

(2) But, this exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

(a) Had no knowledge of any threat at the time the conveyance began; or

(b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

**h. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

4. Insuring Agreement **A.6.** does not cover:

**a. Authorized Access**

Loss resulting from a fraudulent:

(1) Entry of "electronic data" or "computer program" into; or

(2) Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you by a person or organization with authorized access to that "computer system", except when covered under Insuring Agreement **A.6.b.**

**b. Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

**c. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**d. Fraudulent Instructions**

Loss resulting from an "employee" or "financial institution" acting upon any instruction to:

(1) Transfer, pay or deliver "money", "securities" or "other property"; or

(2) Debit or delete your account;

which instruction proves to be fraudulent, except when covered under Insuring Agreement **A.6.a.(2)** or **A.6.b.**

**e. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

**E. Conditions**

The following conditions apply in addition to the Common Policy Conditions:

1. **Conditions Applicable To All Insuring Agreements**

**a. Additional Premises Or Employees**

If, while this insurance is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this insurance. Notice to us of an increase in the number of "premises" or "employees" is not required, and no additional premium will be charged for the remainder of the Policy Period shown in the Declarations.

**b. Concealment, Misrepresentation Or Fraud**

This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresents a material fact concerning:

(1) This insurance;

(2) The property covered under this insurance;

(3) Your interest in the property covered under this insurance; or

(4) A claim under this insurance.

**c. Consolidation - Merger Or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

(1) You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this insurance to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this insurance shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition or assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

d. **Cooperation**

You must cooperate with us in all matters pertaining to this insurance as stated in the terms and conditions.

e. **Duties In The Event Of Loss**

After you discover a loss or a situation that may result in loss of or damage to "money", "securities" or "other property", you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities;

(2) Give us a detailed, sworn proof of loss within 120 days;

(3) Cooperate with us in the investigation and settlement of any claim;

(4) Produce for our examination all pertinent records;

(5) Submit to examination under oath at our request and give us a signed statement of your answers; and

(6) Secure all of your rights of recovery against any person or organization responsible for the loss and do nothing to impair those rights.

f. **Employee Benefit Plans**

The "employee benefit plans" shown in the Declarations (hereinafter referred to as Plan) are included as insureds under Insuring Agreement **A.1.** subject to the following:

(1) If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator is responsible for selecting a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required under ERISA as if each Plan were separately insured.

(2) With respect to loss sustained or discovered by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(3) If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

(4) If two or more Plans are insured under this insurance, any payment we make for loss:

(a) Sustained by two or more Plans; or

(b) Of commingled "money", "securities' or "other property" of two or more Plans;

resulting directly from an "occurrence" will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required under ERISA for each Plan bears to the total of those limits.

(5) The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

g. **Extended Period To Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:

(1) No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(2) No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**h. Joint Insured**

(1) If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

(2) If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

(3) An "employee" of any Insured is considered to be an "employee" of every Insured.

(4) If this insurance or any of its coverages are cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

(a) No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(b) No later than one year from the date of that cancellation

with regard to any "employee benefit plan".

(5) We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

(6) Payment by us to the first Named Insured for loss sustained by any Insured, or payment by us to any "employee benefit plan" for loss sustained by that Plan, shall fully release us on account of such loss.

**i. Legal Action Against Us**

You may not bring any legal action against us involving loss:

(1) Unless you have complied with all the terms of this insurance;

(2) Until 90 days after you have filed proof of loss with us; and

(3) Unless brought within two years from the date you "discovered" the loss.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**j. Liberalization**

If we adopt any revision that would broaden the coverage under this insurance without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this insurance.

**k. Loss Sustained During Prior Insurance Issued By Us Or Any Affiliate**

(1) **Loss Sustained Partly During This Insurance And Partly During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting from an "occurrence" taking place:

(a) Partly during the Policy Period shown in the Declarations; and

(b) Partly during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest;

and this insurance became effective at the time of cancellation of the prior insurance, we will first settle the amount of loss that you sustained during this policy period. We will then settle the remaining amount of loss that you sustained during the policy period(s) of the prior insurance.

**(2) Loss Sustained Entirely During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place entirely during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest, we will pay for the loss, provided:

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

We will first settle the amount of loss that you sustained during the most recent prior insurance. We will then settle any remaining amount of loss that you sustained during the policy period(s) of any other prior insurance.

**(3)** In settling loss under Paragraphs **k.(1)** and **k.(2)**:

**(a)** The most we will pay for the entire loss is the highest single Limit of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior insurance issued by us.

**(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this insurance. If no loss was sustained under this insurance, we will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this insurance, of the most recent prior insurance, we will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

We will not apply any other Deductible Amount that may have been applicable to the loss.

**(4)** The following examples demonstrate how we will settle losses subject to this condition:

**Example Number 1**

The Insured sustained a covered loss of $10,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B**.

**Policy A**

The current policy. Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

**Policy B**

Issued prior to Policy **A**. Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

The amount of loss sustained under Policy **A** is $2,500 and under Policy **B**, $7,500.

The highest single Limit of Insurance applicable to this entire loss is $50,000 written under Policy **A**. The Policy **A** Deductible Amount of $5,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($2,500) is settled first. The amount we will pay is nil ($0.00) because the amount of loss is less than the Deductible Amount (i.e., $2,500 loss - $5,000 deductible = $0.00)

**(b)** The remaining amount of loss sustained under Policy **B** ($7,500) is settled next. The amount recoverable is $5,000 after the remaining Deductible Amount from Policy **A** of $2,500 is applied to the loss (i.e., $7,500 loss - $2,500 deductible = $5,000).

The most we will pay for this loss is $5,000.

**EXHIBIT 6**

### Example Number 2

The Insured sustained a covered loss of $250,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B**.

#### Policy A

The current policy. Written at a Limit of Insurance of $125,000 and a Deductible Amount of $10,000.

#### Policy B

Issued prior to Policy **A**. Written at a Limit of Insurance of $150,000 and a Deductible Amount of $25,000.

The amount of loss sustained under Policy **A** is $175,000 and under Policy **B**, $75,000

The highest single Limit of Insurance applicable to this entire loss is $150,000 written under Policy **B**. The Policy **A** Deductible Amount of $10,000 applies. The loss is settled as follows:

(a) The amount of loss sustained under Policy **A** ($175,000) is settled first. The amount we will pay is the Policy **A** Limit of $125,000 because $175,000 loss - $10,000 deductible = $165,000, which is greater than the $125,000 policy limit.

(b) The remaining amount of loss sustained under Policy **B** ($75,000) is settled next. The amount we will pay is $25,000 (i.e., $150,000 Policy **B** limit - $125,000 paid under Policy **A** = $25,000).

The most we will pay for this loss is $150,000.

### Example Number 3

The Insured sustained a covered loss of $2,000,000 resulting directly from an "occurrence" taking place during the terms of Policies **A**, **B**, **C** and **D**.

#### Policy A

The current policy. Written at a Limit of Insurance of $1,000,000 and a Deductible Amount of $100,000.

#### Policy B

Issued prior to Policy **A**. Written at a Limit of Insurance of $750,000 and a Deductible Amount of $75,000.

#### Policy C

Issued prior to Policy **B**. Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

#### Policy D

Issued prior to Policy **C**. Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

The amount of loss sustained under Policy **A** is $350,000, under Policy **B**, is $250,000, under Policy **C**, $600,000 and under Policy **D**, $800,000.

The highest single Limit of Insurance applicable to this entire loss is is $1,000,000 written under Policy **A**. The Policy **A** Deductible Amount of $100,000 applies. The loss is settled as follows:

(a) The amount of loss sustained under Policy **A** ($350,000) is settled first. The amount we will pay is $250,000 (i.e., $350,000 loss - $100,000 deductible = $250,000).

(b) The amount of loss sustained under Policy **B** ($250,000) is settled next. The amount we will pay is $250,000 (no deductible is applied).

(c) The amount of loss sustained under Policy **C** ($600,000) is settled next. The amount we will pay is $500,000, the policy limit (no deductible is applied).

(d) We will not make any further payment under Policy **D**, as the maximum amount payable under the highest single Limit of Insurance applying to the loss of $1,000,000 under Policy **A** has been satisfied.

The most we will pay for the loss is $1,000,000.

**I.** **Loss Sustained During Prior Insurance Not Issued By Us Or Any Affiliate**

(1) If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place during the policy period of any prior cancelled insurance that was issued to you or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, we will pay for the loss under this insurance, provided:

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

**(2)** In settling loss subject to this condition:

**(a)** The most we will pay for the entire loss is the lesser of the Limits of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior cancelled insurance.

**(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

**(3)** The insurance provided under this condition is subject to the following:

**(a)** If loss covered under this condition is also partially covered under Condition **E.1.k**, the amount recoverable under this condition is part of, not in addition to, the amount recoverable under Condition **E.1.k.**

**(b)** For loss covered under this condition that is not subject to Paragraph **l.(3)(a)**, the amount recoverable under this condition is part of, not in addition to, the Limit of Insurance applicable to the loss covered under this insurance and is limited to the lesser of the amount recoverable under:

**(i)** This insurance as of its effective date; or

**(ii)** The prior cancelled insurance had it remained in effect.

**m.** **Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this insurance, our obligations are limited as follows:

**(1)** **Primary Insurance**

When this insurance is written as primary insurance, and:

**(a)** You have other insurance subject to the same terms and conditions as this insurance, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit Of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

**(b)** You have other insurance covering the same loss other than that described in Paragraph **m.(1)(a)**, we will only pay for the amount of loss that exceeds:

**(i)** The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

**(ii)** The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this insurance.

**(2)** **Excess Insurance**

**(a)** When this insurance is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit Of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this insurance.

**(b)** However, if loss covered under this insurance is subject to a deductible, we will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

**n.** **Ownership Of Property; Interests Covered**

The property covered under this insurance is limited to property:

**(1)** That you own or lease;

**(2)** That is held by you in any capacity; or

**(3)** For which you are legally liable, provided you were liable for the property prior to the time the loss was sustained.

**EXHIBIT 6**

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this insurance must be presented by you.

o. **Records**

You must keep records of all property covered under this insurance so we can verify the amount of any loss.

p. **Recoveries**

(1) Any recoveries, whether effected before or after any payment under this insurance, whether made by us or by you, shall be applied net of the expense of such recovery:

(a) First, to you in satisfaction of your covered loss in excess of the amount paid under this insurance;

(b) Second, to us in satisfaction of amounts paid in settlement of your claim;

(c) Third, to you in satisfaction of any Deductible Amount; and

(d) Fourth, to you in satisfaction of any loss not covered under this insurance.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

q. **Territory**

This insurance covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

r. **Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

s. **Valuation - Settlement**

The value of any loss for purposes of coverage under this insurance shall be determined as follows:

(1) **Money**

Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

(a) At face value in the "money" issued by that country; or

(b) In the United States of America dollar equivalent, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

(2) **Securities**

Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

(a) Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(b) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(i) Market value of the "securities" at the close of business on the day the loss was "discovered"; or

(ii) Limit of Insurance applicable to the "securities".

(3) **Property Other Than Money And Securities**

(a) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

(i) The Limit of Insurance applicable to the lost or damaged property;

(ii) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

(iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(b) We will not pay on a replacement cost basis for any loss or damage to property covered under Paragraph s.(3)(a):

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repairs or replacement is made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

(c) We will, at your option, pay for loss or damage to such property:

(i) In the "money" of the country in which the loss or damage was sustained; or

(ii) In the United States of America dollar equivalent of the "money" of the country in which the loss or damage was sustained, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

(d) Any property that we pay for or replace becomes our property.

2. **Conditions Applicable To Insuring Agreement A.1.**

a. **Termination As To Any Employee**

This Insuring Agreement terminates as to any "employee":

(1) As soon as:

(a) You; or

(b) Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you; or

(2) On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

b. **Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in Territory Condition **E.1.q.** for a period of not more than 90 consecutive days.

3. **Conditions Applicable To Insuring Agreement A.2.**

a. **Deductible Amount**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

b. **Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

c. **Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d. **Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.2.**

4. **Conditions Applicable To Insuring Agreements A.4. And A.5.**

a. **Armored Motor Vehicle Companies**

Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

(1) Under your contract with the armored motor vehicle company; and

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

b. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) Manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

5. **Conditions Applicable To Insuring Agreement A.6.**

a. **Special Limit Of Insurance for Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

b. **Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.6.**

F. **Definitions**

1. "Computer program" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enable the computer or devices to receive, process, store or send "electronic data".

2. "Computer system" means:

a. Computers, including Personal Digital Assistants (PDAs) and other transportable or handheld devices, electronic storage devices and related peripheral components;

b. Systems and applications software; and

c. Related communications networks;

by which "electronic data" is collected, transmitted, processed, stored or retrieved.

3. "Counterfeit money" means an imitation of "money" which is intended to deceive and to be taken as genuine.

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

"Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this insurance.

6. "Electronic data" means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on data storage devices, including hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

7. "Employee":

a. Means:

(1) Any natural person:

   (a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by the "employee";

   (b) Whom you compensate directly by salary, wages or commissions; and

   (c) Whom you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

   (a) To substitute for a permanent "employee", as defined in Paragraph 7.a.(1), who is on leave; or

   (b) To meet seasonal or short-term work load conditions;

   while that person is subject to your direction and control and performing services for you;

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in Paragraph 7.a.(2);

(4) Any natural person who is:

   (a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; or

   (b) Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of

any "employee benefit plan";

(5) Any natural person who is a former "employee", partner, "member", "manager", director, or trustee retained by you as a consultant while performing services for you;

(6) Any natural person who is a guest student or intern pursuing studies or duties;

(7) Any natural person employed by an entity merged or consolidated with you prior to the effective date of this Policy; and

(8) Any natural person who is your "manager", director or trustee while:

   (a) Performing acts within the scope of the usual duties of an "employee"; or

   (b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

b. Does not mean:

   Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph 7.a.

8. "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and that is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

9. "Financial institution" means:

a. With regard to Insuring Agreement **A.3.:**

   (1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution; or

   (2) An insurance company.

b. With regard to Insuring Agreement **A.6.:**

(1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution;

(2) An insurance company; or

(3) A stock brokerage firm or investment company.

10. "Financial institution premises" means the interior of that portion of any building occupied by a "financial institution".

11. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

12. "Fraudulent instruction" means:

a. With regard to Insuring Agreement **A.6.a.(2)**:

(1) A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instruction directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", which instruction purports to have been issued by you, but which in fact was fraudulently issued by someone else without your knowledge or consent.

(2) A written instruction (other than those covered under Insuring Agreement **A.2.**) issued to a "financial institution" directing the "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by you, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

(3) A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic or written instruction initially received by you, which instruction purports to have been issued by an "employee", but which in fact was fraudulently issued by someone else without your or the "employee's" knowledge or consent.

b. With regard to Insuring Agreement **A.6.b.**:

A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic, written or voice instruction directing an "employee" to enter or change "electronic data" or "computer programs" within a "computer system" covered under the Insuring Agreement, which instruction in fact was fraudulently issued by your computer software contractor.

13. "Manager" means a natural person serving in a directorial capacity for a limited liability company.

14. "Member" means an owner of a limited liability company represented by its membership interest who, if a natural person, may also serve as a "manager".

15. "Messenger" means you, or your relative, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

16. "Money" means:

a. Currency, coins and bank notes in current use and having a face value;

b. Traveler's checks and money orders held for sale to the public; and

c. In addition, includes:

(1) Under Insuring Agreements **A.1.** and **A.2.**, deposits in your account at any financial institution;and

(2) Under Insuring Agreement **A.6.**, deposits in your account at a "financial institution" as defined in Paragraph **F.9.b.**

17. "Occurrence" means:

a. Under Insuring Agreement **A.1.**:

(1) An individual act;

(2) The combined total of all separate acts whether or not related; or

(3) A series of acts whether or not related;

committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

b. Under Insuring Agreement **A.2.**:

(1) An individual act;

(2) The combined total of all separate acts whether or not related; or

(3) A series of acts whether or not related;

committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

c. Under all other Insuring Agreement:

(1) An individual act or event;

(2) The combined total of all separate acts or events whether or not related; or

(3) A series of acts or events whether or not related;

committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

18. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include "computer programs", "electronic data" or any property specifically excluded under this insurance.

19. "Premises" means the interior of that portion of any building you occupy in conducting your business.

20. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

a. Caused or threatened to cause that person bodily harm; or

b. Committed an obviously unlawful act witnessed by that person.

21. "Safe burglary" means the unlawful taking of:

a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

b. A safe or vault from inside the "premises".

22. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

23. "Theft" means the unlawful taking of property to the deprivation of the Insured.

24. "Transfer account" means an account maintained by you at a "financial institution" from which you can initiate the transfer, payment or delivery of "money" or "securities":

a. By means of computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instructions; or

b. By means of written instructions (other than those covered under Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such "financial institution" through an electronic funds transfer system.

25. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

CRIME AND FIDELITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# KENTUCKY CHANGES - TERMINATION OF EMPLOYEE

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

Paragraph **(2)** of the **Termination As To Any Employee** Condition **E.2.a** is deleted.

© ISO Properties, Inc., 2006     CR 02 53  05 06

229
**EXHIBIT 6**

POLICY NUMBER:  CWP 3263063                                    CRIME AND FIDELITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# KENTUCKY CHANGES - OBLIGEE

This endorsement modifies insurance provided under the following:

GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY
GOVERNMENT EMPLOYEE THEFT AND FORGERY POLICY

### SCHEDULE

| Name Of Obligee |
|---|
|  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

1. We agree to indemnify the Obligee shown in the Schedule for loss covered by this insurance.

2. This insurance may be cancelled by you or by the Obligee shown in the Schedule in accordance with the Cancellation Of Policy Condition.  If we cancel, we agree to mail our notice to both the Obligee and to you.

3. The **Termination As To Any Employee** Condition is replaced by the following:

    This insurance terminates as to any "employee" as soon as:

    a. The Obligee or you; or

    b. Any official or employee authorized to manage, govern or control your "employees" who is not in collusion with the "employee";

    learn of "theft" or any other dishonest act committed by the "employees" whether before or after becoming employed by you.

4. By acceptance of this insurance both the Obligee and you give us notice cancelling any prior insurance as shown in the Declarations.

© Insurance Services Office, Inc., 2009
CR 01 68  10 10

230
**EXHIBIT 6**

# UMBRELLA COVERAGE

UMBRELLA COVERAGE

**EXHIBIT 6**

**31**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**NEW**
**COMMERCIAL LIABILITY UMBRELLA DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |

| NAMED INSURED AND MAILING ADDRESS | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSURED NEACE LUKENS INS AGCY<br>2416 SIR BARTON WAY STE 300<br>LEXINGTON KY 40509-3001<br>TELEPHONE 859-543-1716 |

Policy Number: CWP 3 263 063      ³11³  WIC Account Number: 1600961480   ³  A

| Policy | From | 10/26/15 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| Period | To | 10/26/16 | mailing address shown above. |

## LIMITS OF INSURANCE

| | |
|---|---|
| $4,000,000 | EACH OCCURRENCE LIMIT |
| $4,000,000 | GENERAL AGGREGATE LIMIT |
| $4,000,000 | PERSONAL & ADVERTISING INJURY LIMIT |
| $0 | SELF INSURED RETENTION |

### SCHEDULE OF UNDERLYING INSURANCE

| POLICY<br>NUMBER | TYPE OF<br>COVERAGE | INSURER | LIMITS OF LIABILITY | | POLICY<br>PERIOD |
|---|---|---|---|---|---|
| CWP<br>3263063 | General<br>Liability | Westfield<br>National<br>Insurance | $2,000,000<br>$2,000,000<br><br>$1,000,000<br><br>$1,000,000 | General Aggregate<br>Products/Completed<br>Operations Aggregate<br>Personal And<br>Advertising Injury<br>Each Occurrence | 10/26/15<br>To<br>10/26/16 |
| CWP<br>3263063 | Auto<br>Liability | Westfield<br>National<br>Insurance | $1,000,000 | Bodily Injury And<br>Property Damage Each Accident | 10/26/15<br>To<br>10/26/16 |
| QUW<br>605058 | Employers<br>Liability | BERKSHIRE<br>HATHAWAY<br>GUARD | $1,000,000<br>$1,000,000<br><br>$1,000,000 | Bodily Injury Each Accident<br>Bodily Injury By Disease<br>Policy Limit<br>Bodily Injury By Disease<br>Each Employee | 10/01/15<br>To<br>10/01/16 |

PREMIUM BASIS: FLATCHARGE

| | |
|---|---|
| COMMERCIAL UMBRELLA ANNUAL PREMIUM | $2,250.00 |
| TOTAL ADVANCE ANNUAL PREMIUM | $2,250.00 |

Forms And Endorsements Applicable To This Coverage Part:
CUDS01  0900*, CU0001  0413*, CU7000  1206*, CU2108  0413*, CU2125  1201*,
CU2123  0202*, CU2432  0413*, CU7033  0911*, CU2186  0514*, CU2130  0115*,
CU2430  0413*.

232
**EXHIBIT 6**

# COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERAGES

### COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. But:

      (1) The amount we will pay for the "ultimate net loss" is limited as described in Section **III** - Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

   b. This insurance applies to "bodily injury" or "property damage" that is subject to an applicable "retained limit". If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "bodily injury" or "property damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance".

   c. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph **1.a.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   d. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.a.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

e. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.a.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

f. Damages because of "bodily injury" include damages claimed by any person by organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

This insurance does not apply to:

a. **Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

   (1) That the insured would have in the absence of the contract or agreement; or

   (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than

an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

   (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

   (b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

   (1) Causing or contributing to the intoxication of any person;

   (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

   (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

   (a) The supervision, hiring, employment, training or monitoring of others by that insured; or

   (b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage" involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

This exclusion does not apply to the extent that valid "underlying insurance" for the liquor liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the liquor liability risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

d.  **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e.  **ERISA**

Any obligation of the insured under the Employees' Retirement Income Security Act of 1974 (ERISA), and any amendments thereto or any similar federal, state or local statute.

f.  **Auto Coverages**

(1)  "Bodily injury" or "property damage" arising out of the ownership, maintenance or use of any "auto" which is not a "covered auto"; or

(2)  Any loss, cost or expense payable under or resulting from any first-party physical damage coverage; no-fault law, personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law.

g.  **Employer's Liability**

"Bodily injury" to:

(1)  An "employee" of the insured arising out of and in the course of:

(a)  Employment by the insured; or

(b)  Performing duties related to the conduct of the insured's business; or

(2)  The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

With respect to injury arising out of a "covered auto", this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits. For the purposes of this insurance, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

This exclusion does not apply to the extent that valid "underlying insurance" for the employer's liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the employer's liability risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

h.  **Employment-related Practices**

"Bodily injury" to:

(1)  A person arising out of any:

(a)  Refusal to employ that person;

(b)  Termination of that person's employment; or

(c)  Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harrassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2)  The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraph **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraph **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

i. **Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

(2) "Pollution cost or expense".

This exclusion does not apply if valid "underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the pollution risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

j. **Aircraft Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 50 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

(4) The extent that valid "underlying insurance" for the aircraft or watercraft liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" or "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the aircraft or watercraft risks described above will follow the same provisions, exclusions and limitations that are contained in the "underlying insurance", unless otherwise directed by this insurance; or

(5) Aircraft that is:

(a) Chartered by, loaned to, or hired by you with a paid crew; and

(b) Not owned by any insured.

k. **Racing Activities**

"Bodily injury" or "property damage" arising out of the use of "mobile equipment" or "autos" in, or while in practice for, or while being prepared for, any prearranged professional or organized racing, speed, demolition, or stunting activity or contest.

l. **War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

m. **Damage To Property**

"Property damage" to:

(1) Property:

(a) You own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property; or

(b) Owned or transported by the insured and arising out of the ownership, maintenance or use of a "covered auto".

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (1)(b), (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraphs (3) and (4) of this exclusion do not apply to liability assumed under a written Trailer Interchange agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**n. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**o. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

**p. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**q. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**r. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**s. Professional Services**

"Bodily injury" or "property damage" due to rendering of or failure to render any professional service. This includes but is not limited to:

(1) Legal, accounting or advertising services;

(2) Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

(3) Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

(4) Engineering services, including related supervisory or inspection services;

(5) Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

(6) Any health or therapeutic service treatment, advice or instruction;

(7) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming or therapy;

(8) Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardio-vascular fitness, bodybuilding or physical training programs;

(9) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

(10) Body piercing services;

(11) Services in the practice of pharmacy;

(12) Law enforcement or firefighting services; and

(13) Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", involved the rendering of or failure to render any professional service.

t. **Electronic Data**

Damage arising out of the loss of, loss of use of, damage to, corruption of, inability to access or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

This exclusion does not apply if valid "underlying insurance" for the electronic data risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". The in-

surance provided under this Coverage Part will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

u. **Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. At our discretion, we may investigate any offense that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. But:

(1) The amount we will pay for the "ultimate net loss" is limited as described in Section **III** - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

b. This insurance applies to "personal and advertising injury" that is subject to an applicable "retained limit". If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "personal and advertising injury" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance".

c. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

This insurance does not apply to:

a. "Personal and advertising injury":

(1) **Knowing Violation Of Rights Of Another**

Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

(2) **Material Published With Knowledge Of Falsity**

Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

(3) **Material Published Prior To Policy Period**

Arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

(4) **Criminal Acts**

Arising out of a criminal act committed by or at the direction of the insured.

(5) **Contractual Liability**

For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to:

(a) Liability for damages that the insured would have in the absence of the contract or agreement.

(b) Liability for false arrest, detention or imprisonment assumed in a contract or agreement.

(6) **Breach Of Contract**

Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

(7) **Quality Or Performance Of Goods -- Failure To Conform To Statements**

Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

(8) **Wrong Description Of Prices**

Arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

(9) **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

(10) **Insureds In Media And Internet Type Businesses**

Committed by an insured whose business is:

(a) Advertising, broadcasting, publishing or telecasting;

(b) Designing or determining content of web sites for others; or

(c) An Internet search, access, content or service provider.

**EXHIBIT 6**

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**(11) Electronic Chatrooms Or Bulletin Boards**

Arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**(12) Unauthorized Use Of Another's Name Or Product**

Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**(13) Pollution**

Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(14) Employment-related Practices**

To:

**(a)** A person arising out of any:

**(i)** Refusal to employ that person;

**(ii)** Termination of that person's employment; or

**(iii)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harrassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(b)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices

described in Paragraph **(i)**, **(ii)** or **(iii)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraph **(i)**, **(ii)** or **(iii)** above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**(15) Professional Services**

Arising out of the rendering of or failure to render any professional service.  This includes but is not limited to:

**(a)** Legal, accounting or advertising services;

**(b)** Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**(c)** Inspection, supervision, quality control, architectural or engineering activities done, by or for you on a project on which you serve as construction manager;

**(d)** Engineering services, including related supervisory or inspection services;

**(e)** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**(f)** Any health or therapeutic service treatment, advice or instruction;

**(g)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming or therapy;

**(h)** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;

(i) Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

(j) Body piercing services;

(k) Services in the practice of pharmacy;

(l) Law enforcement or firefighting services; and

(m) Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

**(16) War**

However caused, arising, directly or indirectly, out of:

(a) War, including undeclared or civil war;

(b) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(c) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**(17) Recording And Distribution Of Material Or Information In Violation Of Law**

Arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(a) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(b) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(c) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(d) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

b. "Pollution cost or expense".

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend, when the duty to defend exists:

a. All expenses we incur.

b. Up to $2000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "occurrence" we cover. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. When we have the right but not the duty to defend the insured and elect to participate in the defense, we will pay our own expenses but will not contribute to the expenses of the insured or the "underlying insurer".

3. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit";

         (b) Immediately send us copies if any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) Notify any other insurer whose coverage is available to the indemnitee; and

         (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      (2) Provides us with written authorization to:

         (a) Obtain records and other information related to the "suit"; and

         (b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. Except for liability arising out of the ownership, maintenance or use of "covered autos":

   a. If you are designated in the Declarations as:

      (1) An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

      (2) A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

      (3) A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

      (4) An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

(5) A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

b. Each of the following is also an insured:

(1) Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(a) "Bodily injury" or "personal and advertising injury":

(i) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" in the course of his or her employment or performing duties related to the conduct of your business or to your other "volunteer workers" while performing duties related to the conduct of your business;

(ii) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (a)(i) above; or

(iii) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (a)(i) or (ii) above.

(b) "Property damage" to property:

(i) Owned, occupied or used by;

(ii) Rented to, in the care, custody or control of, or over which physical control is

being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

(2) Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

(3) Any person or organization having proper temporary custody of your property if you die, but only:

(a) With respect to liability arising out of the maintenance or use of that property; and

(b) Until your legal representative has been appointed.

(4) Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

c. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

(1) Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

(2) Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

(3) Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

2. Only with respect to liability arising out of the ownership, maintenance or use of "covered autos":

a. You are an insured.

b. Anyone else while using with your permission a "covered auto" you own, hire or borrow is also an insured except:

(1) The owner or anyone else from whom you hire or borrow a "covered auto". This exception does not apply if the "covered auto" is a trailer or semitrailer connected to a "covered auto" you own.

(2) Your "employee" if the "covered auto" is owned by that "employee" or a member of his or her household.

(3) Someone using a "covered auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

(4) Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a "covered auto".

(5) A partner (if you are a partnership), or a member (if you are a limited liability company) for a "covered auto" owned by him or her or a member of his or her household.

(6) "Employees" with respect to "bodily injury" to:

(a) Any fellow "employee" of the insured arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

(b) The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph (a) above.

c. Anyone liable for the conduct of an insured described above is also an insured, but only to the extent of that liability.

3. Any additional insured under any policy of "underlying insurance" will automatically be an insured under this insurance.

Subject to Section **III** - Limits Of Insurance, if coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

a. Required by the contract or agreement, less any amounts payable by any "underlying insurance"; or

b. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance".

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

### SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made, "suits" brought, or number of vehicles involved; or

c. Persons or organizations making claims or bringing "suits".

2. The Aggregate Limit is the most we will pay for the sum of all "ultimate net loss" under:

a. Coverage **A**, except "ultimate net loss" because of "bodily injury" or "property damage" arising out of the ownership, maintenance or use of a "covered auto"; and

b. Coverage **B**.

3. Subject to Paragraph **2.** above, the Each Occurrence Limit is the most we will pay for the sum of all "ultimate net loss" because of all "bodily injury" and "property damage" under Coverage **A** arising out of any one "occurrence".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all "ultimate net loss" because of all "personal and advertising injury" sustained by any one person or organization.

5. If there is "underlying insurance" with a policy period that is nonconcurrent with the policy period of this Commercial Liability Umbrella Coverage Part, the "retained limit(s)" will only be reduced or exhausted by payments for:

a. "Bodily injury" or "property damage" which occurs during the policy period of this Coverage Part; or

b. "Personal and advertising injury" for offenses that are committed during the policy period of this Coverage Part.

However, if any "underlying insurance" is written on a claims-made basis, the "retained limit(s)" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this Coverage Part.

The Aggregate Limit, as described in Paragraph **2.** above, applies separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - CONDITIONS

1. **Appeals**

   If the "underlying insurer" or insured elects not to appeal a judgment in excess of the "retained limit", we may do so at our own expense.  We will also pay for taxable court costs, pre- and postjudgment interest and disbursements associated with such appeal.  In no event will this provision increase our liability beyond the applicable Limits of Insurance described in Section **III** - Limits Of Insurance.

2. **Bankruptcy**

   a. **Bankruptcy Of Insured**

      Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

   b. **Bankruptcy Of Underlying Insurer**

      Bankruptcy or insolvency of the "underlying insurer" will not relieve us of our obligations under this Coverage Part.

   However, this insurance will not replace the "underlying insurance" in the event of bankruptcy or insolvency of the "underlying insurer".  This insurance will apply as if the "underlying insurance" were in full effect.

3. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense, regardless of the amount, which may result in a claim.  To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

4. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been full complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance.  An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

5. **Other Insurance**

   a. This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis.  This condition will not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**b.** When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of the insurance provided under this Coverage Part; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

**6. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**7. Representations Of Fraud**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us;

**c.** We have issued this policy in reliance upon your representations; and

**d.** This policy is void in any case of fraud by you as it relates to this policy or any claim under this policy.

**8. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**9. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**10. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**11. Loss Payable**

Liability under this Coverage Part does not apply to a given claim unless and until:

**a.** The insured or insured's "underlying insurer" has become obligated to pay the "retained limit"; and

**b.** The obligation of the insured to pay the "ultimate net loss" in excess of the "retained limit" has been determined by a final settlement or judgment or written agreement among the insured, claimant and us.

**12. Transfer Of Defense**

When the underlying limits of insurance have been used up in the payment of judgments or settlements, the duty to defend will be transferred to us. We will cooperate in the transfer of control to us of any outstanding claims or "suits" seeking damages to which this insurance applies which would have been covered by the "underlying insurance" had the applicable limit not been used up.

**13. Maintenance Of/Changes To Underlying Insurance**

Any "underlying insurance" must be maintained in full effect without reduction of coverage or limits except for the reduction of the aggregate limit in accordance with the provisions of such "underlying insurance" that results from payment of claims, settlement or judgments to which this insurance applies.

Such exhaustion or reduction is not a failure to maintain "underlying insurance". Failure to maintain "underlying insurance" will not invalidate insurance provided under this Coverage Part, but insurance provided under this Coverage Part will apply as if the "underlying insurance" were in full effect.

If there is an increase in the scope of coverage of any "underlying insurance" during the term of this policy, our liability will be no more than it would have been if there had been no such increase.

You must notify us in writing, as soon as practicable, if any "underlying insurance" is cancelled, not renewed, replaced or otherwise terminated, or if the limits or scope of coverage of any "underlying insurance" is changed.

**14. Expanded Coverage Territory**

a. If a "suit" is brought in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from defending the insured, the insured will initiate a defense of the "suit".  We will reimburse the insured, under Supplementary Payments, for any reasonable and necessary expenses incurred for the defense of a "suit" seeking damages to which this insurance applies, that we would have paid had we been able to exercise our right and duty to defend.

If the insured becomes legally obligated to pay sums because of damages to which this insurance applies in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from paying such sums on the insured's behalf, we will reimburse the insured for such sums.

b. All payments or reimbursements we make for damages because of judgments or settlements will be made in U.S. currency at the prevailing exchange rate at the time the insured became legally obligated to pay such sums.  All payments or reimbursements we make for expenses under Supplementary Payments will be made in U.S. currency at the prevailing exchange rate at the time the expenses were incurred.

c. Any disputes between you and us as to whether there is coverage under this policy must be filed in the courts of the United States of America (including its territories and possessions), Canada or Puerto Rico.

d. The insured must fully maintain any coverage required by law, regulation or other governmental authority during the policy period, except for reduction of the aggregate limits due to payments of claims, judgments or settlements.

Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance.  However, this insurance will apply as if the required coverage by law, regulation or other governmental authority was in full effect.

**SECTION V - DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, "trailer" or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time.  "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

4. "Coverage territory" means anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

5. "Covered auto" means only those "autos" to which "underlying insurance" applies.

6. "Employee" includes a "leased worker".  "Employee" does not include a "temporary worker".

**EXHIBIT 6**

7. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b. You have failed to fulfill the terms of a contract or agreement;

    if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work", or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

    a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

    b. A sidetrack agreement;

    c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    e. An elevator maintenance agreement;

    f. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto." However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

    g. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

    Paragraphs f. and g. do not include that part of any contract or agreement:

    (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

    (2) That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

    (3) That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a "covered auto" over a route or territory that person or organization is authorized to serve by public authority.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Pollution cost or expense" means any loss, cost or expense arising out of any:

a. Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

17. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

**18.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

With respect to the ownership, maintenance or use of "covered autos", property damage also includes "pollution cost or expense", but only to the extent that coverage exists under the "underlying insurance" or would have existed but for the exhaustion of the underlying limits.

For the purposes of this insurance, with respect to other than the ownership maintenance or use of "covered autos", electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CD-ROMs, tapes, drives, cells,

data processing devices or any other media which are used with electronically controlled equipment.

**19.** "Retained limit" means the available limits of "underlying insurance" scheduled in the Declarations or the "self-insured retention", whichever applies.

**20.** "Self-insured retention" means the dollar amount listed in the Declarations that will be paid by the insured before this insurance becomes applicable only with respect to "occurrences" or offenses not covered by the "underlying insurance". The "self-insured retention" does not apply to "occurrences" or offenses which would have been covered by "underlying insurance" but for the exhaustion of applicable limits.

**21.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent or the "underlying insurer's" consent.

**22.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**23.** "Ultimate net loss" means the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with our consent or the "underlying insurer's" consent.

**24.** "Underlying insurance" means any policies of insurance listed in the Declarations under the Schedule of "underlying insurance".

**25.** "Underlying insurer" means any insurer who provides any policy of insurance listed in the Schedule of "underlying insurance".

**26.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**27.** "Your product":

a. Means:

   (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (a) You;

      (b) Others trading under your name; or

      (c) A person or organization whose business or assets you have acquired; and

   (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

   (2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

28. "Your work":

a. Means:

   (1) Work or operations performed by you or on your behalf; and

   (2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

   (2) The providing of or failure to provide warnings or instructions.

COMMERCIAL LIABILITY UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WHO IS AN INSURED AMENDMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

Under **SECTION II - WHO IS AN INSURED** Item **2.b.(1)** is deleted and replaced with the following:

**(1)** The owner, any "employee" or agent of the owner, or anyone else from whom you hire or borrow a covered "auto".  This exception does not apply if the covered "auto" is a trailer or semitrailer connected to a covered "auto" you own.

**CU 70 33  09 11**

252
**EXHIBIT 6**

COMMERCIAL LIABILITY UMBRELLA

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** Exclusion **2.t.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**t. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

**CU 21 86 05 14**

253
**EXHIBIT 6**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

This insurance does not apply to "bodily injury" or "property damage" arising out of:

1. Inhaling, ingesting or physical exposure to asbestos or goods or products containing asbestos;

2. The use of asbestos in constructing or manufacturing any goods, product or structure;

3. The removal, repair, encapsulation, enclosure, abatement or maintenance of asbestos in or from any goods, product or structure; or

4. The manufacture, sale, distribution, transportation, storage or disposal of asbestos or goods or products containing asbestos.

This insurance does not apply to payment for the investigation or defense of any claim, injury, loss, fine, penalty or "suit" related to any of the foregoing items **1** thru **4**.  Moreover we have no duty to investigate or defend any such claim, injury, loss or "suit".

This insurance also does not apply to any loss, cost or expense incurred in complying with any federal, state or local provision of law regarding the inspection, monitoring, or control of asbestos in any goods, products or structures.

**CU 70 00** 12 06

**EXHIBIT 6**

**COMMERCIAL LIABILITY UMBRELLA**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# EXCLUSION - INTERCOMPANY PRODUCTS SUITS

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

This insurance does not apply to any claim for damages by any Named Insured under this policy against another Named Insured under this policy because of "bodily injury" or "property damage" arising out of "your products" and included within the "products-completed operations hazard".

© Insurance Services Office, Inc., 2012                                    **CU 21 08  04 13**

**EXHIBIT 6**

| POLICY NUMBER:   CWP 3263063 | COMMERCIAL LIABILITY UMBRELLA |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

Exclusion **i.** under Paragraph **2.**, **Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

i. **Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

(2) "Pollution cost or expense".

© ISO Properties, Inc., 2001

CU 21 25  12 01

256

**EXHIBIT 6**

---

COMMERCIAL LIABILITY UMBRELLA

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

I.   The insurance does not apply:

A.   Under any Liability Coverage, to "bodily injury" or "property damage":

(1)  With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2)  Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.   Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1)  The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or **(b)** has been discharged or dispersed therefrom;

(2)  The "nuclear material" is contained in "spent fuel" or "waste" at any time

possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

(3)  The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

II.  As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailing or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

---

© ISO Properties, Inc., 2001    CU 21 23  02 02

257
EXHIBIT 6

COMMERCIAL LIABILITY UMBRELLA

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# LIMITED COVERAGE TERRITORY

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** Paragraph **14. Expanded Coverage Territory** under **Section IV - Conditions** does not apply.

**B.** The definition of "coverage territory" in the **Definitions** section is replaced by the following:

"Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in **a.** above;

**(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

© Insurance Services Office, Inc., 2012

CU 24 32  04 13

258
**EXHIBIT 6**

COMMERCIAL LIABILITY UMBRELLA

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.**  If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.**  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.**  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.**  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015

**CU 21 30** 01 15

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

Paragraph **9.** of the **Definitions** section is replaced by the following:

9.    "Insured contract" means"

a.    A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b.    A sidetrack agreement;

c.    Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.    An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.    An elevator maintenance agreement;

f.    That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto".    However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees";

g.    That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf.    However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraphs **f.** and **g.** do not include that part of any contract or agreement:

(1)    That indemnifies a railroad for "bodily injury" or "property damage" arising out of the construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(2)    That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

(3)    That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a "covered auto" over a route or territory that person or organization is authorized to serve by public authority.

© Insurance Services Office, Inc., 2012                                        **CU 24 30  04 13**

Insured:     QUEST PHARMACEUTICALS INC.
Claim Number: 0001874313
Date of Loss:   September 30, 2017





Policy Number:     CWP 3263063
Policy Period(s):   10/1/2016 - 10/1/2017
Policy Cancelled:   _____

☐ CERTIFIED POLICY

I,     LISA EVISON            , Region Service Leader of the
Westfield National Insurance Company, do hereby certify that the foregoing copy was prepared
under my supervision and to the best of my knowledge and belief is a true and correct copy of
the policy with an effective date of 10/1/2016 - 10/1/2017.

Signature: _____

☐ NON-CERTIFIED POLICY

This policy is not certified for the following reason(s): _____

_____

_____

Westfield Insurance • P.O. Box 5005 • Westfield Center, OH • 44251-5005

www.westfieldinsurance.com          Page 2 of 2

001
**EXHIBIT 7**

# *Commercial Insurance*

# *Coverage Policy*



**THIS POLICY HAS BEEN
ESPECIALLY DESIGNED**

*FOR:*

*QUEST PHARMACEUTICALS INC.*

*BY:*

*ASSUREDPARTNERS NL LLC*

*THROUGH:*

*WESTFIELD INSURANCE COMPANY*



**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**ID 7004 (0411)**

002
**EXHIBIT 7**

*IN WITNESS WHEREOF,* this Company has caused this policy to be signed by its President and Secretary and countersigned by a duly authorized representative of the Company if required by law.

*Frank A Carrino*   *Secretary*          *Edward J Loyd II*   *President*

003
**EXHIBIT 7**

3/21/18

Certified Policy: CWP 3263063

At the time of issuance this policy was under agency:    ASSURED NEACE LUKENS INS AGCY

This agency has been renamed to:
ASSUREDPARTNERS NL LLC

**EXHIBIT 7**

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON, KY 40509-2527

859-543-1716

Policy Number:   **CWP 3263063**

**QUEST PHARMACEUTICALS INC.**
**PO BOX 270**
**MURRAY KY 42071**

---

# Assembly Instructions

These pages update your current policy.  To keep it current, you should:

1.  Check the upper right hand corner of each page in this packet.

    a.  If it says "Renewal or Rating Period Declarations", **remove** the expired declarations page from your current policy and **replace** it with the updated "Renewal or Rating Period Declarations" page.

    b.  If it says "Amended Declarations", insert this amended page **on top** of the last declarations page you received.

2.  Every time you receive a "Renewal or Rating Period Declarations", **remove** all prior "Amended Declarations".

3.  When you remove pages from your policy, retain them for a permanent record.

    Thank you for placing your business with us!



**W E S T F I E L D**
**I N S U R A N C E**
Sharing Knowledge. Building Trust.®

P.O. Box 5001, Westfield Center, Ohio  44251-5001

CRP2117 (08-10)

# KENTUCKY STATE SURCHARGE EXPLANATION

The State Surcharge included in your policy is required by the Insurance Premium Tax Laws in Chapter 136 of the Kentucky Revised Statutes. The funds generated from this surcharge provide sufficient funds for the uses and purposes of the Firefighters Foundation Program fund as prescribed by KRS 95A.220 and KRS 95A.262 and the Law Enforcement Foundation Program fund as prescribed by KRS 15.430.

If you have any questions concerning this surcharge, please contact your independent insurance agent.

**AD 755  04-10**

**EXHIBIT 7**



**WESTFIELD**
I N S U R A N C E
Sharing Knowledge. Building Trust.®

03/15/18

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

CWP 3263063

## NOTICE TO KENTUCKY POLICYHOLDERS

Your insurance policy(ies) may be subject to a license fee or tax imposed by your local government.  The amount of the fee or tax is determined by the local government of the insured risk location.  The amount of tax and the local government(s) charging the tax will be shown on all future renewal certificates for your policy(ies).

If you believe you have been charged the tax in error, or overcharged, you may contact your insurance company at the address below to request a refund or credit for the tax paid.  If you need further assistance after contacting the company, you may contact the Kentucky Office of Insurance.

According to the Kentucky Revised Statute (KRS) 91A.080 and the regulations thereunder, a refund request or dispute notice **must** be mailed and contain the following information:

 i. Name of insured
 ii. Address(es) of insured property(ies)
 iii. Dates of coverage
 iv. Amount of tax paid
 v. Type of premium

It is also helpful to include the policy number for all policy(ies) involved.  Please mail this information to:

Westfield Group
Attn:  Legal Department
P.O. Box 5001
Westfield Center, Ohio  44251-5001

Upon receipt of this information, the company will have 90 days to respond to your request and, if deemed appropriate, refund any money due to you.

AD 89 28  12/08

007
**EXHIBIT 7**



**WESTFIELD**
INSURANCE
Sharing Knowledge. Building Trust.®

## IMPORTANT NOTICE TO OUR POLICYHOLDERS

*Westfield Insurance Fraud Hot-Line*

PLEASE READ THIS IMPORTANT INFORMATION

- Fraudulent insurance claims cost us all money.
- Call us if you have information concerning a fraudulent insurance claim.
- All information will be kept confidential.
- Call and discuss your information with a trained investigator, or leave the information anonymously on a telephone answering machine.
- We can all help fight insurance fraud.

AD 8522  (08-10)

## Be a Fraud Buster
## 1-800-654-6482

### Detach and retain information below for future use.



**Fraud Hot-Line**
**1-800-654-6482**



**Westfield Center, Ohio  44251**
**www.westfieldinsurance.com**



**Fraud Hot-Line**
**1-800-654-6482**



**Westfield Center, Ohio  44251**
**www.westfieldinsurance.com**

---

**THIS NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY. IF THERE IS ANY CONFLICT BETWEEN YOUR POLICY AND THIS NOTICE, THE PROVISIONS OF YOUR POLICY SHALL PREVAIL.**

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM
# INSURANCE COVERAGE and PREMIUM

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

## PREMIUM CHARGED

During your current policy period, the portion, if any, of your premium that is attributable to coverage for acts of terrorism as defined in the Act is $_____   (refer to Common Policy Declarations if blank).

**If you do not desire the coverage** for acts of terrorism as defined in the Act, as amended, you may reject the coverage and instruct the insurance company to remove it and refund the premium described above. **To reject the coverage, you must:**

1) advise the insurance company by letter (on your company letterhead),

2) signed by the owner, representative, or properly designated official of the named insured.

**The insurance company must receive your letter within 60 days** from the date shown at the bottom right side of the forms titled "Common Policy Declarations". Please refer to "Common Policy Declarations" for the mailing address of the insurance company.

If your policy premium is $500, that may represent a minimum premium. In that case, the portion that is attributable to acts of terrorism as defined in the Act, as amended, may be included within that minimum and your total premium will not be reduced if you reject coverage for acts of terrorism. The minimum premium will still apply.

Should you have any question regarding this notice, please contact your insurance agent.

**AD 85 84  01 15**

---

009
**EXHIBIT 7**

## IMPORTANT -- PREMIUM AUDIT NOTICE

Westfield Insurance welcomes the opportunity to service your insurance needs. The following information outlines the company's requirements for auditing your accounting records.

Your particular type of business has a policy premium that is based on estimated exposures at the time this policy was issued. Since the exposures that are used to rate your policy fluctuate during the policy year, your final premium cannot be determined until after the expiration date of the policy term.

An accurate premium audit is a benefit to you and your business. We recommend the person(s) in charge of keeping your financial records (e.g., Payroll; Gross Sales; Total Cost) be aware of insurance auditor needs. Records that are accurate and properly maintained allow you to gain the most benefit from your premium audit. Please ask questions and allow your auditor to assist you.

**WHO WILL MAKE THE AUDIT?**

You will be asked to complete a premium audit in one of three ways:

**Mail/Voluntary** - a form will be provided to you. The form will ask a series of questions relative to your type of risk and your type of policy. You will be asked to fill out the form in its entirety and return to Westfield for summary.

**Telephone** - a telephone auditor will call you on the phone to discuss your risk and gather your financials. This could be a staff auditor or vendor auditor depending on your policy.

**Physical** - a field auditor will contact you to visit your premises. They will ask about your operations and physically review your financial records. This could be a staff auditor or vendor auditor depending on your policy.

**WHAT RECORDS WILL BE NEEDED?**

The Premium Auditor will examine and audit all of your records that relate to your policy. The records needed will vary depending upon the type of coverage you have. In most cases, the auditor will be able to obtain the necessary audit data from two or more of the following records:

| | |
|---|---|
| Payroll Journals with monthly/quarterly totals | Individual Earning Cards with monthly/quarterly totals |
| Quarterly Tax Reports for Federal/State | Certificates of Insurance for sub-contractors |
| General Ledgers/Income/Sales Journals | |

In the course of the audit, the auditor will ask some questions about your records and your business operations. This will assist the Auditor in properly classifying your operations and employees.

**HOW SHOULD YOUR RECORDS BE KEPT:**

**Payroll:** Many of the premiums for your General Liability insurance are based on payroll which is defined as remuneration. Remuneration means money or substitutes for money. Payroll includes:

| | | | |
|---|---|---|---|
| Wages | Bonuses | Holiday Pay | Sick Pay |
| Commissions | Overtime Pay | Vacation Pay | Payment for piece work |

**Overtime:** The amount paid in excess of straight time pay can be deducted if the excess can be verified by your records. Your records must show overtime separately by employee.

**Division of Payroll:** Division of an individual employee's payroll to more than one classification is not allowed. Exception: For construction or erection operations, the payroll of an employee may be allocated to each type of work performed **if proper records are kept.** Payroll **cannot** be divided between construction and office or sales classifications.

**Gross Sales:** Another premium base for General Liability insurance is gross sales. This means the gross amount charged by you to others for all goods or products, sold or distributed and operations performed by you for others.

This information is provided to you as assistance for proper record-keeping requirements. Other insurance companies may differ in their requirements.

**AD 80 12 (8-10)**

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**RENEWAL**
**COMMON POLICY DECLARATIONS**

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | 11 | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From 10/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|
| | To 10/01/17 | mailing address shown above. |

**Business:** DRUG DIST                    **Named Insured is:** Corporation

In return for the payment of the premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy.

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS

| | |
|---|---|
| COMMERCIAL PROPERTY COVERAGE PART | $ 8,823.00 |
| DATA COMPROMISE/IDENTITY RECOVERY COVERAGE PART | $ 107.00 |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ 4,586.00 |
| COMMERCIAL AUTO COVERAGE PART | $ 71.00 |
| COMMERCIAL INLAND MARINE COVERAGE PART | Included |
| CRIME AND FIDELITY COVERAGE PART | Included |
| COMMERCIAL UMBRELLA COVERAGE PART | $ 2,250.00 |
| TERRORISM INSURANCE COVERAGE | $ 146.00 |
| Policy Annual Premium | $ 15,983.00 |
| Municipal Tax | $ 1,742.89 |
| State Surcharge | $ 287.69 |
| Total Advance Annual Policy Premium | $ 18,013.58 |

The above is a summary of your coverages. For more detail, please refer to the individual coverage parts inside your policy.

**Forms and Endorsements applicable to all coverage parts:**
IL0019   0488*, IL0017   1198*, ID7004   0411 , IL0003   0908*, IL0263   0908*.

COUNTERSIGNED: _____ BY _____
Date                                    Authorized Representative

PAGE   01 OF 02          IL 00 19 (04-88)          08/10/16          HF

011
EXHIBIT 7



**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**RENEWAL**
**COMMON POLICY DECLARATIONS**
(Continued)

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | | A |
|---|---|---|---|

| Policy Period | From | 10/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| | To | 10/01/17 | mailing address shown above. |

**Commercial Lines**
**Disclosure of Local Government Tax**

Municipal Tax          * - CITY   MURRAY                    $  1,742.89

Municipal Tax          * - TOTAL                            $  1,742.89

**\* The municipal tax amount includes a collection fee that is either 15% of the tax collected or 2% of the premium charged, whichever is less**

012
**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    CRIME AND FIDELITY COVERAGE PART
    EMPLOYMENT - RELATED PRACTICES LIABILITY COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued.  On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

© ISO Properties, Inc., 2007       **IL 00 03  09 08**

**EXHIBIT 7**

INTERLINE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# KENTUCKY CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART *
EMPLOYMENT - RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.  Cancellation of Policies in Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least 14 days before the effective date of cancellation.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.  Cancellation of Policies In Effect For More Than 60 Days**

**a.** If this policy has been in effect for more than 60 days or is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Discovery of fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

**(3)** Discovery of willful or reckless acts or omissions on your part which increase any hazard insured against;

**(4)** The occurrence of a change in the risk which substantially in-

creases any hazard insured against after insurance coverage has been issued or renewed;

**(5)** A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

**(6)** We are unable to reinsure the risk covered by the policy; or

**(7)** A determination by the commissioner that the continuation of the policy would place us in violation of the Kentucky insurance code or regulations of the commissioner.

**b.** If we cancel this policy based on Paragraph **7.a.** above, we will mail or deliver a written notice of cancellation to the first Named Insured, stating the reason for cancellation, at least:

**(1)** 14 days before the effective date of the cancellation, if cancellation is for nonpayment of premium; or

**(2)** 75 days before the effective date of the cancellation, if cancellation is for any reason stated in **7.a.(2)** through **7.a.(7)** above.

---

© ISO Properties, Inc., 2007

014
**EXHIBIT 7**

**C.** The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

1. For the purpose of this Condition:

    a. Any policy period or term of less than six months shall be considered to be a policy period or term of six months; and

    b. Any policy period or term of more than one year or any policy with no fixed expiration date shall be considered a policy period or term of one year.

2. If we elect not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the reason for nonrenewal, to the first Named Insured shown in the Declarations, at the last mailing address known to us, at least 75 days before the expiration date of the policy period.

3. If notice of nonrenewal is not provided pursuant to this Condition, coverage under the same terms and conditions shall be deemed to be renewed for the ensuing policy period upon payment of the appropriate premium until you have accepted replacement coverage with another insurer, or until you have agreed to the nonrenewal.

4. If we mail or deliver a renewal notice to the first Named Insured at least 30 days before the end of the policy period, stating the renewal premium and its due date, the policy will terminate without further notice unless the renewal premium is received by us or our authorized agent by the due date.

5. If this policy terminates because the renewal premium has not been received by the due date, we will, within 15 days, mail or deliver to the first Named Insured at his last known address a notice that the policy was not renewed and the date it was terminated.

6. If notice is mailed, proof of mailing is sufficient proof of notice.

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statues, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

IL 00 17 11 98

**31**

## WESTFIELD INSURANCE
### Sharing Knowledge. Building Trust.®

**RENEWAL**
**COMMERCIAL PROPERTY DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 |11| WIC Account Number: 1600961480 | A |
|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

**DESCRIPTION OF PREMISES**

| Loc Bldg | Address, City & State | Construction | Occupancy |
|---|---|---|---|
| 001 001 | 300 CHESTNUT ST MURRAY, KY 42071 | Non-Combustible | DRUG STORE |
| 001 002 | 300 CHESTNUT ST MURRAY, KY 42071 | Non-Combustible | DRUG STORE |

**COVERAGES PROVIDED - Insurance at the described premises applies only for coverages for which a limit of insurance is shown. OPTIONAL COVERAGES applicable only when entries are made in the schedules below:**

| Loc Bldg | Coverage | Coins | Infl. Guard | Repl. Cost | Limit of Insurance | Premium |
|---|---|---|---|---|---|---|
| | Blanket Building & Pers Prop | 100% | N/A | See Below | $5,870,000 | $6,630 |
| 001 001 | Building | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 001 001 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 001 001 | Bus Income incl Rental Value | 100% | N/A | N/A | $1,000,000 | $950 |
| | Cause of Loss:  Special | | | | | |
| 001 002 | Building | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |
| 001 002 | Business Personal Property | Blkt | N/A | Yes | Blanket | Blanket |
| | Cause of Loss:  Special | | | | | |

**OPTIONAL COVERAGES**

| Loc Bldg | Applicable to | Option Description | Premium |
|---|---|---|---|
| ALL ALL | Blanket Building & Pers Prop | Agreed value - expires 10/01/17 | INCLUDED |
| 001 001 | | Sig Series Distributor Endt | $330 |
| 001 002 | | Sig Series Distributor Endt | $250 |

| Equipment Breakdown Coverage Premium | $ 663.00 |
|---|---|
| Total Advance Annual Property Premium | $ 8,823.00 |

| Deductible is | $1000 |
|---|---|

**Forms and Endorsements applicable to this coverage part:**

| CP0030 | 0607*, | CP0090 | 0788*, | IL0952 | 0115*, | CP0166 | 0900*, | CP0140 | 0706*, |
|---|---|---|---|---|---|---|---|---|---|
| CP7083 | 0408*, | CP7084 | 0408*, | CP1032 | 0808*, | CP1556 | 0607*, | CP7091 | 1112*, |
| CP7102 | 1113*, | CPDS00 | 1014*, | CP1030 | 0607*, | CP0010 | 0607*, | IL0415 | 1004*, |
| CP7092 | 1109*, | CP0415 | 1000*, | CP0405 | 0402*, | CP1230 | 0695*, | CP0407 | 1091*, |
| CP0440 | 0607*, | CP0417 | 0607*, | CP0401 | 1000*. | | | | |

017
**EXHIBIT 7**

**WESTFIELD INSURANCE**
I N S U R A N C E
Sharing Knowledge. Building Trust.®

31

**RENEWAL**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** 16-07381 | **PROD.** | 000 |

| | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY 42071 | ASSUREDPARTNERS NL LLC<br>2443 SIR BARTON WAY STE 400<br>LEXINGTON KY 40509-2527<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063 |11| WIC Account Number: 1600961480 | A |
|---|---|---|

| **Policy Period** | **From** 10/01/16<br>**To** 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

**SIGNATURE SERIES**
**COMMERCIAL PROPERTY DISTRIBUTOR ENDORSEMENT**
**SCHEDULE**

This schedule modifies insurance provided under the

SIGNATURE SERIES COMMERCIAL PROPERTY ENDORSEMENT
SIGNATURE SERIES COMMERCIAL PROPERTY DISTRIBUTOR ENDORSEMENT

**LOCATION SCHEDULE**
Note: Crime Coverages included via CR 00 21 apply on a policy-level basis, including those locations/buildings not scheduled below.

| Loc. No. | Bldg. No. | Address, City & State |
|---|---|---|
| 001 | 001 | 300 CHESTNUT ST, MURRAY, KY 42071 |
| 001 | 002 | 300 CHESTNUT ST, MURRAY, KY 42071 |

The limits listed in Section I below are the most we will pay for each coverage in any one occurrence unless a different limit is listed in Section II below. (Refer to policy language for specific coverages, conditions and exclusions.)

**Section I**

| Coverage | Limit of Insurance |
|---|---|
| Accounts Receivable (CM 00 66)<br>    Property At Your Premises<br>    Property Away From Your Premises | $50,000<br>NIL |
| Appurtenant Buildings and Structures | $25,000 |
| Backup of Sewers or Drains | $50,000 |
| Brands and Labels (CP 04 01) | Included |
| Bridges, Roadways, Walks, Patios and other Paved Surfaces | Included |
| Business Income Changes - Beginning of the Period of Restoration (CP 15 56)<br>    Business Income (and Extra Expense), Business Income<br>    (without Extra Expense) including Civil Authority<br>        Reduction in Waiting Period | 24 hours |
| Business Income from Dependent Properties | $250,000 |
| Changes in Temperature | $50,000 |
| Computer Coverage<br>    Hardware, Data and Media<br>    Laptops/Portable Computers and Software (away from premises) | $250,000<br>$10,000 |
| Credit Card Invoices | $1,000 |
| Debris Removal - Additional Insurance (CP 04 15)<br>    Building & Contents (Combined) | $100,000 |
| Deferred Payments | $50,000 |
| Employee Theft (CR 00 21)<br>    Deductible Amount Per Occurrence: | $25,000<br>NIL |

018
EXHIBIT 7

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

31

**RENEWAL**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| **Policy Number: CWP 3 263 063** |11| **WIC Account Number:** 1600961480 | A |
|---|---|---|

| **Policy Period** | **From** 10/01/16 **To** 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

| | |
|---|---|
| Excavation Costs | Included |
| Extra Expense | $50,000 |
| Fine Arts (IM 74 00) | |
| Max per item | $5,000 |
| Catastrophe Limit | $25,000 |
| Deductible: | NIL |
| Breakage: | Breakage Exclusion Applies |
| Fire Department Service Charge | $25,000 |
| (Virginia Includes Volunteer Fire Departments) | |
| (Increased Limits Are Not Available For Arizona) | |
| Fire Extinguisher Recharge Expense | Included |
| Forgery or Alteration (CR 00 21) | $25,000 |
| Deductible Amount Per Occurrence: | NIL |
| Foundations of Buildings | Included |
| Ingress / Egress | $50,000 |
| | 12 Hour Waiting Period |
| Inside the Premises - Theft of Money & Securities   (CR 00 21) | $25,000 |
| Deductible Amount Per Occurrence: | NIL |
| Outside the Premises (CR 00 21) | $25,000 |
| Deductible Amount Per Occurrence: | NIL |
| Inventory and Appraisals | $10,000 |
| Leasehold Interest in Improvements and Betterments | Included |
| Lock Replacement | $10,000 |
| Loss Adjustment Expenses | $25,000 |
| Money Orders and Counterfeit Money (CR 00 21) | $1,500 |
| Deductible Amount Per Occurrence: | NIL |
| Newly Acquired or Constructed Property | |
| Buildings | $1,000,000/180 days |
| Business Personal Property | $500,000/180 days |
| Fine Arts | $10,000/180 days |
| Business Income | 180 days |
| Non Owned Detached Trailers | $10,000 |
| Ordinance or Law (CP 04 05) | |
| Loss to undamaged portion of building (if applicable)   Incl up to Bldg Lmt | |
| Demolition Cost / Increased Cost Of Const. Combined Limit | $100,000 |
| Equipment | Included |
| Outdoor Property | |
| Any one tree, shrub or plant | $2,500 |
| Any one occurrence | $25,000 |
| Outdoor Signs | $12,500 |
| Patterns, Dies, Molds, and Forms | $10,000 |

019
**EXHIBIT 7**

**31**

## WESTFIELD
### INSURANCE
Sharing Knowledge. Building Trust.®

**RENEWAL**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 |11| WIC Account Number: 1600961480 | A |
|---|---|---|

| **Policy Period** | **From** 10/01/16 **To** 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

| | |
|---|---|
| Peak Season - Automatic Increase (CP 12 30)<br>    Period (From/To): Annual Policy Period | Lesser of: 25% or $50,000 |
| Personal Effects and Property of Others<br>    Any one person in any one loss<br>    Any one occurrence | $5,000<br>$50,000 |
| Pollutant Clean Up and Removal  (CP 04 07)<br>    Deductible: | $50,000<br>NIL |
| Premises Boundary Increased Distance | 1,000 feet |
| Professional Fees - Architect and Engineer | $25,000 |
| Property at Un-named Locations | $25,000 |
| Property at Un-named Locations - Business Income | $25,000 |
| Property in Transit | $50,000 |
| Property in Transit - Business Income and Extra Expense | $50,000 |
| Property off Premises<br>    Max per salesperson | $50,000<br>$10,000 |
| Reward Payment<br>    Information<br>    Stolen Property | $10,000<br>$10,000 |
| Spoilage incl. Refrigeration Maintenance Agreement, Selling Price,<br>    Breakdown Or Contamination and Power Outage (CP 04 40)<br>    Deductible: | $50,000<br>$500 |
| Stamps, tickets, including lottery tickets held for sale, and letters of credit | $500 |
| Storage of Duplicate Data and Records | $25,000 |
| Theft Damage to Un-owned Building Property | Included |
| Tree Debris Removal | $1,000 |
| Underground Pipes, Flues, and Drains | Included |
| Utility Services - Direct Damage (CP 04 17)<br>Building<br>    Includes: Water Supply Property<br>            Communication Supply Property (No Overhead Transmission Lines)<br>            Power Supply Property (No Overhead Transmission Lines) | $50,000 |
| Business Personal Property<br>    Includes: Water Supply Property<br>            Communication Supply Property (No Overhead Transmission Lines)<br>            Power Supply Property (No Overhead Transmission Lines) | $50,000 |
| Vacancy | 11% Occupied |

020
**EXHIBIT 7**

**31**

## WESTFIELD INSURANCE
### Sharing Knowledge. Building Trust.®

**RENEWAL**
**COMMERCIAL PROPERTY DISTRIBUTOR**
**ENDORSEMENT SCHEDULE**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | | A |
|---|---|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

Valuable Papers and Records (CM 00 67)
   All Other Covered Property                             $50,000
   Property Away From Your Premises             $5,000
   Deductible:                                        NIL

| Distributor Coverage | Limit of Insurance |
|---|---|
| Non Owned Detached Trailers | $50,000 |
| Refrigeration Breakdown Expense | $10,000 |
| Transit Property in Care of Carriers for Hire | $50,000 |

If a limit is listed in Section II, that limit will supersede the limit in Section I for the designated coverage(s), location(s) and building(s) listed below.

If no limit is listed in Section II, there are no changes to Section I.

Note: If "All" is designated as the Loc. No./Bldg. No. Coverage applies to all locations, including those locations / buildings not scheduled.

### Section II

| Loc. No. | Bldg. No. | Coverage | Limit of Insurance |
|---|---|---|---|

021
**EXHIBIT 7**

COMMERCIAL PROPERTY

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.**, **Definitions.**

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle,

the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies to that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

© ISO Properties, Inc., 2007

022
EXHIBIT 7

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise have been payable under this Coverage Form.

**3.  Covered Causes Of Loss**

See applicable Causes Of Loss Form as shown in the Declarations.

**4.  Additional Limitation - Interruption of Computer Operations**

    **a.**   Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage - Interruption of Computer Operations.

    **b.**   Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage - Interruption of Computer Operations.

    **c.**   Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**5.  Additional Coverages**

    **a.  Civil Authority**

    In this Additional Coverage - Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

    When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

    **(1)**  Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

    **(2)**  The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

    **(1)**  Four consecutive weeks after the date of that action; or

    **(2)**  When your Civil Authority Coverage for Business Income ends;

whichever is later.

    **b.  Alterations And New Buildings**

    We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

    **(1)**  New buildings or structures, whether complete or under construction;

    **(2)**  Alterations or additions to existing buildings or structures; and

(3) Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

    (a) Used in the construction, alterations or additions; or

    (b) Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

    **(1) Business Income Other Than "Rental Value"**

    If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

        (a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

        (b) Ends on the earlier of:

            (i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

            (ii) 30 consecutive days after the date determined in **(1)(a)** above.

    However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

    **(2) "Rental Value"**

    If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

        (a) Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

        (b) Ends on the earlier of:

            (i) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

            (ii) 30 consecutive days after the date determined in **(2)(a)** above.

    However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**d. Interruption of Computer Operations**

    **(1)** Under this Additional Coverage, electronic data has the meaning described under Additional Limitation - Interruption of Computer Operations.

024
**EXHIBIT 7**

**(2)** Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss.

**(3)** With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

   **(a)** If the Causes of Loss - Special Form applies, coverage under this Additional Coverage - Interruption Of Computer Operations is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

   **(b)** If the Causes Of Loss - Broad Form applies, coverage under this Additional Coverage - Interruption Of Computer Operations includes Collapse as set forth in that form.

   **(c)** If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage - Interruption Of Computer Operations.

   **(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for

you to inspect, design, install, maintain, repair or replace that system.

   **(4)** The most we will pay under this Additional Coverage - Interruption of Computer Operations is $2,500 for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

   **(5)** This Additional Coverage - Interruption in Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in (4) above has not been exhausted.

**6. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**EXHIBIT 7**

(1) This policy expires;

(2) 30 days expire after you acquire or begin to construct the property; or

(3) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

**B. Limits Of Insurance**

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

1. Alterations And New Buildings;
2. Civil Authority;
3. Extra Expense; or
4. Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage.

**C. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

a. You must see that the following are done in the event of loss:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(7) Cooperate with us in the investigation or settlement of the claim.

(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

CP 00 30  06 07
Page 5 of 9

026
**EXHIBIT 7**

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Loss Determination**

**a.** The amount of Business Income loss will be determined based on:

**(1)** The Net Income of the business before the direct physical loss or damage occurred;

**(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**D. Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

**a.** The Net Income (Net Profit or Loss before income taxes), and

**b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

**Step (1):** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

**Step (2):** Divide the Limit of Insurance for the described premises by the figure determined in Step **(1)**; and

**Step (3):** Multiply the total amount of loss by the figure determined in Step **(2)**:

We will pay the amount determined in Step **(3)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**(1)** Prepaid freight - outgoing;

**(2)** Returns and allowances;

**(3)** Discounts;

**(4)** Bad debts;

**(5)** Collection expenses;

**(6)** Cost of raw stock and factory supplies consumed (including transportation charges);

**(7)** Cost of merchandise sold (including transportation charges);

**(8)** Cost of other supplies consumed (including transportation charges);

**(9)** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**(10)** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

**(11)** All ordinary payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

**(12)** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion - not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**EXAMPLE #1 (UNDERINSURANCE)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $400,000
The Coinsurance percentage is: 50%
The Limit of Insurance is: $150,000
The amount of loss is: $ 80,000

Step **(1):** $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2):** $150,000 ÷ $200,000 = .75

Step **(3):** $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**EXAMPLE #2 (ADEQUATE INSURANCE)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $400,000
The Coinsurance percentage is: 50%
The Limit of Insurance is: $200,000
The amount of loss is: $ 80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Maximum Period Of Indemnity**

**a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

**b.** The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

(1) The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

(2) The Limit of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

(1) The Limit of Insurance, multiplied by

(2) The fraction shown in the Declarations for this Optional Coverage.

**EXAMPLE**

When: The Limit of Insurance is $120,000
The fraction shown in the Declarations for this Optional Coverage is 1/4

The most we will pay for loss in each period of 30 consecutive days is: $30,000

($120,000 x 1/4 = $30,000)

If, in this example, the actual amount of loss is:

Days 1-30: $40,000
Days 31-60: 20,000
Days 61-90: 30,000
$90,000

We will pay:

Days 1-30: $30,000
Days 31-60: 20,000
Days 61-90: 30,000
$80,000

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

a. To activate this Optional Coverage:

(1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

(a) During the 12 months prior to the date of the Work Sheet; and

(b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

(2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

(a) The Coinsurance percentage shown in the Declarations; multiplied by

(b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

b. The Additional Condition, Coinsurance, is suspended until:

(1) 12 months after the effective date of this Optional Coverage; or

(2) The expiration date of this policy;

whichever occurs first.

c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

(1) Within 12 months of the effective date of this Optional Coverage; or

(2) When you request a change in your Business Income Limit of Insurance.

d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

(1) The Business Income Limit of Insurance; divided by

(2) The Agreed Value.

**EXAMPLE**

When: The Limit of Insurance is $100,000
The Agreed Value is $200,000
The amount of loss is $ 80,000

Step (1): $100,000 ÷ $200,000 = .50

Step (2): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

029
EXHIBIT 7

**4. Extended Period Of Indemnity**

Under Paragraph **A.5.c., Extended Business Income**, the number 30 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

**F. Definitions**

1. "Finished stock" means stock you have manufactured.

   "Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

   "Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

2. "Operations" means:

   a. Your business activities occurring at the described premises; and

   b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

3. "Period of restoration" means the period of time that:

   a. Begins:

      (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

      (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (2) The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

   (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration."

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Rental Value" means Business Income that consists of:

   a. Net Income (Net Profit of Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

   b. Continuing normal operating expenses incurred in connection with that premises, including;

      (1) Payroll; and

      (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

6. "Suspension" means:

   a. The slowdown or cessation of your business activities; or

   b. That a part of all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

030
EXHIBIT 7

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

## A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

## B. CONTROL OF PROPERTY

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

## C. INSURANCE UNDER TWO OR MORE COVERAGES

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

## D. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## E. LIBERALIZATION

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

## F. NO BENEFIT TO BAILEE

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

## G. OTHER INSURANCE

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:

   a. During the policy period shown in the Declarations; and
   b. Within the coverage territory.

2. The coverage territory is:

   a. The United States of America (including its territories and possessions);
   b. Puerto Rico; and
   c. Canada.

## I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

031
EXHIBIT 7

   **a.**   Someone insured by this insurance;

   **b.**   A business firm:

       **(1)**   Owned or controlled by you; or

       **(2)**   That owns or controls you; or

   **c.**   Your tenant.

This will not restrict your insurance.

032
**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> EQUIPMENT BREAKDOWN COVERAGE PART
> FARM COVERAGE PART
> STANDARD PROPERTY POLICY

**A. Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

© Insurance Services Office, Inc., 2015

**IL 09 52  01 15**

**EXHIBIT 7**

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

**1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

**2.** Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

© ISO Properties, Inc., 2006

**CP 01 40  07 06**

034
**EXHIBIT 7**

| POLICY NUMBER:  CWP 3263063 | COMMERCIAL PROPERTY |
|---|---|

# COMMERCIAL PROPERTY COVERAGE PART
## EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

These coverages apply to all locations covered on the policy, unless otherwise specified.

### SCHEDULE OF COVERED LOCATIONS WITH DEDUCTIBLES

| Loc. No. | Bldg. No. | Combined All Coverages Deductible | Direct Coverages Deductible | Indirect Coverages Deductible | Spoilage Deductible ($ Amt. or % of Loss) |
|---|---|---|---|---|---|
| 001 | ALL | $ 1,000 | | | |

**CP 70 83  04 08**

035

**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063                                    COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

Equipment Breakdown is subject to the Limits of Insurance shown in the Commercial Property Coverage Part Declarations unless otherwise specified on the schedule below.

| Coverages | Limits |
|---|---|
| Equipment Breakdown Limit | $ |
| Business Income | $ |
| Extra Expense | $ |

The Limits for the following Coverages are included in the Equipment Breakdown Coverage form for $50,000 each unless otherwise specified on the schedule below.  (Note:  The Service Interruption Limit will follow the Business Income, Extra Expense or Spoilage Limit with a 24 hour waiting period).

| Coverages | Limits |
|---|---|
| Expediting Expenses | $ |
| Hazardous Substances | $ |
| Spoilage | $ |
| Computer Equipment | $ |
| Data Restoration | $ |
| Service Interruption | $ |

**CP 70 83  04 08**

036
**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063 COMMERCIAL PROPERTY

# COMMERCIAL PROPERTY COVERAGE PART
# EQUIPMENT BREAKDOWN COVERAGE SCHEDULE

**Other Conditions**

**CP 70 83  04 08**

037
**EXHIBIT 7**

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EQUIPMENT BREAKDOWN COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** The following is added as an **Additional Coverage** to the **Causes of Loss - Basic Form, Broad Form or Special Form.**

**Additional Coverage - Equipment Breakdown**

The term Covered Cause of Loss includes the Additional Coverage Equipment Breakdown as described and limited below:

**1.** We will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:

   **a.** mechanical breakdown, including rupture or bursting caused by centrifugal force;

   **b.** artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

   **c.** explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control;

   **d.** loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

   **e.** loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

**2.** Unless otherwise shown in the Schedule, the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance:

   **a. Expediting Expenses**

   With respect to your damaged Covered Property, we will pay up to $50,000 unless otherwise shown in a Schedule, the reasonable extra cost to:

   **(1)** make temporary repairs; and

   **(2)** expedite permanent repairs or permanent replacement.

   **b. Hazardous Substances**

   We will pay for the additional cost to repair or replace Covered Property because of contamination by a "hazardous substance." This includes the additional expenses to clean up or dispose of such property.

   This does not include contamination of "perishable goods" by refrigerant, including but not limited to ammonia, which is addressed in **2.c.(1)(b)** below. As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

   The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000 unless otherwise shown in a Schedule.

   **c. Spoilage**

   **(1)** We will pay:

      **(a)** for physical damage to "perishable goods" due to spoilage;

      **(b)** for physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia;

      **(c)** any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CP 70 84  04 08
Page 1 of 6

038
EXHIBIT 7

**(2)** If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss, damage or expense under this coverage is $50,000 unless otherwise shown in the Schedule.

**d.  Computer Equipment**

We will pay for loss, damage or expense caused by or resulting from an "accident" to "computer equipment."

The most we will pay for loss, damage or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, is shown as covered, is $50,000 unless otherwise shown in a Schedule. Computers used primarily to control or operate "covered equipment" are not subject to this limit.

**e.  Data Restoration**

We will pay for your reasonable and necessary cost to research, replace and restore lost "data."

The most we will pay for loss or expense under this coverage, including actual loss of Business Income you sustain and necessary Extra Expense you incur, if shown as covered, is $50,000 unless otherwise shown in a Schedule.

**f.  Service Interruption**

**(1)** Any insurance provided for Business Income, Extra Expense or Spoilage is extended to apply to your loss, damage or expense caused by an "accident" to equipment that is owned by a utility, landlord or other supplier with whom you have a contract to supply you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed

air, water, steam, internet access, telecommunications services, wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that is not Covered Property.

**(2)** Unless otherwise shown in a Schedule, Service Interruption coverage will not apply unless the failure or disruption of service exceeds 24 hours immediately following the "accident."

**(3)** The most we will pay for loss, damage or expense under this coverage is the limit that applies to Business Income, Extra Expense or Spoilage, except that if a limit is shown in a Schedule for Service Interruption, that limit will apply to Business Income and Extra Expense loss under this coverage.

**g.  Business Income and Extra Expense**

Any insurance provided under this coverage part for Business Income or Extra Expense is extended to the coverage provided by this endorsement. The most we will pay for loss of Business Income you sustain or necessary Extra Expense you incur is the limit shown in the Declarations for that coverage, unless otherwise shown in a Schedule.

**3.  EXCLUSIONS**

All exclusions in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

**a.** The exclusions are modified as follows:

**(1)** If the Causes of Loss - Basic Form or Causes of Loss - Broad Form applies, the following is added to Exclusion **B.2.**:

Depletion, deterioration, corrosion, erosion, wear and tear, or other gradually developing conditions. But if an "accident" results, we will pay for the resulting loss, damage or expense.

**(2)** The following is added to Exclusion **B.1.g.**:

However, if electrical "covered equipment" requires drying out because of Water as described in **g.(1)** through **g.(3)** above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Building or Business Personal Property, whichever applies.

**(3)** If the Causes of Loss - Special Form applies, as respects this endorsement only, the last paragraph of Exclusion **B.2.d.** is deleted and replaced with the following:

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in an "accident," we will pay for the loss, damage or expense caused by that "accident."

**b.** We will not pay under this endorsement for loss, damage or expense caused by or resulting from:

**(1)** your failure to use all reasonable means to protect Covered Property from damage following an "accident";

**(2)** any defect, programming error, programming limitation, computer virus, malicious code, loss of "data," loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind. But if an "accident" results, we will pay for the resulting loss, damage or expense; or

**(3)** any of the following tests:

a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

**c.** With respect to Service Interruption coverage, we will also not pay for an "accident" caused by or resulting from: fire; lightning; windstorm or hail; explosion (except as specifically provided in **A.1.c.** above); smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; falling objects; weight of snow, ice or sleet; freezing; collapse; flood or earth movement.

**d.** With respect to Business Income, Extra Expense and Service Interruption coverages, we will also not pay for:

**(1)** loss caused by your failure to use due diligence and dispatch all reasonable means to resume business; or

**(2)** any increase in loss resulting from an agreement between you and your customer or supplier.

**e.** We will not pay for loss, damage or expense caused directly or indirectly by the following, whether or not caused by or resulting from an "accident": Any mold, fungus, mildew or yeast, including any spores or toxins produced by or emanating from such mold, fungus, mildew or yeast. This includes, but is not limited to, costs arising from clean up, removal, or abatement of such mold, fungus, mildew or yeast, spores or toxins. However, this exclusion does not apply to spoilage of personal property that is "perishable goods," to the extent that spoilage is covered under Spoilage coverage.

**f.** We will not pay under this endorsement for any loss or damage to animals.

4. DEFINITIONS

The following definitions are added:

**a.** "Boilers and vessels" means:

**(1)** Any boiler, including attached steam, condensate and feedwater piping; and

**(2)** Any fired or unfired pressure vessel subject to vacuum or internal pressure other than the static pressure of its contents.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

**b.** "Computer equipment" means Covered Property that is electronic computer or other data processing equipment, including "media" and peripherals used in conjunction with such equipment.

**c.** "Covered equipment"

**(1)** "Covered equipment" means, unless otherwise specified in a Schedule, Covered Property:

**CP 70 84  04 08**
**Page 3 of 6**

**(a)** that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

**(b)** which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

**(2)** None of the following is "covered equipment":

**(a)** structure, foundation, cabinet, compartment or air supported structure or building;

**(b)** insulating or refractory material;

**(c)** sewer piping, underground vessels or piping, or piping forming a part of a sprinkler system;

**(d)** water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

**(e)** "vehicle" or any equipment mounted on a "vehicle";

**(f)** satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

**(g)** dragline, excavation or construction equipment; or

**(h)** equipment manufactured by you for sale.

**d.** "Data" means information or instructions stored in digital code capable of being processed by machinery.

**e.** "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

**f.** "Media" means material on which "data" is recorded, such as magnetic tapes, hard disks, optical disks or floppy disks.

**g.** "One accident" means: If an initial "accident" causes other "accidents,"

all will be considered "one accident." All "accidents" that are the result of the same event will be considered "one accident."

**h.** "Perishable goods" means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

**i.** "Production machinery" means any machine or apparatus that processes or produces a product intended for eventual sale. However, "production machinery" does not mean any fired or unfired pressure vessel other than a cylinder containing a movable plunger or piston.

This term does not appear elsewhere in this endorsement, but may appear in a Schedule.

**j.** "Vehicle" means, as respects this endorsement only, any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.

However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external power source will not be considered a "vehicle."

**B.** The Building and Personal Property Coverage Form is modified as follows. The definitions stated above also apply to section **B.** of this endorsement.

**1.** DEDUCTIBLE

The deductible in the Declarations applies unless a separate Equipment Breakdown deductible is shown in a Schedule. If a separate Equipment Breakdown deductible is shown, the following applies.

Only as regards Equipment Breakdown Coverage, provision D. DEDUCTIBLE is deleted and replaced with the following:

**a.** Deductibles for Each Coverage

**(1)** Unless the Schedule indicates that your deductible is combined for all coverages, multiple deductibles may apply to any "one accident."

**CP 70 84   04 08**
**Page 4 of 6**

(2) We will not pay for loss, damage or expense under any coverage until the amount of the covered loss, damage or expense exceeds the deductible amount indicated for that coverage in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable deductible amount, subject to the applicable limit.

(3) If deductibles vary by type of "covered equipment" and more than one type of "covered equipment" is involved in any "one accident," only the highest deductible for each coverage will apply.

**b.** Direct and Indirect Coverages

(1) Direct Coverages Deductibles and Indirect Coverages Deductibles may be indicated in the Schedule.

(2) Unless more specifically indicated in the Schedule:

(a) Indirect Coverages Deductibles apply to Business Income and Extra Expense loss; and

(b) Direct Coverages Deductibles apply to all remaining loss, damage or expense covered by this endorsement.

**c.** Application of Deductibles

(1) Dollar Deductibles

We will not pay for loss, damage or expense resulting from any "one accident" until the amount of loss, damage or expense exceeds the applicable Deductible shown in the Schedule. We will then pay the amount of loss, damage or expense in excess of the applicable Deductible or Deductibles, up to the applicable Limit of Insurance.

(2) Time Deductible

If a time deductible is shown in the Schedule, we will not be liable for any loss occurring during the specified number of hours or day immediately following the "accident." If a time deductible is expressed in days, each day

shall mean twenty-four consecutive hours.

(3) Multiple of Average Daily Value (ADV)

If a deductible is expressed as a number of times ADV, that amount will be calculated as follows:

The ADV (Average Daily Value) will be the Business Income (as defined in any Business Income coverage that is part of this policy) that would have been earned during the period of interruption of business had no "accident" occurred, divided by the number of working days in that period. No reduction shall be made for the Business Income not being earned, or in the number of working days, because of the "accident" or any other scheduled or unscheduled shutdowns during the period of interruption. The ADV applies to the Business Income Value of the entire location, whether or not the loss affects the entire location. If more than one location is included in the valuation of the loss, the ADV will be the combined value of all affected locations. For purposes of this calculation, the period of interruption may not extend beyond the period of restoration.

The number indicated in the Schedule will be multiplied by the ADV as determined above. The result shall be used as the applicable deductible.

(4) Percentage of Loss Deductibles

If a deductible is expressed as a percentage of loss, we will not be liable for the indicated percentage of the gross amount of loss, damage or expense (prior to any applicable deductible or coinsurance) insured under the applicable coverage. If the dollar amount of such percentage is less than the indicated minimum deductible, the minimum deductible will be the applicable deductible.

**2.** CONDITIONS

The following conditions are in addition to the Conditions in the Building and Personal Property Coverage Form and the Common Policy Conditions.

042
EXHIBIT 7

**a.** Suspension

Whenever "covered equipment" is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an "accident" to that "covered equipment." This can be done by mailing or delivering a written notice of suspension to:

(1) your last known address; or

(2) the address where the "covered equipment" is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment." If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But the suspension will be effective even if we have not yet made or offered a refund.

**b.** Jurisdictional Inspections

If any property that is "covered equipment" under this endorsement requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

**c.** Environmental, Safety and Efficiency Improvements

If "covered equipment" requires replacement due to an "accident," we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality. This condition does not increase any of the applicable limits. This condition does not apply to any property to which Actual Cash Value applies.

**d.** Coinsurance

If a coinsurance percentage is shown in a Schedule for specified coverages, the following condition applies.

We will not pay for the full amount of your loss if the applicable limit is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, we will determine what percentage this calculated product is compared to the applicable limit and apply that percentage to the gross amount of loss. We will then subtract the applicable deductible. The resulting amount, or the applicable limit, is the most we will pay. We will not pay for the remainder of the loss. Coinsurance applies separately to each insured location.

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in a Schedule. Coverage provided under this endorsement does not provide an additional amount of insurance.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WATER EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion in Paragraph **B.** replaces the **Water** Exclusion in this Coverage Part or Policy.

**B. Water**

1. Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

2. Mudslide or mudflow;

3. Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

4. Water under the ground surface pressing on, or flowing or seeping through:

   **a.** Foundations, walls, floors or paved surfaces;

   **b.** Basements, whether paved or not; or

   **c.** Doors, windows or other openings; or

5. Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.**, **3.** or **4.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **5.**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

© Insurance Services Office, Inc., 2008

CP 10 32  08 08

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

# BUSINESS INCOME CHANGES-
# BEGINNING OF THE PERIOD OF RESTORATION

This endorsement modifies insurance provided under the following:

BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

**SCHEDULE**

| Select Either A, or B |
| --- |
| |
| A | ☐   72 Hour Time Period Is Replaced By 24 Hours |
| B | ☐   72 Hour Time Period Is Eliminated |

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** If the Schedule indicates that the 72-hour time period is replaced by 24 hours, then;

    **1.** The 72-hour time period in the definition of "period of restoration" is replaced by 24 hours.  Therefore, the period of restoration for Business Income Coverage begins 24 hours after the time of direct physical loss or damage, subject to all other provisions of the definition of "period of restoration"; and

    **2.** The 72-hour time period in the Civil Authority Additional Coverage is replaced by 24 hours. Therefore, coverage under the Additional Coverage - Civil Authority begins 24 hours after the time of action of civil authority, subject to all other provisions of the Additional Coverage.

**B.** If the Schedule indicates that the 72-hour time period is eliminated then;

    **1.** The 72-hour time period in the definition of "period of restoration" is deleted.  Therefore, the period of restoration for Business Income Coverage begins at the time of direct physical loss or damage, subject to all other provisions of the definition of "period of restoration"; and

    **2.** The 72-hour time period in the Civil Authority Additional Coverage is deleted. Therefore, coverage under the Additional Coverage - Civil Authority begins at the time of action of civil authority, subject to all other provisions of that Additional Coverage.

© ISO Properties, Inc., 2006                                           **CP 15 56  06 07**

COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.



WESTFIELD *Signature* SERIES (SM)

# COMMERCIAL PROPERTY ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUSINESS INCOME COVERAGE FORMS
CAUSES OF LOSS - SPECIAL FORM

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM AMENDMENT**

If a coverage limit is shown as applicable in the Signature Series Commercial Property Coverage Endorsement Schedule, the following coverages apply.  These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

Under **Section A. Coverage 1. Covered Property a. Building,** the following is added;

(6) Foundations of buildings, structures, machinery or boilers if their foundations are below:

(a) The lowest basement floor: or

(b) The surface of the ground, if there is no basement.

(7) Appurtenant buildings and structures at the described premises up to a limit of $25,000;

(8) Underground pipes, flues and drains.

(9) Bridges, roadways, walks, patios and other paved surfaces.

(10) Retaining walls that are not part of a building.

Under **Section A. Coverage 1. Covered Property b. Your Business Personal Property,** the following is added:

(8) Your leasehold interest in improvements and betterments which are not damaged or destroyed, but which you lose because your lease is cancelled by the lessor as a result of damage to the building from a Covered Cause of Loss.  When this occurs, we will calculate the value of your interest in the improvements and betterments as though they had been damaged or destroyed and not repaired or replaced promptly, as provided in the Valuation Loss Condition.

Under Section **A. Coverage 2. Property Not Covered,** the following items are amended:

Paragraphs **d. g., l.** and **m.** are deleted.

Paragraph **f.** is replaced with the following:

f. The cost of excavations, grading, backfilling or filling, unless such cost is necessarily incurred in the repair or replacement of covered loss or damage to Covered Property below the surface of the ground;

Paragraph **i.** is replaced with the following:

i. Personal property while airborne or waterborne, except with respect to the property in transit coverages provided in the Coverage Extensions;

In **Section A. Coverage,** the references to 100 feet are changed to read 1,000 feet in the following paragraphs:

**1.a.(5)(b) Building;
1.b. Business Personal Property;
1.c.(2) Personal Property of Others; and
5. Coverage Extensions**

Under **Section A. Coverage, 4. Additional Coverages, c. Fire Department Service Charge,** the limit is changed from $1,000 to $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **A. Coverage, 4. Additional Coverages,** the following is **added:**

g. **Fire Extinguisher Recharge Expense**

We will pay to recharge or replace your fire extinguishers, whichever cost is less, when they are discharged as a result of fighting a fire caused by a Covered Cause of Loss, on or within 1,000 feet of your described premises.

No deductible apples to this Additional Coverage.

**CP 70 91  11 12
Page 1 of 12**

046
**EXHIBIT 7**

**h.  Lock Replacement**

We will pay the cost to repair the door locks or tumblers of your described premises due to "theft" of your door keys.

"Theft" means any act of stealing. "Theft" does not mean mysterious or unexplained disappearance of property.

The most we will pay under this Additional Coverage is $10,000, unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

No deductible applies to this Additional Coverage.

**i.  Reward Payment**

(1) We will reimburse you for rewards paid as follows:

(a) Up to $10,000 to an eligible person for information leading to the arrest and conviction of any person or persons committing a crime resulting in loss or damage to Covered Property from a Covered Cause of Loss. However, we will pay no more than the lesser of the following amounts

(i) Actual cash value of the Covered Property at the time of loss or damage, but no more than the amount required to repair or replace it; or

(ii) The amount determined by the loss settlement procedure applicable to Covered Property under the Loss Payment Condition.

(b) Up to $10,000 to an eligible person for the return of stolen Covered Property, when the loss or damage is caused by theft. However, we will pay no more than the lesser of the following amounts:

(i) Actual cash value based on the condition of the Covered Property at the time it is returned, but not more than the amount required to repair or replace it; or

(ii) The amount determined by the loss settlement procedure applicable to the return Covered Property under the Loss Payment Condition.

(2) This Additional Coverage applies subject to the following additional conditions:

(a) An eligible person means that person designated by a law enforcement agency as being the first to voluntarily provide the information leading to the arrest and conviction or return of the stolen Covered Property, and who is not:

(i) You;

(ii) Your employee;

(iii) Any employee of a law enforcement agency;

(iv) An employee of a business engaged in property protection;

(v) Any person who had custody of the Covered Property at the time the theft was committed; or

(vi) Any person involved in the crime.

(b) No reward will be reimbursed unless and until the person(s) committing the crime is/are convicted or the Covered Property is returned.

(c) You must have posted public notice of reward prior to the first person volunteering the necessary information or returning the stolen Covered Property.

(3) The lesser of the amount of the reward or the amount shown in the Signature Series Commercial Property Endorsement Schedule is the most we will reimburse for loss under this Additional Coverage for any one occurrence.

We will pay up to $10,000 as a reward for information which leads to an arson, theft or vandalism conviction in connection with a fire, theft or vandalism loss to property covered under this policy. Regardless of the number of persons involved in providing information, the limit of our liability under this Additional Coverage shall not be increased.

No deductible applies to this Additional Coverage.

047
EXHIBIT 7

**j. Theft Damage to Un-owned Building Property**

(1) We will pay for damage caused directly by theft or attempted theft to:

    (a) That part of any un-owned building containing Your Business Personal Property; or

    (b) Un-owned Equipment within the un-owned building used to maintain or service the building.

(2) This Additional Coverage is primary and applies only to premises where you are a tenant and are required in your lease to cover this exposure. This Additional Coverage does not apply to damage by fire or explosion.

(3) This Additional Coverage is included within the Limit of Insurance applicable to Your Business Personal Property at the location of loss, and does not increase that Limit of Insurance.

**k. Professional Fees - Architects & Engineers**

We will pay for architect and engineering fees that are necessarily incurred in the repairing or replacing of the Building property as a direct result of a covered loss. These fees do not include those incurred by you in the preparation of a claim. Also, the architects and engineers used will be at our discretion.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

This Additional Coverage is included within the Building Limit of Insurance applicable at the location of loss and does not increase that Limit of Insurance.

**l. Ordinance Or Law - Equipment Coverage**

(1) Subject to Paragraph (2) below, if a Covered Cause of Loss occurs to equipment that is Covered Property, we will pay the additional costs to repair or replace the equipment as required by law.

(2) If the Covered Cause of Loss occurs to refrigeration equipment that is Covered Property, we will pay:

    (a) The cost to reclaim the refrigerant as required by law;

    (b) The cost to retrofit the equipment to use a non-CFC refrigerant as required by the Clean Air Act of 1990 and any amendments thereto or any similar laws; and

    (c) The increased cost to recharge the system with a non-CFC refrigerant.

(3) The terms of this coverage apply separately to each piece of covered equipment.

(4) We will not pay under this endorsement for the costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", except as provided in (2)(a) above.

(5) Loss to the equipment will be determined as follows:

    (a) If the Replacement Cost applies and the equipment is repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

        (i) The amount you actually spend to repair the equipment, but not for more than the amount it would cost to replace the equipment of the same kind and quality; or

        (ii) The Limit of Insurance shown in the Declarations as applicable to the covered Building or Your Business Personal Property.

    (b) If the Replacement Cost applies and the equipment is not repaired or replaced, or if the Replacement Cost does not apply, we will not pay more than the lesser of:

**CP 70 91  11 12**
**Page 3 of 12**

048
**EXHIBIT 7**

      (i) The actual cash value of the equipment at the time of loss; or

      (ii) The Limit of Insurance shown in the Declarations as applicable to the covered Building or Your Business Personal Property.

(c) We will not pay for loss due to any ordinance or law that:

      (i) You were required to comply with before the loss, even if the equipment was undamaged; and

      (ii) You failed to comply with.

Under **Section A. Coverage, 5. Coverage Extensions, a. Newly Acquired Or Constructed Property (1) Buildings** the limit changed from $250,000 at each building to $1,000,000 at each building unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions, a. Newly Acquired Or Constructed Property (2) Your Business Personal Property** the limit is changed from $100,000 at each building to $500,000 at each building unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions, a. Newly Acquired Or Constructed Property (3) Period of Coverage (b)** is changed from 30 days to 180 days.

Under **Section A. Coverage, 5. Coverage Extensions, b. Personal Effects and Property of Others** subparagraph **(2)** is amended to personal property of others in your care, custody, or control while anywhere within the coverage territory.

The limit is changed from $2,500 at each described premises to $50,000 at each described premises unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule. We will not pay more than $5,000 to any one person in any one loss. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

Under **Section A. Coverage, 5. Coverage Extensions, d. Property Off-premises**, subparagraph **(3)** is replaced with the following: The most we will pay for loss or damage under this Extension is $50,000 to property of others while in the care, custody or control of a salesperson unless a different limit of insurance is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions, e. Outdoor Property**, the last paragraph is amended to change the limit under this Extension from $1,000 to $25,000. The limit for any one tree, shrub or plant is changed from $250 to $2,500. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Under **Section A. Coverage, 5. Coverage Extensions, f. Non-owned Detached Trailers**, subparagraph **(3)**, the limit is changed from $5,000 to $10,000 unless a different limit of insurance is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section A. Coverage, 5. Coverage Extensions** the following is added:

    **g. Property In Transit**

      You may extend the insurance provided by this Coverage Form to apply to your Covered Property (including property that is in the care, custody or control of your salespersons) in transit in or on a motor vehicle you own, lease or operate while between points within the coverage territory and more than 1,000 feet from the described premises. Loss or damage must be caused by or result from one of the following Covered Causes of Loss:

      (1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion or vandalism;

      (2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the road bed;

      (3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry;

      (4) Flood; or

      (5) Earthquake.

      The coverage provided under this Extension replaces coverage provided under any other additional coverage extension applying to property in transit. The most we will pay for this coverage is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

    **h. Extra Expense**

      We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises, including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

CP 70 91  11 12
Page 4 of 12

049
EXHIBIT 7

Extra Expense means expense incurred:

**(1)** To avoid or minimize the suspension of business to continue "operations":

    **(a)** At the described premises; or

    **(b)** At replacement premises or at temporary locations, including:

        **(i)** Relocation expenses: and

        **(ii)** Costs to equip and operate the replacement or temporary locations.

**(2)** To minimize the suspension of business if you cannot continue "operations"; or

**(3)** To repair or replace any property; or

**(4)** To research, replace or restore the lost information on damaged valuable papers and records;

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage.

We will only pay for Extra Expense that occurs after the date of direct physical loss or damage. The most we will pay for loss or damage under this Extension is $50,000.

"Operations" means your business activities occuring at the described premises.

"Period of Restoration" means the period of time that:

**(1)** Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

**(2)** Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of Restoration" does not include any increased period required due to the enforcement of any law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Regulates the prevention, control, repair, clean-up or restoration of environmental damage.

The expiration date of this policy will not cut short the "period of restoration."

**i.** **Back Up of Sewers or Drains**

You may extend the insurance provided by this Coverage Part to apply to loss or damage to your Covered Property caused by:

**(1)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment.

**(2)** Subsurface water that enters into and overflows from within a:

    **(a)** Sump pump;

    **(b)** Sump pump well; or

    **(c)** Other type system;

designed to remove subsurface water from the foundation area.

The most we will pay for loss or damage under this Extension is $50,000 per any one occurrence including Business Income unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**j.** **Credit Card Invoices**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Sums owed you from grantors of credit provided you are unable to collect from them due to direct loss or damage to your credit card invoice records;

**(2)** Increased collection costs as a result of such direct loss or damage; or

**(3)** Other reasonable expenses that you incur to re-establish your records of credit card invoices following such direct loss or damage:

that results from a Covered Cause of Loss to your records of credit card invoices.

This insurance applies to credit card invoices while:

**(1)** On premises scheduled in the Declarations of this policy;

**(2)** While being conveyed outside the premises; or

**(3)** While temporarily at other premises for any reason except storage.

The most we will pay for loss or damage under this Extension is $1,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

050
**EXHIBIT 7**

**k.  Changes in Temperature**

You may extend the insurance provided by this coverage to apply to direct physical loss or damage to Covered Property, other than spoilage, caused by changes or extremes in temperature or humidity.

The most we will pay for loss or damage is $50,000 per any one occurrence including Business Income unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**l.  Inventory and Appraisals**

You may extend the insurance provided for Covered Property to apply to the cost of any inventory or appraisal that we require when loss or damage occurs to Covered Property.

The most we will pay for loss or damage under this Extension is $10,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**m.  Computer Coverage**

You may extend the insurance that applies to your Business Personal Property to apply to "computer equipment", "media", "data", and "computer programs". We will cover "computer equipment", "media", "data", and "computer programs" which you own, lease or rent from others or that are in your care, custody or control. We will pay the replacement cost of reproducing lost or accidentally erased "data", "computer programs", documentation and source materials provided you actually replace or reproduce them.

This extension does not apply to:

**(1)**  Property you lease or rent to others while it is away from the described premises;

**(2)**  Any "data" or "media" which cannot be replaced with others of like kind or quality; or

**(3)**  Accounts, bills, evidence of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents, except as they may be converted to "data" processing "media" form, and then only in that form.

The most we will pay for loss or damage under this Extension is $250,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

A sublimit of $10,000 applies to laptops/portable computers and their software while away from the premises.

**n.  Deferred Payments**

You may extend the insurance that applies to your Business Personal Property to apply to direct physical loss or damage to personal property you have sold on an installment or other deferred payment basis after it has been accepted by the customer.

The most we will pay for loss or damage under this Extension is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**o.  Storage of Duplicate Data and Records**

You may extend the insurance provided by this Coverage form to apply to duplicate electronic data and valuable papers and records permanently stored at locations other than the described premises.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**p.  Tree Debris Removal**

You may extend the insurance provided by this Coverage Form to apply to your expense to remove debris of trees that are blown onto the described premises by wind.

This Extension applies only if the wind is a Covered Cause of Loss.

The most we will pay for loss or damage under this Extension is $1,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**q.  Property at Un-named Locations**

You may extend the insurance provided by this Coverage Form to apply to Covered Property at Un-named Locations. Un-named Locations are locations that you own, lease or operate, but are not described in the Declarations.

This Extension does not apply to Covered Property that will or has become permanent part of an installation, fabrication or erection project being performed by you, or on your behalf, while at the project location.

However, for this Coverage Extension, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood, even if they are otherwise Covered Causes of Loss. Also, none of the Additional Coverages or other Coverage Extensions included in this Coverage Form applies to the coverage extended to an Un-named location.

If covered loss to Property at Un-named Locations results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm", the most we will pay in any one occurrence at any one un-named location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

r. **Newly Acquired Fine Arts**

We will cover additional objects of art that you acquire during the policy period, for up to 180 days, but not beyond the end of the policy period. The most we will pay for a loss for any one occurrence for such newly acquired objects of art is $10,000.

Under **Section C. Limits of Insurance** the second paragraph is replaced with the following:

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to the building, is $10,000 per sign in any one occurrence unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section E. Loss Conditions, 6. Vacancy, a. Description of Terms,** subparagraph **(1) (b),** the 31% provision is amended to read 11%.

Under **Section E. Loss Conditions, 7. Valuation,** the following conditions are added:

f. "Data"

We will figure your loss to be the actual cost of reproducing the data, provided you actually replace or reproduce it. This includes computer programs, but not "media".

g. "Media"

We will figure your loss to be the actual cost of repairing or replacing the "media" with material of the same kind or quality.

Under **Section G. Optional Coverages, 3. Replacement Cost,** subparagraph **b. (1)** is deleted when the Replacement Cost option is selected for Business Personal Property.

Under **Section H. Definitions,** the following is added:

4. "Computer Equipment" means a network of machine components capable of accepting information, processing it according to plan and producing the desired results. It includes air conditioning, fire protection equipment and electrical equipment used exclusively in your computer operations.

5. "Data" means facts, concepts or instructions, including computer programs, which are converted to a form usable to your data processing operations.

6. "Media" means material on which data are recorded.

7. "Computer Programs" means data used to direct computer equipment including diagrams or other records which can be used to reproduce programs.

8. "Named Storm" means a storm system identified by the National Weather Service as a tropical windstorm or hurricane.

**BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM AMENDMENT**

Under **Section A. Coverage, 5. Additional Coverages** the following is added:

e. **Business Income From Dependent Properties**

(1) The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of "operations" during the "period of restoration" caused by direct physical loss of or damage by a Covered Cause of Loss to property at the premises of a Dependent Property not specifically described under the Business Income From Dependent Properties - Broad Form endorsement or under the Business Income From Dependent Properties - Limited Form endorsement. However, for this additional coverage, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood, even if they are otherwise Covered Causes of Loss.

(2) Dependent Property means property at premises located anywhere in the world, which is operated by other on whom you depend to:

(a) Deliver materials or services to you or to others for your account;

(b) Deliver services, other than power, water or communication supply services (including services relating to internet access or access to any electronic network), to you or to others for your account;

(c) Accept your products or services;

(d) Manufacture products for delivery to your customers under contract of sale; or

(e) Attract customers to your business.

**(3)** With respect only to the insurance provided under this Additional Coverage, the following changes apply:

**(a)** The Extended Business Income Additional Coverage is amended by the following:

The loss of Business Income or loss of "Rental Value" must be caused by direct physical loss or damage at the premises of a Dependent Property caused by or resulting from a Covered Cause of Loss. However, for this Additional Coverage, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood even if they are otherwise Covered Causes of Loss.

**(b)** The Resumption of Operations Loss Condition is amended as follows:

We will reduce the amount of your Business Income loss to the extent you can resume your "operations" in whole or in part, by using any other available source of materials or outlet for your products or services.

**(4)** The most we will pay for loss in any one occurrence under this Additional Coverage is:

**(a)** $250,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement Schedule; or

**(b)** The sum of the Limits of Insurance shown on the Declarations that applies to loss of Business Income and Extra Expense under this Coverage form when direct physical loss occurs to property at the described premises, whichever is less. The limit applicable to this Additional Coverage is an additional amount of insurance.

However, if covered loss to Miscellaneous Dependent Property results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm," the most we will pay in any one occurrence at any one dependent property location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

**f. Ingress/Egress**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused when ingress or egress to the described premises is physically prevented due to direct loss or damage to Property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

This coverage will not begin until 12 hours after the physical loss or damage has occurred. The most we will pay for loss under this Additional Coverage is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

**g. Property in Transit**

**(1)** We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur during the "period of restoration" due to direct physical loss of or damage to:

**(a)** Your business personal property; or

**(b)** Personal property of others in your care, custody or control;

While such property is in the due course of transit, including such property described in **(1)(a)** and **(1)(b)** above while in your vehicle more than 1,000 feet from the site at which the described premises are located.

If caused by such loss or damage to property in the due course of transit, we will also pay for the actual loss of Business Income you sustain during the additional period of coverage provided under the Extended Business Income Additional Coverage.

**(2)** Insurance under this Additional Coverage applies only if the loss or damage to the property in transit is caused by a covered Cause of Loss. Insurance under this Additional Coverage does not apply to any loss of Business Income or Extra Expense due to loss of or damage to:

**(a)** Vehicles or self propelled machines (including motor vehicles, trailers, aircraft, watercraft and similar conveyances) unless such vehicles are themselves in the due course of transit in or on another transporting conveyance;

**(b)** Property while waterborne, except in regular ferry operations in the course being moved by other means of transportation;

**(c)** Property shipped by mail;

**(d)** Contraband, or property in the course of illegal transportation or trade;

**(e)** Import shipments that have not been unloaded from any importing aircraft or watercraft, or that are under the protection of marine insurance;

**(f)** Export shipments once loaded on board exporting aircraft or watercraft, or under the protection of marine insurance; or

**(g)** Property sold by you under conditional sale, trust agreement, installment payment or other deferred payment plan, after delivery to customers.

**(3)** The most we will pay for loss or damage under this Additional Coverage is $50,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement schedule for Property in Transit - Business Income and Extra Expense.

**h.  Property at Un-named Locations**

**(1)** The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of your "operations" during the "period of restoration" caused by direct physical loss or damage by a Covered Cause of Loss to:

**(a)** Your business personal property; or

**(b)** Personal property of others in your care, custody or control; while such property is at an Un-named Location as provided under the **Property at Un-named Locations** Coverage Extension.

**(2)** This Additional Coverage does not apply to:

**(a)** Property at a newly acquired location; or

**(b)** Property at the premises of a Dependent Property.

**(3)** The most we will pay for loss in any one occurrence under this Additional Coverage is $25,000.

The Limit applicable to this Additional Coverage is an additional amount of insurance.

However, if loss to Property at Un-named Locations results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm" the most we will pay for in any one occurrence at any one Un-named location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

Also, for Property at Un-named Locations, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood even if they are otherwise Covered Causes of Loss.

Also, none of the other Additional Coverages or Coverage Extensions included in this Coverage Form applies to the coverage extended to an Un-named location.

**i.  Loss Adjustment Expenses**

In the event of covered loss or damage under this Coverage Part, we will pay for reasonable expenses incurred by you, at our request, to assist us in the determination of the amount of loss, such as taking inventory and appraisals and preparing documentation to develop the extent of loss.

We will not pay the following:

**(1)** Expenses incurred in connection with **Section C. Loss Conditions, 1. Appraisal;** or

**(2)** Public Adjustors' fees; or

**(3)** Expenses payable to attorneys.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement schedule.

No deductible applies to this Additional Coverage.

Under **6. Coverage Extension, Newly Acquired Locations,** paragraph **c.** subparagraph **(2)** is changed from 30 days to 180 days.

**BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM AMENDMENT**

Under **Section A. Coverage, 4. Additional Coverages** the following is added:

**f. Business Income From Dependent Properties**

(1) The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of "operations" during the "period of restoration" caused by direct physical loss of or damage by a Covered Cause of Loss to property at the premises of a Dependent Property not specifically described under the Business Income From Dependent Properties - Broad Form endorsement or under the Business Income From Dependent Properties - Limited Form endorsement. However, for this additional coverage, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood, even if they are otherwise Covered Causes of Loss.

(2) Dependent property means property at premises located anywhere in the world, which is operated by others on whom you depend to:

(a) Deliver materials or services to you or to others for your account;

(b) Deliver services, other than power, water or communication supply services (including services relating to internet access or access to any electronic network), to you or to others for your account;

(c) Accept your products or services;

(d) Manufacture products for delivery to your customers under contract of sale; or

(e) Attract customers to your business.

(3) With respect only to the insurance provided under this Additional Coverage, the following changes apply:

(a) The Extended Business Income Additional Coverage is amended by the following:

The loss of Business Income or loss of "Rental Value" must be caused by direct physical loss or damage at the premises of a Dependent Property caused by or resulting from a Covered Cause of Loss. However, for this Additional Coverage, we

will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood even if they are otherwise Covered Causes of Loss.

(b) The Resumption of Operations Loss Condition is amended as follows:

We will reduce the amount of your Business Income loss to the extent you can resume your "operations" in whole or in part, by using any other available source of materials or outlet for your products or services.

(4) The most we will pay for loss in any one occurrence under this Additional Coverage is:

(a) $250,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement Schedule; or

(b) The sum of the Limits of Insurance shown on the Declarations that applies to loss of Business Income and Extra Expense under this Coverage form when direct physical loss occurs to property at the described premises, whichever is less. The limit applicable to this Additional Coverage is an additional amount of insurance.

However, if covered loss to Miscellaneous Dependent Property results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm", the most we will pay in any one occurrence at any one dependent property location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

**g. Ingress/Egress**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused when ingress or egress to the described premises is physically prevented due to direct loss or damage to Property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

This coverage will not begin until 12 hours after the physical loss or damage has occurred. The most we will pay for loss under this Additional Coverage is $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement schedule.

CP 70 91  11 12
Page 10 of 12

**h.   Property in Transit**

**(1)**   We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur during the "period of restoration" due to direct physical loss of or damage to:

**(a)**   Your business personal property; or

**(b)**   Personal property of others in your care, custody or control;

While such property is in the due course of transit, including such property described in **(1)(a)** and **(1)(b)** above while in your vehicle more than 1,000 feet from the site at which the described premises are located.

If caused by such loss or damage to property in the due course of transit, we will also pay for the actual loss of Business Income you sustain during the additional period of coverage provided under the Extended Business Income Additional Coverage.

**(2)**   Insurance under this Additional Coverage applies only if the loss or damage to the property in transit is caused by a covered Cause of Loss. Insurance under this Additional Coverage does not apply to any loss of Business Income or Extra Expense due to loss of or damage to:

**(a)**   Vehicles or self propelled machines (including motor vehicles, trailers, aircraft, watercraft and similar conveyances) unless such vehicles are themselves in the due course of transit in or on another transporting conveyance;

**(b)**   Property while waterborne, except in regular ferry operations in the course being moved by other means of transportation;

**(c)**   Property shipped by mail;

**(d)**   Contraband, or property in the course of illegal transportation or trade;

**(e)**   Import shipments that have not been unloaded from any importing aircraft or watercraft, or that are under the protection of marine insurance;

**(f)**   Export shipments once loaded on board exporting aircraft or watercraft, or under the protection of marine insurance; or

**(g)**   Property sold by you under conditional sale, trust agreement, installment payment or other deferred payment plan, after delivery to customers.

**(3)**   The most we will pay for loss or damage under this Additional Coverage is $50,000 unless a different Limit of Insurance is shown in the Signature Series Commercial Property Endorsement schedule for Property in Transit - Business Income and Extra Expense.

**i.   Property at Un-named Locations**

**(1)**   The insurance provided for loss of Business Income and Extra Expense is extended to apply to the actual and necessary amount of such loss which you incur due to the necessary "suspension" of your "operations" during the "period of restoration" caused by direct physical loss or damage by a Covered Cause of Loss to:

**(a)**   Your business personal property; or

**(b)**   Personal property of others in your care, custody or control; while such property is at an Un-named Location as provided under the **Property at Un-named Locations** Coverage Extension.

**(2)**   This Additional Coverage does not apply to:

**(a)**   Property at a newly acquired location; or

**(b)**   Property at the premises of a Dependent Property.

**(3)**   The most we will pay for loss in any one occurrence under this Additional coverage is $25,000.

The Limit applicable to this Additional Coverage is an additional amount of insurance.

However, if loss to Property at Un-named Locations results from a "Named Storm" including but not limited to wind, wind driven rain, flood or hail, caused by or associated with a "Named Storm" the most we will pay for in any one occurrence at any one Un-named location under this extension is $5,000 and the most we will pay for all loss or damage sustained in any one policy year is $25,000, regardless of the number of occurrences of loss or damage or the number of premises or locations involved.

Also, for Property at Un-named Locations, we will not pay for loss or damage caused by or resulting from Earthquake, Volcanic Eruption and Flood even if they are otherwise Covered Causes of Loss.

Also, none of the other Additional Coverages or Coverage Extensions included in this Coverage Form applies to the coverage extended to an Un-named location.

**j.   Loss Adjustment Expenses**

In the event of covered loss or damage under this Coverage Part, we will pay for reasonable expenses incurred by you, at our request, to assist us in the determination of the amount of loss, such as taking inventory and appraisals and preparing documentation to develop the extent of loss.

We will not pay the following:

**(1)** Expenses incurred in connection with **Section C. Loss Conditions, 1. Appraisal;** or

**(2)** Public Adjustors' fees; or

**(3)** Expenses payable to attorneys.

The most we will pay for loss or damage under this Extension is $25,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement schedule.

No deductible applies to this Additional Coverage.

Under **5. Coverage Extension, NEWLY ACQUIRED LOCATIONS,** paragraph **c.** subparagraph **(2)** is changed from 30 days to 180 days.

**CAUSES OF LOSS - SPECIAL FORM AMENDMENT**

Under **Section C. Limitations,** subparagraph **3.c.,** the limit is changed from $2,500 to $10,000 for patterns, dies, molds and forms.

Under **Section C. Limitations,** subparagraph **3.d.,** the limit is changed from $250 to $500 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

Under **Section G. Definitions,** the following are added:

**3.** "Computer Equipment" means a network of machine components capable of accepting information processing it according to plan and producing the desired results. It includes air conditioning, fire protection equipment and electrical equipment used exclusively in your computer operations.

**4.** "Data" means facts, concepts or instructions, including computer programs, which are converted to a form usable to your data processing operations.

**5.** "Media" means material on which data are recorded.

**6.** "Computer Programs" means data used to direct computer equipment including diagrams or other records which can be used to reproduce programs.

**7.** "Named Storm" means a storm system identified by the National Weather Service as a tropical windstorm or hurricane.

# CAUSES OF LOSS - SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning.  Refer to Section **G.**, Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

**1.** Excluded in Section **B.**, Exclusions; or

**2.** Limited in Section **C.**, Limitations;

that follow.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance Or Law**

The enforcement of any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance Or Law, applies whether the loss results from:

**(a)** An ordinance or law that is enforced even if the property has not been damaged; or

**(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Earthquake, including any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty.  Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion.  But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d.  Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e.  Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access to access to any electronic, cellular or satellite network.

**f.  War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g.  Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h.  "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**1.** When "fungus", wet or dry rot or bacteria results from fire or lightning; or

**2.** To the extent that coverage is provided in the Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.**  We will not pay for loss or damage caused by or resulting from any of the following:

**a.**  Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, magnetic, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.** **(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results

in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**CP 10 30  06 07**
**Page 3 of 10**

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

   **(1)** An abrupt falling down or caving in;

   **(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

   **(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

   **(a)** To the extent that coverage is provided under the Additional Coverage - Collapse; or

   **(b)** To collapse caused by one or more of the following:

     **(i)** The "specified causes of loss";

     **(ii)** Breakage of building glass;

     **(iii)** Weight of rain that collects on a roof; or

     **(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

   **(1)** Planning, zoning, development, surveying, siting;

   **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   **(3)** Materials used in repair, construction, renovation or remodeling; or

   **(4)** Maintenance;

of part or all of any property on or off the described premises.

**4.** **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a.** **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

   **(1)** Any loss caused by or resulting from:

     **(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to re-produce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

    **(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

    **(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

    **(a)** Your cancelling the lease;

    **(b)** The suspension, lapse or cancellation of any license; or

    **(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

    **(a)** Paragraph **B.1.a.**, Ordinance Or Law;

    **(b)** Paragraph **B.1.c.**, Governmental Action;

    **(c)** Paragraph **B.1.d.**, Nuclear Hazard;

    **(d)** Paragraph **B.1.e.**, Utility Services; and

    **(e)** Paragraph **B.1.f.**, War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

    **(a) Contractual Liability**

    We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

        **(i)** Your assumption of liability was executed prior to the accident; and

        **(ii)** The building is Covered Property under this Coverage Form.

    **(b) Nuclear Hazard**

    We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property.

CP 10 30   06 07
Page 5 of 10

EXHIBIT 7

**LOSS OR DAMAGE TO PRODUCTS**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair.  This exclusion applies to any effect that compromises the form, substance or quality of the product.  But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C.  Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1.  We will not pay for loss of or damage to property, as described and limited in this section.  In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   **a.**  Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment.  But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   **b.**  Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   **c.**  The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      **(1)**  The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      **(2)**  The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   **d.**  Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

   However, this limitation does not apply to:

      **(1)**  Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      **(2)**  Business Income Coverage or Extra Expense Coverage.

   **e.**  Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   **f.**  Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2.  We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   **a.**  Animals, and then only if they are killed or their destruction is made necessary.

   **b.**  Fragile articles such as statuary, marbles, chinaware and porcelains, if broken.  This restriction does not apply to:

      **(1)**  Glass; or

      **(2)**  Containers of property held for sale.

   **c.**  Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

   However, this limitation does not apply:

      **(1)**  If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

      **(2)**  To Business Income Coverage or to Extra Expense Coverage.

3.  The special limit shown for each category, **a.** through **d.,** is the total limit for loss of or damage to all property in that category.  The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence.  The special limits are:

a. $2,500 for furs, fur garments and garments trimmed with fur.

b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

c. $2,500 for patterns, dies, molds and forms.

d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

a. Results in discharge of any substance from an automatic fire protection system; or

b. Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage - Collapse**

The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(1) A cause of loss listed in **2.a.** or **2.b.**;

(2) One or more of the "specified causes of loss";

(3) Breakage of building glass;

(4) Weight of people or personal property; or

(5) Weight of rain that collects on a roof.

3. This **Additional Coverage - Collapse** does **not** apply to:

a. A building or any part of a building that is in danger of falling down or caving in;

b. A part of a building that is standing, even if it has separated from another part of the building; or

c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

b. Awnings, gutters and downspouts;

c. Yard fixtures;

d. Outdoor swimming pools;

e. Fences;

f. Piers, wharves and docks;

g. Beach or diving platforms or appurtenances;

h. Retaining walls; and

i. Walks, roadways and other paved surfaces;

064
EXHIBIT 7

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

**(1)** Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

**(2)** The property is Covered Property under this Coverage Form.

**5.** If personal property abruptly falls down or caves in and such collapse is not the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**6.** This Additional Coverage - Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**7.** This Additional Coverage - Collapse will not increase the Limits of Insurance provided in this Coverage Part.

**8.** The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in **D.1.** through **D.7.**

**E. Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

**a.** A "specified cause of loss" other than fire or lightning; or

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

**2.** We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

**a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

**b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

**3.** The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

**4.** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**5.** The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss Form or under the Additional Coverage - Collapse.

6. The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form.

   **a.** If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount for loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

   **b** If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

**1. Property In Transit**

   This Extension applies only to your personal property to which this form applies.

   **a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

   **b.** Loss or damage must be caused by or result from one of the following causes of loss:

   **(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

   **(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

   **(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

   **c.** The most we will pay for loss or damage under this Extension is $5,000.

   This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**2. Water Damage, Other Liquids, Powder Or Molten Material Damage**

   If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

**3. Glass**

   **a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

   **b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

   This Coverage Extension, **F.3.**, does not increase the Limit of Insurance.

**G. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   **a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

**CP 10 30  06 07**
**Page 9 of 10**

066
**EXHIBIT 7**

**(1)** The cost of filling sinkholes; or

**(2)** Sinking or collapse of land into man-made underground cavities.

**b.** Falling objects does not include loss or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

067
EXHIBIT 7

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H., Definitions.**

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.,** Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property - Separation Of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control; and

Copyright, Insurance Services Office, Inc., 2007

EXHIBIT 7

**(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

**(1)** The lowest basement floor; or

**(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns;

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage - Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enables the computer or device connected to receive, process, store, retrieve or send data. This paragraph, **n.,** does not apply to your "stock" of prepackaged software;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

**(1)** Are licensed for use on public roads; or

**(2)** Are operated principally away from the described premises.

This paragraph does not apply to:

**(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

**(b)** Vehicles or self-propelled machines, other than autos, you hold for sale;

**(c)** Rowboats or canoes out of water at the described premises; or

**(d)** Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers

q. The following property while outside of buildings:

(1) Grain, hay, straw or other crops;

(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

3. **Covered Causes Of Loss**

See applicable Causes Of Loss Form as shown in the Declarations.

4. **Additional Coverages**

a. **Debris Removal**

(1) Subject to Paragraphs (3) and (4), we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris removal does not apply to costs to:

(a) Extract "pollutants" from land or water; or

(b) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in Paragraph (4), the following provisions apply:

(a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

(4) We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

(5) Examples

The following examples assume that there is no Coinsurance penalty.

**Example #1**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $    500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph (3).

**Example #2**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $    500 |
| Amount of Loss | $ 80,000 |
| Amount of Loss Payable | $ 79,500 |
| | ($80,000 - $500) |
| Debris Removal Expense | $ 30,000 |

Debris Removal Expense Payable

| | |
|---|---|
| Basic Amount | $ 10,500 |
| Additional Amount | $ 10,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph **(4)**. Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b. Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 unless a higher limit is shown in the Declarations, for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

(3) The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

(4) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

(a) You were required to comply with before the loss, even when the building was undamaged; and

(b) You failed to comply with.

(5) Under this Additional Coverage, we will not pay for:

(a) The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

(b) Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

(6) The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of : $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

(7) With respect to this Additional Coverage:

(a) We will not pay for the Increased Cost of Construction:

(i) Until the property is actually repaired or replaced, at the same or another premises; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

(c) If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

(8) This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

(9) The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

072
EXHIBIT 7

**f. Electronic Data**

(1) Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, - Electronic Data.

(2) Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

(3) The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, - Electronic Data, subject to the following:

    (a) If the Causes of Loss - Special Form applies, coverage under this Additional Coverage, - Electronic Data is limited to the "specified causes of loss" as defined in that Form, and Collapse as set forth in that Form.

    (b) If the Causes of Loss - Broad Form applies, coverage under this Additional Coverage, - Electronic Data includes Collapse as set forth in that Form.

    (c) If the Causes of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, - Electronic Data.

    (d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, - Electronic Data is $2,500 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after the policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more or, a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Buildings, you may extend that insurance to apply to:

    (a) Your new buildings while being built on the described premises; and

    (b) Buildings you acquire at locations, other than the described premises, intended for:

        (i) Similar use as the building described in the Declarations; or

        (ii) Use as a warehouse.

EXHIBIT 7

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2)  Your Business Personal Property**

(a)  If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

(i)  Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

(ii)  Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

(iii)  Business personal property that you newly acquire, located at the described premises.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

(b)  This Extension does not apply to:

(i)  Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

(ii)  Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3)  Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

(a)  This policy expires;

(b)  30 days after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

(c)  You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b.  Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

(1)  Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

(2)  Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c.  Valuable Papers And Records (Other Than Electronic Data)**

(1)  You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, - Electronic Data.

(2)  If the Causes of Loss - Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that Form, and Collapse as set forth in that Form.

(3)  If the Causes of Loss - Broad Form applies, coverage under this Extension includes Collapse as set forth in that Form.

074
EXHIBIT 7

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d.   Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

  **(a)** Temporarily at a location you do not own, lease or operate;

  **(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

  **(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

  **(a)** In or on a vehicle; or

  **(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e.   Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of

loss if they are Covered Causes of Loss:

  **(1)** Fire;

  **(2)** Lightning;

  **(3)** Explosion;

  **(4)** Riot or Civil Commotion; or

  **(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f.   Non-owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

  **(a)** The trailer is used in your business;

  **(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

  **(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

  **(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

  **(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized land conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss Form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to the building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage:

1. Fire Department Service Charge;

2. Pollutant Clean-up And Removal;

3. Increased Cost of construction; and

4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (herein-after referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**EXAMPLE #1**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $250 |
| Limit of Insurance - Building #1: | $60,000 |
| Limit of Insurance - Building #2: | $80,000 |
| Loss to Building #1: | $60,100 |
| Loss to Building #2: | $90,000 |

The amount of loss to Building #1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building #1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building #1:

$60,100
-    250
$59,850 Loss Payable - Building #1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building #2. Loss payable for Building #2 is the Limit of Insurance of $80,000.

Total amount of loss payable:  $59,850 + $80,000 = $139,850

**EXAMPLE #2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example #1.

| | |
|---|---|
| Loss to Building #1: | $ 70,000 |
| (exceeds Limit of Insurance plus Deductible) | |
| Loss to Building #2: | $ 90,000 |
| (exceeds Limit of Insurance plus Deductible) | |
| Loss Payable - Building #1: | $ 60,000 |
| (Limit of Insurance) | |
| Loss Payable - Building #2: | $ 80,000 |
| (Limit of Insurance) | |
| Total amount of loss payable: | $140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   a. Pay its chosen appraiser; and

076
EXHIBIT 7

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

  **a.** You must see that the following are done in the event of loss or damage to Covered Property:

    **(1)** Notify the police if a law may have been broken.

    **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

    **(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

    **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

    **(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

    **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

    Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

    **(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

    **(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

  **a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

    **(1)** Pay the value of lost or damaged property;

    **(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

    **(3)** Take all or any part of the property at an agreed or appraised value; or

    **(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

    We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

  **b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

  **c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

  **d.** We will not pay you more than your financial interest in the Covered Property.

  **e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

  **f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

077
**EXHIBIT 7**

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

h. A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in **b.**, **c.**, **d.**, **e.** and **f.** below.

EXHIBIT 7

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenant's Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**EXAMPLE #1 (UNDERINSURANCE)**

| When: | The value of the property is | $250,000 |
|---|---|---|
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $100,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $40,000 |
| Step (1): | $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements) | |
| Step (2): | $100,000 ÷ $200,000 = .50 | |
| Step (3): | $40,000 x .50 = $20,000 | |
| Step (4): | $20,000 - $250 = $19,750 | |

We will pay no more than $19,750. The remaining $20,250 is not covered.

**EXAMPLE #2 (ADEQUATE INSURANCE)**

| When: | The value of the property is | $250,000 |
|---|---|---|
| | The Coinsurance percentage for it is | 80% |
| | The Limit of Insurance for it is | $200,000 |
| | The Deductible is | $250 |
| | The amount of loss is | $40,000 |

079
EXHIBIT 7

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**EXAMPLE #3**

| When: | The value of the property is: | |
|---|---|---|
| | Building at Location #1 | $ 75,000 |
| | Building at Location #2 | $100,000 |
| | Personal Property at Location #2 | $ 75,000 |
| | | $250,000 |
| | The Coinsurance percentage for it is | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Location #1 and #2 is | $180,000 |
| | The Deductible is | $ 1,000 |
| | The amount of loss is: Building at Location #2 | $ 30,000 |
| | Personal Property at Location #2. | $ 20,000 |
| | | $ 50,000 |

| Step (1): | $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below) |
|---|---|
| Step (2): | $180,000 ÷ $225,000 = .80 |
| Step (3): | $ 50,000 x .80 = $40,000 |
| Step (4): | $ 40,000 - $1,000 = $39,000 |

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclo-

sure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

080
EXHIBIT 7

## G.  Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

### 1.  Agreed Value

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

### 2.  Inflation Guard

**a.** The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

If:  The applicable Limit

| | |
|---|---|
| of Insurance is | $100,000 |
| The annual percentage increase is | 8% |
| The number of days since the beginning of the policy year (or last policy change) is | 146 |
| The amount of increase is $100,000 x .08 x 146 ÷ 365 = | $3,200 |

### 3.  Replacement Cost

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition, of this Coverage Form.

**b.** This Optional Coverage does not apply to:

**(1)** Personal property of others;

**(2)** Contents of a residence;

**(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

081
EXHIBIT 7

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments, will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e.  We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f.  The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**4.  Extension Of Replacement Cost To Personal Property Of Others**

a.  If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

b.  With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the replacement cost of the property or the applicable Limit of Insurance.

**H.  Definitions**

1.  "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2.  "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3.  "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

082
EXHIBIT 7

POLICY NUMBER:   CWP 3263063                                             INTERLINE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

    COMMERCIAL PROPERTY COVERAGE PART
    FARM COVERAGE PART

## SCHEDULE*

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| 001 | 001 | P-1 |

Describe any "P-9":

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to the:

Commercial Property Conditions
General Conditions in the Farm Property - Other Farm Provisions Form - Additional Coverages, Conditions, Definitions
General Conditions in the Mobile Agricultural Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage Form

**PROTECTIVE SAFEGUARDS**

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

   **"P-1" Automatic Sprinkler System,** including related supervisory services.

   Automatic Sprinkler System means:

   a. Any automatic fire protective or extinguishing system, including connected:

      (1) Sprinklers and discharge nozzles;

      (2) Ducts, pipes, valves and fittings;

      (3) Tanks, their component parts and supports; and

      (4) Pumps and private fire protection mains.

   b. When supplied from an automatic fire protective system:

      (1) Non-automatic fire protective systems; and

      (2) Hydrants, standpipes and outlets.

   **"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

   a. Connected to a central station; or

   b. Reporting to a public or private fire alarm station.

   **"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

   **"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

   **"P-9"** The protective system described in the Schedule.

Copyright, Insurance Services Office, Inc., 1997

**IL 04 15** 10 04
**Page 1 of 2**

**B.** The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS - BASIC FORM
CAUSES OF LOSS - BROAD FORM
CAUSES OF LOSS - SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND
    OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
CAUSES OF LOSS FORM - FARM
    PROPERTY
MOBILE AGRICULTURAL MACHINERY
    AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

1.  Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2.  Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

084
EXHIBIT 7

| POLICY NUMBER:   CWP 3263063 | INTERLINE |
|---|---|

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

### SCHEDULE*

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| 001 | 002 | P = 1 |

Describe any "P-9":

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to the:

Commercial Property Conditions
General Conditions in the Farm Property - Other Farm Provisions Form - Additional Coverages, Conditions, Definitions
General Conditions in the Mobile Agricultural Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage Form

**PROTECTIVE SAFEGUARDS**

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

   **"P-1"** **Automatic Sprinkler System**, including related supervisory services.

   Automatic Sprinkler System means:

   a. Any automatic fire protective or extinguishing system, including connected:

      (1) Sprinklers and discharge nozzles;

      (2) Ducts, pipes, valves and fittings;

      (3) Tanks, their component parts and supports; and

      (4) Pumps and private fire protection mains.

   b. When supplied from an automatic fire protective system:

      (1) Non-automatic fire protective systems; and

      (2) Hydrants, standpipes and outlets.

   **"P-2"** **Automatic Fire Alarm,** protecting the entire building, that is:

   a. Connected to a central station; or

   b. Reporting to a public or private fire alarm station.

   **"P-3"** **Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

   **"P-4"** **Service Contract** with a privately owned fire department providing fire protection service to the described premises.

   **"P-9"** The protective system described in the Schedule.

Copyright, Insurance Services Office, Inc., 1997

IL 04 15 10 04
Page 1 of 2

EXHIBIT 7

**B.** The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS - BASIC FORM
CAUSES OF LOSS - BROAD FORM
CAUSES OF LOSS - SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND
  OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
CAUSES OF LOSS FORM - FARM
  PROPERTY
MOBILE AGRICULTURAL MACHINERY
  AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

086
EXHIBIT 7

COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**



# COMMERCIAL PROPERTY DISTRIBUTORS ENDORSEMENT

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
SIGNATURE SERIES COMMERCIAL PROPERTY ENDORSEMENT
BUSINESS INCOME COVERAGE FORMS
CAUSES OF LOSS - SPECIAL FORM

**SIGNATURE SERIES COMMERCIAL PROPERTY ENDORSEMENT AMENDMENT**

Under Section **A. Coverage, 4. Additional Coverages** the following is added:

**m.** **"Refrigeration Breakdown Expense" - Vehicles You Own or Lease**

We will pay for necessary "Refrigeration Breakdown Expense" you incur to avoid the imminent spoilage of your refrigerated product due to the sudden and accidental breakdown of refrigeration equipment on transporting conveyances you own or lease.

The most we will pay for loss or damage under this Additional Coverage is $10,000 in any one occurrence unless a different limit of insurance is shown in the Signature Series Commercial Property Endorsement Schedule.

This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

"Refrigeration Breakdown Expense" means:

**(1)** Expenses to dispatch a replacement vehicle, including the additional wages of the driver of that replacement vehicle;

**(2)** Wages for laborers to unload the disabled vehicle and reload the replacement vehicle; and

**(3)** Expenses for temporary storage in cold storage facilities while awaiting disposition of the product.

**n.** **Transit Property in the Care of a "Carrier for Hire"**

We will cover direct physical loss caused by a Covered Cause of Loss to your property while in due course of "transit" including loading and unloading.

We only cover your property while in due course of "transit" when property is in the care of a "Carrier for Hire"

**(1)** If your property in "transit" includes property of others, we only cover property of others to the extent of your legal liability for direct physical loss caused by a Covered Cause of Loss.

**(2)** We only cover loading and unloading if your property in "transit" is loaded from or unloaded onto a sidewalk, street, loading dock, or similar area that is adjacent to the "Carrier for Hire".

The most we will pay for loss or damage under this Additional Coverage is $50,000 in any one occurrence unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under Section **A. Coverage, 5. Coverage Extensions, f. Non-Owned Detached Trailers**, subparagraph **(3)**, the limit is changed from $10,000 to $50,000 unless a different limit is shown in the Signature Series Commercial Property Endorsement Schedule.

Under **Section H. Definitions**, the following is added:

**9.** "Carriers for Hire" means any one vehicle, truck, trailer, semitrailer, or combination of these pulled by one power unit operated by a carrier for hire.

**CP 70 92  11 09**
**Page 1 of 2**

087
**EXHIBIT 7**

10. "Transit" means the shipment of covered property that:

    a.  begins at the point of shipment to a specific destination;

    b.  includes the ordinary reasonable and necessary stops, interruptions, delays, or transfers incidental to the route and method of shipment, including rest periods taken by the driver(s); and

    c.  ends upon acceptance of the good by or on behalf of the cosignee at the specified destination.

088
EXHIBIT 7

| POLICY NUMBER:   CWP 3263063 | COMMERCIAL PROPERTY |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DEBRIS REMOVAL ADDITIONAL INSURANCE

This endorsement modifies insurance provided under the following:

> BUILDERS' RISK COVERAGE FORM
> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> CONDOMINIUM ASSOCIATION COVERAGE FORM
> CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
> STANDARD PROPERTY POLICY
> TOBACCO SALES WAREHOUSES COVERAGE FORM

**SCHEDULE\***

| Prem.<br>No. | Bldg.<br>No. | Debris Removal<br>Amount | Additional<br>Premium |
|---|---|---|---|
| **Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.** | | | |
| | | | |

\*  Information required to complete this Schedule, If not shown on this endorsement will be shown in the Declarations.

The additional limit of $10,000 for debris removal in the **Debris Removal** Additional Coverages section is replaced by the higher amount shown in the Schedule.

Copyright, Insurance Services Office, Inc., 1999                                    **CP 04 15** 10 00

*THIS PAGE INTENTIONALLY LEFT BLANK*

| POLICY NUMBER: CWP 3263063 | COMMERCIAL PROPERTY |
|---|---|

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE*

| Prem. No./ Bldg. No. | Cov. A | Cov. B Limit Of Insurance | Cov. C Limit Of Insurance | Cov. B and C Combined Limit Of Insurance | |
|---|---|---|---|---|---|
| / | ☐ | $ | $ | $ | ** |
| / | ☐ | $ | $ | $ | ** |
| / | ☐ | $ | $ | $ | ** |

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

\* Information required to complete the Schedule, if not shown on this endorsement, will be shown in the Declarations.

\*\* Do **not** enter a Combined Limit of Insurance if individual Limits of Insurance are selected for Coverages **B** and **C**, or if one of these Coverages is not applicable.

**A.** Each Coverage - Coverage **A**, Coverage **B** and Coverage **C** - is provided under this endorsement only if that Coverage(s) is chosen by entry in the above Schedule and then only with respect to the building identified for that Coverage(s) in the Schedule.

**B. Application Of Coverage(s)**

The Coverage(s) provided by this endorsement apply only if both **B.1.** and **B.2.** are satisfied and are then subject to the qualifications set forth in **B.3.**

**1.** The ordinance or law:

**a.** Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

**b.** Is in force at the time of loss.

But coverage under this endorsement applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this endorsement.

**2. a.** The building sustains direct physical damage that is covered under this policy and such damage results in enforcement of the ordinance or law; or

**b.** The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and the building damage in its entirety results in enforcement of the ordinance or law.

**c.** But if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no coverage under this endorsement even if the building has also sustained covered direct physical damage.

**3.** In the situation described in **B.2.b.** above, we will not pay the full amount of loss otherwise payable under the terms of Coverages A, B and/or C of this endorsement. Instead, we will pay a proportion of such loss; meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

Copyright, Insurance Services Office, Inc., 2001

CP 04 05 04 02
Page 1 of 4

091
EXHIBIT 7

(Section **H.** of this endorsement provides an example of this procedure.)

However, if the covered direct physical damage, alone, would have resulted in enforcement of the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of Coverages **A, B** and/or **C** of this endorsement.

**C.** We will not pay under Coverage **A, B** or **C** of this endorsement for:

   **1.** Enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

   **2.** The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**D. Coverage**

   **1. Coverage A - Coverage For Loss To The Undamaged Portion Of The Building**

   With respect to the building that has sustained covered direct physical damage, we will pay under Coverage **A** for the loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building.

   Coverage **A** is included within the Limit of Insurance shown in the Declarations as applicable to the covered building. Coverage **A** does not increase the Limit of Insurance.

   **2. Coverage B - Demolition Cost Coverage**

   With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building, as a consequence of enforcement of an ordinance or law that requires demolition of such damaged property.

   The Coinsurance Additional Condition does not apply to Demolition Cost Coverage.

   **3. Coverage C - Increased Cost Of Construction Coverage**

   **a.** With respect to the building that has sustained covered direct physical damage, we will pay for the increased cost to:

      **(1)** Repair or reconstruct damaged portions of that building; and/or

      **(2)** Reconstruct or remodel undamaged portions of that building, whether or not demolition is required;

   when the increased cost is a consequence of enforcement of the minimum requirements of the ordinance or law.

   However:

      **(1)** This coverage applies only if the restored or remodeled property is intended for similar occupancy as the current property, unless such occupancy is not permitted by zoning or land use ordinance or law.

      **(2)** We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

   The Coinsurance Additional Condition does not apply to Increased Cost of Construction Coverage.

   **b.** When a building is damaged or destroyed and Coverage **C** applies to that building in accordance with **3.a.** above, coverage for the increased cost of construction also applies to repair or reconstruction of the following, subject to the same conditions stated in **3.a.**:

      **(1)** The cost of excavations, grading, backfilling and filling;

      **(2)** Foundation of the building;

      **(3)** Pilings; and

      **(4)** Underground pipes, flues and drains.

   The items listed in **b.(1)** through **b.(4)** above are deleted from Property Not Covered, but only with respect to the coverage described in this Provision, **3.b.**

**E. Loss Payment**

   **1.** All following loss payment Provisions, **E.2.** through **E.5.**, are subject to the appointment procedures set forth in Section **B.3.** of this endorsement.

EXHIBIT 7

2. When there is a loss in value of an un-damaged portion of a building to which Coverage **A** applies, the loss payment for that building, including damaged and undamaged portions, will be determined as follows:

   a. If the Replacement Cost Coverage Option applies and the property is being repaired or replaced, on the same or another premises, we will not pay more than the lesser of:

      (1) The amount you would actually spend to repair, rebuild or re-construct the building, but not for more than the amount it would cost to restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured; or

      (2) The Limit of Insurance shown in the Declarations as applica-ble to the covered building.

   b. If the Replacement Cost Coverage Option applies and the property is **not** repaired or replaced, or if the Replacement Cost Coverage Option does **not** apply, we will not pay more than the lesser of:

      (1) The actual cash value of the building at the time of loss; or

      (2) The Limit of Insurance shown in the Declarations as applica-ble to the covered building.

3. Unless Paragraph **E.5.** applies, loss payment under Coverage **B** - Demolition Cost Coverage will be determined as follows:

   We will not pay more than the lesser of the following:

   a. The amount you actually spend to demolish and clear the site of the described premises; or

   b. The applicable Limit of Insurance shown for Coverage **B** in the Schedule above.

4. Unless Paragraph **E.5.** applies, loss payment under Coverage **C** - Increased Cost of Construction Coverage will be determined as follows:

   a. We will not pay under Coverage **C**:

      (1) Until the property is actually repaired or replaced, at the same or another premises; and

      (2) Unless the repairs or replace-ment are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

   b. If the building is repaired or re-placed at the same premises, or if you elect to rebuild at another premises, the most we will pay un-der Coverage **C** is the lesser of:

      (1) The increased cost of con-struction at the same prem-ises; or

      (2) The applicable Limit of Insur-ance shown for Coverage **C** in the Schedule above.

   c. If the ordinance or law requires re-location to another premises, the most we will pay under Coverage **C** is the lesser of:

      (1) The increased cost of con-struction at the new premises; or

      (2) The applicable Limit of Insur-ance shown for Coverage **C** in the Schedule above.

5. If a **Combined** Limit of Insurance is shown for Coverages **B** and **C** in the Schedule above, Paragraphs **E.3.** and **E.4.** of this endorsement do not apply with respect to the building that is sub-ject to the Combined Limit, and the fol-lowing loss payment provisions apply instead:

   The most we will pay, for the total of all covered losses for Demolition Cost and Increased Cost of Construction, is the Combined Limit of Insurance shown for Coverages **B** and **C** in the Schedule above. Subject to this Combined Limit of Insurance, the following loss payment provisions apply:

   a. For Demolition Cost, we will not pay more than the amount you actually spend to demolish and clear the site of the described premises.

   b. With respect to the Increased Cost of Construction:

      (1) We will not pay for the in-creased cost of construction:

         (a) Until the property is actu-ally repaired or replaced, at the same or another premises; and

    **(b)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

    **(2)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the same premises.

    **(3)** If the ordinance or law requires relocation to another premises, the most we will pay for the increased cost of construction is the increased cost of construction at the new premises.

**F.** The terms of this endorsement apply separately to each building to which this endorsement applies.

**G.** Under this endorsement we will not pay for loss due to any ordinance or law that:

    **1.** You were required to comply with before the loss, even if the building was undamaged; and

    **2.** You failed to comply with.

**H.** Example of Proportionate Loss Payment for Ordinance or Law Coverage Losses (procedure as set forth in Section **B.3.** of this endorsement)

Assume:

- Wind is a Covered Cause of Loss; Flood is an excluded Cause of Loss

- The building has a value of $200,000

- Total direct physical damage to building: $100,000

- The ordinance or law in this jurisdiction is enforced when building damage equals or exceeds 50% of the building's value

- Portion of direct physical damage that is covered (caused by wind): $30,000

- Portion of direct physical damage that is not covered (caused by flood): $70,000

- Loss under Ordinance or Law Coverage **C** of this endorsement: $60,000

Step **1:**

Determine the proportion that the covered direct physical damage bears to the total direct physical damage.

$30,000 ÷ $100,000 = .30

Step **2:**

Apply that proportion to the Ordinance or Law loss.

$60,000 x .30 = $18,000

In this example, the most we will pay under this endorsement for the Coverage **C** loss is $18,000, subject to the applicable Limit of Insurance and any other applicable provisions.

**NOTE:** The same procedure applies to losses under Coverages **A** and **B** of this endorsement.

**I.** The following definition is added:

"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

| POLICY NUMBER:   CWP 3263063 | COMMERCIAL PROPERTY |
|---|---|

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PEAK SEASON LIMIT OF INSURANCE

This endorsement modifies insurance provided under the following:

> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
> STANDARD PROPERTY POLICY

### SCHEDULE*

| | | | Peak Season | | |
|---|---|---|---|---|---|
| Prem.<br>No. | Bldg.<br>No. | Covered<br>Property | Additional<br>Limit of<br>Insurance | Period<br>From | To |

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

The Limit of Insurance on covered personal property is increased to include the amount shown in the Schedule:

**A.**   At the described location(s); and

**B.**   Only from 12:01 A.M. Standard Time of the first day to 12:01 A.M. Standard Time of the last day of the applicable period(s) shown in the Schedule.

\* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

Copyright, ISO Commercial Risk Services, Inc., 1994                                    **CP 12 30** 06 95

095
**EXHIBIT 7**

*THIS PAGE INTENTIONALLY LEFT BLANK*

**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063                              COMMERCIAL PROPERTY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLLUTANT CLEAN UP AND REMOVAL
# ADDITIONAL AGGREGATE LIMIT OF INSURANCE

This endorsement modifies insurance provided under the following:

> BUILDING AND PERSONAL PROPERTY COVERAGE FORM
> CONDOMINIUM ASSOCIATION COVERAGE FORM
> CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
> BUILDERS' RISK COVERAGE FORM
> STANDARD PROPERTY POLICY
> TOBACCO SALES WAREHOUSE COVERAGE FORM

**SCHEDULE***

| Prem. No. | Additional Aggregate Limit of Insurance | Deductible | Additional Premium |
|---|---|---|---|

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

**A.** The $10,000 annual aggregate limit for the POLLUTANT CLEAN UP AND REMOVAL Additional Coverage is increased by the Additional Aggregate Limit of Insurance shown in the Schedule.

**B.** We will not pay under this endorsement for "pollutants" clean up or removal costs in any occurrence until the total of all such costs exceeds the sum of:

> **1.** The $10,000 aggregate limit from the basic Pollutant Clean Up and Removal Additional Coverage, less any prior payments for the same policy year; plus

> **2.** The Deductible shown in the Schedule.

We will then pay the costs in excess of that sum, until the Additional Aggregate Limit of Insurance shown in the Schedule is used up during the applicable 12-month period.

Example:

> The cost of "pollutants" clean up and removal is                                      $40,000

The remaining aggregate from the basic Additional Coverage (assuming $4,000 has previously been paid for the same policy year) is                                      $ 6,000

The Deductible shown in the Schedule is                                      $10,000

The Pollutant Clean Up and Removal Additional Aggregate Limit of Insurance is                                      $25,000

We will determine the most we will pay under this endorsement as follows:

| | | |
|---|---|---|
| The cost incurred | | $40,000 |
| Less the sum of the remaining basic Additional Coverage aggregate | $ 6,000 | |
| and the Deductible | 10,000. | -16,000 |

The most we will pay under this endorsement is                                      $24,000.

The remaining benefit under this endorsement for costs incurred for the policy year is $1,000.

**C.** No other Deductible in this policy applies to this endorsement.

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

Copyright, ISO Commercial Risk Services, Inc., 1985, 1990                              **CP 04 07** 10 91

*THIS PAGE INTENTIONALLY LEFT BLANK*

**EXHIBIT 7**

POLICY NUMBER:    CWP 3263063                              COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SPOILAGE COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM

### SCHEDULE

| Premises Number | Building Number | Limit Of Insurance |
|---|---|---|
| **Description Of Property:** | | |
| **Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.** | | |
| **Deductible:** $500 | | |
| **Refrigeration Maintenance Agreement:** | | |
| **Causes Of Loss** | | |
| **Breakdown Or Contamination:** | | |
| **Information required to complete this Schedule, if not shown above, will be shown in the Declarations** | | |

The Coverage Form to which this endorsement applies is extended to insure against direct physical loss or damage by the Covered Causes of Loss, but only with respect to coverage provided by this endorsement.

**A.** Paragraph **A.1.**, **Covered Property** is replaced by the following:

    **1.** **Covered Property**

        Covered Property means "perishable stock" at the described premises owned by you or by others that is in your care, custody or control.

**B.** With respect to the coverage provided by this endorsement, property located on buildings or in the open or in vehicles is considered to be Property Not Covered.

**C.** Paragraph **A.3.**, **Covered Causes Of Loss** is replaced by the following:

    **3.** **Covered Causes Of Loss**

        Covered Causes of Loss means the following only if indicated by an "X" in the Schedule:

        **a.** Breakdown or Contamination, meaning:

        **(1)** Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at the described premises; and

        **(2)** Contamination by the refrigerant.

        **b.** Power Outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

**D.** **Selling Price**

If Selling Price is indicated by an "X" in the Schedule, the following is added to the **Valuation** Loss Condition:

We will determine the value of finished "perishable stock" in the event of loss or damage at:

    **1.** The selling price, as if no loss or damage had occurred;

© ISO Properties, Inc., 2006

**CP 04 40** 06 07
**Page 1 of 2**

**EXHIBIT 7**

2. Less discounts and expenses you otherwise would have had.

E. Paragraph **A.5.**, **Coverage Extensions** does not apply.

F. Paragraph **B. Exclusions** is replaced by the following:

**B. Exclusions**

1. Only the following Exclusions contained in Paragraph **B.1.** of the Causes of Loss Form applicable to this Coverage Part apply to Spoilage Coverage:

   **a.** Earth Movement;

   **b.** Governmental Action;

   **c.** Nuclear Hazard;

   **d.** War And Military Action; and

   **e.** Water.

2. The following Exclusions are added:

   We will not pay for loss or damage caused by or resulting from:

   **a.** The disconnection of any refrigerating, cooling or humidity control system from the source of power.

   **b.** The deactivation of electrical power caused by the manipulation of any switch or other device used to control the flow of electrical power or current.

   **c.** The inability of an Electrical Utility Company or other power source to provide sufficient power due to:

      **(1)** Lack of fuel; or

      **(2)** Governmental order.

   **d.** The inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand.

   **e.** Breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit.

G. Paragraph **D. Deductible** is replaced by the following:

   We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Schedule of this endorsement. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance. No other deductible in this policy applies to the coverage provided by this endorsement.

H. Paragraph **F.**, **Additional Conditions** is replaced by the following:

   **ADDITIONAL CONDITION**

   The following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

   **REFRIGERATION MAINTENANCE AGREEMENTS**

   If Breakdown or Contamination is designated as a Covered Cause of Loss and a refrigeration maintenance agreement is shown as applicable by an "X" in the Schedule, the following condition applies:

   You must maintain a refrigeration maintenance or service agreement. If you voluntarily terminate this agreement and do not notify us, the insurance provided by this endorsement will be automatically suspended at the involved location.

I. Paragraph **G., Optional Coverages** does not apply.

J. The following is added to the **Definitions**:

   "**Perishable stock**" means personal property:

   **a.** Maintained under controlled conditions for its preservation; and

   **b.** Susceptible to loss or damage if the controlled conditions change.

POLICY NUMBER:   CWP 3263063           COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# UTILITY SERVICES -  DIRECT DAMAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY
TOBACCO SALES WAREHOUSES COVERAGE FORM

### SCHEDULE*

| Prem. No. | Bldg. No. | Utility Services Limit Of Insurance | Enter "X" for each applicable Property | | | | |
|---|---|---|---|---|---|---|---|
| | | | Water Supply Property | Commu-nication Supply Property (including overhead transmis-sion lines) | Commu-nication Supply Property (not including overhead transmis-sion lines) | Power Supply Property (including overhead transmis-sion lines) | Power Supply Property (not including overhead transimis-sion lines) |
| | | $ | | | | | |
| **Covered Property:** | | | | | | | |
| **Causes Of Loss Form Applicable:** | | | | | | | |
| **Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.** | | | | | | | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | | | | |

**A.** We will pay for loss of or damage to Covered Property described in the Schedule, caused by an interruption of service to the described premises. The interruption in utility service must result from direct physical loss or damage by a Covered Cause of Loss (as indicated in the Schedule) to the property described in Paragraph **C.** if such property is indicated by an "X" in the Schedule.

**B. Exception**

Coverage under this endorsement for loss or damage to Covered Property does not apply to loss or damage to electronic data, including destruction or corruption of electronic data.   The term electronic data has the meaning set forth in the Coverage Form to which this endorsement applies.

**C. Utility Services**

  **1.** **Water Supply Services,** meaning the following types of property supplying water to the described premises:

    **a.** Pumping stations; and

    **b.** Water mains.

  **2.** **Communication Supply Services,** meaning property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

    **a.** Communication transmission lines, including optic fiber transmission lines;

    **b.** Coaxial cables; and

    **c.** Microwave radio relays except satellites.

    It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

© ISO Properties, Inc., 2006          **CP 04 17  06 07**
         **Page 1 of 2**

3. **Power Supply Services,** meaning the following types of property supplying electricity, steam or gas to the described premises:

   **a.** Utility generating plants;

   **b.** Switching stations;

   **c.** Substations;

   **d.** Transformers; and

   **e.** Transmission lines.

It does not include overhead transmission lines unless indicated by an "X" in the Schedule.

**D.** If a Utility Services Limit Of Insurance is shown in the Schedule, such limit is part of, not in addition to, the Limit of Insurance stated in the Declarations or in the Separation Of Coverage endorsement as applicable to the Covered Property.

If no Limit of Insurance is shown for Utility Services, coverage under this endorsement is subject to the applicable Limit of Insurance on the Covered Property as shown in the Declarations or in the Separation Of Coverage endorsement. But this Utility Services endorsement does not increase the applicable Limit of Insurance.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BRANDS AND LABELS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

**A.** If branded or labeled merchandise that is Covered Property is damaged by a Covered Cause of Loss, we may take all or any part of the property at an agreed or appraised value.  If so, you may:

**1.** Stamp "salvage" on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

**2.** Remove the brands or labels, if doing so will not physically damage the merchandise.  You must relabel the merchandise or its containers to comply with the law.

**B.** We will pay reasonable costs you incur to perform the activity described in **A.1.** or **A.2.** above.  But the total we pay for these costs and the value of the damaged property will not exceed the applicable Limit of Insurance on such property.

**Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.**

Copyright, Insurance Services Office, Inc., 1999

**CP 04 01 10 00**

**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# KENTUCKY CHANGES

This endorsement modifies insurance provided under the following:

    COMMERCIAL PROPERTY COVERAGE PART
    STANDARD PROPERTY POLICY

**A.** The following exclusion and related provisions are added to Paragraph **B.2. Exclusions** in the Causes Of Loss Forms and to any Coverage Form or policy to which a Causes Of Loss Form is not attached:

    **1.** We will not pay for loss or damage arising out of any act committed:

        **a.** By or at the direction of any insured; and

        **b.** With the intent to cause a loss.

    **2.** However, this exclusion will not apply to deny coverage to an innocent co-insured who did not cooperate in or contribute to the creation of the loss, provided the loss is otherwise covered under this Coverage Part and:

        **a.** The loss arose out of a pattern of domestic violence and abuse; and

        **b.** The perpetrator of the loss is criminally prosecuted for the act causing the loss.

    **3.** If we pay a claim pursuant to Paragraph **A.2.**, our payment to the insured is limited to that insured's ownership interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property.  In no event will we pay more than the Limit of Insurance.

**B.** The **Transfer Of Rights Of Recovery Against Others To Us** Condition, in the Commercial Property Conditions, is amended by adding the following:

If we pay an innocent co-insured for loss described in Paragraph **A.2.**, the rights of the innocent co-insured to recover damages from the perpetrator are transferred to us to the extent of our payment. Following the loss, the innocent co-insured may not waive such rights to recover against the perpetrator of the domestic violence.

Copyright, Insurance Services Office, Inc., 2000

**CP 01 66** 09 00

**EXHIBIT 7**

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**RENEWAL**
**DATA COMPROMISE/IDENTITY RECOVERY**
**COVERAGE DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

| COVERAGES PROVIDED | LIMIT |
|---|---|
| **DATA COMPROMISE** | |
| Section 1 - Response Expenses | |
| Data Compromise Response Expenses Limit (Annual Aggregate) | $50,000 |
| Legal and Forensic Information Technology Review Sublimit (Each "Personal Data Compromise") | $5,000 |
| Section 2 - Defense and Liability | |
| Data Compromise Defense and Liability Limit (Annual Aggregate) | $50,000 |
| | |
| **IDENTITY RECOVERY** | |
| Identity Recovery Expense Reimbursement Limit | $15,000 |

| POLICY DEDUCTIBLE IS | |
|---|---|
| **DATA COMPROMISE** | |
| Data Compromise Response Expenses Deductible (Each "Personal Data Compromise") | $2,500 |
| Data Compromise Defense and Liability Deductible (Each "Data Compromise Suit") | $2,500 |
| | |
| **IDENTITY RECOVERY** | |
| Identity Recovery Expense Reimbursement Deductible | $250 |

| Total Advance Annual Data Compromise/Identity Recovery Premium | $107 |
|---|---|

**Forms and Endorsements applicable to this Coverage part:**
IL7040  0611*, CP7113  0611*, IL7039  0611*.

# IDENTITY RECOVERY COVERAGE FORM

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this Insurance. Other words and phrases that appear in quotation marks have special meaning.  Refer to Section G - DEFINITIONS.

## A.  COVERAGE

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

1. There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

2. Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery Coverage is applicable; and

3. Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured."

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

1. **Case Management Service**

   Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

2. **Expense Reimbursement**

   Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft."

## B.  EXCLUSIONS

We do not cover loss or expense arising from any of the following.

1. The theft of a professional or business identity.

2. Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others.  However, this exclusion shall not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

3. An "identity theft" that is not reported in writing to the police.

4. War, including any of the following and any consequence of the following:

   a. Undeclared war, civil war, insurrection rebellion or revolution;

   b. Warlike act by a military force or military personnel; or

   c. Destruction, seizure or use for a military purpose.

5. Nuclear Hazard.  Nuclear Hazard means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

6. "Bodily injury" or "property damage".

## C.  LIMITS OF INSURANCE

1. Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service.  Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement Coverage.

2. Expense Reimbursement Coverage is subject to a limit as indicated in the Declarations.  This is an annual aggregate per "identity recovery insured". Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period.  If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.

Includes material from
Insurance Services Office, Inc.
with permission

**IL 70 40  06 11**
**Page 1 of 4**

3. Legal costs as provided under item **d.** of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement Coverage limit.

4. Item **e.** (Lost Wages) and item **f.** (Child and Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

5. Item **g.** (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement Coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

6. Item **h.** (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expenses Reimbursement Coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

**D. DEDUCTIBLES**

1. Case Management Service is not subject to a deductible.

2. Expense Reimbursement Coverage is subject to a deductible of $250. Any one "identity recovery insured" shall be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

**E. CONDITIONS**

The following conditions apply.

1. **Assistance and Claims**

   For assistance, the "identity recovery insured" should call the **Identity Recovery Help Line** at **866-937-2663**.

   The **Identity Recovery Help Line** can provide the "identity recovery insured" with:

   a. Information and advice for how to respond to a possible "identity theft"; and

   b. Instructions for how to submit a service request for Case Management

Service and/or a claim form for Expense Reimbursement Coverage.

In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.

As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity recovery expenses."

2. **Bankruptcy**

   The bankruptcy or insolvency of you or your estate will not relieve you or us of any obligation under this Identity Recovery Coverage.

3. **Concealment, Misrepresentation or Fraud**

   We will not pay for any loss and coverage will be void if you or any additional insured at any time:

   a. Intentionally cause or allow loss or expense in order to collect on insurance; or

   b. Intentionally conceal or misrepresent a material fact concerning:

      (1) This Identity Recovery Coverage; or

      (2) A claim under this Identity Recovery Coverage.

4. **Coverage Territory**

   Subject to its terms, conditions and exclusions, this policy applies to an "identity theft" occurring anywhere in the world, but we shall only pay for loss incurred by an "identity recovery insured" in the United States, Puerto Rico or Canada.

5. **Duties in the Event of Loss or Damage**

   You must see that the following are done in the event of loss:

   a. Report the "identity theft" to the police in writing.

   b. Give us a prompt notice of the loss.

**c.** Send us a signed, sworn proof of loss containing the information we request. You must do this within 60 days after our request.

**d.** Cooperate with us in the investigation and settlement of the claim.

**6. Legal Action Against Us**

No one may bring a legal action against us under this Identity Recovery Coverage unless:

**a.** There has been full compliance with all the terms of this Identity Recovery Coverage; and

**b.** The action is brought within two years after the date that the "identity theft" is first discovered by the "identity recovery insured".

**7. Liberalization**

If we adopt any standard form revision for general use that would broaden the coverage under this Identity Recovery Coverage without additional premium, the broadened coverage will apply to this Identity Recovery Coverage commencing on the date that such revision becomes effective in the jurisdiction of the mailing address for the First Named Insured.

**8. Other Insurance**

If there is other insurance that applies to the same loss, damage or expense, this Identity Recovery Coverage shall apply only as excess insurance after all other applicable insurance has been exhausted.

**9. Services**

The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:

**a.** Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured."

**b.** All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with the local conditions.

**c.** We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts."

**F. DEFINITIONS**

**1.** "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**2.** "**Identity Recovery Case Manager**" means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured." This includes, with the permission and cooperation of the "identity recovery insured," written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

**3.** "**Identity Recovery Expenses**" means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

**a.** Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft."

**b.** Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft."

**c.** Costs for credit reports from established credit bureaus.

**d.** Fees and expenses for an attorney approved by us for the following:

**(1)** The defense of any civil suit brought against an "identity recovery insured."

**(2)** The removal of any civil judgment wrongfully entered against an "identity recovery insured."

**(3)** Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency.

**(4)** Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report.

**(5)** The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured."

**e.** Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

**f.** Actual costs for supervision of children or elderly or infirm relatives or dependants of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

**g.** Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

**h.** Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft."

**(1)** Such costs include:

**(a)** Costs by the "identity recovery insured" to recover control over his or her personal identity.

**(b)** Deductibles or service fees from financial institutions.

**(2)** Such costs do not include:

**(a)** Costs to avoid, prevent or detect "identity theft" or other loss.

**(b)** Money lost or stolen.

**(c)** Costs that are restricted or excluded elsewhere in this endorsement or policy.

**4.** **"Identity Recovery Insured"** means the following:

**a.** When the entity insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured entity.

**b.** When the entity insured under this policy is a partnership, the "identity recovery insureds" are the current partners.

**c.** When the entity insured under this policy is a corporation or other organization, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" shall be:

**(1)** The chief executive of the insured entity; or

**(2)** As respects a religious institution, the senior ministerial employee.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured."

**5.** **"Identity Theft"** means the fraudulent use of the social security number or other method of identifying an "identity recovery insured." This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

**6.** **"Property Damage"** means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured.

# DATA COMPROMISE COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Some words and phrases that appear in quotation marks have special meaning. Refer to Definitions.

## SECTION 1 - RESPONSE EXPENSES

### A. COVERAGE - SECTION 1

If the three conditions listed below have been met, then we will pay your expenses for Legal and Forensic Information Technology Review, Notification to Affected Individuals and Services to Affected Individuals directly arising from the covered cause of loss.

1. There has been a "personal data compromise"; and

2. Such "personal data compromise" is first discovered by you during the policy period for which this Coverage Form is applicable; and

3. Such "personal data compromise" is reported to us within 60 days after the date it is first discovered by you.

The amount we will pay is limited as described in paragraph B, LIMITS OF INSURANCE - SECTION 1.

Please note that service providers must be approved by us as described in Condition 13. - Service Providers.

1. **Legal and Forensic Information Technology Review**

   We will pay your necessary and reasonable costs for the following outside professional services.

   a. Legal Services

      Professional legal counsel review of the "personal data compromise" and how you should best respond to it.

   b. Forensic Information Technology Services

      Professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals."

2. **Notification to Affected Individuals**

   We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals."

3. **Services to Affected Individuals**

   We will pay your necessary and reasonable costs to provide the following services to "affected individuals."

   a. Informational Materials

      A packet of loss prevention and customer support information.

   b. Help Line

      A toll-free telephone line for "affected individuals" with questions about the "personal data compromise" or wanting to request additional services as listed in **c.** and **d.**

   c. Credit Report and Monitoring

      A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records. This service is subject to the "affected individual" enrolling for this service with the designated service provider.

   d. Identity Restoration Case Management

      As respects any "affected individual" who is or appears to be a victim of "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

### B. LIMITS OF INSURANCE - SECTION 1

1. The most we will pay under Response Expenses coverage is the Data Compromise Response Expenses Limit indicated in the Declarations.

© 2006, 2009
Includes material from Insurance
Services Office, Inc. with permission

2. The most we will pay under Legal and Forensic Information Technology Review coverage for loss arising from any one "personal data compromise" is the Legal and Forensic Information Technology Sublimit indicated in the Declarations. This sublimit is part of, and not in addition to, the Data Compromise Response Expenses Limit.

3. The Data Compromise Response Expenses Limit is an annual aggregate limit. This amount is the most we will pay for the total of all loss covered under Section 1 arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events occurring during that period.

4. A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Response Expenses Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

5. Coverage for Services to "affected individuals" is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals." Notwithstanding, coverage for Identity Restoration Case Management services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

C. **DEDUCTIBLE - SECTION 1**

Response Expenses coverage is subject to the Response Expenses Deductible indicated in the Declarations. You shall be responsible for such deductible amount as respects each "personal data compromise" covered under this Coverage Form.

## SECTION 2 - DEFENSE AND LIABILITY

A. **COVERAGE - SECTION 2**

1. If the five conditions listed below have been met, then we will pay for "data compromise defense costs" and "data compromise liability" directly arising from the covered cause of loss.

   a. All three conditions in SECTION 1 - RESPONSE EXPENSES, paragraph A, COVERAGE - SECTION 1 are met; and

   b. You have provided notifications and services to "affected individuals" in consultation with us pursuant to Response Expenses coverage; and

   c. You receive notice of a "data compromise suit" brought by one or more "affected individuals"; and

   d. Notice of such "data compromise suit" is received by you within two years of the date that the "affected individuals" are notified of the "personal data compromise"; and

   e. Such "data compromise suit" is reported to us within 60 days after the date it is first received by you.

2. The amount we will pay is limited as described in paragraph B, LIMITS OF INSURANCE - SECTION 2.

3. We will have the right but not the duty to defend the insured against any "data compromise suit." We reserve the right to approve any firm, service or legal counsel you select as stated in the CONDITIONS.

B. **LIMITS OF INSURANCE - SECTION 2**

1. The most we will pay under Defense and Liability coverage is the Data Compromise Defense and Liability Limit indicated in the Declarations.

2. The Data Compromise Defense and Liability Limit is an annual aggregate limit. This amount is the most we will pay for all loss covered under Section 2 arising out of all "personal data compromise" events which are first discovered by you during the present annual policy period. This limit applies regardless of the number of "personal data compromise" events occurring during that period.

3. A "personal data compromise" may be first discovered by you in one policy period but cause covered costs in one or more subsequent policy periods. If so, all covered costs arising from such "personal data compromise" will be subject to the Data Compromise Defense and Liability Limit applicable to the policy period when the "personal data compromise" was first discovered by you.

C. **DEDUCTIBLE - SECTION 2**

Defense and Liability coverage is subject to the Defense and Liability Deductible indicated in the Declarations. You shall be responsible for such deductible amount as respects each "data compromise suit" covered under this Coverage Form.

**EXCLUSIONS, CONDITIONS AND DEFINITIONS APPLICABLE TO BOTH SECTION 1 AND SECTION 2**

## A. EXCLUSIONS

We will not pay for costs arising from the following:

1. Your intentional or willful complicity in a "personal data compromise."

2. Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by you.

3. Any "personal data compromise" occurring prior to the first inception of this Coverage Form.

4. Except as specifically provided under coverage **A.1.b.** Forensic Information Technology Review Services, costs to research any deficiency. This includes, but is not limited to, any deficiency in your systems, procedures or physical security that may have contributed to a "personal data compromise."

5. Costs to correct any deficiency. This includes, but is not limited to, any deficiency in your systems, procedures or physical security that may have contributed to a "personal data compromise."

6. Any fines or penalties. This includes, but is not limited to, fees or surcharges from affected financial institutions.

7. Any criminal investigations or proceedings.

8. Any extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance.

9. Any virus or other malicious code that is or becomes named and recognized by the CERT Coordination Center, McAfee, Secunia, Symantec or other comparable third party monitors of malicious code activity.

10. Your reckless disregard for the security of "personally identifying information" in your care, custody or control.

11. That part of any "data compromise suit" seeking any non-monetary relief.

12. Seizure or destruction of property by order of governmental authority.

13. Nuclear reaction or radiation or radioactive contamination, however caused.

14. War and military action including any of the following and any consequence of any of the following:

   a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

15. "Bodily injury" or "property damage."

## B. CONDITIONS

The following conditions apply:

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Concealment or Fraud**

   This policy is void if you have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

3. **Coverage Territory**

   The "personal data compromise" must involve "personally identifying information" that was within your care, custody or control within the United States of America and Puerto Rico.

4. **Data Compromise Liability Defense**

   a. We shall have the right, but not the duty, to assume the defense of any applicable "data compromise suit" against you. You shall give us such information and cooperation as we may reasonably require. In the event we do not assume your defense, we shall, nevertheless, have the right to effectively associate with you in the defense and settlement of any "data compromise suit" that appears reasonably likely to involve us, including, but not limited to, the right to effectively associate in the negotiation of a settlement.

   b. You shall not admit liability for or settle any "data compromise suit" or incur any defense costs without our prior written consent. However, if you are able to dispose of all "data compromise suits" which are subject to one deductible amount for an amount not exceeding the deductible amount (inclusive of defense costs), then our consent shall not be required for such claims and suits.

**IL 70 39  06 11**
**Page 3 of 8**

**EXHIBIT 7**

c. If you refuse to consent to any settlement recommended by us and acceptable to the claimant, we may then withdraw from your defense (if we have assumed your defense) by tendering control of the defense to you. From that point forward, you shall, at your own expense, negotiate or defend such "data compromise suit" independently of us. Our liability shall not exceed the amount for which the claim or suit could have been settled if such recommendation was consented to, plus defense costs incurred by us, and defense costs incurred by you with our written consent, prior to the date of such refusal.

d. We shall not be obligated to pay any damages or defense costs, or to defend or continue to defend any "data compromise suit" if we have assumed your defense, after the Data Compromise Defense and Liability Limit has been exhausted.

**5. Defense Counsel**

We will only pay for "data compromise defense costs" for services provided by legal counsel approved by us. You must obtain our prior approval for any firm, service or legal counsel whose expenses you want covered as "data compromise defense costs." We will not unreasonably withhold such approval.

**6. Due Diligence**

You agree to use due diligence to prevent and mitigate costs covered under this Coverage Form. This includes, but is not limited to, complying with reasonable and industry-accepted protocols for:

a. Providing and maintaining appropriate physical security for your premises, computer systems and hard copy files;

b. Providing and maintaining appropriate computer and Internet security;

c. Maintaining and updating at appropriate intervals backups of computer data;

d. Protecting transactions, such as processing credit card, debit card and check payments; and

e. Appropriate disposal of files containing "personally identifying information," including shredding hard copy files and destroying physical media used to store electronic data.

**7. Duties in the Event of a "Data Compromise Suit"**

a. If a "data compromise suit" is brought against you, you must:

(1) Immediately record the specifics of the "data compromise suit" and the date received; and

(2) Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "data compromise suit" is first received by you.

b. You must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "data compromise suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the "data compromise suit";

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of loss to which this insurance may also apply; and

(5) Take no action, or fail to take any required action, that prejudices your rights or our rights with respect to such "data compromise suit".

c. You may not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

d. If you become aware of a claim or complaint that may become a "data compromise suit," you shall promptly inform us of such claim or complaint.

**8. Duties In The Event Of a "Personal Data Compromise"**

You must see that the following are done in the event of a "personal data compromise":

a. Notify the police if a law may have been broken.

b. Give us prompt notice of the "personal data compromise". As noted in Section 1, A.3., you must report the "personal data compromise" to us within 60 days of the date you first discover it.

**c.** As soon as possible, give us a description of how, when and where the "personal data compromise" occurred.

**d.** Take all reasonable steps to protect "personally identifying information" remaining in your care, custody or control.   If feasible, preserve evidence of the "personal data compromise".

**e.** Permit us to inspect the property and records proving the "personal data compromise".

**f.** If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records.   In such event, your answers must be signed.

**g.** Send us a signed, sworn statement containing the information we request to investigate the claim.   You must do this within 60 days after our request.   We will supply you with the necessary forms.

**h.** Cooperate with us in the investigation or settlement of the claim.

**9. Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

**a.** There has been full compliance with all of the terms of this insurance; and

**b.** The actions is brought within 2 years after the date the "personal data compromise" is first discovered by you.

**10. Legal Advice**

We are not your legal advisor. Our determination of what is or is not covered under this Coverage Form does not represent advice or counsel from us about what you should or should not do.

**11. Policy Period**

This policy applies only to "personal data compromises" that are first discovered by you during the policy period shown in the General Declarations.   The policy period begins and ends at 12:01 a.m., Standard Time, at your address shown in the General Declarations.

**12. Pre-Notification Consultation**

You agree to consult with us prior to the issuance of notification to "affected individuals."   We assume no responsibility under this Data Compromise Coverage

for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under Additional Condition **13.** Service Providers.   You must provide the following at our pre-notification consultation with you:

**a.** The exact list of "affected individuals" to be notified, including contact information.

**b.** Information about the "personal data compromise" that may appropriately be communicated with "affected individuals."

**c.** The scope of services that you desire for the "affected individuals." For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Data Compromise Limit.

**13. Service Providers**

**a.** We will only pay under this Data Compromise Coverage for services that are provided by service providers approved by us.   You must obtain our prior approval for any service provider whose expenses you want covered under this Data Compromise Coverage.   We will not unreasonably withhold such approval.

**b.** Prior to the Pre-Notification Consultation described in Condition **12.** above, you must come to agreement with us regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals.   We will suggest a service provider.   If you prefer to use an alternate service provider, our coverage is subject to the following limitations:

**(1)** Such alternate service provider must be approved by us;

**(2)** Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

**(3)** Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

114
**EXHIBIT 7**

**14. Other Insurance**

If there is other insurance that applies to the same loss, damage or expense, this Data Compromise Coverage shall apply only as excess insurance after all other applicable insurance has been exhausted.

**15. Services**

The following conditions apply as respects any services provided to you or any "affected individual" by us, our designees or any service firm paid for in whole or in part under this Data Compromise coverage:

**a.** The effectiveness of such services depends on your cooperation and assistance.

**b.** All services may not be available or applicable to all individuals. For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

**c.** We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

**d.** You will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for you. We will pay you for costs and expenses covered under this Coverage Form after receiving receipts, bills or other records that support your claim.

## C. DEFINITIONS

With respect to the provisions of this Coverage Form only, the following definitions are added:

**1.** **"Affected individual"** means any person who is your current, former or prospective customer, client, member, owner, director or employee and whose "personally identifying information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this Coverage Form. This definition is subject to the following provisions:

**a.** "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual."

**b.** An "affected individual" must have a direct relationship with your interests as insured under this policy. The following are examples of individuals who would not meet this requirement:

**(1)** If you aggregate or sell information about individuals as part of your business, the individuals about whom you keep such information do not qualify as "affected individuals." However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

**(2)** If you store, process, transmit or transport records, the individuals whose "personally identifying information" you are storing, processing, transmitting or transporting for another entity do not qualify as "affected individuals." However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

**(3)** You may have operations, interests or properties that are not insured under this policy. Individuals who have a relationship with you through such other operations, interests or properties do not qualify as "affected individuals." However, specific individuals, may qualify as "affected individuals" for another reason, such as being an employee of the operation insured under this policy.

**c.** An "affected individual" may reside anywhere in the world. However, the coverage and services provided under this Coverage Form are only applicable and available within the United States of America, Puerto Rico and Canada.

**2.** **"Bodily Injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**3.** **"Data Compromise Defense Costs"** means expenses resulting solely from the investigation, defense and appeal of any "data compromise suit" against you. Such expenses must be reasonable and necessary. They may be incurred by us or by you with our written consent. They do not include your salaries or your loss of earnings. They do include premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond.

4. **"Data Compromise Liability"**

   a. "Data compromise liability" means the following, when they arise from a "data compromise suit":

      (1) Damages, judgments or settlements to "affected individuals";

      (2) Defense costs added to that part of any judgment paid by us, when such defense costs are awarded by law or court order; and

      (3) Pre-judgment interest and post-judgment interest on that part of any judgment paid by us.

   b. "Data compromise liability" does not mean:

      (1) Damages, judgments or settlements to anyone who is not an "affected individual";

      (2) Civil or criminal fines or penalties imposed by law;

      (3) Punitive or exemplary damages;

      (4) The multiplied portion of multiplied damages;

      (5) Taxes; or

      (6) Matters which may be deemed uninsurable under the applicable law.

5. **"Data Compromise Suit"**

   a. "Data Compromise Suit" means a civil proceeding in which damages to one or more "affected individuals" arising from a "personal data compromise" are alleged. Such proceeding must be brought in the United States of America, Puerto Rico or Canada. "Data compromise suit" includes:

      (1) An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent;

      (2) Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent; or

      (3) A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

   b. "Data compromise suit" does not mean any demand or action brought by or on behalf of someone who is:

      (1) Your director or officer;

      (2) Your owner or part-owner; or

      (3) A holder of your securities;

      in their capacity as such, whether directly, derivatively, or by class action. "Data compromise suit" will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual."

   c. "Data compromise suit" does not mean any demand or action brought by or on behalf of an organization, business, institution, governmental entity or any other party that is not an "affected individual."

6. **"Identity Theft"** means the fraudulent use of "personally identifying information." This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes.

   "Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

7. **"Personal Data Compromise"** means the loss, theft, accidental release or accidental publication of "personally identifying information" as respects one or more "affected individuals", if such loss, theft, accidental release or accidental publication has or could reasonably result in the fraudulent use of such information. This definition is subject to the following provisions:

   a. At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" must be in your direct care, custody or control.

   b. "Personal data compromise" does not include the loss, theft, release or publication of information that is in the care, custody or control of a third party to whom you have directly or indirectly turned over such information for any reason. This includes, but is not limited to, storage, processing, transmission or transportation of such information.

c.  "Personal data compromise" includes disposal or abandonment of "personally identifying information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

(1)  Your failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

(2)  Such disposal or abandonment must take place during the time period for which this Data Compromise Coverage Form is effective.

d.  "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof.

e.  All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise."

8.  **"Personally Identifying Information"** means information that could be used to commit fraud or other illegal activity involving the credit or identity of an "affected individual." This includes, but it not limited to, Social Security numbers or account numbers correlated with names and addresses.

"Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses with no correlated Social Security numbers or account numbers.

9.  **"Property Damage"** means:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured.

All other provisions of this policy apply.

# LIABILITY COVERAGE

LIABILITY COVERAGE

**EXHIBIT 7**

**EXHIBIT 7**

**31**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**RENEWAL**
**GENERAL LIABILITY DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | | A |
|---|---|---|---|---|

| Policy Period | From To | 10/01/16 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|---|

**LIMITS OF INSURANCE -**

| General Aggregate Limit (Other Than Products/Completed Operations) | $2,000,000 |
|---|---|
| Products/Completed Operations Aggregate Limit | $2,000,000 |
| Personal & Advertising Injury Limit (Per Person Or Organization) | $1,000,000 |
| Each Occurrence Limit | $1,000,000 |
| Damage to Premises Rented to You Limit    (Any One Premises) | $500,000 |
| Medical Expense Limit                    (Any One Person) | $5,000 |

**TOTAL ADVANCE ANNUAL GENERAL LIABILITY PREMIUM**    $4,586.00

**Forms And Endorsements Applicable To This Coverage Part:**
CG0001  0413*, IL0021  0908*, CG7000  1298*, CG2503  0509*, CG2504A 0509*,
CG2147  1207*, CG7017  1298*, CG2106  0514*, CG2170  0115*, CG2404A 0509*,
CG2426  0413*, CG7118  1112*, CG2003  0413*, CG2005  0413*, CG2011  0413*,
CG2012  0413*, CG2015  0413*, CG2018  0413*, CG2024  0413*, CG2027  0413*,
CG2029  0413*, CG2034  0413*.

120
**EXHIBIT 7**

**31**

# WESTFIELD INSURANCE
### Sharing Knowledge. Building Trust.®

**RENEWAL**
**GENERAL LIABILITY DECLARATIONS**
(Continued)

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| WIC Account Number: 1600961480 | | A |
|---|---|---|

| Policy Period | From 10/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|
| | To 10/01/17 | mailing address shown above. |

Location Of All Premises Owned By, Rented To Or Controlled By The Named Insured
Are The Same As The Mailing Address Of The Policy Declarations Unless Otherwise
Indicated.

### GENERAL LIABILITY SCHEDULE

PREMIUM BASIS LEGEND -
S = GROSS      PER $1,000        A = AREA   PER 1,000 SQ. FT.      U = UNITS PER UNIT
   SALES                        C = TOTAL COST  PER $1,000        T = SEE CLASSIFICATION
P = PAYROLL    PER $1,000        M = ADMISSIONS  PER 1,000           NOTES
O = OTHERS     PER $1,000

RATE LEGEND -
PREM/OP  =  PREMISES AND OPERATIONS                    MP = MINIMUM PREMIUM
PROD     =  PRODUCTS AND COMPLETED OPERATIONS
CMPCBN   =  COMPOSITE PREMISES/PRODUCTS COMPLETED OPERATIONS

| CLASSIFICATION KENTUCKY | CODE | PREMIUM BASIS | RATE | PREMIUM |
|---|---|---|---|---|
| 300 CHESTNUT ST MURRAY        KY  42071 | | | | |
| DRUG DISTRIBUTORS | 12373 | S 52,000,000 | PREM/OP  .035 PROD.    .049 | $1,820 $2,548 |

PREM/OP   MP     $113
PROD      MP     $47

ADDITIONAL COVERAGES AND ENDORSEMENTS -
  SIGNATURE SERIES COMML GL ENDT                                        $218

TOTAL
TOTAL PREMIUM - PREMISES AND OPERATIONS                                 $1,820
TOTAL PREMIUM - PRODUCTS AND COMPLETED OPERATIONS                       $2,548
TOTAL PREMIUM - ADDITIONAL COVERAGES AND ENDORSEMENTS                   $218

           TOTAL ADVANCE ANNUAL GENERAL LIABILITY PREMIUM     $4,586

**EXHIBIT 7**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

## COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

CG 00 01 04 13
Page 2 of 16

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**CG 00 01  04 13**
**Page 3 of 16**

124
**EXHIBIT 7**

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g.  Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and "loading or unloading."

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment."

**h.  Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.  War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**CG 00 01  04 13**
**Page 4 of 16**

125
**EXHIBIT 7**

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j.   Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.   Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.   Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.   Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.   Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product;"

**(2)** "Your work;" or

**(3)** "Impaired property;"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.   Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p.   Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

**CG 00 01   04 13**
**Page 5 of 16**

126
**EXHIBIT 7**

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may at our discretion investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g.** **Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h.** **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i.** **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.   Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j.** **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k.** **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l.** **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address,

domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m.** **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n.** **Pollution - related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o.** **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p.** **Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**CG 00 01  04 13**
**Page 7 of 16**

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C - MEDICAL PAYMENTS

1. **Insuring Agreement**

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (a) The accident takes place in the "coverage territory" and during the policy period;

      (b) The expenses are incurred and reported to us within one year of the date of the accident; and

      (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

      (1) First aid administered at the time of an accident;

      (2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

      (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

   We will not pay expenses for "bodily injury:"

   a. **Any insured**

      To any insured, except "volunteer workers".

   b. **Hired Person**

      To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. **Injury On Normally Occupied Premises**

      To a person injured on that part of premises you own or rent that the person normally occupies.

   d. **Workers' Compensation And Similar Laws**

      To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

   e. **Athletics Activities**

      To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

   f. **Products - Completed Operations Hazard**

      Included within the "products-completed operations hazard."

   g. **Coverage A Exclusions**

      Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit." However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**CG 00 01  04 13**
**Page 8 of 16**

129
**EXHIBIT 7**

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II - WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    **(1)** "Bodily injury" or "personal and advertising injury":

        **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business or to your other "volunteer workers" while performing duties related to the conduct of your business;

        **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1) (a)** above;

        **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1) (a)** or **(b)** above; or

        **(d)** Arising out of his or her providing or failing to provide professional health care services.

    **(2)** "Property damage" to property:

        **(a)** Owned, occupied or used by;

        **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker), or any organiza-

tion while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

    **(1)** With respect to liability arising out of the maintenance or use of that property; and

    **(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits."

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C**;

**b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard;" and

**CG 00 01  04 13**
**Page 10 of 16**

c. Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A**; and

   **b.** Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence."

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

### SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      **(1)** How, when and where the "occurrence" or offense took place;

      **(2)** The names and addresses of any injured persons and witnesses; and

      **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

   **b.** If a claim is made or "suit" is brought against any insured, you must:

      **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

      **(2)** Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   **c.** You and any other involved insured must:

      **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

      **(2)** Authorize us to obtain records and other information;

      **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against

that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above; or

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

**CG 00 01  04 13**
**Page 13 of 16**

134
**EXHIBIT 7**

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto;"

**b.** While it is in or on an aircraft, watercraft or "auto;" or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos:"

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

**CG 00 01  04 13**
**Page 15 of 16**

136
**EXHIBIT 7**

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products - completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

POLICY NUMBER:    CWP 3263063                                COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**Designated Construction Projects:**

All Projects

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section I - Coverage A and for all medical expenses caused by accidents under Section I - Coverage C, which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

2. The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under Coverage C regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

3. Any payments made under Coverage A for damages or under Coverage C for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project.  Such payments shall

not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

4. The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply.  However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section I - Coverage A and for all medical expenses caused by accidents under Section I - Coverage C, which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1. Any payments made under Coverage A for damages or under Coverage C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

© Insurance Services Office, Inc., 2008

**CG 25 03  05 09**
**Page 1 of 2**

138
**EXHIBIT 7**

C.  When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

D.  If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

E.  The provisions of Section - III Limits of Insurance not otherwise modified by this endorsement shall continue to apply as stipulated.

139
**EXHIBIT 7**

POLICY NUMBER:   CWP 3263063                          COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESIGNATED LOCATION(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Designated Location(s):**

    All rented, owned and occupied locations other than construction projects.

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I** - Coverage **A** and for all medical expenses caused by accidents under Section **I** - Coverage **C**, which can be attributed only to operations at a single designated "location" shown in the Schedule above:

    **1.** A separate Designated Location General Aggregate Limit applies to each designated "location", and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

    **2.** The Designated Location General Aggregate Limit is the most we will pay for the sum of all damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under Coverage **C** regardless of the number of:

        **a.** Insureds;

        **b.** Claims made or "suits" brought; or

        **c.** Persons or organizations making claims or bringing "suits".

    **3.** Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses shall reduce the Designated Location General Aggregate Limit for that designated "location". Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Location General Aggregate Limit for any other designated "location" shown in the Schedule above.

    **4.** The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Location General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I** - Coverage **A** and for all medical expenses caused by accidents under Section **I** - Coverage **C**, which cannot be attributed only to operations at a single designated "location" shown in the Schedule above:

    **1.** Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-completed Operations Aggregate Limit, whichever is applicable; and

    **2.** Such payments shall not reduce any Designated Location General Aggregate Limit.

**C.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Location General Aggregate Limit.

**D.** For the purposes of this endorsement, the **Definitions** Section is amended by the addition of the following definition:

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**E.** The provisions of Section **III** Limits of Insurance not otherwise modified by this endorsement shall continue to apply as stipulated.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT - RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity: and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006

**CG 21 47** 12 07

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**2.   Exclusions**

This insurance does not apply to:

**p.   Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2.   Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

CG 21 06  05 14

**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063            COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person Or Organization: |
| --- |
| Any person or organization for whom you are required in a written contract or agreement to include a waiver of transfer of rights of recovery against others to us, provided the "bodily injury" or "property damage" occurs subsequent to the execution of the written agreement. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph 8. Transfer Of Rights Of Recovery Against Others To Us of Section IV - Conditions:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard".  This waiver applies only to the person or organization shown in the Schedule above.

© Insurance Services Office, Inc., 2008            **CG 24 04A** 05 09

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf.  However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability

is permitted by law.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

   **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© Insurance Services Office, Inc., 2012

**CG 24 26  04 13**

COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.



# COMMERCIAL GENERAL LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

### SCHEDULE

The coverage provided by this endorsement is summarized below and is intended to provide a general coverage description only.  For the details affecting each coverage, please refer to the terms and conditions in this endorsement.

A. **Expected or Intended Injury**
   - Reasonable Force
B. **Non-owned Watercraft**
   - Increased to 60 feet
C. **Non-owned Aircraft**
D. **Property Damage - Elevators**
E. **Damage To Premises Rented To You**
   - Limit increased to $500,000
F. **Personal and Advertising Injury**
   - Exclusions
G. **Medical Payments - Volunteer Workers**
H. **Voluntary Property Damage**
I. **Care, Custody and Control**
J. **Supplementary Payments**
   - Bail Bonds - $2500
   - Loss of Earnings - $1000
K. **Who Is An Insured broadened:**
   - Limited Liability Partnership
   - Joint Ventures / Partnership / Limited Liability Company
   - Health Care Professionals (Incidental Medical Malpractice)
   - Newly Formed or Acquired Entities (up to 365 days)
   - Individual Owners of Buildings
L. **Knowledge and Notice Of Occurrence**
M. **Unintentional Failure To Disclose Hazards**
N. **Liberalization**
O. **Definitions**
   - Bodily Injury redefined
   - Expanded Personal and Advertising Injury definition
   - Unintentional Damage or Destruction added

**In addition to the policy amendments contained in A through O listed above, the endorsements listed below will automatically be attached to your policy to complete the coverage provided by the Signature Series Commercial General Liability Endorsement:**

   - Additional Insured - Co-Owners of Insured Premises - CG 20 27
   - Additional Insured - Concessionaire - CG 20 03
   - Additional Insured - Controlling Interest - CG 20 05
   - Additional Insured - Grantor of Franchise - CG 20 29
   - Additional Insured - Lessor of Leased Equipment - CG 20 34
   - Additional Insured - Managers or Lessors of Premises - CG 20 11
   - Additional Insured - Mortgagee, Assignee or Receiver - CG 20 18
   - Additional Insured - Owners or Other Interests From Whom Land Has Been Leased - CG 20 24
   - Additional Insured - State or Governmental Agency or Subdivision or Political Subdivision - Permits or Authorizations - CG 20 12
   - Additional Insured - Vendors - CG 20 15
   - Waiver of Transfer of Rights of Recovery - CG 24 04

## A. EXPECTED OR INTENDED INJURY

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions a.** is replaced with the following:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force for the purpose of protecting persons or property.

## B. NON-OWNED WATERCRAFT

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions g. (2) (a)** is replaced with the following:

**(a)** Less than 60 feet long; and

## C. NON-OWNED AIRCRAFT

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions g. Aircraft, Auto or Watercraft,** the following is added:

**(6)** An aircraft you do not own, provided that:

**(a)** The pilot in command holds a currently effective certificate issued by the duly constituted authority of the United States of America or Canada, designating that person as a commercial or airline transport pilot;

**(b)** It is rented with a trained, paid crew; and

**(c)** It does not transport persons or cargo for a charge.

## D. PROPERTY DAMAGE - ELEVATORS

With respect to Exclusions of **SECTION I COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** item **2. Exclusions,** paragraphs **(3), (4) and (6)** Exclusion **j. Damage to Property** and Exclusion **K Damage To Your Product** do not apply to the use of elevators. The insurance afforded by this provision is excess over any valid and collectible property insurance (including any deductible) available to the insured, and the Other Insurance Condition is changed accordingly.

## E. DAMAGE TO PREMISES RENTED TO YOU

Under **SECTION I. COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Item **2. Exclusions,** the last paragraph of item **2. Exclusions,** is replaced with the following:

Exclusions **c.** through **n.** do not apply to damage by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in **Section III - LIMITS OF INSURANCE.**

## F. PERSONAL AND ADVERTISING INJURY

Under **SECTION I - COVERAGES, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY,** the following are added to Item **2. Exclusions:**

### q. Discrimination Relating To Room, Dwelling or Premises

Caused by discrimination directly or indirectly related to the sale, rental, lease or sub-lease or prospective sale, rental, lease or sub-lease of any room, dwelling or premises by or at the direction of any insured.

### r. Fines or Penalties

Fines or penalties levied or imposed by a governmental entity because of discrimination.

## G. MEDICAL PAYMENTS - VOLUNTEER WORKERS

Under **SECTION I - COVERAGES, COVERAGE C MEDICAL PAYMENTS,** item **2. Exclusions b. Hired Person** is replaced with the following:

### b. Hired Person

To a person hired to do work for or on behalf of any insured or tenant of any insured; however this exclusion does not apply to "volunteer workers" while engaged in maintenance or repair of your premises.

Under **SECTION I - COVERAGES,** the following are added:

## H. VOLUNTARY PROPERTY DAMAGE

### 1. Insuring Agreement

We will pay, at your request, for "property damage" to property of others caused by you, or while in your possession arising out of your business operations.

### 2. Exclusions

Coverage for Voluntary Property Damage does not apply to:

**a.** "Loss" of property at premises owned, rented, leased, operated or used by you.

**b.** "Loss" of property while in transit;

**c.** "Loss" of property owned by, rented to, leased to, borrowed by or used by you;

**d.** The cost of repairing or replacing:

    **(1)** "Your work" defectively or incorrectly done by you;

    **(2)** "Your product" manufactured, sold or supplied by you; or

    unless the "property damage" is caused directly by you after delivery of "your product" or completion of "your work" and resulting from a subsequent undertaking.

**e.** "Loss" of property caused by or arising out of the "products-completed operations hazard."

**3.** **Deductible**

We will not pay for "loss" in any one "occurrence" until the amount of "loss" exceeds $250. We will then pay the amount of "loss" in excess of $250, up to the applicable limit of insurance.

**4.** **Actual Cost**

In the event of covered "loss", you shall, if requested by us, replace the damaged property or furnish the labor and materials necessary for repairs thereto at your actual cost, excluding profit or overhead charges.

The most we will pay under Voluntary Property Damage for "loss" arising out of any one "occurrence" is $250. The most we will pay for the sum of all "losses" under this coverage is $1,000.

**I.** **CARE, CUSTODY OR CONTROL**

**1.** **Insuring Agreement**

We will pay those sums the insured becomes legally obligated to pay as damages because of "property damage" to property of others while in your care, custody or control or property as to which you are exercising physical control if the "property damage" arises out of your business operations.

**2.** **Exclusions**

Coverage for Care, Custody or Control does not apply to:

**a.** "Property damage" to property at any premises owned, rented, leased, operated or used by you;

**b.** "Property damage" to property while in transit;

**c.** The cost of repairing or replacing;

    **(1)** "Your work" defectively or incorrectly done by you; or

    **(2)** "Your product" manufactured, sold or supplied by you;

    unless the "property damage" is caused directly by you after delivery of "your product" or completion of "your work" and resulting from a subsequent undertaking.

**d.** "Property damage" to property caused by or arising out of the "products-completed operations hazard".

**3.** **Deductible**

We will not pay for "property damage" in any one "occurrence" until the amount of "property damage" exceeds $250. We will then pay the amount of "property damage" in excess of $250, up to the applicable limit of insurance.

**4.** **Actual Cost**

In the event of covered "property damage", you shall, if requested by us, replace the property or furnish the labor and materials necessary for repairs thereto at your actual cost, excluding profit or overhead charges.

The most we will pay under Care, Custody or Control for "property damage" is $1,000 for each occurrence. The most we will pay for the sum of all damages because of "property damage" under this coverage is $5,000.

**J.** **SUPPLEMENTARY PAYMENTS**

Under **SECTION I - SUPPLEMENTARY PAYMENTS COVERAGES A AND B**, item **1.b.** is replaced with the following:

**b.** Up to $2,500 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the "Bodily Injury" Liability Coverage applies. We do not have to furnish these bonds.

Under **SECTION I - SUPPLEMENTARY PAYMENTS COVERAGES A AND B**, item **1.d.** is replaced with the following:

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $1,000 a day because of time off from work.

**K. WHO IS AN INSURED BROADENED**

Under **SECTION II - WHO IS AN INSURED** Item **1.b.** is replaced with the following:

    **b.** A partnership (including a limited liability partnership) or joint venture, you are an insured. Your members, your partners, and their spouses are also insured, but only with respect to the conduct of your business.

Under **SECTION II - WHO IS AN INSURED** the following is added to item **1:**

    **f. Joint Ventures/Partnership/Limited Liability Company Coverage**

    You are an insured when you had an interest in a joint venture, partnership or limited liability company which is terminated or ended prior to or during this policy period but only to the extent of your interest in such joint venture, partnership or limited liability company. This coverage does not apply:

    **(1)** Prior to the termination date of any joint venture, partnership or limited liability company; or

    **(2)** If there is other valid and collectible insurance purchased specifically to insure the partnership, joint venture or legal liability company.

Under **SECTION II - WHO IS AN INSURED,** item **2.a.** is replaced with the following:

    **a.** Your "employees" or volunteer workers, other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or volunteer workers are an insured for:

    **(1)** "Bodily injury" or "personal and advertising injury":

    **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are limited liability company), or to a co-"employee" or co-volunteer worker while that is either in the course of his or her employment or performing duties related to the conduct of your business;

    **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or co-volunteer worker as a consequence of paragraph **(1)(a)** above;

    **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

    **(d)** Arising out of his or her providing or failing to provide professional health care services.

    This does not apply to nurses, emergency medical technicians or paramedics employed by you to provide health care services, but only if you are not in the business or occupation of providing such professional services.

    **(2)** "Property damage" to property:

    **(a)** Owned, occupied or used by,

    **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

    you, any of your "employees" or volunteer workers, any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

Under **SECTION II - WHO IS AN INSURED,** item **3.a.** is replaced with the following:

    **a.** Coverage under this provision is afforded only until the end of the policy period or the next anniversary of this policy's effective date after you acquire or form the organization, whichever is earlier.

Under **SECTION II - WHO IS AN INSURED,** the following is added:

    **4.** For **COVERAGE A** and **COVERAGE B** only the owner of any building leased to you, but only if the building owner is a shareholder in your corporation or a partner in your partnership insured in this policy, and only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you. However, this insurance does not apply:

**CG 71 18  11 12**
**Page 4 of 6**

149
**EXHIBIT 7**

**a.** To any "occurrence" or offense which takes place after you cease to be a tenant in the premises; or

**b.** To structural alterations, new construction or demolition operations performed by or on behalf of the building owner.

Under **SECTION II - WHO IS AN INSURED** the last paragraph of this section is replaced with the following:

Except as provided in **3.** above, no person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a named insured in the Declarations.

**L. KNOWLEDGE AND NOTICE OF OCCURRENCE**

Under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 2. Duties in the Event of Occurrence, Offense, Claim Or Suit,** the following is added:

**e.** The requirement in Condition **2.a.** applies only when the "occurrence" or offense is known to:

(1) You, if you are an individual;

(2) A partner, if you are a partnership;

(3) An "executive officer" or insurance manager, if you are a corporation; or

(4) A manager, if you are a limited liability company.

**f.** The requirement in Condition **2. b.** will not be breached unless the breach occurs after such claim or "suit" is known to:

(1) You, if you are an individual;

(2) A partner, if you are a partnership;

(3) An "executive officer" or insurance manager, if you are a corporation; or

(4) A manager, if you are a limited liability company.

**g.** Your rights under this Coverage Part will not be prejudiced if you fail to give us notice of an "occurrence," offense, claim, or "suit" and that failure is solely due to your reasonable belief that the "bodily injury" or "property damage" is not covered under this Coverage Part. However, you shall give written notice of this "occurrence," offense, claim, or "suit" to us as soon as you are aware this insurance may apply to such "occurrence", offense, claim, or "suit".

**M. UNINTENTIONAL FAILURE TO DISCLOSE HAZARDS**

Under **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 6. Representations,** the following is added:

**d.** Your failure to disclose all hazards or prior "occurrences" existing as of the inception date of this policy shall not prejudice the coverage afforded by this policy, provided such failure to disclose all hazards or prior "occurrences" is not intentional.

**N. LIBERALIZATION**

Under **SECTION I - COVERAGES, SECTION II - WHO IS AN INSURED, SECTION III - LIMITS OF INSURANCE, SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS AND SECTION V - DEFINITIONS,** the following is added:

**Liberalization**

If we adopt any revision that would broaden the coverage under this endorsement without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this endorsement.

**O. DEFINITIONS**

Under **SECTION V - DEFINITIONS,** item **3.** is deleted and replaced with the following:

**3.** "Bodily injury" means bodily injury, disability, sickness, or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

Under **SECTION V - DEFINITIONS,** item **14.** the following is added to the definition of "Personal and advertising injury":

**h.** Discrimination or humiliation that results in injury to the feelings or reputation of a natural person but only if such discrimination or humiliation is:

(1) not done intentionally by or at the direction of:

(a) The insured; or

(b) Any "executive officer," director, stockholder, partner, member or manager (if you are a limited liability company) of the insured; and

**CG 71 18  11 12**
**Page 5 of 6**

150
**EXHIBIT 7**

**(2)** Not directly or indirectly related to the employment, prospective employment, past employment or termination of employment of any person or persons by any insured.

Under **SECTION V - DEFINITIONS, the following definition is added:**

**23.** "Loss" means unintentional damage or destruction but does not include disappearance, theft, or loss of use.

POLICY NUMBER:  CWP 3263063            **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - CONCESSIONAIRES TRADING UNDER YOUR NAME

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Concessionaire(s): |
| --- |
|  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the concessionaire(s) shown in the Schedule but only with respect to their liability as a concessionaire trading under your name.

However:

   **1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

   **2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

   **1.** Required by the contract or agreement; or

   **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Service Office, Inc., 2012        **CG 20 03  04 13**

152

**EXHIBIT 7**

POLICY NUMBER: CWP 3263063          **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# ADDITIONAL INSURED - CONTROLLING INTEREST

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Persons Or Organization: |
| --- |
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability arising out of:

    **1.** Their financial control of you; or

    **2.** Premises they own, maintain or control while you lease or occupy these premises.

However:

    **1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

    **2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance**:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

    **1.** Required by the contract or agreement; or

    **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012           **CG 20 05 04 13**

**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063                                    **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Designation Of Premises (Part Leased To You):** |
| **Name Of Person(s) Or Organization (Additional Insured):** |
| **Additional Premium:**    $ |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                                          **CG 20 11  04 13**

154
**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063                                      **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED -
## STATE OR GOVERNMENTAL AGENCY OR SUBDIVISION
## OR POLITICAL SUBDIVISION - PERMITS OR AUTHORIZATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **State Or Governmental Agency Or Subdivision Or Political Subdivision:** |
| **Automatic status when required by written contract, agreement or permit.** |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.  Section II - Who Is An Insured** is amended to include as an additional insured any state or governmental agency or subdivision or political subdivision shown in the Schedule, subject to the following provisions:

1.  This insurance applies only with respect to operations performed by you or on your behalf for which the state or governmental agency or subdivision or political subdivision has issued a permit or authorization.

   However:

   a.  The insurance afforded to such additional insured only applies to the extent permitted by law; and

   b.  If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

2.  This insurance does not apply to:

   a.  "Bodily injury" "property damage" or "personal and advertising injury" arising out of operations performed for the federal government, state or municipality; or

   b.  "Bodily injury" or "property damage" included within the "products-completed operations hazard".

**B.  With respect to the insurance afforded to these additional insureds, the following is added to Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1.  Required by the contract or agreement; or

2.  Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office Inc., 2012                                      **CG 20 12  04 13**

155
**EXHIBIT 7**

POLICY NUMBER: CWP 3263063        **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) (Vendor) | Your Products |
|---|---|
| Automatic status when required by written contract, agreement or permit. | Your products related to your operations. |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II - Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) (referred to throughout this endorsement as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business.

However:

1. The insurance afforded to such vendor only applies to the extent permitted by law; and

2. If coverage provided to the vendor is required by a contract or agreement, the insurance afforded to such vendor will not be broader than that which you are required by the contract or agreement to provide for such vendor.

**B.** With respect to the insurance afforded to these vendors, the following additional exclusions apply:

1. The insurance afforded the vendor does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

   b. Any express warranty unauthorized by you;

   c. Any physical or chemical change in the product made intentionally by the vendor;

   d. Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

   e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

   f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

   g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

   h. "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

© Insurance Services Office, Inc., 2012

**CG 20 15 04 13**
**Page 1 of 2**

**(1)** The exceptions contained in Subparagraphs **d.** or **f.**; or

**(2)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**2.** This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**C.** With respect to the insurance afforded to these vendors, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the vendor is required by a contract or agreement, the most we will pay on behalf of the vendor is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

POLICY NUMBER:    CWP 3263063                                **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

**SCHEDULE**

| Name Of Person Or Organization: | Designation Of Premises: |
|---|---|
| | |
| | |
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                                **CG 20 18  04 13**

**EXHIBIT 7**

POLICY NUMBER:   CWP 3263063                    **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - OWNERS OR OTHER INTERESTS FROM WHOM LAND HAS BEEN LEASED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s) | Designation Of Premises (Part Leased To You) |
|---|---|
|  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to you and shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to lease that land;

2. Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                    **CG 20 24** 04 13

POLICY NUMBER:   CWP 3263063                    **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - CO-OWNER OF INSURED PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Person(s) Or Organization(s) | Location Of Premises |
|---|---|
| | |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as co-owner of the premises shown in the Schedule.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                    **CG 20 27** 04 13

160

**EXHIBIT 7**

POLICY NUMBER:                            **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - GRANTOR OF FRANCHISE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Name Of Persons Or Organization(s):** |
|---|
| |
| |

Information required to complete this Schedule, if not shown above in the Declarations.

Automatic status when required by written contract, agreement or permit.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as grantor of a franchise to you.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                                  **CG 20 29 04 13**

**EXHIBIT 7**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury", "personal and advertising injury" or "property damage" arising out of:

1. Inhaling, ingesting or physical exposure to asbestos or goods or products containing asbestos; or

2. The use of asbestos in constructing or manufacturing any goods, product or structure; or

3. The removal, repair, encapsulation, enclosure, abatement or maintenance of asbestos in or from any goods, product or structure; or

4. The manufacture, sale, distribution, transportation, storage or disposal of asbestos or goods or products containing asbestos.

This insurance does not apply to payment for the investigation or defense of any claim, injury, loss, fine, penalty or lawsuit related to any of the foregoing items 1 thru 4. Nor do we have a duty to investigate or defend any such claim, injury, loss or lawsuit.

This insurance also does not apply to any loss, cost or expense incurred in complying with any federal, state or local provision of law regarding the inspection, monitoring, or control of asbestos in any goods, products or structures.

**CG 70 17** 12 98

162
**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015

**CG 21 70  01 15**

**EXHIBIT 7**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT - AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) from whom you lease equipment when you and such person(s) or organization(s) have agreed in writing in a contract or agreement that such person(s) or organization(s) be added as an additional insured on your policy.  Such person(s) or organization(s) is an insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

However, the insurance afforded to such additional insured:

1. Only applies to the extent permitted by law; and

2. Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

**B.** With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement you have entered into with the additional insured; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012

CG 20 34  04 13

164

**EXHIBIT 7**

# AUTO COVERAGE

AUTO COVERAGE

AUTO COVERAGE

**EXHIBIT 7**

31

## WESTFIELD INSURANCE
### Sharing Knowledge. Building Trust.®

**RENEWAL**
**BUSINESS AUTO COVERAGE DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **ITEM ONE–NAMED INSURED & MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | | A |
|---|---|---|---|---|

| Policy Period | From To | 10/01/16 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|---|

**ITEM TWO**       **SCHEDULE OF COVERAGES AND COVERED AUTOS**

Each Of These Coverages Will Apply Only To Those "Autos" Shown As Covered "Autos". "Autos" Are Shown As Covered "Autos" For A Particular Coverage By The Entry Of One Or More Of The Symbols From The Covered Auto Section of The Business Auto Coverage Form Next To The Name Of The Coverage.

| COVERAGES | COVERED AUTO SYMBOLS | LIMIT THE MOST WE WILL PAY FOR ANY ONE ACCIDENT OR LOSS | | PREMIUM |
|---|---|---|---|---|
| Liability | 08 09 | Bodily Injury and Property Damage | $1,000,000 Each Accident | $71 |
| | | **TOTAL ADVANCE ANNUAL PREMIUM** | | $71 |

Audit Period (If Applies)    ☐ Annual    ☐ Semi-Annual    ☐ Quarterly    ☐ Monthly

**Forms And Endorsements Attached To This Coverage Form:**
CADS03  0310*, CA0001  0310*, IL0021  0908*, CA0125  1202*, CA7080  0312*.

166
**EXHIBIT 7**

**WESTFIELD INSURANCE**
INSURANCE
Sharing Knowledge. Building Trust.®

31

**RENEWAL**
**BUSINESS AUTO COVERAGE DECLARATIONS**
(Continued)

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| ITEM ONE-NAMED INSURED & MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |

| | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSUREDPARTNERS NL LLC<br>2443 SIR BARTON WAY STE 400<br>LEXINGTON KY 40509-2527<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063 | 11 | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From  10/01/16<br>To  10/01/17 | at 12:01 A.M. Standard Time at your<br>mailing address shown above. |
|---|---|---|

### HIRED AUTO LIABILITY

| STATE | ESTIMATED ANNUAL COST OF HIRE | PREMIUM |
|---|---|---|
| KY | IF ANY | |

Cost Of Hire Means The Total Amount You Incur For The Hire Of Autos You Do Not Own (Not Including Autos You Borrow Or Rent From Your Partners Or Employees Or Their Family Members).  Cost Of Hire Does Not Include Charges For Services Performed By Motor Carriers Of Property Or Passengers.

### NON-OWNERSHIP LIABILITY

| STATE | RATING BASIS-NUMBER OF EMPLOYEES | ESTIMATED NUMBER OF EMPLOYEES | PREMIUM |
|---|---|---|---|
| KY | | 1 | $71 |

| TOTAL ADVANCE ANNUAL AUTO PREMIUM | $71 |
|---|---|

| PAGE   02 OF  02 | CA DS 03 (03-10) | 08/10/16 | HF |
|---|---|---|---|

167
**EXHIBIT 7**

# BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos." The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description Of Covered Auto Designation Symbols**

| Symbol | Description Of Covered Auto Designation Symbols | |
|--------|------|------|
| **1** | Any "Auto" | |
| **2** | Owned "Autos" Only | Only those "autos" you own (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" you acquire ownership of after the policy begins. |
| **3** | Owned Private Passenger "Autos" Only | Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the policy begins. |
| **4** | Owned "Autos" Other Than Private Passenger "Autos" Only | Only those "autos" you own that are not of the private passenger type (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins. |
| **5** | Owned "Autos" Subject to No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are required to have no-fault benefits in the state where they are licensed or principally garaged. |
| **6** | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| **7** | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| **8** | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households. |
| **9** | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs. |
| **19** | Mobile Equipment Subject To Compulsory Or Financial Responsibility Or Other Motor Vehicle Insurance Law Only | Only those "autos" that are land vehicles and that would qualify under the definition of "mobile equipment" under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged. |

© Insurance Services Office, Inc., 2009

**CA 00 01 03 10**
**Page 1 of 12**

**EXHIBIT 7**

**B. Owned Autos You Acquire After The Policy Begins**

1. If Symbols **1, 2, 3, 4, 5, 6** or **19** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol **7** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

   a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

   b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos**

If Liability Coverage is provided by this coverage form, the following types of vehicles are also covered "autos" for Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto".

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

   a. Breakdown;

   b. Repair;

   c. Servicing;

   d. "Loss"; or

   e. Destruction.

## SECTION II - LIABILITY COVERAGE

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos." However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1. Who Is An Insured**

The following are "insureds":

a. You for any covered "auto".

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

   (1) The owner or anyone else from whom you hire or borrow a covered "auto". This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

   (2) Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

   (3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

   (4) Anyone other than your "employees", partner (if you are a partnership), members (if you are a limited liability company) or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

   (5) A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

**CA 00 01 03 10**
**Page 2 of 12**

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the "insured":

**(1)** All expenses we incur.

**(2)** Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

**(3)** The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

**(4)** All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

**(5)** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**(6)** All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend, but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b. Out-of-state Coverage Extensions**

While a covered "auto" is away from the state where it is licensed we will:

**(1)** Increase the Limit of Insurance for Liability Coverage to meet the limits specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

**(2)** Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

**B. Exclusions**

This insurance does not apply to any of the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured."

**2. Contractual**

Liability assumed under any contract or agreement.

But this exclusion does not apply to liability for damages:

**a.** Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

**b.** That the "insured" would have in the absence of the contract or agreement.

**3. Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4. Employee Indemnification And Employer's Liability**

"Bodily injury" to:

**a.** An "employee" of the "insured" arising out of and in the course of:

**(1)** Employment by the "insured"; or

**(2)** Performing the duties related to the conduct of the "insured's" business; or

**b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**CA 00 01 03 10**
**Page 3 of 12**

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract." For the purposes of the coverage form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

5. **Fellow Employee**

"Bodily injury" to:

a. Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

b. The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph a. above.

6. **Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

7. **Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

a. Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

b. After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

8. **Movement Of Property By Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

9. **Operations**

"Bodily injury" or "property damage" arising out of the operation of:

a. Any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment"; or

b. Machinery or equipment that is on, attached to or part of a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

10. **Completed Operations**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraphs a. or b. above.

Your work will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

11. **Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured"; or

(3) Being stored, disposed of, treated or processed in or upon the covered "auto";

**CA 00 01 03 10**
**Page 4 of 12**

171
**EXHIBIT 7**

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury", and "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

**SECTION III - PHYSICAL DAMAGE COVERAGE**

**A. Coverage**

**1.** We will pay for "loss" to a covered "auto" or its equipment under:

**a. Comprehensive Coverage**

From any cause except:

**(1)** The covered "auto's" collision with another object; or

**(2)** The covered "auto's" overturn.

**b. Specified Causes Of Loss Coverage**

Caused by:

**(1)** Fire, lightning or explosion;

**(2)** Theft;

**(3)** Windstorm, hail or earthquake;

**(4)** Flood;

**(5)** Mischief or vandalism; or

**(6)** The sinking, burning, collision or derailment of any conveyance transporting the covered "auto."

**EXHIBIT 7**

**c. Collision Coverage**

Caused by:

**(1)** The covered "auto's" collision with another object; or

**(2)** The covered "auto's" overturn.

**2. Towing**

We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

**3. Glass Breakage - Hitting A Bird Or Animal - Falling Objects Or Missiles**

If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

**a.** Glass breakage;

**b.** "Loss" caused by hitting a bird or animal; and

**c.** "Loss" caused by falling objects or missiles.

However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

**4. Coverage Extension**

**a. Transportation Expenses**

We will pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the private passenger type. We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes Of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

**b. Loss of Use Expenses**

For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

**(1)** Other than collision only if the Declarations indicate that Comprehensive Coverage is provided for any covered "auto";

**(2)** Specified Causes Of Loss only if the Declarations indicate that Specified Causes of Loss Coverage is provided for any covered "auto"; or

**(3)** Collision only if the Declarations indicate that Collision Coverage is provided for any covered "auto".

However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

**B. Exclusions**

**1.** We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

**a. Nuclear Hazard**

**(1)** The explosion of any weapon employing atomic fission or fusion; or

**(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

**b. War Or Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for "loss" to any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

**3.** We will not pay for "loss" due and confined to:

**a.** Wear and tear, freezing, mechanical or electrical breakdown.

**b.** Blowouts, punctures or other road damage to tires.

**CA 00 01 03 10**
**Page 6 of 12**

This exclusion does not apply to such "loss" resulting from the total theft of a covered "auto".

4. We will not pay for "loss" to any of the following:

   **a.** Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

   **b.** Any device designed or used to detect speed-measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed-measurement equipment.

   **c.** Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

   **d.** Any accessories used with the electronic equipment described in Paragraph **c.** above.

5. Exclusions **4.c.** and **4.d.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:

   **a.** Permanently installed in or upon the covered "auto";

   **b.** Removable from a housing unit which is permanently installed in or upon the covered "auto";

   **c.** An integral part of the same unit housing any electronic equipment described in Paragraphs **a.** and **b.** above; or

   **d.** Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system.

6. We will not pay for "loss" to a covered "auto" due to "diminution in value".

**C. Limit Of Insurance**

1. The most we will pay for "loss" in any one "accident" is the lesser of:

   **a.** The actual cash value of the damaged or stolen property as of the time of the "loss"; or

   **b.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

2. $1,000 is the most we will pay for "loss" in any one "accident" to all electronic equipment that reproduces, receives or transmits audio, visual or data signals which, at the time of "loss", is:

   **a.** Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

   **b.** Removable from a permanently installed housing unit as described in Paragraph **2.a.** above or is an integral part of that equipment; or

   **c.** An integral part of such equipment.

3. An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

4. If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

**D. Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

**SECTION IV - BUSINESS AUTO CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

1. **Appraisal For Physical Damage Loss**

   If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

   If we submit to an appraisal, we will still retain our right to deny the claim.

2. **Duties In The Event Of Accident, Claim, Suit Or Loss**

   We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**CA 00 01 03 10**
**Page 7 of 12**

174
**EXHIBIT 7**

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

**(1)** How, when and where the "accident" or "loss" occurred;

**(2)** The "insured's" name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**(4)** Authorize us to obtain medical records or other pertinent information.

**(5)** Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is "loss" to a covered "auto" or its equipment you must also do the following:

**(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

**(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

**(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

**(4)** Agree to examinations under oath at our request and give us a signed statement of your answers.

**3.** **Legal Action Against Us**

No one may bring a legal action against us under this coverage form until:

**a.** There has been full compliance with all the terms of this coverage form; and

**b.** Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4.** **Loss Payment - Physical Damage Coverages**

At our option we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property, at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5.** **Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this coverage form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B.** **General Conditions**

**1.** **Bankruptcy**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligations under this coverage form.

**2.** **Concealment, Misrepresentation Or Fraud**

This coverage form is void in any case of fraud by you at any time as it relates to this coverage form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This coverage form;

**b.** The covered "auto";

**c.** Your interest in the covered "auto"; or

**d.** A claim under this coverage form.

**3. Liberalization**

If we revise this coverage form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit To Bailee - Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this coverage form.

**5. Other Insurance**

**a.** For any covered "auto" you own, this coverage form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this coverage form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this coverage form provides for the "trailer" is:

**(1)** Excess while it is connected to a motor vehicle you do not own.

**(2)** Primary while it is connected to a covered "auto" you own.

**b.** For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

**c.** Regardless of the provisions of Paragraph **a.** above, this coverage form's Liability Coverage is primary for any liability assumed under an "insured contract."

**d.** When this coverage form and any other coverage form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our coverage form bears to the total of the limits of all the coverage forms and policies covering on the same basis.

**6. Premium Audit**

**a.** The estimated premium for this coverage form is based on the exposures you told us you would have when this policy began.   We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

**b.** If this policy is issued for more than one year, the premium for this coverage form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

Under this coverage form, we cover "accidents" and "losses" occurring:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

The coverage territory is:

**(1)** The United States of America;

**(2)** The territories and possessions of the United States of America;

**(3)** Puerto Rico; and

**(4)** Canada; and

**(5)** Anywhere in the world, if:

**(a)** A covered "auto" of the private passenger type is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and

**(b)** The "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico or Canada or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. Two Or More Coverage Forms Or Policies Issued By Us**

If this coverage form and any other coverage form or policy issued to you by us or any company affiliated with us applies to the same "accident," the aggregate maximum Limit of Insurance under all the coverage forms or policies shall not exceed the highest applicable Limit of

CA 00 01 03 10
**Page 9 of 12**

176
**EXHIBIT 7**

Insurance under any one coverage form or policy. This condition does not apply to any coverage form or policy issued by us or an affiliated company specifically to apply as excess insurance over this coverage form.

## SECTION V - DEFINITIONS

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means:

**1.** A land motor vehicle, "trailer" or semi-trailer designed for travel on public roads; or

**2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** or **6.c.** of the definition of "mobile equipment",

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto;" and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract" means:

1. A lease of premises;

2. A sidetrack agreement;

3. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

5. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

6. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

   An "insured contract" does not include that part of any contract or agreement:

   **a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   **b.** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

   **c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

**K.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **a.** Power cranes, shovels, loaders, diggers or drills; or

   **b.** Road construction or resurfacing equipment such as graders, scrapers or rollers;

5. Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

   **b.** Cherry pickers and similar devices used to raise or lower workers; or

6. Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   **a.** Equipment designed primarily for:

      **(1)** Snow removal;

      **(2)** Road maintenance, but not construction or resurfacing; or

      **(3)** Street cleaning;

   **b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well-servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

L. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

M. "Property damage" means damage to or loss of use of tangible property.

N. "Suit" means a civil proceeding in which:

1. Damages because of "bodily injury" or "property damage"; or

2. A "covered pollution cost or expense"

to which this insurance applies, are alleged.

"Suit" includes:

a. An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the insured submits with our consent.

O. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

P. "Trailer" includes semitrailer.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies insurance provided under the following:

> COMMERCIAL AUTO MOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage:"

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured;" or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material," "special nuclear material" or "by-product material."

© ISO Properties, Inc., 2007

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor;"

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste;"

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;"

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

COMMERCIAL AUTO

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# KENTUCKY CHANGES

For a covered "auto" licensed or principally garaged in, or "garage operations" conducted in Kentucky, this endorsement modifies insurance provided under the following:

    BUSINESS AUTO COVERAGE FORM
    GARAGE COVERAGE FORM
    MOTOR CARRIER COVERAGE FORM
    TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Changes In Covered Autos**

The following is added to Paragraph **C.** Certain Trailers, Mobile Equipment And Temporary Substitute Autos of Section **I** - Covered Autos:

If Collision Coverage is provided by the Coverage Form, any "auto" you do not own which is loaned to you as a temporary substitute for a covered "auto" you own that is out of use because of its breakdown, repair or servicing by a person, firm or corporation engaged in the business of selling, repairing and servicing "autos" is a covered "auto" for Collision Coverage.

**B. Changes In Liability Coverage**

The following Liability Coverage Exclusions of the Business Auto, Garage, Motor Carrier and Truckers Coverage Forms apply only to the extent that the limits of liability for such coverage exceed the limits of liability required by the Kentucky Motor Vehicle Reparations Act:

   **a.** Expected or Intended Injury;

   **b.** Care, Custody or Control;

   **c.** Pollution; and

   **d.** Pollution Exclusion Applicable To "Garage Operations" - Covered "Autos".

**C. Changes In Physical Damage Coverage**

No deductible applies under Comprehensive Coverage to "loss" to:

   **a.** Glass used in the windshield, doors and windows; and

   **b.** Glass, plastic or any other material used in lights required on an automobile by Chapter 189 of Kentucky Revised Statutes.

All other Physical Damage Coverage Provisions apply.

**D. Changes In Conditions**

   **a.** For a temporary substitute for an "auto" you own which is out of use because of its breakdown, repair or servicing, if the substitute "auto" is operated by an "insured" and is loaned to you, with or without consideration, by a person engaged in the business of selling, repairing and servicing "autos", Liability and Collision Coverage provided by this form shall be primary in the event of an "accident" caused by the negligence of the "insured".

   **b.** If you are engaged in the business of selling, repairing and servicing "autos", then for any "auto" you own, which is loaned to a customer, with or without consideration, as a temporary substitute for an "auto" owned by the customer which is out of use because of its breakdown, repair or servicing, Liability and Collision Coverage provided by this form shall be excess in the event of an "accident" caused by the negligence of the customer.

Copyright, Insurance Services Office, Inc., 2000

**CA 01 25** 12 02
**Page 1 of 1**

**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WHO IS AN INSURED AMENDMENT

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

Under **SECTION II - LIABILITY COVERAGE** Item **A.  Coverage**, paragraph **1.b.(1)** is deleted and replaced with the following:

**(1)** The owner, any "employee" or agent of the owner, or anyone else from whom you hire or borrow a covered "auto".  This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

CA 70 80  03 12

183
EXHIBIT 7

# INLAND MARINE COVERAGE

INLAND MARINE COVERAGE

INLAND MARINE COVERAGE

**EXHIBIT 7**



**WESTFIELD**
INSURANCE
Sharing Knowledge. Building Trust.®

**COMMERCIAL INLAND MARINE
RENEWAL DECLARATIONS
SCHEDULE OF COVERAGE FORMS**

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | A |
|---|---|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

This policy contains the following Inland Marine Coverage Forms:

**Coverage Forms**          **Premium**
Accounts Receivable          Included
Fine Arts Floater Coverage      Included
Valuable Papers and Records     Included

**Total Advance Annual Inland Marine Premium**     Included

All Forms and Endorsements applicable to Inland Marine Coverages:
CM0001   0904*, CM7090   0300*, CM7001   1110*, CM0066   0113*, IM7400   0811*,
IM7405   0811*, IM7406   0811*, IM7417   0811*, IM7423   0513*, CM7000   0292*,
CM0067   0113*.

185
**EXHIBIT 7**

# COMMERCIAL INLAND MARINE CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

## LOSS CONDITIONS

### A. Abandonment

There can be no abandonment of any property to us.

### B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### C. Duties In The Event Of Loss

You must see that the following are done in the event of loss or damage to Covered Property:

1. Notify the police if a law may have been broken.

2. Give us prompt notice of the loss or damage. Include a description of the property involved.

3. As soon as possible, give us a description of how, when and where the loss or damage occurred.

4. Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

5. You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

6. As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7. We may examine any insured under oath, while not in presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

8. Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

10. Cooperate with us in the investigation or settlement of the claim.

### D. Insurance Under Two Or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### E. Loss Payment

1. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

2. We will not pay you more than your financial interest in the Covered Property.

3. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claim against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

4. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

5. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if you have complied with all the terms of this Coverage Part and:

   a. We have reached agreement with you on the amount of the loss; or

   b. An appraisal award has been made.

6. We will not be liable for any part of a loss that has been paid or made good by others.

**F. Other Insurance**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**G. Pair, Sets Or Parts**

1. Pair or Set

   In case of loss or damage to any part of a pair or set we may:

   a. Repair or replace any part to restore the pair or set to its value before the loss or damage; or

   b. Pay the difference between the value of the pair or set before and after the loss or damage.

2. Parts

   In case of loss or damage to any part of Covered Property consisting of several parts when complete, we will only pay for the value of the lost or damaged part.

**H. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**I. Reinstatement Of Limit After Loss**

The Limit of Insurance will not be reduced by the payment of any claim, except for total loss or damage of a scheduled item, in which event we will refund the unearned premium on that item.

**J. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property.

2. After a loss to your Covered Property only if, at the time of loss, that party is one of the following:

   a. Someone insured by this insurance; or

   b. A business firm:

      (1) Owned or controlled by you; or

      (2) That owns or controls you.

This will not restrict your insurance.

**GENERAL CONDITIONS**

**A. Concealment, Misrepresentation Or Fraud**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

CM 00 01 09 04
Page 2 of 3

187
**EXHIBIT 7**

**B. Control Of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all the terms of this Coverage Part; and

**2.** The action is brought within 2 years after you first have knowledge of the direct loss or damage.

**D. No Benefit To Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**E. Policy Period, Coverage Territory**

We cover loss or damage commencing:

**1.** During the policy period shown in the Declarations; and

**2.** Within the coverage territory.

**F. Valuation**

The value of property will be the least of the following amounts:

**1.** The actual cash value of that property;

**2.** The cost of reasonably restoring that property to its condition immediately before loss or damage; or

**3.** The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage.

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**COMMERCIAL INLAND MARINE**
**RENEWAL DECLARATIONS**
**ACCOUNTS RECEIVABLE COVERAGE**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| WIC Account Number: 1600961480 | A |
|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

**DESCRIPTION OF PREMISES**
Loc Bldg  Street Address, City & State                    Occupancy

✱Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.✱

**COVERED PROPERTY AND LIMITS OF INSURANCE**
A. Coverage Applicable At Your Premises
Loc Bldg Item                                        Limits of Insurance

B. Coverage Applicable Away From Your Premises

✱ 80 % COINSURANCE APPLIES. REFER TO COVERAGE FORM.

**DESCRIPTION OF RECEPTACLES**
Loc Bldg Item  Class  Label  Issuer   Manufacturer

Total Advance Annual
Accounts Receivable Premium            Included

Forms and Endorsements applicable to this coverage:

**EXHIBIT 7**

COMMERCIAL INLAND MARINE

# ACCOUNTS RECEIVABLE COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section E - Definitions.

**A. Coverage**

   **1.** We will pay:

      **a.** All amounts due from your customers that you are unable to collect;

      **b.** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

      **c.** Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

      **d.** Other reasonable expenses that you incur to reestablish your records of accounts receivable;

     that result from Covered Causes of Loss to your records of accounts receivable.

   **2. Property Not Covered**

     Coverage does not apply to:

      **a.** Records of accounts receivable in storage away from the "premises" shown in the Declarations; or

      **b.** Contraband, or property in the course of illegal transportation or trade.

   **3. Covered Causes Of Loss**

     Covered Causes of Loss means direct physical loss or damage to your records of accounts receivable except those causes of loss listed in the Exclusions.

   **4. Additional Coverage - Collapse**

     The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in Paragraphs **a.** through **c.**

      **a.** For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

      **b.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

        **(1)** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

        **(2)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

        **(3)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation;

        **(4)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

          **(a)** A cause of loss listed in Paragraph **(1)** or **(2)**;

          **(b)** One or more of the following causes of loss: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; all only as insured against in this Coverage Form;

(c) Weight of people or personal property; or

(d) Weight of rain that collects on a roof;

**c.** This Additional Coverage - Collapse will not increase the Limits of Insurance provided in this Coverage Form.

**5. Coverage Extension**

**REMOVAL**

If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of loss or damage, we will pay for loss or damage while they are:

**a.** At a safe place away from your "premises"; or

**b.** Being taken to and returned from that place.

This Coverage Extension is included within the Limit of Insurance applicable to the "premises" from which the records of accounts receivable are removed.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

**b. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

**c. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for a loss or damage caused by or resulting from any of the following:

**a.** Delay, loss of use, loss of market or any other consequential loss.

**b.** Dishonest or criminal act (including theft) committed by:

(1) You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

(2) A manager or a member if you are a limited liability company; or

(3) Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

whether acting alone or in collusion with each other or with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**c.** Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

**d.** Bookkeeping, accounting or billing errors or omissions.

**e.** Electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

    **(1)** Programming errors or faulty machine instructions;

    **(2)** Faulty installation or maintenance of data processing equipment or component parts;

    **(3)** An occurrence that took place more than 100 feet from your "premises"; or

    **(4)** Interruption of electrical power supply, power surge, blackout or brownout if the cause of such occurrence took place more than 100 feet from your "premises".

But we will pay for direct loss or damage caused by lightning.

**f.** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**g.** Unauthorized instructions to transfer property to any person or to any place.

**h.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**i.** Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

**3.** We will not pay for loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

**4.** We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

    **(1)** Planning, zoning, development, surveying, siting;

    **(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    **(3)** Materials used in repair, construction, renovation or remodeling; or

    **(4)** Maintenance;

of part or all of any property wherever located.

**d.** Collapse, including any of the following conditions of property or any part of the property:

    **(1)** An abrupt falling down or caving in;

    **(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

    **(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinking or expansion as such condition relates to Paragraph **(1)** or **(2).**

This Exclusion **d.** does not apply to the extent that coverage is provided under the Additional Coverage - Collapse or to collapse caused by one or more of the following: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; weight of people or personal property; weight of rain that collects on a roof.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

**CM 00 66 01 13**
**Page 3 of 4**

192
**EXHIBIT 7**

**D. Additional Conditions**

**1. Determination Of Receivables**

General Condition **F. Valuation** in the Commercial Inland Marine Conditions is replaced by the following:

**a.** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage, the following method will be used:

**(1)** Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

**(2)** Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

**b.** The following will be deducted from the total amount of accounts receivable, however that amount is established:

**(1)** The amount of the accounts for which there is no loss or damage;

**(2)** The amount of the accounts that you are able to reestablish or collect;

**(3)** An amount to allow for probable bad debts that you are normally unable to collect; and

**(4)** All unearned interest and service charges.

**2. Recoveries**

The following is added to Loss Condition **H. Recovered Property** in the Commercial Inland Marine Conditions:

You will pay us the amount of all recoveries you receive for a loss or damage paid by us. But any recoveries in excess of the amount we have paid belong to you.

**3.** The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

**a. Coverage Territory**

We cover records of accounts receivable:

**(1)** Within your "premises"; and

**(2)** Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

**(a)** The United States of America (including its territories and possessions);

**(b)** Puerto Rico; and

**(c)** Canada.

**b. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

We will not pay the full amount of any loss if the value of all accounts receivable, except those in transit, at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for Coverage Applicable at All Locations.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of all accounts receivable, except those in transit, at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance for Coverage Applicable At All Locations by the figure determined in Step **(1)**; and

**(3)** Multiply the total amount of loss by the figure determined in Step **(2)**.

We will pay the amount determined in Step **(3)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

This condition will not apply to records of accounts receivable in transit, interest charges, excess collection expenses or expenses to reestablish your records of accounts receivable.

**c. Protection Of Records**

Whenever you are not open for business, and except while you are actually using the records, you must keep all records of accounts receivable in receptacles that are described in the Declarations.

**E. Definitions**

"Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

31

**COMMERCIAL INLAND MARINE**
**RENEWAL DECLARATIONS**
**VALUABLE PAPERS AND RECORDS COVERAGE**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | 11 | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

**COVERED PROPERTY AND LIMITS OF INSURANCE**

Specifically Described Property
Loc Bldg Item   Description                                    Limit of Insurance

✗Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for
Coverages and Limits of Insurance.✗

All Other Covered Property
Loc Bldg Item                                                  Limit of Insurance

Property Away From Your Premises
Item                                                           Limit of Insurance

**DESCRIPTION OF RECEPTACLES**
Loc Bldg Item Class  Label        Issuer    Manufacturer

| Total Advance Annual Valuable Papers and Records Premium | Included |
|---|---|

Forms and Endorsements applicable to this coverage:
CM7000  0292*, CM0067  0113*.

COMMERCIAL INLAND MARINE

# VALUABLE PAPERS AND RECORDS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F** - Definitions.

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss.

**1.** Covered Property, as used in this Coverage Form, means "valuable papers and records" that are your property or property of others in your care, custody or control.

**2. Property Not Covered**

Covered Property does not include:

**a.** Property not specifically declared and described in the Declarations if such property cannot be replaced with other property of like kind and quality;

**b.** Property held as samples or for delivery after sale;

**c.** Property in storage away from the "premises" shown in the Declarations; or

**d.** Contraband, or property in the course of illegal transportation or trade.

**3. Covered Causes Of Loss**

Covered Causes of Loss means direct physical loss or damage to Covered Property except those causes of loss listed in the Exclusions.

**4. Additional Coverage - Collapse**

The coverage provided under this Additional Coverage - Collapse applies only to an abrupt collapse as described and limited in Paragraphs **a.** through **c.**

**a.** For the purpose of this Additional Coverage - Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**b.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

**(1)** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**(2)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(3)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation;

**(4)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(a)** A cause of loss listed in Paragraph **(1)** or **(2)**;

**(b)** One or more of the following causes of loss: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; all only as insured against in this Coverage Form;

**(c)** Weight of people or personal property; or

**(d)** Weight of rain that collects on a roof;

**c.** This Additional Coverage - Collapse will not increase the Limits of Insurance provided in this Coverage Form.

EXHIBIT 7

5. **Coverage Extensions**

a. **Removal**

If you give us written notice within 10 days of removal of your "valuable papers and records" because of imminent danger of loss or damage, we will pay for loss or damage while it is:

(1) At a safe place away from your "premises"; or

(2) Being taken to and returned from that place.

This Coverage Extension is included within the Limits of Insurance applicable to the "premises" from which the Covered Property is removed.

b. **Away From Your Premises**

We will pay up to $5,000 for loss or damage to Covered Property while it is away from your "premises".

But if a higher Limit Of Insurance is specified in the Declarations, the higher limit will apply.

The limit for this Coverage Extension is additional insurance.

B. **Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

a. **Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread if the fire would be covered under this Coverage Form.

b. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the direct loss or damage caused by that fire if the fire would be covered under this Coverage Form.

c. **War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

Exclusions **B.1.a.** through **B.1.c.** apply whether or not the loss event results in widespread damage or affects a substantial area.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Delay, loss of use, loss of market or any other consequential loss.

b. Dishonest or criminal act (including theft) committed by:

(1) You, any of your partners, employees (including temporary employees and leased workers), officers, directors, trustees, or authorized representatives;

(2) A manager or a member if you are a limited liability company; or

(3) Anyone else with an interest in the property, or their employees (including temporary employees and leased workers) or authorized representatives;

whether acting alone or in collusion with each other or with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

This exclusion does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

c. Errors or omissions in processing or copying.

But if errors or omissions in processing or copying result in fire or explosion, we will pay for the direct loss or damage caused by that fire or explosion if fire or explosion would be covered under this Coverage Form.

d. Electrical or magnetic injury, disturbance or erasure of electronic recordings.

But we will pay for direct loss or damage caused by lightning.

e. Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

f. Unauthorized instructions to transfer property to any person or to any place.

g. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

h. Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during your normal hours of operation.

3. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property wherever located.

d. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinking or expansion as such condition relates to Paragraph **(1)** or **(2).**

This Exclusion **d.** does not apply to the extent that coverage is provided under the Additional Coverage - Collapse or to collapse caused by one or more of the following: fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage; earthquake; weight of people or personal property; weight of rain that collects on a roof.

e. Wear and tear, any quality in the property that causes it to damage or destroy itself, gradual deterioration; insects, vermin or rodents.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

**D. Deductible**

We will not pay for loss or damage in any one occurrence until the amount of the adjusted loss or damage before applying the applicable Limits of Insurance exceeds the Deductible shown in the Declarations. We will then pay the amount of the adjusted loss or damage in excess of the Deductible, up to the applicable Limit of Insurance.

**E. Additional Conditions**

**1. Valuation - Specifically Declared Items**

The following is added to General Condition **F. Valuation** in the Commercial Inland Marine Conditions:

The value of each item of property that is specifically declared and described in the Declarations is the applicable Limit Of Insurance shown in the Declarations for that item.

**2. Recoveries**

The following is added to Loss Condition **H. Recovered Property** in the Commercial Inland Marine Conditions:

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. If so, your loss or damage will be readjusted based on the amount you received for the property recovered, with allowance for recovery expenses incurred.

3. The following conditions apply in addition to the Commercial Inland Marine Conditions and the Common Policy Conditions:

   **a. Coverage Territory**

   We cover property:

   **(1)** Within your "premises"; and

   **(2)** Away from your "premises" while in transit or within premises of others if those premises are located or the transit is within:

       **(a)** The United States of America (including its territories and possessions);

       **(b)** Puerto Rico; and

       **(c)** Canada.

   **b. Protection Of Records**

   Whenever you are not open for business, and except while you are actually using the property, you must keep all "valuable papers and records" in receptacles that are described in the Declarations.

**F. Definitions**

1. "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

   But "valuable papers and records" does not mean "money" or "securities", converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

2. "Premises" means that interior portion of the building at the address shown in the Declarations that you occupy for your business.

3. "Money" means:

   **a.** Currency, coins and bank notes whether or not in current use; and

   **b.** Travelers checks, register checks and money orders held for sale to the public.

4. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

   **a.** Tokens, tickets, revenue and other stamps whether or not in current use; and

   **b.** Evidences of debt issued in connection with credit or charge cards, which cards are not of your own issue;

   but does not include "money".

POLICY NUMBER: CWP 3263063

POLICY PERIOD: FROM 10/01/2016 TO 10/01/2017

## SCHEDULE OF COVERAGES
## FINE ARTS FLOATER

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

**COVERED PREMISES**

Refer to attached Fine Arts Schedule

**COVERED FINE ARTS**

Refer to attached Fine Arts Schedule

**CATASTROPHE LIMIT** Refer To Commercial Property Expanded and/or
Signature  Series Schedule

**DEDUCTIBLE AMOUNT** Refer To Commercial Property Expanded and/or
Signature  Series Schedule

| **COVERAGE EXTENSIONS** | | **"Limit"** |
|---|---|---|
| Emergency Removal | | 30 days |
| Emergency Removal Expenses | 30 days | $    1,000 |

| **SUPPLEMENTAL COVERAGES** | | **"Limit"** |
|---|---|---|
| Newly Acquired Art | | 25% of |
| | | catastrophe limit |
| Off-Premises Coverage | | $   25,000 |
| Property Used To Display Or Protect Art | | $    5,000 |
| Transit Coverage | | $   25,000 |

**ADDITIONAL INFORMATION**

IM7400   0811✱, IM7405   0811✱, IM7406   0811✱, IM7417   0811✱, IM7423   0513✱.

Copyright, American Association of Insurance Services, Inc., 2011

EXHIBIT 7

POLICY NUMBER: CWP 3263063

POLICY PERIOD: FROM 10/01/2016 TO 10/01/2017

## FINE ARTS SCHEDULE
## FINE ARTS FLOATER

(The entries required to complete this schedule
will be shown below or on the "schedule of coverages".)

Refer To Commercial Property Expanded and/or Signature Series Schedule(s) For
Coverages And Limits Of Insurance

Prem. No.                    Described Premises

SCHEDULED FINE ARTS

Item No.                    Description                          "Limit"

Copyright, American Association of Insurance Services, Inc., 2011

EXHIBIT 7

# FINE ARTS COVERAGE
## FINE ARTS FLOATER

In this coverage form, the words "you" and "your" mean the persons or organizations named as the insured on the declarations and the words "we", "us", and "our" mean the company providing this coverage.

Refer to the Definitions section at the end of this coverage form for additional words and phrases that have special meaning. These words and phrases are shown in quotation marks.

### AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Fine Arts Coverage. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment; cancellation; change, modification, or waiver of policy terms; inspections; and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

### PROPERTY COVERED

"We" cover the following property unless the property is excluded or subject to limitations.

**Fine Arts**

1. **Coverage** - "We" cover direct physical loss or damage caused by a covered peril to:

   **a.** "your" "fine arts";

   **b.** "fine arts" of others in "your" care, custody, and control; and

   **c.** "your" interest in jointly owned "fine arts".

   "We" only cover jointly owned "fine arts" to the extent of "your" interest at the time of loss or damage.

2. **Coverage Limitations**

   **a.** "We" only cover "fine arts":

      **(1)** that are described on the Fine Arts Schedule; and

      **(2)** while at a premises that is described on the Fine Arts Schedule.

   **b.** "We" only cover a described "fine art" item while the item is at the premises that is described on the same schedule as the item.

3. **We Do Not Cover** - "We" do not cover the loss of any "fine arts" due to a dispute of ownership by a party claiming rightful ownership of the "fine arts". This includes a defect in title, whether or not the title has been perfected or secured.

### PROPERTY NOT COVERED

1. **Coins, Currency, And Stamps** - "We" do not cover numismatic or philatelic objects or collections including, but not limited to, coins, bills, currency, notes, and stamps.

2. **Contraband** - "We" do not cover contraband or property in the course of illegal transportation or trade.

3. **Jewelry, Stones, And Metals** - "We" do not cover jewelry, precious or semi-precious stones, gold, silver, platinum, or other precious metals or alloys.

   However, this exclusion does not apply to "antique" jewelry.

### COVERAGE EXTENSIONS

**Provisions That Apply To Coverage Extensions** - The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage, including a Coverage Extension, Supplemental Coverage, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following Coverage Extensions are not subject to and not considered in applying coinsurance conditions.

1. **Emergency Removal**

   **a.** **Coverage** - "We" cover direct physical loss or damage to covered property while it is being moved or being stored to prevent loss or damage caused by a covered peril.

Copyright, American Association of Insurance Service, Inc. 2011

IM 7400  08 11
Page 1 of 8

201
**EXHIBIT 7**

**b. Time Limitation** - This coverage applies for up to 30 days after the property is first moved.

However, this coverage does not extend past the end of the policy period.

**2. Emergency Removal Expenses**

**a. Coverage** - "We" pay for "your" expenses to move or store covered property to prevent loss or damage caused by a covered peril.

**b. Time Limitation** - This coverage applies for up to 30 days after the property is first moved.

However, this coverage does not extend past the end of the policy period.

**c. Limit** - The most "we" pay in any one occurrence for expenses to move or store covered property to prevent a loss or damage is $1,000.

**d. This Is A Separate Limit** - The "limit" for Emergency Removal Expenses is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

## SUPPLEMENTAL COVERAGES

**Provisions That Apply To Supplemental Coverages** - The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages".

If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage within this coverage form, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

The "limit" available for coverage described under a Supplemental Coverage:

**a.** is the only "limit" available for the described coverage; and

**b.** is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension, including a Supplemental Cover-

age, Coverage Extension, or other coverage that is added to this policy by endorsement.

If coinsurance provisions are part of this policy, the following Supplemental Coverages are not subject to and not considered in applying coinsurance conditions.

**1. Newly Acquired Art**

**a. Coverage** - "We" cover direct physical loss or damage caused by a covered peril to "fine arts" that "you" acquire during the policy period.

**b. Coverage Limitation** - "We" only cover newly acquired "fine arts" while in transit to or located at a premises that is described on the "schedule of coverages".

**c. Time Limitation** - This coverage applies for up to 90 days from the date "you" acquire the "fine arts" or until "you" report the acquired "fine arts" to "us", whichever occurs first.

However, this coverage does not extend past the end of the policy period.

**d. Additional Premium** - "You" must pay any additional premium due from the date "you" acquire the "fine arts".

**e. Limit** - The most "we" pay in any one occurrence for all newly acquired "fine arts" is 25% of the Catastrophe Limit that is indicated on the "schedule of coverages".

**2. Off-Premises Coverage**

**a. Coverage** - "We" cover direct physical loss or damage caused by a covered peril to "fine arts" while temporarily away from a premises that is described on the "schedule of coverages" for:

**(1)** exhibition at a museum, gallery, or other public premises not owned, operated, or occupied by "you"; or

**(2)** framing, repair, restoration, packing, or appraising.

**b. Limit** - The most "we" pay in any one occurrence for loss or damage to "fine arts" while temporarily away from a described premises is $10,000.

**3. Property Used To Display Or Protect Art**

**a. Coverage** - "We" cover direct physical loss or damage caused by a covered peril to stands, glass cases, and other similar property used to display covered "fine arts".

"We" will also cover protective devices designed and used specifically to protect covered "fine arts".

**IM 7400  08 11**
**Page 2 of 8**

202
**EXHIBIT 7**

b. **Coverage Limitation** - "We" only cover property used to display or protect "fine arts" while at a premises described on the "schedule of coverages".

c. **Limit** - The most "we" pay in any one occurrence for loss or damage to property used to display or protect "fine arts" is $5,000.

4. **Transit Coverage**

a. **Coverage** - "We" cover direct physical loss or damage caused by a covered peril to covered "fine arts" in transit.

b. **Limit** - The most "we" pay in any one occurrence for loss or damage to "fine arts" in transit is $10,000.

**PERILS COVERED**

"We" cover risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded.

**PERILS EXCLUDED**

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

a. **Civil Authority** - Order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do cover loss or damage resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

b. **Nuclear Hazard** - Nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

c. **War And Military Action**

(1) War, including undeclared war or civil war;

(2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sover-

eign, or other authority using military personnel or other agents; or

(3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War And Military Action exclusion will apply in place of the Nuclear Hazard exclusion.

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following:

a. **Birds, Vermin, Rodents, Or Insects** - "We" do not pay for loss or damage caused by or resulting from birds, vermin, rodents, or insects.

b. **Contamination Or Deterioration** - "We" do not pay for loss or damage caused by or resulting from contamination or deterioration including, but not limited to, corrosion, decay, fungus, mildew, mold, rot, rust, or any other quality, fault, or weakness in the covered property that causes it to damage or destroy itself.

c. **Exposure To Light** - "We" do not pay for loss or damage caused by or resulting from exposure to light or UV rays including, but not limited to, fading or darkening resulting from exposure to light or UV rays.

d. **Missing Property** - "We" do not pay for missing property where the only proof of loss is unexplained or mysterious disappearance of covered property, or shortage of property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property.

This exclusion does not apply to covered property in the custody of a carrier for hire.

e. **Repair, Restoration, Retouching, Framing, Or Packing** - "We" do not pay for loss or damage caused by processing of or work upon covered property including, but not limited to, repair, restoration, retouching, framing, or packing.

f. **Temperature/Humidity** - "We" do not pay for loss or damage caused by dryness, dampness, humidity, or changes in or extremes of temperature.

However, if dryness, dampness, humidity, or changes in or extremes of temperature results from a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

**g.** **Voluntary Parting** - "We" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

**h.** **Wear And Tear** - "We" do not pay for loss or damage caused by wear and tear.

## WHAT MUST BE DONE IN CASE OF LOSS

**1.** **Notice** - In case of a loss, "you" must:

**a.** give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

**b.** give notice to the police when the act that causes the loss is a crime.

**2.** **You Must Protect Property** - "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss.

**a.** **Payment Of Reasonable Costs** - "We" do pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. "Our" payment of reasonable costs does not increase the "limit".

**b.** **We Do Not Pay** - "We" do not pay for such repairs or emergency measures performed on property that has not been damaged by a peril insured against except as covered under the Coverage Extension, Emergency Removal Expenses.

**3.** **Proof Of Loss** - "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

**a.** the time, place, and circumstances of the loss;

**b.** other policies of insurance that may cover the loss;

**c.** "your" interest and the interests of all others in the property involved, including all mortgages and liens;

**d.** changes in title of the covered property during the policy period; and

**e.** estimates, specifications, inventories, and other reasonable information that "we" may require to settle the loss.

**4.** **Examination** - "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

**5.** **Records** - "You" must produce records, including, but not limited to, tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

**6.** **Damaged Property** - "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

**7.** **Volunteer Payments** - "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

**8.** **Abandonment** - "You" may not abandon the property to "us" without "our" written consent.

**9.** **Cooperation** - "You" must cooperate with "us" in performing all acts required by this policy.

## VALUATION

**1.** **Fine Arts**

**a.** **Total Loss**

**(1)** **Scheduled Fine Arts** - In the event of a total loss to scheduled "fine arts", the value will be based on the "limit" indicated for the lost or damaged "fine arts" on the Fine Arts Schedule.

**(2)** **Newly Acquired Art** - In the event of a total loss to "fine arts" covered under the Supplemental Coverage, Newly Acquired Art, the value of the "fine arts" will be based on the fair market value of the lost or damaged "fine arts" at the time of loss.

**b.** **Partial Loss** - In the event of a partial loss or damage to a covered piece of "fine arts":

**(1)** **Cost To Repair Or Restore** - The value of covered "fine arts" will be based on the cost to repair or restore the covered "fine arts" to the condition immediately before the loss or damage.

**(2) Diminished Value** - The value of covered "fine arts" will also be based on the diminished value of the covered "fine arts" that results from partial loss or damage.

Diminished value means the reduced value of the covered "fine arts" based on the difference between the value of the covered "fine arts" before the loss or damage and the fair market value of the "fine arts" after the loss or damage has been repaired and the "fine arts" restored.

**(3) Determination Of Diminished Value** - The diminished value will be determined by an independent certified fine arts appraiser. The independent certified fine arts appraiser may be selected by "you", subject to "our" approval. The cost of the appraisal will be borne equally by "you" and "us".

**(4) Cost To Repair Or Restore Plus Diminished Value Will Not Exceed**

**(a) Scheduled Fine Arts** - The cost to repair or restore plus the amount of the diminished value will not exceed the "limit" indicated for the piece on the Fine Arts Schedule.

**(b) Newly Acquired Art** - In the event of a partial loss to "fine arts" covered under the Supplemental Coverage, Newly Acquired Art, the cost to repair or restore plus the amount of the diminished value will not exceed the fair market value of the covered "fine arts" at the time of loss.

**c. Pair Or Set** - If a covered loss to "fine arts" involves a pair or set and part of the pair or set is undamaged:

**(1)** "you" may surrender the undamaged part of the pair or set to "us", and the covered loss will be valued on the basis of a total loss to the entire pair or set (refer to item **1.a.** Total Loss for the valuation of a total loss); or

**(2)** "you" may keep the undamaged part of the pair or set, and the covered loss will be valued on the basis of a partial loss to the entire pair or set (refer to item **1.b.** Partial Loss for the valuation of a partial loss).

**2. Other Property** - In the event of loss or damage to covered property other than "fine arts", the value of the property will be based on the actual cash value at the time of the loss (with a deduction for depreciation).

**HOW MUCH WE PAY**

**1. Insurable Interest** - "We" do not cover more than "your" insurable interest in any property.

**2. Deductible** - "We" pay only that part of "your" loss over the deductible amount indicated on the "schedule of coverages" in any one occurrence.

**3. Loss Settlement Terms**

**a. Fine Arts** - Subject to paragraphs **1.**, **2.**, **4.**, **5.**, and **6.** under How Much We Pay, in the event of a total loss to covered "fine arts", "we" pay the lesser of:

**(1)** the amount determined under Valuation; or

**(2)** the "limit" that applies to the covered "fine arts".

**b. Other Property** - Subject to paragraphs **1.**, **2.**, **4.**, **5.**, and **6.** under How Much We Pay, in the event of a total loss to covered property other than "fine arts", "we" pay the lesser of:

**(1)** the amount determined under Valuation;

**(2)** the cost to repair, restore, or replace the property with material of like kind and quality to the extent practicable; or

**(3)** the "limit" that applies to the covered property.

**4. Catastrophe Limit** - The most "we" pay in any one occurrence is the Catastrophe Limit indicated on the "schedule of coverages" regardless if an occurrence or loss involves:

**a.** one or more pieces of "fine arts";

**b.** one or more described premises; or

**c.** any combination of "fine arts", described premises, or coverages described under Coverage Extensions or Supplemental Coverages.

**5. Insurance Under More Than One Coverage** - If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

**6. Insurance Under More Than One Policy**

**a. Proportional Share** - "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

**IM 7400  08 11**
**Page 5 of 8**

205
**EXHIBIT 7**

**b. Excess Amount** - If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

## LOSS PAYMENT

**1. Loss Payment Options**

**a. Our Options** -- In the event of loss covered by this coverage form, "we" have the following options:

**(1)** pay the value of the lost or damaged property;

**(2)** pay the cost of repairing, restoring, or replacing the lost or damaged property;

**(3)** repair, restore, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

**(4)** take all or any part of the property at the agreed or appraised value.

**b. Notice Of Our Intent To Repair, Restore, Or Replace** - "We" must give "you" notice of "our" intent to repair, restore, or replace within 30 days after receipt of a duly executed proof of loss.

**2. Your Losses**

**a. Adjustment And Payment Of Loss** - "We" adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy.

**b. Conditions For Payment Of Loss** - An insured loss will be payable 30 days after:

**(1)** a satisfactory proof of loss is received; and

**(2)** the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

**3. Property Of Others** -

**a. Adjustment And Payment Of Loss To Property Of Others** - Losses to property of others may be adjusted with and paid to:

**(1)** "you" on behalf of the owner; or

**(2)** the owner.

**b. We Do Not Have To Pay You If We Pay The Owner** - If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits brought by the owners at "our" expense.

## OTHER CONDITIONS

**1. Appraisal** - If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

The appraisers will then determine and state separately the amount of each loss.

The appraisers will also determine the value of covered property items at the time of the loss, if requested.

If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three, sets the amount of the loss.

Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us".

**2. Benefit To Others** - Insurance under this coverage will not directly or indirectly benefit anyone having custody of "your" property.

**3. Carriers For Hire** - "You" may accept bills of lading or shipping receipts issued by carriers for hire that limit their liability to less than the value of the covered property.

**4. Conformity With Statute** - When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

**5. Estates** - This provision applies only if the insured is an individual.

**a. Your Death** - On "your" death, "we" cover the following as an insured:

**(1)** the person who has custody of "your" property until a legal representative is qualified and appointed; or

**(2)** "your" legal representative.

This person or organization is an insured only with respect to property covered by this coverage.

   **b.**  **Policy Period Is Not Extended** - This coverage does not extend past the policy period.

**6.**  **Misrepresentation, Concealment, Or Fraud** - This coverage is void as to "you" and any other insured if, before or after a loss:

   **a.**  "you" or any other insured have willfully concealed or misrepresented:

      **(1)**  a material fact or circumstance that relates to this insurance or the subject thereof; or

      **(2)**  "your" interest herein; or

   **b.**  there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

**7.**  **Policy Period** - "We" pay for a covered loss that occurs during the policy period.

**8.**  **Recoveries** - If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

   **a.**  "you" must notify "us" promptly if "you" recover property or receive payment;

   **b.**  "we" must notify "you" promptly if "we" recover property or receive payment;

   **c.**  any recovery expenses incurred by either are reimbursed first;

   **d.**  "you" may keep the recovered property but "you" must refund to "us" the amount of the claim paid, or any lesser amount to which "we" agree; and

   **e.**  if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be pro rated between "you" and "us" based on "our" respective interest in the loss.

**9.**  **Restoration Of Limits** - A loss "we" pay under this coverage does not reduce the applicable "limits" except in the event of:

   **a.**  a total loss to a scheduled item; or

   **b.**  payment of diminished value on a scheduled item.

"We" will reduce the limit and refund the unearned premium on that item.

**10.**  **Subrogation** - If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" do not pay for a loss if "you" impair this right to recover.

"You" may waive "your" right to recover from others in writing before a loss occurs.

**11.**  **Suit Against Us** - No one may bring a legal action against "us" under this coverage unless:

   **a.**  all of the "terms" of this coverage have been complied with; and

   **b.**  the suit has been brought within two years after "you" first have knowledge of the loss.

     If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by law.

**12.**  **Territorial Limits** - "We" cover property while it is in the United States of America, its territories and possessions, Canada, and Puerto Rico.

## DEFINITIONS

**1.**  "Antique" means an object having value because its:

   **a.**  craftsmanship is in the style or fashion of former times; and

   **b.**  age is 100 years old or older.

**2.**  "Fine arts" means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; "antique" furniture; "antique" jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit.

**3.**  "Limit" means the amount of coverage that applies.

**4.**  "Schedule of coverages" means:

   **a.**  all pages labeled "schedule of coverages" or schedules that pertain to this coverage; and

   **b.**  declarations or supplemental declarations that pertain to this coverage.

**5.**  "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

**6.**  "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

Falling objects does not include loss or damage to:

   **a.**  personal property in the open; or

**b.** the interior of buildings or structures or to personal property inside buildings or structures unless the exterior of the roofs or walls are first damaged by a falling object.

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

7. "Terms" means all provisions, limitations, exclusions, conditions, and definitions that apply.

8. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow.

   "Volcanic action" does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss or damage to the covered property.

This endorsement changes the
Fine Arts Coverage
**- PLEASE READ THIS CAREFULLY -**

# BREAKAGE EXCLUSION

**ADDITIONAL PERILS EXCLUDED**

The following exclusion is added:

**Breakage, Marring, And Scratching** - "We" do not pay for loss or damage caused by breakage, marring, or scratching of "fine arts".

But if breakage, marring, or scratching results in a "specified peril", "we" do cover the loss or damage caused by that "specified peril".

Copyright, American Association of
Insurance Services, Inc., 2011                                    **IM 7417  08 11**

This endorsement changes the
Fine Arts Coverage
- **PLEASE READ THIS CAREFULLY** -

# DISHONEST ACTS EXCLUSION
## KENTUCKY

**ADDITIONAL PERIL EXCLUDED**

The following exclusion is added:

**Dishonest Acts** - "We" do not pay for loss or damage caused by or resulting from dishonest acts including, but not limited to, dishonest acts that are criminal, fraudulent, or illegal. This exclusion applies whether the acts are committed alone or in collusion with another by:

**(1)** "you";

**(2)** others who have an interest in the property;

**(3)** others to whom "you" entrust the property;

**(4)** "your" partners, officers, directors, trustees, or joint venturers; or

**(5)** the employees or agents of **(1), (2), (3),** or **(4)** above, whether or not they are at work.

However, if the loss arose out of a pattern of domestic abuse, committed by or at the direction of an insured, this exclusion will not apply to an otherwise covered loss suffered by another insured who did not cooperate with or contribute to the act that caused the loss. The insured that caused the loss must be criminally prosecuted for the act causing the loss. The innocent insured must cooperate in the prosecution.

Subject to all other "terms" of this policy, "our" payment to an insured who did not cooperate in or contribute to the act that caused the loss may be limited to that person's insurable interest in the property, less any payment made to a mortgagee or other party with a legal secured interest in the property. "We" retain all rights set forth in the Subrogation condition of this policy with regard to action against the perpetrator of the act that caused the loss.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for theft by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

Copyright, American Association of
Insurance Services, Inc., 2012

**IM 7423  05 13**

# CRIME COVERAGE

CRIME COVERAGE

CRIME COVERAGE

**EXHIBIT 7**

**31**

## WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**RENEWAL**
**CRIME AND FIDELITY COVERAGE PART DECLARATION**
**(COMMERCIAL ENTITIES)**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 |11| WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From  10/01/16  To  10/01/17 | at 12:01 A.M. at your mailing address shown above. |
|---|---|---|

| Insuring Agreements | Limit of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|

**✻Refer to Commercial Property Expanded and/or Signature Series Schedule(s) for Coverages and Limits of Insurance.✻**

Note: Employee Theft, Forgery Or Alterations, Inside The Premises - Theft Of Money And Securities, Outside The Premises, and Money Orders And Counterfeit Money included in the schedule(s) apply on a policy-level basis.

Coverage is Written: **Primary**

| Total Advance Annual Crime Premium | Included |
|---|---|

Forms and Endorsements forming part of this policy coverage when issued:
CR7000   0813*, CR0021   0813*, CR0253   0506*, CR0168   1010*.

CANCELLATION OF PRIOR INSURANCE ISSUED BY US:
By acceptance of this Coverage Part / Policy you give us notice cancelling prior policy Nos. _____; the cancellation to be effective at the time this Coverage Part become effective.

212
**EXHIBIT 7**

# COMMERCIAL CRIME COVERAGE FORM
# (LOSS SUSTAINED FORM)

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is or is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place during the Policy Period shown in the Declarations, except as provided in Condition **E.1.k.** or **E.1.l.**, which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.g.**:

### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

### 2. Forgery Or Alteration

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

**(1)** Made or drawn by or drawn upon you; or

**(2)** Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated to the same as the original it replaced.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **2.a.**, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay for such legal expenses is in addition to the Limit of Insurance applicable to this Insuring Agreement.

### 3. Inside The Premises - Theft Of Money And Securities

We will pay for:

**a.** Loss of "money" and "securities" inside the "premises" or "financial institution premises";

**(1)** Resulting directly from "theft" committed by a person present inside such "premises" or "financial institution premises"; or

**(2)** Resulting directly from disappearance or destruction.

**b.** Loss from damage to the "premises" or its exterior resulting from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** Loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of, or unlawful entry into, those containers.

### 4. Inside the Premises - Robbery Or Safe Burglary Of Other Property

We will pay for:

**a.** Loss of or damage to "other property":

**(1)** Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

**(2)** Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

**b.** Loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

c. Loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**5. Outside The Premises**

We will pay for:

a. Loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. Loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer And Funds Transfer Fraud**

a. We will pay for:

(1) Loss resulting directly from a fraudulent:

(a) Entry of "electronic data" or "computer program" into; or

(b) Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **6.a.(1)(a)** and **6.a.(1)(b)**:

(i) "Money", "securities" or "other property" to be transferred, paid or delivered; or

(ii) Your account at a "financial institution" to be debited or deleted.

(2) Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and transfer, pay or deliver "money" or "securities" from that account.

b. As used in Paragraph **6.a.(1)**, fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such

entry or change made by an "employee" acting, in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for a "computer system" covered under this Insuring Agreement.

**7. Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having, in good faith, accepted in exchange for merchandise, "money" or services:

a. Money orders issued by any post office, express company or "financial institution" that are not paid upon presentation; or

b. "Counterfeit money" that is acquired during the regular course of business.

**B. Limit Of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit Of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or coverages.

**C. Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**D. Exclusions**

1. This insurance does not cover:

a. **Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

(1) You; or

(2) Any of your partners or "members";

whether acting alone or in collusion with other persons.

b. **Acts Committed By Your Employees Learned Of By You Prior To The Policy Period**

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of such "theft" or dishonest act prior to the Policy Period shown in the Declarations.

**c. Acts Committed By Your Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

**(1)** Whether acting alone or in collusion with other persons; or

**(2)** While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

**d. Confidential Or Personal Information**

Loss resulting from:

**(1)** The disclosure of your or another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The use of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of non-public information.

**e. Data Security Breach**

Fees, costs, fines, penalties and other expenses incurred by you which are related to the access to or disclosure of another person's or organization's confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists,

financial information, credit card information, health information or any other type of nonpublic information.

**f. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**g. Indirect Loss**

Loss that is an indirect result of an "occurrence" covered by this insurance including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property";

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance; or

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

**h. Legal Fees, Costs And Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

**i. Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**j. Pollution**

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**k. War And Military Action**

Loss or damage resulting from:

**(1)** War, including undeclared or civil war;

**CR 00 21  08 13**
**Page 3 of 16**

215
**EXHIBIT 7**

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

2. Insuring Agreement **A.1.** does not cover:

**a. Inventory Shortages**

Loss, or that part of any loss; the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b. Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c. Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not cover:

**a. Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**c. Fire**

Loss or damage resulting from fire, however caused, except:

**(1)** Loss of or damage to "money" and "securities"; and

**(2)** Loss from damage to a safe or vault.

**d. Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**e. Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**f. Transfer Or Surrender Of Property**

**(1)** Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "financial institution premises":

**(a)** On the basis of unauthorized instructions;

**(b)** As a result of a threat including, but not limited to:

**(i)** A threat to do bodily harm to any person;

**(ii)** A threat to do damage to any property;

**(iii)** A threat to introduce a denial of service attack into any "computer system";

**(iv)** A threat to introduce a virus or other malicious instruction into any "computer system" which is designed to damage, destroy or corrupt "electronic data" or "computer programs" stored within the "computer system";

**(v)** A threat to contaminate, pollute or render substandard your products or goods; or

**(vi)** A threat to disseminate, divulge or utilize:

**i.** Your confidential information;

**ii.** Confidential or personal information of another person or organization; or

**iii.** Weaknesses in the source code within any "computer system".

CR 00 21  08 13
Page 4 of 16

**EXHIBIT 7**

**(2)** But, this exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

    **(a)** Had no knowledge of any threat at the time the conveyance began; or

    **(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

**h. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**4.** Insuring Agreement **A.6.** does not cover:

**a. Authorized Access**

Loss resulting from a fraudulent:

    **(1)** Entry of "electronic data" or "computer program" into; or

    **(2)** Change of "electronic data" or "computer program" within;

any "computer system" owned, leased or operated by you by a person or organization with authorized access to that "computer system", except when covered under Insuring Agreement **A.6.b.**

**b. Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

**c. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**d. Fraudulent Instructions**

Loss resulting from an "employee" or "financial institution" acting upon any instruction to:

    **(1)** Transfer, pay or deliver "money", "securities" or "other property"; or

    **(2)** Debit or delete your account;

which instruction proves to be fraudulent, except when covered under Insuring Agreement **A.6.a.(2)** or **A.6.b.**

**e. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

    **(1)** An inventory computation; or

    **(2)** A profit and loss computation.

**E. Conditions**

The following conditions apply in addition to the Common Policy Conditions:

**1. Conditions Applicable To All Insuring Agreements**

**a. Additional Premises Or Employees**

If, while this insurance is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this insurance. Notice to us of an increase in the number of "premises" or "employees" is not required, and no additional premium will be charged for the remainder of the Policy Period shown in the Declarations.

**b. Concealment, Misrepresentation Or Fraud**

This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresents a material fact concerning:

    **(1)** This insurance;

    **(2)** The property covered under this insurance;

    **(3)** Your interest in the property covered under this insurance; or

    **(4)** A claim under this insurance.

**c. Consolidation - Merger Or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

CR 00 21  08 13
Page 5 of 16

**(1)** You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this insurance to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

**(2)** For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this insurance shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition or assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**d. Cooperation**

You must cooperate with us in all matters pertaining to this insurance as stated in the terms and conditions.

**e. Duties In The Event Of Loss**

After you discover a loss or a situation that may result in loss of or damage to "money", "securities" or "other property", you must:

**(1)** Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities;

**(2)** Give us a detailed, sworn proof of loss within 120 days;

**(3)** Cooperate with us in the investigation and settlement of any claim;

**(4)** Produce for our examination all pertinent records;

**(5)** Submit to examination under oath at our request and give us a signed statement of your answers; and

**(6)** Secure all of your rights of recovery against any person or organization responsible for the loss and do nothing to impair those rights.

**f. Employee Benefit Plans**

The "employee benefit plans" shown in the Declarations (hereinafter referred to as Plan) are included as insureds under Insuring Agreement **A.1.** subject to the following:

**(1)** If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator is responsible for selecting a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required under ERISA as if each Plan were separately insured.

**(2)** With respect to loss sustained or discovered by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

**(3)** If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

**(4)** If two or more Plans are insured under this insurance, any payment we make for loss:

**(a)** Sustained by two or more Plans; or

**(b)** Of commingled "money", "securities" or "other property" of two or more Plans;

resulting directly from an "occurrence" will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required under ERISA for each Plan bears to the total of those limits.

**(5)** The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

**g. Extended Period To Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:

**(1)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(2)** No later than one year from the date of that cancellation with regard to any "employee benefit plan".

**h. Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any Insured is considered to be an "employee" of every Insured.

**(4)** If this insurance or any of its coverages are cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

**(a)** No later than one year from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(b)** No later than one year from the date of that cancellation

with regard to any "employee benefit plan".

**(5)** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

**(6)** Payment by us to the first Named Insured for loss sustained by any Insured, or payment by us to any "employee benefit plan" for loss sustained by that Plan, shall fully release us on account of such loss.

**i. Legal Action Against Us**

You may not bring any legal action against us involving loss:

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of loss with us; and

**(3)** Unless brought within two years from the date you "discovered" the loss.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**j. Liberalization**

If we adopt any revision that would broaden the coverage under this insurance without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this insurance.

**k. Loss Sustained During Prior Insurance Issued By Us Or Any Affiliate**

**(1) Loss Sustained Partly During This Insurance And Partly During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting from an "occurrence" taking place:

**(a)** Partly during the Policy Period shown in the Declarations; and

**(b)** Partly during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest;

and this insurance became effective at the time of cancellation of the prior insurance, we will first settle the amount of loss that you sustained during this policy period. We will then settle the remaining amount of loss that you sustained during the policy period(s) of the prior insurance.

**(2) Loss Sustained Entirely During Prior Insurance**

If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place entirely during the policy period(s) of any prior cancelled insurance that we or any affiliate issued to you or any predecessor in interest, we will pay for the loss, provided:

    **(a)** This insurance became effective at the time of cancellation of the prior insurance; and

    **(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

We will first settle the amount of loss that you sustained during the most recent prior insurance. We will then settle any remaining amount of loss that you sustained during the policy period(s) of any other prior insurance.

**(3)** In settling loss under Paragraphs **k.(1)** and **k.(2)**:

    **(a)** The most we will pay for the entire loss is the highest single Limit of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior insurance issued by us.

    **(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this insurance. If no loss was sustained under this insurance, we will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this insurance, of the most recent prior insurance, we will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

We will not apply any other Deductible Amount that may have been applicable to the loss.

**(4)** The following examples demonstrate how we will settle losses subject to this condition:

**Example Number 1**

The Insured sustained a covered loss of $10,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B**.

**Policy A**

The current policy. Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

**Policy B**

Issued prior to Policy **A**. Written at a Limit of Insurance of $50,000 and a Deductible Amount of $5,000.

The amount of loss sustained under Policy **A** is $2,500 and under Policy **B**, $7,500.

The highest single Limit of Insurance applicable to this entire loss is $50,000 written under Policy **A**. The Policy **A** Deductible Amount of $5,000 applies. The loss is settled as follows:

    **(a)** The amount of loss sustained under Policy **A** ($2,500) is settled first. The amount we will pay is nil ($0.00) because the amount of loss is less than the Deductible Amount (i.e., $2,500 loss - $5,000 deductible = $0.00)

    **(b)** The remaining amount of loss sustained under Policy **B** ($7,500) is settled next. The amount recoverable is $5,000 after the remaining Deductible Amount from Policy **A** of $2,500 is applied to the loss (i.e., $7,500 loss - $2,500 deductible = $5,000).

The most we will pay for this loss is $5,000.

**Example Number 2**

The Insured sustained a covered loss of $250,000 resulting directly from an "occurrence" taking place during the terms of Policy **A** and Policy **B**.

### Policy A

The current policy. Written at a Limit of Insurance of $125,000 and a Deductible Amount of $10,000.

### Policy B

Issued prior to Policy **A**. Written at a Limit of Insurance of $150,000 and a Deductible Amount of $25,000.

The amount of loss sustained under Policy **A** is $175,000 and under Policy **B**, $75,000

The highest single Limit of Insurance applicable to this entire loss is $150,000 written under Policy **B**. The Policy **A** Deductible Amount of $10,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($175,000) is settled first. The amount we will pay is the Policy **A** Limit of $125,000 because $175,000 loss - $10,000 deductible = $165,000, which is greater than the $125,000 policy limit.

**(b)** The remaining amount of loss sustained under Policy **B** ($75,000) is settled next. The amount we will pay is $25,000 (i.e., $150,000 Policy **B** limit - $125,000 paid under Policy **A** = $25,000).

The most we will pay for this loss is $150,000.

**Example Number 3**

The Insured sustained a covered loss of $2,000,000 resulting directly from an "occurrence" taking place during the terms of Policies **A, B, C** and **D**.

### Policy A

The current policy. Written at a Limit of Insurance of $1,000,000 and a Deductible Amount of $100,000.

### Policy B

Issued prior to Policy **A**. Written at a Limit of Insurance of $750,000 and a Deductible Amount of $75,000.

### Policy C

Issued prior to Policy **B**. Written at a Limit of Insurance of

$500,000 and a Deductible Amount of $50,000.

### Policy D

Issued prior to Policy **C**. Written at a Limit of Insurance of $500,000 and a Deductible Amount of $50,000.

The amount of loss sustained under Policy **A** is $350,000, under Policy **B**, is $250,000, under Policy **C**, $600,000 and under Policy **D**, $800,000.

The highest single Limit of Insurance applicable to this entire loss is is $1,000,000 written under Policy **A**. The Policy **A** Deductible Amount of $100,000 applies. The loss is settled as follows:

**(a)** The amount of loss sustained under Policy **A** ($350,000) is settled first. The amount we will pay is $250,000 (i.e., $350,000 - $100,000 deductible = $250,000).

**(b)** The amount of loss sustained under Policy **B** ($250,000) is settled next. The amount we will pay is $250,000 (no deductible is applied).

**(c)** The amount of loss sustained under Policy **C** ($600,000) is settled next. The amount we will pay is $500,000, the policy limit (no deductible is applied).

**(d)** We will not make any further payment under Policy **D**, as the maximum amount payable under the highest single Limit of Insurance applying to the loss of $1,000,000 under Policy **A** has been satisfied.

The most we will pay for the loss is $1,000,000.

**I.   Loss Sustained During Prior Insurance Not Issued By Us Or Any Affiliate**

**(1)**   If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place during the policy period of any prior cancelled insurance that was issued to you or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, we will pay for the loss under this insurance, provided:

**CR 00 21  08 13**
**Page 9 of 16**

221

**EXHIBIT 7**

**(a)** This insurance became effective at the time of cancellation of the prior insurance; and

**(b)** The loss would have been covered under this insurance had it been in effect at the time of the "occurrence".

**(2)** In settling loss subject to this condition:

**(a)** The most we will pay for the entire loss is the lesser of the Limits of Insurance applicable during the period of loss, whether such limit was written under this insurance or was written under the prior cancelled insurance.

**(b)** We will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

**(3)** The insurance provided under this condition is subject to the following:

**(a)** If loss covered under this condition is also partially covered under Condition **E.1.k,** the amount recoverable under this condition is part of, not in addition to, the amount recoverable under Condition **E.1.k.**

**(b)** For loss covered under this condition that is not subject to Paragraph **l.(3)(a),** the amount recoverable under this condition is part of, not in addition to, the Limit of Insurance applicable to the loss covered under this insurance and is limited to the lesser of the amount recoverable under:

**(i)** This insurance as of its effective date; or

**(ii)** The prior cancelled insurance had it remained in effect.

**m.** **Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this insurance, our obligations are limited as follows:

**(1) Primary Insurance**

When this insurance is written as primary insurance, and:

**(a)** You have other insurance subject to the same terms and conditions as this insurance, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit Of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

**(b)** You have other insurance covering the same loss other than that described in Paragraph **m.(1)(a),** we will only pay for the amount of loss that exceeds:

**(i)** The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

**(ii)** The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this insurance.

**(2) Excess Insurance**

**(a)** When this insurance is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit Of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this insurance.

**(b)** However, if loss covered under this insurance is subject to a deductible, we will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

**n.** **Ownership Of Property; Interests Covered**

The property covered under this insurance is limited to property:

**(1)** That you own or lease;

**(2)** That is held by you in any capacity; or

**(3)** For which you are legally liable, provided you were liable for the property prior to the time the loss was sustained.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this insurance must be presented by you.

**o. Records**

You must keep records of all property covered under this insurance so we can verify the amount of any loss.

**p. Recoveries**

(1) Any recoveries, whether effected before or after any payment under this insurance, whether made by us or by you, shall be applied net of the expense of such recovery:

(a) First, to you in satisfaction of your covered loss in excess of the amount paid under this insurance;

(b) Second, to us in satisfaction of amounts paid in settlement of your claim;

(c) Third, to you in satisfaction of any Deductible Amount; and

(d) Fourth, to you in satisfaction of any loss not covered under this insurance.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

**q. Territory**

This insurance covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**r. Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**s. Valuation - Settlement**

The value of any loss for purposes of coverage under this insurance shall be determined as follows:

**(1) Money**

Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

(a) At face value in the "money" issued by that country; or

(b) In the United States of America dollar equivalent, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

**(2) Securities**

Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

(a) Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(b) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(i) Market value of the "securities" at the close of business on the day the loss was "discovered"; or

(ii) Limit of Insurance applicable to the "securities".

**(3) Property Other Than Money And Securities**

(a) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

**(i)** The Limit of Insurance applicable to the lost or damaged property;

**(ii)** The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

**(iii)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

**(b)** We will not pay on a replacement cost basis for any loss or damage to property covered under Paragraph **s.(3)(a):**

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement is made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

**(c)** We will, at your option, pay for loss or damage to such property:

**(i)** In the "money" of the country in which the loss or damage was sustained; or

**(ii)** In the United States of America dollar equivalent of the "money" of the country in which the loss or damage was sustained, determined by the rate of exchange published in The Wall Street Journal on the day the loss was "discovered".

**(d)** Any property that we pay for or replace becomes our property.

**2.** **Conditions Applicable To Insuring Agreement A.1.**

**a.** **Termination As To Any Employee**

This Insuring Agreement terminates as to any "employee":

**(1)** As soon as:

**(a)** You; or

**(b)** Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you; or

**(2)** On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**b.** **Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in Territory Condition **E.1.q.** for a period of not more than 90 consecutive days.

**3.** **Conditions Applicable To Insuring Agreement A.2.**

**a.** **Deductible Amount**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

**b.** **Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

**c.** **Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d.   **Territory**

We will cover loss that you sus-tain resulting directly from an "occurrence" taking place any-where in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.2.**

4.   **Conditions Applicable To Insuring Agreements A.4. And A.5.**

a.   **Armored Motor Vehicle Compa-nies**

Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

(1)   Under your contract with the armored motor vehicle company; and

(2)   From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

b.   **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1)   Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed arti-cles made of or containing such materials that consti-tute the principal value of such articles; or

(2)   Manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any infor-mation contained in them.

5.   **Conditions Applicable To Insuring Agreement A.6.**

a.   **Special Limit Of Insurance for Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstruct-ing them or reproducing any in-formation contained in them.

b.   **Territory**

We will cover loss that you sus-tain resulting directly from an "occurrence" taking place any-where in the world. Territory Condition **E.1.q.** does not apply to Insuring Agreement **A.6.**

**F.   Definitions**

1.   "Computer program" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enable the computer or de-vices to receive, process, store or send "electronic data".

2.   "Computer system" means:

a.   Computers, including Personal Digital Assistants (PDAs) and other transportable or handheld devices, electronic storage de-vices and related peripheral components;

b.   Systems and applications soft-ware; and

c.   Related communications net-works;

by which "electronic data" is col-lected, transmitted, processed, stored or retrieved.

3.   "Counterfeit money" means an imi-tation of "money" which is intended to deceive and to be taken as genu-ine.

4.   "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5.   "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insur-ance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

"Discover" or "discovered" also means the time when you first re-ceive notice of an actual or potential claim in which it is alleged that you are liable to a third party under cir-cumstances which, if true, would constitute a loss under this insur-ance.

6.   "Electronic data" means information, facts, images or sounds stored as or on, created or used on, or transmit-ted to or from computer software (including systems and applications software) on data storage devices, including hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electron-ically controlled equipment.

**CR 00 21  08 13**

**Page 13 of 16**

225

**EXHIBIT 7**

**7.** "Employee":

**a.** Means:

(1) Any natural person:

(a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any dishonest act committed by the "employee";

(b) Whom you compensate directly by salary, wages or commissions; and

(c) Whom you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

(a) To substitute for a permanent "employee", as defined in Paragraph **7.a.(1)**, who is on leave; or

(b) To meet seasonal or short-term work load conditions;

while that person is subject to your direction and control and performing services for you;

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary "employee" as defined in Paragraph **7.a.(2)**;

(4) Any natural person who is:

(a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; or

(b) Your director or trustee while that person is engaged in handling "money", "securities" or "other property" of any "employee benefit plan";

(5) Any natural person who is a former "employee", partner, "member", "manager", director, or trustee retained by you as a consultant while performing services for you;

(6) Any natural person who is a guest student or intern pursuing studies or duties;

(7) Any natural person employed by an entity merged or consolidated with you prior to the effective date of this Policy; and

(8) Any natural person who is your "manager", director or trustee while:

(a) Performing acts within the scope of the usual duties of an "employee"; or

(b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

**b.** Does not mean:

Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph **7.a.**

**8.** "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and that is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

**9.** "Financial institution" means:

**a.** With regard to Insuring Agreement **A.3.**:

(1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution; or

(2) An insurance company.

**b.** With regard to Insuring Agreement **A.6.**:

(1) A bank, savings bank, savings and loan association, trust company, credit union or similar depository institution;

(2) An insurance company; or

(3) A stock brokerage firm or investment company.

10. "Financial institution premises" means the interior of that portion of any building occupied by a "financial institution".

11. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

12. "Fraudulent instruction" means:

a. With regard to Insuring Agreement **A.6.a.(2)**:

(1) A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instruction directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", which instruction purports to have been issued by you, but which in fact was fraudulently issued by someone else without your knowledge or consent.

(2) A written instruction (other than those covered under Insuring Agreement **A.2.**) issued to a "financial institution" directing the "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by you, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

(3) A computer, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you, which instruction

purports to have been issued by an "employee", but which in fact was fraudulently issued by someone else without your or the "employee's" knowledge or consent.

b. With regard to Insuring Agreement **A.6.b.**:

A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic, written or voice instruction directing an "employee" to enter or change "electronic data" or "computer programs" within a "computer system" covered under the Insuring Agreement, which instruction in fact was fraudulently issued by your computer software contractor.

13. "Manager" means a natural person serving in a directorial capacity for a limited liability company.

14. "Member" means an owner of a limited liability company represented by its membership interest who, if a natural person, may also serve as a "manager".

15. "Messenger" means you, or your relative, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

16. "Money" means:

a. Currency, coins and bank notes in current use and having a face value;

b. Traveler's checks and money orders held for sale to the public; and

c. In addition, includes:

(1) Under Insuring Agreements **A.1.** and **A.2.**, deposits in your account at any financial institution;and

(2) Under Insuring Agreement **A.6.**, deposits in your account at a "financial institution" as defined in Paragraph **F.9.b.**

17. "Occurrence" means:

a. Under Insuring Agreement **A.1.**:

(1) An individual act;

(2) The combined total of all separate acts whether or not related; or

(3) A series of acts whether or not related;

committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

**b.** Under Insuring Agreement **A.2.**:

**(1)** An individual act;

**(2)** The combined total of all separate acts whether or not related; or

**(3)** A series of acts whether or not related;

committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

**c.** Under all other Insuring Agreement:

**(1)** An individual act or event;

**(2)** The combined total of all separate acts or events whether or not related; or

**(3)** A series of acts or events whether or not related;

committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition **E.1.k.** or **E.1.l.**

**18.** "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include "computer programs", "electronic data" or any property specifically excluded under this insurance.

**19.** "Premises" means the interior of that portion of any building you occupy in conducting your business.

**20.** "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

**a.** Caused or threatened to cause that person bodily harm; or

**b.** Committed an obviously unlawful act witnessed by that person.

**21.** "Safe burglary" means the unlawful taking of:

**a.** Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

**b.** A safe or vault from inside the "premises".

**22.** "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

**a.** Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

**23.** "Theft" means the unlawful taking of property" to the deprivation of the Insured.

**24.** "Transfer account" means an account maintained by you at a "financial institution" from which you can initiate the transfer, payment or delivery of "money" or "securities":

**a.** By means of computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instructions; or

**b.** By means of written instructions (other than those covered under Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such "financial institution" through an electronic funds transfer system.

**25.** "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# KENTUCKY CHANGES - TERMINATION OF EMPLOYEE

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

Paragraph **(2)** of the **Termination As To Any Employee** Condition **E.2.a** is deleted.

© ISO Properties, Inc., 2006     CR 02 53  05 06

**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063          **CRIME AND FIDELITY**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# KENTUCKY CHANGES - OBLIGEE

This endorsement modifies insurance provided under the following:

    GOVERNMENT CRIME COVERAGE FORM
    GOVERNMENT CRIME POLICY
    GOVERNMENT EMPLOYEE THEFT AND FORGERY POLICY

### SCHEDULE

| Name Of Obligee |
|---|
|  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

1. We agree to indemnify the Obligee shown in the Schedule for loss covered by this insurance.

2. This insurance may be cancelled by you or by the Obligee shown in the Schedule in accordance with the Cancellation Of Policy Condition.  If we cancel, we agree to mail our notice to both the Obligee and to you.

3. The **Termination As To Any Employee** Condition is replaced by the following:

   This insurance terminates as to any "employee" as soon as:

   a. The Obligee or you; or

   b. Any official or employee authorized to manage, govern or control your "employees" who is not in collusion with the "employee";

   learn of "theft" or any other dishonest act committed by the "employees" whether before or after becoming employed by you.

4. By acceptance of this insurance both the Obligee and you give us notice cancelling any prior insurance as shown in the Declarations.

© Insurance Services Office, Inc., 2009        **CR 01 68  10 10**

**EXHIBIT 7**

# UMBRELLA COVERAGE

UMBRELLA COVERAGE

**31**

## WESTFIELD INSURANCE
*Sharing Knowledge. Building Trust.®*

**RENEWAL**
**COMMERCIAL LIABILITY UMBRELLA DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

### LIMITS OF INSURANCE

$4,000,000  EACH OCCURRENCE LIMIT
$4,000,000  GENERAL AGGREGATE LIMIT
$4,000,000  PERSONAL & ADVERTISING INJURY LIMIT
        $0  SELF INSURED RETENTION

### SCHEDULE OF UNDERLYING INSURANCE

| POLICY NUMBER | TYPE OF COVERAGE | INSURER | LIMITS OF LIABILITY | | POLICY PERIOD |
|---|---|---|---|---|---|
| CWP 3263063 | General Liability | Westfield National Insurance | $2,000,000<br>$2,000,000<br><br>$1,000,000<br><br>$1,000,000 | General Aggregate<br>Products/Completed Operations Aggregate<br>Personal And Advertising Injury<br>Each Occurrence | 10/01/16 To 10/01/17 |
| CWP 3263063 | Auto Liability | Westfield National Insurance | $1,000,000 | Bodily Injury And Property Damage Each Accident | 10/01/16 To 10/01/17 |
| QUW 605058 | Employers Liability | BERKSHIRE HATHAWAY GUARD | $1,000,000<br>$1,000,000<br><br>$1,000,000 | Bodily Injury Each Accident<br>Bodily Injury By Disease Policy Limit<br>Bodily Injury By Disease Each Employee | 10/01/15 To 10/01/16 |

**PREMIUM BASIS:** FLATCHARGE

| COMMERCIAL UMBRELLA ANNUAL PREMIUM | $2,250.00 |
|---|---|
| TOTAL ADVANCE ANNUAL PREMIUM | $2,250.00 |

**Forms And Endorsements Applicable To This Coverage Part:**
CUDS01  0900*, CU0001  0413*, CU7000  1206*, CU2108  0413*, CU2125  1201*,
CU2123  0202*, CU2432  0413*, CU7033  0911*, CU2186  0514*, CU2130  0115*,
CU2430  0413*.

232
**EXHIBIT 7**

# COMMERCIAL LIABILITY UMBRELLA
## COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning.  Refer to Section V - Definitions.

### SECTION I - COVERAGES

### COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1.  Insuring Agreement**

    **a.**  We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted.  When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend.  But:

        **(1)**  The amount we will pay for the "ultimate net loss" is limited as described in Section III - Limits Of Insurance; and

        **(2)**  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

    **b.**  This insurance applies to "bodily injury" or "property damage" that is subject to an applicable "retained limit". If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "bodily injury" or "property damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance".

    **c.**  This insurance applies to "bodily injury" and "property damage" only if:

        **(1)**  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        **(2)**  The "bodily injury" or "property damage" occurs during the policy period; and

        **(3)**  Prior to the policy period, no insured listed under Paragraph **1.a.** of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

    **d.**  "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.a.** of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

© Insurance Services Office, Inc., 2012

**EXHIBIT 7**

**e.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.a.** of Section **II - Who Is An Insured** or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

  **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

  **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

  **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**f.** Damages because of "bodily injury" include damages claimed by any person by organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

  **(1)** That the insured would have in the absence of the contract or agreement; or

  **(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than

an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

  **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

  **(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

  **(1)** Causing or contributing to the intoxication of any person;

  **(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

  **(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

  **(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

  **(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage" involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

This exclusion does not apply to the extent that valid "underlying insurance" for the liquor liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the liquor liability risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. ERISA**

Any obligation of the insured under the Employees' Retirement Income Security Act of 1974 (ERISA), and any amendments thereto or any similar federal, state or local statute.

**f. Auto Coverages**

   **(1)** "Bodily injury" or "property damage" arising out of the ownership, maintenance or use of any "auto" which is not a "covered auto"; or

   **(2)** Any loss, cost or expense payable under or resulting from any first-party physical damage coverage; no-fault law, personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law.

**g. Employer's Liability**

"Bodily injury" to:

   **(1)** An "employee" of the insured arising out of and in the course of:

      **(a)** Employment by the insured; or

      **(b)** Performing duties related to the conduct of the insured's business; or

   **(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

With respect to injury arising out of a "covered auto", this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits. For the purposes of this insurance, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

This exclusion does not apply to the extent that valid "underlying insurance" for the employer's liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the employer's liability risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**h. Employment-related Practices**

"Bodily injury" to:

   **(1)** A person arising out of any:

      **(a)** Refusal to employ that person;

      **(b)** Termination of that person's employment; or

      **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harrassment, humiliation, discrimination or malicious prosecution directed at that person; or

   **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraph **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraph **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**CU 00 01  04 13**
**Page 3 of 19**

**EXHIBIT 7**

**i. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

**(2)** "Pollution cost or expense".

This exclusion does not apply if valid "underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the pollution risks described above will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**j. Aircraft Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment; training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 50 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

**(4)** The extent that valid "underlying insurance" for the aircraft or watercraft liability risks described

above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" or "property damage". To the extent this exclusion does not apply, the insurance provided under this Coverage Part for the aircraft or watercraft risks described above will follow the same provisions, exclusions and limitations that are contained in the "underlying insurance", unless otherwise directed by this insurance; or

**(5)** Aircraft that is:

**(a)** Chartered by, loaned to, or hired by you with a paid crew; and

**(b)** Not owned by any insured.

**k. Racing Activities**

"Bodily injury" or "property damage" arising out of the use of "mobile equipment" or "autos" in, or while in practice for, or while being prepared for, any prearranged professional or organized racing, speed, demolition, or stunting activity or contest.

**l. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**m. Damage To Property**

"Property damage" to:

**(1)** Property:

**(a)** You own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property; or

**(b)** Owned or transported by the insured and arising out of the ownership, maintenance or use of a "covered auto".

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(1)(b)**, **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to liability assumed under a written Trailer Interchange agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**n.  Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**o.  Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

**p.  Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**q.  Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**r.  Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**s.  Professional Services**

"Bodily injury" or "property damage" due to rendering of or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**(3)** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**(4)** Engineering services, including related supervisory or inspection services;

**(5)** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**(6)** Any health or therapeutic service treatment, advice or instruction;

**(7)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming or therapy;

**(8)** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardio-vascular fitness, bodybuilding or physical training programs;

**(9)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(10)** Body piercing services;

**(11)** Services in the practice of pharmacy;

**(12)** Law enforcement or firefighting services; and

**(13)** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", involved the rendering of or failure to render any professional service.

**t.** **Electronic Data**

Damage arising out of the loss of, loss of use of, damage to, corruption of, inability to access or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

This exclusion does not apply if valid "underlying insurance" for the electronic data risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury" and "property damage". The in-

surance provided under this Coverage Part will follow the same provisions, exclusions and limitations that are contained in the applicable "underlying insurance", unless otherwise directed by this insurance.

**u.** **Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.** **Insuring Agreement**

**a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. At our discretion, we may investigate any offense that may involve this insurance and settle any resultant claim or "suit" for which we have the duty to defend. But:

**CU 00 01 04 13**
**Page 6 of 19**

238
**EXHIBIT 7**

**(1)** The amount we will pay for the "ultimate net loss" is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" that is subject to an applicable "retained limit". If any other limit, such as a sublimit, is specified in the "underlying insurance", this insurance does not apply to "personal and advertising injury" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "underlying insurance".

**c.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a.** "Personal and advertising injury":

**(1) Knowing Violation Of Rights Of Another**

Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**(2) Material Published With Knowledge Of Falsity**

Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**(3) Material Published Prior To Policy Period**

Arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**(4) Criminal Acts**

Arising out of a criminal act committed by or at the direction of the insured.

**(5) Contractual Liability**

For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to:

**(a)** Liability for damages that the insured would have in the absence of the contract or agreement.

**(b)** Liability for false arrest, detention or imprisonment assumed in a contract or agreement.

**(6) Breach Of Contract**

Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**(7) Quality Or Performance Of Goods -- Failure To Conform To Statements**

Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**(8) Wrong Description Of Prices**

Arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**(9) Infringement Of Copyright, Patent, Trademark Or Trade Secret**

Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**(10) Insureds In Media And Internet Type Businesses**

Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**(11) Electronic Chatrooms Or Bulletin Boards**

Arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**(12) Unauthorized Use Of Another's Name Or Product**

Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**(13) Pollution**

Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(14) Employment-related Practices**

To:

**(a)** A person arising out of any:

**(i)** Refusal to employ that person;

**(ii)** Termination of that person's employment; or

**(iii)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harrassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(b)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices

described in Paragraph **(i)**, **(ii)** or **(iii)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraph **(i)**, **(ii)** or **(iii)** above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**(15) Professional Services**

Arising out of the rendering of or failure to render any professional service. This includes but is not limited to:

**(a)** Legal, accounting or advertising services;

**(b)** Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**(c)** Inspection, supervision, quality control, architectural or engineering activities done, by or for you on a project on which you serve as construction manager;

**(d)** Engineering services, including related supervisory or inspection services;

**(e)** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**(f)** Any health or therapeutic service treatment, advice or instruction;

**(g)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming or therapy;

**(h)** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;

**(i)** Optometry or optical or hearing aid services including the pre-scribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(j)** Body piercing services;

**(k)** Services in the practice of phar-macy;

**(l)** Law enforcement or firefighting services; and

**(m)** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertis-ing injury", involved the rendering of or failure to render any professional service.

**(16) War**

However caused, arising, directly or indirectly, out of:

**(a)** War, including undeclared or civil war;

**(b)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(c)** Insurrection, rebellion, revo-lution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**(17) Recording And Distribution Of Mate-rial Or Information In Violation Of Law**

Arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(a)** The Telephone Consumer Pro-tection Act (TCPA), including any amendment of or addition to such law;

**(b)** The CAN-SPAM Act of 2003, in-cluding any amendment of or addition to such law;

**(c)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, includ-ing the Fair and Accurate Credit Transactions Act (FACTA); or

**(d)** Any federal, state or local stat-ute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and ad-ditions, that addresses, prohib-its, or limits the printing, dissemination, disposal, collect-ing, recording, sending, trans-mitting, communicating or distribution of material or infor-mation.

**b.** "Pollution cost or expense".

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we in-vestigate or settle, or any "suit" against an insured we defend, when the duty to defend exists:

   **a.** All expenses we incur.

   **b.** Up to $2000 for cost of bail bonds (in-cluding bonds for related traffic law vio-lations) required because of an "occurrence" we cover. We do not have to furnish these bonds.

   **c.** The cost of bonds to release attach-ments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   **e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attor-neys' expenses taxed against the in-sured.

   **f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   **g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, of-fered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** When we have the right but not the duty to defend the insured and elect to participate in the defense, we will pay our own expenses but will not contribute to the expenses of the insured or the "underlying insurer".

**3.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies if any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

**1.** Except for liability arising out of the ownership, maintenance or use of "covered autos":

**a.** If you are designated in the Declarations as:

**(1)** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**(2)** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**(3)** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**(4)** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**EXHIBIT 7**

**(5)** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**b.** Each of the following is also an insured:

**(1)** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

  **(a)** "Bodily injury" or "personal and advertising injury":

    **(i)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" in the course of his or her employment or performing duties related to the conduct of your business or to your other "volunteer workers" while performing duties related to the conduct of your business;

    **(ii)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(a)(i)** above; or

    **(iii)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)(i)** or **(ii)** above.

  **(b)** "Property damage" to property:

    **(i)** Owned, occupied or used by;

    **(ii)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**(2)** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**(3)** Any person or organization having proper temporary custody of your property if you die, but only:

  **(a)** With respect to liability arising out of the maintenance or use of that property; and

  **(b)** Until your legal representative has been appointed.

**(4)** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**c.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**(1)** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**(2)** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**(3)** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

**2.** Only with respect to liability arising out of the ownership, maintenance or use of "covered autos":

**a.** You are an insured.

**b.** Anyone else while using with your permission a "covered auto" you own, hire or borrow is also an insured except:

(1) The owner or anyone else from whom you hire or borrow a "covered auto". This exception does not apply if the "covered auto" is a trailer or semitrailer connected to a "covered auto" you own.

(2) Your "employee" if the "covered auto" is owned by that "employee" or a member of his or her household.

(3) Someone using a "covered auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

(4) Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a "covered auto".

(5) A partner (if you are a partnership), or a member (if you are a limited liability company) for a "covered auto" owned by him or her or a member of his or her household.

(6) "Employees" with respect to "bodily injury" to:

(a) Any fellow "employee" of the insured arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

(b) The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph (a) above.

c. Anyone liable for the conduct of an insured described above is also an insured, but only to the extent of that liability.

3. Any additional insured under any policy of "underlying insurance" will automatically be an insured under this insurance.

Subject to Section III - Limits Of Insurance, if coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

a. Required by the contract or agreement, less any amounts payable by any "underlying insurance"; or

b. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance".

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made, "suits" brought, or number of vehicles involved; or

c. Persons or organizations making claims or bringing "suits".

2. The Aggregate Limit is the most we will pay for the sum of all "ultimate net loss" under:

a. Coverage **A**, except "ultimate net loss" because of "bodily injury" or "property damage" arising out of the ownership, maintenance or use of a "covered auto"; and

b. Coverage **B**.

3. Subject to Paragraph **2.** above, the Each Occurrence Limit is the most we will pay for the sum of all "ultimate net loss" because of all "bodily injury" and "property damage" under Coverage **A** arising out of any one "occurrence".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all "ultimate net loss" because of all "personal and advertising injury" sustained by any one person or organization.

5. If there is "underlying insurance" with a policy period that is nonconcurrent with the policy period of this Commercial Liability Umbrella Coverage Part, the "retained limit(s)" will only be reduced or exhausted by payments for:

a. "Bodily injury" or "property damage" which occurs during the policy period of this Coverage Part; or

b. "Personal and advertising injury" for offenses that are committed during the policy period of this Coverage Part.

However, if any "underlying insurance" is written on a claims-made basis, the "retained limit(s)" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this Coverage Part.

CU 00 01  04 13
Page 12 of 19

244
**EXHIBIT 7**

The Aggregate Limit, as described in Paragraph **2.** above, applies separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - CONDITIONS

**1. Appeals**

If the "underlying insurer" or insured elects not to appeal a judgment in excess of the "retained limit", we may do so at our own expense. We will also pay for taxable court costs, pre- and postjudgment interest and disbursements associated with such appeal. In no event will this provision increase our liability beyond the applicable Limits of Insurance described in Section **III** - Limits Of Insurance.

**2. Bankruptcy**

**a. Bankruptcy Of Insured**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**b. Bankruptcy Of Underlying Insurer**

Bankruptcy or insolvency of the "underlying insurer" will not relieve us of our obligations under this Coverage Part.

However, this insurance will not replace the "underlying insurance" in the event of bankruptcy or insolvency of the "underlying insurer". This insurance will apply as if the "underlying insurance" were in full effect.

**3. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense, regardless of the amount, which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**4. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been full complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**5. Other Insurance**

**a.** This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, but we will be entitled to the insured's rights against all those insurers.

**b.** When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of the insurance provided under this Coverage Part; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

**6. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**7. Representations Of Fraud**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us;

**c.** We have issued this policy in reliance upon your representations; and

**d.** This policy is void in any case of fraud by you as it relates to this policy or any claim under this policy.

**8. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**9. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**10. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**11. Loss Payable**

Liability under this Coverage Part does not apply to a given claim unless and until:

**a.** The insured or insured's "underlying insurer" has become obligated to pay the "retained limit"; and

**b.** The obligation of the insured to pay the "ultimate net loss" in excess of the "retained limit" has been determined by a final settlement or judgment or written agreement among the insured, claimant and us.

**12. Transfer Of Defense**

When the underlying limits of insurance have been used up in the payment of judgments or settlements, the duty to defend will be transferred to us. We will cooperate in the transfer of control to us of any outstanding claims or "suits" seeking damages to which this insurance applies which would have been covered by the "underlying insurance" had the applicable limit not been used up.

**13. Maintenance Of/Changes To Underlying Insurance**

Any "underlying insurance" must be maintained in full effect without reduction of coverage or limits except for the reduction of the aggregate limit in accordance with the provisions of such "underlying insurance" that results from payment of claims, settlement or judgments to which this insurance applies.

Such exhaustion or reduction is not a failure to maintain "underlying insurance". Failure to maintain "underlying insurance" will not invalidate insurance provided under this Coverage Part, but insurance provided under this Coverage Part will apply as if the "underlying insurance" were in full effect.

If there is an increase in the scope of coverage of any "underlying insurance" during the term of this policy, our liability will be no more than it would have been if there had been no such increase.

You must notify us in writing, as soon as practicable, if any "underlying insurance" is cancelled, not renewed, replaced or otherwise terminated, or if the limits or scope of coverage of any "underlying insurance" is changed.

**14. Expanded Coverage Territory**

a. If a "suit" is brought in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from defending the insured, the insured will initiate a defense of the "suit". We will reimburse the insured, under Supplementary Payments, for any reasonable and necessary expenses incurred for the defense of a "suit" seeking damages to which this insurance applies, that we would have paid had we been able to exercise our right and duty to defend.

If the insured becomes legally obligated to pay sums because of damages to which this insurance applies in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from paying such sums on the insured's behalf, we will reimburse the insured for such sums.

b. All payments or reimbursements we make for damages because of judgments or settlements will be made in U.S. currency at the prevailing exchange rate at the time the insured became legally obligated to pay such sums. All payments or reimbursements we make for expenses under Supplementary Payments will be made in U.S. currency at the prevailing exchange rate at the time the expenses were incurred.

c. Any disputes between you and us as to whether there is coverage under this policy must be filed in the courts of the United States of America (including its territories and possessions), Canada or Puerto Rico.

d. The insured must fully maintain any coverage required by law, regulation or other governmental authority during the policy period, except for reduction of the aggregate limits due to payments of claims, judgments or settlements.

Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance. However, this insurance will apply as if the required coverage by law, regulation or other governmental authority was in full effect.

**SECTION V - DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, "trailer" or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

4. "Coverage territory" means anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

5. "Covered auto" means only those "autos" to which "underlying insurance" applies.

6. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

CU 00 01  04 13
Page 15 of 19

247
EXHIBIT 7

7. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work", or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto." However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

   g. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraphs f. and g. do not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   (2) That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

   (3) That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a "covered auto" over a route or territory that person or organization is authorized to serve by public authority.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury",

arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Pollution cost or expense" means any loss, cost or expense arising out of any:

**a.** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**b.** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**17.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**18.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

With respect to the ownership, maintenance or use of "covered autos", property damage also includes "pollution cost or expense", but only to the extent that coverage exists under the "underlying insurance" or would have existed but for the exhaustion of the underlying limits.

For the purposes of this insurance, with respect to other than the ownership maintenance or use of "covered autos", electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**19.** "Retained limit" means the available limits of "underlying insurance" scheduled in the Declarations or the "self-insured retention", whichever applies.

**20.** "Self-insured retention" means the dollar amount listed in the Declarations that will be paid by the insured before this insurance becomes applicable only with respect to "occurrences" or offenses not covered by the "underlying insurance". The "self-insured retention" does not apply to "occurrences" or offenses which would have been covered by "underlying insurance" but for the exhaustion of applicable limits.

**21.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent or the "underlying insurer's" consent.

**22.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**23.** "Ultimate net loss" means the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with our consent or the "underlying insurer's" consent.

**24.** "Underlying insurance" means any policies of insurance listed in the Declarations under the Schedule of "underlying insurance".

**25.** "Underlying insurer" means any insurer who provides any policy of insurance listed in the Schedule of "underlying insurance".

**26.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**27.** "Your product":

**a.** Means:

    **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        **(a)** You;

        **(b)** Others trading under your name; or

        **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**28.** "Your work":

**a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)** The providing of or failure to provide warnings or instructions.

COMMERCIAL LIABILITY UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WHO IS AN INSURED AMENDMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

Under **SECTION II - WHO IS AN INSURED** Item **2.b.(1)** is deleted and replaced with the following:

**(1)** The owner, any "employee" or agent of the owner, or anyone else from whom you hire or borrow a covered "auto". This exception does not apply if the covered "auto" is a trailer or semitrailer connected to a covered "auto" you own.

**CU 70 33  09 11**

252
**EXHIBIT 7**

COMMERCIAL LIABILITY UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** Exclusion **2.t.** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

  **2. Exclusions**

  This insurance does not apply to:

  **t. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

  Damages arising out of:

  **(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

  **(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

  This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

  However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

  **2. Exclusions**

  This insurance does not apply to:

  **Access Or Disclosure Of Confidential Or Personal Information**

  "Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

  This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013                           **CU 21 86 05 14**

253
**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2015

**CU 21 30** 01 15

254

**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

This insurance does not apply to "bodily injury" or "property damage" arising out of:

1. Inhaling, ingesting or physical exposure to asbestos or goods or products containing asbestos;

2. The use of asbestos in constructing or manufacturing any goods, product or structure;

3. The removal, repair, encapsulation, enclosure, abatement or maintenance of asbestos in or from any goods, product or structure; or

4. The manufacture, sale, distribution, transportation, storage or disposal of asbestos or goods or products containing asbestos.

This insurance does not apply to payment for the investigation or defense of any claim, injury, loss, fine, penalty or "suit" related to any of the foregoing items **1** thru **4**. Moreover we have no duty to investigate or defend any such claim, injury, loss or "suit".

This insurance also does not apply to any loss, cost or expense incurred in complying with any federal, state or local provision of law regarding the inspection, monitoring, or control of asbestos in any goods, products or structures.

**CU 70 00** 12 06

EXHIBIT 7

**COMMERCIAL LIABILITY UMBRELLA**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - INTERCOMPANY PRODUCTS SUITS

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

This insurance does not apply to any claim for damages by any Named Insured under this policy against another Named Insured under this policy because of "bodily injury" or "property damage" arising out of "your products" and included within the "products-completed operations hazard".

© Insurance Services Office, Inc., 2012                                          **CU 21 08  04 13**

256
EXHIBIT 7

POLICY NUMBER:   CWP 3263063                                COMMERCIAL LIABILITY UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

Exclusion **i.** under Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**i.   Pollution**

(1)   "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

(2)   "Pollution cost or expense".

© ISO Properties, Inc., 2001                                **CU 21 25  12 01**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
(Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**I.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time

possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**II.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailing or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

© ISO Properties, Inc., 2001                                                        **CU 21 23  02 02**

258
**EXHIBIT 7**

COMMERCIAL LIABILITY UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED COVERAGE TERRITORY

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

**A.** Paragraph **14. Expanded Coverage Territory** under **Section IV - Conditions** does not apply.

**B.** The definition of "coverage territory" in the **Definitions** section is replaced by the following:

"Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in **a.** above;

**(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

© Insurance Services Office, Inc., 2012

**CU 24 32  04 13**

**EXHIBIT 7**

COMMERCIAL LIABILITY UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL LIABILITY UMBRELLA COVERAGE PART

Paragraph **9.** of the **Definitions** section is replaced by the following:

**9.**  "Insured contract" means"

   **a.**  A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   **b.**  A sidetrack agreement;

   **c.**  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **d.**  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **e.**  An elevator maintenance agreement;

   **f.**  That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto".  However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees";

   **g.**  That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work

performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf.  However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraphs **f.** and **g.** do not include that part of any contract or agreement:

   **(1)**  That indemnifies a railroad for "bodily injury" or "property damage" arising out of the construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   **(2)**  That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

   **(3)**  That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a "covered auto" over a route or territory that person or organization is authorized to serve by public authority.

© Insurance Services Office, Inc., 2012

**CU 24 30  04 13**

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| **Policy Period** | **From** 10/01/16 **To** 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

✖✖ **Effective 10/01/16 this Common Policy declarations amends all prior**   ✖✖
✖✖ **Common Policy declarations and endorses this policy as shown below.**   ✖✖

**Business:** DRUG DIST                    **Named Insured is:**  Corporation

In return for the payment of the premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy.

### THE COVERAGE PARTS BELOW HAVE BEEN ENDORSED AS FOLLOWS:

| | | | |
|---|---|---|---|
| COMMERCIAL GENERAL LIAB. COVERAGE PART ENDORSEMENT | Return | $ | 617.00 CR |
| TERRORISM INSURANCE COVERAGE PART ENDORSEMENT | Return | $ | 2.00 CR |
| | | | |
| Returned Municipal Tax | | $ | 68.00 CR |
| Returned State Surcharge | | $ | 11.14 CR |
| | | | |
| Net Returned Premium | | $ | 698.14 CR |

GENERAL LIABILITY COVERAGE PART ENDORSEMENT

  1. CHANGED CLASSIFICATION 12373-KY
     - PREMIUM BASIS FROM 52,000,000 TO 45,000,000

FORMS CHANGES

  1. ADDED FORM CA2395 03/06

            ** This endorsement changes your policy. Please
                attach it to your original policy. **

**Forms and Endorsements applicable to all coverage parts:**
IL0019   0488 , IL0017   1198 , ID7004   0411 , IL0003   0908 , IL0263   0908 .

COUNTERSIGNED: _____  BY _____
                        Date                          Authorized Representative

| PAGE   01 OF  02 | IL 00 19 (04-88) | 10/13/16 | HF |
|---|---|---|---|

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**
(Continued)

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

| | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSUREDPARTNERS NL LLC<br>2443 SIR BARTON WAY STE 400<br>LEXINGTON KY 40509-2527<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From  10/01/16<br>To  10/01/17 | at 12:01 A.M. Standard Time at your<br>mailing address shown above. |
|---|---|---|

**✱✱ Effective 10/01/16 this Common Policy declarations amends all prior ✱✱**
**✱✱ Common Policy declarations and endorses this policy as shown below. ✱✱**

Endorsement Activity
Commercial Lines
Disclosure of Local Government Tax

Returned Municipal Tax  ✱ - CITY   MURRAY                         $       68.00 CR

Returned Municipal Tax  ✱ - TOTAL                               $       68.00 CR

**✱ The municipal tax amount includes a collection fee that is either 15% of the**
**tax collected or 2% of the premium charged, whichever is less**

| | | | |
|---|---|---|---|
| **PAGE   02 OF  02** | IL 00 19 (04-88) | 10/13/16 | HF |

**EXHIBIT 7**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# KENTUCKY SILICA OR SILICA-RELATED DUST EXCLUSION FOR COVERED AUTOS EXPOSURE

For a covered "auto" licensed or principally garaged in Kentucky, this endorsement modifies insurance provided under the following:

    BUSINESS AUTO COVERAGE FORM
    GARAGE COVERAGE FORM
    MOTOR CARRIER COVERAGE FORM
    TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** The following exclusion is added to Paragraph **B. Exclusions** of **Section II - Liability Coverage** in the Business Auto, Motor Carrier and Truckers Coverage Forms and for **"Garage Operations" - Covered "Autos"** in the Garage Coverage Form:

**SILICA OR SILICA-RELATED DUST EXCLUSION FOR COVERED AUTOS EXPOSURE**

To the extent that the limits of liability exceed the limits of liability required by the Kentucky Motor Vehicle Reparations Act, this insurance does not apply to:

**1.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**2.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**3.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any "insured" or by any other person or entity.

**B.** **Additional Definitions**

As used in this endorsement:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

© ISO Properties, Inc., 2005

**CA 23 95 03 06**

263
**EXHIBIT 7**

# WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

**Policy Number: CWP 3 263 063** |11| **WIC Account Number: 1600961480** | A

| Policy Period | From 10/01/16 <br> To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

** Effective 10/01/16 this Common Policy declarations amends all prior  **
** Common Policy declarations and endorses this policy as shown below.  **

**Business: DRUG DIST**            **Named Insured is:** Corporation

In return for the payment of the premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy.

### THE COVERAGE PARTS BELOW HAVE BEEN ENDORSED AS FOLLOWS:

COMMERCIAL GENERAL LIAB. COVERAGE PART ENDORSEMENT  Additional $      88.00

Additional Municipal Tax            $      11.00
Additional State Surcharge          $       1.58

Net Additional Premium              $     100.58

GENERAL LIABILITY COVERAGE PART ENDORSEMENT

1. CHANGED CLASSIFICATION 12373-KY
   - PREMIUM BASIS FROM 45,000,000 TO 46,000,000

** This endorsement changes your policy. Please attach it to your original policy. **

**Forms and Endorsements applicable to all coverage parts:**
IL0019  0488 , IL0017  1198 , ID7004  0411 , IL0003  0908 , IL0263  0908 .

COUNTERSIGNED: _____  BY _____
                        Date                          Authorized Representative

**PAGE   01 OF  02**          IL 00 19 (04-88)          10/20/16                    HF

264

**EXHIBIT 7**

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**
(Continued)

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 |11| WIC Account Number: 1600961480 | A |
|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

**※※ Effective 10/01/16 this Common Policy declarations amends all prior ※※**
**※※ Common Policy declarations and endorses this policy as shown below. ※※**

Endorsement Activity
Commercial Lines
Disclosure of Local Government Tax

Additional Municipal Tax * - CITY   MURRAY                    $    11.00

Additional Municipal Tax * - TOTAL                          $    11.00

**※ The municipal tax amount includes a collection fee that is either 15% of the tax collected or 2% of the premium charged, whichever is less**

265
EXHIBIT 7

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

31

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| WIC Account Number: 1600961480 | | A |
|---|---|---|---|

| Policy Period | From 10/01/16 To 10/01/17 | at 12:01 A.M. Standard Time at your mailing address shown above. |
|---|---|---|

** Effective 10/01/16 this Common Policy declarations amends all prior **
** Common Policy declarations and endorses this policy as shown below. **

**Business:** DRUG DIST          **Named Insured is:** Corporation

In return for the payment of the premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy.

**THE COVERAGE PARTS BELOW HAVE BEEN ENDORSED AS FOLLOWS:**

COMMERCIAL GENERAL LIAB. COVERAGE PART ENDORSEMENT  Return    $        88.00 CR

        Returned Municipal Tax              $        11.00 CR
        Returned State Surcharge           $         1.58 CR

        Net Returned Premium               $       100.58 CR

GENERAL LIABILITY COVERAGE PART ENDORSEMENT

1. CHANGED CLASSIFICATION 12373-KY
   - PREMIUM BASIS FROM 46,000,000 TO 45,000,000

      ** This endorsement changes your policy. Please
      attach it to your original policy. **

**Forms and Endorsements applicable to all coverage parts:**
IL0019   0488 , IL0017   1198 , ID7004   0411 , IL0003   0908 , IL0263   0908 .

COUNTERSIGNED: _____   BY _____
              Date              Authorized Representative

PAGE   01 OF  02          IL 00 19 (04-88)          10/24/16          HF

# WESTFIELD INSURANCE
### Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**
(Continued)

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

| | |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSUREDPARTNERS NL LLC<br>2443 SIR BARTON WAY STE 400<br>LEXINGTON KY 40509-2527<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063 | 11 | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From | 10/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| | To | 10/01/17 | mailing address shown above. |

** Effective 10/01/16 this Common Policy declarations amends all prior **
** Common Policy declarations and endorses this policy as shown below. **

**Endorsement Activity**
**Commercial Lines**
**Disclosure of Local Government Tax**

Returned Municipal Tax  * - CITY   MURRAY                         $   11.00 CR

Returned Municipal Tax  * - TOTAL                                $   11.00 CR

**\* The municipal tax amount includes a collection fee that is either 15% of the tax collected or 2% of the premium charged, whichever is less**

267
EXHIBIT 7

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

**Policy Number: CWP 3 263 063** |11| **WIC Account Number: 1600961480** | A

| **Policy Period** | **From** | 10/01/16 | at 12:01 A.M. Standard Time at your |
| | **To** | 10/01/17 | mailing address shown above. |

** Effective 10/01/16 this Common Policy declarations amends all prior **
** Common Policy declarations and endorses this policy as shown below. **

**Business:** DRUG DIST          **Named Insured is:** Corporation

In return for the payment of the premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy.

### THE COVERAGE PARTS BELOW HAVE BEEN ENDORSED AS FOLLOWS:

COMMERCIAL GENERAL LIAB. COVERAGE PART ENDORSEMENT  Additional $       88.00

Additional Municipal Tax                    $       11.00
Additional State Surcharge                  $        1.58

Net Additional Premium                      $      100.58

GENERAL LIABILITY COVERAGE PART ENDORSEMENT

1. CHANGED CLASSIFICATION 12373-KY
   - PREMIUM BASIS FROM 45,000,000 TO 46,000,000

** This endorsement changes your policy. Please attach it to your original policy. **

**Forms and Endorsements applicable to all coverage parts:**
IL0019   0488 , IL0017   1198 , ID7004   0411 , IL0003   0908 , IL0263   0908 .

COUNTERSIGNED: _____  BY ____

Date                           Authorized Representative

**PAGE   01 OF   02         IL 00 19 (04-88)         11/15/16         HF**

EXHIBIT 7

# WESTFIELD INSURANCE
**Sharing Knowledge. Building Trust.®**

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**
(Continued)

**31**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| **Policy Number: CWP 3 263 063** | |11| **WIC Account Number:** 1600961480 | A |
|---|---|---|---|

| **Policy Period** | **From** 10/01/16 **To** 10/01/17 | **at 12:01 A.M. Standard Time at your mailing address shown above.** |
|---|---|---|

** Effective 10/01/16 this Common Policy declarations amends all prior **
** Common Policy declarations and endorses this policy as shown below. **

Endorsement Activity
Commercial Lines
Disclosure of Local Government Tax

Additional Municipal Tax * - CITY   MURRAY                          $    11.00

Additional Municipal Tax * - TOTAL                                 $    11.00

* The municipal tax amount includes a collection fee that is either 15% of the
tax collected or 2% of the premium charged, whichever is less

**EXHIBIT 7**

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY 42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| WIC Account Number: 1600961480 | A |

| Policy Period | From  10/01/16 | at 12:01 A.M. Standard Time at your |
| | To  10/01/17 | mailing address shown above. |

**xx Effective 07/01/17 this Common Policy declarations amends all prior  xx**
**xx Common Policy declarations and endorses this policy as shown below.  xx**

Business: DRUG DIST                    Named Insured is:  Corporation

In return for the payment of the premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy.

**THE COVERAGE PARTS BELOW HAVE BEEN ENDORSED AS FOLLOWS:**

| COMMERCIAL PROPERTY COVERAGE PART ENDORSEMENT | Additional $ | 114.00 |
| TERRORISM INSURANCE COVERAGE PART ENDORSEMENT | Additional $ | 2.00 |

| Additional Municipal Tax | $ | 12.42 |
| Additional State Surcharge | $ | 2.04 |

| Net Additional Premium | $ | 130.46 |

PROPERTY COVERAGE PART ENDORSEMENT

1. CHANGED BLANKET COVERAGE
   - BLANKET BUILDING & PERSONAL PROPERTY
     . LIMIT FROM $5,870,000 TO $6,230,000

2. CHANGED COVERAGE AT LOC 001 BLDG 001
   - ADDED LOSS PAYEE
     PACKSIZE, LLC
     6440 SOUTH WASATCH BLVD # 305
     SALT LAKE CITY UT 84121
   - BUSINESS PERSONAL PROPERTY
     . RATING BASIS FROM $3,900,000 TO $4,260,000

FORMS CHANGES

1. DELETED FORM CA2395 03/06

2. ADDED FORM CP1218 06/07

         ** This endorsement changes your policy. Please
            attach it to your original policy. **

270
EXHIBIT 7

**WESTFIELD INSURANCE**
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**
(Continued)

**31**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 |11| WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy Period | From  10/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|
| | To    10/01/17 | mailing address shown above. |

**xx** Effective 07/01/17 this Common Policy declarations amends all prior **xx**
**xx** Common Policy declarations and endorses this policy as shown below. **xx**

**Forms and Endorsements applicable to all coverage parts:**
IL0019   0488 , IL0017   1198 , ID7004   0411 , IL0003   0908 , IL0263   0908 .

COUNTERSIGNED: _____     BY _____
                        Date                              Authorized Representative

| PAGE   02 OF   03 | IL 00 19 (04-88) | 06/19/17 | HF |
|---|---|---|---|

271
EXHIBIT 7

# WESTFIELD INSURANCE
Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**
(Continued)

31

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

| Policy Number: CWP 3 263 063 | |11| | WIC Account Number: 1600961480 | | A |
|---|---|---|---|---|

| Policy Period | From | 10/01/16 | at 12:01 A.M. Standard Time at your |
|---|---|---|---|
| | To | 10/01/17 | mailing address shown above. |

**✖✖ Effective 07/01/17 this Common Policy declarations amends all prior ✖✖**
**✖✖ Common Policy declarations and endorses this policy as shown below. ✖✖**

Endorsement Activity
Commercial Lines
Disclosure of Local Government Tax

Additional Municipal Tax ✱ - CITY    MURRAY                              $      12.42

Additional Municipal Tax ✱ - TOTAL                                      $      12.42

**✱ The municipal tax amount includes a collection fee that is either 15% of the tax collected or 2% of the premium charged, whichever is less**

EXHIBIT 7

POLICY NUMBER:   CWP 3263063                                 COMMERCIAL PROPERTY

## THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

### SCHEDULE

| Premises Number: | 001 | Building Number: | 001 | Applicable Clause (Enter C., D., E., or F.): | C |
|---|---|---|---|---|---|
| Description Of Property:   BUSINESS PERSONAL PROPERTY | | | | | |
| Loss Payee Name:   PACKSIZE, LLC | | | | | |
| Loss Payee Address:   6440 SOUTH WASATCH BLVD # 305 SALT LAKE CITY    UT 841210000 | | | | | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** When this endorsement is attached to the STANDARD PROPERTY POLICY **CP 00 99** the term Coverage Part in this endorsement is replaced by the term Policy.

**B.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the covered Property.

The following is added to the **Loss Payment** Loss Condition, as indicated in the Declarations or in the Schedule.

**C. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

**D. LENDER'S LOSS PAYABLE CLAUSE**

**1.** The Loss Payee shown in the Schedule or in the Declarations is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**a.** Warehouse receipts;

**b.** A contract for deed;

**c.** Bills of lading;

**d.** Financing statements; or

**e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**a.** We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

**b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**c.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

© ISO Properties, Inc. 2007

CP 12 18  06 07
Page 1 of 2

273
EXHIBIT 7

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**E. CONTRACT OF SALE**

**1.** The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear:

**3.** The following is added to the OTHER INSURANCE Condition:

For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**F. BUILDING OWNER LOSS PAYABLE CLAUSE**

**1.** The Loss Payee shown in the Schedule or in the Declarations is the owner of the described building, in which you are a tenant.

**2.** We will adjust losses to the described building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**3.** We will adjust losses to tenant's improvements and betterments with you, unless the lease provides otherwise.

274
EXHIBIT 7

**WESTFIELD**
**INSURANCE**
Sharing Knowledge. Building Trust.®

**31**

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | |
|---|---|---|---|

| NAMED INSURED AND MAILING ADDRESS | AGENCY | 16-07381 | PROD. | 000 |
|---|---|---|---|---|

QUEST PHARMACEUTICALS INC.
PO BOX 270
MURRAY KY  42071

ASSUREDPARTNERS NL LLC
2443 SIR BARTON WAY STE 400
LEXINGTON KY 40509-2527
TELEPHONE 859-543-1716

**Policy Number: CWP 3 263 063** |11| **WIC Account Number:** 1600961480 | A

| Policy   From   10/01/16 | at 12:01 A.M. Standard Time at your |
| Period   To     10/01/17 | mailing address shown above. |

✗✗ **Effective 08/24/17 this Common Policy declarations amends all prior** ✗✗
✗✗ **Common Policy declarations and endorses this policy as shown below.** ✗✗

**Business:** DRUG DIST                    **Named Insured is:**  Corporation

**In return for the payment of the premium, and subject to all terms of this**
**policy, we agree with you to provide the insurance as stated in this policy.**

**THE COVERAGE PARTS BELOW HAVE BEEN ENDORSED AS FOLLOWS:**

COMMERCIAL GENERAL LIAB. COVERAGE PART ENDORSEMENT  Additional $       75.00

Additional Municipal Tax                      $        8.00
Additional State Surcharge                    $        1.36

Net Additional Premium                        $       84.36

GENERAL LIABILITY COVERAGE PART ENDORSEMENT

   1. ADDED ADDITIONAL INSURED
      - ADDL INSD DESIGNATED PERSON OR ORG(CG2026)
      MARYLAND BOARD OF PHARMACY
      4201 PATTERSON AVE
      BALTIMORE MD 21215

FORMS CHANGES

   1. ADDED FORM CG2026 04/13

            ** This endorsement changes your policy. Please
               attach it to your original policy. **

**Forms and Endorsements applicable to all coverage parts:**
IL0019   0488 , IL0017   1198 , ID7004   0411 , IL0003   0908 , IL0263   0908 .

COUNTERSIGNED: _____ BY _____
                    Date                    Authorized Representative

**PAGE   01 OF  02**          IL 00 19 (04-88)          09/11/17          HF

# WESTFIELD INSURANCE
### Sharing Knowledge. Building Trust.®

**COMMERCIAL PACKAGE POLICY**
**AMENDED**
**COMMON POLICY DECLARATIONS**
(Continued)

**31**

| COMPANY PROVIDING COVERAGE | WESTFIELD NATIONAL INSURANCE COMPANY | | | |
|---|---|---|---|---|
| **NAMED INSURED AND MAILING ADDRESS** | **AGENCY** | 16-07381 | **PROD.** | 000 |

| NAMED INSURED AND MAILING ADDRESS | AGENCY |
|---|---|
| QUEST PHARMACEUTICALS INC.<br>PO BOX 270<br>MURRAY KY  42071 | ASSUREDPARTNERS NL LLC<br>2443 SIR BARTON WAY STE 400<br>LEXINGTON KY 40509-2527<br>TELEPHONE 859-543-1716 |

| Policy Number: CWP 3 263 063 | 11 | WIC Account Number: 1600961480 | A |
|---|---|---|---|

| Policy<br>Period | From<br>To | 10/01/16<br>10/01/17 | at 12:01 A.M. Standard Time at your<br>mailing address shown above. |
|---|---|---|---|

**✖✖ Effective 08/24/17 this Common Policy declarations amends all prior ✖✖**
**✖✖ Common Policy declarations and endorses this policy as shown below. ✖✖**

**Endorsement Activity**
**Commercial Lines**
**Disclosure of Local Government Tax**

Additional Municipal Tax * - CITY   MURRAY                    $      8.00

Additional Municipal Tax * - TOTAL                           $      8.00

**✖ The municipal tax amount includes a collection fee that is either 15% of the**
**tax collected or 2% of the premium charged, whichever is less**

276
**EXHIBIT 7**

POLICY NUMBER:  CWP 3263063                          **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** **Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

   **1.** In the performance of your ongoing operations; or

   **2.** In connection with your premises owned by or rented to you.

However:

   **1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

   **2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such

additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

   **1.** Required by the contract or agreement; or

   **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012                          **CG 20 26  04 13**

## IN THE CIRCUIT COURT OF BOONE COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA
ex rel DARRELL V. MCGRAW, JR.
Attorney General,

        Plaintiff,

v.

        Civil Action No. _13 - C - 141_

**AMERISOURCEBERGEN DRUG CORPORATION**,
a Delaware corporation doing business in
West Virginia, **MIAMI-LUKEN, INC.**, an
Ohio corporation doing business in West Virginia,
**J.M. SMITH CORPORATION d/b/a SMITH DRUG
COMPANY**, a South Carolina corporation doing
business in West Virginia, **THE HARVARD DRUG
GROUP, LLC**, a Michigan corporation doing business
in West Virginia, **ANDA INC.**, a Florida corporation doing
business in West Virginia, **ASSOCIATED PHARMACIES,
INC.**, an Alabama corporation doing business in West
Virginia, **AUBURN PHARMACEUTICAL COMPANY**, a
Michigan corporation doing business in West Virginia,
**H.D. SMITH WHOLESALE DRUG COMPANY**, a
Delaware corporation doing business in West Virginia,
**KEYSOURCE MEDICAL INC.**, an Ohio corporation
doing business in West Virginia, **MASTERS
PHARMACEUTICALS, INC.**, an Ohio corporation doing
business in West Virginia, **QUEST PHARMACEUTICALS,
INC.**, a Kentucky corporation doing business in West Virginia,
**RICHIE PHARMACAL CO., INC.**, a Kentucky corporation
doing business in West Virginia, and **TOP RX, INC.**, a Tennessee
corporation doing business in West Virginia,

        Defendants.

## COMPLAINT

For its complaint the State of West Virginia, by and through its duly-elected Attorney

General Darrell V. McGraw, Jr., states the following:

1

**EXHIBIT 8**

# I.

## Summary of Action

1.      This civil action addresses the epidemic of prescription drug abuse and its costs.  Prescription drug abuse costs the State of West Virginia hundreds of millions of dollars annually.  Beyond the actual dollars lost, prescription drug abuse devastates families, communities and reduces the State's economic productivity.  Prescription drug abuse adversely affects West Virginia's hospitals, schools, courts, social service agencies, jails and prisons as well as diminishing the very quality of life in our cities and towns.  Accordingly, the State, by its Attorney General, brings this action against parties whom the Attorney General has identified as having substantially contributing to and who have substantially, illicitly and tortiously benefitted financially from the prescription drug abuse problem in West Virginia.

2.      The Defendants herein named distribute various prescription drugs which are closely identified with the prescription drug abuse problem in West Virginia.  These Defendants were on notice of the growing epidemic from the abuse of those prescription drugs which they supplied and of the quantities and frequency with which those drugs were distributed to entities in West Virginia.  For reasons which are more specifically set forth in the following causes of actions these Defendants are answerable in damages to the State of West Virginia and are susceptible to such other relief as is requested.

3.      These Defendants are major distributors of controlled substances who have supplied controlled substances to drugstores which then dispense controlled substances based upon bogus prescriptions from physicians who are prescribing controlled substances for illegitimate medical purposes.

2

EXHIBIT 8

4.      Through their acts and omissions these Defendants have inserted themselves as an integral part of the pill mill process.  As alleged herein, "Pill Mills" consist of medical providers, pharmacies and distributors of controlled substances, each of whom must knowingly or while acting grossly negligent prescribe, dispense or distribute prescription medicine for illegitimate medical purposes.  Each actor alone would be ineffective to divert controlled substances for illegitimate medical purposes. Conversely, each actor together causes and contributes to the diversion of prescription medicine

5.      As hereinafter alleged these Defendants have acted negligently, recklessly and at times illegally all in contravention of West Virginia law.  More particularly, these Defendants have violated West Virginia statutes and regulations which govern controlled substances, consumer protection and antitrust.  The Defendants received substantial revenue from West Virginia entities while engaging in wholesale drug distribution in West Virginia.

6.      The problems, crimes, damages and losses related to the prescription drug epidemic in West Virginia include, inter alia, the following:

a.      Costs to the State of as much as $430 million annually in the year 2010 with costs projected to be as much as $695 million annually by 2017;

b.      A per capita death rate from prescription drug overdose which has at times been either the highest or the second highest recorded for all states in the United States.  One county, McDowell located in Southern West Virginia, had a death rate of 34.2 per 100,000 in 2001 and 97.3 in 2008;

c.      Between 2001 and 2008 West Virginia deaths from overdoses involving prescription drugs quadrupled from 5.1 deaths per 100,000 residents to 21.5;

3

**EXHIBIT 8**

    d.      According to Charleston Area Medical Center approximately twenty (20) percent of patients admitted through the hospital's trauma service have an issue with narcotic usage which contributes to their injuries. As such, the demand from the growing problem of addiction and management of addicted patients will eventually be too great for the available care provides unless the problem is addressed. Many of the addicted patients have no medical insurance coverage;

    e.      West Virginia has been identified as the nation's "most medicated state" based upon data gathered for 2009. Pharmacies in the State filled 18.4 prescriptions per capita as compared to the national average of 11.6 per capita;

    f.      One pharmacy which is located in tiny Kermit, West Virginia in 2006 received 3,194,400 dosage units of hydrocodone which ranked 22nd in the nation among pharmacies with respect to purchases of hydrocodone dosage and 35th nationally if you include mail order pharmacies. The owner who is a licensed pharmacist has testified that the pharmacy filled one prescription per minute. Pharmacy records reveal that the pharmacy regularly paid suppliers hundreds of thousands of dollars, that virtually 90% of the drugs ordered and received and are of the kind associated with the prescription drug epidemic. The pharmacy reported revenue of more than $500,000 per month. Recently, an article described Kermit, population 300, as "ground zero" in the prescription drug epidemic;

    g.      One Pittsburgh area physician who has entered a guilty plea to a drug law violation allegedly worked in or owned an operation in Southern West Virginia which a federal investigation disclosed netted him personally as much as $20,000 per day in cash deposits made to his personal bank account. That so-called clinic was closed by the government

4

**EXHIBIT 8**

resulting in seizure of hundreds of thousands of dollars in cash from physicians and others who were associated with the clinic;

      h.    State prosecutors and judges lament that as much as 90% of their case load is regularly made up of matters which are either directly or indirectly related to prescription drug abuse.  As one prosecutor recently told a Charleston newspaper " I have sometimes morbidly said I would welcome a cocaine case because at least not as many people are dying from cocaine abuse as they are from prescription drug abuse. I bring this up to point out foremost that we continue to ignore the human cost of substance abuse. Families are destroyed. People die. People can't get jobs and become homeless. They don't send their children to school, which ultimately contributes to truancy, delinquency, another generation of crime and a host of other problems. We're at the top of the nation in births of drug-addicted babies."

## II.

## Parties

      7.    The Plaintiff is the State of West Virginia.  Darrell V. McGraw, Jr. is the Attorney General of the State of West Virginia.  He is authorized both by the West Virginia Constitution and by statute to bring this action.  More particularly:

      a.    West Virginia Code, Chap. 60A, Art. 5, Sec. 501( c ) invests the Attorney General with the duty and the authority to assist in the enforcement of the provisions of the Uniform Controlled Substances Act and to cooperate with agencies and other governmental entities as relates to controlled substances; and

      b.    West Virginia Code, Chap. 46A, Art. 7, Sec, 101 et seq,and Code 47-18-1 et seq invest the Attorney General with the authority to sue for violations of the West

5

**EXHIBIT 8**

Virginia Consumer Protection Act and the West Virginia Antitrust Act, to recover civil penalties

and to seek other remedies for violations of said statutes.

        8.     The Defendants are registrants with the West Virginia Board of

Pharmacy.  At times pertinent to this Complaint each Defendant was doing business in West

Virginia as a wholesale drug distributor.  The Defendants are:

    a.     **AMERISOURCEBERGEN DRUG CORPORATION**,
a Delaware corporation doing business in West Virginia.

    b.     **MIAMI-LUKEN, INC.**, an Ohio corporation.

    c.     **J.M. SMITH CORPORATION d/b/a SMITH DRUG
COMPANY**, a South Carolina corporation.

    d.     **THE HARVARD DRUG GROUP, LLC**, a Michigan
corporation.

    e,     **ANDA INC.**, a Florida corporation.

    f.     **ASSOCIATED PHARMACIES, INC.**, an Alabama corporation.

    g.     **AUBURN PHARMACEUTICAL COMPANY**, a Michigan
corporation.

    h.     **H.D. SMITH WHOLESALE DRUG COMPANY**, a Delaware
corporation.

    i.     **KEYSOURCE MEDICAL INC.**, an Ohio corporation.

    j.     **MASTERS PHARMACEUTICALS, INC.**, an Ohio corporation.

    k.     **QUEST PHARMACEUTICALS, INC.**, a Kentucky corporation.

    l.     **RICHIE PHARMACAL CO., INC.**, a Kentucky corporation.

    m.    **TOP RX, INC.**, a Tennessee corporation.

**EXHIBIT 8**

## III.

### Jurisdiction and Venue

9.      Jurisdiction exists pursuant to the provisions of West Virginia Code Chap. 56, Art. 3, Sec. 33, as amended in that Defendants by and through their authorized agents, servants and employees regularly transacted business in West Virginia, supplied and distributed prescription drugs in West Virginia and further through their acts and omissions tortiously caused injuries in West Virginia by engaging in a persistent course of conduct in West Virginia which violated West Virginia law.  These Defendants derived substantial revenue as the result of the prescription drugs which were distributed to West Virginia entities and later consumed by persons then residing in West Virginia.

10.     Pursuant to W.Va. Code §46A-7-114 and W.Va Code §47-18-15 venue is proper in that the Defendants committed acts in violation of the West Virginia Uniform Controlled Substances Act and the West Virginia Consumer Credit and Protection Act and the West Virginia Antitrust Act in Boone County West Virginia.  Further, the Defendants transacted business in Boone County as well as in other counties within the State of West Virginia.

### IV
# Causes of Action

### Count I

### Injunctive Relief for Violations of Responsibilities and Duties Under The West Virginia Uniform Controlled Substances Act

EXHIBIT 8

11.     Plaintiff hereby incorporates by reference all of the previous allegations of this complaint.

12.     West Virginia Code §60A-5-501( c ) provides: "All prosecuting attorneys and the **attorney general, or any of their assistants, shall assist in the enforcement of all provisions of this act** and shall cooperate with all agencies charged with the enforcement of the laws of the United States, of this state, and of all other states relating to controlled substances."

13.     West Virginia Code § 60A-5-503(a) states that "The courts of record of this state have and may exercise jurisdiction to restrain or enjoin violations of this act."

14.     The Uniform Controlled Substances Act, W. Va. Code § 60A-3-301, provides, in relevant part that "The State Board of Pharmacy shall promulgate rules . . . relating to the registration and control of the manufacture **and distribution of controlled substances within this State** . . . ."

15.     The regulations promulgated pursuant to the above-referenced authority, effective May 1, 2001, provide, inter alia, for the following:

- **"Every person who manufactures, distributes or dispenses any controlled substance or who proposes to engage in the manufacture, distribution or dispensing of any controlled substance shall obtain annually a controlled substance permit unless exempted by law or pursuant to Section 3.2 of this rule." 15 C.S.R. § 2-3.1.1.**

- **"All registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances." 15 C.S.R. § 2-4.2.1.**

- **"The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Office of the West Virginia Board of Pharmacy of**

8

**EXHIBIT 8**

suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 15 C.S.R. § 2-4.4.

16.     The Defendants have failed to diligently respond to suspicious orders which the Defendants have filled. The Defendants therefore have failed to provide effective controls and procedures to guard against diversion of controlled substances in contravention of West Virginia law.

17.     By failing to do so, Defendants have willfully and repeatedly violated the Uniform Controlled Substances Act and corresponding regulations.

18.     The State, by and through, the Attorney General under the authority of W.Va. Code § 60A-5-501( c ) and W. Va. Code § 60A-5-503(a) seeks to restrain the violations of 15 C.S.R. § 2-4.4.

19.     The State of West Virginia has in the past sustained enormous damages as the proximate result of the failure by the Defendants to comply with 15 CSR §2-4.2.1 and 15 CSR §2-4.4. Unless restrained by injunctive relief the State will continue to suffer losses as the proximate result of the failure by the Defendants to monitor and to disclose suspicious orders of controlled substances.

20.     The State of West Virginia has suffered irreparable harm and will in the future suffer irreparable harm unless the Defendants are restrained by an injunction.

21.     An action for damages for past losses as sustained by the State is an inadequate remedy to prevent future losses which will result from the failure to comply with West Virginia law.

9

**EXHIBIT 8**

## Count II

### Damages Resulting From Negligence and Violations of the
### West Virginia Uniform Controlled Substances Act

22.     The Plaintiff hereby incorporates by reference all of the previous

allegations of this Complaint.

23.     In addition to regulating the wholesale distribution of controlled

substances the West Virginia Uniform Controlled Substances Act authorizes the Board of

Pharmacy to administer the provisions of Chapter 60A (the UCSA), §60A-2-201, which this

Plaintiff is required by law to enforce, §60A-5-501( c ).

24.     The epidemic prescription drug abuse is attended and promoted by the

repeated violation of various provisions of the West Virginia Uniform Controlled Substances

Act, to wit;

     a.    Improper dispensing of prescriptions contrary to
        W.Va Code §60A-3-308;

     b.    Engaging in prohibited acts contrary to W.Va Code
        §§60A-4-401 through 403;

     c.    Deceiving and attempting to deceive medical practitioners
        in order to obtain prescriptions in contravention of W.Va.
        Code §60A-4-410;

     d.    Disregarding the requirements of the Wholesale Drug
        Distribution Licensing Act of 1991, W.Va. Code
        §60A-8-1 et seq,; and

     e.    Conspiring to violate the West Virginia Uniform Controlled
        Substances Act.

25.     The Defendants are distributors of controlled substances and are expected

to comply both with the laws of the State into which they distribute controlled substances and

10

**EXHIBIT 8**

with industry custom and standards. In the instant case the standard of conduct for Defendants' industry requires that the Defendants know their customers which includes <u>inter alia</u> an awareness of their customer base, knowledge of the average prescriptions filled each day, the percentage of controlled substances compared to overall purchases, a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and identification of physicians and bogus centers for the alleged treatment of pain that are the dispenser's most frequent prescribers.

  26. This Defendants have wilfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to customers who are serving a customer base comprised of individuals who are themselves abusing prescription medications, many of whom are addicted and all of whom can reasonably be expected to become addicted. The Defendants negligently acted with others to violate West Virginia's drug laws, dispensing controlled substances for non-legitimate medical purposes, operating bogus pain clinics which do little more than provide prescriptions for controlled substances and thereby creating and continuing addictions to prescription medications.

  27. Under West Virginia law a party who violates a statute which violation results in damages is liable for such damages as are sustained therefrom, W.Va. Code §55-7-9.

  28. This Defendants have by their acts and omissions proximately caused and substantially contributed to damages to the State of West Virginia by violating West Virginia laws, by creating conditions which contribute to the violations of West Virginia laws by others, by their negligence and by their reckless disregard of the customs, standards and practices within Defendants' own industry.

**EXHIBIT 8**

## Count III

## Violation of the West Virginia Consumer Credit and Protection Act (WVCCPA)

## Unfair Methods of Competition or Unfair or Deceptive Acts or Practices

29.     Plaintiff hereby incorporates by reference all of the previous allegations of this Complaint.

30.     West Virginia law as embodied in W.Va. Code §46A-6-104 prohibits the use of unfair methods and/or competition or unfair or deceptive acts or practices in any trade or commerce.

31.     The Attorney General is specifically charged with the administration of this provision and may act *sua sponte* as the agent and legal representative of the State in civil proceedings to enforce the statute, W. Va. Code § 46A-6-103, §§ 46A-7-102, -108, -110, -111.

32.     Violations of statutes and regulations which are enacted to protect the public or in the exercise of the State's police power constitute unfair or deceptive acts or practices.

33.     The Uniform West Virginia Controlled Substances Act, W. Va. Code § 60A-3-301, provides, in relevant part that "The State Board of Pharmacy shall promulgate rules and charge fees relating to the registration and control of the manufacture and distribution of controlled substances within this State . . . ."

34.     The regulations promulgated pursuant to this authority, effective May 1, 2001, provided that:

- **"Every person who manufactures, distributes or dispenses any controlled substance or who proposes to engage in the manufacture, distribution or dispensing of any controlled substance shall obtain**

12

EXHIBIT 8

annually a controlled substance permit unless exempted by law or pursuant to Section 3.2 of this rule." 15 C.S.R. § 2-3.1.1.

- "All registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances." 15 C.S.R. § 2-4.2.1.

- "The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Office of the West Virginia Board of Pharmacy of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 15 C.S.R. § 2-4.4.

35.     Each violation of these mandatory duties in the West Virginia Uniform Controlled Substances Act and its corresponding regulations is an unfair or deceptive act or practice in the conduct of trade or commerce, as set forth in W. Va. Code § 46A-6-104.

36.     Defendants' repeated violations were and are willful.

37.     As a result of the Defendants' actions and omissions Plaintiff has sustained damages, both past and in the future.

38.     In addition to compensatory damages, Plaintiff seeks all statutory damages available under the WVCCPA, including but not limited to the following:

a.     Actual damages for past and future violations of the WVCCPA as authorized by W. Va. Code § 46A-5-101(1);

b.     Statutory damages in the maximum amount authorized by W. Va. Code § 46A-5-101(1) as adjusted for inflation pursuant to W. Va. Code § 46A-5-106;

c.     Attorney fees and court costs, pursuant to W. Va. Code § 46A-5-104; and

d.     Penalties for *each* willful violation pursuant to W. Va. Code § 46A-7-111(2).

13

**EXHIBIT 8**

## Count IV

## Creating A Public Nuisance

39.     Plaintiff hereby incorporates by reference all of the previous allegations of this Complaint.

40.     These Defendants were on notice that an epidemic from prescription drug abuse existed and has existed during times which are relevant to this Complaint.  Such notice is the result of

- An inordinate amount of media coverage by both national and local print, television and radio media.

- Publications received from government sources as well as warnings and recommendations contained in trade and professional journals.

- Changes in law and regulations which were designed specifically to address the growing problem of prescription drug abuse.

41.     The widespread publicity contained many references and statistics concerning West Virginia's problems from prescription drug abuse including, but not limited to, suffering the nations' highest per capita death rate from prescription drug overdose.

42.     Notwithstanding the knowledge of this epidemic the Defendants persistently engaged in a pattern of distributing controlled substances of the kinds which were well-known to be abused and diverted all the while distributing them in such quantities and with such frequency that the Defendants knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes.

43.     As the result of the above-described conduct the Defendants negligently, recklessly and/or intentionally, and acting with blind indifference to the facts, created and

14

EXHIBIT 8

continued a public nuisance. More particularly, the public nuisance so created injuriously affects the communities of West Virginia, endangers the public health and safety and inconveniences the citizens of the State in the following ways:

- Areas in certain communities have become congested with persons who gather in large groups outside of "clinics, pharmacies and physician offices" which are in fact component parts of pill mills which exist only to prescribe and deliver drugs for illicit, non-medical purposes.

- Crimes and other dangerous activities have increased.

- Hospital services, especially those services provided by emergency rooms, are being consumed by persons with prescription drug abuse issues.

- Law enforcement and prosecutorial resources are being exhausted and consumed by having to address prescription drug abuse issues to the exclusion of other matters.

- Public resources are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources which could be used to benefit the public at large.

- Court dockets are congested by drug-related cases as well as by crimes committed by addicts, thereby diminishing access to our courts by others.

- Jails and prisons suffer from overcrowding.

44.     The Defendants' acts and omissions which have caused and contributed to the nuisance described herein has damaged the health and safety of West Virginia citizens in the past and will continue to do so in the future unless the nuisance is abated.

45.     The State of West Virginia has sustained economic harm and will in the future suffer economic harm unless the above-described public nuisance is abated.

15

**EXHIBIT 8**

## Count V

## Unjust Enrichment

46.     Plaintiff hereby incorporates by reference all of the previous allegations of this Complaint.

47.     Because of prescription drug abuse the State of West Virginia expends additionally hundreds of millions of dollars annually on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole, public welfare and service agencies, healthcare and medical services and drug abuse education.  Further, the State suffers losses in revenue and incurs costs from workplace accidents and absenteeism resulting from prescription drug abuse.

48.     The State of West Virginia remains responsible for costs of prescriptions, health care and other medically-related costs, rehabilitation and work-related programs, workers' compensation, public insurance, law enforcement, prosecution costs, court related costs, public defender services, correctional institutions, probation and parole services, which costs have substantially increased as the result of the Defendants' acts and omissions herein complained of and will in the future continue to increase unless the Defendants' conduct is abated.

49.     The Defendants have thus been enriched unjustly by neglecting its duty of distributing drugs only for proper medical purposes which substances are consumed for reasons which are other than medical.

50.     The unjust enrichment of the Defendants is directly related to the damage, loss and detriment to the Plaintiff State of West Virginia.

16

EXHIBIT 8

## Count VI

### Negligence

51.     The State realleges and incorporates by reference all preceding paragraphs as though fully set forth herein and further alleges the following.

52.     Defendants have a duty to exercise reasonable care in the marketing, promotion and distribution of controlled substances.

53.     Defendants have breached this duty by their conduct alleged above.

54.     As a proximate result, Defendants and their agents have caused the State to incur excessive prescription costs, health care costs and other medical costs related to diagnosis, treatment and cure of addiction or the risk of addiction to such controlled substances in that many of the citizens of West Virginia are Medicaid or publicly-funded health care recipients, thus the State has borne the massive costs of these illnesses and conditions by having to provide necessary medical care, facilities and services for treatment of citizens of West Virginia who are unable to afford or otherwise obtain such necessary medical care, facilities and services.

55.     The Defendants were negligent in failing to guard against third-party misconduct, i.e. the conduct of the so-called "pill mill" physicians and staff as wells as corrupt pharmacists and staff and, in fact, by their actions the Defendants participated in such misconduct.

56.     Defendants' conduct has imposed an unreasonable risk of harm to others separately and/or as combined with the negligent and/or criminal acts of third parties.

57.     The Defendants are in a class of a limited number of parties that distribute

17

**EXHIBIT 8**

controlled substances and such activity poses distinctive and significant dangers. The dangers

include diversion of controlled substances for non-legitimate medical purposes and addiction to

same by consumers.

58.    The Defendants are negligent in not acquiring and utilizing special

knowledge and special skills that relate to the dangerous activity in order to prevent and/or

ameliorate such distinctive and significant dangers.

59. .   Controlled substances are dangerous commodities.  The Defendant

distributors are required to exercise a high degree of care and diligence to prevent injury to the

public from the diversion of controlled substances during distribution.  The Defendants breached

their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to

the dangers involved in the transaction of its business.  The Defendants cannot delegate this duty

of care to another.

60.    The distribution of these controlled substances are under the exclusive

control and management of the Defendants.  Plaintiff is without fault and the injuries to Plaintiff

would not have happened in the ordinary course of events had the Defendants used due care

commensurate to the dangers involved in the distribution of controlled substances. Hence, the

Defendants are negligent.

## Count VII

## Medical Monitoring

61.    Through Defendants' tortious acts, omissions, and conduct as set forth

above, users and abusers of prescription drugs have been significantly exposed to the dangers of

addiction and misuse.  Further, pill mill doctors and pharmacies and other careless professionals

18

**EXHIBIT 8**

have been assisted in their acts or in their carelessness by the availability of such large quantities

of abused substances. The increased risk of harm which attends these acts and omissions makes

it both reasonable and necessary for the dependent users and abusers to undergo periodic

diagnostic medical examinations different from what would be prescribed in the absence of the

exposure. Monitoring, testing and counseling procedures exist for such treatment.

62. Diagnosis and treatment of these conditions is clinically invaluable in that

it can prevent or reduce illness, suffering and/or death.

63. Many individuals who are at risk for addiction and dependency from

exposure to overuse of prescription drugs cannot afford appropriate testing and/or therapy.

64. The increased susceptibility to death, injuries and irreparable harm

to the health of abusers and dependent users resulting from their exposure to prescription drugs

can only be mitigated or addressed by the creation of a Court-supervised fund, financed by the

Defendants, that will fund a comprehensive medical monitoring program of:

a. Notifying individuals.

b. Aiding in diagnosis and treatment.

c. Funding studies and research of the short and long term effects
and treatment of overuse, misuse and addiction to prescription
drugs.

d. Accumulating and analyzing relevant medical and demographic
information.

e. Creating, maintaining and operating a "registry" in which relevant
demographic and medical information is gathered, maintained and
analyzed; and

f. Gathering and forwarding to treating physicians information
related to proper diagnosis and treatment.

19

**EXHIBIT 8**

65.     Prescription drug users in West Virginia have no adequate remedy at law in that monetary damages alone do not compensate for the continuing nature of the harm to them, and a monitoring program which notifies them of the dangers and aids in their treatment can prevent the greater harms which may not occur immediately but which is preventable if proper research is conducted and the health risk is diagnosed and treated before harm occurs or become worse.

66.     Without a court-approved medical treatment monitoring program, the relevant product users will not receive prompt medical care which could detect and prolong their productive lives, increase prospects for improvement and minimize disability.

## Count VIII

## Antitrust

67.     The State realleges and incorporates by reference all preceding paragraphs as though fully set forth herein and further alleges as follows:

68.     The Attorney General of the State of West Virginia is empowered by law pursuant to West Virginia Code §§47-18-6, 47-18-7 and 47-18-9 to investigate suspected violation of, and to bring actions of behalf of, the State of West Virginia for damages sustained by the State that result from violation of the West Virginia Antitrust Act.

69.     Defendants, as described above, have violated said Act in particular, but without limitation, W.Va Code §47-18-3(b)(1)(B) and W.Va Code §47-18-4, which read in pertinent part:

b.     Without limiting the effect of subsection (a) of the section, the

20

EXHIBIT 8

following shall be deemed to restrain commerce unreasonably and are unlawful:

1.    A contract, combination or conspiracy between two or more persons:

. . . . .

B.    Fixing, controlling, maintaining, limiting or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of fixing, controlling or maintaining the market price rate or fee of the commodity or service. . . .

W.Va Code §47-18-3(b)(1)(B). §47-18-4.

70.    The Defendants have utilized unfair and deceptive business practices to attempt to obtain dominant market share in the West Virginia market for controlled substances.

71.    The Defendants have conspired with "pill mill" physicians and pharmacies who prescribe and fill these prescriptions for non-legitimate medicine purposes in order to restrain and monopolize trade in West Virginia for the "pill mill" market. This conduct had and has resulted in a restraint of trade or had an anti-competitive effect on trade by seeking to gain an advantage over law-abiding, careful wholesale distributors.

72.    Such attempts to provide controlled substances for non-legitimate medical purposes, contrary to law, substantially lessened competition, restrained trade or tended to create a monopoly in the illicit pill mill controlled substance scheme in West Virginia.

73.    The combined actions of certain physicians, pharmacies and the Defendants in prescribing, filling and distributing controlled substances for non-legitimate medical use, harms and restrains competition. The Defendants unfairly and contrary to law distributed controlled substances which prohibits distributors who distribute controlled substances for legitimate medical purposes from competing in the "pill mill market" which resulted in harm to the citizens of West Virginia and restrained trade.

**EXHIBIT 8**

74.     The combined actions, described above, allocates or divides customers or markets within West Virginia to the Defendants that distributes controlled substances for non-legitimate medical purposes, which is in violation of W.Va Code 47-18-3(b)(1)( c ).

## Prayer

**WHEREFORE**, the Plaintiff prays that the Court grant the following relief:

1.     Enter temporary and permanent injunction which mandates the Defendants to promptly inform the West Virginia Board of Pharmacy of any all and all suspicious orders for controlled substances as received from parties who are located in West Virginia and to submit their system for determining suspicious orders to West Virginia authorities for prior approval. Enter temporary and permanent injunction which mandates that Defendants are enjoined from distributing in West Virginia any controlled substances for any non-legitimate medical purpose.

2.     Order a jury trial to determine such costs, losses and damages as are proved in this action in relation to the several counts of this Complaint including, but not limited to:

    a.     Losses sustained as the proximate result of both negligent and conscious violations of the West Virginia Uniform Controlled Substances Act and regulations;

    b.     Damages sustained as the proximate result of nuisances created by the prescription drug abuse epidemic;

    c.     Damages and losses sustained as the proximate result of the Defendants' negligence in marketing, promoting and distribution of controlled substances in West Virginia;

    d.     Disgorgement of unjust enrichment of the Defendants;

**EXHIBIT 8**

    e.  Treble damages under the West Virginia Antitrust Act.

  3.  Such relief, fees and cost as shall be available under the West

Virginia Credit and Consumer Protection Act.

  4.  Order reimbursement of all litigation costs and enter an award of

attorney fees herein.

  5.  Order a plan of medical monitoring.

  6.  And grant such other and further relief as shall be deemed

appropriate herein.

  **Plaintiff seeks a jury trial for all such counts as are so triable**.

       State of West Virginia ex. rel.
       **Darrell V. McGraw, Jr.**
       Attorney General

       *By Counsel,*

       Frances A. Hughes, WV Bar No.1816
       Managing Deputy Attorney General
       **OFFICE OF ATTORNEY GENERAL**
       Building 1, Room 26-E, Capitol Complex
       Charleston, WV 25305
       Telephone: 304-558-2021

James M. Cagle, WV Bar No. 580    Rudolph L. DiTrapano WV Bar No.1024
Cagle & Jackson, Attorneys     DiTrapano, Barrett & DiPiero
P.O. Box 12326       604 Virginia Street, East
Big Chimney Station      Charleston, WV 25301
Charleston, WV 25301

**EXHIBIT 8**